Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th Floor
New York, NY 10011
T: 212.727.2700 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; ALASKA WILDERNESS LEAGUE; DEFENDERS OF WILDLIFE; NORTHERN ALASKA ENVIRONMENTAL CENTER; RESISTING ENVIRONMENTAL DESTRUCTION ON INDIGENOUS LANDS; CENTER FOR BIOLOGICAL DIVERSITY; GREENPEACE, INC.; and THE WILDERNESS SOCIETY; <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; RYAN ZINKE, in his official capacity as Secretary of the Interior; and WILBUR ROSS, in his official capacity as Secretary of Commerce; <br><br> *Defendants*. | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## SUMMARY

1.      This action arises from President Trump's unlawful attempt to undo permanent protections for the vast majority of the U.S. Arctic Ocean and dozens of underwater canyons in the Atlantic Ocean, put in place on December 20, 2016, and January 27, 2015, by President Obama. Citing the dangers to communities and wildlife of offshore oil and gas exploration and development, the sensitivity of marine resources in the regions, the need to address climate change, the adequacy of energy sources near existing infrastructure elsewhere, and various barriers to development of the Arctic and Atlantic areas in question, President Obama withdrew them from future oil and gas leasing. He made the withdrawals pursuant to his authority under Section 12(a) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1341(a). Section 12(a) authorizes Presidents to withdraw unleased public lands on the outer continental shelf from disposition, including through leasing. Neither OCSLA nor any other provision of law authorizes Presidents to undo such withdrawals. Nonetheless, on April 28, 2017, President Trump issued an executive order purporting to reverse the Arctic and Atlantic Ocean withdrawals by eliminating all protections they provided. In this respect, President Trump's order exceeds his constitutional authority and his statutory authority under OCSLA, and is therefore *ultra vires* and unlawful. Plaintiffs seek declaratory, injunctive, and mandamus relief to prevent injury to the interests of their members that are threatened by the President's action.

## JURISDICTION

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

3.      The Court may issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202. Pursuant to 28 U.S.C. § 1361, the Court may issue a writ of mandamus

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                              1

prohibiting executive officials' reliance on the reversal and compelling their compliance with President Obama's withdrawal orders.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) as this civil action is brought against officers of the United States acting in their official capacities and under color of legal authority, and a substantial part of property that is the subject of the action is situated, and some Plaintiffs reside, in this judicial district.

## PLAINTIFFS

5. Plaintiff League of Conservation Voters is a non-profit environmental advocacy organization with more than two million members throughout the United States that advocates for sound environmental law and policies, holds elected officials accountable for their votes and actions, and works to elect pro-environment candidates who will champion clean energy, air, and water issues irrespective of party affiliation. It has a long history of educating its members, the general public, and policymakers about the risks that offshore drilling in the Arctic and Atlantic Oceans poses to marine life, coastal economies and ways of life, and our climate, and advocating for protection of the Arctic and Atlantic Oceans from oil development.

6. Plaintiff Natural Resources Defense Council (NRDC) is a non-profit environmental advocacy organization with more than two million members and online activists. It has a longstanding and active involvement in the protection of the Arctic and Atlantic Oceans from oil and gas exploration and development, including working for their permanent protection from expanded oil and gas leasing. With its nationwide membership and a staff of lawyers, scientists, communications specialists, and other environmental professionals, NRDC gathers, analyzes, and uses information about federal government proposals to shape its

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                      2

advocacy and inform its members on a diverse range of land and wildlife management and resource development issues, including those associated with climate change.

7.     The Sierra Club is a national non-profit organization of approximately 740,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth, to practicing and promoting the responsible use of the Earth's ecosystems and resources, to educating and enlisting humanity to protect and restore the quality of the natural and human environment, and to using all lawful means to carry out these objectives. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water, and clean air. The Sierra Club has long been active in issues relating to the impacts of oil and gas exploration and development in America's Arctic and Atlantic Oceans and has pushed for their protection from the risks of offshore drilling.

