JEFFREY WOOD
Acting Assistant Attorney General

SARAH D. HIMMELHOCH (MD Bar. No. 199212160064)
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101- SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

# MEMORANDUM IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS PURSUANT TO
# FEDERAL RULE OF CIVIL PROCEDURE 12(b)

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     CERTIFICATION OF MEET AND CONFER REGARDING THE MOTION................ 2

III.    THE CHALLENGED EXECUTIVE ORDER AND STATUTORY
        BACKGROUND ................................................................................................. 3

        A.      The Executive Order Implementing an America-First Offshore Energy Strategy . 3
        B.      Plaintiffs' Claims.................................................................................................. 3
        C.      The Outer Continental Shelf ................................................................................. 4
        D.      The Outer Continental Shelf Lands Act and the Leasing Program ....................... 5
        E.      Withdrawals from the Leasing Program ................................................................. 7

IV.     ARGUMENT ................................................................................................................. 9

        A.      Standard for a Motion to Dismiss ....................................................................... 10
        B.      Plaintiffs Lack an Applicable Waiver of Sovereign Immunity ........................... 11
        C.      Plaintiffs Lack a Private Right of Action............................................................ 12
        D.      Courts May Not Issue Declaratory Relief Against Co-Equal Branches of
                Government.......................................................................................................... 14
        E.      Plaintiffs' Claims Are Not Yet Ripe ................................................................... 16
        F.      Plaintiffs Lack Article III Standing..................................................................... 18
                1.      Plaintiffs Have Not Alleged an Imminent Harm ..................................... 19
                2.      Plaintiffs Have Not Alleged a Concrete Harm to an Area that their
                        Members Visit or Use .............................................................................. 21
                3.      Plaintiffs Do Not Allege a Harm Particular to Them .............................. 23

V.      CONCLUSION........................................................................................................... 26

i

# EXHIBITS

Exhibit 1:      Executive Order 13795 of April 28, 2017, 82 Fed. Reg. 202815 (May 3, 2017)

Exhibit 2:      Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945)

Exhibit 3:      H.R. Rep. No. 413, 83rd Congress, 1st Sess. 2 (1953)

Exhibit 4:      Record of Decision and Approval of the 2017-2022 OCS Oil and Gas Leasing Program (Jan. 17, 2017)

Exhibit 5:      Secretarial Order No. 3350 (May 1, 2017)

Exhibit 6:      Proclamation 3339, 25 Fed. Reg. 2352 (Mar. 19, 1960)

Exhibit 7:      Public Land Order 4587, 34 Fed. Reg. 5655-56 (Mar. 26, 1969)

Exhibit 8:      Statement on OCS Oil and Gas Development, 26 Weekly Comp. Pres. Docs. 1001 (June 26, 1990)

Exhibit 9:      Memorandum for the Secretary of the Interior (Aug. 4, 1992)

Exhibit 10:     Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1111 (June 12, 1998)

Exhibit 11:     Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007)

Exhibit 12:     Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the United States OCS from Leasing Disposition, 44 Weekly Comp. Pres. Docs 986 (July 14, 2008)

Exhibit 13:     Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1 (Mar. 31, 2010)

Exhibit 14:     Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1 (Dec. 16, 2014).

Exhibit 15:     Memorandum on Withdrawal of Certain Areas of the United States OCS Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1 (Jan. 27, 2015).

Exhibit 16:     Executive Order 13754 North Bering Sea Climate Resilience, 2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016).

Exhibit 17:     Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016)

Exhibit 18:    Memorandum on Withdrawal of Certain Portions of the United States Arctic OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016).

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)..........................................................16

*Alexander v. Sandoval*, 532 U.S. 275 (2001)............................................................12

*Allen v. Wright*, 468 U.S. 737 (1984) ......................................................................24

*Am. Petroleum Inst. v. EPA*, 683 F.3d 382 (D.C. Cir. 2012)....................................16

*Amigos Bravos v. BLM*, 816 F. Supp. 2d 1118 (D.N.M. 2011) ................................25

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................10

*Babbitt v. Farm Workers,* 442 U.S. 289 (1979)........................................................19

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)..............................................10

*Burns Ranches, Inc. v. U.S. Dept. of the Interior*, 851 F.Supp.2d 1267 (D. Mont. 2011)...........12

*Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009)...........................21

*Center for Biological Diversity v. U.S. Dept. of the Interior*, 563 F.3d 466 (D.C. Cir. 2009) .... 17, 18, 24

*Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115 (9th Cir. 2010) ..............................11

*Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438 (4th Cir. 2014).........................12

*Clinton v. Jones*, 520 U.S. 681 (1997)......................................................................14

*Consejo de Desarollo Economico De Mexicali, A.C. v. United States*, 482 F.3d 1157 (9th Cir. 2007) ..........11

*Ctr. for Sustainable Econ. v. Jewell*, 779 F. 3d 588 (D.C. Cir. 2015) ...................................4, 5, 6

*Dunn v. Black, P.S. v. United States*, 492 F.3d 1084 (9th Cir. 2007)........................................11

*Elizabeth Retail Props. LLC v. KeyBank Nat. Ass'n*, 83 F. Supp. 3d 972, 985-86 (D. Or. 2015) 10

*FDIC v. Meyer*, 510 U.S. 471 (1994) ........................................................................11

*Fox-Quamme v. Health Net Health Plan of Or.*, *Inc*., No. 3:15-CV-01248-BR, 2016 WL 1724358 (D. Or. Apr. 29, 2016)...........................................................................13

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1 (1983)....13

*Franklin v. Massachusetts*, 505 U.S. 788 (1992).................................................13, 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 181 (2000)................19

*Frothingham v. Mellon*, 262 U.S. 447 (1923)............................................................15

*Graham v. U.S. Bank, Nat'l Ass'n*, No. 3:15-CV-0990-AC, 2015 WL 10322087  (D. Or. Dec. 2, 2015), report and recommendation adopted, No. 3:15-CV-00990-AC, 2016 WL 393336 (D. Or. Feb. 1, 2016)....................................................................................14

*Heckler v. Ringer*, 466 U.S. 602 (1984) ...................................................................12

*In re Aiken Cty.,* 645 F.3d 428 (D.C. Cir. 2011)........................................................16

*Kunaknana v. U.S. Army Corps of Engineers*, 23 F. Supp. 3d 1063 (D. Alaska 2014)..........21, 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...........................18, 19, 22, 23, 24

*Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ............................10

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ........................................................23

*Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996)...................16

*Newdow v. Bush*, 355 F. Supp. 2d 265  (D.D.C. 2005) ........................................14, 15

*O'Shea v. Littleton*, 414 U.S. 488 (1974)..................................................................20

*Pacific OperatorsOffshore, LLP v. Valladolid*, 132 S. Ct. 680 (2012).........................................4

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ................................................19

*Pit River Home and Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088 (9th Cir. 1994)..............12

iv

*Powelson v. U.S., By & Through Sec'y of Treasury*, 150 F.3d 1103 (9th Cir.1998) .................. 11

*Reynolds v. Giusto*, No. CV. 08-6261 PK, 2009 WL 2523727 (D. Or. Aug. 18, 2009) .............. 10

*Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208 (1974) ..................................... 24

*Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632 (9th Cir. 2014) .... 13

*Sierra Club v. U.S. Def. Energy Support Ctr.*, Civ. A. No. 01:11-cv-41, 2011 WL 3321296 (E.D. Va. July 29, 2011) ................................................................................................................... 25

*Skelly Oil Co. v. Phillips Petroleum Co.*, 399 U.S. 667 (1950) ................................................. 13

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), *as revised* (May 24, 2016) .............................. 23

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ........................................................... 21

*Texas v. United States*, 523 U.S. 296 (1998) ............................................................................. 16

*United States v. Florida*, 363 U.S. 121 (1960) ............................................................................ 4

*United States v. Louisiana*, 363 U.S. 1 (1960) ........................................................................... 4

*United States v. Mitchell*, 445 U.S.538 (1980) .......................................................................... 11

*United States v. Mottaz*, 476 U.S. 834 (1986) ........................................................................... 11

*United States v. Park Place Assocs., Ltd.*, 563 F.3d 907 (9th Cir. 2009) .................................. 11

*United States v. SCRAP*, 412 U.S. 669 (1973) .......................................................................... 19

*United States v. Testan*, 424 U.S. 392 (1976) ............................................................................ 11

*United Transp. Union v. ICC*, 891 F.2d 908 (D.C. Cir. 1989) ................................................... 19

*Valley Forge Christian College v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ..................................................................................................................... 14, 18, 24

*W. Shoshone Nat. Council v. United States*, 408 F. Supp. 2d 1040 (D. Nev. 2005) .................... 12

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................... 10, 19

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ........................................................ 11, 19, 20, 23

*WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77 (D.D.C. 2012), *aff'd sub nom. WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) .............................................................. 25

## Constitution and Statutes

28 U.S.C. § 1331 ....................................................................................................................... 11

28 U.S.C. § 1361 ................................................................................................................. 11, 12

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ................................................. 7, 13, 16, 25

Clean Water Act, 33 U.S.C. §§ 1251-1387 ................................................................................ 22

Declaratory Judgment Act, 28 U.S.C. § 2201 ................................................................. 11, 12, 13

National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ................................................... 22

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356b. 1, 4, 5, 6, 7, 12, 13, 14, 16, 17, 18, 20, 25

U.S. Const. Art. III ................................................................................................... 9, 10, 14, 24

U.S. Const. Art. IV, § 3, cl. 2 ................................................................................................. 4, 12

U.S. Const., Art. II ....................................................................................................................... 4

## Other Authorities

30 C.F.R. Part 551 .............................................................................................................. 6, 18, 20

Executive Order 13754 North Bering Sea Climate Resilience, 2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016) ........................................................................................................................... 8

Executive Order 13795 of April 28, 2017, 82 Fed. Reg. 02815 § 1 (May 3, 2017) .............. passim
Federal Rule of Civil Procedure 12(b)(1) ........................................................................ 10, 11
H.R. Rep. No. 413, 83rd Congress, 1st Sess. 2 (1953) ............................................................ 5
Memorandum for the Secretary of the Interior (Aug. 4, 1992) .............................................. 8
Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the
   United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs
   986 (July 14, 2008) ........................................................................................................ 8
Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United
   States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19
   (Jan. 9, 2007)................................................................................................................... 8
Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing
   Disposition, 2010 Daily Comp. Pres. Docs. 1 (Mar. 31, 2010) .................................... 8
Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from
   Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1 (Dec. 16, 2014).................................... 8
Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from
   Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1111 (June 12, 1998) ............................. 8
Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf
   Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1 (Jan. 27, 2015).. 8
Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral
   Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) ..................................................... 8
Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental
   Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) ................... 8
Proclamation 3339, 25 Fed. Reg 2352 (March 15, 1960).............................................................. 7
Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945) ..................................................... 5
Public Land Order 4587, 34 Fed. Reg. 5655-56 (Mar. 26, 1969).................................................. 7
Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing
   Program (Jan. 17, 2017) ............................................................................................... 6, 7
Secretarial Order No. 3350 (May 1, 2017) .................................................................................... 7
Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp. Pres. Docs.
   1006 (June 26, 1990)..................................................................................................... 7

# I.     INTRODUCTION

One month before President Donald J. Trump's inauguration, President Barack H. Obama withdrew most of the Arctic Outer Continental Shelf ("OCS"), as well as other areas of the OCS, from oil and gas development. On April 28, 2017, President Trump issued the Executive Order Implementing an America-First Offshore Energy Strategy, supporting increased domestic energy production including from the OCS while also "ensuring that any such activity is safe and environmentally responsible." Executive Order 13795 of April 28, 2017, 82 Fed. Reg. 02815 § 1 (May 3, 2017) (Exhibit 1). Consistent with this policy, the President modified President Obama's withdrawal of certain areas of the OCS from leasing, thus allowing the Secretary of the Interior to include those areas in future lease sales. *Id*. § 5. President Trump's action is fully consistent with prior presidential decisions under the statute and a valid exercise of his authority.

Plaintiffs allege that the President's exercise of the broad discretion afforded him under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356b, violated the separation of powers instituted in the Constitution and exceeds his authority as granted by the statute itself. Plaintiffs' claims must be dismissed for at least the following four reasons.

First, Plaintiffs have failed to identify any private right of action or waiver of sovereign immunity that would allow the Court to review their claims. Without citation to a single authority, the Complaint baldly asserts Plaintiffs "have a right of action." This allegation is unsupported by the law and, therefore, Plaintiffs have failed to assert a claim upon which relief can be granted.

Second, longstanding respect for the separation of powers prohibits the relief the Plaintiffs seek. Plaintiffs ask for a declaration as to the legality of the President's actions. Courts have long held that such declarations against co-equal branches of the government are improper

and unavailable because they represent an unwarranted violation of the separation of powers. Therefore, Plaintiffs have not stated a claim for relief that can be granted.

