JEFFREY WOOD
Acting Assistant Attorney General

SARAH D. HIMMELHOCH
(MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101- SLG |
| v. | ) |
| **DONALD J. TRUMP**, et al., | ) |
| Defendants. | ) |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)**

In Executive Order 13,795, the President of the United States sought to “encourage energy exploration and production, including on the Outer Continental Shelf, in order to maintain the Nation's position as a global energy leader and foster energy security and resilience for the benefit of the American people, while ensuring that any such activity is safe and environmentally responsible." 82 Fed. Reg. 2,815 § 2 (May 3, 2017) (Exhibit 1, Document No. 13-1). Plaintiffs target Section 5 of this Executive Order, which modifies prior presidential

memoranda concerning areas of the Outer Continental Shelf withdrawn from leasing. As Federal Defendants explained in their Motion to Dismiss, the President's action here is fully consistent with prior presidential decisions under the statute and a valid exercise of his authority.

Nevertheless, Plaintiffs ask this Court to ignore long-standing constitutional requirements so that they may improperly challenge the President's lawful directive now, rather than waiting to challenge the implementation of this policy in the context of specific agency actions. Nothing in Plaintiffs' opposition brief establishes—(a) any basis for Article III standing to bring this case, (b) any ripe claim, (c) any waiver of sovereign immunity, or (d) any constitutional or statutory right of action, all of which would be required in order for Plaintiffs to be allowed to prosecute their challenge to Executive Order 13,795. For these reasons, and as set forth in the opening brief, the Federal Defendants respectfully move this Court to dismiss Plaintiffs' claims.

## I. PLAINTIFFS LACK STANDING

Plaintiffs rely heavily on the principle that their factual allegations must be accepted as true when deciding a motion to dismiss. But even if a factual allegation is true, it may be legally insufficient, and that is exactly the case here with Plaintiffs' allegations regarding standing. Even taking reasonable inferences in Plaintiffs' favor, they simply have not identified the existence of a specific imminent harm that will personally affect them or their members. Plaintiffs' inability to allege imminence or a connection between their members and the alleged harmful effects are sufficient grounds, alone, to require dismissal of their claims.

### A. Plaintiffs Do Not and Cannot Allege Specific Harms

As even the cases cited by Plaintiffs make clear, "the judicial power conferred by Art. III may not be exercised unless the plaintiff shows 'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Blum v.*

*Yaretsky*, 487 U.S. 991, 1000 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)). The plaintiffs in *Blum* – a case relied upon by Plaintiffs here – challenged the adequacy of the procedural safeguards afforded to Medicaid patients when one of two entities sought to downgrade or upgrade the level of care deemed medically necessary. Critically, only one of the entities had ever changed any patients' status, and only by downgrading those patients. *Id*. at 1000-01.

Although the Supreme Court held that there was standing to challenge the downgrade procedures, the Court also held that the plaintiffs lacked standing to challenge the adequacy of procedural safeguards for *upgrades* because none of the patients had been upgraded or threatened with such an upgrade. *Id.* at 1001. Recognizing that the plaintiffs might "one day confront this eventuality," the Court concluded that "assessing the possibility now would 'tak[e] [the Court] into the area of speculation and conjecture.'" *Id*. In other words, the Court looked for evidence of a harm that was reasonably likely to take place *and* affect the actual parties to the litigation.

And while Plaintiffs are correct that the court found standing in *City of Oakland v. Lynch*, 798 F.3d 1159 (9th Cir. 2015) — a city's challenge to the U.S. Department of Justice's filing of an *in rem* forfeiture action against a privately-owned medical marijuana facility — that decision is inapposite to this case. The *Lynch* court was not faced with a circumstance in which the decision to act was still pending, nor was there any question about where the action would occur. A forfeiture action targeting a specific facility had already been filed, and any discussion of uncertainty relating to injury focused instead on the potential economic consequences of the forfeiture action. *Id.* at 1162.

In contrast to these and the other cases cited in their briefs, Plaintiffs cannot point to any particular government action and describe how that action will cause (or is substantially likely to cause) them imminent or particularized harm because there simply is not enough information to draw that conclusion yet. Here, the specific decisions to authorize exploration, development, or production have not yet been made; and when made, those decisions will require compliance with environmentally protective measures embedded in the context of applicable statutes, regulations, and the Executive Order that each require consideration and minimization of the harms that Plaintiffs allege.

