James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American Petroleum Institute*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS, *et al.*, <br><br>             *Plaintiffs*, <br><br>     v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>             *Defendants*. | No. 3:17-cv-00101 (SLG) |

## REPLY IN SUPPORT OF INTERVENOR-DEFENDANT AMERICAN PETROLEUM INSTITUTE'S MOTION TO DISMISS

DC: 6528898-5

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 1 of 32

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.      OCSLA'S EXCLUSIVE JURISDICTION PROVISION APPLIES TO
        PLAINTIFFS' CLAIMED VIOLATIONS OF SECTION 1341(a). ................................. 3

II.     WELL-ESTABLISHED PRINCIPLES OF EXCLUSIVE JURISDICTION AND
        STATUTORY CONSTRUCTION CONFIRM THE D.C. CIRCUIT'S
        EXCLUSIVE JURISDICTION OVER PLAINTIFFS' CLAIMS .................................... 7

        A.      Section 1349(c)(1)'s Exclusive Jurisdiction Provision Applies Broadly To
                Actions, Like Executive Order 13795, That Are Interrelated With The
                Five-Year Leasing Program. ........................................................................ 7

        B.      OCSLA's Language, Purpose, And History Confirm That Plaintiffs'
                Claims Are Subject To The D.C. Circuit's Exclusive Jurisdiction Pursuant
                To Section 1341(a). ................................................................................... 13

CONCLUSION ................................................................................................................. 24

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG     Document 39     Filed 10/02/17     Page 2 of 32

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States,*
  134 S. Ct. 2259 (2014) ........................................................................................................ 14

*Alaska v. Kerry,*
  972 F. Supp. 2d 1111 (D. Alaska 2013) ............................................................................. 17

*Am. Bird Conservancy v. FCC,*
  545 F.3d 1190 (9th Cir. 2008) ............................................................................................ 11

*Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n,*
  796 F.3d 18 (D.C. Cir. 2015) .............................................................................................. 14

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ............................................................................................................... 22

*Banks v. Warner,*
  No. 94-56732, 1995 WL 465773 (9th Cir. Aug. 7, 1995) ................................................... 6

*Cal. Energy Comm'n v. Dep't of Energy,*
  585 F.3d 1143 (9th Cir. 2009) ............................................................................. 8, 10, 11, 12

*California Save Our Streams Council, Inc. v. Yeutter,*
  887 F.2d 908 (9th Cir. 1989) ................................................................................... 8, 9, 10, 11

*Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.,*
  844 F.3d 1133 (9th Cir. 2017) ......................................................................................... 14, 15

*Coleman v. Dretke,*
  409 F.3d 665 (5th Cir. 2005) ................................................................................................. 6

*Communities Against Runway Expansion, Inc. v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ............................................................................................. 12

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) .............................................................................................................. 22

*Ctr. for Sustainable Economy v. Jewell,*
  779 F.3d 588 (D.C. Cir. 2015) ......................................................................................... 1, 10

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ........................................................................................................... 3, 23

*EEOC v. Peabody Western Coal Co.,*
  773 F.3d 977 (9th Cir. 2014) ............................................................................................... 17

*FCC v. ITT World Commc'n, Inc.,*
  466 U.S. 463 (1984) .............................................................................................................. 12

*Fiallo v. Bell,*
  430 U.S. 787 (1977) .............................................................................................................. 22

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 3 of 32

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................................. 22

*Haig v. Agee,*
  453 U.S. 280 (1981) ............................................................................................ 15, 16

*Hawaii v. Trump,*
  859 F.3d 741 (9th Cir. 2017) ................................................................................... 22

*Idaho Rivers United v. Foss,*
  373 F. Supp. 2d 1158 (D. Idaho 2005) ................................................................... 11

*In re DBSI, Inc.,*
  — F.3d —, 2017 WL 3760847 (9th Cir. Aug. 31, 2017) ......................................... 14

*Int'l Refugee Assistance Project v. Trump,*
  857 F.3d 554 (4th Cir. 2017) ................................................................................... 22

*K Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988) ................................................................................................. 14

*Marbury v. Madison,*
  1 Cranch 137 (1803) ................................................................................................ 17

*McCulluch v. Maryland,*
  4 Wheat. 316 (1819) ................................................................................................ 17

*Media Access Project v. FCC,*
  883 F.2d 1063 (D.C. Cir. 1989) ........................................................................... 8, 12

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
  526 U.S. 172 (1999) ................................................................................................. 22

*N. Slope Borough v. Andrus,*
  642 F.2d 589 (D.C. Cir. 1980) ................................................................................... 4

*Nat'l Parks & Conserv. Ass'n v. FAA,*
  998 F.2d 1523 (10th Cir. 1993) ............................................................................... 11

*New Process Steel, L.P. v. NLRB,*
  560 U.S. 674 (2010) ................................................................................................. 15

*NLRB v. Noel Canning,*
  134 S. Ct. 2550 (2014) ....................................................................................... 17, 24

*Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Res. & Special Programs Admin.,*
  457 F.3d 956 (9th Cir. 2006) ............................................................................... 8, 12

*Presidio Hist. Ass'n v. Presidio Trust,*
  811 F.3d 1154 (9th Cir. 2016) ................................................................................. 14

*Saxbe v. Bustos,*
  419 U.S. 65 (1974) ................................................................................................... 16

*Sw. Ctr. for Biological Diversity v. FERC,*
  967 F. Supp. 1166 (D. Ariz. 1997) .......................................................................... 11

iii

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 4 of 32

*Trustees for Alaska v. U.S. Dep't of Interior*,
    919 F.2d 119 (9th Cir. 1990) ................................................................. 5

*United States v. Amirnazmi*,
    645 F.3d 564 (3rd Cir. 2011) ............................................................... 16

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ..................................................... 16, 17, 18, 22

*Village of False Pass v. Clark*,
    733 F.2d 605 (9th Cir. 1984) ................................................................. 4

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ....................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................... 3, 22, 23

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State*,
    725 F.3d 197 (D.C. Cir. 2013) .......................................................... 23

