**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

LEAGUE OF CONSERVATION VOTERS, *et al.*,

                Plaintiffs,

    v.

DONALD J. TRUMP, *et al.*,

                Defendants.

Case No. 3:17-cv-0101-SLG

## <u>ORDER RE MOTIONS TO DISMISS</u>

Before the Court are the following motions: Defendants Donald J. Trump, Ryan Zinke, and Wilbur Ross's Motion to Dismiss at Docket 12[1]; Intervenor-Defendant American Petroleum Institute's Motion to Dismiss at Docket 25; and Intervenor-Defendant State of Alaska's Motion to Dismiss at Docket 34. The motions have been fully briefed.[2] Oral argument on the motions was held on November 8, 2017.[3] For the following reasons, the motions will be denied.

## BACKGROUND

For purposes of the motions to dismiss, the facts are briefly summarized as they are alleged in Plaintiffs' Complaint:

---

[1] *See also* Docket 13 (Mem. in Supp. Mot. to Dismiss).

[2] *See* Docket 36 (Opp'n); Docket 38 (Federal Defendants' Reply); Docket 39 (Intervenor-Defendant American Petroleum Institute's Reply).

[3] Docket 44 (Minute Entry for Oral Arg.).

The Arctic Ocean includes the Chukchi and Beaufort Seas, which are home to a wide array of wildlife, including polar bears, walruses, whales, seals, other mammals, birds, and fish, some of which are endangered.[4] The Atlantic Ocean is also inhabited by various marine life and contains diverse habitats, including methane-dependent organisms that live in the undersea canyons found off the Atlantic continental shelf.[5] Businesses along the U.S. Atlantic coast are dependent on these habitats for tourism and commercial fishing.[6]

One of the reasons that Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") was to provide protection to the environment.[7] Section 12(a) of OCSLA provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."[8] For the areas that are not withdrawn, OCSLA provides a process for oil and gas development activities, which includes the following: "(1) formulation of a five year leasing plan . . . ; (2) lease sales; (3) exploration by the lessees; (4) development and production."[9] Seismic

_____

[4] Docket 1 at 9, ¶ 21.

[5] Docket 1 at 10, ¶ 23.

[6] Docket 1 at 10, ¶ 24.

[7] Docket 1 at 14, ¶ 33; *see also* 43 U.S.C. § 1332(3) ("[T]he outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.").

[8] Section 12(a) of OCSLA is codified at 43 U.S.C. § 1341(a).

[9] *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984); *see also* 43 U.S.C. § 1331 *et seq.*

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 2 of 29

surveying can occur before any of these stages and typically occurs two to four years prior to lease sales in order to locate areas with oil and gas prospects.[10]

On January 27, 2015, acting pursuant to Section 12(a) of OCSLA, President Obama withdrew coastal areas in the Arctic's Beaufort and Chukchi Seas from oil and gas leasing.[11] President Obama cited as reasons for this action the importance of these areas to subsistence for Alaska Natives as well as the need to protect marine mammals and other wildlife.[12] On December 20, 2016, again acting pursuant to Section 12(a) of OCSLA, President Obama withdrew another large portion of the U.S. Arctic Ocean and areas of the Atlantic Ocean from future oil and gas leasing.[13] The combined withdrawals in the Arctic and Atlantic Oceans totaled 128 million acres.[14]

On April 28, 2017, President Trump issued Executive Order 13795 entitled "Implementing an America-First Offshore Energy Strategy."[15] The Executive Order reverses President Obama's January 27, 2015 and December 20, 2016 withdrawals in the Arctic and Atlantic Oceans. The stated purpose of the order is to encourage energy exploration and production of the outer continental shelf. On April 29, 2017, the Secretary

---

[10] Docket 1 at 14, 17, ¶¶ 33, 43.

[11] Docket 1 at 18, ¶ 46.

[12] Docket 1 at 18, ¶ 46.

[13] Docket 1 at 17–18, ¶ 47.

[14] Docket 1 at 7, ¶ 16.

[15] Docket 1 at 21, ¶ 53; Docket 13-1 (Executive Order 13795).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 3 of 29

of the Interior issued an order implementing the Executive Order, calling for expedited consideration of seismic permitting applications for the Atlantic Ocean.[16]

There is industry interest in oil and gas activities in the Arctic and Atlantic Oceans, including industry groups expressing interest in conducting seismic surveys in those oceans. After the President issued the Executive Order, one seismic industry trade group called for seismic surveying in the previously withdrawn areas to proceed "without delay."[17] Several seismic operations companies have applied for permits to conduct "deep-penetration seismic surveys."[18]

Seismic surveys use loud, frequent sound pulses to map the sea floor in order to identify potential oil and gas deposits.[19] Plaintiffs maintain that these pulses are harmful to marine mammals as well as fish and shellfish, causing these animals to suffer loss of hearing and sensory capabilities, which could result in death.[20] In 2012, the National Marine Fisheries Service estimated that a two-month-long seismic survey would disrupt 60,000 ringed seals and 4,600 beluga whales in the Arctic Ocean.[21]

On May 3, 2017, Plaintiffs brought this action, which challenges Executive Order 13795. Plaintiffs include the following organizations: League of Conservation Voters, Natural Resources Defense Council, Sierra Club, Alaska Wilderness League, Defenders

---

[16] Docket 1 at 20, ¶ 54; Docket 13-5 (Secretarial Order).

