Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th Floor
New York, NY 10011
T: 212.727.2700 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00101-SLG |
| | ) | |
| DONALD J. TRUMP *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| AMERICAN PETROLEUM INSTITUTE and STATE OF ALASKA, | ) | |
| | ) | |
| *Intervenor-Defendants*. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................. 1

BACKGROUND ..................................................................................... 2

ARGUMENT ......................................................................................... 9

I.      PLAINTIFFS HAVE STANDING ................................................. 9

        A.      Plaintiffs have suffered injury-in-fact ................................ 10

                1.      Harm to Plaintiffs' members is concrete ................................. 11

                2.      Harm to Plaintiffs' members is particularized .......................... 13

                3.      Harm to Plaintiffs' members is imminent ................................ 14

                4.      Plaintiffs satisfy the other elements of standing ...................... 17

II.     PRESIDENT TRUMP UNLAWFULLY REVERSED OUTER
        CONTINENTAL SHELF WITHDRAWALS .............................. 18

        A.      There is no constitutional authority for President Trump's action ..... 18

        B.      President Obama permanently withdrew submerged lands in the
                Arctic and Atlantic Oceans pursuant to his delegated authority ......... 22

        C.      President Trump lacked any authority for his reversals ...................... 23

III.    THE COURT SHOULD DECLARE SECTION 5 OF THE ORDER
        UNLAWFUL AND INVALID AND ENJOIN THE SECRETARIES OF
        THE INTERIOR AND COMMERCE FROM IMPLEMENTING IT ........ 32

        A.      The Court may grant the declaratory and injunctive relief
                Plaintiffs seek .................................................................. 33

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                          i

Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 2 of 55

B.     A declaration and injunction would remedy Plaintiffs' harm.............34

C.     The equities compel an injunction here ...............................................37

        1.     Plaintiffs will suffer irreparable harm absent an injunction .....37

        2.     The balance of equities and the public interest favor
               injunctive relief .......................................................................39

CONCLUSION ......................................................................................................40

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                        ii
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 3 of 55

# TABLE OF AUTORITIES

## CASES

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998).........................................................................................25

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987).........................................................................................37

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002).........................................................................................24

*Bond v. United States*,
    564 U.S. 211 (2011).........................................................................................20

*Bragdon v. Abbott*,
    524 U.S. 624 (1998).........................................................................................27

*Carcieri v. Salazar*,
    555 U.S. 379 (2009).........................................................................................24

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845) ..........................................................................33

*Cent. Bank of Denver v. First Interstate Bank*,
    511 U.S. 164 (1994).........................................................................................26

*Clinton v. City of New York*,
    524 U.S. 417 (1998).........................................................................................33

*Clinton v. Jones*,
    520 U.S. 681 (1997).........................................................................................33

*Cochnower v. United States*,
    248 U.S. 405 (1919).........................................................................................24

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) .................................................................12, 14

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG               iii

Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 4 of 55

*Ctr. for Biological Diversity v. Nat'l Sci. Found.*,
No. C 02-5065 JL, 2002 WL 31548073 (N.D. Cal. Oct. 30, 2002)..............38

*Doe 1 v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017)...............................................34

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ...........................................10, 11, 18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)..................................................................33, 34

*Franklin Nat'l Bank v. New York*,
347 U.S. 373 (1954)..........................................................................27

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..................................................................10, 13

*Hawaii v. Trump*,
878 F.3d 662 (9th Cir. 2017) .........................................................33

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)..........................................................................18

*Idaho Sporting Cong. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) .........................................................39

*In re Zappos.com, Inc.*,
888 F.3d 1020 (9th Cir. 2018) .......................................................14

*Karnoski v. Trump*,
No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ........34

*Kent v. Dulles*,
357 U.S. 116 (1958)..........................................................................27

*Kidd v. U.S. Dep't of Interior*,
756 F.2d 1410 (9th Cir. 1985) .......................................................25

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                   iv

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) .......................................................14

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................11, 18

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996)....................................................................27

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
    456 U.S. 353 (1982)....................................................................27

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)......................................................................28

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974)........................................19, 24, 33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) .......................................................37

*Nat. Res. Def. Council v. Evans*,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003)........................................39

*Nat. Res. Def. Council v. Gutierrez*,
    No. C-07-04771 EDL, 2008 WL 360852 (N.D. Cal. Feb. 6, 2008).............38

*Native Vill. of Point Hope v. Jewell*,
    1:08–cv–0004–RRB (D. Alaska, April 24, 2014) ........................38

*Native Vill. of Point Hope v. Salazar*,
    1:08–cv–0004–RRB (D. Alaska, July 21, 2010)..........................38

*Noriega-Perez v. United States*,
    179 F.3d 1166 (9th Cir. 1999) ....................................................19

*Ocean Mammal Inst. v. Gates*,
    546 F. Supp. 2d 960 (D. Haw. Feb. 29, 2008)..............................38

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG      v

Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 6 of 55

*Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*,
    725 F.2d 537 (9th Cir. 1984) .........................................................................19

*Padash v. INS*,
    358 F.3d 1161 (9th Cir. 2004) ....................................................................25

*Ross v. Blake*,
    136 S. Ct. 1850 (2016)..........................................................................24, 25

*Sierra Club v. Morton*,
    405 U.S. 727 (1972).....................................................................................13

*Sioux Tribe of Indians v. United States*,
    316 U.S. 317 (1942)...............................................................................20, 21

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).........................................................................10, 13

*Stern v. Marshall*,
    564 U.S. 462 (2011).....................................................................................19

*United States v. California*,
    332 U.S. 19 (1947).......................................................................................20

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915).....................................................................................21

*United States v. Patton*,
    771 F.2d 1240 (9th Cir. 1985) ....................................................................25

*Yates v. United States*,
    135 S. Ct. 1074 (2015).................................................................................30

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).......................................................................18, 33, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
    103 F. Supp. 569 (D.D.C 1952)...................................................................40

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG            vi

Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 7 of 55

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. IV, § 3 ................................................................................32

U.S. Const. art. IV, § 3, cl. 2 ...............................................................19, 20

## STATUTES

16 U.S.C. § 473 ......................................................................................26

16 U.S.C. § 1371(a)(5)(A) .....................................................................36

16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa) .....................................................36

16 U.S.C. § 1371(a)(5)(D) .....................................................................36

43 U.S.C. § 1332(1) ..........................................................................20, 29

43 U.S.C. § 1337 ...................................................................................35

43 U.S.C. § 1337(a)(1) ..........................................................................30

43 U.S.C. § 1340 ...................................................................................35

43 U.S.C. § 1341(a) ..............................................................6, 19, 22, 30, 35

43 U.S.C. § 1344 ...................................................................................32

54 U.S.C. § 320301(a) ...........................................................................26

54 U.S.C. § 320301(b) ...........................................................................26

Pub. L. No. 61-303, 36 Stat. 847 (1910).................................................26

Pub. L. No. 74-286, 49 Stat. 660 (1935).................................................26

Pub. L. No. 83-212, 67 Stat. 462 (1953)...........................................7, 29, 30

Pub. L. No. 94-579, 90 Stat. 2732 (1976)...............................................21

Pub. L. No. 95-372, 92 Stat. 629 (1978)......................................................32

Pub. L. No. 109-54, 119 Stat. 499 (2005)....................................................8

Pub. L. No. 111-8, 123 Stat. 524 (2009)......................................................8

OTHER AUTHORITIES

Executive Order 13795—Implementing an America-First Offshore Energy
Strategy,
    2017 Daily Comp. Pres. Docs. 287 (Apr. 28, 2017) ................8, 9, 14, 15, 17

Presidential Memorandum—Withdrawal of Certain Areas of the United States
Outer Continental Shelf Offshore Alaska from Leasing Disposition,
    2015 Daily Comp. Pres. Docs. 59 (Jan. 27, 2015) ..............................3, 22, 23

Presidential Memorandum—Withdrawal of Certain Portions of the United States
Arctic Outer Continental Shelf from Mineral Leasing,
    2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) ............................4, 5, 23

Presidential Memorandum—Withdrawal of Certain Areas off the Atlantic Coast on
the Outer Continental Shelf from Mineral Leasing,
    2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) ................................ 3, 23

25 Fed. Reg. 2352 (Mar. 19, 1960)................................................................7

34 Fed. Reg. 5655 (Mar. 26, 1969)................................................................7

H.R. Rep. No. 82-695 (1951)......................................................................21

