JEFFREY WOOD
Acting Assistant Attorney General
ERIC GRANT
Deputy Assistant Attorney General

SARAH D. HIMMELHOCH (MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101-SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

# DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      INTRODUCTION..............................................................................................1
II.     THE CHALLENGED EXECUTIVE ORDER AND STATUTORY
        BACKGROUND ...........................................................................................2
    A.  The Unique Nature of the Outer Continental Shelf .................................2
    B.  The Outer Continental Shelf Lands Act and the Leasing Program............4
    C.  The Permitting of Geological and Geophysical Surveys ..........................5
    D.  Withdrawals from the Leasing Program...................................................7
    E.  The Challenged Executive Order – Executive Order 13795 .....................10
III.    ARGUMENT ................................................................................................11
    A.  Standard for a Motion for Summary Judgment........................................12
    B.  Plaintiffs Lack Article III Standing........................................................13
            1.  Plaintiffs' Alleged Harm Cannot Be Redressed by the Relief they
                Seek ...........................................................................................13

            2.  Plaintiffs' Alleged Injury Is Not Imminent ..................................16

    C.  Plaintiffs' Claims Are Not Ripe ..............................................................18
    D.  Plaintiffs Lack an Applicable Waiver of Sovereign Immunity ..................19
    E.  Plaintiffs Lack a Private Right of Action.................................................20
    F.  Plaintiffs' Ultra Vires Claims Fail as a Matter of Law. ............................22
            1.  The Plain Language of OCSLA Leaves Withdrawals to the Discretion
                of the President .........................................................................23

            2.  The Legislative History of OCSLA Emphasizes the President's
                Discretion Under OCSLA ..........................................................24

            3.  The Purpose of OCSLA Supports the President's Wide Discretion to
                Modify Prior Withdrawals..........................................................27

            4.  Past Conduct under OCSLA Demonstrates the President's Discretion
                29

            5.  Withdrawal Authority Includes Authority to Modify or Revoke ......32

    G.  Plaintiffs Are Not Entitled to An Injunction, Especially As Against the President ......35
IV.     CONCLUSION..............................................................................................37

## EXHIBITS

**Exhibit 1**     Kumkum Ray, Resource Evaluation Report: Geological & Geophysical Data
                  Acquisition at 20 (OCS Report BOEM 2017-02)

**Exhibit 2**     S. Rep. 83-411 (1953)

i

# TABLE OF AUTHORITIES

**Cases**

*Albertson v. FCC*, 182 F.2d 397 (D.C. Cir. 1950) ........................................24

*Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010) (en banc) ...........................30

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................ 20, 21

*Am. Petroleum Inst. v. EPA*, 683 F.3d 382 (D.C. Cir. 2012) ...........................18

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) ..................22

*Clapper v. Amnesty International USA,* 568 U.S. 398 (2013) .........................17

*Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438 (4th Cir. 2014)..............20

*Clinton v. Jones*, 520 U.S. 681 (1997) ..............................................35

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ...........................2, 5

*Dalton v. Specter*, 511 U.S. 462 (1994) ............................................23

*Dunn v. Black, P.S. v. United States*, 492 F.3d 1084 (9th Cir. 2007) ..............................19

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)..........................................12, 35, 36, 37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .....14

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 283 (2002).........................................20

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir.) (per curiam), *vacated and remanded on other grounds*, 138 S. Ct. 377 (2017) .......................................35, 36, 37

*Henry v. Wregglesworth*, No. 3:13–cv–00208-SLG, 2015 WL 2185074 (D. Alaska May 11, 2015) ..........................................12

*In re Aiken Cty.*, 645 F.3d 428 (D.C. Cir. 2011)..........................................18

*In re Zappos.com, Inc.*, 888 F.3d 1020 (9th Cir. 2018) ..............................16, 17

*Jenkins v. City of Riverside*, 398 F.3d 1093 (9th Cir. 2005) (per curiam) ......................18

*King v. Burwell*, 135 S. Ct. 2480 (2015) ..............................................27

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ...................19, 20

*Lonberg v. City of Riverside*, 571 F.3d 846 (9th Cir. 2009) ..............................21

*Leslie Salt Co. v. United States*, 55 F.3d 1388 (9th Cir. 1995) .......................................18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................13

*M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..............................30

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ..............................30

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ..............................36

*Medellin v. Texas*, 552 U.S. 491 (2008)..........................................30

*Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475 (1866) ..............................35

*National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003)...............19

*Native Village of Point Hope v. Jewell,* 740 F.3d 489 (9th Cir. 2014) ..............................5

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) ..............................35

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ..............................35

*NLRB v. Canning*, 134 S. Ct. 2550 (2014) ..............................30

*Ohio Forestry Ass'n. v. Sierra Club*, 523 U.S. 726 (1998) ..............................11

*S. Utah Wilderness All. v. Bureau of Land Mgmt.(SUWA)*, 425 F.3d 735 (10th Cir. 2005)..........................................26, 28

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ..............................22

*Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21 (D.D.C. 2008) ..............................24

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ..............................36

*Texas v. United States*, 523 U.S. 296 (1998)..........................................18

*Treasure Salvors, Inc. v. Unidentified Wreck & Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978)....................................................................................4

*Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002)......................................23

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365 (1988).......27

*United States v. California*, 332 U.S. 19 (1947) ............................................3

*United States v. George S. Bush & Co.*, 310 U.S. 371 (1940) ..........................23

*United States v. Louisiana*, 339 U.S. 699 (1950) ..........................................3

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) ..........................30, 34

*United States v Texas* 339 U.S. 707 (1950) ...................................................3

*Webster v. Doe*, 486 U.S. 592 (1988)............................................................21

*Western Radio Servs. Co. v. United States Forest Serv.*, 578 F.3d 1116 (9th Cir. 2009), *cert. denied*, 559 U.S. 1106 (2010) ............................21

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .................................................13

*Wilkie v. Robbins*, 551 U.S. 537 (2007).......................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ......................30

## Constitution and Statutes

Administrative Procedure Act, 5 U.S.C. chapter 5 .............................16, 19, 21

Act of June 25, 1910, ch. 421, 36 Stat. 847, codified at 43 U.S.C. § 141.................32, 33

Antiquities Act, 16 U.S.C. §§ 431-433 ..............................................31, 34

Endangered Species Act, 16 U.S.C. §§ 1531-1544...............................6, 14, 16

Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1423h ....................6, 14

National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12 .................5

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356b ............. 1, 4, 5, 7, 8, 9, 11, 12, 14, 20, 23-29, 31, 34, 37

Reclamation Act of 1902, 43 U.S.C. § 416 (1964) ........................................33

Stock Raising Homestead Act, 45 Stat. 1144, Sec. 10 (1916) ........................33

U.S. Constitution, Article II...........................................................2, 3, 24

U.S. Constitution, Article III..........................................................................22

U.S. Constitution, Article IV § 3................................................2, 3, 11, 20

## Other Authorities

Atlantic G&G permit applications filed between March 21 and October 16, 2014, https://www.boem.gov/Currently-submitted-Atlantic-OCS-Region-Permits/ (Last accessed on July 18, 2018)....................................................................15

Camp Hancock-Transfer from War Dep't to Dep't of Agriculture, 28 Op. Att'y Gen. 143 (1910)................................................................31

Camp Wright, California, 16 Op. Att'y Gen. 121 (1878) ...........................30-31

CHARLES F. WHEATLEY, JR., II STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS A–1 (1969) (report to Public Land Law Review Commission) (http://hdl.handle.net/2027/wu.89041980905) ..................26, 28, 33

Convention on the Continental Shelf, art. 2, Apr. 29, 1958, [1964] 15 U.S.T. 471, T.I.A.S. No. 5578, in force June 10, 1964 ...........................................3