8.     Plaintiff Alaska Wilderness League is a non-profit organization with approximately 100,000 members and activists. Alaska Wilderness League was founded in 1993 to advocate for protection of Alaska's public lands and waters that are threatened with environmental degradation. Since its inception, it has taken, and continues to take, an active role on issues related to oil and gas exploration and development in Alaska, consistently advocating for protecting the Arctic, its wildlife, and communities from the risks and harms associated with offshore drilling. Its Alaska office employs four full-time employees and houses its Arctic Environmental Justice Program. Through advocacy and education, Alaska Wilderness League's Arctic Environmental Justice Program works closely with communities in the Arctic affected by development. Alaska Wilderness League is committed to honoring the human rights and

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                                    3
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 4 of 24

traditional values of the people of the Arctic, and the shared interest in protecting critical areas for future generations.

9. Plaintiff Defenders of Wildlife is a non-profit conservation organization founded in 1947 and based in Washington, D.C., with offices across the country, including Alaska. Defenders of Wildlife is dedicated to protecting and restoring all native wild animals and plants in their natural communities. Defenders of Wildlife's Alaska Office, in particular, counts among its top priorities protecting imperiled marine species and addressing the impacts of climate change in Alaska. To this end, Defenders of Wildlife is actively involved in advocating for the protection of Arctic marine species and their habitats, including in the Chukchi Sea, from the cumulative impacts of oil and gas development, risks from increased vessel traffic, and climate change. It has also opposed both seismic testing and oil and gas drilling in the Atlantic Ocean and advocated for permanent protection of the Arctic and Atlantic Oceans from expanded oil and gas leasing.

10. Plaintiff Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with approximately 1,400 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in Arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways of life; transportation and infrastructure alternatives that minimize impacts on wild lands; and clean water and wild rivers to protect health, fish, and recreational opportunities. It has been actively involved in efforts to protect the key values of public lands in the Arctic, including in the Arctic Ocean, from the threats of oil and gas exploration and development.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    4

11.     Plaintiff Resisting Environmental Destruction on Indigenous Lands (REDOIL) is a network of grassroots Alaska Natives of the Inupiat, Yupik, Aleut, Tlingit, Gwich'in, Eyak, and Dena'ina Athabascan tribes, including residents of Arctic Ocean coastal communities, operating as a non-profit educational organization. REDOIL takes an active role in addressing the human and ecological health impacts of the unsustainable development practices of the fossil fuel industry in Alaska. It advocates for the preservation of subsistence rights for Alaska Natives, self-determination rights of tribes in Alaska, a just transition from fossil fuel development, and the implementation of tribal options for sustainable development. It opposes expansion of offshore oil drilling in the Arctic and has worked for years to stop it.

12.     Plaintiff Center for Biological Diversity (the Center) is a non-profit organization with offices in Alaska, Arizona, California, Florida, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Virginia, and Washington, D.C. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 1.3 million members and online activists. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of Arctic and Atlantic wildlife threatened by oil and gas exploration and development. It has long advocated keeping the Arctic and Atlantic Oceans off-limits to oil drilling.

13.     Plaintiff Greenpeace, Inc., is a non-profit corporation organized under the laws of the State of California, with its principal place of business in Washington, D.C. Its mission is to promote the protection and preservation of the environment. Greenpeace is an independent campaigning organization that uses peaceful, creative confrontation to expose global environmental problems and to force solutions that are essential for a green and peaceful future.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                              5

Greenpeace has over 840,000 active supporters in the United States. For more than a decade Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to pressure for serious cuts in greenhouse gas emissions through local, national and global action. In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems. As a part of these efforts Greenpeace has actively worked to protect the outer continental shelf, including the Arctic and Atlantic Oceans, from the harmful effects of offshore oil and gas activities.

14. Plaintiff The Wilderness Society, founded in 1935, is a national, non-profit membership organization devoted to preserving wilderness and wildlife; protecting America's prime forests, parks, rivers, deserts and shorelines; and fostering an American land ethic. It has more than 1 million members and supporters, including in Alaska, and has a longstanding involvement with efforts to reduce or eliminate the impacts of oil and gas exploration and development on public lands and waters, including in Alaska's Arctic Ocean.

15. Members of the Plaintiff organizations visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters for cultural and subsistence purposes, recreation, wildlife viewing, education, research, photography, aesthetic and spiritual enjoyment, or their professions or livelihoods, or they enjoy or use wildlife that utilizes these areas. The members' use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife and populations and their habitat in the wild. Any activities, such as oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, injure, harm, harass, or displace wildlife,

also interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife. As such, these activities directly and irreparably injure the interests of Plaintiffs' members.