Third, Plaintiffs claims are unripe because any actual oil and gas development within the affected area could only occur after further agency action, and any such action would be subject to public comment and, if properly sought, judicial review. The doctrine of ripeness requires a more developed factual record with concrete proposals regarding oil and gas development before the court can resolve Plaintiffs' allegations of harm.[1]

Fourth, Plaintiffs lack standing to bring these claims because none of the areas at issue in this case has been identified for oil and gas exploration or leasing activities. Plaintiffs, therefore, cannot demonstrate a specific harm to any single member of their organizations. In addition, Plaintiffs' broad concerns regarding the way in which the government is administered are too general to give rise to standing because they affect all citizens equally and therefore are not particular to the Plaintiffs.

## II.    CERTIFICATION OF MEET AND CONFER REGARDING THE MOTION

In accordance with the requirements of this Court's Order, undersigned counsel for the Defendants met and conferred with Plaintiffs' counsel regarding this motion to dismiss. Because the Defendants contend that the claims and defenses must be dismissed on grounds that cannot be cured, the parties were unable to reach an agreement that would obviate the need for filing this motion.

---

[1] Plaintiffs' constitutional and statutory claims also fail on their merits, but the Court need not reach the merits because the action fails at the threshold of standing and ripeness.

**III.  THE CHALLENGED EXECUTIVE ORDER AND STATUTORY BACKGROUND**

### A.  The Executive Order Implementing an America-First Offshore Energy Strategy

The Executive Order Implementing an America-First Offshore Energy Strategy announced "the policy of the United States to encourage energy exploration and production on the OCS, in order to maintain the Nation's position as a global energy leader and foster energy security and resilience for the benefit of the American people, while ensuring that any such activity is safe and environmentally responsible." E.O. 13795 at § 2, 82 Fed. Reg. at 20815. To implement this policy the President: (1) modified President Obama's December 20, 2016 decision to withdraw areas of the OCS from oil and gas development (*id.* § 5); (2) directed the Secretary of the Interior to reconsider certain lease schedules and related survey, legal, financial, pollution, and permit requirements (*id.* §§ 3, 6, 7, 8, 9, 11); and (3) directed the Secretary of Commerce to reconsider certain Marine Sanctuaries, regulations, and permitting programs (*id.* §§ 4, 9, 10). Plaintiffs challenge only the modification of President Obama's December 20, 2016 decision.

### B.  Plaintiffs' Claims

Plaintiffs consist of ten environmental organizations, each of which asserts a corporate purpose related to defeating development of the nation's energy resources in the OCS for the protection of environmental and indigenous rights. Each organization asserts that it has members that "visit or otherwise use and enjoy the Atlantic Ocean, . . . the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters" for reasons related to their corporate purposes. Compl. ¶ 5-15.

Plaintiffs allege that the "purpose and likely result" of the America-First Offshore Energy Policy are that "oil and gas exploration and development" will occur somewhere in the 128

million acres addressed by the Order and that these activities "will degrade Arctic and Atlantic Ocean and coastal environments . . . ." Compl. ¶ 16. Plaintiffs, however, cannot identify any specific area within the 128 million acres that is imminently or clearly subject to exploration or development activities, much less any specific degradation that will occur in any part of the 128 million acres.

Plaintiffs assert two claims for relief. First, they assert that the President violated Article IV, § 3, cl. 2 (the Property Clause), Article II (Presidential Powers), and separation of powers under the U.S. Constitution by narrowing the withdrawal of certain areas from offshore leasing. Second, they assert that the President exceeded the broad discretion given to him under the OCSLA by modifying the prior withdrawal. As relief, Plaintiffs seek a declaration that the President's action exceeds his statutory and constitutional authority, as well as an injunction specifically prohibiting the Secretaries of the Interior and Commerce from implementing Section 5 of the Executive Order and ordering them to comply with the earlier withdrawal. *See* Compl. ¶¶ 22-23 and Prayer for Relief 1-4.

## C. The Outer Continental Shelf

The OCS of the United States "is a vast underwater expanse nearly equal in size to the Australian continent." *Ctr. for Sustainable Econ. v. Jewell*, 779 F. 3d 588, 592 (D.C. Cir. 2015). The OCS includes "all submerged lands lying seaward" of coastal state jurisdiction. 43 U.S.C. § 1331(a); *see also Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 685 (2012). For most coastal states (except those adjacent to the Gulf of Mexico and the Great Lakes), the inward boundary of the outer continental shelf begins three nautical miles from the coastline. 43 U.S.C. §§ 1301(b), 1312; *United States v. Louisiana*, 363 U.S. 1, 66 (1960); *United States v. Florida*, 363 U.S. 121, 129 (1960). The outer boundary of the outer continental shelf extends roughly two

hundred nautical miles into the ocean to the seaward limit of the international-law jurisdiction of the United States. 43 U.S.C. § 1312; *Ctr. for Sustainable Econ.*, 779 F. 3d at 592.

President Truman first exercised the United States' control over the natural resources of the OCS by issuing the "Truman Proclamation" in 1945, informing other nations that:

> the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control.

Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945) (Exhibit 2).

### D. The Outer Continental Shelf Lands Act and the Leasing Program

Congress passed OCSLA in August 1953. In passing OCSLA, Congress made clear that the purpose for the United States' control over the OCS was to make available its mineral resources for development. That purpose was unambiguously described in a committee report on proposed legislation that was the basis of OCSLA:

> The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of [] the shelf.

H.R. Rep. No. 413, 83rd Congress, 1st Sess. 2 (1953) (Exhibit 3).[2]

To achieve the development of these offshore mineral rights, the Act as amended sets forth a four-stage process to allow development of oil or gas: (1) the Department of the Interior prepares a five-year program of proposed lease sales across the entire OCS (*see* 43 U.S.C. §

---

[2] OCSLA was amended in 1978 to provide a revised declaration that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). Despite these additional safeguards, the purpose of OCSLA nonetheless remains to facilitate the expeditious and orderly development of oil and gas resources of the outer continental shelf.

1344); (2) the Department "issues leases in accordance with the program" (*see id.* § 1337(a)); (3) the Department reviews the lessee's exploration plans (*see id.* § 1340); and (4) the Department, in consultation with state and local governments, reviews the lessee's development plans (*see id.* § 1351). *See also Native Village of Point Hope v. Jewell,* 740 F.3d 489, 493 (9th Cir. 2014); *Ctr. for Sustainable Econ.*, 779 F.3d at 594.