The governing statute sets forth certain steps in order for exploration, development, and production to occur on the OCS:

1. The Department of the Interior prepares a Five-Year Leasing Program containing a five-year schedule of proposed lease sales.
2. Interior then solicits bids and issues leases for particular offshore leasing areas identified in the Five-Year Leasing Program.
3. Interior reviews and determines whether to approve the lessees' more specific exploration plans.
4. Interior and those affected state and local governments review an additional and more detailed development and production plan from the lessee if the lessee decides to move forward with production.

*Center for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 473 (D.C. Cir. 2009) (citing OCSLA, 43 U.S.C. §§ 1344, 1370, 1340(a), and 1351). If Interior determines that the proposed activity will "probably cause serious harm or damage . . . to the marine, coastal or human environments," then the lease sales may be cancelled or the scope reduced, and exploration and development may be disapproved. 43 U.S.C. § 1351(h)(1)(D)(i). Plaintiffs do not, and cannot, allege that any of these steps have been completed. In fact, all that has happened to date is the initiation of the development of a new Five-Year Leasing Program. *See*

www.boem.gov/National-OCS-Program/; *see also* Request for Information and Comments on the Preparation of the 2019-2024 National Outer Continental Shelf Oil and Gas Leasing Program, 82 Fed. Reg. 30,886 (July 3, 2017).

Plaintiffs ignore the fact that the multi-staged process required by OCSLA makes it distinct from the claims addressed in the cases they cite: here, there will be several opportunities to challenge the specific decisions made pursuant to the Executive Order before any exploration, development, or production occurs. Judicial review of the Five-Year Leasing Programs is available, as are reviews of particular lease sales, plan approvals, and seismic survey permits. *See, e.g., Center for Biological Diversity*, 563 F.3d 466. Accordingly, Plaintiffs do not, and cannot, allege the imminence of harm required to establish standing.

Perhaps sensing the extremely attenuated nature of the unspecific threat posed by potential lease sales and any corresponding drilling activity, Plaintiffs focus their opposition on the potential use of seismic surveys, which they allege would harm marine mammals and fish. These activities are authorized by statute independent of the leasing and were not restricted by President Obama's December 20, 2016 decision. *See* 43 U.S.C. § 1340.[1] The seismic survey permits may be applied for and granted without regard to planned leasing, and therefore cannot confer standing for Plaintiffs' OSCLA claims. Moreover, the only operators to apply for seismic survey permits propose to conduct these activities in areas offshore the mid-Atlantic coastal states, far from the area in the Atlantic withdrawn by President Obama. *See, e.g.,*

[1] Seismic surveys fall within the category of "geological and geophysical" exploration. *See* 30 C.F.R. §§ 550.105, 551.1. Such activities may occur either on an area that has been leased under the Five-Year Program, or outside of leased areas. *See id.* If conducted on leased areas, seismic surveys may be conducted either pursuant to a permit or in accordance with 30 C.F.R. § 550. If conducted outside of a leased area, they must be conducted pursuant to a permit issued in accordance with 30 C.F.R. § 551.1.

https://www.data.boem.gov/PDFDocs/Scan/GGPERMITS/2/2762.pdf; 82 Fed. Reg. 26244 (June 6, 2017).

Plaintiffs also attempt to establish the imminence of their alleged harm by alleging that the President and industry have expressed an interest in expediting energy production. In so alleging, Plaintiffs oversimplify the purpose of the Executive Order, which is designed to "encourage energy exploration and production" to maintain the United States' position as a "global energy leader." Exhibit 1, Doc. 13-1. Even accepting that industry has expressed an interest in expediting energy production, such an allegation is legally insufficient to establish the type of imminent and particular harm necessary to establish standing. The expedited process contemplated by each of the cited provisions of Executive Order 13,795 involves specific statutorily required steps. As set forth in more detail in the Federal Defendants' opening brief, the Executive Order modified President Obama's December 20, 2016 decision to withdraw areas of the OCS from oil and gas development and directs the Secretaries of the Interior and Commerce to consider authorizing exploration and development activities in certain previously withdrawn areas of the OCS. Notably, with the exception of the modification of the withdrawal, none of the elements of the Executive Order addresses or changes prior policy decisions. Further, Plaintiffs overlook the requirement in both the governing statute (OCSLA) and the Executive Order that any actions to explore and develop OCS energy resources be conducted "while ensuring that any such activity is safe and environmentally responsible." Exhibit 1, Document 13-1. Without a new five-year leasing program that includes areas for leasing that had been withdrawn previously, the actual leasing of lands available in a lease sale, or a lessee's exploration plan to engage in exploration activities, Plaintiffs cannot allege (much less

demonstrate) whether and how the approved activities will be injurious in any particular manner.