## **Statutes**

28 U.S.C. § 2071(a) ....................................................................................... 13

29 U.S.C. § 160(f) .......................................................................................... 24

43 U.S.C. 1332(3) .......................................................................................... 15

43 U.S.C. § 1340(a)(1) ..................................................................................... 5

43 U.S.C. § 1341(a) ................................................................................. passim

43 U.S.C. § 1344(a) ....................................................................................... 10

43 U.S.C. § 1344(d) ....................................................................................... 10

43 U.S.C. § 1349(a)(6) ................................................................................. 4, 8

43 U.S.C. § 1349(b) ..................................................................................... 4, 5

43 U.S.C. § 1349(c)(1) ............................................................................ passim

43 U.S.C. § 1802(1) ....................................................................................... 15

8 U.S.C. § 1329 ............................................................................................. 22

Pub. L. No. 105-83, 111 Stat. 1543 (Nov. 14, 1997) .................................... 19

Pub. L. No. 109-54, 119 Stat. 499 (Aug. 2, 2005) ....................................... 20

## **Other Authorities**

Const., Art. I § 1 ........................................................................................... 17

Const., Art. III § 1 ......................................................................................... 14

Const., Art. IV § 3 ......................................................................................... 17

H.R. Rep. No. 413, 83rd Cong., 1st Sess. 2 (1953) ...................................... 15

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 5 of 32

**Rules**

Fed. R. Evid. 201(c)..................................................................................................... 6

**Regulations**

30 C.F.R. § 551.2...................................................................................................... 5

v

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 6 of 32

# INTRODUCTION

The American Petroleum Institute ("API") submits this reply memorandum in support of its Motion to Dismiss Plaintiffs' claims challenging Executive Order 13795's re-opening of certain previously withdrawn sections of the Arctic and Atlantic Outer Continental Shelf ("OCS") for potential future disposition for oil and gas leasing. *See* API Mot. to Dismiss (Dkt. No. 25).

API's motion incorporated the grounds for dismissal set forth in the Federal Defendants' motion to dismiss, which demonstrated that Plaintiffs do not state a cognizable claim for relief, and that their claims are not justiciable. *See id*. at 2; Defs.' Mem. (Dkt. No. 13) at 11–25. API also identified an additional ground for dismissal: that this Court lacks jurisdiction, because the first time Plaintiffs' claims even arguably could be ripe for resolution, judicial review would not be available in this Court, due to the Outer Continental Shelf Lands Act's ("OCSLA") provision placing exclusive jurisdiction over OCS leasing programs in the D.C. Circuit. *See* 43 U.S.C. § 1349(c)(1).

Plaintiffs' opposition falls well short of showing that their claims do not raise the type of challenge—whether specific areas of the OCS can or should be made available for leasing—that Congress has exclusively consigned to the D.C. Circuit's review of leasing programs, where "[t]he key national decisions as to the size, timing, and location of OCS leasing . . . are made." *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015). Their efforts to separate withdrawal decisions from leasing program decisions is entirely unavailing: Governing case law makes clear that where, as here, Congress has assigned to a court of appeals jurisdiction to resolve a specified matter, that court *also* has the *sole* jurisdiction to resolve precedent decisions that are intertwined with that specified matter, *even if* those precedent decisions are

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

made by an entirely different federal entity. That principle applies on all fours to the instant dispute.

In an effort to sidestep the jurisdictional and justiciability flaws demonstrated by API and the Federal Defendants, Plaintiffs mischaracterize their claims as purely constitutional. Plaintiffs ignore that their alleged constitutional claim that Executive Order 13795 exceeds the President's delegated statutory authority necessarily depends, in the first instance, upon the proper interpretation of the statutory provision, 43 U.S.C. § 1341(a), authorizing the President to withdraw unleased lands on the OCS from disposition for oil and gas leasing. Plaintiffs' contention that the Executive Order is *ultra vires* of Section 1341(a), *see* Pls.' Opp. (Dkt. No. 36) at 1–2, simply begs the question of the scope of Section 1341(a)'s delegation to the President. Accepting Plaintiffs' contrary theory that only a constitutional claim is alleged where, as here, a party challenges executive action as exceeding the executive's delegated authority—according to the party's reading of the statutory delegation—would transform a vast array of statutory challenges into constitutional claims.

Because the Plaintiffs ultimately allege a violation, or seek to enforce their reading, of Section 1341(a), OCSLA's jurisdictional provisions govern Plaintiffs' claims. Plaintiffs' insistence that they must be afforded jurisdiction in this court independent of any "statutory authorization," Pls.' Opp. at 2, ignores the legal principles governing the breadth of provisions— like those in OCSLA—establishing exclusive jurisdiction in the courts of appeals, as well as the language, purpose, and history of OCSLA. As detailed below, those well-settled authorities confirm that Plaintiffs' suit belongs exclusively to the D.C. Circuit, and this Court should therefore dismiss the Complaint.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG     Document 39     Filed 10/02/17     Page 8 of 32

**ARGUMENT**

I.  **OCSLA'S EXCLUSIVE JURISDICTION PROVISION APPLIES TO PLAINTIFFS' CLAIMED VIOLATIONS OF SECTION 1341(a).**

The President's power to take a given action "must stem either from an act of Congress or from the Constitution itself." *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Executive Order 13795 revised orders issued by President Obama on December 20, 2016 and January 27, 2015 withdrawing certain areas of the OCS in the Arctic Ocean and the Atlantic Ocean from potential disposition for oil and gas leasing "for a time period without specific expiration" based upon the authority delegated to the President under Section 1341(a). Defs.' Mem, Exh. 1, § 5. *See also id.*, Exhs. 15, 17, 18. Plaintiffs contend that Section 1341(a) "authorizes the President to withdraw unleased lands," but "[i]t does not authorize the President to re-open withdrawn areas to disposition." Compl. (Dkt. No. 1), ¶ 58. *See also id.*, ¶ 64. For this reason, in their view, the Executive Order exceeds the President's statutory authority under Section 1341(a) and is therefore *ultra vires*. *See id.* ¶¶ 58–60, 64–65.

Although they characterize their claims as alleging constitutional violations, Plaintiffs' claims hinge upon the scope of authority delegated to the President under Section 1341(a), with their claims predicated on Plaintiffs' narrow reading of the statutory language to permit the President only to withdraw unleased lands, and not subsequently to revise the withdrawal (although as discussed *infra*, such revisions long predate Executive Order 13795).[1] But Plaintiffs' alleged constitutional questions are a mirror of their statutory claims—only if the

---

[1] Plaintiffs' implicitly concede that statutory interpretation underlies their claims by acknowledging that Congress controls public lands "except **to the degree** it explicitly delegates that authority to the executive branch." Pls. Opp. at 1 (emphasis added).