[17] Docket 1 at 15, ¶ 39.

[18] Docket 1 at 16–17, ¶¶ 39–40.

[19] Docket 1 at 11, ¶ 27.

[20] Docket 1 at 12, ¶¶ 28, 29.

[21] Docket 1 at 12, ¶ 28.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 4 of 29

of Wildlife, Northern Alaska Environmental Center, Resisting Environmental Destruction on Indigenous Lands, Center for Biological Diversity, Greenpeace, Inc., and The Wilderness Society.[22]

Plaintiffs allege that "President Trump acted in excess of his authority under Article II of the U.S. Constitution and intruded on Congress's non-delegated exclusive power under the Property Clause, in violation of the doctrine of separation of powers."[23] Plaintiffs also allege a cause of action for statutory *ultra vires* action, alleging that the President "lacks authority to reverse or undo Section 12(a) withdrawals" and "[n]either OCSLA nor any other statute authorizes the President to re-open for disposition areas withdrawn under OCSLA Section 12(a)."[24] Plaintiffs filed suit against President Donald J. Trump, who issued the Executive Order, Ryan Zinke, the Secretary of the Interior, who administers and implements OCSLA, and Wilbur Ross, Secretary of Commerce, who has the responsibility for administering and implementing the Marine Mammal Protection Act and the Endangered Species Act (collectively the "Federal Defendants").[25] The Federal Defendants are all sued in their official capacities. American Petroleum Institute ("API") intervened as a national trade association of the oil and natural gas industry.[26] The State

---

[22] Docket 1 at 3–7, ¶¶ 5–14.

[23] Docket 1 at 22, ¶ 60.

[24] Docket 1 at 23, ¶ 64.

[25] Docket 1 at 7–8, ¶¶ 18–20.

[26] Docket 22 (Order Granting API's Mot. to Intervene).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 5 of 29

of Alaska also intervened, asserting that some "State offshore land within the coastal zone of the Beaufort Sea is available for oil and gas leasing[.]"[27]

## LEGAL STANDARDS

Federal Defendants and the Intervenors all seek dismissal of Plaintiffs' Complaint under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### I.     Dismissal Under Rule 12(b)(1)

A "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."[28] "A Rule 12(b)(1) jurisdictional attack may be facial or factual."[29] In this case, Federal Defendants assert a facial challenge.[30] "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."[31]

The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."[32] However, "[t]his is not to

---

[27] Docket 30 (State of Alaska's Mot. to Intervene) at 3; Docket 32 (Order Granting State of Alaska's Mot. to Intervene).

[28] *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (emphasis omitted).

[29] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

[30] Docket 13 at 16.

[31] *Safe Air for Everyone*, 373 F.3d at 1039.

[32] *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 6 of 29

say that plaintiff may rely on a bare legal conclusion to assert injury-in-fact[.]"[33]   The

plaintiff has the burden of establishing the elements of Article III standing.[34]

## II.     Dismissal Under Rule 12(b)(6)

When reviewing a Rule 12(b)(6) motion, a court considers only the pleadings and

documents incorporated into the pleadings by reference, as well as matters on which a

court may take judicial notice.[35]    "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"[36]   A claim is plausible on its face "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[37]    Thus, there must be "more than a sheer possibility that a

defendant has acted unlawfully."[38]   A court "accept[s] factual allegations in the complaint

as true and construe[s] the pleadings in the light most favorable to the nonmoving party."[39]

Plaintiffs assert that this Court has jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1361.[40]

---

[33] *Maya*, 658 F.3d at 1068.

[34] *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[35] *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[37] *Id.* at 678.

[38] *Id.*

[39] *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[40] Docket 1 at 2, ¶ 2.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 7 of 29

**DISCUSSION**

Federal Defendants move to dismiss Plaintiffs' Complaint for the following reasons: (1) the Federal Defendants are immune from suit under sovereign immunity; (2) Plaintiffs do not have a private right of action; (3) a court cannot issue declaratory relief against the President of the United States; and (4) Plaintiffs lack Article III standing. API asserts in its motion to dismiss that the Court lacks jurisdiction to hear this case under OCSLA. The State of Alaska incorporates the arguments made by both parties in its motion to dismiss.

## I.    Sovereign Immunity

Federal Defendants first assert that "the United States is immune from suit except to the extent Congress unequivocally and expressly waives that immunity" and Plaintiffs have not shown that their action falls within a waiver of sovereign immunity.[41]

Generally, when an individual brings a lawsuit against the government, the plaintiff must obtain a waiver of the government's sovereign immunity, which must be expressed in statutory text.[42] Federal Defendants assert that the sovereign immunity waiver set forth in § 702 of the Administrative Procedure Act does not apply to this case "because the President is not an 'agency' and thus his actions are not reviewable under the APA."[43] Although Federal Defendants are correct in that Plaintiffs are not proceeding under that statute, the United States Supreme Court has held that there are circumstances where

---

[41] Docket 13 at 18.

[42] *See Lane v. Pena*, 518 U.S. 187, 192 (1996).