H.R. Rep. No. 95-590 (1978)................................................................20, 32

S. Rep. 83-411 (1953)............................................................................29, 31

S. Rep. No 95-284 (1978) ..................................................................21, 31, 32

26 Weekly Comp. Pres. Docs. 1006 (June 26, 1990)................................7

34 Weekly Comp. Pres. Docs. 1111 (June 12, 1998)...........................7, 8

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG        viii

Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 9 of 55

43 Weekly Comp. Pres. Docs. 19 (Jan. 9, 2007) .................................................7, 8

44 Weekly Comp. Pres. Docs. 986 (July 14, 2008)..........................................7, 8, 9

10 U.S. Op. Atty. Gen. 359 (Nov. 8, 1862) .............................................................28

16 U.S. Op. Atty. Gen. 121 (Aug. 10, 1878) ...........................................................29

17 U.S. Op. Atty. Gen. 168 (July 20, 1881) ............................................................29

21 U.S. Op. Atty. Gen.  120 (Jan. 19, 1895)...........................................................29

28 U.S. Op. Atty. Gen. 143 (Jan. 24, 1910).............................................................29

36 U.S. Op. Atty. Gen. 75 (July 8, 1929) ................................................................29

39 U.S. Op. Atty. Gen. 185 (Sept. 26, 1938)......................................................28, 29

2010 Daily Comp. Pres. Docs. 214 (Mar. 31, 2010) .................................................7

2014 Daily Comp. Pres. Docs. 934 (Dec. 16, 2014) .................................................7

2016 Daily Comp. Pres. Docs. 836 (Dec. 9, 2016) ...................................................8

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                        ix
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 10 of 55

INTRODUCTION

Plaintiffs ask this Court to curb an abuse of executive power that touches deeply on the people and wildlife that depend upon the Arctic and Atlantic Oceans. Acting without statutory or constitutional authority, President Trump issued an executive order that purports to strip protections from vast areas of these fragile and biologically rich oceans that had been permanently withdrawn from industrial oil and gas development.

The Order spurs oil and gas activities that endanger marine mammals and other ocean denizens, carrying serious risks for ecosystem health. These impacts pose threats to many people who use these oceans, like scientific researchers and tourists, subsistence hunters and recreational fishermen, tour boat operators and photographers. Only Congress has the power to make those lands available again for mineral exploitation and its accompanying threats.

The law here is straightforward and well established. Under the Constitution, the President has powers over public lands only to the extent Congress delegates those powers. Through the Outer Continental Shelf Lands Act, Congress has granted the President power to withdraw lands from industrial development, but—in contrast to its explicit authorizations in other statutes—it has not granted the power to reverse such withdrawals. The clear import of the Act's

text is buttressed by contextual and historical indicia of congressional intent. The President's order is unlawful.

Plaintiffs ask the Court to declare the Order unlawful and to enjoin any agency actions that are inconsistent with the prior withdrawals. The Court has the power to grant that relief, and it will redress Plaintiffs' imminent injuries.

BACKGROUND

In December 2016, President Obama protected the United States' Arctic Ocean—except 2.8 million nearshore acres in the Beaufort Sea—and, separately, a series of deepwater canyons in the Atlantic Ocean, from oil and gas development. Though the Secretary of the Interior had already decided not to include these areas in the federal government's five-year offshore leasing program, President Obama's actions, by their terms, made those areas ineligible for leasing in any future such program. His actions built on steps he took in January 2015 to withdraw from leasing several Arctic Ocean areas with particularly high ecological and subsistence values. He took these actions in service of a variety of compelling public purposes, utilizing—as did several of his predecessors—unique authority Congress bestowed on Presidents to preserve publicly owned ocean areas from mineral exploitation.

In each instance, President Obama placed mineral resources off limits to protect biological resources—resources valuable to the American public in their

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                    2
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 12 of 55

own right but also for their importance to human users. His 2015 Arctic withdrawal cited "the critical importance of certain areas . . . to subsistence use by Alaska Natives as well as for marine mammals, other wildlife, and wildlife habitat." Ex. 2. A contemporaneous White House statement explained that the President was putting these areas "off-limits to consideration for future oil and gas leasing" because they are "[t]eeming with biological diversity," are "part of one of the last great marine wildernesses," support endangered species and fish that "grant fishermen their livelihoods," and "include Alaskan coastal buffer and subsistence areas." Ex. 7 at 1. President Obama also cited intergenerational responsibilities, acting, he stated, "to ensure that the unique resources of these areas remain available for future generations." Ex. 2.

Similarly, the 2016 withdrawal of 26 Atlantic canyons and canyon complexes reflected their "critical importance . . . for marine mammals, deep water corals, other wildlife, and wildlife habitat." Ex. 4. To ensure they remain available for future generations, the withdrawal "prevents consideration . . . for any future mineral leasing." *Id.* The accompanying White House fact sheet cited the "incredible ecological importance" of the canyons, making them "ecologically and economically valuable for fisheries" including "numerous large, commercially valuable species such as marlin, sailfish, swordfish, tunas, and sharks." Ex. 6 at 1-2. The fact sheet also pointed to "unique biological communities" in and around

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                    3
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 13 of 55

the canyons that include—in addition to many cold-water corals—sponges, crustaceans, and numerous bottom fish, as well as sea turtles, and endangered and other deep-diving whales. *Id.* at 3. "Many of these species live many years, have low reproductive rates, grow slowly, and rely on the habitats provided by canyon features throughout their lifespans." *Id.* at 2.

The fact sheet noted the importance of the Atlantic canyon withdrawal in protecting vulnerable species already threatened by ocean warming—warming that is projected to increase in northeast United States seas at three times the global average. *Id.* at 1. These species are also "susceptible to physical disturbance by human activities," including impacts associated with oil drilling. *Id.* at 3. At the same time, the impact on the Nation's energy resources was "estimated to be minimal," in part because of the "technical and operational risks related to the canyon geology." *Id.* at 4.

In expanding his Arctic withdrawals in 2016 to include minerals under the large majority of federal Arctic waters, President Obama responded in part to "irreplaceable values of the Chukchi Sea and portions of the Beaufort Sea for marine mammals, other wildlife, wildlife habitat, scientific research, and Alaska Native subsistence use." Ex. 3. The White House's supporting fact sheet lists "several species of seals, Pacific walrus, polar bears, and more than 98 species of fish," "a number of whale species," "[m]any bird species," and "several Federally

listed and candidate species under the Endangered Species Act." Ex. 5 at 2. The fact sheet also found that "Alaska Native communities of the North Slope depend largely on the natural environment, especially the marine environment, for food and materials" and that this "environment is integrally linked with the cultural and spiritual values of these communities." *Id.* at 3.

While the President had already in 2015 withdrawn some specific high-value habitats in the Arctic Ocean, the U.S. Department of the Interior had subsequently identified several other "Environmentally Important Areas (EIAs)." *Id.* In addition, the White House fact sheet noted, "many of the species and ecosystem components are not limited to the EIAs themselves" and hence are vulnerable to activities elsewhere in the Arctic. *Id.* Moreover, protecting only the highest-value habitat would not "account for the way in which oil could spread" in the event of a substantial spill, an event the Department put at 75% likely for just a single lease sale. *Id.* at 3, 7; *see also* Ex. 3 (President noting "the vulnerability of these ecosystems to an oil spill").

This threat from spills region-wide is greatly exacerbated by the remoteness and harsh conditions of the Arctic Ocean. The President's withdrawal specifically cited "the unique logistical, operational, safety, and scientific challenges and risks of oil extraction and spill response in these Arctic waters." Ex. 3. Logistical support in the remote region is "very limited" and expected to remain so; oil breaks

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                    5
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 15 of 55

down slowly, if at all, in cold water; ice covers the sea eight to nine months a year; darkness is a major issue during freeze-up; and oil under or in ice would be trapped until spring and dispersed widely.  Ex. 5 at 6-7.

President Obama acted, as well, because factors making Arctic spill response and remediation so challenging also make delivery of oil and gas from the withdrawn areas to consumers a remote possibility.  "[A]ny potential Arctic offshore production would only occur around the middle of this century."[1]  Ex. 5 at 1-2.  Production then would run headlong into measures the United States and other countries need to take to reduce carbon pollution and stem climate change. "These timelines," the White House fact sheet pointed out, "would only bring significant new oil and gas resources into the market at a time when the United States and its international partners must be transitioning to alternative energy sources."  *Id.* at 8.