Department of the Interior, Bureau of Ocean Energy Management, 2017-2022 Outer
　　Continental Shelf Oil & Gas Leasing Proposed Program, p. S-8 (Mar 2016),
　　https://www.boem.gov/2017-2022-Proposed-Program-Decision/ ........................ 15
Department of the Interior, Bureau of Ocean Energy Management, Memorandum of
　　Approval and Record of Decision for the Five Year Outer Continental Shelf
　　(OCS) Oil and Gas Leasing Program for 2012-2017 (Aug. 27, 2012),
　　https://www.boem.gov/5-year/2012-2017/ Exec. Order No. 10426, 18 Fed. Reg.
　　405 (Jan. 16, 1953) ................................................................................................ 3
Exec. Order No. 9146, 7 Fed. Reg. 9146 (Apr. 24, 1942) ............................................... 33
Exec. Order No. 9337, 8 Fed. Reg. 5516 (Apr. 24, 1943) ............................................... 33
Exec. Order No. 10355, 17 Fed. Reg. 4831 (May 26, 1952) ..................................... 32-33
Exec. Order No. 10426, 18 Fed. Reg. 405 (Jan. 16, 1953) ............................................... 3
Exec. Order No. 13754, 81 Fed. Reg. 90,669 (Dec. 9, 2016) (ECF No. 13-16) .............. 10
Exec. Order No. 13795, 82 Fed. Reg. 20815
　　(Apr. 28, 2017) (ECF No. 13-1) ............... 1, 7, 10-11, 13, 15-17, 19, 20, 25-26, 29
Federal Rule of Civil Procedure 56 ........................................................................... 1, 12
H.R. Rep. No. 83-413 at 2 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178 (ECF
　　No. 13-3) .............................................................................................................. 4
H.R. Rep. No. 83-1031 (1953) ................................................................................. 27-28
Joint Hearings on S. 1988 & Similar House Bills Before the Comms. on the
　　Judiciary, 80th Cong. 737 (1948) ...................................................................... 25
Legal Issues Raised by Proposed Presidential Proclamation to Extend the Territorial
　　Sea, 12 Op. O.L.C. 238, 245 (1988) .................................................................... 4
Marine Mammals, 50 C.F.R. Part 18 .............................................................................. 6
Memorandum for the Secretary of the Interior (Aug. 4, 1992) (ECF No. 13-9) ............... 8
Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas
　　of the United States Outer Continental Shelf from Leasing Disposition, 43
　　Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) (ECF No. 13-11) ...................... 9
Memorandum on Modification of the Withdrawal of Areas of the United States
　　Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres.
　　Docs. 986 (July 14, 2008) (ECF No. 13-12) ........................................................ 9
Memorandum on Withdrawal of Certain Areas of the United States Outer
　　Continental Shelf from Leasing Disposition, 34 Weekly Comp. Pres.
　　Docs. 1111 (June 12, 1998) (ECF No. 13-10) ...................................................... 9
Memorandum on Withdrawal of Certain Areas of the United States Outer
　　Continental Shelf from Leasing Disposition, 2010 Daily Comp. Pres.
　　Docs. 1 (Mar. 31, 2010) (ECF No. 13-13) ........................................................... 9
Memorandum on Withdrawal of Certain Areas of the United States Outer
　　Continental Shelf from Leasing Disposition, 2014 Daily Comp. Pres.
　　Docs. 1 (Dec. 16, 2014) (ECF No. 13-14) .......................................................... 10
Memorandum on Withdrawal of Certain Areas of the United States Outer
　　Continental Shelf Offshore Alaska from Leasing Disposition, 2015 Daily
　　Comp. Pres. Docs. 1 (Jan. 27, 2015) (ECF No. 13-15) ....................................... 10
Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer
　　Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1
　　(Dec. 20, 2016) (ECF No. 13-17) ................................................................. 10, 32

Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer
    Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1
    (Dec. 20, 2016) (ECF No. 13-18) ................................................................... 10, 32
Memorandum re Outer Continental Shelf Oil and Gas Program for 1992-1997
    (Aug. 4, 1992) (ECF No. 13-9) .................................................................................8
Military Reservation at Fort Fetterman, 17 Op. Att'y Gen. 168 (1881) ...........................31
Naval Reservation-Restoration to Public Domain, 21 Op. Att'y Gen. 120 (1895) ...........31
Oil and Gas and Sulphur Operations in the Outer Continental Shelf,
    30 C.F.R. Part 550 ...................................................................................... 5-6, 7
Order re Motions to Dismiss 14, ECF No. 45 ....................................................... 13, 18
Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945) (ECF No. 13-2) ...............2
Proclamation No. 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg.
    2352 (Mar. 15, 1960) (ECF No. 13-6) .................................................................8
Proposed Abolishment of Castle Pinkney Nat'l Monument,
    39 Op. Att'y Gen. 185 (1938) ............................................................................31
Public Land Order No. 4587, 34 Fed. Reg. 5655, 5656
    (Mar. 26, 1969) (ECF No. 13-7) ........................................................................8
Regulations Governing the Taking and Importing of Marine Mammals,
    50 C.F.R. Part 216 ..............................................................................................6
S. Rep. 83-411 at 39 (1953) (Ex. 2) .................................................................. 26, 32
Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp.
    Pres. Doc. 1006 (June 26, 1990) (ECF No. 13-8) ................................................8
Transfer to Treasury Dep't Jurisdiction Over Portion of Naval Reservation, Ediz Hook
    Spit, Port Angeles Harbor, Washington, 37 Op. Att'y Gen. 431, 432 (1934) .......34
VIVIAN S. CHU & TODD GARVEY, CONG. RES. SERV., RS20846, EXECUTIVE ORDERS:
    ISSUANCE, MODIFICATION, AND REVOCATION 7 (2014)
    (https://fas.org/sgp/crs/misc/RS20846.pdf) .......................................................24

## I.  INTRODUCTION

On April 28, 2017, President Donald J. Trump issued the Executive Order Implementing an America-First Offshore Energy Strategy, citing his authority under the "Constitution and the laws of the United States of America, including the Outer Continental Shelf Lands Act, 43 U.S.C. [§] 1331 *et seq.*" ("OCSLA") and finding that "[i]ncreased domestic energy production on Federal lands and waters strengthens the Nation's security and reduces reliance on imported energy." Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017) (ECF No. 13-1). Consistent with this policy, the President modified President Barack H. Obama's prior withdrawals of certain areas of the Outer Continental Shelf ("OCS") from oil, gas, and other mineral leasing, allowing the Secretary of the Interior to include such areas for consideration in any future leasing program. *Id.* § 5. Plaintiffs challenge this Executive Order, claiming it is an improper exercise of the President's authority under the governing statutes and the U.S. Constitution. Defendants are entitled to summary judgment under Federal Rule of Civil Procedure 56. In addition, Plaintiffs' motion for summary judgment should be denied.

As a threshold matter, Plaintiffs have failed to demonstrate standing. The harm they allege cannot be redressed by the relief they seek. Geological and geophysical surveys can and do occur even in withdrawn areas; therefore, declaring Executive Order 13795 invalid would not address or prevent the harm of which they complain. Moreover, the harm they allege to be attributable to potential leases made possible by the Executive Order is not imminent.

In any event, Plaintiffs' claims have no merit. President Trump lawfully exercised his authority under the U.S. Constitution and OCSLA to modify President Obama's prior withdrawal, allowing certain areas to again be *considered* for oil and gas leasing. Nothing in OCSLA suggests permanency or irrevocability of Presidential withdrawals, nor does OCSLA restrict the exercise of the President's constitutional and statutory authority to modify a prior

withdrawal. Indeed, no President exercising withdrawal authority has done so consistent with Plaintiff's theory of permanent and irreversible withdrawal power. To the contrary, Presidents have modified withdrawals on at least three occasions – a practice in which Congress has acquiesced. Contrary to this established practice, Plaintiffs advance a novel and sweeping legal theory under which a President could withdraw the entire Outer Continental Shelf from leasing and thereafter that President, and every subsequent President, would be powerless to implement federal offshore leasing absent an Act of Congress. Apart from encroaching on the President's Constitutional responsibility to provide for national security, Plaintiffs' theory has no support in the text or legislative history of OCSLA, and would undermine the Act's purpose to make the minerals of the continental shelf available for exploration and development. Accordingly, Defendants are entitled to summary judgment.

## II.     THE CHALLENGED EXECUTIVE ORDER AND STATUTORY BACKGROUND

### A.  The Unique Nature of the Outer Continental Shelf

As with the mineral resources on most federal land, under the Property Clause of the Constitution, Congress has authority over the disposition of the mineral resources of the OCS – that vast area extending from the end of the State's jurisdiction (generally 3 miles) to 200 nautical miles seaward of the United States' shoreline. U.S. Const. art. IV § 3; *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015). Unlike onshore mineral resources located on most federal lands, however, the management and disposition of the resources on the OCS also implicate the President's authority to provide for national security and conduct foreign affairs. U.S. Const. art. II § 2. In fact, it was under Article II of the U.S. Constitution that President Harry S. Truman first exercised the United States' control over the natural resources of the OCS. Specifically, the "Truman Proclamation" in 1945, informed other nations that:

the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control.

Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945).[1] Prior to OCSLA's enactment, President Truman also relied on his constitutional powers to issue Executive Order 10426 on January 16, 1953, setting aside the Continental Shelf as a naval petroleum reserve. *See* 18 Fed. Reg. 405 (Jan. 16, 1953).

In 1961, the United States' rights to the submerged lands on the Outer Continental Shelf were further defined, and to a certain extent limited, when the United States ratified the 1958 Convention on the Continental Shelf. The Convention describes such rights in terms of their purpose: "The coastal State exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources." Convention on the Continental Shelf, art. 2, Apr. 29, 1958, [1964] 15 U.S.T. 471, T.I.A.S. No. 5578, in force June 10, 1964.

Since first asserting jurisdiction over the OCS, the United States has viewed the authority to manage the mineral resources of the Shelf as stemming from both the Property Clause and the President's Article II authority. For instance, in referring to the Truman Proclamation, the Office of Legal Counsel of the Department of Justice stated that:

the President's constitutional power as the representative of the United States in foreign relations includes the authority to claim portions of the sea for the United States for purposes of international law. . . . This Office approved the [Truman] Proclamation and advised that it was lawful both as a statement of national policy in foreign affairs and as an expansion of the territorial jurisdiction of the United States.