16.    Plaintiffs and their members are harmed by the reversal in President Trump's order of the Arctic and Atlantic Ocean withdrawals.  The order purports to reverse protections that barred oil and gas leasing and drilling in approximately 128 million acres of federally owned portions of the Arctic and Atlantic Oceans.  It also mandates consideration of revising the federal government's offshore oil and gas program so that it includes annual lease sales in the Arctic and Atlantic Oceans and requires the Secretaries of Interior and Commerce to expedite seismic surveying.  The purpose and likely result of the order are oil and gas exploration and development in the regions affected by the reversals, activities that will degrade Arctic and Atlantic Ocean and coastal environments and harm wildlife, their habitats, and the interests of Plaintiffs and their members.  Among those activities is seismic surveying, which often precedes oil and gas lease sales by several years and which poses imminent risks to the affected regions and wildlife.

17.    The President's violation of law threatens imminent, irreparable harm to the interests of Plaintiffs and their members.  These injuries will continue unless this Court grants the requested relief.

**DEFENDANTS**

18.    Defendant Donald J. Trump is the President of the United States and took the action challenged in this Complaint.  Plaintiffs sue President Trump in his official capacity.

19.    Defendant Ryan Zinke, United States Secretary of the Interior, is the highest ranking official within the Department of the Interior (Interior) and, in that capacity, has ultimate responsibility for administration and implementation of OCSLA, the Marine Mammal Protection

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                                  7
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 8 of 24

Act (MMPA), and the Endangered Species Act (ESA), including issuance of permits required for seismic surveying, offshore drilling, and production of oil and gas in areas withdrawn by President Obama, and for compliance with all other federal laws applicable to Interior. He is sued in his official capacity.

20.     Defendant Wilbur Ross, United States Secretary of Commerce, is the highest ranking official within the Department of the Commerce and, in that capacity, has ultimate responsibility for administration and implementation of the MMPA and the ESA, including issuance of permits required for seismic surveying, offshore drilling, and production of oil and gas in areas withdrawn by President Obama, and for compliance with all other federal laws applicable to the Department of Commerce. He is sued in his official capacity.

## BACKGROUND

### I.     The Chukchi and Beaufort Seas and Atlantic Ocean

21.     The Chukchi and Beaufort Seas constitute America's Arctic Ocean. With their federal waters still essentially undeveloped, they border sensitive federal lands and provide habitat to a rich array of unique wildlife species including polar bears, walruses, whales, seals, and numerous other mammals, birds, and fish, some of them classified as threatened or endangered. Some of these animals also support thriving indigenous Alaska Native cultural and subsistence activities. Several Arctic mammals, including polar bears and bearded seals, have been listed under the ESA because of global warming threats to sea ice on which they rely for crucial life functions such as foraging and raising young; they and numerous other imperiled species are also protected under the MMPA. Many Arctic species of birds, which migrate to and from the region's waters annually in the millions, are also threatened by global warming.

22.     The region is remote and foreboding. In winter, the seas are covered in ice and

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    8
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 9 of 24

shrouded in darkness.  Even in summer, ice can encroach with little notice, and the seas are prone to storms and fog.  There is little infrastructure in the region to support industrial activity. The coastal region contains only eight small communities, unconnected to one another by roads. It mostly lacks jet runways, has no deepwater ports, and is hundreds of miles from the nearest Coast Guard station.

23.     Federal waters in the Atlantic Ocean are also home to important and sensitive marine species and constitute a marine environment very largely still unmarked by industrial development.  They contain highly diverse habitats and harbor important fish and shellfish populations.  The waters of the Atlantic continental shelf furnish nurseries, feeding grounds, and transit routes for marine animals.  Among their unique and outstanding geological features are dozens of undersea canyons, some of them 100 miles long and deeper than the Grand Canyon, rich in marine life.  Incised into the continental shelf, these canyons support cold-water corals hundreds of years old, multitudes of whale species, swordfish, bluefin tuna, sea turtles, seabirds, crustaceans, and methane-dependent organisms known only from such canyons.  The surrounding seafloor and continental slope break comprise a vast biodiversity hotspot, a mixing zone of currents and sharp temperature gradients, and underlie an internationally known whale migration corridor that connects feeding grounds in the Gulf of Maine to calving areas offshore Florida.