The five-year leasing program must address the nation's energy needs for a five year period and "serves as the template for the Government's leasing of drilling rights on the [Shelf] for the five-year period following its preparation." *Id.* at 592 n.6; 43 U.S.C. § 1344. Under the statute, the leasing program "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] . . . ." *Id.* § 1344(a)(1). Similar requirements apply to the remaining three steps. *See, e.g., id.* §§ 1340(g)(3), 1351(h)(1)(D)(i).

Development of oil and gas resources on the OCS must occur pursuant to this program. *See, e.g., id.* § 1344(d)(3). Even exploration such as the seismic surveys Plaintiffs reference in their complaint can only occur after the proponent of a survey obtains the relevant federal permits, which are subject to environmental and other procedural requirements, and which may themselves be challenged in a properly framed civil action. *See id.* § 1340; 30 C.F.R. Part 551.

On January 17, 2017, three months before the challenged Executive Order, the Department of the Interior approved the most recent five year program for oil and gas leasing on the OCS. *See* Record of Decision and Approval of the 2017-2022 OCS Oil and Gas Leasing Program (Jan. 17, 2017) (Exhibit 4).[3] As the record of decision explicitly states, the program

---

[3] This decision and the underlying program are publicly available at https://www.boem.gov/Five-Year-Program/ (last visited June 30, 2017).

"excludes the Beaufort Sea Program Area and the Chukchi Sea Program Area." *Id.* Because these areas were excluded under the terms of the 2017 program, no leasing can occur in those areas unless and until a new five-year program is developed that would authorize leasing in those areas. *See* 43 U.S.C. § 1344(d)(3) ("[N]o lease shall be issued unless it is for an area included in the approved leasing program . . . ."). The challenged Executive Order does not alter that fact. In other words, the next opportunity to issue new leases for oil and gas development in the areas addressed by the Executive Order cannot arise until another five-year program is approved.[4]

When a new five-year leasing program is approved by the Secretary pursuant to 43 U.S.C. § 1344, a person who "participated in the administrative proceedings related to the" the leasing program and who "is adversely affected or aggrieved by such action" may file a petition for review pursuant to 43 U.S.C. § 1349(c).

### E. Withdrawals from the Leasing Program

OCSLA Section 12(a) provides that the President "may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). Section 12(a) has been invoked only a limited number of times since the passage of OCSLA in 1953.[5]

---

[4] The Executive Order directs the Secretary of the Interior to "give full consideration to revising" the approved leasing program. E.O. 13795 § 3(a), 82 Fed. Reg. at 20815. The Secretary of the Interior issued a Secretarial Order to commence that consideration. *See* Secretarial Order No. 3350 § 4(a)(1) (May 1, 2017) (Exhibit 5). That new plan, however, has not yet been developed or even proposed, much less finalized. Should such a plan be proposed and subsequently finalized, Plaintiffs will have an opportunity to seek review of the plan at that time under the judicial review provisions of OCSLA and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

[5] *See* Proclamation 3339, 25 Fed. Reg. 2352 (March 19, 1960). (Exhibit 6); Public Land Order 4587, 34 Fed. Reg. 5655-56 (Mar. 26, 1969) (Exhibit 7); Statement on OCS Oil and Gas Development, 26 Weekly Comp. Pres. Docs. 1001, 1006 (June 26, 1990) (Exhibit 8) (President Bush's Statement of June 26, 1990 did not specifically cite the authority for the "withdrawals". Later, in 1992, President Bush's intent to invoke section 12(a) was confirmed in a memorandum

Several of the prior actions under Section 12(a) constituted a modification or even a revocation of a prior withdrawal from leasing. *See* Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs 986 (July 14, 2008) (Exhibit 12); Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014) (Exhibit 14). Moreover, one of the withdrawals was nearly identical to the modification at issue in this case. Specifically, President George W. Bush's 2008 memorandum "modif[ied] the prior memoranda of withdrawals" to limit the withdrawals to "those areas of the OCS designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972." *See* 44 Weekly Comp. Pres. Docs 986 (July 14, 2008). This language is nearly identical to President Trump's order, which stated the language in the 2016, 2015, and 2008 withdrawals is modified to limit those withdrawals to "those areas of the OCS designated as of July 14, 2008, as Marine

_____

to the DOI Secretary dated August 4, 1992. *See* Memorandum for the Secretary of the Interior (Aug. 4, 1992) (Exhibit 9)); Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1107, 1111 (June 12, 1998) (Exhibit 10); Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) (Exhibit 11); Memorandum for the Secretary of the Interior re Modification of the Withdrawal of Areas of the United States OCS from Leasing Disposition, 44 Weekly Comp. Pres. Docs 986 (July 14, 2008) (Exhibit 12); Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Mar. 31, 2010) (Exhibit 13); Memorandum on Withdrawal of Certain Areas of the United States OCS from Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014) (Exhibit 14); Memorandum on Withdrawal of Certain Areas of the United States OCS Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1, 1 (Jan. 27, 2015) (Exhibit 15); Executive Order 13754 North Bering Sea Climate Resilience, 2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016) (Exhibit 16); Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) (Exhibit 17); Memorandum on Withdrawal of Certain Portions of the United States Arctic OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) (Exhibit 18).

Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972." *See* E.O. 13795 § 5, 82 Fed. Reg. at 20816. In sum, President Trump's Executive Order is not unprecedented and in fact mirrors the action taken by President George W. Bush in limiting the size of withdrawn OCS areas.

## IV.    ARGUMENT

Following the footsteps of both Presidents George W. Bush and President Obama, President Trump has modified the offshore leasing policy for the OCS. While this is a crucial step toward ensuring the nation's security and economy, it is also merely a preliminary step that allows the Secretary of the Interior to consider leasing in the areas visited and used by the members of the Plaintiff organizations.

Plaintiffs' challenge to this action must be dismissed, as a threshold matter, because Plaintiffs have failed to identify a private right of action or waiver of sovereign immunity for their claims, and because their requested relief ignores the longstanding constitutional doctrine that courts may not issue a declaratory judgment against a co-equal part of the government. Even more fundamental, however, is the fact that Plaintiffs have failed to satisfy the case or controversy requirement in Article III. Because no harm has yet come or is imminently going to come to the Plaintiffs' members' interests, Plaintiffs lack standing to bring this case. Moreover, Plaintiffs' claims are not ripe because there is no harm to Plaintiffs from waiting until there is a fully developed factual record that addresses specific proposals to allow leasing in the areas about which the Plaintiffs have expressed concern. Accordingly, Plaintiffs' claims must be dismissed both for lack of jurisdiction and for failure to state a claim upon which relief may be granted.