Where, as here, there are legal requirements to reduce any theoretical harms, and there are no actual activities planned or scheduled, there is simply no concrete threat of harm sufficient to support a claim of standing. Accordingly, Plaintiffs do not, and cannot, allege the imminence of harm required to establish standing.

**B. Plaintiffs Cannot Allege Their Members Will Actually Be Affected**

Just as Plaintiffs are required to allege that the harm is imminent, they must also provide legally sufficient allegations to establish that their members will be affected by the harms allegedly caused by the challenged action. *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). Plaintiffs argue that because they allege wide-ranging harm, they can rest on allegations that are extremely broad and vague. Notably, the area affected by the Executive Order is as large as the entire state of Texas — 198 million acres. Plaintiffs do not, and cannot, allege that the potential exploration activities will affect all of this area. Yet, the only allegation that they offer in support of their connection to the affected area is that their members "visit or otherwise use and enjoy the Atlantic Ocean, . . . the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters." Compl. ¶ 5-15.

Even assuming this allegation is true, it is insufficient even under the standard in the standing case upon which they place major reliance, namely, *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009). In that case, the plaintiffs challenged an already promulgated regulation that governed the taking of polar bears in a specified area. The geographic area governed by that rule, while large, was discrete and defined. Accordingly, the

Ninth Circuit had some means of comparing the allegations of harm against a defined geographic area and concluding there was standing.

Even assuming exploration or development activities were to occur, Plaintiffs cannot allege they will be affected because no one yet knows *where* such activities will occur, if they ever do. Plaintiffs' inability to allege where the activity will occur precludes the necessary showing that their members' activities occur in areas in which they allege harm. This flaw is alone sufficient to require dismissal of the Plaintiffs' claims.

## II. PLAINTIFFS CLAIMS ARE NOT RIPE

Plaintiffs' claims are not constitutionally ripe for the same reason that their allegations are legally insufficient to establish standing. *See* Plaintiffs' Brief at 33. Simply put, Plaintiffs can only guess as to what harm they may suffer in the event of future exploration or development of the previously withdrawn lands. It is undisputed that no harm could possibly occur unless and until the Department of the Interior issues a new Five-Year Leasing Program and accepts bids on tracts of land offered under that program, or otherwise permits exploration activities like seismic surveys and exploratory drilling or approves a lessee's plan to proceed with development and production.

In light of this jurisdictional flaw, the Court need not address the issue of prudential ripeness. Nonetheless, prudential ripeness is an independent and adequate basis for dismissing Plaintiffs' claims. Plaintiffs can demonstrate no harm from waiting until the approval of a new Five-Year Leasing Program. Only after such approval may companies apply for permits for exploration activities prior to a lease sale, and only after such applications may companies that ultimately purchase leases proceed with exploration activities, submit an exploration plan or application for a permit for exploratory drilling, and eventually submit an exploration plan and a

development and production plan. By contrast, the passage of time would significantly improve the effectiveness of judicial review, because a court would have the benefit from a fully developed administrative record if and when Plaintiffs challenge a discrete and final agency action implementing the challenged aspects of the Executive Order. Any such agency action, moreover, will include due consideration of environmental issues, as explicitly required by the Executive Order. Exhibit 1, Doc. 13-1. The administrative record would, therefore, provide a robust evidentiary basis on which to assess an agency action pursuant to the applicable statute (e.g., OCSLA), which evidence could include the delicate balance of the needs of our economy, national security, and environment. These important needs demand analysis of a great many facts and alternatives, all of which will be better identified and addressed in a properly constituted lawsuit brought after a final decision on a leasing program, permit, or lessee plan.

Plaintiffs' reliance on *Organized Village of Kake v. U.S. Dep't of Agriculture*, 776 F. Supp. 2d 960 (D. Alaska 2011), *rev'd on other grounds* 746 F.3d 970 (9th Cir. 2014), to counter these conclusions is unavailing. In that case, the plaintiffs challenged the decision to allow timber sales in the Tongass National Forest. This decision is analogous to the Five-Year Leasing Program, not the Executive Order challenged here. In *Organized Village*, the court found no need for further administrative development because the challenged decision was a "final rule that has been published in the Federal Register." *Id.* at 969. This decision supports the Federal Defendants' position here — that the appropriate time for review is *after* a specific decision has been issued, rather than at the broad policy stage. Because the Executive Order is nothing more than a broad policy, Plaintiffs claims are not ripe.