3

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 9 of 32

scope of the Section 1341(a) delegation fails to cover Executive Order 13795 could it be *ultra*

*vires* and a violation of the federal separation of powers.  At bottom, therefore, Plaintiffs' suit

turns on a question of statutory interpretation—the scope of the delegation conferred by Section

1341(a)—and seeks to enforce, or to end the alleged violation of, their reading of Section

1341(a).

Because OCSLA defines the procedures and courts of jurisdiction for "***all suits***

challenging actions or decisions ***allegedly in violation of, or seeking enforcement of, the***

***provisions*** of" OCSLA.  43 U.S.C. § 1349(a)(6) (emphases added),[2] Plaintiffs must demonstrate

a basis for this Court's review within the OCSLA's jurisdictional provisions.  It is therefore to

those provisions that the Court must turn to determine whether it, or another Court, has

jurisdiction to resolve Plaintiffs' claims.

Plaintiffs do not dispute that their claims do ***not*** fall within OCSLA's provisions

delimiting district court jurisdiction to:

> cases and controversies arising out of, or in connection with (A) any ***operation***
> conducted on the [OCS] which involves exploration, development, or production
> of the minerals, of the subsoil and seabed of the [OCS], or which involves rights
> to such minerals, or (B) the cancellation, suspension, or termination of a ***lease*** or
> permit . . . .

43 U.S.C. § 1349(b)(1) (emphases added).  *See also* API Mot. to Dismiss at 12 & n.18

(explaining that "no covered OCS leases or exploration, development, or production operations

---

[2] Plaintiffs' attempt to distinguish *Village of False Pass v. Clark*, 733 F.2d 605, 608–09 (9th Cir. 1984), *see* Pls.' Opp. at 15, is unavailing.  That decision confirms the unremarkable proposition that federal courts reviewing actions taken pursuant to OCSLA apply legal obligations based on the staged structure dictated by Congress—with the scope of review varying depending upon the stage of development.  *See* API Mot. at 8.  *See also N. Slope Borough v. Andrus*, 642 F.2d 589, 598 (D.C. Cir. 1980).

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 10 of 32

or permits may occur until later stages of the OCS development process"); *Trustees for Alaska v. U.S. Dep't of Interior*, 919 F.2d 119, 121 (9th Cir. 1990).

The closest that Plaintiffs come to alleging district court jurisdiction pursuant to 43 U.S.C. § 1349(b) is their claim of purported injury from the issuance of permits for seismic surveys in the areas opened to potential future leasing by Executive Order 13795. *See* Pls.' Opp. at 1 (alleging that Executive Order "threatens imminent injury, including from seismic activity"). But that allegation falls short of establishing district court jurisdiction for the alleged violations of Section 1341(a). Because Section 1341(a) only provides presidential authority over "***disposition*** . . . of the unleased lands of the [OCS]," 43 U.S.C. § 1341(a) (emphasis added), a presidential withdrawal decision—like Executive Order 13795 or the withdrawals previously issued by President Obama—does not apply to applications to conduct seismic surveys, which may be conducted independent of any leasing. *See* 43 U.S.C. § 1340(a)(1) ("[A]ny person authorized by the Secretary may conduct geological and geophysical explorations in the [OCS], which do not interfere with or endanger actual operations under any lease . . ., and which are not unduly harmful to aquatic life in such area."); 30 C.F.R. § 551.2. Indeed, the withdrawals speak only in terms of "withdraw[al] from disposition by leasing." Defs.' Mem., Exhs. 15, 17, 18.

For example, several applications for permits to conduct seismic surveys in the Atlantic Ocean were pending before BOEM at the time of President Obama's withdrawal decisions. *See* Defs.' Mem, Exhs. 15, 17; Exhibits A–G (attached hereto and available at BOEM, *Currently Submitted Atlantic OCS Region Permits*, https://www.boem.gov/Currently-submitted-Atlantic-OCS-Region-Permits/ (last visited Sept. 29, 2017)). As Plaintiffs have noted, less than two weeks before leaving office, former BOEM Director Abigail Ross Hopper "directed her agency to deny all pending applications to conduct seismic airgun surveys in the Mid-Atlantic and South

5

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 11 of 32

Atlantic Planning Areas." Compl. ¶ 42. In issuing this directive, however, Director Hopper relied on "*the Secretary's decision* to remove the Atlantic planning areas from any leasing in the *2017–2022 Five Year Program*," *see* Exhibit A at 17 (emphases added); *see also id.* at 19, and made no mention of President Obama's withdrawal decisions.[3]

The only remaining source of jurisdiction for claims, like Plaintiffs', alleging violations of an OCSLA provision is 43 U.S.C. § 1349(c). Section 1349(c)(1) provides that "[a]ny action of the Secretary to approve a [five-year] leasing program . . . shall be subject to judicial review only in the United States Court of Appeal for the District of Columbia," and Section 1349(c)(2) provides that "[a]ny action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located." As API explained in its Motion to Dismiss, the former provision vests exclusive jurisdiction over this action in the D.C. Circuit because "Plaintiffs raise the type of challenge—whether areas of the OCS should be made available for leasing—that Congress has exclusively consigned to the D.C. Circuit's review of a five-year leasing program." API Mot. to Dismiss at 12–16.

Plaintiffs' attempts to escape Congress' express dictate for jurisdiction over such actions in the D.C. Circuit founder on the law governing provisions for exclusive appellate jurisdiction in general, and the language, purpose, and history of OCSLA in particular.

---

[3] This Court may take judicial notice of government records and materials obtained from, and available on, government websites. *See*, *e.g.*, Fed. R. Evid. 201(c); *Banks v. Warner*, No. 94-56732, 1995 WL 465773, at *1 (9th Cir. Aug. 7, 1995) ("It is entirely proper for a court to take judicial notice of records and reports of administrative agencies."); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) ("fail[ing] to see any merit to an objection to the [Fifth Circuit] panel taking judicial notice of the state agency's own website").

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 12 of 32

## II. WELL-ESTABLISHED PRINCIPLES OF EXCLUSIVE JURISDICTION AND STATUTORY CONSTRUCTION CONFIRM THE D.C. CIRCUIT'S EXCLUSIVE JURISDICTION OVER PLAINTIFFS' CLAIMS.