[43] Docket 38 at 11 (citing 5 U.S.C. § 702).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 8 of 29

the sovereign immunity doctrine does not apply. In *Larson v. Domestic & Foreign Commerce Corp.*, the Supreme Court held that sovereign immunity does not apply where:

> the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.[44]

The *Larson* Court also acknowledged a second exception to the sovereign immunity doctrine: when an officer "take[s] action in the sovereign's name [and that action] is claimed to be unconstitutional."[45]

In this case, Plaintiffs allege that the President "acted in excess of his statutory authority" and "acted in excess of his authority under Article II of the U.S. Constitution."[46] Because Plaintiffs assert that the President acted beyond his delegated powers enumerated in OCSLA and the Constitution, the doctrine of sovereign immunity does not

---

[44] 337 U.S. 682, 689 (1949); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("In *Larson*, . . . we held that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers.'" (internal citation omitted)); *United States v. Yakima Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986) ("[I]f a federal official, acting pursuant to a constitutional statute, commits an unconstitutional act, he cannot be acting on behalf of the government because his actions go beyond the scope of his authority and are *ultra vires.*").

[45] *Larson*, 337 U.S. at 691 & n.11; *see also Swan v. Clinton*, 100 F.3d 973, 981 (1996) ("The '*Larson-Dugan* exception,' [ ] holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the grounds that 'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.'" (quoting *Larson*, 337 U.S. at 689; citing *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963))); *Yakima Tribal Court*, 806 F.2d at 859 ("According to *Larson*, suits that charge federal officials with unconstitutional acts are not barred by sovereign immunity. In *Larson*, the Supreme Court noted that when a federal official commits an unconstitutional act, he is necessarily acting outside his official capacity." (internal citations omitted)).

[46] Docket 1 at 21, 23, ¶¶ 60, 65.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 9 of 29

apply, and Plaintiffs are not required to demonstrate a Congressional waiver of sovereign immunity in order to bring this suit.

## II.    Private Right of Action

Federal Defendants next contend that "Plaintiffs fail to identify any statute that provides them a right of action to enforce their alleged rights under OCSLA and the Property Clause."[47]

Relying on *Alexander v. Sandoval* and *Lonberg v. City of Riverside*, Federal Defendants assert that "private rights of action to enforce federal law must be created by Congress" and "courts may not create one, no matter how desirable that might be as a policy matter."[48]  *Sandoval* and *Lonberg* each involved the courts determining whether the plaintiffs had private causes of action to enforce a federal regulation against a third party.[49]

Plaintiffs respond that they are not seeking "to step into the statute-enforcing shoes of the federal government as to third parties."[50]   Instead, Plaintiffs allege that the President exceeded his statutory and constitutional authority and acted *ultra vires* in issuing Executive Order 13795; therefore, Plaintiffs are not seeking to enforce a federal law.  Courts have on occasion adjudicated causes of action alleging that the President

---

[47] Docket 13 at 19.

[48] Docket 13 at 19 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)); Docket 38 at 12 (quoting *Lonberg v. City of Riverside*, 571 F.3d 846, 848 (9th Cir. 2009)).

[49] *See Sandoval*, 532 U.S. at 278–79, 293 (holding private individuals may not sue to enforce disparate-impact regulations under § 602 of Title VI of the Civil Rights Act); *Lonberg*, 571 F.3d at 847, 852 (holding Americans with Disabilities Act transition plan regulations not enforceable by private right of action).

[50] Docket 36 at 20.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 10 of 29

has exceeded his constitutional or statutory authority.[51]  As the Supreme Court held in *Franklin v. Massachusetts*, "the President's actions may still be reviewed for constitutionality . . . [even if] they are not reviewable for abuse of discretion under the APA."[52]  Therefore, Plaintiffs do not need express Congressional authorization to maintain these causes of action.[53]

### III.    Declaratory Relief

Federal Defendants next argue that "[c]ourts may not issue declaratory relief against co-equal branches of government."[54]  Plaintiffs respond that they are not seeking an injunction against the President.  Rather, they seek only a declaration that he exceeded his authority.  They maintain that "[w]ith such a finding, Plaintiff's harm can be redressed by an injunction against the Defendant Secretaries."[55]

The power of this Court to issue a declaratory judgment against the President is limited at best.  In *Franklin v. Massachusetts*, a plurality of the Supreme Court held that

---

[51] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (holding that Executive Order directing Secretary of Commerce to seize steel plants exceeded constitutional power of President); *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2574 (2014) (holding President's NLRB appointments were beyond scope of Recess Appointments Clause); *Dames & Moore v. Regan*, 453 U.S. 654, 667, 674 (1981) (holding that President and Secretary of Treasury did not act "beyond their statutory and constitutional powers").

[52] *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (citing *Youngstown*, 343 U.S. at 579; *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

[53] Federal Defendants also claim that Plaintiffs' causes of action fail because they did not provide notice in writing to the Secretary within 60 days of commencing this action.  Docket 13 at 21 (citing 43 U.S.C. § 1349(a)(2)(A)).  However, as discussed below, Plaintiffs' claims do not arise under § 1349.  *See infra* p. 24–28.

[54] Docket 13 at 21.