President Obama acted pursuant to section 12(a) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1341(a).  *See* Exs. 2, 3 & 4 (all citing "the

---

[1] The withdrawal did not apply in 2.8 million nearshore acres of the Beaufort Sea with high oil and gas potential close to existing state leases and infrastructure, which might shorten timelines.  Still, there are "significant concerns about oil and gas activity occurring in this area" and it was excluded from the current five-year leasing program.  Ex. 5 at 2.  Instead, the President left that area to future "evaluation and study to determine if new leasing could be appropriate at some point."  *Id.*

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                    6
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 16 of 55

authority granted to me in section 12(a)").  Congress enacted OCSLA in 1953 to establish and regulate federal jurisdiction over the outer continental shelf, that is, beyond state waters.  *See* Pub. L. No. 83-212, preamble, 67 Stat. 462, 462 (1953). Congress authorized the Secretary of the Interior to determine whether to dispose of federal interests in those lands by leasing them for extraction of minerals, principally oil and gas (as well as by issuing rights of way for pipelines).  Pub. L. No. 83-212, §§ 5, 8, 67 Stat. at 464, 468.  In section 12(a), Congress gave Presidents special authority, beyond their supervisory power over their own inferior officers, to withdraw unleased outer continental shelf lands from disposition by future Secretaries of the Interior.  Pub. L. No. 83-212, § 12(a), 67 Stat. at 469.

Presidents from Eisenhower to Obama have used this delegation to create or enlarge upon withdrawals in the outer continental shelf, in addition to those described above.  *See* 25 Fed. Reg. 2352 (Mar. 19, 1960); 34 Fed. Reg. 5655 (Mar. 26, 1969);[2] 26 Weekly Comp. Pres. Docs. 1006 (June 26, 1990); 34 Weekly Comp. Pres. Docs. 1111 (June 12, 1998); 43 Weekly Comp. Pres. Docs. 19 (Jan. 9, 2007); 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008); 2010 Daily Comp. Pres. Docs. 214 (Mar. 31, 2010); 2014 Daily Comp. Pres. Docs. 934 (Dec. 16, 2014); 2016

---

[2] President Nixon made this withdrawal through his Interior Secretary and did not explicitly cite section 12(a).

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                        7

Daily Comp. Pres. Docs. 836 (Dec. 9, 2016).[3]  Some of their withdrawals have

been time-limited, but most have not.[4]

Despite the absence of statutory authority, in April 2017 President Trump

issued an executive order purporting to reverse all existing presidential

withdrawals in the Arctic and Atlantic Oceans.  *See* Ex. 1.[5]  Styled as a

"Modification," Section 5 of the Order directed that the wording of his

predecessor's memoranda withdrawing portions of the Chukchi and Beaufort Seas

and the Atlantic be replaced verbatim by the text from President Bush's 2008

withdrawal memorandum, which affected only entirely different ocean areas.  The

end result of that sleight-of-hand, if the Trump order were valid, would be to

---

[3] This withdrawal was included in Executive Order 13754, creating the Northern Bering Sea Climate Resilience Area, for which President Obama cited OCSLA without specifically mentioning section 12(a).

[4] While President George W. Bush twice curtailed a time-limited withdrawal, once in 2007 and again in 2008, *see* 43 Weekly Comp. Pres. Docs. 19; 44 Weekly Comp. Pres. Docs. 986, neither of these efforts was judicially reviewed, let alone upheld.  That these actions were not challenged is not surprising.  The withdrawal President Bush curtailed expired by its terms in 2012, s*ee* 34 Weekly Comp. Pres. Docs. 1111; Bush's first curtailment simply reflected prior congressional action, *compare* 43 Weekly Comp. Pres. Docs. 19, *with* Pub. L. No. 109-54, §§ 104-06, 119 Stat. 499, 521-22 (2005); and Congress acted to lift its own funding moratoria shortly after the second curtailment, *compare* Pub. L. No. 111-8, Div. E, 123 Stat. 524, 711-12 (2009), *with* Pub. L. No. 109-54, §§ 104-06.

[5] Though not at issue in this case, Section 4(c) of President Trump's order also revoked Executive Order 13754, *see* Ex. 1 at 2, which, in creating the Northern Bering Sea Climate Resilience Area, included a withdrawal in lower portions of the Arctic Ocean.  *See* 2016 Daily Comp. Pres. Docs. 836.

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                           8
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 18 of 55

render the Obama memoranda identical to and redundant with Bush's, and the Obama withdrawals therefore of no effect. *Compare id.* at 2, *with* 44 Weekly Comp. Pres. Docs. 986. President Trump's order also directed the Secretary of the Interior to "give full consideration" to annual lease sales in, among other ocean areas, the Chukchi and Beaufort Seas and the mid-Atlantic Ocean, and to reconsider recently adopted safety and pollution rules applicable to outer continental shelf drilling in general and to Arctic drilling in particular. Ex. 1 at 1, 3. It also directed him, together with the Secretary of Commerce, to develop a streamlined seismic permitting approach and expedite the granting of offshore seismic permits, to the maximum extent permitted by law. *Id.*

Plaintiffs filed this lawsuit challenging President Trump's reversals on May 3, 2017. Subsequently, Interior Secretary Zinke has issued a draft proposed program of offshore drilling that would include three lease sales each in the Chukchi and Beaufort Seas and five in the north- and mid-Atlantic Ocean. Ex. 13 at 2-3. He has also issued an information request related to a proposed 2019 lease sale in the Beaufort Sea. Ex. 14 at 1.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs'

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                  9
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 19 of 55

organizational purposes, and the lawsuit does not require the participation of individual members. *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Plaintiffs' members have standing because (1) they have suffered an injury-in-fact, (2) that is fairly traceable to the Order, and (3) that is likely to be redressed by the remedy sought here. *Id.* at 180-81; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs' members visit or otherwise use and enjoy specific areas of the Atlantic and Arctic Oceans from which the Order strips protections, and the fish and wildlife that depend on those areas. The Order enables and promotes activities related to oil and gas exploration or development, including seismic surveying, that destroy, degrade, or diminish the wild and natural state of these areas, or that kill, harm, harass, or displace wildlife. These activities interfere with Plaintiffs' members' use and enjoyment of the areas and associated wildlife. As such, the Order directly and irreparably injures the cognizable interests of Plaintiffs' members. *See, e.g.*, *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000). A declaration that the Order is illegal and an injunction preventing its implementation will redress Plaintiffs' injuries.

A.    Plaintiffs have suffered injury-in-fact.

To establish injury-in-fact, Plaintiffs must show an invasion of a legally protected interest that is (a) "concrete and particularized" and (b) "actual or

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                    10
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 20 of 55

imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992) (internal quotation marks omitted).[6] Plaintiffs satisfy this

test.

### 1. Harm to Plaintiffs' members is concrete.

The oil and gas activities that the Order catalyzes, and seismic surveying in

particular, threaten harm to the broad areas affected by those activities and the

marine wildlife that depends upon those areas. *See* Ex. 19 at 3-13 (National

Marine Fisheries Service environmental impact statement assessing effects of

seismic surveying and exploration activities in the Arctic Ocean if it is open to

leasing); *id.* at 42-57 (providing an overview description of noise effects on marine

mammals); *id.* at 58-67 (assessing aggregate chronic effects of industrial ocean

noise); *id.* at 58 (concluding that chronic higher background noise levels can "limit

the ability of marine species to detect and interpret important acoustic cues" and

"has the potential to decrease the value of habitat and can lead to consequent

chronic effects"); *id.* at 59 (noting ample evidence that decreasing listening and

communication space can negatively affect aquatic animals); *id.* at 67-84

---

[6] An individual's aesthetic or recreational interest in a particular place or species is a legally protected interest. *See Ecological Rights Found.*, 230 F.3d at 1147, and cases cited therein.

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                    11

(assessing bowhead whale impacts from seismic and drilling); *id.* at 85-92

(assessing beluga whale impacts from seismic surveying).