_____

[1] Before Congress took any action with regard to the continental shelf, the Supreme Court affirmed this Presidential assertion of jurisdiction under Article II against challenges brought by coastal states. *United States v. California*, 332 U.S. 19 (1947); *United States v. Louisiana*, 339 U.S. 699 (1950); *United States v Texas* 339 U.S. 707 (1950).

*Legal Issues Raised by Proposed Presidential Proclamation to Extend the Territorial Sea*, 12 Op. O.L.C. 238, 245 (1988).

### B. The Outer Continental Shelf Lands Act and the Leasing Program

Congress, too, exercised authority in the OCS by passing OCSLA in August 1953. In doing so, Congress made clear that the purpose for the United States' control over the OCS was to make available its mineral resources for development:

> The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of . . . the shelf.

H.R. Rep. No. 83-413 at 2 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178 (ECF No. 13-3). Thus, the central purpose of OCSLA was to allow for development of oil, gas, and other mineral resources. As one court has stated, the Act "consists almost exclusively of specific measures to facilitate exploitation of natural resources on the continental shelf." *Treasure Salvors, Inc. v. Unidentified Wreck & Abandoned Sailing Vessel*, 569 F.2d 330, 339 (5th Cir. 1978).

Even when OCSLA was amended in 1978 to enhance the consideration of environmental and economic risks and benefits of mineral development, the focus of the statute remained the development of the minerals found on the OCS:

> the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.

43 U.S.C. § 1332(3).

As amended, OCSLA sets forth a four-step detailed procedure for developing offshore minerals. This procedure begins with a five-year program of proposed lease sales in areas of the OCS, followed by a more in-depth presale process for each lease sale that is authorized in the five-year program. *See* 43 U.S.C. §§ 1344, 1345. After a competitive sale is held, the Department issues individual leases that contain terms designed to protect the environment from the risks

4

identified by analyses performed pursuant to the National Environmental Policy Act. *See id.* § 1337(a); 42 U.S.C. §§ 4321-4370m-12. Lessees thereafter submit exploration plans and, upon discovery of commercial quantities of minerals, development plans. These plans are reviewed in consultation with state and local governments, and must be approved for exploration and development to occur. *See* 43 U.S.C. §§ 1340, 1351; *Ctr. for Sustainable Economy*, 779 F.3d at 594; *Native Village of Point Hope v. Jewell,* 740 F.3d 489, 493 (9th Cir. 2014).[2]

### C. The Permitting of Geological and Geophysical Surveys

Separate and apart from the leasing program, OCSLA also provides a permitting process for conducting geological and geophysical surveys to investigate the potential for oil and gas resources in the area, which also may assist in assessing the potential risks and benefits of investing the substantial resources required to explore and develop offshore oil and gas resources. Section 11 of OCSLA provides that:

> any person authorized by the Secretary [of the Interior] may conduct geological and geophysical explorations in the outer Continental Shelf, which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to this subchapter, and which are not unduly harmful to aquatic life in such area.

43 U.S.C. § 1340(a)(1).

The Department of the Interior requires a permit to conduct any geological or geophysical exploration on unleased land and land leased to another party. 30 C.F.R. § 551.4(a).[3] In order to be permitted, a geological or geophysical survey "must not," among other things, "[c]ause harm or damage to life (including fish and other aquatic life), property, or to the marine,

[2] For more detail on the leasing program, see the Memorandum in Support of Defendants' Motion to Dismiss, 5-6, ECF No. 13 ("Def.'s Mem."), and the authorities cited therein.
[3] Certain survey activities for scientific research require only a notice, but they are subject to the same requirements under 30 C.F.R. § 551.6. Plaintiffs have not challenged the authorization of these scientific activities and therefore they are not addressed here in detail.

5

coastal, or human environment . . . ." *Id.* § 551.6(a)(2); *see also* 43 U.S.C. § 1340(g). Moreover, any such surveys must not unreasonably interfere with or cause harm to other uses of the area, and must not create hazardous or unsafe conditions. 30 C.F.R. § 551.6(a)(6)-(7).

In addition to OCSLA's prohibition against permitted surveys causing harm or damage to aquatic life, other applicable statutes help protect environmental resources. For example, the marine mammals that Plaintiffs discuss are protected under the Marine Mammal Protection Act. 16 U.S.C. §§ 1361-1423h. This statute places a moratorium on the taking of marine mammals and marine mammal products except when such takes are incidental to certain activities. *Id.* § 1371(a). The National Marine Fisheries Service and the Fish and Wildlife Service have issued regulations governing such "incidental takes" – including regulations that would govern the geological and geophysical survey activities permitted by the Bureau of Ocean Energy Management ("BOEM") pursuant to 30 C.F.R. Part 551. *See* 50 C.F.R. pts. 18, 216. Therefore, an entity seeking to conduct geological or geophysical surveys that could result in the taking of marine mammals would be expected to obtain an incidental take authorization and undertake any mitigation required by the authorization (or risk penalties or prosecution under the Marine Mammal Protection Act in the event of an unpermitted take). 16 U.S.C. § 1371(a)(5) (allowing the National Marine Fisheries Service or the Fish and Wildlife Service to authorize the incidental, but not intentional taking of small numbers of marine mammals upon a finding that such take will have a negligible impact on marine mammal species or stocks and will not have an unmitigable adverse impact on subsistence uses of marine mammals). If any such proposed survey could affect endangered or threatened species, the authorizing agency would be required to engage in consultation under Section 7 of the Endangered Species Act. 16 U.S.C. § 1536(a)(2) (directing federal agencies to consult with the Services to ensure that any action authorized,

funded, or carried out by the federal agency is not likely to jeopardize the continued existence of any listed endangered or threatened species or result in the destruction or adverse modification of designated critical habitat).[4]

Notably, entities seeking to conduct geological and geophysical surveys can obtain a permit in *any* area of the OCS, including those areas that have been withdrawn from leasing, if they otherwise meet the requirements of the OCSLA permitting regulations and other applicable law, such as the Marine Mammal Protection Act and the Endangered Species Act. *See* 43 U.S.C. § 1340; 30 C.F.R. pt. 551. The withdrawal authority in Section 12(a) of OCSLA applies only to disposition of minerals; an authorization to explore without the rights to remove minerals is not affected by a decision under Section 12(a). BOEM can and does permit geological and geophysical survey activities in areas currently subject to a Presidential withdrawal. Accordingly, Executive Order 13795 had no legal effect on the conduct of such surveys, which are authorized under a specific section of OCSLA separate from the sections of OCSLA that govern the issuance of leases and the management of mineral exploration and development. *Compare* 43 U.S.C. § 1337 *with id.* § 1340.

### D. Withdrawals from the Leasing Program

Executive Order 13795 did, however, have a legal effect on leasing (and thereby development activities), fully in accordance with OCSLA. In Section 12(a) of the Act, Congress provided that the President "may, from time to time, withdraw from disposition any of the

---

[4] Obligations to comply with the OCSLA performance standards also apply to on-lease geological and geophysical surveys. While certain surveys may be conducted as an "ancillary activity" under a lease, any activity that could cause "undue or serious harm or damage to the human, marine, or coastal environment" is required to be included in an exploration or development plan for review and approval. *See* 30 C.F.R. § 550.209 (referring to 30 C.F.R. § 550.202(e)). Other requirements under the Endangered Species Act and Marine Mammal Protection Act may apply and could include mitigation measures and monitoring.

unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). This provision is a narrow exception to the primary purpose of OCSLA – to manage the development of the mineral resources in the OCS.

Section 12(a) has been invoked only a limited number of times since the passage of OCSLA in 1953:

1. <u>1960</u>. President Eisenhower established the Key Largo Coral Reef Preserve. *See* Proclamation No. 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2352 (Mar. 15, 1960) (ECF No. 13-6).

2. <u>1969</u>. Secretary of the Interior Walter Hickel provided notice that certain areas were "withheld from leasing as an adjunct to the" creation of the Santa Barbara Channel Ecological Preserve. *See* Public Land Order No. 4587, 34 Fed. Reg. 5655, 5656 (Mar. 26, 1969) (ECF No. 13-7).

3. <u>1990</u>. President George H.W. Bush supported the congressional moratorium of offshore oil and gas leasing and development in much of the OCS in a statement issued June 26, 1990, that was later confirmed to be an exercise of Section 12(a) authority. *See* Memorandum for the Secretary of the Interior (Aug. 4, 1992) (ECF No. 13-9) (clarifying an earlier Presidential statement supporting a moratorium for ten years, Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp. Pres. Doc. 1006 (June 26, 1990) (ECF No. 13-8)). In the August 1992 memorandum, President Bush noted that the withdrawal of the areas of OCS were "subject to revocation should the President determine the scheduling of a lease sale to be required in the interest of national security." Memorandum re Outer Continental Shelf Oil and Gas Program for 1992-1997 (Aug. 4, 1992) (ECF No. 13-9).