24.     Businesses along the U.S. Atlantic coast—including fishing, tourism, and recreation industries—that are heavily dependent on the health of this ocean ecosystem are major contributors to the region's economy.  In 2012 alone, the Mid-Atlantic tourism industry generated over 500,000 jobs and 27 billion dollars; in 2014, commercial fisheries along the Atlantic Coast landed 1.3 billion pounds of seafood, much of it supporting local processing jobs.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.

Reflecting the ocean's economic importance to the region, groups representing over 35,000 businesses petitioned President Obama to bar oil and gas development and/or seismic surveying permanently, throughout federal waters of the Atlantic Ocean.

25.     Even without oil and gas development, both the Arctic and the Atlantic Oceans are greatly threatened by climate change. The Arctic region is warming rapidly—at twice the average global rate—driving profound changes for the species that are adapted to its unique conditions. The average surface air temperature there in 2016 was the highest ever recorded, contributing to sea ice loss and seawater acidification to which the Arctic Ocean is especially vulnerable. For its part, the northeast Atlantic is predicted to warm three times as rapidly as the oceans at large, threatening the continued viability of the majority of fish species in the region.

## II.     Threats from Offshore Exploration and Development

26.     All stages of oil and gas development can harm marine mammals, birds, and fish. The deafening sounds generated by pre-lease and on-lease seismic surveys and drilling activities disturb and injure marine animals. The heightened risk of oil spills from exploratory and development drilling puts marine life—and human activities dependent on it—at risk. Vessels, fixed-winged aircraft, and helicopters used in oil and gas activities also adversely affect ocean species, sometimes fatally. In the Arctic, loss of sea ice owing to black carbon, including that emitted from oil operations, reduces essential habitat.

27.     Seismic surveying associated with oil and gas activities uses very loud, frequent sound pulses from airgun arrays to map the geology of the sea floor and identify potential oil and gas deposits. Seismic surveying generally occurs from ships that can operate over long distances and cover large areas of the ocean during their operations. Combined with the long-distance propagation through water of sound from seismic airguns, this means that seismic

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    10

surveying can "ensonify" very large areas of the ocean to dangerous levels.

28.     Noise from seismic operations harms marine mammals.  If animals are exposed to high enough levels of sound, such as exist close to some seismic airguns, they can suffer shifts in hearing thresholds and hearing loss that may result in mortality.  Noise at lower levels also causes many marine mammal species to alter their natural behavior in ways that interfere with vital activities, including avoiding feeding areas, diverting their migratory paths, separating mothers and young, and impeding communication among individuals.  The National Marine Fisheries Service (NMFS), an agency within the Department of Commerce, estimated that a single two-month-long seismic survey in 2012 in the Arctic Ocean would disturb over 60,000 ringed seals and 4,600 beluga whales.  In July 2014, when an Interior agency issued a Record of Decision that opened most federal waters in the Mid- and South Atlantic to seismic oil and gas exploration, it estimated that these activities could result in as many as 138,000 injuries and 13.4 million disturbances of marine mammals, including disruptions in vital behaviors such as feeding and mating, over the first nine years.

29.     Seismic surveys also harm commercially important fish and shellfish.  The intense sound pressures produced by the industry's airguns can injure or kill fish with swim bladders or other gas-filled chambers, and the particle motion of the powerful sound through the water can damage the hearing and sensory capabilities of both fish and invertebrates.  At lower intensities, the same sounds can also produce a physical stress response.  Over time, this stress response to seismic sound can degrade health and fitness, and increase mortality.  Seismic airgun disruption to fish behavior over large areas of ocean is associated with dramatic reductions in documented catch rates of commercially important fish.  Depression of catch rates can persist well after a seismic survey has ended.

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                          11
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 12 of 24

30.     Exploration and production drilling also involves loud underwater sounds from drill rigs, vessels and aircraft, ice breaking, and other associated activities.  These sounds can likewise injure or interfere with the vital behavior of marine mammals, fish, and invertebrates.

31.     Offshore oil and gas exploration and development threaten, in addition, oil spills that irreparably damage the marine ecosystem and its wildlife.  Interior has concluded that if just one major lease sale in the Arctic's Chukchi Sea were developed, there would be a 75 percent chance of an oil spill of greater than 1,000 barrels in this sensitive region.  No response technologies reliably result in recovery or containment of even half of the oil from a large offshore spill in any region.  The three primary oil spill response methods—mechanical containment and recovery, in situ burning, and dispersants—would likely be particularly ineffective and damaging in the Arctic.  In the Atlantic, a spill equivalent to the BP Gulf oil disaster could coat beaches stretching from Savannah to Boston.