### A.    Standard for a Motion to Dismiss

To survive a motion to dismiss, a complaint must state a claim for relief that may be granted under the law. In considering a Rule 12(b)(6) motion, the court must accept all of the claimant's material factual allegations as true and view all facts in the light most favorable to the claimant. *See Reynolds v. Giusto*, No. CV. 08-6261 PK, 2009 WL 2523727, at *1 (D. Or. Aug. 18, 2009). However, a court need not accept as true any legal conclusion set forth in a pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court addressed the proper pleading standard under Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*: "While a complaint attacked [under] Rule 12(b)(6) . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." 550 U.S. 544, 555 (2007) (citation and brackets omitted). The complaint must set forth facts supporting a *plausible*, not merely *possible*, claim for relief. *Id*. A motion to dismiss under Rule 12(b)(6) is an appropriate vehicle for resolving purely legal challenges. *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (recognizing that "a court can fully resolve any purely legal question on a motion to dismiss").

A court reviews a motion to dismiss a complaint for ripeness or for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1). *See Elizabeth Retail Props. LLC v. KeyBank Nat. Ass'n*, 83 F. Supp. 3d 972, 985-86 (D. Or. 2015). Where the jurisdictional attack is facial, as this one is, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). Once a party has moved to dismiss for lack of subject matter

jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the Court's jurisdiction. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In doing so, the court decides the question of jurisdiction without regard to the merits of the underlying claim. *See Whitmore v. Arkansas*, 495 U.S. 149, 155-156 (1990).

### B.     Plaintiffs Lack an Applicable Waiver of Sovereign Immunity

Under the sovereign immunity doctrine, the United States is immune from suit except to the extent Congress unequivocally and expressly waives that immunity. *FDIC v. Meyer*, 510 U.S. 471 (1994); *United States v. Mitchell*, 445 U.S.538 (1980). A party asserting a claim against the United States bears "the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress." *Dunn v. Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).  Any such waiver, moreover, must be strictly construed, and accompanying limitations on the court's jurisdiction must be strictly enforced. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986); *United States v. Testan*, 424 U.S. 392, 399 (1976). "'When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction.'" *Consejo de Desarollo Economico De Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007).

None of the allegations in the Complaint identify an applicable waiver. And while Plaintiffs do identify several statutory provisions that may serve as the basis for this Court's jurisdiction, *see* Compl. ¶¶ 2-3 (citing 28 U.S.C. §§ 1331, 1361, 2201-2202), those references are insufficient. As the Ninth Circuit has explained, "[a] statute may create subject matter jurisdiction yet not waive sovereign immunity." *Powelson v. U.S., By & Through Sec'y of Treasury*, 150 F.3d 1103, 1105 (9th Cir.1998); *see also United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 923-24 (9th Cir. 2009). In this case, none of the referenced provisions waive sovereign immunity and, accordingly, the claims must be dismissed on this basis alone. *See*

*Heckler v. Ringer*, 466 U.S. 602, 616-17 (1984) (holding that the common law writ of mandamus, as codified in 28 U.S.C. § 1361 is intended to provide a remedy once the plaintiff has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty); *Pit River Home and Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1097 n.5 (9th Cir. 1994) ("Sections 1331 and 1361 do not waive the sovereign immunity of the United States"); *Burns Ranches, Inc. v. U.S. Dept. of the Interior*, 851 F.Supp.2d 1267, 1270-71 (D. Mont. 2011) (recognizing that 28 U.S.C. § 2201 does not waive sovereign immunity, and collecting cases); *W. Shoshone Nat. Council v. United States*, 408 F. Supp. 2d 1040, 1047-48 (D. Nev. 2005) ("[T]he Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, does not constitute the United States' consent to be sued, it 'merely grants an additional remedy in cases where jurisdiction already exists in the court.'").

## C.    Plaintiffs Lack a Private Right of Action

The Supreme Court has made clear that private plaintiffs may not bring suits to enforce federal rights unless Congress has provided a private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "To create a private right of action, Congress must 'speak with a clear voice,' and the statute must 'unambiguously' express the intent 'to create not just a private right but also a private remedy.'" *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014) (alteration omitted) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 283, 284 (2002)). Where the necessary intent is absent, "a cause of action does not exist and courts may not create one." *Sandoval*, 532 U.S. at 286-87.

Plaintiffs fail to identify any statute that provides them a right of action to enforce their alleged rights under OCSLA and the Property Clause. Notably, they allege that they "have a right

of action to seek redress for official actions by the President that violate the Constitution" and "a right of action to redress unlawful official action by the President" under OCSLA, but cite no relevant legal authority. *See* Compl. ¶¶ 56, 63. Their failure to identify a statute supporting these allegations is fatal to their claims.

Even if Plaintiffs had invoked the private right of action conferred by the Administrative Procedure Act, 5 U.S.C. § 702, their claims would still fail because judicial review under that statute is available only with respect to a final "agency action." 5 U.S.C. §§ 551, 702, 704. The President is not an "agency" within the meaning of the Act, and thus his actions are not reviewable under that statute. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).[6]

Any reliance that Plaintiffs may have intended to place on the Declaratory Judgment Act, 28 U.S.C. § 2201, is also unavailing. "It is well-settled . . . that the Declaratory Judgment Act does not create a stand-alone cause of action." *Fox-Quamme v. Health Net Health Plan of Oregon*, Inc., No. 3:15-CV-01248-BR, 2016 WL 1724358, at *1 (D. Or. Apr. 29, 2016); *see also Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 15 (1983) ("[T]he operation of the Declaratory Judgment Act is procedural only."). Instead, the Act "created a new procedural mechanism for removing the threat of impending litigation, [but] it did not expand the jurisdiction of the federal courts." *Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.,* 771 F.3d 632, 635 (9th Cir. 2014) (citing *Skelly Oil Co. v. Phillips Petroleum Co.,* 399 U.S. 667, 671 (1950)); *accord Graham v. U.S. Bank, Nat'l Ass'n*, No. 3:15-CV-0990-AC, 2015 WL 10322087, at *13 (D. Or. Dec. 2, 2015), report and recommendation adopted, No.