*Kempthorne* likewise supports Federal Defendants' arguments. There, the D.C. Circuit explicitly required the Plaintiffs to allege more than a general environmental concern: as that

court stated, "[s]tanding analysis does not examine whether the environment in general has suffered an injury." 563 F.3d at 480. Rather, a plaintiff must allege an injury that affects it "in a personal and individual way." *Id.* Here, a general policy statement — that the agencies should consider leasing and exploration in an area the size of Texas — has not yet been crystalized by concrete decisions to act. Under these circumstances, the decision in *Kempthorne* would compel a conclusion that the claims are not yet ripe. *See* 563 F. 3d at 481-82.

Finally, while the Plaintiffs rely on the Supreme Court's decision in *National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003), that case further demonstrates that their claims are unripe. The Court in that case found that interpretive decisions were not ripe for review absent a "concrete action" affecting the challengers. The same is true of the Executive Order: the decision to open the areas of the OCS for consideration as part of the national energy plan has no concrete immediate effect on Plaintiffs. Only when that decision is implemented through a lease, plan, or permit will there be a ripe controversy that can be addressed in a properly constituted lawsuit.

## III. PLAINTIFFS LACK AN APPLICABLE WAIVER OF SOVEREIGN IMMUNITY

In their opposition brief, Plaintiffs make no attempt to identify any applicable statutory waiver of sovereign immunity. *See* Plaintiffs' Brief at 6-7. Instead, Plaintiffs mistakenly invoke the ultra vires exception, arguing that "sovereign immunity poses no bar to Plaintiffs' suit" because the President acted in a non-sovereign capacity. Plaintiffs' argument is without merit.

It is well-established that the United States is immune from suit except to the extent Congress unequivocally and expressly waives sovereign immunity. *FDIC v. Meyer*, 510 471 (1994); *United States v. Mitchell*, 445 U.S. 538 (1980). This immunity extends to a public official sued in his or her official capacity. *Meyer*, 510 U.S. at 483-86. The ultra vires doctrine is

a narrow exception that allows a plaintiff to overcome a sovereign immunity claim only upon a showing that the public official (1) lacked statutorily delegated authority; or (2) exceeded the scope of statutorily conferred authority. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949). Under either instance, the public official's action is not considered a sovereign action, but rather a constitutionally impermissible individual action. *Id.* Additionally, a plaintiff's mere allegation of error by the public official in the exercise of authority is not sufficient to survive a claim of sovereign immunity. *Id.* at 698.[2]

In light of this well-established law, Plaintiffs' reliance on *Glines v. Wade*, 586 F.2d 675, 681 (9th Cir. 1978), *rev'd on other grounds sub nom. Brown v. Glines*, 444 U.S. 348 (1980); *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088 (9th Cir. 1994); and *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031-32 (9th Cir. 2013), to support its argument that "sovereign immunity poses no bar to" the present lawsuit is misplaced. All three of these cases relied on an express waiver of sovereign immunity set forth in § 702 of the Administrative Procedure Act (APA), 5 U.S.C. § 702. As explained in our opening brief, Section 702 does not apply because the President is not an "agency" and thus his actions are not reviewable under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Furthermore, to the extent that Plaintiffs are seeking an injunction against the Secretaries of the Interior and Commerce, Plaintiffs' claim is not yet ripe because there has not been any "final agency action" to enjoin.

---

[2] "[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign . . . [and] cannot be enjoined" in the absence of an express waiver of sovereign immunity. *Larson,* 337 U.S. at 698. The Federal Defendants disagree with Plaintiffs' assumption that President Trump acted *ultra vires* in modifying President Obama's OCS memoranda, but we do not ask for a ruling on this question at this early stage because Plaintiffs cannot establish the jurisdiction or waiver of sovereign immunity necessary to properly present the question to this Court.

Likewise, Plaintiffs' ultra vires claim fails because President Trump has authority to modify offshore leasing policy for the OCS. The "crucial question" in determining whether the *Larson* exception to the requirement for a statutory waiver of sovereign immunity applies is "whether the relief sought in the suit nominally addressed to the officer is relief against the sovereign." *Larson,* 337 U.S. at 687. Here, the relief sought is clearly and explicitly is addressed to the President in his official capacity — a declaration of the legality of his actions as President and an injunction prohibiting the agencies from taking purely governmental actions. Accordingly, Plaintiffs are required to identify a waiver of sovereign immunity, and they have failed to do so.

## IV. PLAINTIFFS LACK A PRIVATE RIGHT OF ACTION

The Supreme Court has clearly held that private plaintiffs require a statutory right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Without a specific grant of a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter." *Lonberg v. City of Riverside*, 571 F.3d 846, 848 (9th Cir. 2009) (quoting *Sandoval*, 532 U.S. at 286-87).