Plaintiffs argue that OCSLA's exclusive appellate jurisdiction provision does not apply to this case on the grounds that (1) "[t]his case . . . is a challenge to a different decision" from the issuance of a five-year leasing program, "one outside of and prior to the four stages" of OCS development, Pls.' Opp. at 13, and (2) "the President . . . acted *ultra vires* of his authority" in Section 1341(a), *id.* at 15. These arguments, however, simply beg the question as to the scope of Section 1349(c)'s exclusive jurisdiction provision, and of the President's withdrawal authority pursuant to Section 1341(a). As detailed below, well-settled principles of jurisdiction and statutory construction answer those questions against Plaintiffs' invocation of this Court's jurisdiction.

### A. Section 1349(c)(1)'s Exclusive Jurisdiction Provision Applies Broadly To Actions, Like Executive Order 13795, That Are Interrelated With The Five-Year Leasing Program.

Plaintiffs principally allege that OCSLA's exclusive jurisdiction provision is not applicable to their claims because they challenge Executive Order 13795's modification of prior withdrawals under Section 1341(a), not the subsequent five-year leasing program that initiates OCSLA's four-stage structure for OCS development. *See* Pls' Br. at 12–13. But governing case law emphatically rejects Plaintiffs' reading of a statute like OCSLA in which Congress has assigned jurisdiction, especially when jurisdiction has been to a court of appeals. That governing case law makes clear that ***when Congress has assigned to a court of appeals jurisdiction to resolve a specified matter, that court also has sole jurisdiction to resolve precedent decisions that are intertwined with that specified matter, even if that decision is made by an entirely different federal agency.*** In short, the courts rejected efforts such as Plaintiffs', which "[i]n

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 13 of 32

essence . . . seek, through careful pleading[] to avoid the strict jurisdictional limits imposed by Congress." *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989).

**First,** the courts have made clear that "specific jurisdictional provisions," like those in OCSLA, "which expressly govern review of disputes," *id.*, concerning alleged violations of the statute, *see* 43 U.S.C. §§ 1349(a)(6), (c)(1), "control over the general and widely applicable procedures" upon which Plaintiffs rely. *Yeutter*, 887 F.2d at 912. "[W]here a federal statute provides for direct review of an agency action in the court of appeals, such specific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." *Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Res. & Special Programs Admin.*, 457 F.3d 956, 959 (9th Cir. 2006) (quotation omitted); *see also Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C. Cir. 1989) ("The courts uniformly hold that statutory review in the agency's specially designated forum prevails over general federal question jurisdiction in the district courts.").

**Second,** the courts refuse to allow a plaintiff to cast its claim as one relating only to a specific limited decision, when that decision is ultimately intertwined with subsequent decisions as to which Congress has designated a specific jurisdiction for dispute resolution. Where, as here, a "statute[] authoriz[es] review of specified agency actions," *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1148 (9th Cir. 2009) (quotation omitted), it is well settled that interrelated actions are all reviewable in the court of appeals. This includes predicate actions taken by an entity not otherwise covered by the statute giving rise to exclusive jurisdiction in the court of appeals, and whose actions would otherwise be cognizable in district court.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 14 of 32

*Yeutter* is a leading example. That case involved an application to FERC for a license to operate a hydroelectric power facility under the Federal Power Act ("FPA"). *See Yeutter*, 887 F.2d at 909–10. That statute required FERC, as part of reviewing the license application, to obtain a letter opinion from the Forest Service with conditions for protection of the land on which the licensed operation would occur. *See id*. at 910.

Unhappy with the Forest Service's actions, the Plaintiffs sued that agency in district court, pursuant to general district court jurisdiction. But the FPA expressly "provides ***exclusive*** jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders." *Id*. at 911 (emphasis original). To avoid this jurisdictional provision and support district court jurisdiction, the plaintiffs argued—similar to Plaintiffs' argument here—that they were not challenging FERC's licensing action pursuant to the statute (the FPA) with an exclusive appellate jurisdiction provision, but rather challenged the Forest's Service's letter under the National Environmental Policy Act ("NEPA") and the American Indian Religious Freedom Act ("AIRFA"). *See id*. at 911 (arguing that FPA did not apply to alleged claims).

The Ninth Circuit held that the plaintiffs could not bring suit in the district court through such "careful pleading." *Id*. Instead, the FPA's exclusive jurisdiction provision applied to Plaintiff's NEPA and AIRFA challenges to the Forest Service's letter because (1) "the specific jurisdictional provisions of the FPA which expressly govern review of disputes concerning licensing of hydroelectric projects control over the general and widely applicable procedure that regulate NEPA [and] AIRFA," and (2) the Forest Service's letter would "have no significance outside the licensing process" of the FPA. *Id*. at 911–12. *See also id*. at 912 ("[W]e do not believe that the jurisdictional remedy prescribed by Congress [in the FPA] hangs on the ingenuity of the complaint.").

9

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 15 of 32

Precisely the same reasoning applies here. While Plaintiffs "seek to characterize," *id*. at 912, their challenge as an attack only upon a withdrawal determination independently made by the President, *see* Pls.' Opp. at 13 ("This case . . . is a challenge to a different decision, one outside of and prior to the four stages" of OCS development), "it is clear that the suit is [in fact] an attempt to restrain" OCS leasing in the affected areas of the Atlantic and Arctic OCS. *Yeutter*, 887 F.2d at 912. Indeed, President Obama's withdrawals are explicitly written as a "Memorandum For The Secretary Of The Interior," *see* Defs.' Mem., Exhs. 15, 17, 18, given that it is the Secretary whose five-year leasing program determines and defines when, where, and whether leasing may occur, *see* 43 U.S.C. § 1344(a); *Ctr. for Sustainable Economy*, 779 F.3d at 595 ("The key national decisions as to the size, timing, and location of OCS leasing . . . are made at this first stage."); 43 U.S.C. § 1344(d) ("[N]o lease shall be issued unless it is for an area included in the approved leasing program . . . .").

Similarly, Executive Order 13795's withdrawal provision, as well as prior presidential withdrawal statements, apply only to "disposition" of OCS lands "by leasing." Defs.' Mem., Exh. 1, § 5. *See also id*., Exhs. 9–16 (prior withdrawal statements). Moreover, like prior presidential withdrawal statements, Executive Order 13795 is directed to the Secretary of the Interior, who prepares the five-year leasing program. *See* Defs.' Mem., Exh. 1, §§ 3, 5 (directing Secretary of the Interior to "give full consideration to revising the schedule of proposed oil and gas lease sales" in the five-year program to include areas re-opened to leasing); *id*., Exhs. 8–15 (directives to Secretary of the Interior).