[55] Docket 36 at 26.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 11 of 29

an injunction against the President was improper, but nonetheless the plaintiffs had standing because injunctive relief against a subordinate federal official would likely redress the injury alleged.[56]

Federal Defendants cite to *Newdow v. Bush* to support their argument, a case from the District of Columbia District Court.[57]  The plaintiff in *Newdow* sought a declaratory judgment and an injunction to prohibit the inclusion of prayers by invited clergy at the Presidential Inauguration.  *Newdow* was not a challenge to an executive order issued by the President.  The district court, quoting Justice Scalia's concurrence in *Franklin v. Massachusetts*, stated that the President is generally immune from declaratory relief as well as injunctive relief.[58]  But the district court acknowledged there are exceptions to this immunity and that "the outer boundaries of the immunity remain unclear."[59]  Plaintiffs in this case are primarily seeking injunctive relief against subordinate officials; they do not seek injunctive relief against the President.[60]  In the event that Plaintiffs were to prevail on the merits, Plaintiffs' alleged harms may well be adequately redressed if an injunction

---

[56] *Franklin*, 505 U.S. at 803 (plurality opinion).  The plurality opinion did not directly address the propriety of declaratory relief against the President, but stated, "[W]e may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the [relevant] statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination."  *Id.*

[57] 355 F. Supp. 2d 265 (D.D.C. 2005).

[58] *Id.* at 281 (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring, stating, "I think we cannot issue a declaratory judgment against the President.")).

[59] *Newdow*, 355 F. Supp. 2d at 281.

[60] *See* Docket 1 at 2, ¶ 1.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 12 of 29

against subordinate officials were to issue, in which event the President would be dismissed. But dismissal of the entire action on this basis is not warranted.[61]

## IV. Article III Standing

Federal Defendants maintain that Plaintiffs lack Article III standing because Plaintiffs have not alleged an imminent, geographically specific, and particularized harm.[62] Plaintiffs respond that "the complaint [provides that] the President's action has the immediate, purposeful effect of removing an absolute bar to new oil and gas leasing and development in protected areas of the Arctic and Atlantic Oceans."[63]

Article III standing requires that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[64] To establish injury in fact, Plaintiffs must establish that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[65]

---

[61] At oral argument, Federal Defendants suggested that the Court should at least dismiss the President from the case. The parties may further address the propriety of that action in their merits briefing.

[62] Docket 13 at 25–26.

[63] Docket 36 at 28.

[64] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).

[65] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and citations omitted).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 13 of 29

## A. Imminent Harm

Federal Defendants assert that Plaintiffs have not alleged an imminent harm sufficient to confer Article III standing.[66] Plaintiffs respond that they have alleged a substantial risk of future harm sufficient to support Article III standing.[67]

At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim."[68] "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"[69]

Federal Defendants assert that although it is "certainly conceivable that oil and gas exploration and development will occur somewhere within the [128 million acres Plaintiffs claim are affected by the Executive Order] at some point in time," it is unclear "when or where such oil and gas exploration will occur."[70] Furthermore, Federal Defendants argue that because there are multiple steps to obtaining leases and drilling permits in the Arctic and Atlantic Oceans, there is no risk of imminent harm.[71]

---

[66] Docket 13 at 26.

[67] Docket 36 at 29.

[68] *Lujan*, 504 U.S. at 561 (internal quotations omitted) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)).

[69] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)).

[70] Docket 13 at 28 (emphasis omitted).

[71] Docket 13 at 27.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 14 of 29

The Ninth Circuit recently considered whether a group of plaintiffs had a sufficient risk of future harm when they had yet to suffer any actual harm in *In re Zappos.com, Inc.*[72] In *Zappos*, the plaintiffs brought a class action against Zappos alleging that hackers had stolen their personal information from Zappos's servers.[73]  The district court dismissed one group of plaintiffs, holding that the group did not have standing because their personal information had not yet been used by hackers and they had not incurred any financial harm.[74]

The Ninth Circuit reversed and held that there was Article III standing as to those plaintiffs.  The court discussed the Supreme Court's holding in *Clapper v. Amnesty International USA*.[75]  In *Clapper*, the plaintiffs challenged the Foreign Intelligence Surveillance Act, which authorizes surveillance of individuals who are not United States persons.[76]  The plaintiffs—attorneys and human rights, labor, legal, and media organizations—were United States persons but argued that they had Article III standing to challenge the statute "because there [was] an objectively reasonable likelihood that their communications [would] be acquired under [the Act] at some point in the future."[77]

---

[72] No. 16-16860, 2018 WL 1189643, ___ F.3d ___ (9th Cir. March 8, 2018).

[73] *Id.* at *1.

[74] *Id.*

[75] 568 U.S. 398 (2013).

[76] *Id.* at 401; 50 U.S.C. § 1881a.

[77] *Clapper*, 568 U.S. at 406, 407.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 15 of 29

The Supreme Court held that the plaintiffs did not have standing because the risk of harm to them was too attenuated.[78]

The *Zappos* court also considered a similar Ninth Circuit case, *Krottner v. Starbucks Corp.*[79]  In *Krottner*, a laptop was stolen that contained Starbucks employees' personal information.  At issue was whether the employees had standing to sue Starbucks for negligence and breach of contract because there was "no indication that the private information ha[d] been misused" by anyone.[80]  The Ninth Circuit held that the plaintiffs had standing, because they had "alleged a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data."[81]   In evaluating whether the plaintiffs had standing in *Zappos*, the Ninth Circuit reconciled its cases with *Clapper*.  It found that the risk of harm in both *Krottner* and *Zappos* was imminent because the personal information obtained "could be used to help commit

---

[78] *Id.* at 410.  The Court found that before the plaintiffs would suffer any harm, each of the following steps would need to occur:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [plaintiffs'] contacts; and (5) [plaintiffs] will be parties to the particular communications that the Government intercepts.

*Id.*

[79] 628 F.3d 1139 (9th Cir. 2010).

[80] *Id.* at 1141.