Plaintiffs' injury is geographically specific. "Although the geographic area is

very large, it is discrete and defined." Dkt. 45 at 22; *see also Ctr. for Biological*

*Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) (holding that plaintiffs

with interests in viewing polar bears and walrus in the Beaufort Sea region alleged

a sufficiently geographically specific injury to confer standing). Plaintiffs'

members visit or otherwise use and enjoy the Atlantic Ocean, including areas near

deepwater canyons; the Chukchi and Beaufort Seas; the wildlife that depends upon

these regions; and coastal regions adjacent to these waters for cultural and

subsistence purposes, recreation, wildlife viewing, education, research,

photography, aesthetic and spiritual enjoyment, or their professions or livelihoods.

*See* Exs. 21 (Decl. of Regina A. Asmutis-Silvia), 22 (Decl. of Rosemary

Ahtuangaruak), 24 (Decl. of John Hocevar), 26 (Decl. of Dr. Leslie S. Kaufman),

28 (Decl. of Pamela A. Miller), 29 (Decl. of Rob Moir), 30 (Decl. of Dan

Ritzman), 32 (Decl. of Robert Thompson), 34 (Decl. of Michael Wald) & 36

(Decl. of Kiliii Yuyan).

Seismic surveying can cover large geographic areas, blanket the ocean with

sound intense enough to be harmful vast distances from the surveying vessels

themselves, and harm thousands of marine mammals. *See* Ex.19 at 67-71

(summarizing how far potentially harmful sound propagates in Beaufort from 2D/3D seismic; out to almost 75 km); *id.* at75-77 (summarizing for Chukchi; out to over 100 km); *id.* at 32-33 (showing acoustic footprints of seismic survey systems in the Beaufort and Chukchi seas); *id.* at 35-39 (describing areas ensonified to different levels under various seismic and exploration drilling activity scenarios); *id.* at 23-27 (showing estimates of marine mammals exposed to potentially harmful sound for different activity scenarios in the Beaufort and Chukchi seas); Ex. 15 at 26-27 (National Marine Fisheries Service permit for a single two-month-long seismic survey in 2012 in the Arctic Ocean authorizing disturbance of over 60,000 ringed seals and 4,600 beluga whales); Ex. 38 at 4, 10-13 (estimating hundreds of thousands of disturbances to marine mammals from proposed south- and mid-Atlantic seismic activities).  Thus Plaintiffs' use overlaps with the far-reaching harmful effects catalyzed by the Order.

### 2. *Harm to Plaintiffs' members is particularized.*

Plaintiffs' harm is particularized because their members' interests are impaired in a personal and individualized way.  *See* Dkt. 45 at 22-24; *Spokeo, Inc.*, 136 S. Ct. at 1548.  It has long been settled that environmental plaintiffs are personally injured when they use the affected area and "are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*,

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                           13
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 23 of 55

405 U.S. 727, 735 (1972)).  Like the plaintiffs in *Kempthorne*, 588 F.3d at 707-08,

Plaintiffs here have made that showing.  Their members' personal use and

enjoyment of these areas and the wildlife that depends on them would be harmed

by seismic surveying and other oil and gas activities catalyzed by the Order.  Exs.

21, 22, 24, 26, 28, 29, 30, 32, 34 & 36.

### 3. *Harm to Plaintiffs' members is imminent.*

The Order creates "a credible threat of real and immediate harm" sufficient to

support standing.  *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir.

2010); *see also* Dkt. 45 at 17-20.  In this case, "although third parties must obtain

permits before seismic surveying and other activities may occur, there is no

indication that the government will not promptly grant such permits, particularly in

light of the Executive Order's stated purpose of expediting energy production."

Dkt. 45 at 17; *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1025-29 (9th Cir.

2018).  The Order "itself demonstrates that oil and gas exploration activities are

intended to be imminent."  Dkt. 45 at 18.  It purports to reverse protections that

barred oil and gas leasing and drilling in approximately 128 million acres of

federally owned portions of the Arctic and Atlantic Oceans.  *See* Ex. 1 at 2; *see

also* Exs. 2, 3 & 4.  The Order also mandates consideration of revising the federal

government's offshore oil and gas program so that it includes annual lease sales in

the Arctic and Atlantic Oceans. Ex. 1 at 1. And, critically, it requires the Secretaries of the Interior and Commerce to expedite seismic surveying. *Id.* at 3.

The Arctic Ocean has seen extensive seismic surveying and some exploration drilling in the recent past. *See* Ex. 19 at 29-30 (showing a list of past seismic and exploration drilling activities from 2006-2015 in the Arctic Ocean). Seismic surveying often precedes oil and gas lease sales by several years. *See* Dkt. 26 at 12 (¶ 43) ("API . . . admits that geological and geophysical activities may occur prior to lease sales . . . ."); Dkt. 49 at 12 (¶ 43) ("Defendants admit that seismic surveys are sometimes conducted prior to lease sales as an exploration tool to identify prospective resources."); Ex. 11 (showing three seismic survey programs completed in 2006 and one in 2007 preceding a 2008 lease sale in the Chukchi Sea; showing multiple seismic survey programs completed in the four years prior to a 2003 lease sale in the Beaufort Sea); Ex. 10 (showing lease sale dates). In the Atlantic, companies have sought approval to conduct seismic surveys even when lease sales were more than five years away and are not included in an existing or proposed five-year program. Dkt. 49 at 11-12 (¶ 40) (Atlantic seismic survey permit applications pending in June 2017); Ex. 9 (leasing schedule demonstrating no lease sales scheduled in the Atlantic in 2017); Ex. 8 (leasing schedule demonstrating no lease sales scheduled in the Atlantic through 2022).

Industry has demonstrated interest in oil and gas activities, including seismic surveying, in the previously withdrawn areas. *See* Dkt. 26 at 10 (¶ 39) ("API admits that some companies in the oil and gas industry remain interested in oil and gas development . . . in the Arctic Ocean."); *id.* at 11-12 (¶¶ 40-42) (Atlantic); Dkt. 49 at 11 (¶ 39) ("Defendants admit that some companies in the oil and gas industry remain interested in oil and gas development, in the Arctic Ocean."); *id.* at 11-12 (¶ 40) (Atlantic); Ex. 20 (industry statement calling for seismic surveying in frontier areas without delay). In the Atlantic, the Department of the Interior is evaluating applications submitted by at least seven companies to conduct seismic surveying, and the Department of Commerce is proposing to issue permits to four applicants to take marine mammals incidental to seismic surveying activities. Dkt. 26 at 11 (¶ 40); *see also* Ex. 12 (showing eight applications for seismic surveying in the Atlantic Ocean pending before the Department of the Interior). The threat of seismic surveying in both oceans has only grown as Defendants propose scheduling lease sales in both oceans and companies seek authorizations for seismic activities. *See* Ex. 39 (announcing receipt of an application to conduct seismic surveying in non-withdrawn areas of the Beaufort Sea over multiple years starting in July 2018); Ex. 13 at 2-3 (notice of draft proposed 2019-24 leasing schedule offering six lease sales in the Arctic Ocean and five in the north- and mid-

Atlantic Ocean); Ex. 14 at 1 (call for information for a Beaufort Sea lease sale in 2019).

### 4. *Plaintiffs satisfy the other elements of standing.*

Plaintiffs' injury is traceable to the Order, because opening areas to leasing that were formerly permanently off limits to leasing likely increases oil and gas activities in those areas. *See* Ex. 1 at 1 (purpose of the Order is to encourage offshore oil and gas development); Dkt. 45 at 17-18; Ex. 17 at 8 ("Leasing moratoria . . . decrease exploration activity."); Ex. 18 at 5, 7 (agency documents describing the absence of oil and gas activities in withdrawn areas of the outer continental shelf); Ex. 19 at 6 (assuming the Arctic Ocean is open to leasing, "[the National Marine Fisheries Service] expects to receive applications [for] . . . exploration activities"); *id.* at 8 (stating that the EIS activity scenarios present "a reasonable range and level of activities for which permits and authorizations may be requested in the foreseeable future"); *id.* at 8-13 (showing activity scenarios with multiple large-scale seismic and drilling activities occurring each year).

The Court can redress Plaintiffs' harm by declaring Section 5 of the Order unlawful and invalid and enjoining the Secretaries of the Interior and Commerce to act in accordance with the withdrawals. *See* Dkt. 45 at 11-13; *infra* Part III-B.

The harm and threat of harm to Plaintiffs' members' aesthetic, economic, recreational, and subsistence interests in the Arctic and Atlantic Oceans represents

a concrete injury-in-fact, fairly traceable to the President's violation of law, and redressable by the relief Plaintiffs seek. *See Lujan*, 504 U.S. at 560-61; *Ecological Rights Found.*, 230 F.3d at 1147.