4. <u>1998</u>. President Clinton withdrew, for a limited time, certain areas of the OCS, and withdrew other areas for "a time period without specific expiration." Like President Bush, President Clinton noted that his withdrawals of areas of the OCS under Section 12(a) of OCSLA were also "subject to revocation by the President in the interest of national security." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1111, 1111 (June 12, 1998) (ECF No. 13-10).

5. <u>2007</u>. President George W. Bush modified the 1998 withdrawal of areas from leasing for a limited time to match a Congressional moratorium. *See* Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) (ECF No. 13-11).

6. <u>2008</u>. President George W. Bush modified the withdrawal of areas of the OCS from leasing disposition, limiting the withdrawal to those areas designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act. *See* Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008) (ECF No. 13-12).

7. <u>2010</u>. President Obama withdrew the area of Bristol Bay from leasing for the period through June 30, 2017. Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Mar. 31, 2010) (ECF No. 13-13).

8. <u>2014</u>. President Obama revoked his 2010 withdrawal and imposed a withdrawal for the same area for "a time period without specific expiration . . . ." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014) (ECF No. 13-14).

9. <u>2015</u>. President Obama withdrew the Chukchi and Beaufort Sea planning areas "for a time period without specific expiration . . . ." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1, 1 (Jan. 27, 2015) (ECF No. 13-15).

10. <u>2016</u>. In three separate actions, President Obama withdrew areas of the Atlantic Ocean and several offshore Alaska Areas from leasing, each for "a time period without specific expiration." Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 18 (Dec. 20, 2016) (ECF No. 13-17); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 18 (Dec. 20, 2016) (ECF No. 13-18); Exec. Order No. 13754 - Northern Bering Sea Climate Resilience, 81 Fed. Reg. 90,669, 90,670 (Dec. 9, 2016) (ECF No. 13-16).

## E. The Challenged Executive Order – Executive Order 13795

The challenged Executive Order Implementing an America-First Offshore Energy Strategy announced

> the policy of the United States to encourage energy exploration and production on the Outer Continental Shelf, in order to maintain the Nation's position as a global energy leader and foster energy security and resilience for the benefit of the American people, while ensuring that any such activity is safe and environmentally responsible.

10

Exec. Order No. 13,795 § 2, 82 Fed. Reg. at 20,815 (ECF No. 13-1). To implement this policy the President took three categories of action: (1) modified previous actions by President Obama to withdraw certain areas of the OCS from oil and gas development (*id.* § 5); (2) directed the Secretary of the Interior to reconsider certain regulations and policies (*id.* §§ 3, 6, 7, 8, 9, 11); and (3) directed the Secretary of Commerce to reconsider certain Marine Sanctuaries, regulations, and permitting programs (*id.* §§ 4, 9, 10). Plaintiffs challenge only the modification of President Obama's earlier withdrawal.

## III.   ARGUMENT

Following in the footsteps of both Presidents George W. Bush and Obama, President Trump modified the prior withdrawals of areas of the OCS for mineral leasing. While this step was crucial to ensuring the nation's security and economic vitality, it is a preliminary step which simply allows the Secretary of the Interior to consider leasing in the areas visited and used by the members of the Plaintiff organizations.

Defendants are entitled to summary judgment on Plaintiffs' claims. At the outset, Plaintiffs cannot and do not meet their burden of establishing standing to challenge Executive Order 13795. The harm they seek to prove is not caused by the Executive Order and will not be redressed by declaring the Executive Order invalid. Moreover, to the extent Plaintiffs allege they may suffer injuries when exploration, leasing, or development occurs, the time to invoke the Court's jurisdiction is then and not now. *See Ohio Forestry Ass'n. v. Sierra Club*, 523 U.S. 726, 733-734 (1998). Thus, Plaintiffs' lack of standing mandates summary judgment in Defendants' favor.

Plaintiffs are also simply wrong when they assert that President Trump's actions are *ultra vires* or in violation of OCSLA. OCSLA is a statute grounded not only in the Property Clause of the U.S. Constitution, but also the constitutional authority of the President to provide for

national security and conduct foreign affairs. It is also a statute with an express purpose of developing the minerals found in the OCS. *See* 43 U.S.C. § 1332(3). In this context, because there is no express prohibition on the modification of prior withdrawals, Executive Order 13795 falls squarely within the authority granted under the U.S. Constitution and OCSLA. This conclusion is even firmer in light of the prior presidential modifications of withdrawals pursuant to OCSLA. Accordingly, Defendants are entitled to judgment in their favor as a matter of law.

In any event, Plaintiffs' claim for relief seeks an injunction against the President, yet they fail to show that such extraordinary relief is appropriate under the circumstances—or even that it would redress their alleged injuries. *See Franklin v. Massachusetts*, 505 U.S. 788, 796-801 (1992); *id* at 827 (Scalia, J., concurring). For all of these reasons, Defendants are entitled to summary judgment and Plaintiffs' motion for summary judgment should be denied.

A.     **Standard for a Motion for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Solely for purposes of summary judgment, Defendants do not assert any genuine issues of material fact,[5] and therefore, the only question to be decided on both the Defendants' and Plaintiffs' motions for summary judgment is whether either party is entitled to judgment as a matter of law. *See Henry v. Wregglesworth*, No. 3:13–cv–00208-SLG, 2015 WL 2185074, at *1 (D. Alaska May 11, 2015). Here, the Defendants have established that

---

[5] Defendants reserve the right to conduct discovery regarding Plaintiffs' standing should this case proceed past the summary judgment stage.

they are entitled to judgment as a matter of law, and Plaintiffs' motion for summary judgment should be denied.

## B. Plaintiffs Lack Article III Standing[6]

Plaintiffs bear the burden of establishing facts sufficient to satisfy the three minimum requirements of standing and cannot simply rely on allegations. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); Order re Motions to Dismiss 14, ECF No. 45. The requirement for standing is not a mere formality – it is a constitutional requirement to ensure that the Court is deciding a true case or controversy, that is, a dispute that is "appropriately resolved through the judicial process." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. At the summary judgment stage, Plaintiffs must set forth specific facts supporting their standing allegations. *Id.* Plaintiffs have not demonstrated on summary judgment that Executive Order 13795 poses a sufficiently likely or imminent harm that can be redressed by the relief they seek. Accordingly, they lack standing to challenge Executive Order 13795 and Defendants are entitled to judgment as a matter of law on this threshold issue.

### 1. Plaintiffs' Alleged Harm Cannot Be Redressed by the Relief they Seek

Plaintiffs rely upon a projected increase in geological and geophysical surveys to demonstrate that they have suffered a concrete, particularized harm that can be redressed by the relief they seek. Mem. in Supp. of Pls.' Mot. for Summ. J. 9-18, ECF No. 51 ("Pls.' Mem.").

---

[6] For the reasons set forth in the Memorandum in Support of the Defendants' Motion to Dismiss ECF 13, 16-25, Plaintiffs also lack standing because they have failed to establish a particularized harm.

They fail, however, to demonstrate any imminent injury flowing from the Executive Order, or that there is a sufficient causal relationship between the Executive Order and the harm they allege. Plaintiffs' failure to show that their alleged injury is "imminent" or "fairly traceable" to the challenged action destroys Plaintiffs' claim of standing. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (requiring plaintiff to show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").

Notably, Plaintiffs have only challenged the President's authority to modify prior withdrawals under OCSLA. *See* Compl. 22, ECF No. 1 (Plaintiffs' Prayer for Relief seeking only a declaration and injunction with respect to Section 5 of Executive Order 13795); Def.'s Mem. Ex. 1 at 3, ECF No. 13-1 (showing that Section 5 of Executive Order 13795 does not address or affect the geological and geophysical permit program). Declaring Section 5 of Executive Order 13795 invalid or even enjoining implementation of that section would not redress the harm that Plaintiffs cite to support their claim of standing – even without the Executive Order, the Department of the Interior can and does permit geological and geophysical surveys on lands that have been withdrawn under OCSLA Section 12(a),[7] subject to the requirements under OCSLA, the Endangered Species Act, and the Marine Mammal Protection Act.[8]

---

[7] For example, BOEM has issued multiple geological and geophysical survey permits in the Gulf of Mexico that included survey activities in the Flower Gardens Banks National Marine Sanctuary, even after designated National Marine Sanctuaries were withdrawn pursuant to OCSLA Section 12(a) from leasing consideration.

[8] To the extent Plaintiffs complain of surveys that may be completed on leased lands, their arguments fail for lack of imminence as demonstrated below. *See also supra* footnote 4.