32.     Oil and gas development of the Arctic and Atlantic Oceans would, in addition, contribute significant amounts of greenhouse gas emissions that would in turn lead to further dangerous warming and acidification.  Exploiting oil and gas reserves in the U.S. Arctic Ocean has the potential to release as much as 15.8 billion tons of carbon dioxide into the atmosphere when burned—approximately equivalent to the emissions from all U.S. transportation modes over a nine-year time period.  Drilling in the Arctic and Atlantic would trigger carbon "lock-in" that promotes fossil fuel use far beyond levels many scientists conclude must be avoided to prevent catastrophic warming.  Lock-in occurs when an industry has major sunk costs in an enterprise giving it strong incentives to keep operating in pursuit of even marginal income.  This investment lock-in effect is particularly strong for offshore oil and gas in undeveloped areas such as the Arctic and Atlantic because of the huge new infrastructure costs required for

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    12
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 13 of 24

exploration and production.

## III. The Outer Continental Shelf Lands Act

33.     Congress enacted OCSLA to create a framework for the executive branch's disposition and management of potential oil and gas resources on the outer continental shelf and to provide for protection of the environment. In particular, OCSLA directs that offshore development shall be "subject to environmental safeguards," consistent with "national needs," and operations should be conducted so as to "prevent or minimize … damage to the environment." 43 U.S.C. § 1332(3), (6). Under this framework, OCSLA Section 12(a), provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." *Id.* § 1341(a). For areas not so withdrawn and otherwise open to disposition of federal mineral rights, OCSLA establishes distinct stages for oil and gas development activities: (1) the development of a five-year leasing program, (2) issuance of oil and gas leases, (3) approval of lessees' exploration plans, and (4) approval of lessees' development and production plans. *Id.* §§ 1331 *et seq.* Certain exploration activities, such as seismic exploration, can occur at any time before or during these stages in accordance with regulations established pursuant to, *inter alia*, the Secretary of the Interior's OCSLA rulemaking authority. *Id.* §§ 1334(a), 1340(a), (b), (g); *see also* 30 C.F.R. Parts 550, 551.

## IV. Oil and Gas Activities in the Arctic and Atlantic Oceans

34.     Over the past decade, the federal government has considered, proposed, decided on, and/or authorized substantial industrial oil and gas activities in the Arctic and Atlantic Oceans pursuant to the OCSLA scheme described above.

35.     The current five-year outer continental shelf leasing program included lease sales

in both the Arctic and the Atlantic at the draft stage and in the Arctic at the proposal stage, though none in the final program as adopted. The previous three programs all scheduled Arctic Ocean lease sales. While some were ultimately cancelled, Interior held four area-wide lease sales under these plans, which together placed almost 1.3 million acres of the Beaufort outer continental shelf under lease. In February 2008, Interior also held a sale in the Chukchi, which resulted in 487 leases covering almost 2.8 million acres. The 2007-2012 five-year leasing program also included a lease sale in the Atlantic, first as initially adopted and then as resubmitted following litigation.

36.     One oil company, Shell Oil, was particularly active in the Arctic Ocean. In 2012, it undertook a large-scale plan to conduct exploration drilling on its leases in the Beaufort and Chukchi Seas, leading to a series of well-documented problems, mistakes, and violations of environmental laws. During testing in the placid waters of Puget Sound, Shell destroyed its oil spill containment dome, a required component of its plan to respond to oil spills in harsh Arctic conditions. On its way north, Shell's drillship, the *Noble Discoverer*, dragged its anchor and nearly ran aground while moored near an Alaskan island. Once on the drillsite in the Chukchi Sea, Shell undertook an emergency maneuver to relocate the *Noble Discoverer* from the exploration site to avoid a large ice floe. On its way back from a drillsite in the Beaufort Sea, Shell lost control of its drilling vessel, the *Kulluk*, which ran aground in the Gulf of Alaska in severe weather while being towed to Seattle and had to be scrapped. Shell's other drillship, the *Noble Discoverer*, experienced engine troubles and safety violations on its return from the drillsite and was eventually scrapped as well. The U.S. Coast Guard cited the *Noble Discoverer* for numerous deficiencies after the drilling season. The Environmental Protection Agency determined Shell violated its Clean Air Act permits during the drilling effort and fined the

company 1.1 million dollars.  Shell's drilling contractor, Noble Drilling, pled guilty to eight felony offenses relating to environmental pollution and safety in connection with the 2012 campaign, agreeing to pay 12.2 million dollars in fines.