---

[6] To the extent Plaintiffs are seeking an injunction against the Secretaries of the Interior and Commerce, moreover, there is no final agency action to enjoin. The Secretary of the Interior has only begun reconsideration of the five-year program (*see supra* n. 4), and the Plaintiffs allege no specific action taken by the Secretary of Commerce to implement the Executive Order.

3:15-CV-00990-AC, 2016 WL 393336 (D. Or. Feb. 1, 2016). Thus, "[w]here a plaintiff has no private right of action, a declaratory judgment [action] must be dismissed." *Id.*

Finally, Plaintiffs' claims would fail even if they had intended to invoke the private right of action provided by OCSLA. *See* 43 U.S.C. § 1349. Even were this provision to extend to the President's discretion under Section 12(a)—an allegation Plaintiffs do not make—Plaintiffs' claims are barred by their failure to comply with the terms of 43 U.S.C. § 1349. Specifically, Section 1349 provides that anyone seeking to sue under that provision must provide notice of the alleged violation "in writing under oath, to the Secretary and any other appropriate Federal Official . . . ." and others at least 60 days prior to commencing a civil action. *Id.* § 1349(a)(2)(A). Plaintiffs do not allege that they have provided the requisite notice pursuant to OCSLA and defendants have received no such notice. Plaintiffs, therefore, cannot rely on Section 1349 to supply the requisite private right of action.

### D. Courts May Not Issue Declaratory Relief Against Co-Equal Branches of Government

Putting aside the issues of the lack of sovereign immunity and the lack of a private right of action, "[t]here is longstanding legal authority that the judiciary lacks the power to issue an injunction or a declaratory judgment against the co-equal branches of government—the President and the Congress." *Newdow v. Bush*, 355 F. Supp. 2d 265, 280-82 (D.D.C. 2005) (collecting cases and declining to carve an exception to Presidential immunity "where [the President] is claimed to have violated the Constitution"). As the Supreme Court has stated, the "judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts . . . ." *Valley Forge Christian College v. Am. United for Separation of Church and State, Inc.,* 454 U.S. 464, 471 (1982). *see also Clinton v. Jones*, 520 U.S. 681, 718-19 (1997) (Breyer, J. concurring) (acknowledging "the apparently

unbroken historical tradition . . . implicit in the separation of powers that a President may not be ordered by the Judiciary to perform particular Executive acts") (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (Scalia, J. concurring)); *Frothingham v. Mellon*, 262 U.S. 447, 488 (1923) ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other.").

Yet, Plaintiffs seek just such an unconstitutional ruling from the Court. Both claims directly challenge the President's exercise of authority embodied in Section 5 of Executive Order 13795. And, for relief, Plaintiffs explicitly ask this Court to "[d]eclare that Section 5 of President Trump's April 28, 2017, executive order" exceeds his statutory and constitutional authority." Compl. Prayer for Relief ¶ 1. Plaintiffs in essence are asking this Court to "read an exception into the immunity of the President from injunctive relief for instances where he is claimed to have violated the Constitution . . . ." *Newdow,* 355 F. Supp. 2d at 282. There is, however, "no support at all for such an exception." *Id.* Accordingly, Plaintiffs have failed to state a claim upon which relief can be granted.[7]

Plaintiffs in essence are asking this Court to "read an exception into the immunity of the President from injunctive relief for instances where he is claimed to have violated the Constitution . . . ." *Newdow,* 355 F. Supp. 2d at 282. There is, however, "no support at all for such an exception." *Id.* Accordingly, Plaintiffs have failed to state a claim upon which relief can be granted.

---

[7] Plaintiffs also ask the Court to issue a writ compelling the Secretaries of the Interior and Commerce to comply with President Obama's earlier withdrawals. They also include the Secretaries in their request for declaratory relief. For the reasons set forth below, this prayer for relief is not ripe and they lack standing to seek the writ.

### E.    Plaintiffs' Claims Are Not Yet Ripe

A "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).[8] The ripeness factors help to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also . . . protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging part[y]." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). "In assessing the prudential ripeness of a case, [courts] focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387. The "fitness" factor depends "on whether the issues are purely legal, whether consideration of the issues would benefit from a more concrete setting, and whether the agency's actions are sufficiently final." *In re Aiken Cty.,* 645 F.3d 428, 434 (D.C. Cir. 2011).

There will be no harm to the Plaintiffs from deferring the resolution of their claims until they can be reviewed in the context of a new five-year program. At that time, Plaintiffs will have the option to challenge the proposal under the judicial review provisions of OCSLA and the Administrative Procedure Act. By contrast, for the Court to wade in at this early stage would

---

[8] As discussed in the next section, Plaintiffs also lack standing because they cannot establish a particularized imminent injury. Although the constitutional component of ripeness is coextensive with the injury-in-fact requirement of standing, *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), the doctrine of ripeness also includes prudential considerations. Thus, even if the Court were to conclude that Plaintiffs had alleged a "certainly impending" injury-in-fact, which it should not, the prudential considerations of ripeness counsel against permitting the instant challenge to go forward.

result in a ruling regarding the legality of exploration and development activity that may never occur. Waiting for a specific program for review would avoid interference in further administrative action, and allow the Court a full record for consideration.

The conclusion that Plaintiffs' claims are not ripe for review is bolstered by the ruling in *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466, 481 (D.C. Cir. 2009).[9] In that case, the Circuit Court emphasized the multi-stage nature of oil and gas development under OCSLA, stating:

> First, during the preparation stage, Interior creates a leasing program by preparing a five-year schedule of proposed lease sales. 43 U.S.C. § 1344. At this stage, "prospective lease purchasers acquire no rights to explore [by drilling], produce, or develop" any of the areas listed in the leasing program. . . . Second, during the lease-sale stage, Interior solicits bids and issues leases for particular offshore leasing areas. 43 U.S.C. § 1337(a). Third, during the exploration stage, Interior reviews and determines whether to approve the lessees' more extensive exploration plans. 43 U.S.C. § 1340. Interior allows this exploration stage to proceed only if it finds that the lessees' exploration plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." 43 U.S.C. § 1340(g)(3). Fourth and final is the development and production stage. During this stage, Interior and those affected state and local governments review an additional and more detailed plan from the lessee. 43 U.S.C. § 1351. If Interior finds that the plan would "probably cause serious harm or damage ... to the marine, coastal or human environments," then the plan, and consequently the leasing program, may be terminated. 43 U.S.C. § 1351(h)(1)(D)(i).

*Ctr. for Biological Diversity*, 563 F.3d at 473; *accord Native Vill. of Point Hope v. Jewe*ll, 740 F.3d 489, 492-493 (9th Cir. 2014). Notably, each of the steps described by the D.C. Circuit has yet to occur in the case at bar.