Plaintiffs concede that they are not relying upon any statutory right of action to assert their claims. They cite a number of cases in which the courts did not address the requirement for a private right of action. For instance, Plaintiffs argue that the decision in *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), confirms that no private right of action is required for their claims. That case, however, was one in which the State and private parties asserted "a statutory claim" pursuant to the Immigration and Naturalization Act. *Id.* at 766. In other words, the plaintiffs in that case had identified a statutorily granted right of action. Here, the Plaintiffs have done no such thing. There are no criteria in OCSLA by which to adjudicate the Plaintiffs' claims, and no

review is authorized for such a claim. Accordingly, Plaintiffs cannot be asserting a statutory claim as in *Hawaii v. Trump*.

In fact, none of the cases cited by the Plaintiffs addresses the separate requirement to have a private right of action. While the courts in those cases address a wide variety of claims under a number of different statutes, none of the decisions cited squarely addresses the doctrine pronounced by the Supreme Court in *Sandoval*. For this reason, and the reasons set forth in the Federal Defendants' opening brief, Plaintiffs' failure to identify a private cause of action is yet another fatal blow to their claims.

Plaintiffs attempt to distinguish *Sandoval* on the ground that it addressed only the question whether Congress intended to allow private citizens to enforce federal statutes against third parties. Plaintiffs' Brief at 11. That is incorrect: the Supreme Court identified the distinction between the existence of a right and the existence of a cause of action, and concluded that one may exist without the other. *Alexander v. Sandoval,* 532 U.S. at 281-282. It would therefore be a mistake to limit the holding only to cases involving the right to enforce a statute against third parties. When Congress intends to both waive sovereign immunity and create a private write of action, it does so explicitly. For example, the Administrative Procedure Act, 5 U.S.C. § 702, waives sovereign immunity *and* grants a private right of action. If Plaintiffs were correct about the limited nature of the *Sandoval* holding, the provision of a private right of action would be surplusage because the simple waiver of sovereign immunity would be sufficient. Even if Plaintiffs had invoked the private right of action conferred by the Administrative Procedure Act here, their claims would still fail because judicial review under that statute is available only with respect to a final "agency action." 5 U.S.C. §§ 551, 702, 704. The President is not an "agency"

within the meaning of the Act, and thus his actions are not reviewable under that statute. *Franklin*, 505 U.S. at 800-01.

## V. PLAINTIFFS SEEK AN IMPROPER DECLARATORY JUDGMENT

Plaintiffs do not attempt to deny the "longstanding legal authority that the judiciary lacks the power to issue an injunction or a declaratory judgment against the co-equal branches of government — the President and the Congress." *Newdow v. Bush*, 355 F. Supp. 2d 265, 280-82 (D.D.C. 2005) (collecting cases and declining to carve an exception to Presidential immunity "where [the President] is claimed to have violated the Constitution"). Plaintiffs instead point to the decision in *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), as authority that declaratory relief is available against the President when addressing the alleged failure to perform a ministerial duty. *See Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (referring to the *National Treasury* case as one resolving the question of whether a court can issue mandamus the President to perform a ministerial duty.) While it is true that the court did grant declaratory relief in *National Treasury*, the parties in that case had not raised the constitutional issue decided in *Newdow*. Nothing in Plaintiffs' arguments changes the fundamental conclusion of *Newdow* that there is no "exception . . . to the immunity of the President from injunctive relief for instances where he is claimed to have violated the Constitution." 355 F. Supp. 2d at 282. Accordingly, Plaintiffs have failed to state a claim upon which relief can be granted.

## VI. CONCLUSION

Challenges to governmental decisions are justiciable only when they meet the requirements of Article III. Plaintiffs' inability to demonstrate that any particular member of their associations will be (or is even substantially likely to be) affected by any particular action

taken pursuant to this Executive Order is fatal to their effort to invoke this Court's jurisdiction. Three more fatal flaws — no waiver of sovereign immunity, no private right of action, and improper relief against the President — also require the dismissal of their claims for lack of jurisdiction and failure to state a claim.

Dated: October 2, 2017

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ Sarah D. Himmelhoch

SARAH D. HIMMELHOCH
MD Bar. No. 199212160064
Senior Litigation Counsel
JAMES D. GETTE
Principal Deputy Chief
GUILLERMO MONTERO
Assistant Chief
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0057
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

**Certificate of Service**

I hereby certify that on October 2, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

/s/
Sarah D. Himmelhoch
*Attorney for Federal Defendants*