Thus, in both practice and effect, the Executive Order—like its predecessors under former Presidents—is "closely intertwined with" the five-year leasing program, *Cal. Energy Comm'n*, 585 F.3d at 1148, which OCSLA assigns exclusively to the D.C. Circuit for review.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

*See* 43 U.S.C. § 1349(c)(1). The President's withdrawal decision has "no significance outside" its impact on the Secretary's preparation and issuance of a five-year leasing program. *Yeutter*, 887 F.2d at 912. "Ultimately, [Plaintiffs] object to the" Executive Order "only because," *id.*, it permits the Secretary of the Interior to include the affected areas in a five-year leasing program and, as a consequence, thereafter offer parcels for lease in the affected areas.

For these reasons, Plaintiffs' claims can only be heard in the D.C. Circuit, just as the Ninth Circuit in *Yeutter* held that NEPA and related claims against the Forest Service could only be heard in the court of appeals. Similarly, in *Nat'l Parks & Conserv. Ass'n v. FAA*, 998 F.2d 1523, 1529 (10th Cir. 1993), a BLM decision regarding land uses, normally reviewable in district court, was held instead to be properly reviewable only in the court of appeals based on a provision of the Federal Aviation Administration ("FAA") Act applicable to the review of FAA decisions, because the BLM decision was precedent to, and "would be meaningless" without, a subsequent FAA decision subject to exclusive jurisdiction provision. *See also Cal. Energy Comm'n*, 585 F.3d at 1148 (explaining that statutory review provision "should be construed to allow review of agency actions which are functionally similar or tantamount to those specified actions" (internal quotations and citation omitted)); *Sw. Ctr. for Biological Diversity v. FERC*, 967 F. Supp. 1166, 1173–75 (D. Ariz. 1997) (applying *Yeutter* and dismissing Endangered Species Act claim against U.S. Forest Service, given relation between the Service's action and those of the Federal Energy Regulatory Commission made reviewable exclusively in the court of appeals under the Federal Power Act); *Idaho Rivers United v. Foss*, 373 F. Supp. 2d 1158, 1160–61 (D. Idaho 2005) (same); *Am. Bird Conservancy v. FCC*, 545 F.3d 1190, 1192–94 (9th Cir. 2008) (ESA claims relating to licenses for communications towers must be brought in court

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 17 of 32

of appeals pursuant to Federal Communications Act, not in district court pursuant to ESA jurisdiction provisions).

All of these precedents dictate D.C. Circuit jurisdiction, and "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals," that doubt must be resolved "in favor of review by a court of appeals." *Nuclear Info. & Res. Serv.*, 457 F.3d at 960 (internal quotations and citation omitted).

For all these reasons, it is simply irrelevant that Executive Order 13795's challenged withdrawal decision was not made by the Secretary of the Interior. *See* Pls.' Opp. at 13–14. Because it is a determination directly "pertaining to" the five-year leasing program that Congress specifically assigned to D.C. Circuit review, Plaintiffs' challenge must likewise be filed in that court. *Media Access Project*, 883 F.2d at 1068 (quotation omitted).[4] Neither Plaintiffs' assertion of a basis for jurisdiction in addition to OCSLA, *see* Pls.' Opp. at 7–12, nor their claim that Executive Order 13795's withdrawal provision is *ultra vires*, *id*. at 15, change the result. *See FCC v. ITT World Commc'n, Inc.*, 466 U.S. 463, 468 (1984) (illustrating that plaintiff cannot evade exclusive jurisdiction requirement by filing a district court action challenging agency action as *ultra vires*); *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684 (D.C. Cir. 2004) ("When an agency decision has two distinct bases, one of which provides for

---

[4] "Considerations of practicality and consistency with the congressional scheme also militate in favor of review by the court of appeals." *Cal. Energy Comm'n*, 585 F.3d at 1148. On the former, this case presents "a full record" for review and "[n]o further factfinding is necessary," *id*. at 1149, to determine the extent of the President's authority under Section 1341(a). On the latter, Congress specifically provided for executive decisions as to the timing and location of any disposition of lands for leasing—the five-year leasing program—to be decided in the D.C. Circuit, *see* 43 U.S.C. § 1349(c)(1), and it would frustrate that purpose to permit district court jurisdiction over a related executive action precedent to the five-year leasing program.

12

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 18 of 32

exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court." (internal quotations and citation omitted)).

   **B.    OCSLA's Language, Purpose, And History Confirm That Plaintiffs' Claims Are Subject To The D.C. Circuit's Exclusive Jurisdiction Pursuant To Section 1341(a).**

   Section 1341(a) further confirms that Plaintiffs' claims of *ultra vires* action cannot overcome the D.C. Circuit's exclusive jurisdiction.  In effect, Plaintiffs' contend that Section 1341(a) delegates to the President only the authority to "permanent[ly]" withdraw lands from disposition by leasing, and no power to modify or otherwise revise such withdrawals.  *See* Pls.' Opp. at 1–2.[5]  Those contentions beg the question of statutory interpretation presented by this case.  Instead, OCSLA's language, purpose, and history support Executive Order 13795 and belie Plaintiffs' attempt to (mis)characterize their statutory interpretation as a constitutional claim.

   OCSLA provides that the President "***may, from time to time***, withdraw from disposition any of the unleased lands of the [OCS]."  43 U.S.C. 1341(a) (emphasis added).  That discretionary formulation often carries with it a power to revise action previously taken under the delegated authority.  For example, 28 U.S.C. § 2071(a) provides that the Supreme Court and the

---

[5] To the extent Plaintiffs intend to draw a distinction between, on the one hand, modification of a Section 1341(a) withdrawal prior to the date on which the withdrawal is set to expire, and, on the other hand, modification of a withdrawal with a period of no "specific expiration," *see*, *e.g.*, Defs.' Mem., Exh. 14; *compare* Pls.' Opp. at 4 ("[N]o president has attempted to reverse a permanent withdrawal.") *with infra* pp. 18–21 (describing past presidential withdrawal decisions), that distinction is illusory and without any foundation in law or reason.  Plaintiffs' construction is also contradicted by their assertion that Section 1341(a) provides only a limited delegation to the President.  *See* Pls. Opp. at 3.  Reading Section 1341(a) to render withdrawals permanent would allow a president to withdraw permanently all unleased lands in contravention of congressional policy to make the OCS available for leasing and expeditious development.  *See supra*.  This Court can hardly assume that Congress delegated to presidents the authority to negate the purpose of the statute.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

lower federal courts "may from time to time prescribe rules for the conduct of their business," and the Constitution provides that Congress "may from time to time ordain and establish" lower federal courts. Const., Art. III § 1. It is beyond cavil that such formulations permit the courts and Congress to revise or modify rules or courts once initially established.