[81] *Id.* at 1143.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 16 of 29

identify fraud or identity theft."[82]  In contrast, the Circuit observed that the Supreme Court had found no standing in *Clapper* because the risk of harm in *Clapper* rested on a "multi-link chain of inferences [that] was thus 'too speculative' to constitute a cognizable injury in fact."[83]

The risk of harm in this case is similar to *Zappos*.  In *Zappos*, the harm had not yet occurred, but there was a risk of harm from hackers committing identity fraud or identity theft and those hackers had the means to be able to commit those crimes.  In this case, although third parties must obtain permits before seismic surveying and other activities may occur, there is no indication that the government will not promptly grant such permits, particularly in light of the Executive Order's stated purpose of expediting energy production.

The facts as alleged in the Complaint, when taken as true as required when considering a motion to dismiss, adequately support Plaintiffs' allegation that there is an imminent risk of harm from those activities in several respects.

First, the Complaint alleges that the stated purpose of the President's Executive Order is to expedite energy production in the Arctic and Atlantic Oceans.[84]  The Executive Order mandates expedited consideration of seismic survey permits, instructs revision of the schedule of oil and gas lease sales to include annual lease sales in the Arctic and Atlantic Oceans, and directs review of offshore safety and pollution-control regulations

---

[82] *Zappos*, 2018 WL 1189643, at *5.

[83] *Id.* at *4 (citing *Clapper*, 568 U.S. at 401).

[84] Docket 1 at 21, ¶ 53.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 17 of 29

and guidance documents. The Executive Order itself demonstrates that oil and gas exploration activities are intended to be imminent.[85]

Second, Plaintiffs allege current industry interest in oil and gas drilling in the previously withdrawn regions. According to Plaintiffs' Complaint, "[f]ollowing President Trump's April 28, 2017, executive order, one seismic industry trade group called for seismic surveying in the Atlantic and other frontier areas to proceed 'without delay' in order to 'allow for informed decisions as a new five-year lease plan is developed.'"[86] Plaintiffs allege that one seismic operator has already "sought federal authorizations to conduct 3-D seismic exploration in the Beaufort Sea nearshore area" and "[c]ollectively, the four companies with applications now pending before NMFS have proposed to run more than 126,000 linear kilometers of airgun surveys during the first year of exploration activity in the region."[87] In addition, Plaintiffs allege that "[i]n the Atlantic, at least six seismic operation companies have applied . . . for permits to conduct 'deep-penetration seismic surveys,' deploying large airgun arrays to prospect for oil and gas deposits miles beneath the seafloor."[88]

Plaintiffs maintain that seismic surveying can cause the following harmful effects to marine wildlife:

> Seismic surveying associated with oil and gas activities uses very loud, frequent sound pulses from airgun arrays to map the geology of the sea floor and identify potential oil and gas deposits. . . . Noise from seismic

---

[85] Docket 13-1 at 2–5.

[86] Docket 1 at 16, ¶ 39.

[87] Docket 1 at 16, 17, ¶¶ 39, 41.

[88] Docket 1 at 16–17, ¶ 40.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 18 of 29

operations harms marine mammals.  If animals are exposed to high enough levels of sound, such as exist close to some seismic airguns, they can suffer shifts in hearing thresholds and hearing loss that may result in mortality. . . . Seismic surveys also harm commercially important fish and shellfish.[89]

Plaintiff's Complaint adequately alleges a risk of imminent harm from seismic surveying for purposes of Article III standing.[90]

In addition, the Complaint alleges that over the past decade, "the federal government has considered, proposed, decided on, and/or authorized substantial industrial oil and gas activities in the Arctic and Atlantic Oceans pursuant to the OCSLA scheme."[91]  The Complaint alleges "companies also have sought approval to conduct seismic surveys even when lease sales are more than four years away and [are] not included in an existing or proposed five-year program."[92]  In February 2008, the government held a leasing sale in the Chukchi Sea, resulting in 487 leases covering nearly 2.8 million acres.[93]  Plaintiffs also allege that seismic surveying typically precedes oil and gas lease sales by two to four years in order to locate areas with promising oil and gas prospects.[94]  Therefore, the Complaint adequately alleges that previous oil and gas

---

[89] Docket 1 at 11–12, ¶¶ 27–29.

[90] Defendants further assert that seismic surveying is authorized by a separate statute and was not restricted by President Obama's withdrawals. Docket 38 at 5.  Although seismic surveying can go forward regardless of the legality of the challenged Executive Order, there would be no apparent incentive for the industry to conduct seismic surveying in areas closed off from drilling. Therefore, Plaintiffs' allegations on the effect of the Executive Order on seismic surveying activity are considered part of the alleged imminent harm.

[91] Docket 1 at 14, ¶ 34.

[92] Docket 1 at 17–18, ¶ 43.

[93] Docket 1 at 15, ¶ 35.

[94] Docket 1 at 17, ¶ 43.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 19 of 29

exploration and development activities in the Arctic and Atlantic Oceans support Plaintiffs' assertion that seismic surveying is imminent.

The Executive Order's clear intent to expedite energy production in the Arctic and Atlantic Oceans, the oil industry's eagerness to obtain seismic surveying permits, and the fact that seismic surveying typically precedes oil and gas lease sales, together indicate that Plaintiffs have adequately alleged a substantial risk of harm from the passage of Executive Order 13795 that is "imminent" for purposes of Article III standing.