Plaintiffs also meet the second and third elements of associational standing. Safeguarding the Arctic and the Atlantic Oceans from harmful offshore oil and gas activities is germane to the Plaintiffs' organizational purposes. Exs. 23 (Decl. of Elisabeth Balster Dabney), 24, 25 (Decl. of Gene Karpinski), 27 (Decl. of Adam Kolton), 30, 31 (Decl. of Michael Senatore), 32, 33 (Decl. of Gina Trujillo), 35 (Decl. of Nicole Whittington-Evans) & 37 (Decl. of Brendan Cummings). Plaintiffs' members need not participate in this litigation because none of the claims asserted or the relief sought requires individualized proof. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).

## II. PRESIDENT TRUMP UNLAWFULLY REVERSED OUTER CONTINENTAL SHELF WITHDRAWALS

### A.    There is no constitutional authority for President Trump's action.

President Trump's revocation of OSCLA section 12(a) protections for the Atlantic and Arctic Oceans is unconstitutional. Under our system of separation of powers, "[t]he President's power . . . must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 586 (1952). The Property Clause of the Constitution gives Congress the exclusive power to manage the United States' lands and associated resources. *See*

U.S. Const. art. IV, § 3, cl. 2.  Through OCSLA, Congress delegated to the President only the authority to withdraw unleased lands from mineral leasing or other disposal—it reserved for itself the contrary power to revoke such withdrawals.  *See* 43 U.S.C. § 1341(a).  By acting beyond that delegation, President Trump encroached on exclusive congressional powers in derogation of the doctrine of separation of powers.

"On its most fundamental plane, the separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence."  *Noriega-Perez v. United States*, 179 F.3d 1166, 1174 (9th Cir. 1999) (quoting *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 544 (9th Cir. 1984)).  The framers of the Constitution built into it the core principle of separation of powers to contain, and protect the citizenry from, abuse of power by an overreaching branch of government.  As "envisioned by the constitutional principle of checks and balances," judicial review "keep[s] both the Executive and Congress within their respective constitutional domains in order to prevent that concentration of power which the Founding Fathers so feared."  *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 612 (D.C. Cir. 1974) (footnote omitted); *see also Stern v. Marshall*, 564 U.S. 462, 483 (2011) ("The structural principles secured by the separation of powers protect the individual as

well [as the branches of government].'" (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011))).

The Constitution entrusts Congress—exclusively—with the delicate task of managing the United States' lands and natural resources. Under the Property Clause, "Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *See* U.S. Const. art. IV, § 3, cl. 2. As the Supreme Court has noted, "the constitutional power of Congress in this respect is without limitation." *United States v. California*, 332 U.S. 19, 27 (1947); *see also Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942) (recognizing the Property Clause power as exclusive to Congress).

Congress passed OCSLA shortly after the Supreme Court spoke to the plenary nature of congressional jurisdiction under the Property Clause in the context of potential legislation affecting offshore submerged lands. *See California*, 332 U.S. at 27. In enacting OCSLA, Congress ratified that the outer continental shelf's "subsoil and seabed . . . appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this [Act]." 43 U.S.C. § 1332(1). And Congress expressly affirmed its plenary power when it amended OCSLA to establish Five Year Leasing Programs. *See* H.R. Rep. No. 95-590, at 54 (1978) (placing restrictions on the Secretary of the Interior's authority in light

of Congress's "special constitutional responsibility to make all needful rules and regulations respecting the territory and property belonging to the United States," particularly given increasing concerns about "environmental and onshore impacts" of oil and gas leasing); *accord* S. Rep. No 95-284, at 43 (1978). In short, management of the outer continental shelf and its resources falls squarely under Congress's sole purview, with the Executive Branch enjoying authority to dispose of oil and gas resources only as Congress authorized in OCSLA.

Because the President has no Property Clause powers of his own, separation of powers dictates that when he attempts to regulate the United States' lands—as President Trump has done by purporting to open previously withdrawn outer continental shelf lands to oil and gas leasing—his actions "must be traced to Congressional delegation of its authority."[7] *Sioux Tribe*, 316 U.S. at 326; H.R. Rep. No. 82-695, at 3 (1951) (stating during OCSLA deliberations the Executive Branch's view that it lacked authority to issue leases without legislation). Here,

---

[7] At one time, the Supreme Court upheld the President's power to withdraw land onshore without an express delegation of authority, but it carefully disclaimed any suggestion the President had any inherent authority to do so. *See United States v. Midwest Oil Co.*, 236 U.S. 459, 469, 475-80 (1915). Rather, the President's power came from an implied delegation by Congress through long-time acquiescence to repeated exercise of that power. *See id.* at 475. Congress revoked that implied delegation no later than in 1976, sharply limiting the scope of the President's authority to act as its agent under the Property Clause. *See* Federal Land Policy & Management Act of 1976, Pub. L. No. 94-579, 90 Stat. 2743 § 704(a).

there is no such authority.  OCSLA section 12(a) delegates the President power to step into Congress's shoes to withdraw land in the outer continental shelf, but reserves for Congress itself the authority to revoke withdrawals.  *See infra* Part II-C.

B.     <u>President Obama permanently withdrew submerged lands in the Arctic and Atlantic Oceans pursuant to his delegated authority.</u>

When President Obama made leasing withdrawals in the Arctic and Atlantic Oceans in 2015 and 2016, he did so using the authority Congress expressly granted him in OCSLA section 12(a).  Section 12(a) provides in full that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."  43 U.S.C. § 1341(a).  Each of President Obama's Arctic and Atlantic memoranda of withdrawal describes itself, in the subject line, as a "Withdrawal" of "Certain Areas" or "Portions" of the "Outer Continental Shelf from Mineral Leasing" or "Leasing Disposition."  Exs. 2, 3 & 4.  And each cites section 12(a), and only section 12(a), as the source for his authority.  *Id.*

President Obama's withdrawals were, by their terms, designed to be effective until and unless Congress rescinded them.  They barred all prospective leasing for oil or gas.  *See, e.g.*, Ex. 2 ("This withdrawal prevents consideration of these areas for any future oil or gas leasing for purposes of exploration,

development, or production."); Ex. 4 ("This withdrawal prevents consideration of this area for any future mineral leasing for purposes of exploration, development, or production."). The President withdrew these areas to "ensure" that they would "remain available for future generations," that is, protected in perpetuity, barring congressional action. *See, e.g.*, Ex. 2. The factors he cited for his decision were of enduring force, rather than transient effect. *See, e.g.*, Ex. 3 (noting irreplaceable marine values, vulnerability to oil spills, and "unique logistical, operation, safety, and scientific challenges and risks").

In brief, the authority President Obama drew on, language he used in his withdrawals, and reasons he articulated for them all reflect the specific power delegated him by OCSLA section 12(a). None can be reconciled with reversal by a successor President.

C.    President Trump lacked any authority for his reversals.

The text of Section 12(a) is clear and unambiguous. On its face, it does one, and only one, thing. It authorizes the President to exercise one aspect of Congress's Property Clause powers—the power to protect resources and areas from extractive activity offshore. It does not authorize the reverse—the dismantling of established protections there.

The straightforward wording of section 12(a) leaves no room for interpolation. "[C]ourts must presume that a legislature says in a statute what it

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                    23
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 33 of 55

means and means in a statute what it says there." *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 461-62 (2002) (internal quotation marks omitted); *see also Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (under "settled principles of statutory construction," if "the statutory text is plain and unambiguous," then "we must apply the statute according to its terms"); *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("Statutory interpretation . . . begins with the text."); *Cochnower v. United States*, 248 U.S. 405, 407-08, *modified*, 249 U.S. 588 (1919) (statute authorizing Secretary of the Treasury to "increase and fix" compensation did not authorize him to *decrease* compensation of customs official); *id.* ("Reverting then to the statute, we discover that it was at pains to express clearly the power to 'increase.' If it had been intended to give the power to 'decrease'—an accurately opposite power—it would have been at equal pains to have explicitly declared it.").

Fidelity to the words Congress chose is especially required when interpreting a statute that delegates a power the Constitution entrusts solely to Congress, because "[u]nder our system of law, the judiciary has a duty envisioned by the constitutional principle of checks and balances to keep both the Executive and Congress within their respective constitutional domains . . . ." *Nat'l Treasury Emps. Union,* 492 F.2d at 612. Thus, the Ninth Circuit has concluded that "[s]trict adherence to the wording of the statute is of particular importance in construing a statute regulating public lands, over which Congress has unlimited authority."