Plaintiffs seek to obfuscate this causal break by arguing that Executive Order 13795 "promotes" activities related to oil and gas exploration. Plts.' Mem. 10. In support of their argument, Plaintiffs cite the Department of the Interior's Resource Evaluation Report Geological and Geophysical Data Acquisition for the Outer Continental Shelf through 2016. But sections of that report not attached to Plaintiffs' brief show that in 2007, 2011, and 2015—each a year in which the applicable Five-Year Program offered no leases in the vast majority of the Arctic— geological and geophysical surveys covering hundreds or thousands of miles were conducted in the Arctic. *See* Kumkum Ray, Resource Evaluation Report: Geological & Geophysical Data Acquisition at 20 (OCS Report BOEM 2017-02) (Ex. 1). Similarly, in 2003 and 2008, geological and geophysical surveys were conducted in the Atlantic, despite the lack of opportunity to lease in that area. *Id.* at 24. The pending permit applications for surveys in the Atlantic were submitted without Atlantic sales being authorized in a five-year program, and they were not withdrawn when a prior Secretary discontinued the consideration of such sales at the Proposed Program stage of the 2017-22 Program.[9]

_____

[9] *See* Atlantic G&G permit applications filed between March 21 and October 16, 2014, https://www.boem.gov/Currently-submitted-Atlantic-OCS-Region-Permits/ (Last accessed on July 18, 2018) (when no Atlantic lease sales were scheduled in 2012-2017 OCS Oil and Gas Leasing Program); *see* Department of the Interior, Bureau of Ocean Energy Management, Memorandum of Approval and Record of Decision for the Five Year Outer Continental Shelf (OCS) Oil and Gas Leasing Program for 2012-2017 (Aug. 27, 2012), https://www.boem.gov/5-year/2012-2017/ (Last accessed on July 18, 2018). The above G&G permit applications are currently under evaluation and were not withdrawn when the Department of the Interior decided not to schedule lease sales in the Atlantic OCS as part of the 2017-2022 OCS Oil and Gas Program. *See* Department of the Interior, Bureau of Ocean Energy Management, 2017-2022 Outer Continental Shelf Oil & Gas Leasing Proposed Program, p. S-8 (Mar 2016), https://www.boem.gov/2017-2022-Proposed-Program-Decision/ (Last accessed on July 18, 2018).

In sum, the harm that Plaintiffs assert – damage from geological and geophysical surveys – is not caused by Section 5 of Executive Order 13795 and will not be redressed by declaring that section of the Executive Order invalid (the relief the Plaintiffs seek). Accordingly, Plaintiffs have failed to establish standing sufficient to bring their claims for relief.

## 2. Plaintiffs' Alleged Injury Is Not Imminent

Plaintiffs have also failed to establish the harm they allege is imminent. Plaintiffs could challenge any issuance by BOEM of permits for geological or geophysical surveys, as well as any issuance of incidental take authorizations or final Endangered Species Act Section 7 consultations in a properly formulated action under the Administrative Procedure Act ("APA"), 5 U.S.C. chapter 5. At any such time, the Court would be presented with a truly concrete question.

Plaintiffs' reliance on *In Re Zappos.com, Inc.*, 888 F.3d 1020 (9th Cir. 2018), to establish their claims are imminent, is misplaced. In *Zappos*, the plaintiffs brought a class action alleging an imminent risk of identity theft resulting from the theft of personally identifying information from Zappos' servers. In that case, the court found the future harm resulting from identity theft using the data stolen from Zappos was imminent because the thieves had all the necessary information to accomplish identity theft. *Id*. at 1027. The decision necessarily turned on assessing the probability of an unknowable future event (harm from potential misuse of private personal information), and thus the *Zappos* court was precautionary and assumed that the harm was likely "enough" to occur. By contrast, in the case at bar, there are several additional, known steps that must occur before the alleged harm can occur. Moreover, while the *Zappos* plaintiffs would have no further opportunity to intervene or challenge the use of their personal data, Plaintiffs here will have several opportunities to bring properly formulated actions pursuant to the APA: the issuance of a new Five-Year Program, the sale of a particular lease, the issuance of

a geological and geophysical survey permit, etc. The opportunity to challenge any future geological and geophysical survey permit provides a safeguard that was missing in *Zappos*.

Therefore, the case at bar is more akin to the Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), cited in *Zappos*. In *Clapper*, the plaintiffs were attorneys and other organizations assisting prisoners. The plaintiffs in that case challenged the surveillance procedures authorized by the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1881a, claiming that there was "an objectively reasonable likelihood" that their privileged communications would be captured by the surveillance procedures. 568 U.S. at 410. The Supreme Court found such a claim insufficient to establish standing. The Court identified a series of future steps that had to occur before the plaintiffs' communications would be captured and rejected this potential chain of events as a basis for standing: "In the past, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment. . . . We decline to abandon our usual reluctance . . . ." *Id.* at 415 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Like the plaintiffs in *Clapper*, here Plaintiffs are assuming a series of decisions will be made in a particular manner in order to establish an imminent harm. The Secretary of the Interior retains a significant amount of discretion under Executive Order 13795. Specifically, Section 3 of Executive Order 13795 directs that the Secretary "give full consideration" to revising the current Five-Year Program. Where the Executive Order leaves such discretionary decisions for the future, the Plaintiffs cannot presume the outcome of those decisions to establish standing. Such a theory of standing would require the kind of "guesswork" rejected by the Supreme Court in *Clapper*. 568 U.S. at 413. Accordingly, Defendants are entitled to judgment as a matter of law that Plaintiffs lack standing and therefore cannot bring their claims.

17

## C. Plaintiffs' Claims Are Not Ripe [10]

For the same reasons that Plaintiffs have failed to establish standing, they have failed to demonstrate that their claims are ripe. This Court has recognized that the doctrine of ripeness has two components: the constitutional component and the prudential considerations. Order at 24 n. 115, ECF No. 45. The constitutional component of ripeness "is coextensive with the injury-in-fact requirement of standing." *Id.* In other words, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). As demonstrated above, Plaintiffs have failed to establish that their alleged harm is imminent or causally related to the challenged action. This failure also demonstrates that their claims are not constitutionally ripe.

"In assessing the prudential ripeness of a case, [courts] focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387. The "fitness" factor depends "on whether the issues are purely legal, whether consideration of the issues would benefit from a more concrete setting, and whether the agency's actions are sufficiently final." *In re Aiken Cty.*, 645 F.3d 428, 434 (D.C. Cir. 2011). Here, each subsequent action of which Plaintiff complains will present a more complete factual and legal controversy for the Court to decide. The permits, incidental take authorizations, five-year programs, and other actions that may occur should the

---

[10] Defendants respectfully reassert the arguments set forth in ECF No. 13, § IV.E. and ECF No. 38, § II. Though the Court has ruled on the questions of ripeness, sovereign immunity and the need for a private right of action, Defendants respectfully request reconsideration of that ruling. *See Jenkins v. City of Riverside*, 398 F.3d 1093, 1094 n.2 (9th Cir. 2005) (per curiam) ("The law of the case doctrine is not an absolute bar to reconsideration of matters previously decided." (quoting *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995))).

Secretaries choose to issue them are all subject to challenge in a properly formulated claim brought pursuant to the APA.

In an action challenging these specific activities, the Court would be faced not with an embryonic decision to consider additional leasing but rather with an administrative record that would provide a robust evidentiary basis on which to assess an identifiable and specific agency action pursuant to the applicable statute (e.g., OCSLA), which evidence could include the delicate balance of the needs of our economy, national security, and environment. Just as the Supreme Court in *National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003), concluded that the challenged decisions were not ripe for review absent a "concrete action" affecting the challengers, it is clear here that the challenge to Executive Order 13795 is not ripe without some specific lease, permit, or authorization to evaluate.

### D. Plaintiffs Lack an Applicable Waiver of Sovereign Immunity[11]

The Plaintiffs bear "the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress." *Dunn v. Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007). The fact that Plaintiffs assert constitutional claims does not change the requirement to find a waiver of sovereign immunity. The ultra vires doctrine upon which Plaintiffs rely is a narrow exception that allows a plaintiff to overcome a sovereign immunity claim only upon a showing that the public official (1) lacked statutorily delegated authority; or (2) exceeded the scope of statutorily conferred authority. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949).

---

[11] Defendants respectfully reassert the arguments set forth in ECF No. 13, §IV.B. and ECF No. 38, § III.

As demonstrated below, the President's issuance of Executive Order 13795 was a valid exercise of his constitutional and statutory authority. Accordingly, the action was one as a sovereign and not a constitutionally impermissible individual action. *Larson,* 337 U.S. at 698. Moreover, mere allegation of error by the public official in the exercise of authority is not sufficient to survive a claim of sovereign immunity. *Id.* at 698. Because President Trump was acting as a sovereign, Plaintiffs must identify an applicable waiver of sovereign immunity. They have failed to do so and therefore, have no established a right to bring their claims to this Court.

### E. Plaintiffs Lack a Private Right of Action[12]

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001). "To create a private right of action, Congress must 'speak with a clear voice,' and the statute must 'unambiguously' express the intent 'to create not just a private right but also a private remedy.'" *Clear Sky Car Wash LLC v. City of Chesapeake,* 743 F.3d 438, 444 (4th Cir. 2014) (alteration omitted) (quoting *Gonzaga Univ. v. Doe,* 536 U.S. 273, 280, 283, 284 (2002)). Where the necessary intent is absent, "a cause of action does not exist and courts may not create one." *Sandoval,* 532 U.S. at 286-87.