37.     Shell returned to the Chukchi Sea in 2015, drilled a single test well, and thereafter relinquished all but one of its Chukchi Sea leases and most of its Beaufort Sea leases. Other companies also relinquished most of their leases in both seas.

38.     In addition to Shell's drilling activities, the oil industry in the past decade has conducted large-scale seismic surveying covering tens of thousands of square miles across much of the Arctic Ocean.

39.     Notwithstanding the recent lease relinquishments, there is industry interest in oil and gas activities in the Arctic Ocean.  Industry groups have submitted comments over the past year on the most recent five-year leasing program, seeking inclusion of Arctic Ocean lease sales.  Industry groups representing seismic operators have issued public statements expressing interest in conducting seismic surveys of the Arctic and Atlantic outer continental shelf. Following President Trump's April 28, 2017, executive order, one seismic industry trade group called for seismic surveying in the Atlantic and other frontier areas to proceed "without delay" in order to "allow for informed decisions as a new five-year lease plan is developed."  NMFS has predicted that, assuming the Arctic Ocean is open for leasing, there could be multiple seismic surveying operations every year in federal waters.  Currently, an Italian oil major, Eni, has plans to conduct exploration drilling on its existing federal leases in the Beaufort Sea, and a seismic operator, SAExploration, has sought federal authorizations to conduct 3-D seismic exploration in the Beaufort Sea nearshore area.

40.     In the Atlantic, at least six seismic operation companies have applied to the

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                              15

Bureau of Ocean Energy Management (BOEM), an agency within Interior, for permits to conduct "deep-penetration seismic surveys," deploying large airgun arrays to prospect for oil and gas deposits miles beneath the seafloor. Concurrently, several seismic firms have applied to NMFS for authorization under the MMPA to injure and harass marine mammals during their activities.

41.     The proposed surveys would cover many of the same ocean areas, repeatedly exposing the same wildlife populations to disruptive high-intensity sound. Collectively, the four companies with applications now pending before NMFS have proposed to run more than 126,000 linear kilometers of airgun surveys during the first year of exploration activity in the region. At least three of these surveys would traverse deepwater canyons in the Mid-Atlantic.

42.     On January 5, 2017, following adoption of a five-year program with no leases scheduled in the Atlantic, BOEM Director Abigail Ross Hopper directed her agency to deny all pending applications to conduct seismic airgun surveys in the Mid-Atlantic and South Atlantic Planning Areas. In doing so, the Director cited the impacts airgun surveys could have on the environment, including on endangered whales and other species. All permit applicants, however, have appealed the denials administratively, joined by an industry group that has issued public statements anticipating the new Administration's support for seismic exploration in the Atlantic and the reversal of BOEM's denials. Pursuant to notices issued on January 13, 2017, NMFS has only temporarily suspended processing of the seismic industry's MMPA authorizations while the permit decision is resolved.

43.     Seismic surveying is often conducted two to four years prior to lease sales to identify areas with promising oil and gas prospects, although companies also have sought approval to conduct seismic surveys even when lease sales are more than four years away and

not included in an existing or proposed five-year program. As technology advances, companies frequently conduct surveying in areas already subjected to previous surveying.

**V. Presidential Withdrawals**

44. There is a long history of presidential withdrawals from oil and gas leasing under OCSLA, both permanent and time-limited, dating back to 1960, when President Eisenhower withdrew areas of the Key Largo Coral Reef Preserve, now part of Florida Keys National Marine Sanctuary. Since Eisenhower first utilized Section 12(a), Presidents Nixon (through his Secretary of the Interior), George H.W. Bush, Clinton, and Obama have all issued withdrawals. Some of these covered large areas: President Clinton's withdrawals covered 300 million acres. Presidents have also used their withdrawal power in protected areas, such as marine sanctuaries, to permanently bar oil and gas leasing.

45. No president has ever undone or reversed a withdrawal of outer continental shelf areas, other than one with an express end date, prior to the action challenged here.