_____

[9] OCSLA mandates that any review of a five-year leasing program approved pursuant to 43 U.S.C. § 1344 "shall be subject to judicial review only in the United States Court of Appeal[s] for the District of Columbia." 43 U.S.C. § 1349(c)(1).

Even at a later procedural stage than in the case at bar, the D.C. Circuit Court found that a challenge to the environmental effects of the 2017-2022 oil and gas leasing program on the OCS was not ripe. The court reasoned that the plaintiffs' claims were not well enough developed for review – "No lease sales had yet occurred." *Ctr. for Biological Diversity*, 563 F.3d at at 480. In the case at bar, not only have no lease sales occurred – no lease sales have even been proposed. A plaintiff "suffer[s] little by having to wait until the leasing stage has commenced in order to receive the information it requires. In the meantime no drilling will have occurred, and consequently, no harm will yet have occurred to the animals or their environment." *Id*. at 481.

Even with respect to Plaintiffs' claims regarding seismic surveys, there is no harm from waiting until specific surveys are planned. Seismic surveys are governed by OCSLA as well and require a permit issued by the Department of the Interior. *See* 43 U.S.C. § 1340; 30 C.F.R. Part 551. Plaintiffs do not allege that any such permits have been issued for the area freed for development by the Executive Order and when, and if, such permits are issued Plaintiffs will have an opportunity to challenge such permits.

## F. Plaintiffs Lack Article III Standing

For many of the same reasons that the Plaintiffs' claims are not ripe, the Plaintiffs also lack standing. The Supreme Court in *Lujan v. Defenders of Wildlife* reiterated the "irreducible minimum," *Valley Forge Christian Coll.*, 454 U.S. at 472, that a plaintiff seeking to invoke a federal court's jurisdiction must establish. 504 U.S. 555, 560-61 (1992). Plaintiffs must show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that their injury is fairly traceable to the challenged action of the defendant, and not the result of the "independent action of some third party not before the court"; and (3) that it is "'likely' as opposed to merely 'speculative' that the injury will be 'redressed by a

favorable decision.'" *Id.* at 560-61.[10] Plaintiffs here fall at the first hurdle – an imminent, concrete, and particularized harm. Further, because Plaintiffs seek declaratory and injunctive relief for a "predicted future injury" that may never occur, they "bear[] a 'more rigorous burden' to establish standing." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)).

### 1. Plaintiffs Have Not Alleged an Imminent Harm

It is a "settled requirement" of standing that the injury complained of must be "at least *imminent.*" *Lujan*, 504 U.S. at 564 n.2. This requirement is designed to ensure that the claim of standing "is not 'an ingenious academic exercise in the conceivable . . .'" but, rather, an imminent concrete harm. *Id.* at 596 (quoting *SCRAP*, 412 U.S. at 688); *Whitmore*, 495 U.S. at 155 (the injury must be "concrete in both a qualitative and temporal sense" and one that is "'distinct and palpable.'" (quoting *Warth*, 422 U.S. at 501)). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute an injury in fact." *Id*. at 156 (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).

Even comparing Plaintiffs' claim to the "most attenuated injury conferring Art. III standing," they fail to meet the standing requirement of injury in fact. *Whitmore*, 495 U.S. 159 (citing *United States v. SCRAP*, 412 U.S. 669 (1973)). In *SCRAP*, a case in which the Supreme

---

[10] As organizations, Plaintiffs also bear the burden of proving that they have standing to sue on behalf of their members, i.e. that their members would have standing to sue in their own right, the issues at stake are relevant to the purposes of the organizations, and the claims do not require the participation of the individual members. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). Because Plaintiffs cannot satisfy the first of these elements – that their individual members have standing in their own right – Defendants do not here address the other elements of organizational standing. Defendants reserve the right to inquire into and address those other elements should this case proceed further.

Court referred to plaintiffs as having an "attenuated injury", the plaintiffs made a "bald statement" that the challenged surcharge on railroad freight rates would result in increased depletion of natural resources and increased littering by suppressing efforts to recycle. *Id.* at 160. That statement, "even if incorrect was held sufficient to withstand a motion to dismiss, because the plaintiffs in *SCRAP* may have been able to show at trial that the string of occurrences alleged would happen immediately." *Id.*

Plaintiffs cannot meet this "most" attenuated requirement. The regulations in *SCRAP* had been enacted and were going into effect. Here, the Executive Order simply allows the Secretary of the Interior to consider authorizing leasing within the areas about which Plaintiffs have expressed concern. *See* E.O. 13795, 82 Fed. Reg. 20185 (Exhibit 1). For the harm that Plaintiffs allege to occur from development, the Secretary must decide to include the particular areas of the OCS within the leasing program, the Secretary must separately decide to hold a lease sale that includes those areas, third parties must bid for those leases, and then third parties must decide to explore and develop those leases. For the harm the Plaintiffs allege will occur from exploration, the Secretary must receive a permit application from a third party and must decide to grant that application. Thus, "there is no amount of evidence that potentially could establish that [Plaintiffs'] asserted future injury is 'real and immediate.'" *Whitmore*, 495 U.S. at 160 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).[11]

_____

[11] Plaintiffs also make allegations regarding the potential effects of seismic exploration. While seismic exploration can occur before a lease is issued, such exploration can only occur under a permit issued by the Department of the Interior. *See* 43 U.S.C. § 1340; 30 C.F.R. Part 551. Thus, for harm to occur, a third party must seek a permit from the Department, the Department must grant that permit, and the third party must then take action pursuant to the permit.

In the case at bar, while no decision has yet been made on whether to lease any part of the 128 million acres Plaintiffs claim are affected by the Executive Order, it is certainly conceivable that oil and gas exploration and development will occur somewhere within that area at some point in time. What is not clear is *when or where* such oil and gas exploration may occur. While the Secretary is currently initiating the process to develop a new five year leasing program (*see supra n.* 4), a process that will *consider* whether to authorize leasing in the areas affected by the Executive Order, the Executive Order by itself will not directly result in leasing or in any specific project occurring. With the timing of any proposed oil and gas exploration or development as uncertain as the location, Plaintiffs cannot demonstrate the imminent harm required to establish standing.

### 2. Plaintiffs Have Not Alleged a Concrete Harm to an Area that their Members Visit or Use

The Supreme Court has made clear that "to establish standing plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity of a project site . . . ." *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). Plaintiffs cannot make this showing.