Moreover, a reviewing court "must look not only to the 'particular statutory language at issue' but also to 'the language and design of the statute as a whole.'" *In re DBSI, Inc.*, — F.3d —, 2017 WL 3760847, at *4 (9th Cir. Aug. 31, 2017) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). In short, "[s]tatutory construction is a holistic endeavor, that relies on context to be a preliminary determinant of meaning," *id.* (internal quotations and citation omitted), including "the 'structure, history, and purpose' of the statute,'" *Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, 1138 (9th Cir. 2017) (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)). *See also*, *e.g.*, *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1167 (9th Cir. 2016) (favoring reading of statutory term that "ties the statutory requirements together in a manner consistent with the statute's language and purpose"); *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015) ("After all, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which the language is used, and the broader context of the statute as a whole." (quoting *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) (alterations omitted)).

By focusing only on the alleged "limited and specific authority over public lands delegated to" the President in Section 1341(a), Pls.' Opp. at 3, Plaintiffs ignore the remainder of Congress's broad delegation of authority over public lands to the executive in OCSLA, and the clear purpose of that delegation. As API detailed in its Motion to Dismiss, through OCSLA,

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 20 of 32

Congress delegated extensive authority over the nation's offshore resources in a carefully designed statutory scheme. *See* API Mot. at 8–12. The overriding purpose of OCSLA's delegations is to ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. § 1802(1). *See also*, *e.g.*, Defs.' Mem., Exh. 3 ("The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of [] the shelf." (H.R. Rep. No. 413, 83rd Cong., 1st Sess. 2 (1953)); 43 U.S.C. § 1332(3) (finding that the OCS "should be made available for expeditious and orderly development"). That purpose is directly contrary to Plaintiffs' bare assertion that the President may only "permanent[ly]" withdraw—without the possibility of future revision or re-opening—unleased lands from the exploration and development Congress mandated. *See*, *e.g.*, Pls.' Opp. at 1–2.[6]

It is also not enough, as Plaintiffs' contend, *see* Compl. ¶¶ 58, 64, that the statutory language only expressly refers to the President's authority to "withdraw," 43 U.S.C. § 1341(a), unleased lands and "does not in so many words confer" upon the President a power to revise or modify a withdrawal. *Haig v. Agee*, 453 U.S. 280, 290 (1981). Rather, along with OCSLA's purpose, the "history . . . of the statute" informs its ultimate meaning, *see Chan Healthcare*, 844 F.3d at 1138 (quotation omitted), and a reviewing court must give heed to a "consistent" usage of authority delegated to the Executive Branch. *Haig*, 453 U.S. at 291. *See also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 686 (2010) ("[O]ur reading of the court of appeals quorum

---

[6] Plaintiffs apparently disagree with Congress's purpose in enacting OCSLA, instead faulting Executive Order 13795 for promoting the statute's purpose to achieve "expedited offshore oil and gas exploration and development." Pls.' Opp. at 1.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

provision was informed by the longstanding practice of allowing two judges from the initial panel to proceed to judgment in the case of a vacancy . . . ."); *Haig*, 453 U.S. at 300 (noting "that congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy"); *United States v. Amirnazmi*, 645 F.3d 564, 579 (3rd Cir. 2011). Indeed, "a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language." *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (citing *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915)).

The Supreme Court's foundational decision in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), is instructive. At the dawn of oil development in the United States, Congress made public lands "containing petroleum or other mineral oils . . . 'free and open to occupation, exploration, and purchase by citizens of the United States . . . .'" *Id.* at 466 (quoting Act of February 11, 1897). To stem an ever-accelerating transfer of public lands to private ownership under this law, however, the President temporarily withdrew from disposition all unleased public lands in California and Wyoming. *See id.* at 467. The Supreme Court rejected the challenging oil company's argument that "there is no dispensing power in the Executive, and that he could not suspend a statute or withdraw from entry or location any land which Congress had affirmatively declared should be free and open to acquisition by citizens." *Id.* at 468.

Instead, the Court noted the "long-continued practice" of numerous presidents "to make [withdrawal] orders like the one here involved," *id.* at 469, "when it appeared that the public interest would be served . . .," *id.* at 471. As with presidential exercise of the OCSLA withdrawal power, *see infra* pp. 18–21, "Congress did not repudiate the power claimed or the [property] orders made. On the contrary, it uniformly and repeatedly acquiesced in the practice . . . ." *Midwest Oil*, 236 U.S. at 471. As the Court explained,

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation.

*Id*. at 472–73. In short, the continuing practice "would raise [the] presumption that the [presidents' decisions] had been made in pursuance of [congressional] consent or of a recognized administrative power of the Executive in the management of public lands." *Id*. at 474. *See also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) ("[T]he longstanding 'practice of government' can inform our determination of what the law is." (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803))); *EEOC v. Peabody Western Coal Co.*, 773 F.3d 977, 989 (9th Cir. 2014) (citing *Midwest Oil*, 236 U.S. at 474); *Alaska v. Kerry*, 972 F. Supp. 2d 1111, 1141 n.194 (D. Alaska 2013) (same). Accordingly, the Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute . . . ." *Noel Canning*, 134 S. Ct. at 2560.

For this case, the importance of past practice between Congress and the President "is particularly true in view of the fact that . . . the land laws are not of a legislative character in the highest sense" because the Property Clause is not included amongst the enumerated "legislative power[s]" of the United States in Article I of the Constitution, *Midwest Oil*, 236 U.S. at 474; *see also* Const., Art. I § 1, but rather appears in Article IV and therefore "savor[s] somewhat of mere rules prescribed by an owner of property for its disposal." *Midwest Oil*, 236 U.S. at 474; *see also* Const., Art. IV § 3. Where emergencies arise or conditions change, "there is nothing in the nature of the power exercised which prevents Congress from granting it by implication just as could be done by any other owner of property under similar conditions." *Midwest Oil*, 236 U.S.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

at 474. In other words, "[t]he power of the Executive, as agent in charge, . . . need not necessarily be expressed in writing," *id*., but can be defined in practice.