### B. Geographic Specificity

Federal Defendants also assert that Plaintiffs have not alleged a "geographically specific" injury.[95]  The Complaint alleges that the Executive Order reverses protections in "approximately 128 million acres of federally owned portions of the Arctic and Atlantic Oceans."[96]  Plaintiffs allege that their "use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife."[97]  Federal Defendants take issue with the fact that Plaintiffs "do not identify any particular area within that 128 million acres that they use or enjoy that will be the subject of exploration or development activities as a result of the challenged Executive Order[.]"[98]  Plaintiffs

---

[95] Docket 13 at 29.

[96] Docket 1 at 8, ¶ 16.

[97] Docket 1 at 7, ¶ 15.

[98] Docket 13 at 29.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 20 of 29

respond that they "allege the requisite 'geographical nexus between the individual asserting the claim and the location suffering the environmental impact.'"[99]

In *Center for Biological Diversity v. Kempthorne*, the plaintiffs alleged that regulations permitting the non-lethal "taking" of polar bears along the Beaufort Sea and the northern coast of Alaska violated the Marine Mammal Protection Act and the National Environmental Policy Act.[100]  The Center alleged that its members had "viewed polar bears and walrus in the Beaufort Sea region, enjoy doing so, and have plans to return."[101]  The government challenged the Center's standing to bring suit.  The Ninth Circuit held that the Center had alleged a sufficiently "geographically specific" injury to confer standing.[102]

As the Ninth Circuit recognized in *Kempthorne*, the degree of geographic specificity required depends on the size of the area that is impacted by the government's

---

[99] Docket 36 at 34 (quoting *Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013)).

[100] 588 F.3d 701, 706 (9th Cir. 2009).

[101] *Id.* at 707–08.

[102] *Id.* at 708.  The Ninth Circuit distinguished *Kempthorne* from *Summers v. Earth Island Institute*. *Id.* at 707 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 490 (2009)).  In *Summers*, the plaintiffs obtained nationwide injunctive relief that prevented the U.S. Forest Service from enforcing a regulation that exempted certain small timber salvage projects from the notice, comment, and appeal process.  An organization member had alleged she had repeatedly visited one of the sites, and had plans to do so again.  *Summers*, 555 U.S. at 494.  The government conceded that this allegation of harm satisfied Article III standing; however, the parties settled as to this particular site and the member's harm was remedied.  *Id.*  The Court held that the remaining allegations of harm including past injury, injury not subjected to the regulations, and nonspecific plans to visit unnamed national forests in the future were not enough to confer standing.  *Id.* at 496.  The *Kempthorne* court held that "[u]nlike the alleged injury in *Summers*, this injury is geographically specific, is caused by the regulations at issue, and is imminent. . . . The plaintiffs have standing."  *Kempthorne*, 588 F.3d at 708.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 21 of 29

action.[103]  In this case, the area impacted by the Executive Order is 128 million acres located in the Arctic and Atlantic Oceans.[104]  Plaintiffs, similar to the plaintiffs in *Kempthorne*, allege that they "visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters."[105]  Although the geographic area is very large, it is discrete and defined.  Therefore, Plaintiffs have alleged a sufficiently specific geographic area for their alleged harms for Article III standing.

### C.  Particularized Harm

Finally, Federal Defendants maintain that Plaintiffs have not alleged a harm that is personal and particular to them.[106]  Plaintiffs respond that they allege a particularized injury because they have alleged "an interest in visiting, using, inhabiting, studying, and recreating in—or viewing wildlife that depends on—areas affected by President Trump's order."[107]

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"[108]  The Supreme Court has held that in environmental cases, "[t]he

---

[103] *See also Defenders of Wildlife v. EPA*, 420 F.3d 946, 954 (9th Cir. 2005) *rev'd on other grounds sub nom. National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("[I]n light of the statewide impact of the EPA's transfer decision, alleging an injury-in-fact covering large areas within the state simply reflects the relatively broad nature of the potential harm.").

[104] Docket 1 at 7, ¶ 16.

[105] Docket 1 at 7, ¶ 15.

[106] Docket 13 at 30–31.

[107] Docket 36 at 39.

[108] *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 22 of 29

relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."[109]  Thus, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[110]

In *Center for Biological Diversity v. Kempthorne*, discussed above, the Ninth Circuit found that the plaintiffs had alleged an injury that was particularized by alleging that

> they have viewed polar bears and walrus in the Beaufort Sea region, enjoy doing so, and have plans to return. If the plaintiffs' allegations are true, the . . . regulations threaten imminent, concrete harm to these interests by destroying polar bears and walrus in the Beaufort Sea.[111]

In this case, Plaintiffs allege that exposing animals to seismic surveying at "high enough levels of sound" will cause the animals to "suffer shifts in hearing thresholds and hearing loss that may result in mortality."[112]  The Complaint also asserts that

> members of the Plaintiff organizations visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas. . . . The members' use and enjoyment of these areas and wildlife are affected by the condition of the areas and health of individual wildlife and populations and their habitat in the wild.  Any activities, such as oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, injure, harm, harass, or displace wildlife, also interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife.

---

[109] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

[110] *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

[111] *Kempthorne*, 588 F.3d at 707–08.