*United States v. Patton*, 771 F.2d 1240, 1243 (9th Cir. 1985); *see also Kidd v. U.S. Dep't of Interior*, 756 F.2d 1410, 1412 (9th Cir. 1985) ("Congress' constitutional power over the proper administration and disposition of the public lands is without limitation. Once Congress has acted in that regard, both the courts and the executive agencies have no choice but to follow strictly the dictates of such statutes . . . . We are bound by the plain language of the statute.").

Here, the history, context, purpose, and structure of Section 12(a) all confirm that Section 12(a) delegates to the President the authority to withdraw areas of the outer continental shelf from future disposition but not the opposite power to undo those withdrawals once made. *See Ross*, 136 S. Ct. at 1858 (construing a statute by reference to history that "underscores" the meaning of its text); *see also Padash v. INS*, 358 F.3d 1161, 1168 (9th Cir. 2004) ("[T]he statute's language, structure, subject matter, context, and history" are the "factors that typically help courts determine a statute's objective and thereby illuminate its text.") (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998)).

When Congress chose the language of Section 12(a), a long history of prior public land legislation demonstrated that when Congress intended to pair the power to protect public land from disposition with the power to reverse such protections, it did so expressly. The Forest Service Organic Administration Act of 1897, for example, authorized the President to create national forests; it also expressly

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                  25
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 35 of 55

provided that "he may reduce the area or change the boundary lines or may vacate

altogether any order creating a national forest" issued under Section 471 of that

law.  16 U.S.C. § 473.  Similarly, the Pickett Act of 1910 specifically provided that

the President "may, at any time in his discretion, temporarily withdraw . . . any of

the public lands of the United States . . . and such withdrawals or reservations shall

remain in force until revoked by him or by an Act of Congress."  Pub. L. No. 61-

303, Ch. 421, 36 Stat. 847 (1910).  So, too, an act passed by Congress in 1935

concerning use of the Rio Grande empowered the President "to withdraw from

sale, public entry or disposal of such public lands of the United Sates as he may

find to be necessary . . . [p]rovided, [t]hat any such withdrawal may subsequently

be revoked by the President[.]"  Pub. L. No. 74-286, § 4(c), 49 Stat. 660, 661

(1935).[8]  In section 12(a), as in another protective statute—the Antiquities Act of

1906, 54 U.S.C. § 320301(a), (b)—Congress chose not to include language

delegating the power to reverse.  Congress knew how to delegate the authority to

revoke withdrawals, and the Court must give meaning to its decision not to include

language delegating this authority in section 12(a).  *See Cent. Bank of Denver v.*

---

[8] Subsequent to the passage of OCSLA, Congress legislated with the same level of explicitness:  the 1976 Federal Land Policy and Management Act specified that "the Secretary [of the Interior] is authorized to make, modify, extend, or *revoke* withdrawals but only in accordance with the provisions and limitations of this section."  43 U.S.C. § 1714(a) (emphasis added).

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                              26
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 36 of 55

*First Interstate Bank*, 511 U.S. 164, 176-77 (1994) (construing a statute not to impose aiding and abetting liability where Congress had imposed it explicitly in other statutes but language was absent in the statute at issue); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (construing a statute not to provide a recovery remedy where Congress, in a later-passed "analogous, but not parallel" statute, expressly provided for recovery but statute at issue contained no such language); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (construing a statute not to impose local restrictions on banking operations where Congress had done so explicitly in other statutes but similar language was absent in statute at issue).

The context in which Congress adopted section 12(a) also shows that it did not intend it to conceal a silent reversal power. When it chooses the wording of a statute, Congress is presumptively aware of Executive Branch interpretations of similar language in parallel statutes. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) ("In construing the statute, we are informed by interpretations of parallel definitions in previous statutes and the views of various administrative agencies which have faced this interpretive question."); *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 382 n.66 (1982) (interpreting a statute based on the principle that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute") (internal quotation marks omitted); *Kent v. Dulles*, 357

U.S. 116, 127-28 (1958) (interpreting narrowly a statutory provision "expressed in broad terms" based on Congress's presumed awareness of "prior administrative practice"); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (presuming Congress is aware of agency and court constructions of a statutory term when it adopts a new statute using that term).

When Congress passed section 12(a), the Executive Branch had concluded, in a series of formal legal opinions of the Attorney General dating back nearly a century, that if Congress wanted the Executive to have such authority, Congress would need to make that explicit. A foundational opinion, quoted in later ones, explained the rationale this way: "unless it be within the terms of the power conferred by that statute, the Executive can no more destroy his own authorized work, without some other legislative sanction, than any other person can." 10 U.S. Op. Atty. Gen. 359, 364 (Nov. 8, 1862). Closer in time to OCSLA's enactment, interpreting the Antiquities Act—which as noted above, *see supra* p. 26, authorized the President to declare national monuments but did not contain language delegating the power to reverse—a successor Attorney General opined that "if public lands are reserved by the President for a particular purpose under express authority of an act of Congress, the President is thereafter without authority to abolish such reservation." 39 U.S. Op. Atty. Gen. 185, 186-87 (Sept. 26, 1938). The opinion explained that "the reservation made by the President

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                    28
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 38 of 55

under the discretion vested in him by the statute was in effect a reservation by the Congress itself," and that, except where Congress expressly provided, "the President thereafter was without power to revoke or rescind the reservation." *Id.* at 187. Other opinions sent the same message about a variety of enactments over the years. *See* 16 U.S. Op. Atty. Gen. 121, 123 (Aug. 10, 1878); 17 U.S. Op. Atty. Gen. 168, 168-69 (July 20, 1881); 21 U.S. Op. Atty. Gen. 120, 120-21 (Jan. 19, 1895); 28 U.S. Op. Atty. Gen. 143, 144 (Jan. 24, 1910); 36 U.S. Op. Atty. Gen. 75, 79 (July 8, 1929). In the face of this longstanding line of interpretation, Congress's silence in section 12(a) demonstrates that it retained for itself the power to revoke.

OCSLA's purpose and structure confirm that Section 12(a) delegates only authority to withdraw lands from disposition and not its opposite power. In OCSLA, Congress extended federal "jurisdiction, control, and power of disposition as provided in this Act" over outer continental shelf lands and defined how these federal lands should be managed. Pub. L. No. 83-212, § 3(a), 67 Stat. 462, 462 (1953) (codified at 43 U.S.C. § 1332(1)); *see also* S. Rep. No. 83-411 at 6 (1953) (describing Congress's purpose to provide for administration of the outer continental shelf); *id.* at 7 (explaining that OCSLA's provisions "extend the jurisdiction and control of the United States to the seabed and subsoil themselves"); *id.* at 8 (describing Executive Branch's position that it was

"necessary to have congressional action looking toward the future management of the resources of this area").

When it passed in 1953, OCSLA included two provisions addressing the power to dispose of these newly recognized federal lands, sections 8 and 12(a). Section 8 granted broad discretionary disposition authority to the Secretary to lease or not, when and where he chose, by authorizing him "to grant . . . oil and gas leases" on outer continental shelf lands. Pub. L. 83-212, § 8(a), 67 Stat. 462, 468 (1953) (codified at 43 U.S.C. § 1337(a)(1)). Section 12(a) was, by contrast, entirely protective—it authorized the President to withdraw land from disposition by lease altogether. Pub. L. No. 83-212, § 12(a), 67 Stat. 462, 469 (1953) (codified at 43 U.S.C. § 1341(a)). Though Section 8 also authorized the Secretary to protect areas and their natural resources from disposition by withholding them from leasing, that protection was temporary, because nothing in the Act prevented the Secretary, unilaterally or at the President's direction, from revisiting at any time the decision not to lease. Granting to the President a similar, reversible, protective power in Section 12(a) would have been largely redundant, an intent that ought not be imputed to Congress in the absence of explicit expression. *See, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (declining to read one statutory provision so as to "significantly overlap" with another and noting that the "canon

against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme").