Plaintiffs fail to identify any statute that provides them a right of action to enforce their alleged rights under OCSLA and the Property Clause. Notably, they allege that they "have a right of action to seek redress for official actions by the President that violate the Constitution" and "a right of action to redress unlawful official action by the President" under OCSLA, but cite no relevant legal authority. *See* Compl. ¶¶ 56, 63. Without a specific grant of a private right of

---

[12] Defendants respectfully reassert the arguments set forth in ECF No. 13, § IV.C. and ECF No. 38, § IV.

action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter." *Lonberg v. City of Riverside*, 571 F.3d 846, 848 (9th Cir. 2009) (quoting *Sandoval,* 532 U.S. at 286-87).

Moreover, even if Plaintiffs had directed their claims against the Secretaries of the Interior and Commerce—which they did not—the claims would still fail for lack of a private right of action, because Plaintiffs did not invoke the APA as to those two agencies. The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA authorizes a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A)-(B), and to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). The APA thus provides a "comprehensive remedial scheme" for a "person 'adversely affected' . . . by agency action" or alleged failure to act with respect to regulatory requirements and standards, permitting, and other administrative measures. *Western Radio Servs. Co. v. United States Forest Serv.*, 578 F.3d 1116, 1122-1123 (9th Cir. 2009) (citation omitted), *cert. denied*, 559 U.S. 1106 (2010); *see Wilkie v. Robbins*, 551 U.S. 537, 551-554 (2007) (describing the APA as the remedial scheme for vindicating complaints against "unfavorable agency actions"); *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting) (explaining that the APA "is an umbrella statute governing judicial review of all federal agency action" and that "if review is not available under the APA it is not available at all").

Finally, the fact that Plaintiffs assert a constitutional claim makes no difference here, because the Supreme Court has never held that the Constitution itself provides an across-the-board right of action for all constitutional claims. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("[T]he Supremacy Clause does not confer a right of action."). Federal courts do have equitable authority in some circumstances "to enjoin unlawful executive action." *Id.* at 1385. But that equitable power is "subject to express and implied statutory limitations." *Id.* Thus, "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right," courts "have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). Even if the equitable authority of an Article III court could ever extend to a case of this sort, the APA provides "express . . . statutory limitations" that "'foreclose,'" *Armstrong*, 135 S. Ct. at 1385 (citation omitted), Plaintiffs' asserted constitutional claims. Accordingly, Plaintiffs have identified no valid private right of action and the Defendants are therefore entitled to summary judgment as a matter of law.

### F. Plaintiffs' Ultra Vires Claims Fail as a Matter of Law.

To the extent the Court determines it has Article III jurisdiction, Defendants are nonetheless entitled to judgment as a matter of law. The President possesses broad discretionary power under OCSLA to modify the withdrawal of areas from exploration or development, and he also has authority under Article II, which was exercised by President Truman first to claim and later to reserve the OCS as a petroleum reserve. The Court should exercise restraint in this area, especially where the President himself has inherent constitutional authorities to exercise here as well as significant discretionary authority granted to him by Congress under its Property Clause power. Executive Order 13795 explicitly and appropriately invoked these authorities. *See* Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017). ("By the authority vested in me as

President by the Constitution and the law of the United States of America, including the Outer Continental Shelf Lands Act . . . ."). Accordingly, Plaintiffs' motion for summary judgment should be denied, and Defendants' cross-motion for summary judgment should be granted.

It bears noting as a threshold matter what is not at issue here. Plaintiffs assert only an *ultra vires* claim; they do not challenge the president's exercise of discretion under OCSLA, nor could they. The Supreme Court has long recognized that judicial review of presidential action is "not available when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 476 (1994); *see also id.* at 476 ("How the President chooses to exercise the discretion Congress has granted him is not a matter for our review."); *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."); *Tulare Cty. v. Bush*, 306 F.3d 1138, 1141-42 (D.C. Cir. 2002).

### 1. The Plain Language of OCSLA Leaves Withdrawals to the Discretion of the President

The authority to withdraw areas from leasing is provided in remarkably simple language that leaves the nature, purpose, and duration of the withdrawal to the President's discretion. Specifically, Section 12(a) of OCSLA provides:

> The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf.

43 U.S.C. § 1341(a). Notably, Section 12(a) does not cabin the President's authority in any way, other than to clarify that lands must be unleased in order to be withdrawn. Of relevance here, Section 12(a) places no restrictions on the temporal scope of withdrawals. Section 12(a) establishes that the President may exercise withdrawal authority "from time to time." And it leaves the decision to withdraw—and the bases for doing so—entirely to the President, such that the President may choose to exercise his authority for any reason. Section 12(a) also says nothing

about the manner in which lands should be used or managed once withdrawn. Thus, the plain language of the statute leaves it to the President's discretion when, for how long, and for what purpose to withdraw areas from mineral development, with the only limitation that the President must withdraw unleased land. Interpreting the statute to allow the President only to withdraw areas – but not revoke those withdrawals – is contrary to that plain language.

Moreover, it is a well-settled principle that government entities have broad authority to reconsider decisions. *See, e.g., Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."); *Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) (same). It is not possible to reconcile Plaintiffs' cramped view of OCSLA with the general principle that reconsideration "is inherent in the power to decide." *See, e.g., Albertson*, 182 F.2d at 399; *Van Antwerp*, 560 F. Supp. 2d at 23. A President is free to revoke prior Presidents' executive orders, and take other actions—including reversals of prior decisions—necessary to fulfill his constitutional duty to "take Care that the Laws be faithfully executed." *See* U.S. Const., Art II, § 3; *see also* VIVIAN S. CHU & TODD GARVEY, CONG. RES. SERV., RS20846, EXECUTIVE ORDERS: ISSUANCE, MODIFICATION, AND REVOCATION 7 (2014) (https://fas.org/sgp/crs/misc/RS20846.pdf Last visited July 18, 2018)) ("The President is free to revoke, modify, or supersede his own orders or those issued by a predecessor."). The plain language therefore demonstrates that President Trump acted within his authority in modifying President Obama's prior withdrawals and Defendants are entitled to judgment as a matter of law.

### 2. The Legislative History of OCSLA Emphasizes the President's Discretion Under OCSLA

The legislative history of Section 12(a) of OCSLA also demonstrates that Congress intended to delegate wide discretion to the President, including the authority to modify prior withdrawals. Congress initially discussed the future use of withdrawn minerals in 1948, as part

of the legislative process that ultimately led to the passage of OCSLA. Contrary to Plaintiffs' assertions, Congressional discussions were not driven by a desire to protect environmental resources from fossil fuel development. Further, there was never any suggestion in those discussions that such withdrawals be irrevocable and permanent. Rather, Congress' grant of withdrawal authority originated in large part from national security concerns and Congress' desire to ensure availability of petroleum resources for future military use:

> The bill emphasizes the major premise of the vital relationship to our national security of the petroleum in the Continental Shelves beneath the open sea. It declares that the petroleum resources should be conserved as a national asset vital to the security of the Nation, and require the administration of the act to conform to that policy. The President is authorized to withdraw any of the submerged coastal lands from leasing under the act and reserve the oil deposits in the interest of national security, thus providing for the storage of petroleum underground for future military use.

Joint Hearings on S. 1988 & Similar House Bills Before the Comms. on the Judiciary, 80th Cong. 737 (1948) (statement of Interior Secretary Julius Krug, describing a bill draft submitted by the Truman Administration). Thus, ensuring "future use" of offshore mineral resources was one of the driving considerations underlying the discussion of a withdrawal provision.

This legislative history supports the conclusion that a President can modify or revoke prior withdrawals. Under the reasoning set forth in this history, and the plain language of the statute, the President can clearly withdraw an area from leasing for any purpose, including a purpose other than permanent conservation. In other words, a President can withdraw areas from leasing in order to preserve the minerals for future production as a national security matter or for other reasons. This wide latitude necessarily includes Presidential authority to restore the area to productive use.

Congress' response to an objection by the Eisenhower administration further demonstrates that Congress did not intend to make withdrawals irreversible or immutable under

OCSLA Section 12(a). The Eisenhower administration objected to the proposed provision authorizing withdrawal as unnecessary and suggested at minimum that the limitation of that authority to withdrawals in the interest of national security be deleted. *See* Comment from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, S. Rep. 83-411 at 39 (1953) (Ex. 2). When the bill was reported from the Senate Interior and Insular Affairs Committee, that phrase was deleted and the Committee explained that the explicit reference to reservation for future military use was not necessary and "the authority of the President to withdraw certain areas . . . should not be limited to security requirements." *Id*. at 26. Instead, the Committee explained that "[t]he authority vested in the President by the amended section is comparable to that which is vested in him with respect to federally owned lands on the uplands." *Id*. at 26. In other words, in amending Section 10 of the bill as introduced (which later became Section 12(a)), Congress intended to provide increased discretion to the President. Nothing in the legislative history reflects concern about the idea of a President modifying withdrawals to return submerged lands to their primary purpose under the Act, *viz.*, for leasing and development.