46. On January 27, 2015, President Obama permanently withdrew coastal areas in the Arctic's Beaufort and Chukchi Seas and the Hanna Shoal region in the Chukchi Sea from oil and gas leasing. The President acted pursuant to the authority vested in him by Congress through Section 12(a). The President cited the critical importance of these areas to subsistence use by Alaska Natives as well as for marine mammals, other wildlife, and wildlife habitat. He stated his intention to ensure that the unique resources of these areas remain available for future generations.

47. On December 20, 2016, President Obama permanently withdrew the vast majority of the U.S. Arctic Ocean and large areas in the Atlantic Ocean from future oil and gas leasing

and any resulting exploration and development.  The President acted pursuant to the authority

vested in him by Congress through Section 12(a).

48.     In the Arctic Ocean, the President withdrew all unleased portions of the area

designated by BOEM as the Chukchi Sea Planning Area that were not already withdrawn.  The

President also withdrew all unleased portions of the area designated as the Beaufort Sea Planning

Area that were not already withdrawn except for certain nearshore outer continental shelf lease

blocks.  In total, these Beaufort and Chukchi Sea withdrawals protected an additional 115 million

acres of ocean from leasing and its resulting threats to wildlife and subsistence, which, together

with the January 27, 2015, withdrawal, constitutes approximately 98 percent of the Arctic outer

continental shelf.

49.     As described by then-Secretary of the Interior Sally Jewell, the withdrawal will

provide protection for the Arctic Ocean's vibrant and fragile offshore ecosystems, which are

home to marine mammals and other important ecological resources and marine species on which

many Alaska Native communities rely for subsistence and cultural traditions.  Then-BOEM

Director Abigail Ross Hopper, stated that "[r]isks associated with oil and gas activity in the

remote, harsh and undeveloped Arctic are not worth taking when the nation has ample energy

sources near existing infrastructure."  She explained that "[o]il spill response and clean-up raises

unique challenges in the Arctic and a spill could have substantial impacts on the region,

particularly given the ecosystem fragility and limited available resources to respond to a spill."

50.     The White House released a fact sheet detailing numerous factual and scientific

bases for the Arctic withdrawal.  The fact sheet describes a unique, vibrant, vulnerable, and

interconnected ecosystem that contains species relying on and migrating through large areas.  It

notes the increased stress on species in the Arctic Ocean caused by climate change, including

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    18
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 19 of 24

harm to polar bears, seals, and walruses from loss of sea ice. The fact sheet cites the significant risks from oil spills likely to result from offshore drilling in this remote and treacherous region. It notes the imperative to transition from fossil fuels to renewable sources of energy to address climate change, citing our nation's needs and international commitments. It finds that "risks associated with oil and gas activity in remote and harsh Arctic environments are not worth taking when the United States has ample energy sources near existing infrastructure elsewhere." The fact sheet explains technical and financial barriers to successful exploitation of the areas' offshore resources. And it points out that 2.8 million acres with high oil and gas potential closest to existing infrastructure would still be available for inclusion in future five-year programs, a decision that reflects consultation with the State of Alaska, which advocated for the exclusion of these areas from the withdrawal.

51.     In the Atlantic, President Obama withdrew from all future oil and gas leasing 26 massive offshore canyons and canyon complexes, carved initially by rivers and runoff when they were above the ocean's surface and now repositories of extraordinary biological and geological resources. Together these protected canyons comprise 3.8 million acres and represent all major deepwater canyons off the Atlantic coast not otherwise protected. In protecting them, the President cited their critical importance along the edge of the continent for marine mammals, deepwater corals, other wildlife, wildlife habitat, and unique resources, and the need to ensure they remain for future generations.

52.     The White House fact sheet accompanying his proclamation describes at-risk species, commercially valuable fish populations, and habitat for protected sea turtles and marine mammals, including migratory whales found in the canyons. It cites research that established the canyons as biological hotspots, contributors to climate stability, and sources of economic

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                  19

benefits.  And it explains threats to the canyons from climate change and from oil and gas-related activities, as well as technical and operational risks associated with exploring and developing them for oil.