In *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009), the plaintiffs alleged standing based on their observation of polar bears in the Beaufort Sea and their intention to do so in the future. Because the challenged regulation was being implemented in that area and, according to the allegations assumed to be true, threatened concrete harm to the polar bears in that region, the Ninth Circuit found that plaintiffs had alleged an injury that was "geographically specific" and therefore established standing. *Id.* at 707-708.

By contrast, in *Kunaknana v. U.S. Army Corps of Engineers*, 23 F. Supp. 3d 1063 (D. Alaska 2014), the plaintiffs raised claims pursuant to the Clean Water Act, 33 U.S.C. §§ 1251-

1387 and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f, regarding a specific project in a known location. Not one of the plaintiffs claimed to have visited the particular project area and not one testified about plans to visit the specific project area in the future. *Id.* at 1082. In such circumstances, this Court found that "under *Lujan* and *Wilderness Society", Inc. v. Rey,* 622 F.3d 1251 (9th Cir. 2010), the plaintiffs "have not demonstrated the requisite injury in fact necessary to confer standing . . . ." *Id*. The plaintiffs in that case argued that the environmental harm of the project could extend beyond the project area and that, therefore, proof of visiting Alaska generally was sufficient to confer standing. This Court rejected that notion, stating the plaintiffs had "cited no authority for the proposition that an environmental plaintiff's standing can be based on connections to the area that could potentially be affected by an agency decision, i.e., in the event of some catastrophe such as an oil spill, as opposed to the area that will with certainty be affected." *Id*. at 1083.

Plaintiffs in this case also have not alleged a "geographically specific" injury. Plaintiffs acknowledge that the area returned to consideration for future leasing is huge – 128 million acres (Compl. ¶ 16). Plaintiffs' alleged connection with this area is similarly broad – they allege that they "visit or otherwise use and enjoy the Atlantic Ocean, . . . the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters . . ." *See, e.g.,* Compl. ¶¶ 5-15. In short, they do not identify any particular area within that 128 million acres that they use or enjoy that will be the subject of exploration or development activities as a result of the challenged Executive Order – such areas have not yet been authorized for leasing under an approved five-year program, much less included within a lease sale or otherwise subject to exploration or development.[12] As such,

---

[12] There are some leases that were issued before the 2016 withdrawals went into effect and accordingly some development activities may occur in the area subject to Plaintiffs' claims.

they cannot identify the area that could potentially be affected by the complained of action and therefore cannot establish the requisite connection to that area to demonstrate a concrete and particular injury stemming from the complained of action.

### 3. Plaintiffs Do Not Allege a Harm Particular to Them

The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and its laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-574. As early as 1923, the Supreme Court reminded courts that it is not sufficient to show the government's action is not consistent with law – a plaintiff must also show that "he has sustained or is immediately in danger of sustaining some direct injury" as a result of that violation. *Massachusetts v. Mellon*, 262 U.S. 447, 488-89 (1923). Courts since then have not deviated from the principle that such generalized rulings would violate the separation of powers. In 2016 the Supreme Court confirmed these well-established principles. *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016) ("[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'")

In a case with life or death stakes, the Supreme Court emphasized that an allegation of standing premised on the public interest in the legality of government action raises "only the 'generalized interest of all citizens in constitutional governance'" and therefore did not establish standing. *Whitmore*, 495 U.S. at 160 (quoting *Schlesinger v. Reservists Comm. To Stop the War*,

_____

These leases, however, are not a result of the challenged Executive Order and, therefore, cannot serve as the basis for standing. *See Lujan,* 504 U.S. at 560-61.

418 U.S. 208, 217 (1974)). "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.'" *Id*. (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)). The importance of the principles at stake does not justify an exception to the standing requirement: "the requirement of an Art. III 'case or controversy' is not merely a traditional 'rule of practice,' but rather is imposed directly by the Constitution." *Id*. at 161. "It is not for this Court to employ untethered notions of what might be good public policy." *Id.*

Here, by asserting that President Trump exceeded the powers delegated to the President under Section 12(a) of the OCSLA, in violation of the Constitution and the separation of powers doctrine, Plaintiffs raise only "a generally available grievance about government" and the "proper application of the Constitution and its laws" that is not personal and individual to Plaintiffs. *Lujan*, 504 U.S. at 573-574. In other words, any citizen who opposes the Executive Order stands in the same position as the Plaintiffs' members. More is required by Article III in order to prevent the federal courts from becoming immersed in such abstract disagreements. *See Valley Forge Christian Coll.*, 454 U.S. at 486 ("[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy.").

Without demonstrating how that alleged grievance concerning the Constitution and laws is personally harmful to Plaintiffs and without specific exploration or development projects that are likely to occur in areas specifically visited or used or owned by the Plaintiffs, Plaintiffs' generalized claims of injury are "not focused any more on these [Plaintiffs] than [they are] on the remainder of the world's population," *Ctr. for Biological Diversity v. U.S. Dept. of the Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009), and hence Plaintiffs cannot establish particularized injury for standing. *See also WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 83-87 (D.D.C.

2012), *aff'd sub nom. WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013); *Amigos Bravos v. BLM*, 816 F. Supp. 2d 1118, 1126-28 (D.N.M. 2011); *Sierra Club v. U.S. Def. Energy Support Ctr.*, Civ. A. No. 01:11-cv-41, 2011 WL 3321296, at *4-6 (E.D. Va. July 29, 2011).

A straightforward application of these and similar decisions requires the conclusion that Plaintiffs cannot establish Article III standing to challenge the Executive Order. To hold otherwise would have the effect of authorizing environmental groups to proceed with their request to enjoin even the *consideration* of these areas for oil and gas exploration and development, despite the fact that any decision to engage in actual oil and gas leasing or exploration will be the subject of specific, concrete plans reviewable by the courts under the judicial review provisions of OCSLA and the Administrative Procedure Act.

# V. CONCLUSION

This Court should dismiss the Complaint because the Plaintiffs cannot demonstrate standing, their claims are not ripe, and they fail to identify any applicable private right of action or waiver of the United States' sovereign immunity.

Dated: June 30, 2017

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division


_____/s/_____
SARAH D. HIMMELHOCH
MD Bar. No. 199212160064
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0057
sarah.himmelhoch@usdoj.gov

*Attorneys for Defendants*


## Certificate of Service

I hereby certify that on June 30, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

_____/s/_____
Sarah D. Himmelhoch
*Attorney for Defendants*