Here, the practice under Section 1341(a) over at least the past three decades illustrates that withdrawals have rarely, if ever, been treated as permanent or inviolate. Starting with President George H. W. Bush, on June 26, 1990 he "announce[ed] my support for a moratorium on oil and gas leasing and development in Sale Area 116, Part II, off the coast of Florida; Sale Area 91, off the coast of northern California; Sale Area 119, off the coast of central California; and the vast majority of Sale Area 95, off the coast of southern California, ***until after the year 2000***." Defs.' Mem., Exh. 8 at 1006 (emphasis added).[7]

On August 4, 1992, in a memorandum to the Secretary of the Interior, President George H. W. Bush confirmed the Secretary's statement "[i]n the documentation of your decision on the 5-year outer Continental Shelf Oil and Gas Program for 1992-1997" "that my statement on June 26, 1990, concerning putting certain areas off limits to leasing ***until after the year 2000***, was made under the authority of" Section 1341(a). Defs. Mem., Exh. 9 (emphasis added). He then "further withdr[e]w the remaining 87 tracts in the Southern California Planning Area pending the completion of additional studies in response to the report of the National Academy of Sciences pursuant to the guiding principles I announced June 26, 1990, which satisfactorily address

---

[7] Even after these withdrawals expired, the temporarily withdrawn areas were never included in a five-year leasing program and were therefore never leased. *See* BOEM, *Past Five Year Programs*, https://www.boem.gov/Past-Five-Year-Programs/ (last visited Sept. 29, 2017). Indeed, no leasing has occurred offshore California since the 1980s. The absence of a practical impact from the end of a withdrawal further confirms the prematurity of Plaintiffs' claims, because Executive Order 13795's modification of prior withdrawals may never result in offshore leasing.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

concerns relating to these tracts." *Id.* This action confirmed President Bush's time-limited June 26, 1990 withdrawal, and extended it to include additional California tracts.

Exercising his authority under Section 1341(a), on June 12, 1998 President Clinton withdrew "from disposition by leasing ***through June 30, 2012***, those areas of the [OCS] currently under moratoria pursuant to sections 108–111 of Public Law 105–83," and "for a time period without specific expiration those areas of the Outer Continental Shelf currently designated Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq*." Defs. Mem., Exh. 10 (emphasis added). The referenced statute had set moratoria in place "in the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude," and also in the North Aleutian Basin, the Eastern Gulf of Mexico (aside from one defined lease sale area), and the Mid-Atlantic and South Atlantic planning areas. Pub. L. No. 105-83, §§ 108–111, 111 Stat. 1543, 1561 (Nov. 14, 1997).

On January 9, 2007, President George W. Bush expressly invoked his delegated authority under Section 1341(a) to "***modify*** the first sentence of [President Clinton's] withdrawal of June 12, 1998 . . . [to] withdraw from disposition by leasing ***through June 30, 2012***, (1) those areas under moratoria pursuant to sections 104 and 106 of Public Law 109–54, and (2) those areas under moratoria pursuant to section 105 of Public Law 109–54, excluding that portion of the Central Gulf of Mexico planning area defined as the '181 South Area' in section 102(2) of . . . Public Law 109–432 . . . ." Defs.' Mem., Exh. 11 (emphases added). The referenced statutory provisions had set moratoria in (1) the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 25 of 32

north latitude and east of 86 degrees west longitude; (2) the Eastern Gulf of Mexico (aside from one defined lease sale area), and (3) the Mid-Atlantic and South Atlantic planning areas.  *See* Pub. L. No. 109-54, §§ 104–106, 119 Stat. 499, 521 (Aug. 2, 2005).  President Bush's action had the practical effect of opening the North Aleutian Basin for leasing, and that area was in fact covered by proposed leasing in the subsequent five-year leasing program for 2007-2012.  *See Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 21, 35 (April 2007), https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Five-Year-Program/MMSProposedFinalProgram2007-2012-pdf.aspx (last visited Sept. 29, 2017).[8]

Finally, on July 14, 2008, President George W. Bush used his authority under Section 1341(a) to "***modify*** the prior memoranda of withdrawals from disposition by leasing of the United States [OCS] issued on August 4, 1992, and June 12, 1998, as modified on January 9, 2007, to . . . withdraw from disposition by leasing, for a time period without specific expiration, [only] those areas of the [OCS] designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 et seq."  Defs.' Mem., Exh. 12.  This action immediately opened all previously withdrawn OCS lands except for existing Marine Sanctuaries.  Among other things, an area of the Mid-Atlantic was thereafter included in the updated five-year leasing program for 2007-2012.  *See Revised Program: Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 85 (Dec. 2010), https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Five-Year-Program/RP-pdf.aspx (describing "one special interest sale (in 2011), but with a 50-mile buffer

---

[8] In March 2010, the North Aleutian Basin was withdrawn from disposition for leasing through 2017, and the planned lease sale was canceled.  *See* BOEM, *North Aleutian Basin Lease Sale 214*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Alaska-Region/Alaska-Lease-Sales/Sale-214/Index.aspx (last visited Sept. 29, 2017).

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

and a no-obstruction zone from the mouth of the Chesapeake Bay off the coastline of Virginia")
(last visited Sept. 29, 2017).[9]

Viewed as a whole, this history confirms that withdrawals are not a one-way, permanent
street, but have often been either issued on a temporary or time-limited basis,[10] or subsequently
revised prior to the date set for expiration. In each instance, Congress could have issued its own
moratoria, or otherwise over-ridden the President's withdrawals pursuant to the Property Clause,
if it disagreed with the President's exercise of authority under Section 1341(a). It did not do so.
Rather, the presidential withdrawals often incorporated moratoria independently issued by
Congress. *See supra*. Past practice is therefore inconsistent with the notion that withdrawals are
permanent and inviolate, *see* Pls.' Opp. at 4, and directly undermines Plaintiffs' characterization
of Executive Order 13795 as unconstitutionally *ultra vires*.[11]

---

[9] In May 2010, the planned Mid-Atlantic lease sale was canceled. *See* BOEM, *Virginia Lease Sale 220 Information*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Gulf-of-Mexico-Region/Lease-Sales/220/Virginia-Lease-Sale-220-Information.aspx (last visited Sept. 29, 2017).

[10] Indeed, in his December 20, 2016 statement announcing and justifying the withdrawal—which Plaintiffs contend to be permanent—of unleased Arctic areas from disposition for leasing, President Obama indicated the changeable circumstances that may inform a withdrawal decision, noting, *inter alia*, that "at *current* oil prices" the Department of Interior concluded that "significant production in the arctic will not occur." *See Statement by the President on Actions in the Arctic and Atlantic Oceans*, at 1 (Dec. 20, 2016) (emphasis added), https://obamawhitehouse.archives.gov/the-press-office/2016/12/20/statement-president-actions-arctic-and-atlantic-oceans (last visited Sept. 29, 2017).