[112] Docket 1 at 12, ¶ 28.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 23 of 29

As such, these activities directly and irreparably injure the interests of Plaintiffs' members.[113]

Plaintiffs have adequately alleged harms as a result of oil and gas exploration and development activities that are personal to them.[114]

Based on the foregoing analysis, the Court finds that Plaintiffs have adequately pleaded facts that demonstrate Article III standing.[115]

## V.    API's Motion Under OCSLA

American Petroleum Institute filed a separate Motion to Dismiss at Docket 25.  It asserts jurisdiction over Plaintiffs' claims is governed by § 1349(c)(1) of the Outer Continental Shelf Lands Act, which provides that "any action of the [Interior] Secretary to approve a leasing program pursuant to section 1344 of [OCSLA] shall be subject to judicial review only in the United States Court of Appeal for the District of Columbia."[116]

---

[113] Docket 1 at 7–8, ¶ 15.

[114] Federal Defendants assert that Plaintiffs' claims raise "a generally available grievance about the government."  Docket 13 at 31.  However, "the fact that a harm is widely shared does not necessarily render it a generalized grievance."  *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011).

[115] Federal Defendants also assert that Plaintiffs' claims are not ripe.  Docket 13 at 23.  However, as Federal Defendants acknowledge, "the constitutional component of ripeness is coextensive with the injury-in-fact requirement of standing."  Docket 13 at 23 n.8 (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)).  Because the Court finds Plaintiffs have adequately alleged an injury in fact, the Court need not address constitutional ripeness.  Moreover, "[p]rudential considerations of ripeness are discretionary."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000); *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) ("[The request to decline to adjudicate the case on prudential grounds] is in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'") (quotation omitted) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)).

[116] *See* Docket 25 at 17 (quoting 43 U.S.C. § 1349(c)(1)); *see also* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan . . . shall be subject to judicial review only in a United States

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 24 of 29

Plaintiffs respond that they are not seeking review of administrative actions taken under OCSLA § 1344.[117]  Rather, they are claiming that the President acted *ultra vires* in issuing an executive order beyond the authority given to him under a different provision of OCSLA: § 1341.[118]  Plaintiffs also cite to section 1349(a)(6), which provides that "[n]othing in this section shall restrict any right which any person or class of persons may have under any other Act or common law to seek appropriate relief."

API maintains that the Ninth Circuit's holding in *California Save Our Streams Council, Inc. v. Yeutter* supports its assertion that Plaintiffs' claims may only be heard by the D.C. Circuit.[119]  In *Yeutter*, the plaintiffs, after failing to timely intervene in a Federal Energy Regulatory Commission ("FERC") proceeding, brought suit in district court to challenge certain conditions that the Forest Service had provided to FERC for inclusion in a proposed license to build a hydroelectric facility.[120]  Pursuant to the Federal Power Act ("FPA"), FERC was required to solicit and accept such conditions from the Forest Service.[121]  The FPA also provided for "*exclusive* jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders."[122]  The plaintiffs

---

court of appeals for a circuit in which an affected State is located.").

[117] Docket 36 at 22.

[118] Docket 1 at 23, ¶ 64.

[119] *See* Docket 39 at 14–17 (citing *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989)).

[120] *Yeutter*, 887 F.2d at 909–10.

[121] *Id.* at 912.

[122] *Id.* at 911 (emphasis in original).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 25 of 29

asserted that the exclusive review provision was inapplicable because their suit was filed against the Forest Service pursuant to NEPA and related statutes and was not attacking FERC's licensing decision.[123] The Ninth Circuit rejected the plaintiffs' argument, holding that "although [plaintiffs] seek to characterize the proceedings as an attack on the Forest Service's actions, it is clear that the suit is an attempt to restrain the licensing procedures authorized by FERC" and was therefore subject to the exclusive jurisdictional limitation by the court of appeal.[124]

The harm that the plaintiffs alleged in *Yeutter* was different than that being alleged here in a critical respect—namely, Plaintiffs here have asserted that their alleged harms will occur long before a party could obtain judicial review of a leasing plan before the D.C. Circuit pursuant to 43 U.S.C. § 1349(c)(1).[125] Furthermore, the practical consequences of allowing district court review in *Yeutter* would have been significantly more burdensome than in this case, given that substantial administrative proceedings before FERC had already occurred in *Yeutter*.[126] Here, by contrast, there has been no revised leasing plan

---

[123] *Id.*

[124] *Id.* at 912.

[125] Plaintiffs allege that the seismic surveying they complain of could occur imminently. *See* Docket 1 at 14, 17, ¶¶ 33, 43. In *Yeutter*, the challenged conduct—construction of the hydroelectric facility—would not have taken place until after any review of the FERC license by the Ninth Circuit had concluded. Therefore, "funnel[ing] all challenges to the courts of appeals . . . to hear all relevant arguments" was consistent with the FPA. *Yeutter*, 887 F.2d at 912.

[126] In *Yeutter*, the Ninth Circuit emphasized the practical consequences of a ruling for plaintiffs, noting that "[a]fter the license applicant had initially fought his way through the administrative proceedings, he would then have to grind through the district court and, almost certainly, through the appeal as of right to the circuit court." *Id.* Here, by contrast, Plaintiffs have made a preliminary challenge prior to administrative proceedings. Furthermore, the plaintiffs in *Yeutter* brought their challenge in the district court only after they failed to timely intervene in the FERC administrative proceedings, which has not occurred here. *Id.* at 910.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 26 of 29

developed at this time. Instead, Plaintiffs have alleged that independent of any subsequent leasing program established by the Interior Secretary, the Executive Order on its own will result in seismic surveying and the attendant harm. In *Yeutter*, the challenged action "ha[d] no significance outside the licensing process" that would ultimately be the cause of any harm.[127] Accordingly, *Yeutter*'s holding is not applicable here.