Indeed, Congress included section 12(a) in the Act despite the Eisenhower Administration's statement that the provision was "unnecessary, since leasing is not mandatory in any case." S. Rep. 83-411 at 39. Its purpose was to give the President power "to withdraw certain areas of the seabed of the Continental Shelf from leasing" similar to authority "vested in him with respect to federally owned lands on the uplands." *Id.* at 26; *see also id.* at 14. Congress did not include in OCSLA, however, the kind of language it uses in statutes that grant not just explicit power to protect public lands from disposition but also the power to reverse such protections. *See supra* pp. 25-27. OCSLA thus establishes a means for withdrawing land that Congress, but only Congress, could later undo, creating a protective mechanism wholly additive to powers given Interior Secretaries in the legislative scheme defining Executive Branch administration of offshore oil and gas resources.

Subsequent legislative history confirms that when Congress later returned to legislating the regulation and protection of the outer continental shelf, it continued to view section 12(a) as providing only withdrawal authority. In 1978, Congress extensively amended OCSLA in response to the Nixon Administration's acceleration of leasing in the wake of that era's oil crisis. *See* S. Rep. 95-284 at

50-51; *id.* at 61 (including findings by the U.S. Government Accountability Office that accelerated leasing in the early 1970s had been "[h]astily conceived . . . under pressures exerted by the energy crisis"); H. Rep. 95-590, at 100 (1977). The amendments were intended to "reassert[ ] Congress' special constitutional responsibility to 'make all needful rules and regulations respecting the territory or other property belonging to the United States.'" *See* S. Rep. 95-284, at 43 (quoting U.S. Const., art. IV, sec. 3). The amendments added procedural checks on the Executive's discretion to dispose of outer continental shelf lands, including a public five-year planning process involving active congressional oversight and a legislative veto provision. *See id.* at 43; *id.* at 48 (describing the 1953 statute); *id.* at 75-76 (describing five-year leasing program, including congressional review of leasing programs); Pub. L. No. 95-372, § 208, 92 Stat. 629, 649-52 (1978) (codified at 43 U.S.C. § 1344). However, even as it reined in the Executive's disposition authority, Congress left Section 12(a) untouched. Had it viewed that section as potentially fostering disposition by reversing withdrawals, it would not plausibly have failed even to consider revisiting that delegation at the same time.

III.  THE COURT SHOULD DECLARE SECTION 5 OF THE ORDER
      UNLAWFUL AND INVALID AND ENJOIN THE SECRETARIES OF
      THE INTERIOR AND COMMERCE FROM IMPLEMENTING IT

Plaintiffs request a declaration that Section 5 of the Order is unlawful and invalid, and an injunction against the Secretaries of the Interior and Commerce

preventing them from implementing Section 5 of the Order and thereby requiring them to act in conformity with President Obama's withdrawals. The Court may grant this relief, it would remedy Plaintiffs' harm, and the equities compel it.

A. The Court may grant the declaratory and injunctive relief Plaintiffs seek.

The Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Accordingly, a court may issue declaratory relief against the President. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 421, 425 n.9 (1998) (affirming entry of declaratory judgment against President Clinton stating that Line Item Veto Act was unconstitutional); *Youngstown Sheet & Tube Co.*, 343 U.S. at 588-89 (holding that President Truman did not act within his constitutional power in seizing steel mills); *Nat'l Treasury Emps. Union*, 492 F.2d at 616 (issuing declaratory judgment against the President); *see also Hawaii v. Trump*, 878 F.3d 662, 673 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 923 (2018) ("We conclude that the President's issuance of the Proclamation once again exceeds the scope of his delegated authority.").

As to the Secretaries, an injunction is within the long-standing power of the federal courts. *See, e.g.*, *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845)

("[I]n a proper case, relief may be given in a court of equity. . . to prevent an injurious act by a public officer . . . .").  Accordingly, the Court may enjoin the Secretaries from implementing Section 5 of the Order.  *See Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017) (preliminarily enjoining defendants and their officers from implementing presidential memorandum banning transgender individuals from serving in the military and requiring officers to adhere to the policy in existence prior to the presidential memorandum), *appeal dismissed*, No. 17-36009, 2017 WL 8229552 (9th Cir. Dec. 30, 2017); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 217 (D.D.C. 2017) (same), *stay denied* No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017); *Youngstown Sheet & Tube Co.*, 343 U.S. at 588-89 (affirming the district court's decision enjoining the Secretary of Commerce from carrying out President's seizure order); *see also Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").

    B.    A declaration and injunction would remedy Plaintiffs' harm.

    A declaration that Section 5 of the Order is unlawful and invalid would mean President Obama's withdrawals in the Arctic and Atlantic Oceans would remain, and those areas would be withdrawn permanently from disposition, absent

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                       34

an act of Congress.  An order enjoining the Secretaries from implementing Section

5 and requiring them to adhere to President Obama's withdrawals would give

effect to the declaration and greatly reduce the risk of harmful oil and gas activities

in the withdrawn areas and in other areas affected by those activities.  This would

remedy Plaintiffs' harm.

OCSLA authorizes the Secretary of Interior to plan and hold lease sales for

outer continental shelf lands open to disposition, *see* 43 U.S.C. §§ 1337, 1344, and

to oversee the permitting of seismic surveying and other exploration on the outer

continental shelf, *see id.* § 1340.  Spurred by Section 5 of the Order, the Secretary

now is: (i) promulgating an accelerated five-year leasing program that would

schedule six leases in the Arctic Ocean starting in 2019 and five in the north- and

mid-Atlantic Ocean starting in 2020, *see* Ex. 13 at 2-3; (ii) initiating the process for

holding a lease sale in the Beaufort Sea in 2019, *see* Ex. 14 (call for information

for a Beaufort Sea lease sale in 2019); and (iii) evaluating seismic surveying permit

applications for both the Atlantic and the Arctic, *see* Ex. 39; Ex. 12.  An injunction

requiring the Secretary of the Interior to act in conformity with President Obama's

withdrawals would reduce the risk of harm to Plaintiffs because—with the

withdrawals in place—the Secretary would be prevented from holding lease sales

in the withdrawn areas, which would not be available for disposition.  43 U.S.C.

§ 1341(a).  This would make it much less likely that harmful oil and gas activities,

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG
35
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 45 of 55

such as seismic surveying to predict the location of oil and gas deposits ahead of bidding on leases, would occur in the withdrawn areas. *See supra* Part I-A-4 (noting reduced oil and gas exploration activity in withdrawn areas).

An injunction would also make it much less likely that the Secretary of the Interior would plan for leasing in those areas or, relatedly, permit seismic surveying there if companies were to apply. *See, e.g.*, Ex. 16 at 1, 3, 5, 7, 9, 11 (denying seismic permits in the Atlantic in part on the basis that the areas had been removed from the leasing schedule through 2022).

Similarly, an injunction requiring the Secretary of Commerce to act consistently with President Obama's withdrawals would decrease the likelihood that harmful oil and gas activities would occur in the areas at issue. Congress has assigned responsibility to the Secretary for administering the Marine Mammal Protection Act (MMPA) as it applies to whales and seals. The National Marine Fisheries Service (NMFS) is the agency within the Commerce Department that must approve authorizations for seismic exploration. And, like the Bureau of Ocean Energy Management in the Atlantic, NMFS is less likely to issue an authorization that includes the withdrawn area. This is because the MMPA requires NMFS, in issuing any authorization under 16 U.S.C. § 1371(a)(5)(A) or (D), to prescribe means and methods of achieving the "least practicable adverse impact" on marine mammals and their habitat, *see id.* § 1371(a)(5)(A)(i)(II)(aa).

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG
36
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 46 of 55

Since it is practicable for a survey company to avoid seismic exploration in an area that has been permanently withdrawn from oil and gas exploration, and it would reduce adverse impacts, an injunction that requires NMFS to act consistently with the section 12(a) withdrawals would make it more likely that the withdrawn areas are left out of the authorization.

C.    The equities compel an injunction here.

Plaintiffs are entitled to an injunction against the Secretaries of the Interior and Commerce because (1) they will suffer irreparable injury in its absence; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018).