While Plaintiffs assert that this legislative history supports their theory of the case, the opposite is true; Congress' response to the concerns of the Eisenhower Administration makes clear that the purpose of Section 12(a) was to give the President power to withdraw in the same manner and to the same extent as permitted on the uplands. This is significant because, at the time that OCSLA's Section 12(a) was enacted, federal statutes granting the authority to withdraw uplands were historically understood to temporarily suspend the operation of a public land disposal law, thus preserving the *status quo* until Congress *or the Executive* decides on the ultimate disposition of the subject lands. *S. Utah Wilderness All. v. Bureau of Land Mgmt.(SUWA),* 425 F.3d 735, 784 (10th Cir. 2005) (citing CHARLES F. WHEATLEY, JR., II STUDY

OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS A–1 (1969) (report to Public Land Law Review Commission) (http://hdl.handle.net/2027/wu.89041980905 Last visited July 18, 2018).

The committee reports regarding OCSLA clearly state that Congress' purpose in Section 12(a) was to provide the withdrawal authority (and corresponding revision authority) similar to that being exercised by the Executive Branch with respect to onshore federal lands and resources. In sum, the legislative history confirms that Congress did not intend to impose an unwritten restriction on the President's discretion concerning the withdrawal authority in section 12(a) of OCSLA and Defendants are entitled to judgment as a matter of law.

### 3. The Purpose of OCSLA Supports the President's Wide Discretion to Modify Prior Withdrawals

The purpose of OCSLA further evidences that Congress did not intend to foreclose presidential modification of withdrawals under OCSLA § 12(a). A "statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole." 2A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 46:5 (7th ed. 2014). As the Supreme Court has explained, a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ." *King v. Burwell,* 135 S. Ct. 2480, 2493 (2015) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988)).

The conclusion that the President has the authority to modify prior withdrawals conforms to the purpose of OCSLA. That purpose was stated clearly in the conference report as being "to meet the urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf." H.R. Rep. No. 83-1031, at 7 (1953) (Conf.

Rep.). Indisputably, the central purpose of OCSLA as enacted in 1953 was to allow for development of oil, gas, and other mineral resources.[13]

Notwithstanding that purpose, Plaintiffs posit that Section 12(a) of OCSLA must have been intended to create permanent withdrawals—revocable only by Congress itself—because anything less would make Section 12(a) superfluous of the Secretary of the Interior's discretion to lease or not lease already contained in Section 8 of OCSLA. But, as noted above, the committee report indicates that the intention was simply to assure that the President had the same withdrawal authority on the OCS as he did onshore. The two authorities (leasing and withdrawal) had coexisted onshore for thirty-three years by the time of OCSLA's enactment. The onshore withdrawal authority predated onshore leasing authority by many decades and had been used to prevent prospectors from establishing mining claims against the Government while alternative uses were under consideration by Congress or the Executive. The addition of leasing authority in the Mineral Leasing Act of 1920 gave the Secretary the authority to "not lease," but was not understood to change the character of the withdrawal authority. To the extent that the history reflects any specific reason for including withdrawal provisions in OCSLA, it was to give the Commander in Chief a means of protecting national security interests, while leasing decisions were vested in the Secretary of the Interior.

_____

[13] Indeed, and particularly read in context of the overall purpose of the Act, Congress' use of the term "withdrawal", as opposed to "reservation" reinforces the clear purpose of the Act that any withdrawals were not intended to be permanent. "[A withdrawal] temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands." *SUWA*, 425 F.3d at 784-85 (citing CHARLES F. WHEATLEY, JR., STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS, Vol. III (Rev. Sept. 1969)).

28

In sum, the context and stated purpose of OCSLA demonstrates that Congress intended to delegate broad authority to the President to modify prior withdrawals under Section 12. The stated purpose of OCSLA, after the statute was amended to add environmental considerations, is to encourage the "expeditious and orderly" development of the minerals in the OCS. *See* 43 U.S.C. § 1332(3). To read into the statutory language an unstatí restriction on the President's authority to modify prior withdrawals would be to ignore Congress' specific and explicit statement of purpose.

### 4. Past Conduct under OCSLA Demonstrates the President's Discretion

Although the text, purpose, and history of OCSLA Section 12 amply demonstrate that modification of prior withdrawals is within the scope of the President's delegated authority, that conclusion is cemented by Presidential practice in modifying prior withdrawals. Of the only twelve actions taken pursuant to OCSLA Section 12(a), at least five represent modifications of prior withdrawals and two of them – or seventeen percent – represent reductions of prior withdrawals.

The language of Executive Order 13795, which is the subject of this challenge, is virtually identical to the language used by President George W. Bush in 2008 to modify prior presidential withdrawals, in which Congress acquiesced.[14] *See supra* § I.D. Moreover, under Plaintiffs' theory, it would have been unconstitutional as well as illegal for President Barack

---

[14] The area of the OCS that President Bush's order opened up for potential leasing was far greater than the area affected by Executive Order 13795. President Bush undid withdrawals ordered by President Clinton of OCS areas offshore California, Washington and Oregon, the North Atlantic, Mid–Atlantic and South Atlantic planning areas, the eastern Gulf of Mexico, and the North Aleutian Basin planning area. *See* Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) (ECF No. 13-11); Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008) (ECF No. 13-12).

Obama to revoke his own withdrawal prior to the date it was to expire by its terms; under their theory, only President Obama's successor would have the right to determine if it were to continue past that date. Plaintiffs' view that revocation of a withdrawal requires congressional action also was not shared by Presidents George H.W. Bush and William J. Clinton who expressly provided in their 1990 and 1998 withdrawals that they could be revoked if necessary for national security.

When the elected branches of government are in accord on the meaning of a statute, courts are properly reluctant to intervene. "The longstanding 'practice of the government' can inform [a court's] determination of 'what the law is.'" *NLRB v. Canning*, 134 S. Ct. 2550, 2560 (2014) (quoting *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). Thus, courts afford a presumption of congressional consent to presidential action that is "known to and acquiesced in by Congress" over an extended period of time. *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (same); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("Presidential authority can derive support from 'congressional inertia, indifference or quiescence.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)); *Al-Bihani v. Obama*, 619 F.3d 1, 26 (D.C. Cir. 2010) (en banc) ("[C]ourts presume that Congress authorized the President, except to the extent otherwise prohibited by the Constitution or statutes, to take at least those actions that U.S. Presidents have historically taken . . . .").

Plaintiffs assert that prior opinions by the U.S. Attorney General demonstrate that past Administrations interpreted their statutory authorities to withdraw land as excluding the authority to modify prior withdrawals. But those opinions pertain to reservations, not withdrawals, and statutes enacted and opinions issued well before the enactment of OCSLA, and have no relevance here. *See, e.g.,* Camp Wright, California, 16 Op. Att'y Gen. 121 (1878) (discussing the

conversion of military land to use as a tribal reservation by the Department of the Interior); Military Reservation at Fort Fetterman, 17 Op. Att'y Gen. 168 (1881) (discussing the right to return military land to public use); Naval Reservation-Restoration to Public Domain, 21 Op. Att'y Gen. 120 (1895) (same); Camp Hancock-Transfer from War Dep't to Dep't of Agriculture, 28 Op. Att'y Gen. 143 (1910) (same); Proposed Abolishment of Castle Pinkney Nat'l Monument, 39 Op. Att'y Gen. 185 (1938) (discussing Antiquities Act).

For example, while Plaintiffs rely on an Attorney General Opinion addressing the President's authority under the Antiquities Act, *see* 39 Op. Att'y Gen at 188, that Act serves an entirely different purpose than OCSLA. Unlike OCSLA, the Antiquities Act is intended to protect objects of historic or scientific interest; it does not create a federal leasing authority nor does it promote the development and production of mineral resources. The President's authority to withdraw areas of the OCS from leasing under OCSLA is an exception to the primary purpose of OCSLA which is the discovery and production of mineral resources, not the protection of objects.

But even if OCSLA and the Antiquities Act were more analogous, Plaintiffs' reliance on the Attorney General Opinion would still be misplaced here, because Plaintiffs' incorrectly assume that the President lacks the authority to modify national monuments under the Antiquities Act. In fact, the President's authority to modify national monuments was affirmed in the very 1938 opinion cited by Plaintiffs. *See* 39 Op. Att'y Gen at 188. Consequently, Plaintiffs are wrong to interpret the President's withdrawal authority under Section 12(a) of OCSLA as being permanent and irreversible. These irrelevant legal opinions cannot override the explicit evidence that the Executive Branch has interpreted OCSLA Section 12(a) as permitting modifications of prior withdrawals.

In fact, despite the rhetoric cited by Plaintiffs in their brief, and despite their contention that withdrawals are intended to be permanent, President Obama—who revoked and modified his own withdrawals—specifically left open the possibility of future modifications. President Obama specified only that his withdrawals were being made for a "period without specific expiration." *See* Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 1 (Dec. 20, 2016); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 1 (Dec. 20, 2016).