## VII.  President Trump's Executive Order

53.     On April 28, 2017, President Trump issued an executive order entitled "Implementing an America-First Offshore Energy Strategy."  Section 5 of the order purports to reverse President Obama's January 27, 2015, and December 20, 2016, withdrawals in the Arctic and Atlantic Oceans.  The order also states that it is the policy of the United States to encourage energy exploration and production on the outer continental shelf.  To that end, it mandates consideration of revising the five-year program so that it includes annual lease sales in the Arctic and Atlantic Oceans; seeks to encourage expeditious seismic surveying to determine offshore resource potential; mandates expedited seismic permitting; and directs a review and reconsideration of various offshore safety and pollution-control regulations and guidance documents, including noise-limitation guidance for seismic and other activities, for consistency with the order's directive to encourage energy exploration and development.

54.     On the first business day following President Trump's issuance of his executive order, the Secretary of the Interior issued an order implementing it.  The secretarial order calls for expedited consideration of seismic permitting applications for the Atlantic Ocean, establishment, in cooperation with NMFS, of a plan for expedited consideration of MMPA permits for seismic surveying, and development and implementation of a streamlined permitting approach for privately-funded seismic data research and collection aimed at expeditiously determining the offshore energy resource potential of the United States.  It also calls for

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                             20

immediate development of a new five-year program with full consideration of leasing in the Arctic and Atlantic Oceans.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Constitutional Violation)

55.     Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

56.     Plaintiffs have a right of action to seek redress for official actions by the President that violate the Constitution.

57.     The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."  U.S. Const. art. IV, § 3, cl. 2.  The President has the authority to regulate such property only to the limited extent that Congress has delegated that authority to the President.

58.     OCSLA Section 12(a), 43 U.S.C. § 1341(a), authorizes the President to withdraw unleased lands of the outer continental shelf from disposition.  It does not authorize the President to re-open withdrawn areas to disposition.

59.     There is no other source of authority that permits the President to reverse or undo a Section 12(a) withdrawal.

60.     In reversing President Obama's Arctic and Atlantic Ocean withdrawals, President Trump acted in excess of his authority under Article II of the U.S. Constitution and intruded on Congress's non-delegated exclusive power under the Property Clause, in violation of the doctrine of separation of powers.

61.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## SECOND CLAIM FOR RELIEF
### (Statutorily *ultra vires* action)

62.     Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

63.     Plaintiffs have a right of action to redress unlawful official action by the President that exceeds his statutory authority.

64.     The President lacks authority to reverse or undo Section 12(a) withdrawals. OCSLA Section 12(a), 43 U.S.C. § 1341(a), authorizes the President to withdraw unleased lands of the outer continental shelf from disposition.  Neither OCSLA nor any other statute authorizes the President to re-open for disposition areas withdrawn under OCSLA Section 12(a).

65.     In reversing President Obama's Arctic and Atlantic Ocean withdrawals, President Trump acted in excess of his statutory authority.

66.     Plaintiffs and their members have no adequate remedy at law and absent relief from this Court will suffer irreparable injury flowing from President Trump's unlawful action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment providing the following relief:

1.     Declare that Section 5 of President Trump's April 28, 2017, executive order, which purports to reverse the January 27, 2015, and December 20, 2016, withdrawals of portions of the Arctic and Atlantic Oceans from oil and gas leasing, is in excess of his statutory powers, in excess of his powers under, and therefore in violation of, the United States Constitution, not otherwise in accordance with law, and invalid;

COMPLAINT
*League of Conservation Voters et al. v. Trump et al.,*
Case No.                                    22
Case 3:17-cv-00101-SLG   Document 1   Filed 05/03/17   Page 23 of 24

2.      Declare that Defendants cannot lawfully implement Section 5 of President Trump's April 28, 2017, executive order;

3.      Enjoin Defendants from complying with or relying in any way on Section 5 of President Trump's April 28, 2017, executive order in the discharge of their official duties;

4.      Issue a writ of mandamus compelling Defendants Zinke and Ross to comply with the January 27, 2015, and December 20, 2016, withdrawals of portions of the Arctic and Atlantic Oceans from oil and gas leasing;

5.      Award Plaintiffs their costs in this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or as otherwise appropriate; and

6.      Grant such other relief as the Court deems just and proper.


Respectfully submitted this 3rd day of May, 2017.

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*s/ Eric P. Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
Nancy S. Marks (N.Y. Bar No. 2121820) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiffs League of Conservation Voters; Natural Resources Defense Council; Sierra Club; Alaska Wilderness League; Defenders of Wildlife; Northern Alaska Environmental Center; Resisting Environmental Destruction on Indigenous Lands; Center for Biological Diversity; Greenpeace, Inc.; and The Wilderness Society*