[11] Past practice also confirms that the five-year leasing program stage is the appropriate time to challenge a modification of withdrawals under Section 1341(a). At the time President George W. Bush modified prior withdrawals in January 2007, the draft five-year leasing program for 2007-2012 had been publicly released. That draft program contemplated the modification of prior withdrawals, and public comments on the draft program addressed such potential changes to the withdrawals. *See* Comments of Sierra Club, *et al., Draft Proposed Five-Year OCS Oil and Gas Leasing Program for 2007-2012* at 2 (attached as Exhibit H hereto).

21

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 27 of 32

The cases upon which Plaintiffs rely in support of their alleged cause of action, *see* Pls.' Opp. at 8–9, do not overcome OCSLA's exclusive jurisdiction provision as viewed in light of Section 1341(a) practice and OCSLA's purpose. *See supra*. Those cases largely do not involve challenges to government authority exercised under authority of a statute with an exclusive jurisdiction provision, *see*, *e.g.*, *Youngstown Sheet & Tube*, 343 U.S. at 587–89; *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110, 102 (1902) (stating "the courts . . . must have power in a proper proceeding to grant relief "even though the statute "*provide*[*d*] *for no tribunal* . . . to hear or determine any violation of the statute") (emphasis added); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 587–88 (4th Cir. 2017) (rejecting application of "consular nonreviewability" doctrine to bar lawsuit);[12] *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189 (1999), and many of the cases involved claimed governmental invasions of the litigant's individual constitutional rights. *E.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("Constitutional challenges to apportionment are justiciable."); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795 (1985) (reviewing claimed violation of First Amendment); *Refugee Assistance Project*, 857 F.3d at 597 n.19 (reviewing claimed violations of the Establishment Clause). The only constitutional rights alleged here belong to Congress.

---

[12] Notably, the recent cases concerning President Trump's travel and immigration orders, *see Hawaii*, 859 F.3d at 769; *Refugee Assistance Project*, 857 F.3d at 572, involve executive powers allegedly exercised pursuant to the Immigration and Naturalization Act, which specifically provides for jurisdiction in the federal district courts. *See* 8 U.S.C. § 1329. Moreover, because those cases involved issues of immigration particularly entrusted to the Congress, *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (internal quotations and citation omitted), they are far from comparable to the Property Clause that is "not of a legislative character in the highest sense," *Midwest Oil*, 236 U.S. at 474.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 28 of 32

Moreover, two cases cited by Plaintiffs lend additional support to Executive Order 13795 and requiring Plaintiffs to adhere to OCSLA's exclusive jurisdictional provision. First, Plaintiffs rely on *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952), for the proposition that a federal court has jurisdiction over claims of presidential violations of law. *See* Pls.' Opp. at 8. In his well-known concurring opinion, however, "Justice Jackson set forth a tripartite framework for evaluating the President's powers to act depending on the level of congressional acquiescence." *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 204 (D.C. Cir. 2013). Under that framework,

> When the President acts pursuant to an ***express or implied authorization*** from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." When the President acts in the absence of congressional authorization he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." In such a case the analysis becomes more complicated, and the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on ***a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action, including "congressional inertia, indifference or quiescence."*** Finally, when the President acts in contravention of the will of Congress, "his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject."

*Dames & Moore*, 453 U.S. at 668–69 (quoting *Youngstown Sheet & Tube*, 343 U.S. at 637–38 (Jackson, J., concurring)) (emphases added). Here, OCSLA's language and purpose either exhibit implied authorization for Executive Order 13795, *see supra* pp. 13–15, or past practice coupled with congressional "quiescence" support the Presidents' adoption of non-permanent withdrawals and modifications as circumstances dictate. *See supra* pp. 15–21. *See also Dames & Moore*, 453 U.S. at 668–69 ("[I]t is doubtless the case that executive action in any particular

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 29 of 32

instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition.").

More importantly, Plaintiffs cite *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), to justify their right to file suit to challenge Executive Order 13795 as *ultra vires*. *See* Pls.' Opp. at 8, 15–16 (arguing that Section 1349 does not apply to claim that action is *ultra vires*). But that decision supports the D.C. Circuit's exclusive jurisdiction over this case ***despite*** Plaintiffs' allegation of *ultra vires* presidential action. There, the petitioner challenged National Labor Relations Board decisions as *ultra vires* of National Labor Relations Act quorum provisions. The D.C. Circuit, however, exercised exclusive jurisdiction over the *ultra vires* challenge because the Act provided for judicial review "in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged . . ., or in the United States Court of Appeals for the District of Columbia . . . ." 29 U.S.C. § 160(f). *See Noel Canning*, 134 S. Ct. at 2257. Likewise here, Plaintiffs' assertion that Executive Order 13795 is *ultra vires* of OCSLA must be heard pursuant to the jurisdictional provisions of OCSLA. *See supra*.

## CONCLUSION

For the foregoing reasons, as well as those set forth in API's Motion to Dismiss and the Federal Defendants' Motion to Dismiss and reply, this Court should dismiss the Complaint.

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 39    Filed 10/02/17    Page 30 of 32

Respectfully submitted,

*/s/ James D. Linxwiler*
James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
rosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American Petroleum Institute*

October 2, 2017

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

# CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2017, I caused a true and correct copy of the foregoing and all accompanying documents to be filed with the Court electronically and served by the Court's CM/ECF System upon the following:

Erik Grafe
Earthjustice
441 W. 5th Ave., Suite 301
Anchorage, AK 99501
Tel: 907-792-7102
Fax: 907-277-1390
Email: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
Tel: 907-586-2751
Fax: 907-463-5891
Email: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
Tel: 360-534-9900
Email: nlawrence@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Tel: 212-727-2700
Fax: 415-795-4799
Email: nmarks@nrdc.org

*Counsel for Plaintiffs*

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20004
Tel: 202-514-0180
Fax: 202-514-0057
Email: sarah.himmelhoch@usdoj.gov

*Counsel for Federal Defendants*

 */s/  James D. Linxwiler*
James D. Linxwiler

1

Reply in Support of Motion to Dismiss
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 39   Filed 10/02/17   Page 32 of 32