API also asserts that "[w]here, as here, a 'statute authorizes review of specified agency actions,' it is well settled that interrelated actions are all reviewable in the court of appeals."[128] API relies on *Cal. Energy Comm'n v. Dep't of Energy*, in which the Ninth Circuit held that it had jurisdiction over a claim brought under a provision of the Energy Policy and Conservation Act ("EPCA") over which it had not explicitly been granted jurisdiction in part because the claim was closely intertwined with agency action over which it did have express jurisdiction.[129] Here, however, the President's issuance of the

---

[127] *Id.* at 912.

[128] Docket 39 at 14 (quoting *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1148 (9th Cir. 2009)) (alterations and citations omitted).

[129] *Cal. Energy Comm'n*, 585 F.3d at 1148. In *Cal. Energy Comm'n*, the Cal. Energy Commission ("CEC") challenged the denial of a waiver from the Department of Energy to establish state regulations relating to residential clothes washers. *Id.* at 1147. CEC brought its claim in the Ninth Circuit pursuant to the EPCA, which provided for direct court of appeal review of a claim by "[a]ny person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title." *Id.* at 1148 (quoting 42 U.S.C. § 6306(b)(1)). The Department of Energy ("DOE") contested jurisdiction, stating that the challenged action was an order under § 6297(d) and therefore "CEC [was] not challenging a rule adopted pursuant to §§ 6293, 6294, or 6295." *Id.* However, the Ninth Circuit held that the denial of CEC's petition for a waiver was "closely intertwined with the exercise of DOE's authority under § 6295" and thus the court of appeals had jurisdiction. *Id.*. Furthermore, the "CEC [was] 'adversely affected by a rule prescribed under section . . . 6295' within the meaning of § 6306(b), which confers jurisdiction on the circuit courts of appeals." *Id.* (alterations in original). Therefore, the Ninth Circuit appeared to hold that it had jurisdiction over CEC's claim pursuant to the express language of the statute, and not solely as a

---

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 27 of 29

Executive Order is a discrete action distinct from the future anticipated revised leasing plans by the agency and is far less "interrelated" or "intertwined" with agency action than was the case in *Cal. Energy Comm'n*. There, the Ninth Circuit held it had jurisdiction in part because "[t]he type of review required of us is qualitatively no different from the sort that we would engage in upon review of a rule promulgated under 42 U.S.C. § 6295, over which we are expressly assigned jurisdiction under the EPCA."[130] Here, a question of whether the Interior Secretary properly develops a five-year leasing program pursuant to § 1344 is distinct from the question of whether the President has the authority to reverse prior executive withdrawal orders issued pursuant to § 1341(a).[131]

Finally, API cites *Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Research & Special Programs Admin.*, 457 F.3d 956, 960 (9th Cir. 2006), for its statement that "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals, we must resolve that ambiguity in favor of review by a court of appeals."[132] However, API does not identify the particular ambiguity that requires dismissal for lack of jurisdiction over Plaintiffs' claims in this Court. Instead, as the Ninth Circuit held in *Cal. Energy Comm'n*, "[u]nless Congress specifically maps a judicial review path for an

_____

result of interrelatedness.

[130] *Id.* at 1150.

[131] *See* Docket 25 at 13–14 (identifying considerations of the Interior Secretary in developing the five-year leasing program).

[132] Docket 39 at 18.

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 28 of 29

agency, review may be had in federal district court under its general federal question jurisdiction."[133]

Plaintiffs' claims in this action are not challenging a leasing plan under § 1344 pursuant to § 1349(c)(1) and therefore do not need to be brought in the District of Columbia Circuit; this Court has jurisdiction to hear this case.[134]

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Motions to Dismiss at Dockets 12, 25, and 34 are each DENIED. The parties previously agreed to file a proposed schedule for summary judgment briefing within 45 days of the issuance of this order. However, the Court is not persuaded that 45 days is necessary for that task.[135] Accordingly, within **14 days** from the date of this order, the parties shall file a proposed schedule for summary judgment briefing (or proposed schedules if the parties are unable to agree).

DATED this 19th day of March, 2018 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[133] *Cal. Energy Comm'n*, 585 F.3d at 1148 (quoting *Owner–Operators Indep. Drivers Ass'n v. Skinner*, 931 F.2d 582, 585 (9th Cir. 1991)). API contends that "where a federal statute provides for direct review of an agency action in the court of appeals, such specific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." Docket 39 at 14 (alterations omitted) (quoting *Nuclear Info. & Res. Serv.*, 457 F.3d at 959). However, Plaintiffs' claim does not call for this Court's review of agency action pursuant to § 1344, but review of Presidential action under § 1341.

[134] While the Court recognizes the possibility, discussed at oral argument, that allowing this case to proceed could result in concurrent litigation being brought in the D.C. Circuit under § 1349(c)(1), API provides no authority for the proposition that the possibility of redundant or overlapping cases mandates dismissal, especially when the second case is merely hypothetical at this point.

[135] Docket 35 (Order re Joint Schedule Proposal).

Case No. 3:17-cv-00101-SLG, *League of Conservation Voters, et al. v. Trump, et al.*
Order re Motions to Dismiss
Page 29 of 29