1.    *Plaintiffs will suffer irreparable harm absent an injunction.*

Plaintiffs satisfy the first and second factors because they will suffer irreparable injury absent an injunction against the Secretaries of the Interior and Commerce.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Here, the harms to Plaintiffs' interests derive from environmental injuries that

cannot be compensated adequately by remedies at law. Plaintiffs' members use and enjoy the Arctic and Atlantic Oceans and wildlife that depends upon them. *See* Exs. 21, 22, 24, 26, 28, 29, 30, 32, 34 & 36. Oil and gas activities would harm these areas and their wildlife, which would in turn impair Plaintiffs' interests. *Supra* Part I-A; *see* Exs. 21, 22, 24, 26, 28, 29, 30, 32, 34 & 36. Indeed, this Court has repeatedly granted injunctions to prevent irreparable harm from the threat of offshore oil and gas activities in the Arctic Ocean upon concluding that the Executive Branch acted unlawfully. *See Native Vill. of Point Hope v. Salazar*, 1:08–cv–0004–RRB (D. Alaska, July 21, 2010), Dkt. 136 at 20-21 (enjoining all activities under a lease sale found to be unlawful), *as amended by* 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010) (limiting scope of injunction to allow "scientific studies," "routine paper transactions," and certain other off-lease activities); *Native Vill. of Point Hope v. Jewell*, 1:08–cv–0004–RRB (D. Alaska, April 24, 2014), Dkt. 284 at 2 (enjoining drilling on leases found to be unlawful). Other district courts similarly have issued injunctive relief on the basis of harm from industrial activity in the ocean, including seismic surveying, that could cause behavioral disruption or injury. *See, e.g.*, *Ctr. for Biological Diversity v. Nat'l Sci. Found.*, No. C 02-5065 JL, 2002 WL 31548073, at *5 (N.D. Cal. Oct. 30, 2002); *see also Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 983 (D. Haw. Feb. 29, 2008); *Nat. Res. Def. Council v. Gutierrez*, No. C-07-04771 EDL, 2008 WL 360852, at

*30 (N.D. Cal. Feb. 6, 2008); *Nat. Res. Def. Council v. Evans*, 279 F. Supp. 2d 1129, 1188 (N.D. Cal. 2003).

> 2. *The balance of equities and the public interest favor injunctive relief.*

Plaintiffs meet the third and fourth factors because the balance of the harms tips in their favor and in favor of the public interest. "[W]hen environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (internal quotation marks omitted). That is the case here. The offshore oil and gas activities catalyzed by Section 5 of the Order will likely irreparably harm wildlife populations and the character of the areas at issue and, thus, the aesthetic, recreational, economic, and other interests of Plaintiffs' members who use and enjoy those areas or the wildlife that depends upon them. Plaintiffs and the public have an "extremely strong" interest in protecting "the survival and flourishing of marine mammals and endangered species, as well as a healthy marine environment" against unlawful acoustic harassment that is now imminently threatened. *Evans*, 279 F. Supp. 2d at 1190. On the other hand, Defendants would not suffer harm from an injunction. And Defendant-Intervenors have no cognizable interest in profiting from pursuing oil and gas development in the areas that have been withdrawn.

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                    39
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 49 of 55

Finally, the public interest heavily favors an injunction. The injunction sought here simply requires the Secretaries to act consistently with what the Court will have determined is the law—namely, that President Trump exceeded his authority in issuing Section 5 of the Order and, as a result, President Obama's withdrawals remain in place. There would be no public benefit in allowing the Secretaries to continue to act as if President Obama's withdrawals were not in place. *See Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 577 (D.D.C 1952) (describing public interest in preliminarily enjoining officers from implementing "unlimited and unrestrained Executive power," even in the face of a potentially crippling strike), *aff'd*, 343 U.S. 579 (1952).

CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to grant their motion for summary judgment, declare Section 5 of President Trump's executive order to be unlawful, and enjoin the Secretaries to act in accordance with the prior withdrawals.

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                          40
Case 3:17-cv-00101-SLG     Document 51     Filed 06/08/18     Page 50 of 55

Respectfully submitted this 8th day of June, 2018.

*s/ Erik Grafe*

Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

Nathaniel S.W. Lawrence (Wash. Bar No. 30847)
(admitted pro hac vice)
Nancy S. Marks (N.Y. Bar No. 2121820)
(admitted pro hac vice)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiffs League of Conservation Voters; Natural Resources Defense Council; Sierra Club; Alaska Wilderness League; Defenders of Wildlife; Northern Alaska Environmental Center; Resisting Environmental Destruction on Indigenous Lands; Center for Biological Diversity; Greenpeace, Inc.; and The Wilderness Society*

MEM. IN SUPPORT OF MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                    41
Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 51 of 55

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2018, a copy of foregoing MEMORANDUM

IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, with

attachments, was served electronically on all counsel of record using the CM/ECF

system.

_s/ Erik Grafe_
Erik Grafe
EARTHJUSTICE

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Executive Order 13795—Implementing an America-First Offshore Energy Strategy, 2017 Daily Comp. Pres. Docs. 287 (Apr. 28, 2017) |
| 2 | Presidential Memorandum—Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 59 (Jan. 27, 2015) |
| 3 | Presidential Memorandum—Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 860 (Dec. 20, 2016) |
| 4 | Presidential Memorandum—Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016) |
| 5 | The White House, Fact Sheet:  President Obama Protects 125 Million Acres of the Arctic Ocean (Dec. 20, 2016) |
| 6 | The White House, Fact Sheet:  Unique Atlantic Canyons Protected from Oil and Gas Activity (Dec. 20, 2016) |
| 7 | The White House, President Obama Protects Untouched Marine Wilderness in Alaska (Jan. 27, 2015) |
| 8 | Bureau of Ocean Energy Management (BOEM), 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program Lease Sale Schedule |
| 9 | BOEM, 2012-2017 Outer Continental Shelf Oil and Gas Leasing Program Lease Sale Schedule |
| 10 | BOEM, Alaska Lease Sales |
| 11 | BOEM, Alaska Geologic & Geophysical Exploration Permits |

i

12      BOEM, Currently Submitted Atlantic OCS Region Geological and Geophysical Permits

13      BOEM, Notice of Availability of the 2019–2024 Draft Proposed Outer Continental Shelf Oil and Gas Leasing Program and Notice of Intent to Prepare a Programmatic Environmental Impact Statement, Notice and Request for Comments, 83 Fed. Reg. 829 (Jan. 8, 2018)

14      BOEM, Outer Continental Shelf, Alaska OCS Region, Beaufort Sea, Proposed Oil and Gas Lease Sale for 2019, Call for Information and Nominations, 83 Fed. Reg. 13,778 (Mar. 30, 2018)

15      National Marine Fisheries Service (NMFS), Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Seismic Survey in the Beaufort and Chukchi Seas, Alaska, Notice and Issuance of an Incidental Take Authorization, 77 Fed. Reg. 65060 (Oct. 24, 2016)

16      BOEM, Denials of Atlantic Seismic Permit Applications (Jan. 6, 2017)

17      G. Dellagiarino *et al.*, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2004-2005, OCS Report MMS 2007-049 (2007) (excerpt)

18      K. Ray & P. Godfriaux, Geological & Geophysical Data Acquisition: Outer Continental Shelf Through 2016, OCS Report BOEM 2017-02 (2017) (excerpt)

19      NMFS, Effects of Oil and Gas Activities in the Arctic Ocean Final Environmental Impact Statement (Oct. 2016) (excerpts)

20      International Association of Geophysical Contractors, News Release, *IAGC Applauds Administration's First Step to Expand Offshore Exploration, Streamline Seismic* (Apr. 28, 2017)

21      Declaration of Regina A. Asmutis-Silvia

22      Declaration of Rosemary Ahtuangaruak

Case 3:17-cv-00101-SLG    Document 51    Filed 06/08/18    Page 54 of 55

23      Declaration of Elisabeth Balster Dabney

24      Declaration of John Hocevar

25      Declaration of Gene Karpinski

26      Declaration of Dr. Leslie S. Kaufman

27      Declaration of Adam Kolton

28      Declaration of Pamela A. Miller

29      Declaration of Rob Moir

30      Declaration of Dan Ritzman

31      Declaration of Michael Senatore

32      Declaration of Robert Thompson

33      Declaration of Gina Trujillo

34      Declaration of Michael Wald

35      Declaration of Nicole Whittington-Evans

36      Declaration of Kiliii Yuyan

37      Declaration of Brendan Cummings

38      BOEM, Atlantic OCS Proposed Geological and Geophysical
        Activities, Mid-Atlantic and South Atlantic Planning Areas, Final
        Programmatic Environmental Impact Statement, OCS EIS/EA BOEM
        2014-001 (2014) (excerpts)

39      BOEM, Notification of and Chronology for TGS-NOPEC Geologic
        and Geophysical Exploration Permit Application, Alaska Region
        G&G Survey 18-02, Beaufort Sea (2018)