### 5. Withdrawal Authority Includes Authority to Modify or Revoke

Plaintiffs cite several statutes in support of their argument that when Congress intended to authorize the Executive to reverse withdrawals, it did so expressly, and that since Section 12(a) of OCSLA does not include the express power to revoke or modify such withdrawals, the President lacks such power. Plaintiffs' citation to those statutes actually demonstrates the opposite. As noted above, in reporting the bill that became OCSLA to grant to the President broader withdrawal authority than the bill as introduced, the Senate committee said it was vesting withdrawal authority "comparable to that which is vested in him with respect to federally owned lands on the uplands." S. Rep. No. 83-411, at 26 (Ex. 2).

The withdrawal authority generally vested in the President "on the uplands" in 1953 included the power to revoke or modify such withdrawals. Instructive of contemporaneous understanding is a proclamation of President Truman dated barely more than a year before the enactment of OCSLA. In Executive Order No. 10355 of May 26, 1952, the President had delegated to the Secretary of the Interior:

> the authority vested in the President by section 1 of the act of June 25, 1910, ch. 421, 36 Stat. 847 (43 U.S.C. [§] 141) and the authority otherwise vested in him to withdraw or reserve lands of the public domain and other public lands owned or

controlled by the United States in the continental United States or Alaska for public purposes, *including the authority to modify or revoke withdrawals and reservations of such lands heretofore or hereafter made.*

17 Fed. Reg. 4831 (May 26, 1952) (emphasis added).[15]

There were numerous authorities under which withdrawals were made in 1953. And there was an active practice of Executive revocation and modification of withdrawals in that era. In California alone, the Department revoked 167,451 acres of withdrawals in the period 1957-61 and 372,840 acres in 1962-64. CHARLES F. WHEATLEY, ET AL. STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS 424 (1979) (Ex. 2). The principal statutory authority for withdrawals was the Pickett Act, also known as the Withdrawal Act or the Act of June 25, 1910, ch. 421, 36 Stat. 847 (codified as amended at 43 U.S.C. §§ 141-143). That Act provided:

> That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale or entry any of the public lands of the United States, including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

Another important authority was the Reclamation Act of 1902 which directed the President to make withdrawals for irrigation purposes. 43 U.S.C. § 416 (1964). It further provided that he would "restore to public entry any of the lands so withdrawn when, in his judgment, such lands are not required for the purposes. . . ." *Id*. Many other statutes authorized withdrawals for specific purposes.[16] Some expressly addressed the authority to restore withdrawn lands to the public domain, while most did not. No statute expressly restricted the

---

[15] This statement was similar to Exec. Order No. 9146, 7 Fed. Reg. 9146 (Apr. 24, 1942), and Exec. Order No. 9337, 8 Fed. Reg. 5516 (Apr. 24, 1943).

[16] *See, e.g.,* Stock Raising Homestead Act, 45 Stat. 1144, Sec. 10 (1916).

traditional authority of the President or the Secretary to revoke or restore a withdrawal or reservation.

Moreover, Federal courts have recognized that the President had implied authority to make withdrawals prior to the passage of these acts. In the landmark case of *United States v. Midwest Oil Co., et al.*, the Supreme Court upheld a 1909 withdrawal of petroleum lands as a long continued practice acquiesced in by the Congress:

> The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time and affecting vast bodies of land, in many States and Territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved.

236 U.S. at 475.

More importantly for purposes of the issue at bar, in an opinion concerning an executive order transferring a portion of a Naval reservation to the Treasury Department, the same attorney general whose opinion on Antiquities Act withdrawal is cited by plaintiffs, Attorney General Cummings, opined that the general or implied authority of the President "to withdraw land from the public domain for public purposes . . . necessarily implies the power to restore the land to the public domain when it has served the purpose for which it was withdrawn. . .." Transfer to Treasury Dep't Jurisdiction Over Portion of Naval Reservation, Ediz Hook Spit, Port Angeles Harbor, Washington, 37 Op. Att'y Gen. 431, 432 (1934).

Plaintiffs argue that OCSLA Section 12(a) must be narrowly construed because it involves the exercise of Property Clause authority. This history just relayed, however, demonstrates no such restriction. The Supreme Court in *Midwest Oil* made clear that Congress can provide broad instructions which the President can implement at his discretion. There is simply no basis for concluding that, if Congress chooses to provide a broad delegation, this court must somehow constrain the discretion of another branch of government. In short, Defendants

34

are entitled to judgment as a matter of law and Plaintiffs' motion for summary judgment should be denied.

### G. Plaintiffs Are Not Entitled to An Injunction, Especially As Against the President

As demonstrated in the previous sections of this brief, Defendants are entitled to judgment as a matter of law. Accordingly, Plaintiffs are not entitled to an injunction. Most particularly, Plaintiffs are not entitled to an injunction against the President.

The separation of powers generally bars federal courts from issuing an injunction against the President of the United States for official acts. *See Franklin,* 505 U.S. at 802–03 ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)); *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 500 (1866) ("Neither [the Congress nor the President] can be restrained in its action by the judicial department."); *Hawaii v. Trump,* 859 F.3d 741, 788 (9th Cir.) (per curiam), *vacated and remanded on other grounds*, 138 S. Ct. 377 (2017); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280-82 (D.D.C. 2005) ("The prospect of this Court issuing an injunction against the President raises serious separation of powers concerns."); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) ("The President's unique status under the Constitution distinguishes him from other executive officials.").

The Supreme Court has left open the possibility that the President "might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," *Franklin,* 505 U.S. at 802—that is, a duty "in respect to which nothing is left to discretion," *Mississippi,* 71 U.S. at 498. Plaintiffs challenge no such ministerial acts here. Rather, they seek to enjoin the discretionary act of the President in determining what areas of the OCS to lease and which to withhold. Preventing such interference with the President's exercise of his official, constitutionally prescribed duties is the very reason that courts generally prohibit an injunction

against the President. *See Clinton v. Jones*, 520 U.S. 681, 718-19 (1997) (Breyer, J., concurring) ("[C]onstitutional principles counsel caution when judges consider an order that directly requires the President properly to carry out his official duties."); *Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (describing the "apparently unbroken historical tradition . . . implicit in the separation of powers" that a President may not be ordered by the Judiciary to perform particular Executive acts); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other.").[17]

Further, the balance of equities weighs against the issuance of an injunction against the President when less extraordinary relief can redress Plaintiffs' claimed harm. Plaintiffs have available to them avenues to prevent any potential harm that may be caused by the geological and geophysical surveys they fear, and thus they do not require an injunction in this case. Specifically, Plaintiffs have the right to comment upon leasing and many other actions and challenge – where standing and other jurisdictional requirements are satisfied – the permitting and leasing decisions made by the Secretaries of the Interior and Commerce or their delegates. For this additional reason, an injunction against the President would be improper. *See Franklin*, 505 U.S. at 803 (finding that plaintiffs' injuries could be redressed by entry of declaratory relief against the Secretary of Commerce, but ultimately rejecting underlying claim); *Swan v. Clinton*, 100 F.3d 973, 979-81 (D.C. Cir. 1996) (bypassing issue of injunction against President by finding that plaintiffs' alleged injuries are redressable against subordinate executive officials, but ultimately rejecting underlying claim); *Trump*, 859 F.3d at 788 ("We conclude that Plaintiffs'

---

[17] Defendants respectfully re-assert their arguments, set forth in ECF No. 13 § IV.D., establishing that the Plaintiffs are not entitled to Declaratory Judgment for the same reasons.

injuries can be redressed fully by injunctive relief against the remaining Defendants."). Any injuries that Plaintiffs may claim arising from executive action can be redressed through a properly framed APA action against the agency defendants. *See Franklin*, 505 U.S. at 803. Accordingly, "the extraordinary remedy of enjoining the President is not appropriate here," and Defendants are entitled to judgment on Plaintiffs' claims against the President. *Trump*, 859 F.3d at 788.

## IV.    CONCLUSION

President Trump's Executive Order 13795 was a valid exercise of his authority under the Constitution and his authority under OCSLA Section 12(a). His exercise of the discretionary authority granted under Section 12(a) was fully consistent with the clear and unambiguous statutory purpose. Moreover, his modification of prior withdrawals reflects past practice of Presidents and an appropriate reflection of the President's broad authority to reconsider decisions. For these reasons, and the reasons set forth above, Defendants are entitled to summary judgment and Plaintiffs' motion for summary judgment should be denied.

Dated: July 18, 2018                     Respectfully submitted,

JEFFREY WOOD
Acting Assistant Attorney General
ERIC GRANT
Deputy Assistant Attorney General
Environment & Natural Resources Division


_____/s/_____
SARAH D. HIMMELHOCH
MD Bar. No. 199212160064
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0057
sarah.himmelhoch@usdoj.gov

*Attorneys for Defendants*

## **Certificate of Service**

I hereby certify that on July 18, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

_____
Sarah D. Himmelhoch
*Attorney for Defendants*