**LEAGUE OF CONSERVATION VOTERS, et al. v. TRUMP, et al.**

**Case No. 3:17-cv-00101-SLG (D. Or.)**

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 2**

| 83D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 411 |
|---|---|---|

# OUTER CONTINENTAL SHELF LANDS ACT

## REPORT

**TOGETHER WITH**

## MINORITY VIEWS

**FROM THE**

### COMMITTEE ON INTERIOR AND INSULAR AFFAIRS
### SENATE OF THE UNITED STATES

**TO ACCOMPANY**

# S. 1901

A BILL TO PROVIDE FOR THE JURISDICTION OF THE
UNITED STATES OVER THE SUBMERGED LANDS OF
THE OUTER CONTINENTAL SHELF, AND TO AUTHORIZE
THE SECRETARY OF THE INTERIOR TO LEASE SUCH
LANDS FOR CERTAIN PURPOSES



JUNE 15 (legislative day, JUNE 8), 1953.—Ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
36006
WASHINGTON : 1953

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS

HUGH BUTLER, Nebraska, *Chairman*

EUGENE D. MILLIKIN, Colorado
GUY CORDON, Oregon
GEORGE W. MALONE, Nevada
ARTHUR V. WATKINS, Utah
HENRY C. DWORSHAK, Idaho
THOMAS H. KUCHEL, California
FRANK A. BARRETT, Wyoming

JAMES E. MURRAY, Montana
CLINTON P. ANDERSON, New Mexico
RUSSELL B. LONG, Louisiana
GEORGE A. SMATHERS, Florida
EARLE C. CLEMENTS, Kentucky
HENRY M. JACKSON, Washington
PRICE DANIEL, Texas

KIRKLEY S. COULTER, *Chief Clerk*
N. D. McSHERRY, *Assistant Chief Clerk*

*Professional Staff*
ALBERT A. GRORUD
ELMER K. NELSON
STEWART FRENCH
GEORGE B HOLDERER

## OUTER CONTINENTAL SHELF LANDS ACT

-------

JUNE 15 (legislative day, JUNE 8), 1953.—Ordered to be printed

-------

Mr. CORDON, from the Committee on Interior and Insular Affairs,
submitted the following

# R E P O R T

## Together with

## MINORITY VIEWS

[To accompany S. 1901]

The Senate Committee on Interior and Insular Affairs, to whom
was referred the bill, S. 1901, to provide for the jurisdiction of the
United States over the submerged lands of the outer Continental
Shelf, and to authorize the Secretary of the Interior to lease such
lands for certain purposes, having considered the same, report favor-
ably thereon with amendments and recommend that the bill, as
amended, do pass.

Despite the fact that the area and issues concerned in outer Con-
tinental Shelf legislation were extensively discussed in the hearings
held earlier this year on Senate Joint Resolution 13, the measure that
became the Submerged Lands Act (Public Law 31, 83d Cong.), the
committee held 13 days of hearings on S. 1901, including evening
sessions. Approximately 2,500 printed pages of testimony and ex-
hibits have been submitted on the issues presented by the submerged
lands problems during this session of the Congress.

## II. THE AMENDMENTS

For the most part, the committee's amendments are perfecting,
and primarily administrative or clarifying in nature. All of the
amendments sponsored by the committee are presented *seriatim* in
a succeeding section of this report. Each is numbered, and an explana-
tion of the amendment, keyed to the number, set forth below.

The primary changes of policy and substance made by the com-
mittee are:

1

(1) In sections 3 (a) and 4 (a) (1), the jurisdiction and plenary control of the United States is extended to the seabed and subsoil of entire outer Continental Shelf adjacent to the shores of the United States instead of merely to the natural resources of the subsoil and seabed and to structures for their development, such as artificial islands, fixed drilling platforms, and pipelines, as provided in the bill as introduced.

(2) In section 4 (a) (2), the laws of the adjacent States are adopted as the law of the United States with respect to the subsoil and seabed of the outer shelf, and to structures connected with the development of its mineral resources. The State laws adopted will supplement Federal laws and the regulations of the Secretary of the Interior respecting the area.

At the same time, an amendment to the wording of section 3 (b) makes abundantly clear the unequivocal legislative intent of the committee that the jurisdiction asserted is a "horizontal jurisdiction," extending only to the seabed and subsoil, and does not in anywise affect the character as high seas of the waters above that seabed and subsoil nor their use with respect to navigation and fishing.

### III. PURPOSE OF THE BILL

The purpose of S. 1901, as amended, is to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and subsoil of the outer Continental Shelf, and to provide for the development of its vast mineral resources. As a concomitant of this latter purpose, good-faith leases issued prior to the Supreme Court decisions by the coastal States on areas now embraced within the outer shelf which meet some 11 or more carefully specified requirements are validated and the holders authorized to conduct operations under them. The equities of the lessees and the background facts connected with such validation are hereinafter discussed in detail.

To carry out the primary purposes of the measure, a body of law is extended to the outer shelf area, consisting of:

(a) The constitution and the laws, and the civil and political jurisdiction, of the Federal Government;

(b) the regulations, rules, and operating orders of the Secretary of the Interior; and

(c) in the absence of such applicable Federal law or adequate Secretarial regulation, the civil and criminal laws of the State adjacent to the outer shelf area. Such State laws are adopted as Federal law for the area of the shelf that would be within the boundaries of the State if such boundaries were extended seaward to the outer margin of the outer shelf.

*Revenues*

Under the terms of the bill as reported all revenues accruing to the Government from mineral operations on the outer shelf are paid into the Federal Treasury and are covered into miscellaneous receipts. Such revenues include royalties of not less then one-eighth of the oil and gas produced, and in the case of sulfur, not less than one-tenth, and bonuses and rentals.

The committee considered but did not adopt a proposed amendment, sponsored by Senator Lister Hill of Alabama and other Senators, to

dedicate these revenues to national security purposes in the present emergency and then as grants-in-aid to primary, secondary, and higher education. Senator Robert Hendrickson of New Jersey submitted to the committee a proposed amendment in the nature of a substitute which would have provided for exclusive Federal control in the outer shelf and distribution of revenues to the States on a school population per capita basis. Senator Hendrickson's proposal also was considered but not adopted. Another proposed amendment, which would have given to the States one-half of the amount of the additional royalty collected in lieu of State severance taxes to compensate for services rendered the workers of the outer shelf and their families by the States, likewise was not adopted.

In order to prevent the lessees from receiving a windfall in being relieved from paying a tax they contemplated paying when they bid in their leases with the States, the bill provides that the Federal Government will collect as additional royalties, over and above the royalties and rentals provided in the lease, an amount equal to the taxes the lessees would have been required to pay under State law.

## State taxation laws

It is the committee's collective judgment that under the terms of S. 1901 as reported, State taxation laws necessarily are excluded from applicability in this area of exclusive Federal jurisdiction not inside the boundaries of any State. Paragraph (3) of section 4 (a) specifically commands that—

The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom.

## State conservation laws

The committee received very impressive evidence of the excellence of State conservation laws and practices, and the desirability of extending such State laws and practices to the area of Federal jurisdiction beyond State boundaries. The committee also received evidence of the comprehensive Federal conservation system established by the Secretary of the Interior under the authority of the Mineral Leasing Act for Federal public lands. It is evident from the history of Federal conservation on areas of Federal jurisdiction within the borders of a State that the Federal Government has cooperated fully with State conservation authorities, and that the two systems can operate together. Therefore, consistent with the philosophy of S. 1901 as a Federal-control bill, the committee has left conservation authority in the Secretary of the Interior, but recommends that he continue to cooperate fully with State conservation bodies.

As stated in its report on Senate Joint Resolution 13, the measure that became the Submerged Lands Act (Public Law 31, 83d Cong.), the problem facing the committee in providing legislation for the outer Continental Shelf was an extremely complex one, and new to our legal and political experience. There are no precedents whatever in American jurisprudence. The limited experience of other maritime nations, such as England, in dealing with the Continental Shelf was of little assistance because our system of dual Federal-State sovereignty, with its problem of concurrent and conflicting sovereignty,

does not exist elsewhere. In the submerged lands report the committee stated:

The complexity of the problem presented by the assumption by the United States of jurisdiction and control over the subsoil and seabed of the outer Continental Shelf is immediately apparent from even a cursory examination of the Presidential proclamation. [id est proclamation No. 2667. issued September 28, 1945; the text is set forth n the appendix]. The declaration is limited to jurisdiction and control of the resources of the land mass; as stated in the proclamation—"the character as high seas of the waters above the Continental Shelf and the right to their free and unimpeded navigation are n no way thus affected."

Clearly, we have here neither absolute sovereignty nor absolute ownership.

It must follow that the interest of the United States is, from a national and an international standpoint. politically and egally sui generis. What Federal laws are applicable. what should apply? In what court. where situated, does jurisdiction lie or where should it be placed? Should new Federal law be enacted where existing statutes are wholly inadequate or should the laws of abutting States be made applicable? The necessity for answering these questions is clear when we take note of the fact that the full developments of the estimated values in the shelf area will require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area. Industrial accidents, accidental death, peace and order—these and many other problems and situations need and must have legislative attention.

## IV. DESCRIPTION OF OUTER CONTINENTAL SHELF

The Continental Shelf is defined as the extension of the land mass of the continents out under the waters of the ocean to the point where the continental slope leading to the true ocean bottom begins. This point is generally regarded as a depth of approximately 100 fathoms, or 600 feet, more or less. In countries using the metric system, the outer limit of the shelf is generally regarded as a depth of 200 meters, which is approximately the same as the 100-fathoms mark adopted by England and America.

In his testimony in 1949 before the Senate Interior and Insular Affairs Committee, the former Secretary of the Interior gave the following description of the Continental Shelf:

These lands begin at the low-water mark along the open sea, or at the seaward boundary of inland waters—such as bays, ports, and the mouths of rivers—and extend seaward for varying distances at different places.

The Continental Shelves are slightly submerged portions of the continents that surround all the continental areas of the earth. Along some portions of the coasts they are very broad, gently sloping platforms; and at other places they are narrow. The outer boundary of each shelf is marked by an increase in the gradient of slope of the sea floor. This occurs generally at a depth of approximately 100 fathoms, or 600 feet. Beyond the 100-fathom line, the outer slopes of the Continental Shelves are inclined more steeply toward the ocean deeps.

Along the Atlantic coast and in the Gulf of Mexico the Continental Shelves are generally very broad. Off the New England coast, where the width is greatest, the shelf extends seaward about 250 miles. Elsewhere along the Atlantic coast it ranges in width from about 40 to about 100 miles except for a relatively narrow strip along the east coast of Florida. In the Gulf of Mexico the average width of the broad shelf off the west coast of Florida is about 150 miles, and elsewhere in the Gulf the shelf is from 40 to 150 miles wide except where the land area formed by the Delta of the Mississippi River has been extended across the shelf almost to its outer edge.

Off the Pacific Coast States the Continental Shelf is relatively narrow, ranging in width from 5 miles or less to a maximum of about 40 miles.

The Continental Shelves along the coasts of the United States comprise a total area of approximately 290,000 square miles, with nearly 270,000 square miles, or over 90 percent of the total area, located along the Atlantic and Gulf coasts.

The Continental Shelf adjoining the Alaska coast has a very large area, totaling about 600,000 square miles. The shelf forms a broad link with Asia across the

Bering Sea, and it extends northward from the Bering Straits and the Arctic coast for distances that average more than 100 miles (hearings, Senate Interior and Insular Affairs Committee, 81st Cong., 1949, on. S. 923 and related measures, p. 65).

It will be noted that the foregoing definitions deal with the Continental Shelf as a whole, and are not restricted to the area which is the subject matter of S. 1901, namely, the outer Continental Shelf. Section 2 of the bill as reported defines this area in terms of the Submerged Lands Act (Public Law 31, 83d Cong.), stating that it is the area "lying seaward and outside" of the lands beneath navigable waters as defined in the Submerged Lands Act, and "of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."

In the Submerged Lands Act, the text of which is set forth in the appendix. lands beneath navigable waters are defined as submerged lands within State seaward boundaries.

*Size and resources*

Although the area has not, of course, been accurately surveyed, officials of the United States Geological Survey inform the committee that the area inside historic State boundaries is approximately 27,000 square miles, or about 10 percent of the total area of the shelf. Thus the outer shelf can be estimated to contain 261,000 square miles, which is, in turn, almost 10 percent of the upland area of continental United States.

According to information furnished the committee by the Geological Survey, the area of the outer Continental Shelf off Louisiana comprises some 25,300 square miles, and that off Texas some 27,300 square miles. Proved reserves off Louisiana total 335 million barrels of oil and 2,100 million m. c. f. of gas. There are no proved reserves beyond the 10½ mile line off the coast of Texas, according to the Geological Survey.

However, the Geological Survey estimates that there are potential reserves in the outer shelf off Texas totaling 7,800 million barrels of oil and 39 billion m. c. f. of gas. Potential reserves off Louisiana are 3,750 million barrels of oil and 18,800 million m. c. f. of gas.

Several large producers have shown active interest in petroleum explorations off the west coast of Florida, beyond the 10½-mile boundary line.

As to sulfur reserves, the president of one of the largest sulfur companies in the world appeared before the committee and estimated sulfur reserves in the offshore areas in the gulf to be valued at $3 billion.

BACKGROUND OF PROBLEM

As indicated, S. 1901 and the House bill dealing with the same subject matter, H. R. 5134, mark the first attempt by the Congress of the United States to deal with the problems, economic and legal, of the outer Continental Shelf as such. Previous submerged lands legislation had asserted Federal jurisdiction but had not attempted to implement such jurisdiction beyond provisions for leasing. The outer shelf was subordinate to the primary issue of ownership of submerged lands within historic State boundaries.

However, with the enactment of the Submerged Lands Act, the 83d Congress resolved that basic controversy.

se 3:17-cv-00101-SLG   Document 56-2   Filed 07/18/18   Page 8 of

The primary policy question before the committee in its consideration of S. 1901 has been not a question of State versus Federal rights, but whether, and how far, the Federal Government should make use of already existing State laws and State facilities, backed by State experience and knowledge, in providing for administration of the area. The argument was made that the States already were on the job, that they had a governmental system in operation which was effective for the purpose, and that there was no need for this Congress to enact new law, in an area of activity new to the Federal Government. Extension of State boundaries to include the seabed and subsoil of the outer Continental Shelf, it was argued, would be consistent with our historic State-Federal system, under which there is no area of the continental United States that is not also a part of a State, geographically speaking, and within State boundaries.

On the other hand, many of the problems connected with the administration of the outer shelf, extending in some instances some 250 miles out into the ocean, are, it was argued, peculiarly a matter of the external sovereignty of the Government of the United States, and are areas of Federal responsibility not within the boundaries of any State. As pointed out in the report to the committee submitted on behalf of the Attorney General:

> This *id est* the outer Continental Shelf] is a Federal area, outside State boundaries and to give the States a sort of extraterritorial jurisdiction over it is unnecessary and undesirable The situation is not comparable to that of federally owned areas within a State, as to which State law has some measure of applicability. Particularly in view of the intermingling of national and international rights in the area, it is important that the Federal Government, which has the responsibility for handling foreign relations, have the exclusive control of lawmaking and law enforcement there.

*Historical background*

In order that the problem may be seen in proper perspective, the committee deems it advisable to present a very brief sketch of the law of the seas, since it is so intimately connected with, albeit apart from, the problems presented in providing a body of law and enforcement for the seabed and subsoil beneath that part of the seas adjacent to our shores.

In Roman law, the sea was considered as being open to all persons (*res communis*) and therefore incapable of appropriation and ownership (*res nullius*). However, the Roman concept was applicable only within the framework of private international law. The Mediterranean was "Mare Nostrum" to the Romans *vis a vis* other nations. No substantial modification of the *res communis-res nullius* doctrine can be noted until the rise of the great maritime nations of the Middle Ages.

By the beginning of the seventeenth century, Venice had laid claim to ownership of the Adriatic. Genoa asserted proprietorship of the Ligurian Sea. Denmark and Sweden shared, not without argument, pretensions in the Baltic, while France and England made extravagant claims to the area of the seas off their coasts. In the meantime, Spain and Portugal had proceeded, through the Treaty of Tordesillas in 1494, to divide the oceans and territories of the New World between them. Spain asserted dominion over, and exclusive rights to navigate, the Pacific, the Gulf of Mexico, and the western Atlantic. Portugal's claims extended to the Atlantic south of Morocco and covered the Indian Ocean.

England and Holland, however, were unwilling to accept such a division and answered the Iberian decrees with efficient forays by Drake and Cavendish and with a blunt refusal to cease trade with the Orient. England thus argued by force the freedom of the seas, but at the same time she held on to her claims of dominion over portions of the North Sea, the Bay of Biscay, and the Atlantic from Cape Finisterre, Spain, to Stadland, in Norway.

However, with the industrial revolution and the rise of commerce, it became apparent that freedom of the seas was necessary to freedom of exchange of goods. The doctrine of Freedom of the Seas was enunciated as American policy as early as 1793 by Thomas Jefferson, Secretary of State to our first President, George Washington, and reaffirmed as recently as March, 1953 on behalf of the Secretary of State to our 34th President, Dwight D. Eisenhower. In a report to the committee on Senate Joint Resolution 13, made on behalf of Mr. John Foster Dulles, the Department of State declared:

> The general policy of the United States is to support the principle of freedom of the seas. Such freedom is essential to its national interests. It is a time-honored principle of its concept of defense that the greater the freedom and range of its warships and aircraft, the better protected are its security interests. It is axiomatic of its commercial interests that the maintenance of free lanes and air routes is vital to the preeminence of its shipping tonnage and air transport. And it is becoming evident that its fishing interests depend in part, and may come more so to depend in the future, upon fishing resources in seas adjacent to the coasts of foreign states.

*Policies with respect to seas unchanged*

As stated, it is the unequivocal legislative intent of S. 1901 to adhere to this traditional policy with respect to the waters above the outer Continental Shelf—to the waters seaward of State boundaries. Their character as high seas is in nowise affected by the proposed legislation nor is the situation with respect to navigation and fishing in them in any way changed.

However, the discovery of extremely valuable deposits of oil and gas and probably sulfur in the seabed of the Continental Shelf off the shores of the United States, as well as its vast potential as a source for other raw materials, gave rise to the necessity for protection and control of the area and administration of the development of its economic wealth, so essential to our economy in peace or war. On a national scale, this need was met by the Presidential proclamation of September 28, 1945 (Proclamation No. 2667), the text of which is set forth in the appendix.

It will be noted that the proclamation asserted only that the Government of the United States "regards the natural resources of the subsoil and seabed" of the Continental Shelf as "appertaining to" the United States. The provisions of S. 1901 as reported carry this limited control a necessary step forward and extend the jurisdiction and control of the United States to the seabed and subsoil themselves.

## V. Maintenance of Existing Leases

From the outset of the submerged lands controversy, it has been uniformly recommended by the highest officials of both the former administration and the present administration that any legislation enacted should give full recognition to the equities and investments of the holders of existing State-issued mineral leases. In the oral

argument of the first of the submerged lands cases, *United States* v. *California* (332 U. S. 19 (1947)), the Attorney General of the United States made the following statement:

> We will recommend to the Congress that legislation be enacted designed to relieve California and those who have operated under State authority, from the necessity of accounting to the United States for revenues derived in the past from the exploitation of any of the lands here involved  *Such legislation, in the view of the President, should also establish equitable standards for the recognition of investments made by private interests and should offer a basis for the continued operation of private establishments* wherever consistent with the national interest, and on terms which would be fair and just under all circumstances.  [Emphasis supplied.]

The supplemental brief for the United States in the same case contained the following representation on behalf of the Federal Government:

> In this connection it is pertinent to note, as stated by the Attorney General at oral argument, that the President had authorized him to say that there is no desire on the part of the President or of any Federal official to destroy or confiscate any honest or bona fide investment, or to deprive the State or its subdivisions of any reasonable expectation of return from the areas that have been developed.
>
> The President recognizes that in the event the decision of this Court is favorable to the United States, it will be necessary to have congressional action looking toward the future management of the resources of this area.  *And he also intends to recommend to the Congress that legislation be enacted recognizing both prospectively and retrospectively, any equities of the State and those who have operated under it,* to the fullest extent consistent with the national interest.  [Emphasis supplied.]

*Supreme Court statement*

Moreover, in its decision in the California case, the Supreme Court, taking into account that its decision would affect the good-faith investments of many citizens, said that it did not assume that—

> Congress, which has constitutional control over Government property, will execute its powers in such way as to bring about injustices to the States, their subdivisions, or persons acting pursuant to their permission.

Following that decision, the executive branch of the former administration recommended that Congress include in submerged lands legislation provisions protecting the equities of existing operators and their investments made in good faith.[1]  During the 82d Congress that administration endorsed the O'Mahoney bill, Senate Joint Resolution 20, which would have confirmed and ratified all leases on lands of the Continental Shelf issued prior to the filing of the complaints in the Texas and Louisiana cases.[2]  President Harry S. Truman, in vetoing Senator Holland's substitute measure for the O'Mahoney measure, made the following statement on May 29, 1952:

> I believe any legislation dealing with the undersea lands should protect the equitable interests of those holding State-issued leases on those lands.  The Government certainly should not impair bona fide investments which have been made in the undersea lands, and the legislation should make this clear.

*Position of administration*

The present administration takes the same position.  Secretary of the Interior McKay, testifying before the Senate Interior and Insular Affairs Committee on Senate Joint Resolution 13 and other bills on February 24, 1953, said:

---

[1] Testimony of Attorney General Clark at joint hearings of Committees on the Judiciary, 80th Cong., 2d sess., on S. 1988, pp. 612–613; see also hearings before Senate Committee on Interior and Insular Affairs 81st Cong., 1st sess., on S. 923 and other bills, pp. 32–35.
[2] Hearings before Senate Interior and Insular Affairs Committee on Senate Joint Resolution 20, 82d Cong., 1st sess., pp. 18–23.

Various leases to companies and to individuals are currently existent on lands of the Continental Shelf both within and without the line marking the historical boundaries of the several States. In keeping with the American tradition of recognizing the ownership of properties acquired in good faith I do believe that the legislation should empower the Federal Government to grant new leases in exchange for State-issued leases on properties outside the line marking the historical boundaries of the States. (Hearings, S. J. Res. 13, 83d Cong., p. 513.)

In accordance with this uniform policy of recognizing equities and good faith investments in the offshore area, section 6 of this bill authorizes the holders of existing State leases on the outer Continental Shelf to continue to maintain their leases under Federal control and subject to Federal regulation. This authorization, however, is applicable only to such existing leases as meet the 11 requirements of section 6 (a) which are designed to safeguard the national interest.

The equities and investments of the operators who purchased leases from Texas and Louisiana on the outer Continental Shelf have been fully explained by many witnesses at hearings on submerged lands legislation.[3] A summary of the facts surrounding the issuance of the leases will make it clear that the lessees have substantial and significant equities.

The only existing leases on the outer Continental Shelf were granted by the States of Texas and Louisiana prior to the filing of the complaints against those States on December 21, 1948.[4] This fact is recognized in section 6 (a) (2) of the bill which provides that, to be maintained under the Federal Government, a State lease must have been issued prior to December 21, 1948.

*State leasing laws*

The leasing of the outer Continental Shelf areas by Texas and Louisiana was based on the laws of those States. Louisiana, in 1938,[5] and Texas, in 1941,[6] enacted statutes extending their boundaries 24 miles seaward into the gulf from their State boundaries. Texas subsequently extended its State lines to the outer edge of the shelf. When those statutes were enacted, the United States had not asserted its claims in the outer Continental Shelf area. Indeed, prior to that time executive agencies of the Federal Government had ruled that the States, not the Nation, owned the submerged lands within their boundaries. Moreover, the decision in the California case stated that the Supreme Court itself had many times previously used language strong enough to indicate that the Court then believed that the States owned the submerged lands within their boundaries. Thus, in extending their boundaries, Louisiana and Texas were not asserting rights in conflict with those then being asserted by the United States.

When the States offered the leases on the outer Continental Shelf for competitive bidding prior to the filing of the suits against Texas and Louisiana on December 21, 1948, the oil operators, who had already invested substantial sums in geophysical explorations of the offshore area, were in no position to question the jurisdiction of the States over the areas offered for lease. The boundary extensions were political questions which they could not challenge.

---

[3] See hearings on H. R. 5991 and 5992, 81st Cong., 1st sess., testimony of Walter S. Hallanan, pp. 103–108; E. F. Bullard, pp. 120–129; H. H. Kaveler pp. 129–137· Hines H. Baker, pp. 137–164; hearings on S. 155, S. 923 and other bills, 81st Cong., 1st sess., testimony of Walter S. Hallanan, pp. 320–334; Hines H. Baker, pp. 354–417; H. H. Kaveler, pp. 437–445; E. F. Bullard, pp. 445–451; hearings on S. J. Res. 195, 81st Cong., 2d sess., testimony of Walter S. Hallanan, pp. 53–58; Clayton L. Orn, pp. 58–80; Rex G. Baker, pp. 82–109; Lucius M. Lamar, pp. 248–259; hearings on S. J. Res. 20, 82d Cong., 1st sess., testimony of Walter S. Hallanan, pp. 74–92; hearings on S. J. Res. 13 and other bills, 83d Cong., 1st sess., testimony of James J. Cosgrove, pp. 617–623, and Clayton L. Orn pp. 602–617.
[4] The State of California has not issued any leases on the outer Continental Shelf.
[5] Acts 1938, No. 55, sec. 1, West's Louisiana Rev. Stat., sec., 49: 1.
[6] Acts 47th Legislature (1941), ch. 286, p. 454.

e 3:17-cv-00101-SLG    Document 56-2    Filed 07/18/18    Page 12 o

Moreover, the Attorney General of the United States, in a statement issued on the date that the California case was argued, had emphasized that—

Whatever the decision of the Court may be in the California case, it would no be decisive as to the rights of any other State.

Even more important, although Texas and Louisiana gave widespread public notice of their intention to offer leases on the outer Continental Shelf prior to December 21, 1948, the Attorney General of the United States took no action to enjoin the States from selling such leases.

*Large investments made*

Testimony before this committee indicates that the lessees who purchase such leases from the States before December 21, 1948, have invested some $150 million in the exploration and development of the outer Continental Shelf.[7] To date, their return has been only a fraction of the sums invested.

Further support for the position of the holders of existing State leases is found in the fact that the Supreme Court, in its decisions and decrees in the Louisiana and Texas cases in 1950 (339 U. S. 699; 339 U. S 707), declined to order the States to account to the United States for bonuses, rents, and royalties received under leases issued by them prior to June 5, 1950, the date of the decisions. The significance of this ruling was emphasized by former Solicitor General Philip Perlman in his testimony on February 19, 1951, in support of the O'Mahoney bill, as follows:

* * * In the resolution now before this committee it is contemplated that State leases made prior to December 21, 1948—the date of the filing of the suits against Louisiana and Texas—and in force and effect on June 5, 1950, would be recognized by the Federal Government One good reason why this proposal can now be accepted by the Federal Government is that the Supreme Court has declined to order Louisiana and Texas to account to the United States for revenues received under such leases prior to June 5, 1950, the date of the decisions in those cases. (Hearings, S. J Res 20 82d Cong. p. 23)

Moreover, the Supreme Court in the Texas and Louisiana decisions did not invalidate the States' boundary extensions. The Court said:

We intimate no opinion on the power of a State to extend, define, or establish ts external territorial limits or on the consequences of any such extension vis-a-vis persons other than the United States or those acting on behalf of or pursuant to its authority

This holding evidences the good faith of the lessees in purchasing leases from the States and making substantial investments under them.

*Rents paid Federal Government*

Following the Texas and Louisiana decisions in 1950, the lessees of the States have paid the rents and royalties due under the leases to the Federal Government. On nonproducing Louisiana leases, rents paid to the United States since the decisions are 1½ times greater than the original consideration (bonus) paid to the State for the lease. On Texas leases the rents per acre which have been paid annually to the United States since 1950 are higher than those paid per acre on public lands under the Federal Mineral Leasing Act. These rents, which have run to millions of dollars and which ordinarily are paid to defer drilling, have been paid to the Federal Government despite the fact that the lessees have been enjoined from drilling or other exploratory

---

[7] Testimony of James J. Cosgrove at hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13 and other bills, 83d Cong., 1st sess., p. 620.

operations since the decisions, and hence have had no use of the land for which they were paying rents—rents which the Federal Government has received and retained since 1950.

## VI. Sectional Analysis of the Bill, S. 1901, as Reported

### SECTION 1—TITLE OF ACT

Section 1 provides that the Act may be cited as "Outer Continental Shelf Lands Act".

### SECTION 2—DEFINITIONS

Section 2 defines terms used in the bill such as "outer Continental Shelf", "Secretary", "mineral lease", and "person".

### SECTION 3— JURISDICTION OVER OUTER CONTINENTAL SHELF

Section 3 asserts the exclusive jurisdiction of the United States over the subsoil and seabed of the outer Continental Shelf, but provides that said jurisdiction is horizontal, and does not affect the character as high seas of the waters nor the right to navigation and fishing therein.

### SECTION 4—LAWS APPLICABLE TO OUTER CONTINENTAL SHELF

Section 4 provides a body of law for the protection, development, and administration of the seabed and subsoil of the outer shelf. This body of law consists of:

1. The Constitution and laws of the United States;
2. Regulations which the Secretary, in a subsequent section, is specifically authorized to promulgate;
3. The laws of the adjacent States which are adopted as Federal law and made applicable to supplement existing Federal law and regulations.

In precise unequivocal language, the section declares that the provision for the adoption of State laws as Federal law "shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf or the property and natural resources thereof or the revenues therefrom."

Subsection (b) of section 4 extends original jurisdiction of the Federal district court to cases and controversies arising out of operations on the outer shelf and to artificial islands and the fixed structures thereon, including pipelines, used in the development of the mineral resources of the seabed and subsoil.

The Coast Guard is given responsibility for safety regulations and devices on the structures and artificial islands, and the responsibility which the Secretary of the Army now has with respect to obstructions to navigation in the navigable waters of the United States is extended to such artificial islands and fixed structures.

### SECTION 5—ADMINISTRATION OF LEASING OF THE OUTER CONTINENTAL SHELF

Section 5 places the administration of the outer Continental Shelf areas under the Secretary of the Interior, and authorizes him to prescribe rules and regulations to carry out the provisions of the act.

The control of the Secretary over drilling and production practices, and over conservation, is specifically spelled out. However, as pointed out previously, it is the committee's hope and expectation that the Secretary will continue to cooperate fully with State conservation agencies.

Subsection (c) of section 5 authorizes the Secretary to grant rights-of-way on the seabed for pipelines for removal of oil, gas, sulfur, or other minerals. As to oil and gas, such pipelines are required to transport or purchase without discrimination oil and natural gas produced in the vicinity of the pipeline. The Federal Power Commission, in the case of gas, and the Interstate Commerce Commission, in the case of oil, are authorized to determine the conditions of such transportation.

SECTION 6—MAINTENANCE OF LEASES ON OUTER CONTINENTAL SHELF

Section 6 deals with validation by the Federal Government of State-issued leases. Some 11 or more specific standards which each such lease must meet before it is validated are set forth. If all of these specific conditions are met, the leaseholder may continue to maintain a lease and to conduct operations under it.

The Supreme Court of the United States in the Louisiana and Texas opinions handed down on June 5, 1950, enjoined the States and their lessees from conducting further operations on the Continental Shelf on the holding that the Federal Government had paramount rights in the area. Since the lessees have been unable to conduct any development operations under their leases since the date of the opinions, despite the payment of rentals to the Secretary of the Interior or the Secretary of the Navy, the primary term in each lease is extended for the period which remained unexpired under it on June 5, 1950.

A provision has been added to subsection (b) of section 6 which permits the development of sulfur deposits in those instances in which, under State leasing practices, such as those of Louisiana, sulfur rights were included in oil and gas leases. In such cases, the oil and gas lessee is authorized to develop sulfur deposits on the area covered by his lease during its primary term as extended by the act, and as long thereafter as sulfur is being produced in commercial quantities. However, sulfur rights are not kept alive merely by the production of oil and gas. Where the primary term of a lease has expired but which is continued in force by virtue of production of oil or gas, sulfur rights are continued for 2 years. If sulfur is not being produced, or operations for the production of sulfur not being carried on to the satisfaction of the Secretary, the area may be leased by the Secretary for sulfur alone.

The intent of the committee is that mere oil and gas production on an oil and gas lease shall not bottle up sulfur rights in the same lease for an indefinite period of time.

Subsection (c) provides that notwithstanding the validation of State-issued leases, such claims as the Federal Government may have, if any, against either the States or the lessees in connection with past operations on the outer shelf are not waived. In retaining this provision, the committee took notice of the fact that the Supreme Court had refused to require the States to account for any sums received in connection with State leasing of submerged lands prior to the decisions. It is not the committee's intent that bona fide oil and gas operations

conducted on the outer shelf under State leases should now be subjected in any way to any claim by the Federal Government. However, the committee did not believe it had sufficient all-inclusive knowledge to warrant elimination of the provision, taking the view that some acts, other than those described above, might have taken place for which the Federal Government might have a right of action.

### SECTION 7—DISCLAIMER AND CONTROVERSY OVER JURISDICTION

Section 7 provides for temporary resolution of a possible controversy between the State and Federal Governments over whether a given area is within State boundaries, and thus the property of the State, or whether it is a part of the outer Continental Shelf and thus subject to Federal control and jurisdiction. The Secretary, with the approval of the Attorney General, is authorized to enter into agreements with a state to permit continued development of mineral resources from a lease in such an area. The revenues would be impounded until an ultimate determination is reached. Subsection (b) gives legislative validation to the operating orders of the Secretary of the Interior issued after the Louisiana and Texas decrees to permit producing wells to continue to produce and to prevent waste of oil as gas. The text of all of these orders is set forth in the appendix.

### SECTION 8—LEASING OF OUTER CONTINENTAL SHELF

Section 8 authorizes the Secretary to issue Federal mineral leases on the unleased submerged lands of the outer Continental Shelf. Conditions and standards for such leasing are specified for ail and gas, and for sulfur.

The committee, in considering S. 1901, has not attempted to define a system of land surveys to be made applicable to the outer Continental Shelf. It is noted that the Continental Shelf opposite Texas has been subdivided into blocks of 640 acres, and the area opposite Louisiana into blocks of 5,000 acres. In offering lands for lease such subdivisions have been used by the respective States. Some of the leases issued by the States extend out into the outer Continental Shelf, thereby establishing a pattern of land location conformable to the State and Federal areas. The committee recommends that the Secretary of the Interior, in administering the leasing of lands under his jurisdiction, weigh carefully the advantages and disadvantages of maintaining this pattern for leasing the outer Shelf.

As to the 10 percent sulfur royalty, the committee carefully considered evidence as to the royalties required in current State sulfur leasing programs by Texas and Louisiana and concluded that the 10-percent figure would be consistent with present State practices. However, the committee is aware of the fact that the figure may be so high as to discourage development of the outer shelf sulfur deposits, and therefore the Secretary of the Interior is requested to make a study of the situation and to report his findings and recommendations to the committee.

### SECTION 9—DISPOSITION OF REVENUES

Section 9 provides that all rentals, royalties and other sums paid under any lease on the outer Continental Shelf for the period from June 5, 1950, to the time of the enactment of the act, and all such

revenues received thereafter, including bonuses paid for leases, shall be deposited in the Treasury of the United States and credited to miscellaneous receipts. As previously stated, no part of these revenues are to go to any coastal State for any purpose whatever, nor does the bill as reported by the committee dedicate them to any specific purpose. Rather, such funds are available for appropriation by the Congress for necessary expenses of Government in accordance with the Constitution of the United States.

### SECTION 10—REFUNDS

Section 10 provides that where a lessee has made payments to the Federal Government in excess of those required, repayment may be made to him. The Interior Committees of the Senate and House of Representatives will have a period of 30 days in which to examine proposed refunds before they are made.

### SECTION 11—GEOLOGICAL AND GEOPHYSICAL EXPLORATIONS

Section 11 provides that the Secretary may authorize qualified persons to conduct geological and geophysical explorations on the outer shelf, but specifies that such explorations must not be unduly harmful to acquatic life in the areas.

### SECTION 12—RESERVATIONS

Section 12 authorizes the President to withdraw from disposition under the act any of the unleased areas of the outer shelf. Such a provision is similar to authority given to the President on the public domain.

A new subsection recommended by the Atomic Energy Commission reserves materials essential to production of atomic energy, and a further subsection reserves helium gas used in lighter-than-air aircraft to the Federal Government.

### SECTION 13—NAVAL PETROLEUM RESERVE EXECUTIVE ORDER REPEALED

Section 13 revokes the Executive order issued by President Truman on January 16, 1953, purporting to set aside the Continental Shelf as a naval petroleum reserve.

### SECTION 14—PRIOR CLAIMS NOT AFFECTED

Section 14 is a "savings clause," in that it protects any rights in the outer shelf area that may have been acquired prior to the effective date of the act. It is identical with section 8 of the Submerged Lands Act.

### SECTION 15—APPROPRIATIONS

Section 15 authorizes appropriations to carry out the purposes of the act.

### SECTION 16—SEPARABILITY

Section 16 is a separability clause, providing that if one provision of the act is held unconstitutional by the Supreme Court, the remaining provisions shall not fall with the one held invalid.

## VII. The Committee Amendments

For convenient reference, the text of S. 1901 as reported is set forth with the committee amendments shown in italic. Each amendment is numbered with the number enclosed in boldface brackets, and an explanation of each, keyed to the bracketed numbers, presented following the text of the bill.

[S. 1901, 83d Cong., 1st sess., Report No. 411]

[Omit the part struck through and insert the part printed in italic.

A BILL To provide for the jurisdiction of the United States over the submerged lands of the outer Continental Shelf, and to authorize the Secretary of the Interior to lease such lands for certain purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Outer Continental Shelf Lands Act".

SEC. 2. DEFINITIONS.—When used in this Act—

(a) The term "outer Continental Shelf" means all submerged lands **[1]** ~~(1) which lie outside and seaward~~ *lying seaward and outside of the area* of lands beneath navigable waters as defined in **[2]** *section 2 of* the Submerged Lands Act **[3]** *(Public Law 31, Eighty-third Congress, first session),* and **[4]** ~~(2)~~ of which the subsoil and **[5]** ~~natural resources~~ *seabed* appertain to the United States and are subject to its jurisdiction and control;

(b) The term "Secretary" means the Secretary of the Interior;

(c) The term "mineral lease" means any form of authorization for the exploration for, or development or **[6]** ~~production~~ *removal* of deposits of, oil, gas, or other minerals; and

(d) The term "person" includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation.

SEC. 3. JURISDICTION OVER OUTER CONTINENTAL SHELF.—(a) It is hereby declared to be the policy of the United States that the **[7]** ~~natural resources of the~~ subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this Act.

(b) This Act shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to **[8]** ~~their free and unimpeded~~ navigation and **[9]** ~~the navigational servitude~~ *fishing therein* shall not be affected.

**[10]** ~~SEC. 4. LAWS APPLICABLE TO OUTER CONTINENTAL SHELF.—(a) All acts occurring and all offenses committed on any structure (other than a vessel) which is located on the outer Continental Shelf or on the waters above the outer Continental Shelf for the purpose of exploring for, developing, or removing the natural resources of the subsoil or seabed of such outer Continental Shelf, shall be deemed to have occurred or been committed aboard a vessel of the United States on the high seas and shall be adjudicated and determined or adjudged and punished according to the laws relating to such acts or offenses occurring on vessels of the United States on the high seas.~~

**[11]** SEC. 4. *LAWS APPLICABLE TO OUTER CONTINENTAL SHELF.—(a) (1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however. That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this Act.*

*(2) To the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary now in effect or hereinafter adopted, the civil and criminal laws of each adjacent State as of the effective date of this Act are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register the lines defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States.*

(3) *The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any puropse over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom.*

(b) *Except for such matters as are prescribed by law to be within the exclusive jurisdiction of the United States Customs Court and the United States Court of Customs and Patent Appeals,* the United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, ⟦12⟧ ~~or~~ removing ⟦13⟧ *or transporting by pipeline* the natural resources, or involving rights to the natural resources of the subsoil and seabed of the outer Continental Shelf, and proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district nearest the place where the cause of action arose.

(c) With respect to disability or death of an employee resulting from any injury occurring as the result of operations described in subsection (b), compensation shall be payable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act ⟦14⟧ ~~if recovery for such disability or death through workmen's compensation proceedings is not provided by State law.~~ For the purposes of the extension of the provisions of the Longshoremen's and Harbor Workers' Compensation Act under this section—

(1) the term "employee" does not include a master or member of a crew of any vessel, or an officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof;

(2) the term "employer" means an employer any of whose employees are employed in such operations; and

(3) the term "United States" when used in a geographical sense includes the outer Continental Shelf and ⟦15⟧ ~~the waters above the outer Continental Shelf~~ *artificial islands and fixed structures thereon.*

⟦16⟧ ~~(d) (1) The provisions of the Ship Mortgage Act shall be applicable to any structure referred to in subsection (a) in the same manner as if such structure were a "vessel of the United States" within the terms of such Act. For the purpose of the extension of the provisions of such Act under this subsection, every such structure shall be registered in accordance with regulations established by the Secretary of Commerce; and the term "documented" means registered in accordance with this paragraph.~~

~~(2) The Secretary of Commerce shall establish such regulations as he deems necessary to the efficient execution of this subsection.~~

⟦17⟧ ~~(e)~~ *(d)* For the purposes of the National Labor Relations Act, as amended, any unfair labor practice, as defined in such Act, occurring upon any ⟦18⟧ *artificial island or fixed* structure referred to in subsection (a) shall be deemed to have occurred within the judicial district nearest the place of location of such ⟦19⟧ *island or* structure.

⟦20⟧ ~~(f) For the purposes of the Fair Labor Standards Act of 1938, goods produced upon or at any structure referred to in subsection (a) shall be deemed to have been produced within a State.~~

⟦21⟧ ~~(g) (1) No alien shall be employed on any structure referred to in subsection (a) for any period unless the Attorney General shall have certified—~~

~~(A) that such alien has been lawfully admitted to the United States for permanent residence within the meaning of the Immigration and Nationality Act; or~~

~~(B) that such alien has been lawfully admitted to the United States as a nonimmigrant, within the meaning of such Act, and that such alien would not violate any provision of such Act or lose his status as a nonimmigrant by remaining in, and being similarly employed in, the United States during such period.~~

~~(2) The Attorney General shall, by regulations, prescribe the conditions under which an alien, other than an alien employed on any structure referred to in subsection (a), may be permitted to be on any such structure, and the period during which any such alien may remain thereon.~~

~~(3) Any person who—~~

~~(A) knowingly employs an alien on a structure referred to in subsection (a) in violation of paragraph (1) of this subsection, or~~

~~(B) having authority to exclude an alien from any such structure, knowingly permits such alien to be on such structure in violation of the regulations~~

prescribed by the Attorney General under paragraph (2) of this subsection, or knowingly permits such alien to remain on any such structure for a period longer than prescribed by such regulations, shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both.

[22] (h) (1) No merchandise of foreign growth or manufacture shall be brought upon any structure referred to in subsection (a) from any foreign port or place unless it shall have been entered for consumption in the United States in accordance with the customs laws and regulations.

(2) If any person fraudulently or knowingly brings or assists in bringing any merchandise upon any such structure in violation of the provisions of this subsection, or in any manner facilitates the transportation, concealment, or sale of such merchandise after it has been brought upon such structure, knowing the same to have been brought thereon in violation of the provisions of this subsection, the offender shall be punished by a fine not to exceed $5,000 or by imprisonment for not to exceed two years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this subsection.

Merchandise brought upon any such structure in violation of the provisions of this subsection shall be forfeited to the United States in the same manner as in the case of merchandise introduced into the United States in violation of section 545 of title 18 of the United States Code.

[23] (i) All provisions of law applicable with respect to the exportation of any commodity, article, material, or supply from a place in a State of the United States shall be applicable with respect to the exportation of any such commodity, article, material, or supply from any structure referred to in subsection (a).

[24] (j) *(e) (1) The* [25] *head of the Department in which the* Coast Guard [26] *is operating* shall have authority to promulgate and enforce such reasonable regulations with respect to lights and other warning devices, safety equipment, and other matters relating to the promotion of safety of life and property on the [27] *islands and* structures referred to in subsection (a) or on the waters adjacent thereto, as it may deem necessary.

[28] *(2) The head of the Department in which the Coast Guard is operating may mark for the protection of navigation any such island or structure whenever the owner has failed suitably to mark the same in accordance with regulations issued hereunder, and the owner shall pay the cost thereof. Any person, firm, company, or corporation who shall fail or refuse to obey any of the lawful rules and regulations issued hereunder shall be guilty of a misdemeanor and shall be fined not more than $100 for each offense. Each day during which such violation shall continue shall be considered a new offense.*

*(f) The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is hereby extended to artificial islands and fixed structures located on the outer Continental Shelf.*

[29] (k) *(g)* The specific application by this section of certain provisions of law to [30] *artificial islands and fixed* structures referred to in subsection (a) or to acts or offenses occurring or committed [31] on such structures *thereon* shall not give rise to any inference that the application to such [32] *islands and* structures, acts, or offenses of any other provision of law is not intended.

[33] SEC. 5. ADMINISTRATION OF LEASING OF THE OUTER CONTINENTAL SHELF.—(a) (1) The Secretary shall administer the provisions of this Act relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this Act. Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas accruing or reserved to the United States at not less than market value, and, in the interest of conservation, for unitization, pooling, drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas in any of said submerged lands, and drilling or other easements necessary for operations or production.

*(2) Any person who knowingly and willfully violates any rule or regulation prescribed by the Secretary for the prevention of waste, the conservation of the natural resources, or the protection of correlative rights shall be deemed guilty of a misdemeanor and punishable by a fine of not more than $2,000 or by imprisonment for not more than six months, or by both such fine and imprisonment, and each day of violation shall be deemed to be a separate offense. The issuance and continuance in effect of any lease, or of any extension, renewal, or replacement of any lease under the provisions of this Act shall be conditioned upon compliance with the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof, or with the regulations issued under the provisions of section 6 (b), clause (2), hereof if the lease is maintained under the provisions of section 6 hereof.*

⟦34⟧ *(b) (1) Whenever the owner of a nonproducing lease fails to comply with any of the provisions of this Act, or of the lease, or of the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof, or of the regulations issued under the provisions of section 6 (b), clause (2), hereof, if the lease is maintained under the provisions of section 6 hereof, such lease may be canceled by the Secretary, subject to the right of judicial review as provided in section 8 (i), if such default continues for the period of thirty days after mailing of notice by registered letter to the lease owner at his record post office address.*

*(2) Whenever the owner of any producing lease fails to comply with any of the provisions of this Act, or of the lease, or of the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof, or of the regulations issued under the provisions of section 6 (b), clause (2), hereof, if the lease is maintained under the provisions of section 6 hereof, such lease may be forfeited and canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4 (b) of this Act.*

⟦35⟧ *(c) Rights-of-way through the submerged lands of the outer Continental Shelf, whether or not such lands are included in a lease maintained or issued pursuant to this Act, may be granted by the Secretary for pipeline purposes for the transportation of oil, natural gas, sulphur, or other mineral under such regulations and upon such conditions as to the application therefor and the survey, location and width thereof as may be prescribed by the Secretary, and upon the express condition that such pipelines shall transport or purchase without discrimination, oil or natural gas produced from said submerged lands in the vicinity of the pipeline in such proportionate amounts as the Federal Power Commission, in the case of gas, and the Interstate Commerce Commission in the case of oil, may after a full hearing with due notice thereof to the interested parties determine to be reasonable, taking into account, among other things, conservation and the prevention of waste. Failure to comply with the provisions of this section or the regulations and conditions prescribed thereunder shall be ground for forfeiture of the grant in an appropriate judicial proceeding instituted by the United States in any United States district court having jurisdiction under the provisions of section 4 (b) of this Act.*

SEC. 6 MAINTENANCE OF LEASES ON OUTER CONTINENTAL SHELF.—(a) The provisions of this section shall apply to any mineral lease covering submerged lands of the outer Continental Shelf issued by any State ⟦36⟧ ~~or political subdivision or grantee thereof~~ (including any extension, renewal, or replacement thereof heretofore granted pursuant to such lease or under the laws of such State) if—

(1) such lease or a true copy thereof, is filed with the Secretary by the lessee or his duly authorized agent within ninety days from the effective date of this Act, or within such further period or periods ⟦37⟧ *as provided in section 7 hereof or* as may be fixed from time to time by the Secretary;

(2) such lease was issued ⟦38⟧ (A) prior to December 21, 1948, and ⟦39⟧ ~~was~~ *would have been* on June 5, 1950, in force and effect in accordance with its terms and provisions and the law of the State issuing it ⟦40⟧ ~~or whose political subdivision or grantee issued it, or~~ (B) ~~with the approval of the Secretary and was on the effective date of this Act in force and effect in accordance with its terms and provisions and the law of such State~~ *had the State had authority to issue such lease;*

(3) there is filed with the Secretary, within the period or periods specified in paragraph (1) of this subsection, (A) a certificate issued by the State official or agency having jurisdiction over such lease stating that ⟦41⟧ ~~it was~~ *would have been* in force and effect as required by the provisions of paragraph (2) of this subsection, or (B) in the absence of such certificate, evidence in

the form of affidavits, receipts, canceled checks, or other documents that may be required by the Secretary, sufficient to prove that such lease **[42]** ~~was~~ *would have been* so in force and effect;

(4) except as otherwise provided in section 7 hereof, all rents, royalties, and other sums payable under such lease between June 5, 1950, and the effective date of this Act, which have not been paid in accordance with the provisions thereof, **[43]** *or to the Secretary or to the Secretary of the Navy, are paid to the Secretary within the period or periods specified in paragraph (1) of this subsection,* and all rents, royalties, and other sums payable under such lease after the effective date of this Act, are paid to the Secretary, who shall deposit **[44]** ~~them~~ *such payments* in the Treasury in accordance with section 9 of this Act;

(5) the holder of such lease **[45]** ~~certified~~ *certifies* that such lease shall continue to be subject to the overriding royalty obligations existing on the effective date of this Act;

(6) such lease was not obtained by fraud or misrepresentation;

(7) such lease, if issued on or after June 23, 1947, was issued upon the basis of competitive bidding;

(8) such lease provides for a royalty to the lessor **[46]** *on oil and gas* of not less than 12½ per centum **[47]** *and on sulphur of not less than 10 per centum* in amount or value of the production saved, removed, or sold from the lease, or, in any case in which the lease provides for a lesser royalty, the holder thereof consents in writing, filed with the Secretary, to the increase of the royalty to the minimum herein specified;

**[48]** *(9) the holder thereof pays to the Secretary within the period or periods specified in paragraph (1) of this subsection an amount equivalent to any severance, gross production, or occupation taxes imposed by the State issuing the lease on the production from the lease, less the State's royalty interest in such production, between June 5, 1950, and the effective date of this Act and not heretofore paid to the State, and thereafter pays to Secretary as an additional royalty on the production from the lease, less the United States' royalty interest in such production, a sum of money equal to the amount of the severance, gross production, or occupation taxes which would have been payable on such production to the State issuing the lease under its laws as they existed on the effective date of this Act;*

**[49]** ~~(9)~~ *(10)* such lease will terminate within a period of not more than five years from the effective date of this Act in the absence of production or operations for drilling, or, in any case in which the lease provides for a longer period, the holder thereof consents in writing, filed with the Secretary, to the reduction of such period so that it will not exceed the maximum period herein specified; and

**[50]** ~~(10)~~ *(11)* the holder of such lease furnishes such surety bond, if any, as the Secretary may require and complies with such other reasonable requirements as the Secretary may deem necessary to protect the interests of the United States.

**[51]** *(b) Any person holding a mineral lease, which as determined by the Secretary meets the requirements of subsection (a) of this section, may continue to maintain such lease, and may conduct operations thereunder, in accordance with (1) its provisions as to the area, the minerals covered, rentals and, subject to the provisions of paragraphs (8), (9) and (10) of subsection (a) of this section, as to royalties and as to the term thereof and of any extensions, renewals, or replacements authorized therein or heretofore authorized by the laws of the State issuing such lease, or, if oil or gas was not being produced in paying quantities from such lease on or before December 11, 1950, or if production in paying quantities has ceased since December 11, 1950, or if the primary term of such lease has expired since December 11, 1950, then for a term from the effective date hereof equal to the term remaining unexpired on December 11, 1950, under the provisions of such lease or any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of such State, and (2) such regulations as the Secretary may under section 5 of this Act prescribe within ninety days after making his determination that such lease meets the requirements of subsection (a) of this section: Provided, however, That any rights to sulphur under any lease maintained under the provisions of subsection (b) of this section shall not extend beyond the primary term of such lease or any extension thereof under the provisions of such subsection (b) unless sulphur is being produced in paying quantities or drilling, well reworking, plant construction, or other operations for the production of sulphur, as approved by the Secretary, are being conducted on the area covered by such lease on the date of expiration of such primary term or extension: Provided further, That*

*if sulphur is being produced in paying quantities on such date, then such rights shall continue to be maintained in accordance with such lease and the provisions of this Act: Provided further, That, if the primary term of a lease being maintained under subsection (b) hereof has expired prior to the effective date of this Act and oil or gas is being produced in paying quantities on such date, then such rights to sulphur as the lessee may have under such lease shall continue for twenty-four months from the effective date of this Act and as long thereafter as sulphur is produced in paying quantities, or drilling, well working, plant construction, or other operations for the production of sulphur, as approved by the Secretary, are being conducted on the area covered by the lease.*

【52】 ~~(d)~~ (c) The permission granted in subsection (b) of this section shall not be construed to be a waiver of such claims, if any, as the United States may have against the lessor or the lessee or any other person respecting sums payable or paid for or under the lease, or respecting activities conducted under the lease, prior to the effective date of this Act.

【53】 ~~(e)~~ (d) Any person complaining of a negative determination by the Secretary of the Interior under this section may have such determination reviewed by the United States District Court for the District of Columbia 【54】 *by filing a petition for review within sixty days after receiving notice of such action by the Secretary.*

【55】 (e) *In the event any lease maintained under this section covers lands beneath navigable waters, as that term is used in the Submerged Lands Act, as well as lands of the outer Continental Shelf the provisions of this section shall apply to such lease only insofar as it covers lands of the outer Continental Shelf.*

【56】 SEC. 7. DISCLAIMER AND CONTROVERSY OVER JURISDICTION.—*(a) The Secretary is authorized, with the approval of the Attorney General of the United States and upon the application of any lessor or lessee of a mineral lease issued by or under the authority of a State, its political subdivision, or grantee, on submerged lands, to certify that the area covered by such lease does not lie within the outer Continental Shelf.*

【57】 (b) In the event of a controversy between the United States and a State as to whether or not lands are subject to the provisions of this Act, the Secretary is authorized, notwithstanding the provisions of subsections (a) and (c) of section 6 of this Act, and with the concurrence of the Attorney General of the United States, to negotiate and enter into agreements with the State, its political subdivision or grantee or a lessee thereof, respecting operations under existing mineral leases and payment and impounding of rents, royalties, and other sums payable there under, or with the State, its political subdivision or grantee, respecting the issuance or nonissuance of new mineral leases pending the settlement or adjudication of the controversy.   The authorization contained in the preceding sentence of this section shall not be construed to be a limitation upon the authority conferred on the Secretary in other sections of this Act.   Payments made pursuant to such agreement, or pursuant to any stipulation between the United States and a State, shall be considered as compliance with section 6 (a) (4) hereof.   Upon the termination of such agreement or stipulation by reason of the final settlement or adjudication of such controversy, if the lands subject to any mineral lease are determined to be in whole or in part lands subject to the provisions of this Act, the lessee, if he has not already done so, shall comply with the requirements of section 6 (a), and thereupon the provisions of section 6 (b) shall govern such lease.   The notice concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" issued by the Secretary on December 11, 1950 (15 F. R. 8835). as amended by the notice dated January 26, 1951 (16 F. R. 953), and as supplemented by the notices dated February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6404), August 22, 1951 (16 F. R. 8720), October 24, 1951 (16 F. R. 10998), 【58】 ~~and~~ December 21, 1951 (17 F. R. 43), 【59】 *March 25, 1952 17 F. R. 2821)*, 【60】 *June 26, 1952 (17 F. R. 5833)*, 【61】 *and December 24, 1952 (18 F. R. 48)*, respectively, is hereby approved and confirmed.

SEC. 8. LEASING OF OUTER CONTINENTAL SHELF.—【62】 ~~(a) In order to meet the urgent need during the present emergency for further exploration and development of the oil and gas deposits in the submerged lands of the outer Continental Shelf, the Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding oil and gas leases on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of subsection (a) of section 6 of this Act.~~

(a) *In order to meet the urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf, the Secre-*

*tary is authorized to grant to the highest responsible qualified bidder by competitive bidding under regulations promulgated in advance, oil and gas leases on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of subsection (a) of section 6 of this Act. The bidding shall be (1) by sealed bids, and (2) at the discretion of the Secretary, on the basis of a cash bonus with a royalty fixed by the Secretary at not less than 12½ per centum in amount or value of the production saved, removed or sold, or on the basis of royalty, but at not less than the per centum above mentioned, with a cash bonus fixed by the Secretary.*

(b) **[63]** A̶ *An* oil and gas lease issued by the Secretary pursuant to this section shall (1) cover **[64]** a̶n̶ *a compact* area **[65]** o̶f̶ s̶u̶c̶h̶ s̶i̶z̶e̶, *not exceeding five thousand seven hundred and sixty acres,* **[66]** a̶n̶d̶ d̶i̶m̶e̶n̶s̶i̶o̶n̶s̶ *as* the Secretary may determine, (2) be for a period of five years and as long thereafter as oil or gas may be produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon, (3) require the payment of a royalty of not less than 12½ per centum, **[67]** *in the amount or value of the production saved, removed, or sold from the lease,* and (4) contain such rental provisions and such other terms and provisions as the Secretary may **[68]** b̶y̶ r̶e̶g̶u̶l̶a̶t̶i̶o̶n̶ prescribe **[69]** i̶n̶ a̶d̶v̶a̶n̶c̶e̶ *at the time* of offering the area for lease.

**[70]** *(c) In order to meet the urgent need for further exploration and development of the sulphur deposits in the submerged lands of the outer Continental Shelf, the Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competive bidding sulphur leases on submerged lands of the outer Continental Shelf, which are not covered by leases which include sulphur and meet the requirements of subsection (a) of section 6 of this Act, and which sulphur leases shall be offered for bid and granted on separate leases from oil and gas leases, and for a separate consideration, and without priority or preference accorded to oil and gas lessees on the same area.*

*(d) A sulphur lease issued by the Secretary pursuant to this section shall (1) cover an area of such size and dimensions as the Secretary may determine, (2) be for a period of not more than ten years and so long thereafter as sulphur may be produced from the area in paying quantities or drilling, well reworking, plant construction, or other operations for the production of sulphur, as approved by the Secretary, are conducted thereon, (3) require the payment of a royalty of not less than 10 per centum of the value of the sulphur at the wellhead, and (4) contain such rental provisions and such other terms and provisions as the Secretary may by regulation prescribe in advance of offering the area for lease.*

*(e) The Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf not then under lease for such mineral upon such royalty, rental, and other terms and conditions as the Secretary may prescribe at the time of offering the area for lease.*

*(f) Notice of sale of leases, and the terms of bidding, authorized by this section shall be published at least thirty days before the date of sale in accordance with rules and regulations promulgated by the Secretary.*

**[71]** (̶e̶)̶ *(g)* All moneys paid to the Secretary for or under leases granted pursuant to this section shall be deposited in the Treasury in accordance with section 9 of this Act.

**[72]** (̶d̶)̶ *(h)* The issuance of any lease by the Secretary pursuant to this section 8 of this Act, **[73]** *the making of any interim arrangements by the Secretary pursuant to section 7 of this Act,* or the refusal of the Secretary to certify that the United States does not claim any interest in **[74]** a̶n̶y̶ submerged lands pursuant to section 7 of this Act, shall not prejudice the ultimate settlement or adjudication of the question as to whether or not the area involved is **[75]** *in the* outer Continental Shelf.

**[76]** *(i) The Secretary may cancel any lease obtained by fraud or misrepresentation.*

(j) Any person complaining of a cancellation of a lease by the Secretary may have the Secretary's action reviewed in the United States District Court for the District of Columbia by filing a petition for review within sixty days after the Secretary takes such action.

Sᴇᴄ. 9. Dɪsᴘᴏsɪᴛɪᴏɴ ᴏғ Rᴇᴠᴇɴᴜᴇs.—All rentals, royalties, and other sums **[77]** p̶a̶y̶a̶b̶l̶e̶ *paid* under any lease on the outer Continental Shelf for the period from June 5, 1950, to date and thereafter shall be **[78]** p̶a̶i̶d̶ i̶n̶t̶o̶ *deposited by* the Secretary and the Secretary of the Navy in the Treasury of the United States and credited to miscellaneous receipts.

**[79]** Sᴇᴄ. 10. Rᴇғᴜɴᴅs.—*(a) Subject to the provisions of subsection (b) hereof, when it appears to the satisfaction of the Secretary that any person has made a pay-*

*ment to the United States in connection with any lease under this Act in excess of the amount he was lawfully required to pay, such excess shall be repaid without interest to such person or his legal representative, if a request for repayment of such excess is filed with the Secretary within two years after the making of the payment. The Secretary shall certify the amounts of all such repayments to the Secretary of the Treasury, who is authorized and directed to make such repayments out of any moneys not otherwise appropriated and to issue his warrant in settlement thereof.*

*(b) No refund of or credit for such excess payment shall be made until after the expiration of thirty days from the date upon which a report giving the name of the person to whom the refund or credit is to be made, the amount of such refund or credit, and a summary of the facts upon which the determination of the Secretary was made is submitted to the President of the Senate and the Speaker of the House of Representatives for transmittal to the Interior and Insular Affairs Committees of each body, respectfully: Provided, That if the Congress shall not be in session on the date of such submission or shall adjourn prior to the expiration of thirty days from the date of such submission, then such payment or credit shall not be made until thirty days after the opening day of the next succeeding session of Congress.*

**〔80〕** SEC. 11. GEOLOGICAL AND GEOPHYSICAL EXPLORATIONS.—*Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the outer Continental Shelf, which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to this Act, and which are not unduly harmful to aquatic life in such area.*

SEC. **〔81〕** ~~10~~ *12.* **〔82〕** ~~NATIONAL EMERGENCY~~ RESERVATIONS.—(a) **The** President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf **〔83〕** ~~and reserve them for the use of the United States in the interest of national security.~~

(b) In time of war, or when the President shall so prescribe, the United States shall have the right of first refusal to purchase at the market price all or any portion of **〔84〕** ~~the oil and gas~~ *any mineral* produced from the outer Continental Shelf.

(c) All leases issued under this Act, and leases, the maintenance and operation of which are authorized under this Act, shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States after the effective date of this Act, to suspend operations under, or to terminate any lease; and all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended or whose lease is thus terminated.

**〔85〕** *(d) The United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from the exploration and operation that part of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense; and if operations or production under any lease theretofore issued on lands within any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.*

(e) All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the subsoil or seabed of the outer Continental Shelf are hereby reserved for the use of the United States.

(f) The United States reserves and retains the ownership of and the right to extract all helium, under such rules and regulations as shall be prescribed by the Secretary, contained in gas produced from any portion of the outer Continental Shelf which may be subject to any lease maintained or granted pursuant to this Act, but the helium shall be extracted from such gas so as to cause no substantial delay in the delivery of gas produced from such gas to the purchaser of such gas.

SEC. **〔86〕** ~~11~~*13.* NAVAL PETROLEUM RESERVE EXECUTIVE ORDER REPEALED.—Executive Order Numbered 10426, dated January 16, 1953, entitled "Setting Aside Submerged Lands of the Continental Shelf as a Naval Petroleum Reserve", is hereby revoked.

**〔87〕** SEC. 14. PRIOR CLAIMS NOT AFFECTED.—*Nothing herein contained shall affect such rights, if any, as may have been acquired under any law of the United*

*States by any person on lands subject to this Act and such rights, if any, shall be governed by the law in effect at the time they may have been acquired: Provided, however, That nothing herein contained is intended or shall be construed as a finding, interpretation, or construction by the Congress that the law under which such rights may be claimed in fact applies to the lands subject to this Act or authorizes or compels the granting of such rights of such lands, and that the determination of the applicability or effect of such law shall be unaffected by anything herein contained.*

[88] SEC. 15. APPROPRIATIONS.—*There is hereby authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act.*

SEC. [89] ~~12~~16. SEPARABILITY.—If any provision of this Act, or any section, subsection, sentence, clause, phrase or individual word, or the application thereof to any person or circumstance is held invalid, the validity of the remainder of the Act and of the application of any such provision, section, subsection, sentence, clause, phrase or individual word to other persons and circumstances shall not be affected thereby.

### EXPLANATIONS OF AMENDMENTS

[1], [2], and [3]. The change in wording is made to tie the definition of "outer Continental Shelf" to the definitions and terms used in the Submerged Lands Act, the text of which is set forth in the appendix.

[4] The numeral is eliminated because the committee decided to make the definition a single one, tied into the Submerged Lands Act.

[5] The words "natural resources" are eliminated and "seabed" added in order to make the definition consistent with the policy which is set forth in sections 3 (a) and 4 (a), namely, that the jurisdiction of the United States is asserted over the entire seabed and subsoil of the outer Continental Shelf, rather than merely over its natural resources.

[6] The word "removal" is used instead of "production" as being more accurately descriptive of the operations covered by the term "mineral lease."

[7] The deletion of the limitation to "natural resources" carries out the committee's intent to extend the jurisdiction of the United States to the seabed and subsoil as such.

[8] The words "free and unimpeded" are stricken as surplusage.

[9] The words "navigational servitude" are stricken because the Federal Government's power in the outer shelf areas is not dependent upon the constitutional provision for control over navigation as in the navigable waters of the United States.

[10] Section 4 (a) of the bill as introduced extended the maritime and admiralty laws of the United States to structures used in connection with mineral development on the outer shelf. It is stricken because the committee determined to extend jurisdiction over the whole of the seabed and the subsoil, as well as to operational structures.

[11] The new section 4 carries out the intent of the committee explained in [10] namely, that the jurisdiction of the Federal Government is extended to the seabed and subsoil of the outer shelf as such, as well as to artificial islands, and fixed structures, including pipelines, used in mineral resource development. The Constitution and laws of the United States are made applicable, but a proviso is added that leasing shall be only under the provisions of S. 1901 itself.

Paragraph (2) adopts State law as Federal law, to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable.

Paragraph (3) makes it plain that the committee does not intend that the adoption of State law shall ever be the basis for a claim by or on behalf of any State for participation in the administration of or revenues from the areas outside of State boundaries.

[12] Perfecting.

[13] The addition of the words "or transporting by pipelines" add cases or controversies in connection with pipelines on the floor of the outer Continental Shelf to the original jurisdiction conferred upon the United States district courts.

[14] It was deemed inadvisable to have the Federal Longshoremen's and Harbor Workers' Compensation Act apply only if there is no applicable State law. By this amendment, all workers on the outer shelf not already protected under laws respecting seamen are protected by the Longshoremen's and Harbor Workers' Compensation Act.

[15] The words "waters above the Continental Shelf," were deleted and "artificial islands and fixed structures thereon" added to make more definite the application of the Longshoremen's and Harbor Workers' Compensation Act to workers other than those employed on vessels.

**[16]** The deleted provision is believed unnecessary in view of the extension of jurisdiction to the seabed and subsoil.

**[17]** Relettering made necessary by the deletion of the foregoing provision.

**[18]** Perfecting.

**[19]** Perfecting.

**[20]** In view of the blanket extension of Federal law and jurisdiction in section 4 (a) as amended the inclusion of the Fair Labors Standards Act is believed unnecessary

**[21]** As stated in the foregoing, since all applicable Federal laws are extended to the seabed and subsoil of the outer shelf, the specific provisions respecting aliens are believed unnecessary

**[22]** The same reason applies to the provision prohibiting merchandise of foreign growth or manufacture from being brought upon any drilling platform.

**[23]** Same as **[21]** and **[22]**.

**[24]** Change in lettering of subsection necessary because of deletion above.

**[25]** The new material was recommended by the Treasury Department.

**[26]** Same as **[25]**.

**[27]** Perfecting.

**[28]** The new provision is recommended by the Treasury Department to make certain that all structures will have adequate safety devices both for the protection of ships in the area and persons working on the structures.

**[29]** Same as **[24]**.

**[30]** **[31]**, and **[32]** Perfecting

**[33]** Section 5 as introduced merely provided as follows:

"The Secretary shall administer the provisions of this Act relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions   The Secretary may prescribe such rules and regulations as he determines to be necessary and proper in order to provide for the conservation of the natural resources of the outer Continental Shelf   The continuance in effect of any lease, or of any extension, renewal, or replacement of any lease, maintained or granted under the provisions of this act, may be conditioned upon compliance with the regulations prescribed by the Secretary under the provisions of this section."

The amended section is a substitute for the original section 5, being more specific, creating legislative standards, and making violations of secretarial conservation regulations a misdemeanor, subject to criminal persecution and penalties.

**[34]** The new subsection (b) 1 provides that the Secretary may cancel, after appropriate notice a nonproducing lease, the holder of which fails to comply with the provisions of the act and the regulations of the Secretary   Paragraph 2 deals with a producing lease and provides that such a lease may be forfeited in an appropriate court proceeding for failure to comply with the provisions of the act or with the regulations of the Secretary

**[35]** The new subsection (e) authorizes the Secretary to grant rights-of-way for pipelines laid upon the floor of the outer Continental Shelf upon the express condition that such pipelines shall transport or purchase without discrimination mineral products produced in the vicinity of such right-of-way.   In the case of gas, the Federal Power Commission is given authority to regulate transportation or purchase, and in the case of oil, the Interstate Commerce Commission is vested with the necessary authority.

**[36]** The words "or political subdivision or grantee thereof" are deleted because they are inapplicable to existing leases on the outer shelf.   As a factual matter, only the States have issued outer shelf leases which may be validated.

**[37]** Clarifying.

**[38]** Perfecting

**[39–40]** The amendments more clearly explain the legal status of the State-issued leases.

**[41]** Technical change to be consistent with **[39]** and **[40]**.

**[42]** Same as **[40]**.

**[43]** Since the date of the Supreme Court decisions, namely, June 5, 1950, some lessees have paid royalties to both the State and to the Federal Government. After the issuance of the Executive Order No. 10426, on January 16, 1953, by which the President attempted to create a naval petroleum reserve on the Continental Shelf, such royalty payments to the Federal Government were made to the Secretary of the Navy, rather than the Secretary of the Interior, as had been the practice between the decisions and the date of the naval petroleum reserve order.

Therefore, it is necessary to include payments made either to the Secretary of the Interior or to the Secretary of the Navy as complying with the condition for validation.

[44] Perfecting.

[45] Technical to correct a misprint.

[46] The words "on oil and gas" are added here because of the addition of sulfur to the leasing provisions.

[47] The provision for a 10-percent royalty on sulfur was made by the committee after careful consideration of the practices of the States of Louisiana and Texas in issuing leases for sulfur. The new language is necessary to prescribe a minimum royalty for sulfur in State oil and gas leases which are validated.

[48] The new paragraph is the "antiwindfall" provision discussed previously. When the lessees bid for leases, they do so in the knowledge that they would be subject to State taxes on their operations. Therefore, in order to prevent the lessees from receiving a "windfall" through Federal administration of the area, an amount equal to the State taxes is to be added to the royalty payments the lessees will make to the United States.

[49] Technical.

[50] Technical.

[51] Subsection (b) of S. 1901 as introduced, for which the present language is a substitution, reads as follows:

"Any person holding a mineral lease, which as determined by the Secretary meets the requirements of subsection (a) of this section, may continue to maintain such lease, and may conduct operations thereunder, in accordance with its provisions, for the full term thereof and of any extension, renewal, or replacement authorized therein or heretofore authorized by the law of the State issuing or whose subdivision or grantee issued such lease, or, if oil or gas was not being produced from such lease on or before December 11, 1950, then for a term from the effective date hereof equal to the term remaining unexpired on December 11, 1950, under the provisions of such lease or any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of such State."

The amended subsection spells out more specifically the conditions under which a lease which meets the requirements of subsection (a) may be maintained, and makes provision for those leases which contain sulfur rights along with the oil and gas rights.

[52] and [53] Necessary relettering of subsections.

[54] Provides for finality to a determination by the Secretary if action for review is not begun within 60 days.

[55] Provides for those instances in which an area under lease will be found to be partly within State-owned submerged lands and partly within the area of the outer shelf.

[56] Subsection (a) is new to the bill and makes provision for agreement by the Secretary, with the approval of the Attorney General, to reach a working agreement with a State or lessee that a particular lease does not lie within the outer shelf area.

[57] Relettering necessary because of the addition of the new subsection, subsection (a), above.

[58] Technical.

[59], [60], and [61] Corrective.

[62] New wording is substituted for the language of subsection (a) of the bill as introduced in order to provide by law more specific standards to govern the issuance of leases by the Secretary of the Interior.

[63] Technical; made necessary by the inclusion of provision for leasing sulfur as well as oil and gas.

[64] Technical.

[65] Sets maximum acreage in any one lease.

[66] Technical, cared for by [63].

[67] The added words are clarifying.

[68] Technical.

[69] Since leases are always, in practice, offered for bidding well in advance of the actual time of sale, the prescribing of terms and conditions at the time of such offering adequately meets the practical situation.

[70] The new subsections (c) and (d) are added to authorize leasing of sulfur deposits, and specific standards for such leasing are laid down. Subsections (e) and (f) prescribe further conditions for mineral leasing on the outer shelf.

e 3:17-cv-00101-SLG   Document 56-2   Filed 07/18/18   Page 28 o

[71] and [72] Relettering of subsection made necessary by additions described above.

[73] Makes specific reference to the interim leasing arrangements described in [56].

[74] and [75] Perfecting.

[75] Perfecting.

[76] Subsections (i) and (j) authorize the Secretary to cancel a lease by fraud or misrepresentation, but provides a right of appeal from such cancellation.

[77] Grammatical.

[78] Technical to meet the situation described in [43].

[79] Section 10, providing for refunds, is similar to provisions of Federal mineral leasing laws, with the additional requirement of notice to Congress in advance of repayment.

[80] Section 11 also is new to the bill and provides for authorization for geological and geophysical exploration in the area without unnecessary harm to aquatic life.

[81] and [82] Technical.

[83] The committee believes that the authority of the President to withdraw certain areas of the seabed of the Continental Shelf from leasing should not be limited to security requirements. The authority vested in the President by the amended section is comparable to that which is vested in him with respect to federally owned lands on the uplands.

[84] Amendment made necessary by the inclusion of sulfur and other minerals in the bill.

[85] A new subsection authorizes the Secretary of Defense, with the approval of the President, to restrict certain areas from exploration and operations when necessary in the interest of national defense. Provision is made for compensation to lessees suffering loss from such reservation. Subsection (e) was placed in the bill at the request of the Atomic Energy Commission, and its language is adopted directly from the Atomic Energy Act. Subsection (b) reserves to the Federal Government the rights to extract helium from gas produced in the area. Such rights are similar to those possessed by the Federal Government from gas produced on the uplands.

[86] Technical.

[87] Section 14 was added by the committee as a "savings clause" to protect any rights that may have been acquired by any person in the outer shelf area under any previous law. It is identical with section 8 of the Submerged Lands Act, and is designed to serve an identical purpose.

[88] Section 15 was added to give legislative authority for such appropriations as may be necessary to carry out the provisions of the act.

[89] Renumbering made necessary by the addition of new sections.

## VIII. REPORTS FROM EXECUTIVE DEPARTMENTS

Representatives of the Department of Justice, the Department of the Interior, and the Department of State appeared before the committee and testified on specific phases of S. 1901 and proposed amendments. In addition, the committee received several written reports which are set forth below.

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington 25, D. C., June 8, 1953.*

Hon. GUY CORDON,
*Committee on Interior and Insular Affairs,*
*United States Senate,*
*Washington, D. C.*

MY DEAR SENATOR CORDON: This is in response (1) to your letter of May 18, 1953, requesting our comments on, and suggestions for amendments to S. 1901 and H. R. 5134, both of which would authorize the Secretary of the Interior to lease the submerged lands of the outer Continental Shelf for certain purposes, and (2) to your letter of May 26, 1953, requesting recommendations on pipelines and on the amendments submitted by representatives of the offshore operating lessees in the hearing of May 25, 1953. The latter amendments have since been printed in the confidential committee print of S. 1901 of May 28, 1953, hereinafter referred

to as the committee print. All references herein to S. 1901 are to the said committee print. Except as those amendments are modified or deleted in the enclosed schedule of amendments, we concur in their adoption.

We recommend the enactment of S. 1901 providing it is amended as suggested herein and in the attached schedule of amendments.

S. 1901 is believed to be preferable to H. R. 5134. Among other things, H. R., 5134 provides for the extension by coastal States of their laws, except tax laws to the outer Continental Shelf and the permissive use of their facilities and leasing agencies in that area (secs. 9 (a). 10 (h)). As pointed out by Assistant Attorney General Rankin in his letter to you, dated May 26, 1953 (pp. 2, 6, mimeographed copy), these provisions are subject to constitutional and other objections. Moreover, they appear to be inconsistent with a "Statement by the President," dated May 22, 1953, issued by the White House on the occasion of the signing by him of the Submerged Lands Act. in which the President unqualifiedly said that the submerged lands outside of the historic boundaries of the States "* * * should be administered by the Federal Government * * *." (For the same reasons. proposed alternative No. 1 and proposed alternative No. 2 appearing at the end of section 4 in the committee print are objectionable.) Furthermore, in the light of the conditions peculiar to operations in submerged lands and the limited experience in conducting them. it seems more sensible to delegate a broad leasing authority to the Secretary along the lines of S. 1901, rather than one restricted by detailed provisions respecting the exercise of that authority, as provided in H. R. 5134.

However, a number of the provisions of H. R. 5134 included in the proposed amendments to S. 1901 appearing in the committee print are recommended for adoption.

Section 4 of S. 1901 makes provision for the applicability of certain laws to the outer Continental Shelf, which as defined in section 2 (a), would be beyond the seaward boundaries of any State Section 4 (b) concerns itself with jurisdiction of the United States district courts with respect to cases and controversies arising out of or in connection with operations for the purpose "of exploring for, developing, or removing the natural resources" of or involving rights in the outer Continental Shelf. Whether the quoted language includes transportation by pipeline is doubtful. Hence, the words "or transporting" should be added to the quoted words.

Provisions for the granting of rights-of-way for pipelines, to some extent similar to those embodied in section 28 of the Mineral Leasing Act, as amended, should be added to section 5 of S. 1901 as introduced. They should provide for the granting of such rights-of-way by the Secretary of the Interior for the transportation of oil or natural gas upon the express condition that such pipelines shall transport or purchase without discrimination oil or natural gas produced from the submerged lands of the outer Continental Shelf in the vicinity of the pipelines in such proportionate amounts as the Federal Power Commission, in the case of gas, and the Interstate Commerce Commission. in the case of oil, may after a full hearing with due notice thereof to the interested parties, determine to be reasonable. The aforesaid express condition is substantially the same as one contained in section 28, except that the Federal Power and Interstate Commerce Commissions are respectively substituted for the Secretary of the Interior. This is suggested because those Commissions have broad regulatory authority with respect to oil and gas pipelines and are better able to make determinations of the kind described than this Department. Moreover, since all the oil and gas produced in the outer Continental Shelf will come from Federal lands, the additional "common carrier" obligation imposed by section 28 does not appear to be needed. For the reasons mentioned, we recommend against the inclusion of subsection (f) of section 5 of S. 1901 as proposed in the committee print.

Section 5 of S. 1901 as introduced authorizes the Secretary of the Interior to promulgate rules and regulations as may be necessary to carry out the provisions of the act relating to leasing and to provide for the conservation of the natural resources. The expansion of that authority to include the prevention of waste and the protection of correlative rights. as suggested in section 5 (b) of the committee print, is desirable.

The last sentence of section 5 of S. 1901 as introduced provides that: "* * * The continuance in effect of any lease, or of any extension, renewal, or replacement of any lease, maintained or granted under the provisions of this Act, may be conditioned upon compliance with the regulations prescribed by the Secretary under the provisions of this section."

It is suggested that "shall" be substituted for "may" in this sentence, since there seems to be no basis for distinguishing between leases operating under a continuance, extension, renewal, or replacement of any lease, and any other lessee under the act, insofar as compliance with applicable regulations are concerned. In any case, this sentence, revised as aforesaid, and otherwise for clarification reasons, should be retained and not eliminated as suggested in the committee print. There appears to be no reason, and we are aware of none advanced by the sponsors of the deletion of the sentence, why the Secretary should not be authorized to promulgate regulations applicable to lessees complying with section 6 as well as other lessees under the act, as long as the regulations are consistent with the provisions of the act.

Section 5 of S. 1901 should be amended to expressly authorize the Secretary of the Interior to deal by regulations with such matters as unitization, pooling, subsurface storage of oil and gas, suspension of operations and production, waiver or reduction of rentals or royalties, compensatory royalty agreements, the assignment and surrender of leases, and the sale of royalty oil and gas. This authorization should, we believe, be provided for in general terms rather than more specifically as in effect provided for in section 5 (e) of the committee print by adoption of portions of the Mineral Leasing Act of 1920, as amended (secs. 17, 17 (b), 30 (a), 30 (b), 36, 39; 30 U. S. C., 1946 ed., secs. 187a, 187b, 226, 226e, 192, 209). If the authority to promulgate regulations on these subjects is cast in general terms, the Department would be free to incorporate the provisions of the Mineral Leasing Act on the same subjects, but would also be free to modify them as circumstances peculiar to operations and actual experience in administering a leasing program in the submerged lands made appropriate.

The proposed section 5 (c) of the print makes it a misdemeanor to violate a rule or regulation prescribed by the Secretary. The actions involved would in all cases be those of lessees of the United States under the act. It is believed that this provision is appropriate for and should be confined to violations of rules or regulations for the prevention of waste, conservation of natural resources or the protection of correlative rights. Otherwise, the remedies available to the Government by way of cancellation of the lease and other civil relief would appear to adequately protect the interests of the United States in the event the Secretary's rules and regulations are violated.

Section 6 of S. 1901 authorizes persons holding mineral leases issued by a coastal State or a political subdivision or grantee thereof on submerged lands of the outer Continental Shelf prior to December 21, 1948, to continue to maintain those leases and to conduct operations thereunder, if the other conditions prescribed in subsection (a) are met, except that the Secretary of the Interior would, in effect, be substituted as lessor. December 21, 1948, is the date on which the United States commenced the actions against Louisiana and Texas in the Supreme Court which culminated in the decisions of June 5, 1950, favorable to the United States on the controversy concerning the submerged lands of the Continental Shelf (*United States* v. *Louisiana,* 339 U. S. 699; *United States* v. *Texas,* 339 U. S. 707). A similar decision had been rendered in the California case on June 23, 1947 (*United States* v. *California,* 332 U. S. 19). The executive branch of the Government has consistently adhered to the view that the United States ought to recognize the equities of persons who obtained leases on the submerged lands of the Continental Shelf from coastal States at a time when such persons had reason to believe that the lessors thereunder could validly issue them.

Subsection (b) of section 6 should be revised to provide that the person holding a mineral lease determined by the Secretary to meet the requirements of subsection (a) may continue to maintain such lease in accordance with its provisions as to area, minerals covered, rentals, royalties, and term, subject to the provisions of paragraphs (8), (9), and (10) [as redesignated] of subsection (a), and in accordance with such regulations as the Secretary may prescribe under section 5 of the act. As now written, subsection (b) is too broad in adopting in effect all the provisions of the State leases. For a similar reason, and because subsection (a) of section 5 will provide the Secretary with ample authority to promulgate regulations concerning supervision and control, subsection (c) should be eliminated.

Subsection (a) of section 7 of the committee print would permit the holder of a State lease who filed with the Secretary a certificate stating that doubt exists as to whether an area covered by his lease lies within the outer Continental Shelf to interplead the United States and with its consent, if necessary, the State in an action brought to resolve the doubt. In the event the State would be interpleaded, the lessee may deposit with the court all rents, royalties, and other sums payable under the lease. This subsection appears to be subject to the same objec-

tions which Assistant Attorney General Rankin makes in his letter of May 28, 1953, to you (p. 8, mimeographed copy) with respect to section 18 (a) (1) of H. R. 5134. That subsection of the committee print should, therefore, be eliminated.

Section 8 of S. 1901 as introduced makes no provision concerning the leasing of sulfur or other minerals, except oil and gas. The prospects for discovery of sulfur deposits in the submerged lands of the outer Continental Shelf in the Gulf of Mexico are good and the production of sulfur from those deposits by the Frasch solution method appears to be practical. Moreover there have well be other minerals besides sulfur and oil and gas in those submerged lands and their production may be practical in the future, if not now. It is therefore, suggested that a new subsection in general terms authorizing the leasing of minerals other than oil and gas and fissionable minerals. be added to section 8. The proposed subsections (c) and (d) of section 8 of the committee print are objectionable because they are confined to sulfur and they are too detailed for the submerged lands at this time.

It should be pointed out that S. 1901 does not apply to Alaska. Because of the special problems involved in enacting legislation on the subject of mineral leasing of submerged lands adjacent to the Territory, it is suggested that the matter be hereafter treated in a separate bill.

The Bureau of the Budget has advised that there is no objection to the submission of this report to your committee.

Sincerely yours,

DOUGLAS McKAY,
*Secretary of the Interior.*

### SCHEDULE OF AMENDMENTS

The following are suggested by the Department of the Interior as amendments to S. 1901 as proposed to be revised in the confidential committee print of the Senate Interior and Insular Affairs Committee, dated May 28, 1953. Unless otherwise indicated herein, the Department concurs in the proposed amendments to S. 1901 appearing in the committee print.

#### SECTION 3

Revise subsection (b) to read as follows:
"(b) This act shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to their free and unimpeded navigation and to fishing therein shall not be affected."

#### SECTION 4

In subsection (b) strike "or" before "removing" and insert after "removing", the words "or transporting" (p. 3, line 22).

Neither the amendment designated "Proposed Alternative No. 1" nor the one designated "Proposed Alternative No. 2" (pp. 8–10) should be adopted.

#### SECTION 5

Revise to read as follows:
"SEC. 5. *Administration of Leasing of the Outer Continental Shelf.* (a) The Secretary shall administer the provisions of this Act relating to the leasing of the outer Continental Shelf. and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this Act. Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the sale of royalty oil and gas accruing or reserved to the United States at not less than market value, and, in the interest of conservation, for unitization, pooling, communitization or drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements. subsurface storage of oil or gas in any of said submerged lands. and drilling or other easements necessary for operations or production. Any person who knowingly and willfully violates any rule or regulation prescribed

by the Secretary for the prevention of waste, the conservation of the natural resources or the protection of correlative rights shall be deemed guilty of a misdeameanor and punishable by a fine of not more than $2,000 or by imprisonment for not more than six months, or by both such fine and imprisonment, and each day of violation shall be deemed to be a separate offense. The issuance and continuance in effect of any lease, or any extension, renewal, or replacement of any lease under the provisions of this Act shall be conditioned upon compliance with the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof or with the regulations issued under the provisions of section 6 (b) clause (2) hereof if the lease is maintained under the provisions of section 6 hereof.

"(b) Whenever the owner of a nonproducing lease fails to comply with any of the provisions of this Act, or of the lease, or of the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof, or of the regulations issued under the provisions of section 6 (b) clause (2) hereof if the lease is maintained under the provisions of section 6 hereof, such lease may be canceled by the Secretary, subject to the right of judicial review as provided in section 8 (i), if such default continues for the period of thirty days after the mailing of notice sent by registered letter to the lease owner at his record post office address. Whenever the owner of any producing lease fails to comply with any of the provisions of this Act, or of the lease, or of the regulations issued under this Act and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 8 hereof, or of the regulations issued under the provisions of section 6 (b) clause (2) hereof if the lease is maintained under the provisions of section 6 hereof, such lease may be forfeited and canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4 (b) of this Act.

"(c) (1) Rights-of-way through the submerged lands of the outer Continental Shelf, whether or not such lands are included in a lease maintained or issued pursuant to this Act, may be granted by the Secretary of the Interior for pipeline purposes for the transportation of oil or natural gas under such regulations and upon such conditions as to the application therefor and the survey, location and width thereof as may be prescribed by the Secretary of the Interior, and upon the express condition that such pipelines shall transport or purchase without discrimination, oil or natural gas produced from said submerged lands in the vicinity of the pipeline in such proportionate amounts as the Federal Power Commission, in the case of gas, and the Interstate Commerce Commission, in the case of oil, may, after a full hearing with due notice thereof to the interested parties, determine to be reasonable, taking into account, among other things, conservation and the prevention of waste. Failure to comply with the provisions of this section or the regulations and conditions prescribed thereunder shall be ground for forfeiture of the grant in an appropriate judicial proceeding instituted by the United States in any United States district court having jurisdiction under the provisions of section 4 (b) of this Act."

### SECTION 6

Redesignate paragraphs "(9)" and "(10)" of subsection (a) "(10)" and "(11)", respectively.

Add a new paragraph "(9)" to subsection (a), reading as follows:

"(9) the holder thereof pays to the Secretary within the period or periods specified in paragraph (1) of this subsection an amount equivalent to any severance, gross production, or occupation taxes imposed by the State issuing the lease on the production from the lease, less the State's royalty interest in such production, between June 5, 1950, and the effective date of this Act and not heretofore paid to the State, and thereafter pays to the Secretary as an additional royalty on the production from the lease, less the United States royalty interest in such production, a sum of money equal to the amount of the severance, gross production or occupation taxes which would have been payable on such production to the State issuing the lease under its laws as they existed on the effective date of this Act;"

Subsection (b) should be revised to read as follows:

"(b) Any person holding a mineral lease, which as determined by the Secretary meets the requirements of subsection (a) of this section, may continue to maintain such lease, and may conduct operations thereunder, in accordance with (1) its provisions as to area, the minerals covered, rentals and, subject to the provisions

of paragraphs (8), (9) and (10) of subsection (a) of this section, as to royalties and as to the term thereof and of any extensions, renewals, or replacements authorized therein or heretofore authorized by the laws of the State issuing or whose political subdivision or grantee issued such lease, or, if oil or gas was not being produced in paying quantities from such lease on or before December 11, 1950, or if production in paying quantities has ceased since December 11, 1950, of if the primary term of such lease has expired since December 11, 1950, then for a term from the effective date hereof equal to the term remaining unexpired on December 11, 1950, under the provisions of such lease or any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of such State, and (2) such regulations as the Secretary may under section 5 of this Act prescribe within 90 days after making his determination that such lease meets the requirements of subsection (a) of this section."

Subsection (c) should be eliminated.

### SECTION 7

The title should read: "Disclaimer and Controversy over Jurisdiction."

The proposed subsection "(a)" should not be included (see Assistant Attorney General Rankin's letter to Acting Chairman Cordon, May 26, 1953, second full paragraph, p. 8, mimeographed copy).

Subsections "(b)" and "(c)" should be renumbered "(a)" and "(b)", respectively.

In line 3, page 20, "and" should be stricken and after "(17 F. R. 5833)," there should be inserted "and December 24, 1952 (18 F. R. 48),".

### SECTION 8

The word "sealed" before "bidding" in subsection (a) should not be added, as proposed (p. 20, line 11).

In subsection (b) "by regulation" should be eliminated, and "at the time" should be substituted for "in advance" (p. 21, lines 1 and 2).

The proposed subsections "(c)" and "(d)" should not be included. Subsections "(c)" and "(d)" should read as follows:

"(c) The Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding leases of any mineral other than oil and gas in any area of the outer Continental Shelf not then under lease for such mineral upon such royalty, rental, and other terms and conditions as the Secretary may prescribe at the time of offering the area for lease.

"(d) No lease issued under this section shall in any event include uranium, thorium or any other material determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946 to be peculiarly essential to the production of fissionable material."

Subsections (h) and (i) should be added as follows:

"(h) The Secretary may cancel any lease obtained by fraud or misrepresentation.

"(i) Any person complaining of the cancellation of a lease by the Secretary may have the Secretary's action reviewed in the United States District Court for the District of Columbia by filing a petition for review within 60 days after the Secretary takes such action."

### SECTION 12

In subsection (b) substitute "any mineral" for "the oil and gas" (p. 24, line 3).

---

DEPARTMENT OF JUSTICE,
*Washington, May 26, 1953.*

Hon. GUY CORDON,
*Acting Chairman, Committee on Interior and Insular Affairs,
United States Senate, Washington, D. C.*

DEAR SENATOR CORDON: In compliance with your request to the Attorney General, I submit the following comparison of S. 1901 and H. R. 5134, with comments and suggestions.

In form, H. R. 5134 is an amendment to the Submerged Lands Act, whereas S. 1901 is an independent act. It seems immaterial which form is adopted. (For convenience of citation, the Submerged Lands Act as proposed to be amended by H. R. 5134 is designated herein as "House bill," with section numbers of that act, rather than of H. R. 5134 itself.)

*Definitions*

"Outer Continental Shelf" is defined identically in the 2 bills (S. 1901, sec. 2 (a); House bill, sec. 2 (i)).

"Secretary" is defined as the Secretary of the Interior in both bills (S. 1901, sec. 2 (b); House bill, sec. 2 (j)).

"Mineral lease" is defined by S. 1901, section 2 (c), as any form of authorization to explore for, develop, or produce minerals. The House bill, section 2 (k), defines "lease" as "including any form of authorization for the use, development, or production from lands beneath navigable waters or lands of the outer Continental Shelf and the natural resources therein and thereunder." This definition is grammatically defective, in that it does not specify what is to be used, developed, or produced. The Senate definition is also preferable in that it covers Federal as well as State leases. Reference to lands beneath navigable waters and the outer Continental Shelf is unnecessary in the definition, as the substantive provisions of the bill always specify, as they should for clarity, the particular area to which they relate. Mineral leases apparently are the only kind involved, at least at present, in this area: there may be a question whether it is desirable to define "leases" generally. The meaning of "lessee" seems to be an inevitable corollary of the definition of "lease," and no specific definition of it should be necessary.

"Person" is defined by S. 1901, section 2 (d), in the same way as by section 2 (h) of the present Submerged Lands Act. Being an amendment of the latter act, the House bill needs no new corresponding definition.

"Mineral Leasing Act" is defined by section 2 (l) of the House bill. S. 1901 does not refer to that act, and contains no such definition. It should be added if the Senate adopts the provisions of the House bill, or others referring to the Mineral Leasing Act.

*General provisions*

H. R. 5134, section 2, repeals section 11 (separability) of the Submerged Lands Act, and substitutes an identical section 21. S. 1901, section 12, is identical (except for provisions applicable only to the present Submerged Lands Act, and unnecessary in a separate act).

H. R. 5134, section 2, repeals section 10 of the Submerged Lands Act (revoking Executive Order No. 10426 as to lands beneath navigable waters) and substitutes section 19, revoking that order in toto (S. 1901, sec. 11, is identical with sec. 19 of the House bill).

H. R. 5134, section 2, repeals section 9 of the Submerged Lands Act (reserving Federal rights in the outer Continental Shelf), and substitutes sections 9–18, providing for leasing and exchange of leases in that area. S. 1901, being a separate act, not inconsistent with the Submerged Lands Act, needs no repealing provision; it makes corresponding, but different, provisions for leasing and exchange of leases, discussed below.

S. 1901, section 3, declares that the subsoil and seabed of the outer Continental Shelf are subject to the control of the United States, but that the overlying waters retain their character as high seas, and the right to their free and unimpeded navigation and the navigational servitude shall not be affected. Similar provisions are made by section 9 (a) of the House bill. Reference to the navigational servitude should be deleted. That is a right of the Federal Government in navigable waters of the United States; as these are not waters of the United States, the servitude does not exist here. Reference to it is only confusing, and seems to conflict with the declaration that control over the waters is not asserted.

*Jurisdiction*

Section 9 (a) of the House bill makes a blanket provision that Federal laws shall apply to the entire area of the outer Continental Shelf. This is not sufficiently specific, in that it does not indicate what applicability is intended to be given to Federal laws which by their terms apply only to specified places that would not in terms include the outer Continental Shelf. For example, laws relating to national parks, or to public buildings, would not be understood as being extended to the entire seabed of the Continental Shelf. However, it is not clear whether that group of criminal laws applicable to the "special maritime and territorial jurisdiction of the United States", as defined in 18 U. S. C. section 7, would be so extended; the outer Continental Shelf seems not to be within the literal definition of that special jurisdiction, yet those laws probably should be made applicable. Some other Federal laws could not be given full applicability without some specific provision; for example, the Longshoremen's and Harbor

Workers' Act by its terms applies only to maritime workers, and so even though extended territorially to this area probably would not apply to most workmen found there. Section 9 (a) of the House bill gives the Secretary power to make regulations for the area; this would enable him to clarify these situations by regulation, and makes the provisions adequate, to the extent that it is considered sufficient for the applicable law to be found in regulations rather than in statutes.

Section 9 (a) of the House bill further provides that coastal States may extend their laws, other than tax laws, over the outer Continental Shelf within their projected boundaries as determined by the Secretary, so far as such laws are not inconsistent with Federal laws and regulations, and that the Secretary shall reimburse the States for reasonable costs of administering their laws so extended. This is objectionable on several grounds. It raises a serious constitutional question of delegation of legislative power. This is a Federal area, outside State boundaries, and to give the States a sort of extraterritorial jurisdiction over it is unnecessary and undesirable. The situation is not comparable to that of federally owned areas within a State, as to which State law has some measure of applicability. Particularly in view of the intermingling of national and international rights in the area, it is important that the Federal Government, which has the responsibility for handling foreign relations, have the exclusive control of law making and law enforcement there.

S. 1901 presents a different approach to the problem of providing a body of law. Section 4 (a) provides that acts and offenses on structures (other than vessels) shall be governed by the law applicable to vessels of the United States on the high seas. This clearly specifies, as the House bill does not, the manner in which Federal law is to apply, and insofar as it relates to Federal law it is satisfactory, although it should probably be broadened to include the seabed and subsoil as well as structures. Where structures are owned by persons or corporations, this would make applicable the law of the domiciliary State of the owner, to the extent that it did not conflict with Federal law. This constitutes a delegation of Federal legislative power to a State, and raises the same constitutional queston mentioned above with respect to adjoining coastal States. However, the provision may well be left as it is in that respect. Even if the courts hold it inoperative to adopt State law, that should not impair its effectiveness to adopt those Federal laws applicable to American ships on the high seas.

In addition to this blanket adoption of laws applicable to American vessels on the high seas, S. 1901, section 4 (c) through (4) (i), makes specific provision for the application, with modifications in some instances, of Federal laws relating to workmen's compensation, mortgage recordation, labor relations, fair labor standards, immigration, and importation and exportation of goods.

S. 1901, section 4 (c), making the Longshoremen's and Harbor Workers' Compensation Act applicable to employment in exploration or development of resources of the outer Continental Shelf is explicit and adequate.

S. 1901, section 4 (d) makes the Ship Mortgage Act applicable to structures, subject to such regulations as the Secretary of Commerce may establish. The reference should be to the Secretary of the Treasury, in view of Reorganization Plan No. 3 of 1946 (sec. 102, 60 Stat. 1097), substituting the Commissioner of Customs for the Secretary of Commerce with respect to this act, and Reorganization Plan No. 26 of 1950 (sec. 1, 64 Stat. 1280), substituting the Secretary of the Treasury for all officers of the Treasury Department (of whom the Commissioner of Customs is one). A provision for liens and recording is highly desirable, but the Ship Mortgage Act is so peculiarly adapted to the special problems of liens on ships that there may be a serious doubt whether its application to these structures will be altogether satisfactory. However, it will probably be reasonably workable, and consideration of a more satisfactory expedient may well be deferred until experience has developed the problems to be met. It might be desirable, however, to broaden this subsection so as to apply to the outer Continental Shelf as a whole; in that way it could provide for recordation of liens on leaseholds where no structure has yet been built.

S. 1901, sections 4 (e) through 4 (i), should be similarly broadened to cover the entire outer Continental Shelf, and not merely structures thereon.

S. 1901, section 4 (k), contains a very desirable provision that specific reference to the application of certain laws does not imply that others are not applicable.

S. 1901, section 4 (j), gives the Coast Guard authority to establish and enforce safety regulations. This is desirable, but might be broadened to include specifically authority to enforce all other laws and regulations applicable to the area.

S. 1901, section 4 (b), provides for jurisdiction and venue in Federal district courts for controversies arising in connection with operations on the outer Con-

tinental Shelf, or involving rights there. Section 13 of the House bill makes a similar provision, but only as to proceedings involving a lease or rights under a lease on the outer Continental Shelf. The broader form of the Senate version is preferable, but might itself be broadened to include all causes of action arising on the outer Continental Shelf or structures thereon.

S. 1901, section 5, authorizes the Secretary to make regulations relating to leasing and conservation. Section 9 (a) of the House bill authorizes the Secretary to make regulations for the area, without limitation as to their subject matter. The latter provision is preferable, as there may be a need for various regulations not directly relating to leases or conservation.

*Confirmation of State leases*

Both bills protect the rights of lessees under existing leases, but with various differences, some minor and some very important (S. 1901, sec. 6; House bill, sec. 11).

Section 11 (a) of the House bill requires the Secretary to issue exchange leases, with provision for interim operation under existing leases. S. 1901, section 6 (b), provides that State leases which meet the specified requirements shall remain in effect. The provision for exchange leases is preferable from an administrative point of view, and has the advantage of permitting inclusion of new terms and conditions desired by the Secretary.

Both bills apply to leases issued, without fraud, before December 21, 1948 (the date on which the Louisiana and Texas cases were begun), and in effect on June 5, 1950 (the date of the decisions in those cases) (House bill, sec. 11 (a); S. 1901, sec. 6 (a)(2)). The Senate bill also covers leases issued with the approval of the Secretary and in effect on the effective date of the act, without restriction as to date of issuance. The latter appears to be a fair and reasonable provision. The language of the House bill in this respect, "which would have been in force and effect * * * had the State issuing such lease had such paramount rights" etc., is technically more correct than that of S. 1901, "which was * * * in force and effect" etc. However, the words "except as modified as to additional royalties provided later in this section" should be omitted from the first sentence of section 11 (a) of the House bill. That phrase of course relates to the exchange lease, but is there made part of an enumeration of the conditions which the original lease must meet in order to qualify for exchange. It has no relevancy to those conditions, and if given any effect would make all leases ineligible for exchange. Both bills provide for review, by the District Court for the District of Columbia, of a determination by the Secretary that a lease is not qualified for continuance or exchange (House bill, sec. 11 (a); S. 1901, sec. 6 (e)). Such provision is desirable.

The other conditions which a lease must meet to qualify for continuance under S. 1901 are largely different from those prescribed by H. R. 5134 for exchange. S. 1901, section 6 (1) requires filing of the lease or a copy with the Secretary within 90 days from the effective date of the act, or further time fixed by the Secretary. The House bill allows 6 months, or such further time as the Secretary allows, from the effective date of the act (sec. 11 (b)(i)), or 6 months from determination in interpleader that the area involved is part of the outer Continental Shelf (sec. 18 (a)(3)). Six months seems not too liberal a time limit, although there is no real objection to the 90-day limit, especially in view of the Secretary's authority to extend it. The provision relative to interpleader is appropriate, if an interpleader procedure is adopted; but it should be required that the interpleader proceedings be begun within the time allowed for filing a lease or application for exchange, in order to toll the time for such filing.

S. 1901, section 6 (a) (3), and section 11 (b) (v) of the House bill make similar requirements as to filing evidence that the original lease was in effect as required by the act.

Section 11 (b) (iii) of the House bill requires, as a condition precedent to exchange, that the lessee pay to the United States all sums due to the original lessor after June 5, 1950 (the date of decision of the Louisiana and Texas cases), not already paid to the lessor or to the Secretary. Section 11 (a) provides that the exchange lease shall provide for payment to the United States of the same rentals, royalties, and other payments as were provided for by the original lease, plus an additional royalty equal to "any severance tax charged by an abutting State." The provision for additional royalty is important, as it prevents a windfall to lessees through their being relieved of State severance taxes which presumably were taken into consideration in fixing the terms of the original leases. However, it might be preferable to refer to "any severance tax imposed by the State issuing

or whose grantee issued, the lease." The provision does not specify whether the State tax referred to is to be that in effect when the original lease was executed, when the exchange lease is issued, or as it may be from time to time. This should be made specific; probably the date of the exchange lease is the most desirable.

S. 1901, section 6 (a) (4), prescribes as a condition for continuance in effect of a State lease that the lessee shall pay to the Secretary all sums due and unpaid under the lease between June 5, 1950, and the effective date of the act, and all sums due thereafter. This does not impose any obligation on the lessee to make such payments, but only makes them a prerequisite to continuance of his lease. The issuance of an exchange lease, obligating the lessee to pay the United States according to its terms, as provided by the House bill, is preferable; and it is particularly important to provide for additional payments equal to the State severance tax.

S. 1901, section 6 (a) (5), requires the lessee to certify that the lease shall remain subject to the same overriding royalty obligations existing on the effective date of the act. This is believed to be a desirable provision. Section 11 (b) (ii) of the House bill requires a similar statement to be included in an application for an exchange lease, but does not specify a critical date. The date of issuance of the exchange lease should probably be specified, in that case.

S. 1901, section 6 (a) (7), requires leases issued on or after June 23, 1947 (the date of decision of the California case), to have been issued upon competitive bidding, to qualify for continuance. The House bill has no corresponding provision. This requirement seems appropriate but not essential.

S. 1901, section 6 (a) (8), requires that the lessee consent to pay a royalty of 12½ percent in cases where the lease as originally issued requires less. The House bill makes no corresponding requirement. Conceivably, this requirement could work hardship on a lessee who paid a very high cash bonus for his lease, in consideration of a very low royalty; but in practice it is believed that no difficulty will arise.

S. 1901, section 6 (a) (9), requires that if a lease will not terminate within 5 years from the effective date of the act, in the absence of drilling or production, the lessee must file a consent to such termination within 5 years. The House bill has no corresponding provision. The requirement seems reasonable and desirable.

S. 1901, section 6 (a) (10), and the House bill, section 11 (b) (iv), require such surety bond and compliance with such other requirements as the Secretary may impose to protect the interests of the United States. This is desirable.

S. 1901, section 6 (b), provides that the lessee under a qualifying lease may continue operations for the full term thereof, or if oil or gas was not being produced on or before December 11, 1950 (the date of the decrees in the Louisiana and Texas cases), then for a term from the effective date of the act equal to the term remaining unexpired on December 11, 1950; together with extensions authorized by the lease or heretofore authorized by State law. The House bill, section 11 (a), makes a similar provision as to the term of exchange leases, applicable also to any lease of which the primary term has expired since December 11, 1950. These provisions are designed to protect lessees against forfeitures due to suspension of operation as a result of the Supreme Court decrees. The Senate version appears adequate for that purpose.

Section 11 (a) of the House bill provides that exchange leases shall be, in other respects, for the same term, upon the same area, and for the same payments as the original lease, and upon such additional terms as the Secretary may prescribe, consistent with the act. S. 1901 has no such provision for additional terms, since it does not provide for new leases. As stated above, this is one reason why the exchange procedure is preferable.

Section 11 (c) of the House bill provides that where a State lease covers areas both within and without the outer Continental Shelf, the exchange provisions apply only to the area within the outer Continental Shelf. This is a highly desirable provision which is lacking from the Senate bill, and should be added. However, under the Senate procedure for continuance of operations under the original lease, it presumably would take the form of proration of payments, with consents as to increase of royalty and reduction of term made applicable only to the portion of the lease area within the outer Continental Shelf. The complications that this would involve are another cogent reason for preferring the exchange lease procedure.

S. 1901, section 6 (c) vests in the Secretary such powers of supervision and control as the lessor may have by law or under terms of the lease. This may give the Secretary different powers as to to different leases or areas, which will be confusing, and may raise a question of delegation of legislative power if the State law is changed. Under the exchange lease procedure of the House bill, no such pro-

vision is made or needed, as it is implicit that the Secretary will have the same control over exchange leases as over new leases. Again, the exchange procedure is preferable.

S. 1901, section 6 (d), preserves claims of the United States arising out of operations before the effective date of the act. Section 15 of the House bill, on the other hand, waives such claims arising before June 5, 1950 (date of the decision in the Louisiana and Texas cases), except where there was fraud in securing or operating under the lease. However, these provisions probably are similar in effect, since in the Louisiana and Texas cases accounting was ordered only for production after June 5, 1950, so it appears that claims arising after that date are the only ones the United States can enforce in any event.

*New leasing*

Both the Senate and House bills authorize the Secretary to make new oil and gas leases. The House bill establishes a permanent procedure, with detailed provisions (House bill, sec. 10); the Senate bill is designed only to meet "the present emergency" and imposes a minimum of restrictions on the complete discretion of the Secretary (S. 1901, sec. 8). It is believed that a permanent procedure is preferable; the practice of limiting the Secretary's discretion as to leasing procedure and lease provisions follows the precedent of the Mineral Leasing Act, and is not objectionable.

Both bills are permissive only, which is desirable (S. 1901, sec. 8 (a); House bill, sec. 10 (a)).

Both bills provide for issuance of leases upon the highest cash bonus bid of a qualified person (S. 1901, sec. 8 (a); House bill, sec. 10 (a)). However, it is believed that serious consideration might well be given to permitting alternatively, competitive royalty bidding, with minimum royalty fixed by the act and by the Secretary.

Both bills provide for terms of 5 years, and long thereafter as drilling or paying production continues (S. 1901, sec. 8 (b) (2); House bill, sec. 10 (c), 10 (d), 10 (e)). Both bills fix a minimum royalty of 12½ percent (S. 1901, sec. 8 (b) (3); House bill, sec. 10 (d)). These provisions seem satisfactory.

The Senate bill gives the Secretary discretion as to other lease terms (S. 1901, sec. 8 (b) (4)) and as to the size and shape of leased areas (S. 1901, sec. 8 (b) (1)). The House bill fixes maximum sizes of leasing units and requires them to be reasonably compact in form (House bill, sec. 10 (b)), provides against forfeiture for cessation of production if reworking commences within 90 days or, during the primary term, if rental payments or reworking are resumed by the next rental date after 90 days (sec. 10 (d)), and requires leases to provide for skillful and diligent operation (sec. 10 (c)), delay rentals of at least $1 an acre after the first year (sec. 10 (d)), and minimum royalty of at least $1 an acre after discovery of oil or gas (sec. 10 (d)). These provisions are not objectionable. The House bill gives the Secretary discretion as to other lease terms (sec. 10 (h)).

The House bill makes detailed provisions for leasing procedures, which are not objectionable (sec. 10 (a)). S. 1901 has no corresponding provisions.

The House bill permits the Secretary to refuse leases to aliens whose nation denies similar privileges to Americans, and to cancel leases where such ownership arises, subject to a 2-year grace period where it arises by inheritance or judgment. It forbids control of leases by combinations in restraint of trade (sec. 10 (i)). S. 1901 has no corresponding provisions. These provisions are not objectionable.

The House bill permits the Secretary to cancel leases obtained by fraud (sec. 10 (j)), and also permits cancellation, on 20 days' notice, for default (sec 10 (f)), reviewable in either case by the District Court for the District of Columbia (sec. 10 (f)). Such provisions are desirable, and should be added to S. 1901.

The House bill provides that where a lease or interest therein is owned or controlled in violation of the act, the Secretary may cancel the lease or forfeit the interest, or compel disposal of it in a court proceeding (sec. 10 (f)). This provision should be clarified: it leaves doubt whether the Secretary has discretion to cancel entire leases where only an interest in itis held in violation of the act; and because of the arrangement of the paragraph leaves a serious doubt as to whether such cancellation or forfeiture is included in the provision for judicial review. Probably the Secretary should be allowed to cancel or forfeit only the offending interests, and the provision for judicial review should be made applicable. With those modifications, it would be desirable to add such provision to S. 1901.

The House bill permits the Secretary to use facilities of adjacent States and their leasing agencies (sec 10 (h)). Even though only permissive, such provision

is undesirable. As already stated, it is the view of the administration that the outer Continental Shelf is a Federal area and should remain subject to purely Federal control in all respects. S. 1901 has no corresponding provision.

The House bill adopts certain provisions of the Mineral Leasing Act, so far as not inconsistent with the terms of the act (sec. 10 (g)). This is not objectionable. S. 1901 has no corresponding provision. The sections of the Mineral Leasing Act adopted by the House bill are section 17 (30 U. S. C. sec. 226): Lease of oil or gas-lands; royalties and annual rentals; drainage agreements; section 17b (30 U. S. C. sec. 226e): Cooperative or unit plans; regulation; approval of contracts; prevention of waste; section 28 (30 U. S. C. sec. 185): Rights-of-way for pipelines; section 30 (30 U. S. C. sec. 187): Assignment or subletting of leases; relinquishment of rights under leases; conditions in leases as to operation of mines, wells, and so forth; section 30a (30 U. S. C. sec. 187a): Same, oil or gas leases; partial assignments: section 30b (30 U. S. C. sec. 187b): Same, oil or gas leases; written relinquishment of rights; release of obligations; section 32 (30 U. S. C. sec. 189): Rules and regulations; rights of States not affected; section 36 (30 U. S. C. sec. 192): Payment of royalties in oil or gas; sale of such oil or gas; and section 39 (U. S. C. sec. 209) · Waiver, suspension or reduction of rentals or royalties; extension of lease on suspension of operations.

The House bill authorizes delegation and subdelegation of the Secretary's authority (sec. 10 (h)). This is unnecessary, in view of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), permitting the Secretary to provide for performance of any of his functions by any other officer, agency, or employee of the Department. S. 1901 has no corresponding provision.

S. 1901 (sec. 8 (d)) provides that the Secretary's issuance of a lease, or his refusal to certify that the United States does not claim a particular area pursuant to section 7, shall not prejudice the ultimate adjudication of whether the area is part of the outer Continental Shelf. This is a desirable provision, but the reference to section 7 is confusing, since that section makes no provision for such certification. Probably such a provision should be added there. The House bill has no corresponding provision.

*Scrip and Mineral Leasing Act applicants.*

The House bill specifically rejects claims arising otherwise than under the act (i. e., claims under the Mineral Leasing Act or based on any land scrip) (sec. 9 (b)). This conforms to the recommendation of the Department of Justice as to the Submerged Lands Act: but in that act the recommendation was not followed, and rights of such claimants were preserved (but not confirmed). There may be a question whether the two bills should not be uniform in that regard, as a matter of policy. S. 1901 has no provision on the subject.

*Revenues*

Both bills provide that payments for the period beginning June 5, 1950 (date of the decision in the Louisiana and Texas cases, and from which accounting was ordered therein), shall be deposited in the Treasury (S. 1901, sec. 9; House bill, sec. 12). The Senate bill specifically provides that they are to be credited to miscellaneous receipts. Such provision is desirable, particularly in view of the fact that payments heretofore received have been held in a special fund, under the Secretary's notice of December 11, 1950 (15 H. R. 8835), as amended. It may be qualified, however, by the suggestion made below regarding refunds.

*Refunds*

The House bill (sec. 14) provides for refund of overpayments made to the United States, as determined by the Secretary, on application filed within 2 years of issuance of the lease or of the payment. Such provision is desirable, but it seems that the time for applying for refund should run from the date of payment in every case; it is not clear under what circumstances the present provision intends the time to run from the issuance of the lease, or why it should be so computed in any case. Appropriations will be necessary for payment of refunds, unless some provision is made for a special fund under the control of the Secretary. A fund of appropriate size might be established for that purpose, from moneys now held or hereafter received from leases, with provision that maintenance of the fund at the designated amount should be a first charge on all receipts under the act, and only receipts in excess of the amount so needed should be credited to miscellaneous receipts.

*Interpleader and jurisdictional disputes*

S. 1901 (sec. 7) authorizes the Secretary, with the concurrence of the Attorney General, to enter into agreements for operations pending settlement of a dispute

as to whether an area is part of the outer Continental Shelf. The provision is a. desirable one. It confirms the authority for interim operations given by the Secretary's notice of December 11, 1950 (15 F. R. 8835), as amended January 26, 1951 (16 F. R. 953), and supplemented February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R.. 6204), August 22, 1951 (16 F. R. 8720), October 24, 1951 (16 F. R. 10998), and December 21, 1951 (17 F. R. 43). It seems that to this list of supplementary orders should be added those of March 25, 1952 (17 F. R. 2821), June 26, 1952 (17 F R. 5833), and December 24, 1952 (18 F. R. 48).

The House bill does not contain a similar provision. Instead it permits a lessee to file with the Secretary a certificate that an unadjudicated doubt exists as to whether a lease area is within the outer Continental Shelf, or as to who is entitled to payments under a lease; and the lessee may then interplead, in the District Court for the District of Columbia, the United States and, if the State consents, the State, and make his payments into court until the dispute is determined (sec. 18 (a) (1)). This provision is unacceptable. It requires the United States to litigate as to such particular areas, and at such times, as lessees determine. It does not require the States to enter such litigation, and is entirely silent as to what shall happen if the State does not consent. It is understood that to this the State consent which lessees particularly hope to invoke under this provision is the consent given by Louisiana to suits against the State mineral board. Apparently referred to is the provision that "The board shall be a body corporate, with its domicile at the State capitol, may sue and be sued * * *" (La. Rev. Stats. 1950, sec. 30:121). Certainly this is not a consent to suit in the District of Columbia and probably it is not a consent to suit in other than the courts of the State (*Great Northern Ins. Co.* v. *Read*, 322 U. S. 47, 54 (1944)). Thus, it appears that the proposed provision as it stands would not give to lessees the practical advantages which they hope for; and the Department of Justice is vigorously and unalterably opposed to broadening the provision so as to consent to suit in State courts or even in Federal district courts within the various States. The provision should be rejected as undesirable and unworkable.

Alternatively, the House bill permits the lessee, after filing the certificate with the Secretary, to continue making his payments to the State or its grantee as provided in the lease, until there is an adjudication that the Unted States is entitled to them. The State or its grantee is then required to account for payments so received (sec. 18 (a) (2)). This apparently leaves it to the United States to seek adjudication when and where it chooses. In that respect the provision would be desirable; but there may be doubt as to the ability of the United States to require the States to account in this way.

The House bill further provides that a lessee may apply for an exchange lease within 6 months after an adjudication that his lease area is part of the outer Continental Shelf (sec. 18 (a) (3)). As pointed out above, this should be modified so that time for applying for an exchange lease will not be tolled except by filing of a suit, whether interpleader under section 18 (a) (1) or other, under section 18 (a) (2), within the time provided for making application for an exchange lease.

If either of the provisions of section 18 (a) (1) or 18 (a) (2) of the House bill, or both, are adopted, two points should be noticed respecting the subjects of doubt which may be certified to the Secretary. Point (ii), "as to whom", should be "as to whom", etc.; to avoid that rather awkward wording, it would be possible to substitute "regarding to whom" or "as to who is entitled to the rentals, royalties, or other sums payable under such lease." Point (iii), "as to the validity of the claims of the State * * * to the area" etc.. is not clear. If it means a doubt as to whether the area is within the outer Continental Shelf, it duplicates point (i) and should be omitted for/that reason. If it does not mean that, it should be omitted as meaningless as no State has or has had a right to issue leases on the outer Continental Shelf.

Section 18 (b) of the House bill permits lessees to intervene in any suit between the United States and a State to determine jurisdiction over a lease area, and to make their payments into court pending determination of the suit. It would be preferable to permit payment into court, without actual intervention, as it will be undesirable to have numerous parties entitled to participate in the conduct of such litigation, as ordinary interveners would be. With that modification, the provision is a reasonable one.

As pointed out above, S. 1901, section 7, does not contain the provision, referred to in section 8 (d), for certification by the Secretary that the United States does not claim a lease area. Probably such provision should be added.

*Explorations*

The House bill (sec. 17) recognizes the right of any person, subject to applicable provisions of law, and of Federal agencies, to conduct geological and geophysical explorations that do not interfere with or endanger actual operations under any lease issued pursuant to the act. Such provision may be desirable, but might well be conditioned on securing a permit from the Secretary (in the case of private persons), rather than leaving it to the individual as this seems to do to decide what will interfere with or endanger operations. S. 1901 has no corresponding provision.

*Rights reserved to the United States*

S. 1901 (sec. 10 (a)) provides that the President may withdraw and reserve unleased areas for Federal use in the interest of national security. This provision is unnecessary, since leasing is not mandatory in any case; and it is undesirable, in that it may imply that it constitutes the only permissible reason for refusing to lease. It should be omitted, or at least the final pharse, "for the use of the United States in the interest of national security," should be deleted. The House bill has no corresponding provision.

S. 1901 (sec. 10 (b)) gives the United States the right of first refusal to purchase any oil or gas produced, at market price, in time of war or when the President prescribes. Section 16 (a) (i) of the House bill gives a right of first refusal to purchase, in time of war or when the President or Congress so prescribes. It does not mention market price, but its practical effect is probably not materially different in that respect. Such provision is desirable; the House version, being slightly less restrictive, is probably preferable from the Government's point of view.

S. 1901 (sec. 10 (c)) authorizes the Secretary, on recommendation of the Secretary of Defense, to suspend operations or terminate leases during a state of war or national emergency declared by Congress or the President after the effective date of the act, with payment of just compensation. The House bill provides that in time of war or when necessary for national defense, and the President or Congress so prescribes, the United States may terminate leases, becoming owner of improvements and liable to pay just compensation determined as in condemnation (sec. 16 (a) (ii)) or it may suspend operations, thereby suspending payments by the lessee, extending the lease correspondingly, and becoming liable for just compensation (sec. 16 (a) (iii)). The somewhat more specific and less restrictive terms of the House version are probably preferable.

The House bill also permits the Secretary of Defense, with the approval of the President, to designate areas needed for defense, where no explorations or operations may be conducted without the approval of the Secretary of Defense; with provision for suspension of payments, extension of terms and payment of just compensation where this interferes with operations under a lease (sec. 16 (b)). This is a desirable provision. S. 1901 has no corresponding provision.

*Helium*

The House bill reserves to the United States the right to extract helium from all gas produced (sec. 16 (c)). This is a desirable provision. S. 1901 has no corresponding provision.

*Naval petroleum reserve*

Both bills revoke Executive Order No. 10426 (S. 1901, sec. 11; House bill, sec. 19). This is necessary.

*Appropriations*

The House bill includes an authorization for appropriations (sec. 20). This is a desirable provision, but of course is lacking from S. 1901.

In addition to the foregoing, the following comments may be made with respect to suggestions advanced by representatives of certain oil companies:

*Enforcement of regulations*

It seems desirable to add to S. 1901, section 5 (or to the House bill, sec. 10 (f)), provision that violation of applicable laws or regulations of the Secretary shall be punishable as a misdemeanor, and shall not be ground for cancellation of a lease unless continued or repeated after specified notice to comply. This would assist enforcement, in cases where the Secretary did not want to invoke the stringent remedy of cancellation, and would protect the lessees from highly punitive forfeitures for minor infractions.

*Liability for past operations*

The oil companies are particularly concerned that claims based on operations before June 5, 1950, be waived as provided by section 15 (a) of the House bill. For certainty, S. 1901, section 6 (d), should so provide  As indicated above, the Supreme Court has declined to enforce earlier claims against the States, and the lessees should not be held to a greater liability.

*Pipelines*

The oil companies suggest that provision be made for authorization of pipelines by the Secretary, and for their operation and regulation as common carriers. This is desirable, and could be accomplished by adopting the provisions of section 28 of the Mineral Leasing Act (30 U. S. C. sec. 185) as provided by section 10 (g) of the House bill, plus specific provision that such lines should be operated as common carriers, and be subject to regulation as interestate pipelines under part I of the Interstate Commerce Act (49 U. S. C. secs. 1–27) as to oil lines and under the Natural Gas Act (15 U. S. C. secs. 717–717w) as to gas lines.   Such gas lines would apparently be "interstate" within the terms of the Natural Gas Act without specific provision; but oil lines would not be, within the terms of the Interstate Commerce Act.   For certainty, specific provision should be made for the applicability of both acts.   Because of the problems of location, it might be desirable to provide for a right of way wider than the 50 feet allowed by section 28 of the Mineral Leasing Act (30 U. S. C. sec. 185).   That is primarily a question for the Department of the Interior.

*Mineral Leasing Act*

The oil companies are particularly anxious that sections 17 (b), 30 (a), 30 (b), 36, and 39 of the Mineral Leasing Act (30 U. S. C. secs. 226e, 187a, 187b, 192, and 209) be adopted for this area.   As discussed above, with respect to section 10g of the House bill, adopting those and certain other provisions of the Mineral Leasing Act, this seems reasonable and appropriate.

*Sulfur and other minerals*

Where a State lease relates to minerals other than oil or gas, continued exploitation of the same minerals is provided for by S. 1901 (sec. 6 (b)), permitting operation under the State lease, and by the House bill (sec. 11 (a)) providing for exchange leases covering "the same natural resources."   However, under both bills new leasing is limited to oil and gas (S. 1901, sec. 8 (a); House bill, sec. 10 (a)). The oil companies urge that new leasing be permitted for other minerals, particularly sulfur, which apparently is often found in connection with the same salt dome formations as oil and gas.   The desirability of this, and the provisions appropriate to effectuate it, seem primarily questions for the Department of the Interior.

*Leasing procedures*

The oil companies **prefer to have statutory specification of leasing procedures,** particularly 30 days' publication of notice of proposed sale of leases, as provided by section 10 (a) of the House bill, rather than leaving the subject to the discretion of the Secretary, as under S. 1901, section 8.   The requirements of the House bill in this respect appear reasonable; and while they constitute a restriction on the Secretary, they are also a protection to him, as compliance with the statutory requirements will preclude any challenge to the reasonableness of his procedures. There seems to be no objection to their adoption.

*Definition of "State law"*

Both bills require that a State lease, to qualify for continuance or exchange, shall have been validly issued and in effect under the law of the State (S. 1901, sec. 6 (a) (2), 6 (a) (3), 6 (b); House bill, sec. 11 (a). 11 (b)).   Technically, no lease on the outer Continental Shelf has been validly issued or in effect under State law, since State law has no applicability to that area.   This is taken care of by the House bill at the first point where it makes such reference, by use of the phrase, "the laws of the State issuing such lease had the State issuing such lease had such paramount rights in and dominion over the outer Continental Shelf as it assumed it had when it issued the lease" (sec. 11 (a)).   However, that phrase is not repeated at subsequent points in the section, and to do so would be unduly cumbersome.   S. 1901 has no corresponding qualifying phrase at any point. There seems to be much merit in the suggestion of the oil companies that there be added to the definitions (S. 1901, sec. 2: Submerged Lands Act, sec. 2) a provision that the "law of a State," when used with reference to leases issued by the

State or its grantee covering land of the outer Continental Shelf, shall be understood to mean the law of the State as it would have been if the State had had jurisdiction over the area so purported to be leased. However, care should be taken to restrict the definition to that particular subject· to define "State law" in that way for all purposes might extend the scope of State workmen's compensation laws, under S. 1901, section 4 (c), beyond what is intended, or could produce difficulty in constructing the second paragraph of section 9 (a) of the House bill.

Sincerely yours,

J. LEE RANKIN,
*Assistant Attorney General, Office of Legal Counsel.*

---

TEXT OF THE PREPARED STATEMENT PRESENTED ON MAY 28, 1953, TO THE COMMITTEE BY JACK B. TATE, DEPUTY LEGAL ADVISER TO THE SECRETARY OF STATE

Mr. Chairman, members of the committee, my name is Jack B. Tate. I am the Deputy Legal Adviser of the Department of State. I appear at the request of the committee to testify about the foreign relations aspects of S. 1901.

The international problems arising from the discovery and exploitation of the resources of the Continental Shelf are for the most part new problems. Some of our problems are still hypothetical, problems which have not yet arisen in practice. Thus, I do not come here with ready answers to all of the possible questions which may come up. I propose to set forth in general terms the conclusions and suggestions which represent the experience of the Department up to the present date in this field of international relations.

The practical importance of the Continental Shelf principle is that it furnishes the basis for utilization by the contiguous State of the resources, especially oil, in the submerged lands beyond the limit of territorial waters. The undisputed claim by this Nation of the right to the exclusive exercise of jurisdiction and control over such resources accomplishes this purpose.

The assertion of jurisdiction and control in accordance with the President's 1945 proclamation is believed to be preferable to an assertion of sovereignty. Sovereignty, traditionally an absolute concept, might be regarded as affecting the freedom of the waters and the airspace above the seabed and subsoil despite the disclaimers to the contrary.

Claims to sovereignty over the waters and airspace above the Continental Shelf, extending as far as 200 miles from the coast, have in fact been made by a number of nations. This Government opposes such claims. They constitute in its view unwarranted extensions of the Continental Shelf principle and violations of the principle of freedom of the seas traditionally supported by the United States.

The exercise of jurisdiction and control permits full utilization of the resources of the Continental Shelf without casting doubt on our continued support of the principle of freedom of the seas. We consider it important, in dealing with the resources of the Continental Shelf, to make this point clear.

The character as high seas of the waters above the Continental Shelf remains unaffected by the assertion or exercise of jurisdiction and control over its resources. And consequently rights to free navigation and fishing in such waters also remain unaffected.

In order to reduce to a minimum the interference with navigation and fishing which may result from the presence in the waters of structures erected for the exploitation of the resources of the shelf adequate warning signals or other devices should be placed on or near the structures.

As there is need to exercise a certain amount of control around the structures, for purposes such as safety the control should be limited to such purposes and not be made a pretext for claiming extensive rights of jurisdiction around these structures similar to those normally exercised in territorial waters.

Extension of the laws of the contiguous territory to the area of exploration and exploitation of the Continental Shelf should be limited to the structures erected in the high seas and to the seabed and subsoil, and should not apply to the waters themselves.

This outlines the principles which have guided the Department in its handling of the international aspects of the Continental Shelf question. We believe that the domestic problems of exploitation of the resources of the Continental Shelf should be resolved within this framework.

e 3:17-cv-00101-SLG　　Document 56-2　　Filed 07/18/18　　Page 44 o

UNITED STATES DEPARTMENT OF LABOR,
OFFICE OF THE SECRETARY,
*Washington, May 26, 1953.*

Hon. GUY CORDON,
*Committee on Interior and Insular Affairs,*
*United States Senate Washington, D. C.*

DEAR SENATOR CORDON: This is in reply to your letter of May 11, 1953, regarding a bill, which you indicate will be reported by your committee, to provide for the jurisdiction of the United States over the natural resources of the subsoil and seabed of the Continental Shelf beyond the boundaries of the States as established in the Submerged Lands Act. passed by the Senate on May 5 1953.

You refer to the following problems that have arisen in connection with the proposed bill: (1) Which Federal laws should be applicable to the area of the outer Continental Shelf for the public welfare and the welfare of the individuals working in such area; and (2) what legislation, if any, is needed to make such laws applicable.    You request my recommendations, as soon as possible, with respect to these problems as they relate to the laws administered by the Department of Labor.

Due to the time limitation, my comments will be necessarily brief.    Further, until more is known with respect to the basic proposal to establish this new Federal jurisdictional area, it would be difficult to determine its effect on all laws administered by the Department and to draft the particular language changes necessary to extend coverage.    On the basis of a preliminary study, I believe that the coverage of six statutes administered by the Department should include the outer Continental Shelf.    The present language of four of these statutes is sufficiently broad to accomplish this result.    These are as follows:

1. The Fair Labor Standards Act, as amended (29 U. S. C. A. 201 et seq.), extends to possessions of the United States and this has been interpreted by the Supreme Court of the United States as including areas over which Congress has jurisdiction to legislate.    (*Vermilya-Brown Co.* v *Connell* (336 U S. 928).)    Since the proposed bill extends jurisdiction of the United States to the outer Continental Shelf, it would appear that the Fair Labor Standards Act would apply to that area.

2. The 8-hour laws (40 U. S. C. A. 321 et seq.) and the Walsh-Healey Public Contracts Act (41 U. S. C. A. 35 et seq.) apply to certain Government contracts and subcontracts, with no geographical limitations contained in these statutes.    (The Supreme Court has held that the 8-hour laws, in view of their legislative history, do not extend to work performed in foreign countries. (*Foley Bros.* v. *Filardo*, (336 U. S. 281)), but it appears clear that these laws extend to the possessions of the United States )

3. The Federal Employees' Compensation Act (5 U. S. C. A. 751 et seq.) applies to all employees of the Federal Government, regardless of the place of employment.

The remaining two statutes would have to be amended in order to apply to the area of the outer Continental Shelf.    They are as follows:

1. The Davis-Bacon Act, as amended (40 U. S. C. A. 276a), applies to certain Government contracts "within the geographical limits of the States of the Union." It would be necessary, therefore, to amend section 1 of the act so as to extend coverage to areas under the jurisdiction of the United States.

2. The Longshoremen and Harbor Workers' Compensation Act (33 U. S. C. A. 901 et seq.) probably would not apply, since the employees engaged in these areas generally would not fall within the category of "maritime employment" as recognized under the admiralty law and would not be performing services in navigation.    In addition, the present maritime coverage area of the act is "the navigable waters of the United States."    Accordingly, I would recommend an amendment to sections 2 (4), 2 (9), 3 (a), 21 (b) and (c), 37, and 39 (b) of the act to provide jurisdiction thereunder.

The Bureau of the Budget advises that it has no objection to the submission of this report.

Yours very truly,

MARTIN P. DURKIN,
*Secretary of Labor.*

NATIONAL LABOR RELATIONS BOARD,
*Washington, D. C., May 15, 1953.*

The Honorable GUY CORDON,
*Committee on Interior and Insular Affairs,*
*United States Senate, Washington, D. C.*

DEAR SENATOR CORDON: By recent letter you informed the Board of the present plan of the Committee on Interior and Insular Affairs to report a bill relating to the jurisdiction of the United States over the outer Continental Shelf. You indicated that among other considerations confronting the committee is the necessity of determining which Federal laws should be applicable to individuals engaging in work in those areas and whether additional legislation is necessary to make such laws applicable.

This Board and its General Counsel administer the provisions of the National Labor Relations Act, as amended by title I of the Labor-Management Relations Act, 1947 (61 Stat. 136). This act, commonly known as the Taft-Hartley Act, generally provides the statutory guaranty of the right of employees to engage in union or other concerted activities for their mutual aid or benefit, to bargain collectively with their employer respecting wages, hours, and working conditions, or to refrain from such activities. Specific forms of interference with these rights by employers or labor organizations are proscribed, and procedures, including final court review, are provided for the redress of injury. The act also provides election procedures for the peaceful selection of collective bargaining agents by employees and for the resolution of questions concerning their representation.

You have indicated the committee assumes that the work to be performed in the areas "will be done from structures built on or moored to the Continental Shelf which would not be considered to be 'vessels.'" If this work is to be performed by the Federal Government, this Board would have no jurisdiction because the term "employer" as defined by section 2 (2) of the amended act, does not include the United States. But if we may add our assumption that such work would be performed under appropriate arrangements by private employers, it seems to us that whether such work were performed on stationary structures or vessels, it would be the type of business enterprise respecting which Congress intended the National Labor Relations Act, as amended, to apply, and we have normally applied it.

Part of the declared policy of Congress in section 1 of that act is "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to investigate and eliminate these obstructions when they have occurred." The term "commerce" is defined in section 2 (6) to mean "trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

It seems to us that this definition of the scope of our jurisdiction would not include within its ambit either private employers or their employees engaged in work on installations restricted to the "outer Continental Shelf." Moreover, it is clear that the act would be applicable to such employers and employees respecting any of their operations otherwise falling within the present definition of the commerce in section 2 (6). Thus, it is probable that the act would apply to their mainland operations, and to the transporting of personnel, supplies, or products to and from the mainland.

Because the nature of the work to be performed on the "Continental Shelf" would seem to be the type of operation otherwise included within its coverage, it is our impression that the provisions of the National Labor Relations Act, as amended, ought to be made applicable to the same extent as elsewhere in our national economy. If the Congress concurs in this judgment, it appears to us that additional appropriate legislation providing for that statutory coverage will be necessary.

We have recited these brief observations in the hope they will be of immediate assistance to your committee in its deliberations. Time has not permitted this agency to obtain the advice of the Bureau of the Budget on this legislation.

Understandably this Board itself has no opinion regarding the policy and legal issues that may be involved in the legislation under consideration. Our observations are only to be taken as a reply to the specific question submitted by your letter "as they relate to the law[s] administered by" the Board.

If we can be of further assistance, please call upon us.

Very sincerely yours,

PAUL L. STYLES,
*Acting Chairman.*

---

THE SECRETARY OF COMMERCE,
*Washington 25, D. C., May 23, 1953.*

Hon. GUY CORDON,
    *Committee on Interior and Insular Affairs,*
        *United States Senate, Washington, D. C.*

DEAR SENATOR CORDON: This letter is in reply to your request of May 11, 1953, for the views of this Department concerning a bill to provide for the jurisdiction of the United States over the natural resources of the subsoil and seabed of the Continental Shelf beyond the boundaries of the States as established by the Submerged Lands Act as passed by the Senate on May 5, 1953.

Legislation for this purpose would appear to be concerned primarily with matters under the jurisdiction of the Department of State and the Department of the Interior. After careful consideration of this matter, we have concluded that our interest is such legislation is too peripheral to justify our offering for your consideration comments with respect thereto.

If we can be of further assistance in this matter, please call upon us.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

---

TREASURY DEPARTMENT,
*Washington, June 1, 1953.*

Hon. HUGH BUTLER,
    *Chairman, Committee on Interior and Insular Affairs,*
        *United States Senate, Washington, D. C.*

MY DEAR MR. CHAIRMAN: Reference is made to your committee's request for the views of the Treasury Department on S. 1901, "To provide for the jurisdiction of the United States over the submerged lands of the outer Continental Shelf and to authorize the Secretary of the Interior to lease such lands for certain purposes."

The proposed legislation would declare that the natural resources of the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition. It would provide for the continuation of certain existing mineral leases on the outer Continental Shelf, and would authorize the Secretary of the Interior to grant new oil and gas leases in that area. Laws of the United States applicable to acts occurring and offenses committed aboard a vessel of the United States on the high seas would be applicable to acts and offenses occurring on structures located on the outer Continental Shelf. Provision would also be made for extension of certain specific acts and the application of certain provisions of the customs laws and laws relating to safety at sea to such structures and to personnel employed thereon.

The Treasury Department wishes to point out that not all laws of the United States would be made applicable by S. 1901 to the operations, personnel, and structures on the outer Continental Shelf with the consequence that acts may not be regulated, and goods and income may not be taxable on the outer Continental Shelf to the same extent as they are in the continental United States. An accompanying memorandum indicates those areas where laws administered by this Department would not appear to be applicable to the outer Continental Shelf under the provisions of the bill.

Although a number of questions involving the application of existing law to the outer Continental Shelf are likely to arise should the legal status of structures thereon be assimilated to that of vessels on the high seas, as provided in the bill, the Treasury Department does not consider such problems to be insurmountable, inasmuch as remedial legislation could be enacted later if necessary. There are, however, a number of technical changes in the bill which the Department believes

should be adopted in order to minimize any later difficulties in interpretation or application which may arise. The Department's recommendations in this regard are likewise contained in the attached memorandum.

The Department has been advised by the Bureau of the Budget that there is no objection to the submission of this report to your committee.

Very truly yours,

H. CHAPMAN ROSE,
*Acting Secretary of the Treasury.*

## MEMORANDUM

Subject: S. 1901, "To provide for the jurisdiction of the United States over the submerged lands of the outer Continental Shelf, and to authorize the Secretary of the Interior to lease such lands for certain purposes."

I. NONAPPLICABILITY OF EXISTING LAWS TO OPERATIONS, PERSONNEL, OR STRUCTURES ON THE OUTER CONTINENTAL SHELF UNDER S. 1901

### A. INTERNAL REVENUE LAWS

At present the internal-revenue laws are geared in major part to a definition of the United States which is defined in the United States Internal Revenue Code to include the 48 States, the District of Columbia, and the Territories of Alaska and Hawaii. In general, this definition has been interpreted so as to include the waters adjacent to the United States within a 3-mile limit. The application of the internal-revenue laws in many instances will depend upon whether the outer Continental Shelf will be considered within the United States. This problem may be understood more fully if illustrations are submitted as to the areas where the definition of the United States could present a problem insofar as determining whether the internal revenue laws are effective.

*Income taxes*

Citizens and corporations of the United States will be taxable on any income derived while carrying on business or performing services on the outer Continental Shelf, and, thus, it would appear that no problem arises with respect to this group of taxpayers. However, with respect to nonresident alien individuals it should be pointed out that under the Internal Revenue Code the wages paid to such individuals for services performed on the outer Continental Shelf will be deemed to have been derived from sources outside the United States, resulting in exemption from United States income tax on such wages. Furthermore, foreign corporations which derive income from operations under leases granted with respect to the outer Continental Shelf, or from any other activity on the outer Continental Shelf, may be exempt from United States income tax on such income. For example, if the sale and delivery of oil takes place on the outer Continental Shelf, the profits derived from such sale might not be subject to United States income tax.

*Excises*

With respect to the tax imposed on tobacco products under chapter 15 of the Internal Revenue Code, section 2197 would exempt from such tax tobacco products exported to the outer Continental Shelf. Moreover, the occupational tax on retail dealers in liquors provided in section 3250 (b) and (e) would not be applicable to dealers making retail sales on the outer Continental Shelf. Similarly, the special tax on coin-operated amusement and gaming devices provided in section 3267 would not be applicable to any person maintaining or operating any such amusement or gaming devices on the outer Continental Shelf. The tax imposed by section 3469 on the transportation of persons would not be applicable to transportation paid for on the outer Continental Shelf in certain types of cases in which the tax would be applicable if the transportation charges were paid within the United States. Similar problems exist with respect to the tax imposed on the transportation of property provided in section 3475 of the Internal Revenue Code; the tax imposed by section 3465 on telegraph, telephone, radio, and cable facilities; the tax on the transportation of oil by pipeline imposed by section 3460; and the retailers' excise taxes imposed under chapters 19 and 9A of the code.

The Department believes that the internal-revenue taxes should apply to the activities on the outer Continental Shelf to the same extent and under the same conditions as if such activities were carried on within the continental United States. It appears that as a matter of equity taxpayers should not be given any

special tax advantages under the income tax or under the excise taxes solely by reason of the fact that they are performing their operations on the outer Continental Shelf. Accordingly, the Department suggests that your committee give serious consideration to this problem.

The Department considers it desirable to call to the attention of your committee a special problem involving the employment taxes imposed by subchaper A and subchapter C of chapter 9 of the Internal Revenue Code. At the present time, the taxes imposed by the Federal Insurance Contributions Act (Federal old-age and survivors insurance) is generally applicable with respect to services performed within the United States irrespective of citizenship or residence and outside the United States by a citizen of the United States for an American employer. If it is desirable to cover services performed on the outer Continental Shelf by a citizen or alien to the same extent as if such services were performed in the United States, it would be necessary to amend the definition of "United States" in the Internal Revenue Code accordingly. To assure that such services would be covered under the Social Security Act for purposes of the old-age and survivors insurance benefits, it is necessary to correlate the definition of United States contained in the Social Security Act.

A similar problem exists with respect to services covered by the Federal Unemployment Tax Act. At the present time the Federal Unemployment Tax Act generally applies only to services performed within the United States. If it is desirable to cover such services performed on the outer Continental Shelf, it would seem necessary to have the definition of the "United States" in the Internal Revenue Code amended accordingly, and would also seem necessary to extend jurisdiction over such services to appropriate States so as to permit payment of unemployment insurance benefits based upon such services.

### B. CUSTOMS LAWS

Under subsection 4 (i) of the bill, the laws applicable to the exportation of any commodity, article, material, or supply from a place in a State of the United States would be made applicable to the exportation of any such item from any structure located on the outer Continental Shelf.

The exportation of merchandise by sea under the customs and navigation laws is controlled by the clearance of vessels and the procedures incident to that operation. Clearance for the high seas from the United States is not required, however, under existing law nor is clearance necessary in the case of a vessel proceeding from a point on the high seas for a foreign port or place.

### C. NARCOTICS LAWS

1. Section 4 (h) (2) of the bill would provide a different penalty for unlawful importation of narcotic drugs to the outer Continental Shelf than is provided by the Narcotic Drugs Import and Export Act as amended (21 U. S. C. 171) in that section 2 of the act provides for maximum imprisonment of 10 years, wherever the bill provides for maximum imprisonment for 2 years.

2. The Harrison Narcotic Act would not appear to be applicable to the outer Continental Shelf in view of the territorial extent of the act as set forth in 26 United States Code 2563. However, under existing regulations vessels may acquire narcotic drugs for their medical chests, and thus could make such drugs available to the structures in the outer Continental Shelf in the event of an emergency.

3. The provisions of 21 United States Code 184a making it unlawful for any person to bring or have in his possession on board any vessel of the United States, while engaged in a foreign voyage, any narcotic drug or marihuana not constituting a part of the cargo or ship's stores, as it does not appear to apply to the structures on the outer Continental Shelf, as it is doubtful, even though such structures were considered to be vessels, whether they could also be considered to be engaged on a foreign voyage.

4. The Marihuana Tax Act of 1937 would probably not be applicable to the outer Continental Shelf area under S. 1901.

### II. TECHNICAL AMENDMENTS TO S. 1901 RECOMMENDED BY THE TREASURY DEPARTMENT

#### A. INTERNAL REVENUE LAWS

Because of time limitations the Department has not prepared specific technical amendments to the tax laws. The Department would be pleased to furnish the committee with any technical assistance which it may consider desirable.

### B. CUSTOMS LAWS

1. It is recommended that section 4 (h) (1) be amended to read as follows:
"No article of any kind shall be brought upon any structure referred to in subsection (a) directly or indirectly from any foreign port or place without compliance with the customs laws and regulations applicable to like articles imported into the United States."

2. In order to provide for a more complete coverage of the customs laws to merchandise found to have been illegally brought upon any structure referred to in subsection (a) of section 4 of the proposed bill; to provide for the authority for the seizure of such merchandise and the apprehension of the individual involved; and to provide jurisdictional access to such property, it is recommended that the following paragraphs be inserted in lieu of the paragraph beginning on line 12, page 7, of the transcript of S. 1901:

"Any officer of the customs as defined in section 1401 of title 19 of the United States Code may at any time go on board any such structure, without as well as within his district, and examine, inspect, and search the structure and any part thereof, as well as any person, trunk, package, or other container found thereon.

"Merchandise brought upon any such structure in violation of this subsection shall be seized and forfeited and any person engaged in any such violation shall be arrested. All provisions of law relating to the seizure, summary and judicial forfeiture and condemnation of merchandise for violation of the customs laws; the disposition of such merchandise or the proceeds from the sale thereof; the remission or mitigation of such forfeitures; and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures hereunder incurred, or alleged to have been incurred, insofar as applicable and not inconsistent with the provisions hereof."

3 Section 4 (b) should be amended to provide for jurisdiction by the Customs Court over customs matters arising on the outer Continental Shelf.

4 Section 4 (d) would extend to the structures referred to in subsection (a) the provisions of the Ship Mortgage Act (46 U. S. C 911–984) and empower the Secretary of Commerce to establish for them by regulation a registration system. Any such structure would then be considered to be a documented vessel, i. e., a vessel of the United States, within the meaning of that act.

The Ship Mortgage Act was designed for an ambulatory instrument of commerce and, in the Department's judgment a proposal to apply its provisions to a fixed structure located on the outer Continental Shelf raises serious questions of administration.

For example, each vessel of the United States has a home port, designated by the vessel owner and approved by the Commissioner or collector of customs, at which the vessel's current title records are retained. This requirement is necessary because of the wide area in which vessels normally operate. In view of the fact that a structure attached to the outer Continental Shelf is not likely to be moved from place to place. it would appear to be inappropriate to require owners of such structures to designate home ports.

Further, the Ship Mortgage Act contemplates that vessels subject to ts provisions shall be named. shall have masters, shall have documents upon which the existence of a preferred mortgage may be endorsed, and shall be denied clearance if no such endorsement is made. Obviously, these requirements are not susceptible of application to fixed structures. Extended study of the Ship Mortgage Act and related provisions of the navigation laws governing the documentation of vessels would doubtless reveal several other difficulties which would be encountered by making that act applicable to the structures in question.

In addition to the foregoing, and of even greater importance, S. 1901 contemplates that the Ship Mortgage Act, as extended to structures on the outer continental shelf, is to be administered by the Secretary of Commerce, although that act and related vessel documentation laws are now administered solely by the Secretary of the Treasury through the customs service. The impracticability of administering the navigation laws by the former Bureau of Marine Inspection and Navigation of the Department of Commerce through collectors of customs employed and supervised by the Treasury Department resulted in the permanent transfer of the administration of those laws to the Treasury Department in 1946 (Reorganization Plan No. 3 of 1946; 3 C. F. R. 1946 Supp., ch. IV) The proposal in S. 1901 to extend the Ship Mortgage Act under the administrative leadership of the Secretary of Commerce is subject to the objection resulting in the 1946 transfer and to the further objection that it would place the administration of the act in the hands of officers serving two separate departments of the Government.

Rather than to attempt an extension of the system of documentation and recording to a subject for which present law is not designed, your committee may wish to consider a new and separate system designed by those familiar with the operations to fit the particular needs of the situation. Since the purpose, use, ownership, and area of operation of vessels are so alien to fixed structures, it is the view of the Treasury Department that any such legislation should be ad·inistered by the agency charged with the administration of leasing and other problems pertinent to the structures in question.

### C. LAWS ENFORCED BY THE COAST GUARD

1. Since the functions of the Coast Guard have been vested in the Secretary of the Treasury, and since the Coast Guard operates as a service in the Navy Department in time of war, it is recommended that "Coast Guard" be deleted from section 4 (j) of the bill and the words "head of the department in which the Coast Guard is operating" be inserted in lieu thereof.

2. A provision should be added to section 4 (j) to make it clear that the cost of marking the structures will borne by the owners, and provision for penalties for failure to conform to regulations issued hereunder should be made. It is suggested that the following be added to section 4 (j):

"The head of the department in which the Coast Guard is operating may mark for the protection of navigation any such structure whenever the owner has failed suitably to mark the same in accordance with regulations issued hereunder, and the owner shall pay the cost thereof. Any person, firm, company, or corporation who shall fail or refuse to obey any of the lawful rules and regulations issued hereunder shall be guilty of a misdemeanor and shall be fined not more than $100 for each offense. Each day during which such violation shall continue shall be considered a new offense."

3. It is believed that the Corps of Engineers, United States Army, would be a more appropriate agency for establishing standards for safety equipment on structures on the outer Continental Shelf, rather than the Coast Guard, in view of the corps' authority as contained in 33 United States Code 401 et seq. It is therefore recommended that the words "safety equipment" be deleted from section 4 (j).

# APPENDIXES

## Appendix A

Because of the relationship between the Submerged Lands Act and S. 1901 as amended, the text of the act, which is Public Law 31, 83d Congress, is set forth below for convenient reference. Appended is a statement issued by President Eisenhower upon the occasion of the signing of the measure into law.

[PUBLIC LAW 31—83D CONGRESS]

[CHAPTER 65—1ST SESSION]

### H. R. 4198

AN ACT To confirm and establish the titles of the States to lands beneath navigable waters within State boundaries and to the natural resources within such lands and waters, to provide for the use and control of said lands and resources, and to confirm the jurisdiction and control of the United States over the natural resources of the seabed of the Continental Shelf seaward of State boundaries

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Submerged Lands Act".

### TITLE I

#### DEFINITION

SEC. 2. When used in this Act—

(a) The term "lands beneath navigable waters" means—

(1) all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction;

(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles, and

(3) all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined;

(b) The term "boundaries" includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 4 hereof but in no event shall the term "boundaries" or the term "lands beneath navigable waters" be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico;

(c) The term "coast line" means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters;

(d) The terms "grantees" and "lessees" include (without limiting the generality thereof) all political subdivisions, municipalities, public and private corporations, and other persons holding grants or leases from a State, or from its predecessor sovereign if legally validated, to lands beneath navigable waters if such grants or

49

leases were issued in accordance with the constitution, statutes, and decisions of the courts of the State in which such lands are situated, or of its predecessor sovereign: *Provided, however,* That nothing herein shall be construed as conferring upon said grantees or lessees any greater rights or interests other than are described herein and in their respective grants from the State, or its predecessor sovereign;

(e) The term "natural resources" includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power;

(f) The term "lands beneath navigable waters" does not include the beds of streams in lands now or heretofore constituting a part of the public lands of the United States if such streams were not meandered in connection with the public survey of such lands under the laws of the United States and if the title to the beds of such streams was lawfully patented or conveyed by the United States or any State to any person;

(g) The term "State" means any State of the Union;

(h) The term "person" includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation.

## TITLE II

### LANDS BENEATH NAVIGABLE WATERS WITHIN STATE BOUNDARIES

SEC. 3. RIGHTS OF THE STATES.—

(a) It is hereby determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are hereby, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

(b) (1) The United States hereby releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources; (2) the United States hereby releases and relinquishes all claims of the United States, if any it has, for money or damages arising out of any operations of said States or persons pursuant to State authority upon or within said lands and navigable waters; and (3) the Secretary of the Interior or the Secretary of the Navy or the Treasurer of the United States shall pay to the respective States or their grantees issuing leases covering such lands or natural resources all moneys paid thereunder to the Secretary of the Interior or to the Secretary of the Navy or to the Treasurer of the United States and subject to the control of any of them or to the control of the United States on the effective date of this Act, except that portion of such moneys which (1) is required to be returned to a lessee; or (2) is deductible as provided by stipulation or agreement between the United States and any of said States;

(c) The rights, powers, and titles hereby recognized, confirmed, established, and vested in and assigned to the respective States and their grantees are subject to each lease executed by a State, or its grantee, which was in force and effect on June 5, 1950, in accordance with its terms and provisions and the laws of the State issuing, or whose grantee issued, such lease, and such rights, powers, and titles are further subject to the rights herein now granted to any person holding any such lease to continue to maintain the lease, and to conduct operations thereunder, in accordance with its provisions, for the full term thereof, and any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of the State issuing, or whose grantee issued such lease: *Provided, however,* That, if oil or gas was not being produced from such lease on and before December 11, 1950, or if the primary term of such lease has expired since December 11, 1950, then for a term from the effective date hereof equal to the term remaining unexpired on December 11, 1950, under the provisions of such lease or any extensions, renewals, or replacements authorized therein, or heretofore authorized by the laws of the State issuing, or whose grantee issued, such lease: *Provided, however,* That within ninety days from the effective date hereof (i) the lessee shall pay to the State or its grantee issuing such lease all rents, royalties, and other sums payable

between June 5, 1950, and the effective date hereof, under such lease and the laws of the State issuing or whose grantee issued such lease, except such rents, royalties, and other sums as have been paid to the State, its grantee, the Secretary of the Interior or the Secretary of the Navy or the Treasurer of the United States and not refunded to the lessee; and (ii) the lessee shall file with the Secretary of the Interior or the Secretary of the Navy and with the State issuing or whose grantee issued such lease, instruments consenting to the payment by the Secretary of the Interior or the Secretary of the Navy or the Treasurer of the United States to the State or its grantee issuing the lease, of all rents, royalties, and other payments under the control of the Secretary of the Interior or the Secretary of the Navy or the Treasurer of the United States or the United States which have been paid, under the lease, except such rentals, royalties, and other payments as have also been paid by the lessee to the State or its grantee;

(d) Nothing in this Act shall affect the use, development, improvement, or control by or under the constitutional authority of the United States of said lands and waters for the purposes of navigation or flood control or the production of power, or be construed as the release or relinquishment of any rights of the United States arising under the constitutional authority of Congress to regulate or improve navigation, or to provide for flood control, or the production of power;

(e) Nothing in this Act shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian, relating to the ownership and control of ground and surface waters; and the control, appropriation, use, and distribution of such waters shall continue to be in accordance with the laws of such States.

SEC. 4. SEAWARD BOUNDARIES.—The seaward boundary of each original coastal State is hereby approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is hereby approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress.

SEC. 5. EXCEPTIONS FROM OPERATION OF SECTION 3 OF THIS ACT.—There is excepted from the operation of section 3 of this Act—

(a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right;

(b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians; and

(c) all structures and improvements constructed by the United States in the exercise of its navigational servitude.

SEC. 6. POWERS RETAINED BY THE UNITED STATES.—(a) The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 3 of this Act.

(b) In time of war or when necessary for national defense, and the Congress or the President shall so prescribe, the United States shall have the right of first refusal to purchase at the prevailing market price, all or any portion of the said natural resources, or to acquire and use any portion of said lands by proceeding in accordance with due process of law and paying just compensation therefor.

Sec. 7. Nothing in this Act shall be deemed to amend, modify, or repeal the Acts of July 26, 1866 (14 Stat. 251), July 9, 1870 (16 Stat. 217), March 3, 1877 (19 Stat 377), June 17, 1902 (32 Stat. 388), and December 22, 1944 (58 Stat. 887), and Acts amendatory thereof or supplementary thereto.

Sec. 8. Nothing contained in this Act shall affect such rights, if any, as may have been acquired under any law of the United States by any person in lands subject to this Act and such rights, if any, shall be governed by the law in effect at the time they may have been acquired: *Provided, however,* That nothing contained in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that the law under which such rights may be claimed in fact or in law applies to the lands subject to this Act, or authorizes or compels the granting of such rights in such lands, and that the determination of the applicability or effect of such law shall be unaffected by anything contained in this Act.

Sec. 9. Nothing in this Act shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion of the subsoil and seabed of the Continental Shelf lying seaward and outside of the area of lands beneath navigable waters, as defined in section 2 hereof, all of which natural resources appertain to the United States, and the jurisdiction and control of which by the United States is hereby confirmed.

Sec. 10. Executive Order Numbered 10426, dated January 16, 1953, entitled "Setting Aside Submerged Lands of the Continental Shelf as a Naval Petroleum Reserve", is hereby revoked insofar as it applies to any lands beneath navigable waters as defined in section 2 hereof.

Sec. 11. Separability.—If any provision of this Act, or any section, subsection, sentence, clause, phrase or individual word, or the application thereof to any person or circumstance is held invalid, the validity of the remainder of the Act and of the application of any such provision, section, subsection, sentence, clause, phrase, or individual word to other persons and circumstances shall not be affected thereby; without limiting the generality of the foregoing, if subsection 3 (a) 1, 3 (a) 2, 3 (b) 1, 3 (b) 2, 3 (b) 3, or 3 (c) or any provision of any of those subsections is held invalid, such subsection or provision shall be held separable and the remaining subsections and provisions shall not be affected thereby.

Approved May 22, 1953.

## WHITE HOUSE PRESS RELEASE IN CONNECTION WITH PRESIDENT EISENHOWER'S SIGNING OF SUBMERGED LANDS ACT

The White House, *May 22, 1953.*

### Statement by the President

I am pleased to sign this measure into law recognizing the ancient rights of the States in the submerged lands within their historic boundaries. As I have said many times I deplore and I will always resist Federal encroachment upon rights and affairs of the States. Recognizing the States' claim to these lands is in keeping with basic principles of honesty and fair play.

This measure also recognizes the interests of the Federal Government in the submerged lands outside of the historic boundaries of the States. Such lands should be administered by the Federal Government and income therefrom should go into the Federal Treasury.

---

## Appendix B

The Continental Shelf Proclamation (Proclamation No. 2667) issued by the President of the United States on September 28, 1945, has been the legal basis for the formal assertion of Federal jurisdiction over the mineral resources of the outer Continental prior to the enactment of the Submerged Lands Act. Section 9 of this act gave legislative recognition to the jurisdiction asserted in the Presidential

proclamation, and, as explained in the report, this jurisdiction is extended and given administrative implementation by the provisions of S. 1901. The text of the proclamation and the official White House press release explaining it are set forth below. The Fisheries Proclamation (Proclamation No. 2668) of the same date, to which reference was made on several occasions during the hearings on S. 1901, is added.

TWO PROCLAMATIONS, AND TWO COMPANION EXECUTIVE ORDERS, TOGETHER WITH A PRESS RELEASE, ISSUED BY THE PRESIDENT ON SEPTEMBER 28, 1945, RELATIVE TO THE NATURAL RESOURCES OF THE CONTINENTAL SHELF UNDER THE HIGH SEAS CONTIGUOUS TO THE COASTS OF THE UNITED STATES AND ITS TERRITORIES

[Press release]

SEPTEMBER 28, 1945.

The President today issued two proclamations asserting the jurisdication of the United States over the natural resources of the continental shelf under the high seas contiguous to the coasts of the United States and its territories, and providing for the establishment of conservation zones for the protection of fisheries in certain areas of the high seas contiguous to the United States. The action of the President in regard to both the resources of the continental shelf and the conservation of high seas fisheries in which the United States has an interest was taken on the recommendation of the Secretary of State and the Secretary of the Interior.

Two companion Executive orders were also issued by the President. One reserved and set aside the resources of the continental shelf under the high seas and placed them for administrative purposes, pending legislative action, under the jurisdiction and control of the Secretary of the Interior. The other provided for the establishment by Executive orders, on recommendation of the Secretary of State and the Secretary of the Interior of fishery conservation zones in areas of the high seas contiguous to the coasts of the United States.

Until the present the only high seas fisheries in the regulation of which the United States has participated, under treaties or conventions are those for whales, Pacific halibut and fur seals.

In areas where fisheries have been or shall hereafter be developed and maintained by nationals of the United States alone, explicitly bounded zones will be set up in which the United States may regulate and control all fishing activities.

In other areas where the nationals of other countries as well as our own, have developed or shall hereafter legitimately develop fisheries, zones may be established by agreements between the United States and such other States and joint regulations and control will be put into effect.

The United States will recognize the rights of other countries to establish conservation zones off their own coasts where the interests of nationals of the United States are recognized in the same manner that we recognize the interests of the nationals of the other countries.

The assertion of this policy has long been advocated by conservationists, including a substantial section of the fishing industry of the United States, since regulation of a fishery resource within territorial waters cannot control the misuse or prevent the depletion of that resource through uncontrolled fishery activities conducted outside of the commonly accepted limits of territorial jurisdiction.

As a result of the establishment of this new policy, the United States will be able to protect effectively, for instance, its most valuable fishery, that for the Alaska salmon. Through painstaking conservation efforts and scientific management the United States has made excellent progress in maintaining the salmon at high levels. However, since the salmon spends a considerable portion of its life in the open sea, uncontrolled fishery activities on the high seas, either by nationals of the United States or other countries, have constituted an ever present menace to the salmon fishery.

The policy proclaimed by the President in regard to the jurisdiction over the continental shelf does not touch upon the question of Federal versus State control. It is concerned solely with establishing the jurisdiction of the United States from an international standpoint. It will, however, make possible the orderly development of an underwater area 750,000 square miles in extent. Generally, submerged land which is contiguous to the continent and which is covered by no more than 100 fathoms (600 feet) of water is considered as the continental shelf.

Petroleum geologists believe that portions of the continental shelf beyond the 3-mile limit contain valuable oil deposits. The study of subsurface structures associated with oil deposits which have been discovered along the Gulf Coast of Texas, for instance, indicates that corresponding deposits may underlie the offshore or submerged land. The trend of oil-productive salt domes extends directly into the Gulf of Mexico off the Texas coast. Oil is also being taken at present from wells within the 3-mile limit off the coast of California. It is quite possible, geologists say, that the oil deposits extend beyond this traditional limit of national jurisdiction.

Valuable deposits of minerals other than oil may also be expected to be found in these submerged areas. Ore mines now extend under the sea from the coasts of England, Chile, and other countries.

While asserting jurisdiction and control of the United States over the mineral resources of the continental shelf, the proclamation in no wise abridges the right of free and unimpeded navigation of waters of the character of high seas above the shelf, nor does it extend the present limits of the Territorial waters of the United States.

The advance of technology prior to the present war had already made possible the exploitation of a limited amount of minerals from submerged lands within the 3-mile limit. The rapid development of technical knowledge and equipment occasioned by the war, now makes possible the determination of the resources of the submerged lands outside of the 3-mile limit. With the need for the discovery of additional resources of petroleum and other minerals it became advisable for the United States to make possible orderly development of these resources. The proclamation of the President is designed to serve this purpose.

---

### POLICY OF THE UNITED STATES WITH RESPECT TO THE NATURAL RESOURCES OF THE SUBSOIL AND SEABED OF THE CONTINENTAL SHELF

#### (By the President of the United States of America)

##### A PROCLAMATION (NO. 2667)

WHEREAS the Government of the United States of America, aware of the long range worldwide need for new resources of petroleum and other minerals, holds the view that efforts to discover and make available new supplies of these resources should be encouraged; and

WHEREAS its competent experts are of the opinion that such resources underlie many parts of the continental shelf off the coasts of the United States of America, and that with modern technological progress their utilization is already practicable or will become so at an early date; and

WHEREAS recognized jurisdiction over these resources is required in the interest of their conservation and prudent utilization when and as development is undertaken; and

WHEREAS it is the view of the Government of the United States that the exercise of jurisdiction over the natural resources of the subsoil and seabed of the continental shelf by the contiguous nation is reasonable and just, since the effectiveness of measures to utilize or conserve these resources would be contingent upon cooperation and protection from the shore, since the continental shelf may be regarded as an extension of the land mass of the coastal nation and thus naturally appurtenant to it, since these resources frequently form a seaward extension of a pool or deposit lying within the territory, and since self-protection compels the coastal nation to keep close watch over activities off its shores which are of the nature necessary for utilization of these resources;

NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, do hereby proclaim the following policy of the United States of America with respect to the natural resources of the subsoil and sea bed of the continental shelf.

Having concern for the urgency of conserving and prudently utilizing its natural resources, the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control. In cases where the continental shelf extends to the shores of another State, or is shared with an adjacent State, the boundary shall be determined by the United States and the State concerned in accordance with equitable principles. The character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected.

In witness whereof, I have hereunto set my hand and caused the seal of the United States of America to be affixed.

Done at the City of Washington this twenty-eighth day of September, in the year of our Lord nineteen hundred and forty-five, and of the Independence of the United States of America the one hundred and seventieth.

[SEAL] HARRY S. TRUMAN.

By the President:
    DEAN ACHESON,
      *Acting Secretary of State.*

SEPTEMBER 28, 1945.

---

A PROCLAMATION (No. 2668)

POLICY OF THE UNITED STATES WITH RESPECT TO COASTAL FISHERIES IN CERTAIN AREAS OF THE HIGH SEAS

(By the President of the United States of America)

WHEREAS for some years the Government of the United States of America has viewed with concern the inadequacy of present arrangements for the protection and perpetuation of the fishery resources contiguous to its coasts, and, in view of the potentially disturbing effect of this situation, has carefully studied the possibility of improving the jurisdictional basis for conservation measures and international cooperation in this field; and

WHEREAS such fishery resources have a special importance to coastal communities as a source of livelihood and to the nation as a food and industrial resource; and

WHEREAS the progressive development of new methods and techniques contributes to intensified fishing over wide sea areas and in certain cases seriously threatens fisheries with depletion; and

WHEREAS there is an urgent need to protect coastal fishery resources from destructive exploitation, having due regard to conditions peculiar to each region and situation and to the special rights and equities of the coastal State and of any other State which may have established a legitimate interest therein;

NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, do hereby proclaim the following policy of the United States of America with respect to coastal fisheries in certain areas of the high seas:

In view of the pressing need for conservation and protection of fishery resources, the Government of the United States regards it as proper to establish conservation zones in those areas of the high seas contiguous to the coasts of the United States wherein fishing activities have been or in the future may be developed and maintained on a substantial scale. Where such activities have been or shall hereafter be developed and maintained by its nationals alone, the United States regards it as proper to establish explicitly bounded conservation zones n which fishing activities shall be subject to the regulation and control of the United States. Where such activities have been or shall hereafter be legitimately developed and maintained jointly by nationals of the United States and nationals of other States, explicitly bounded conservation zones may be established under agreements between the United States and such other States; and all fishing activities in such zones shall be subject to regulation and control as provided in such agreements. The right of any State to establish conservation zones off its shores in accordance with the above principles is conceded, provided that corresponding recognition is given to any fishing interests of nationals of the United States which may exist in such areas. The character as high seas of the areas in which such conservation zones are established and the right to their free and unimpeded navigation are in no way thus affected.

In witness whereof, I have hereunto set my hand and caused the seal of the United States of America to be affixed.

Done at the City of Washington this twenty-eighth day of September, in the year of our Lord nineteen hundred and forty-five, and of the Independence of the United States of America the one hundred and seventieth.

[SEAL]

HARRY S. TRUMAN.

By the President:
    DEAN ACHESON,
      *Acting Secretary of State.*

SEPTEMBER 28, 1945.

### EXECUTIVE ORDER 9633

**RESERVING AND PLACING CERTAIN RESOURCES OF THE CONTINENTAL SHELF UNDER THE CONTROL AND JURISDICTION OF THE SECRETARY OF THE INTERIOR**

By virtue of and pursuant to the authority vested in me as President of the United States, it is ordered that the natural resources of the subsoil and seabed of the Continental Shelf beneath the high seas but contiguous to the coasts of the United States declare this day by proclamation to appertain to the United States and to be subject to its jurisdiction and control, be and they are hereby reserved, set aside, and placed under the jurisdiction and control of the Secretary of the Interior for administrative purposes, pending the enactment of legislation in regard thereto. Neither this order nor the aforesaid proclamation shall be deemed to affect the determination by legislation or judicial decree of any issues between the United States and the several States, relating to the ownership or control of the subsoil and seabed of the Continental Shelf within or outside of the 3-mile limit.

HARRY S. TRUMAN.

THE WHITE HOUSE,
*September 28, 1945.*

### EXECUTIVE ORDER 9634

**PROVIDING FOR THE ESTABLISHMENT OF FISHERY CONSERVATION ZONES**

By virtue of and pursuant to the authority vested in me as President of the United States, it is hereby ordered that the Secretary of State and the Secretary of the Interior shall from time to time jointly recommend the establishment by Executive orders of fishery conservation zones in areas of the high seas contiguous to the coasts of the United States, pursuant to the proclamation entiled "Policy of the United States With Respect to Coastal Fisheries in Certain Areas of the High Seas," this day signed by me, and said Secretaries shall in each case recommend provisions to be incorporated in such orders relating to the administration, regulation, and control of the fishery resources of and fishing activities in such zones, pursuant to authority of law heretofore or hereafter provided.

HARRY S. TRUMAN.

THE WHITE HOUSE,
*September 28, 1945.*

## APPENDIX C

The notices issued by the Secretary of the Interior concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" and the extensions thereof which are given legislative approval and confirmation in section 7 (b) of S. 1901 are set forth below.

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, December 11, 1950.*

#### NOTICE—OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

### I

On June 5, 1950, the Supreme Court decided the cases of *United States* v. *Louisiana* and *United States* v. *Texas* in favor of the United States (339 U. S. 699, 707). On December 11, 1950, the Court entered its decrees in those cases, adjudging that the Federal Government has paramount rights in, full dominion and power over, and ownership of the lands and the oil and gas deposits underlying that portion of the Gulf of Mexico which extends from the line of ordinary low tide and from the seaward boundaries of inland waters along the coasts of Louisiana and Texas to the outer edge of the Continental Shelf in the case

of Texas and seaward 27 marine miles in the case of Louisiana. Among other things, the decrees enjoin Louisiana and Texas, and their lessees, from carrying on any activities in the aforesaid areas of the Gulf of Mexico for the purpose of taking or removing therefrom any petroleum or gas, and from taking or removing therefrom any petroleum or gas, except under authorization first obtained from the United States.

There appear to be a number of producing oil and gas wells, and other wells where drilling operations are now being conducted, in areas of the Gulf of Mexico which are within the scope of the Supreme Court's decisions and decrees in the Texas and Louisiana cases. These activities presumably are being conducted under leases granted by the States of Louisiana and Texas. As a result of the decisions and decrees of the Supreme Court previously mentioned, such leases must be regarded as never having had any legal effect.

Under Executive Order 9633 (10 F. R. 12305), the natural resources of the submerged coastal lands of the United States were placed under "the jurisdiction and control of the Secretary of the Interior for administrative purposes, pending the enactment of legislation." This places upon the Secretary of the Interior, pending the enactment of legislation, the responsibility for the future protection of the Government's interest in those submerged coastal lands adjacent to Texas and Louisiana which are property of the United States under the Supreme Court's decisions and decrees.

The relationship between the known domestic supplies of petroleum and the present and potential national needs, military and civilian, for petroleum is such that undue interruption of the present operations in the Gulf of Mexico would involve the risk of injury to our national security and economy. Moreover, the producing wells and the elaborate facilities used in drilling for and producing oil and gas in the submerged coastal lands are subjected to unusual risks of loss, injury, and deterioration through action by the elements, which can only be avoided or minimized by continuous and vigilant operation and maintenance. Such loss, injury, and deterioration, if permitted to occur, would be an economic waste in an operation of benefit to the national security and economy and productive of income to the Federal Government. Therefore, it is desirable that appropriate arrangements be made, subject to future congressional action, for the continuance of present operations in order to protect the interests of the United States in this valuable property. The Solicitor of the Department of the Interior is of the opinion that, in such circumstances, the Secretary of the Interior has implied authority to make such arrangements under the principle relied upon by the Attorney General in 40 Opinions of the Attorney General 41.

The extent of the relief to which the United States may be entitled because of trespasses upon and unauthorized leases of submerged coastal lands of the United States is still to be judicially determined; and the question as to whether any equities in lessees of a State, or in those claiming under such lessees, may be recognized by the United States, and, if so, to what extent, is dealt with in proposed legislation pending in the Congress.

## II

Persons now conducting under State leases oil and gas operations in those areas of submerged coastal lands adjacent to the Texas and Louisiana coasts which are seaward of the ordinary low-water mark and are outside the inland waters of those States (1) are hereby authorized to continue such operations for a period of 60 days after December 11, 1950, subject, however, to the payment to the United States of the equivalent of such rentals, royalties, and other payments as were provided to be paid the lessor in such State leases for and during the period from December 11, 1950, to the expiration of said 60-day period, and (2) may file with the Director, Bureau of Land Management, Department of the Interior, Washington 25, D. C., not later than 30 days after December 11, written requests for permission to continue such operations beyond the 60-day period previously mentioned. Each request should describe the nature of the current operations, and should be accompanied by two copies of the State lease pursuant to which such operations have been conducted and, if practicable, two copies of a map of the leased area.

The authorization granted by or pursuant to this notice for the continuation of oil and gas operations by persons now conducting such operations under State leases is not to be construed, in any sense, as an adoption, confirmation, ratification, or validation of said leases by the United States, and is without prejudice to any rights of the United States.

e 3:17-cv-00101-SLG   Document 56-2   Filed 07/18/18   Page 60 o

III

Any sum which the terms of any State lease covering an area of the aforesaid submerged coastal lands require a lessee who is not now conducting operations in such area to pay to the lessor during the period of 60 days from December 11, 1950, may be tendered to the Secretary of the Interior in the form of a check payable to the order of the Treasurer of the United States accompanied by two copies of such lease.  Such a payment will be accepted on the following conditions:

(1)  The remittance will be deposited in a special account within the Treasury of the United States under 31 United States Code, 1946 edition, section 725r, subject to the control of the Secretary of the Interior, the proceeds to be expended in such manner as may hereafter be directed by an act of Congress or, in the absence of such direction, as the Secretary of the Interior may deem to be proper, which may include a refund of the money to the person who paid it.

(2)  The acceptance of such moneys will not amount to, or have the effect of being, an adoption, confirmation, ratification, or validation of the State lease by the United States and will be without prejudice to any rights of the United States.

(3)  The Secretary of the Interior will not grant, in return for such payment, any right to inaugurate operations for the discovery and production of oil and gas within the area of submerged coastal land covered by the State ease, or any other right respecting such land.

(NOTE.—The Secretary of the Interior subsequently submitted the following supplements to pt. II and pt. III:)

NOTICE—OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

This supplements part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, are hereby authorized to continue such operations for a period of 30 days after the expiration of the 60-day period mentioned in subdivision (1) of the first paragraph of part II.  This supplementary authorization is subject to the conditions prescribed in part II.

OSCAR L. CHAPMAN,
*Secretary of the Interior.*

FEBRUARY 2, 1951.

———

[U. S. Department of the Interior, Office of the Secretary, Washington

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

This is a further supplement to part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notice issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, as supplemented by the notice dated February 2, 1951, are hereby authorized to continue such operations to and including May 8, 1951.  This supplementary authorization is subject to the conditions prescribed in Part II.

This notice does not authorize (as the notices of December 11, 1950, and February 2, 1951, did not authorize) the drilling of, or production from, any wells the drilling of which had not been commenced on or before December 11, 1950.

OSCAR L. CHAPMAN,
*Secretary of the Interior.*

MARCH 5, 1951.

[F. R. Doc. 51–3086; Filed, Mar. 8, 1951; 8:48 a. m.]

———

[U. S. Department of the Interior, Washington]

AMENDMENT OF NOTICE ENTITLED "OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

Part III of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Gulf of Mexico" (15 F. R. 8835) is amended, effective December 11, 1950, to read as follows:

Any sum which the provisions of any State oil and gas lease covering an area of the aforesaid submerged coastal lands require or permit a lessee who was not on December 11, 1950, conducting operations in such area to pay to the lessor may be tendered to the Secretary of the Interior in the form of a check payable to the order of the Treasurer of the United States, accompanied by two copies of such lease. Such a payment will be accepted subject to the following conditions:

(a) The acceptance of such remittance will not amount to, or have the effect of being, an adoption, confirmation, ratification, or validation of the State lease by the United States and will be without prejudice to any rights of the United States.

(b) The Secretary of the Interior will not grant, in return for such payment, any right to inaugurate operations for the discovery and production of oil or gas within the area of submerged coastal land covered by the State lease, or any other right respecting such land.

(c) The remittance will be deposited in a special account within the Treasury of the United States under 31 United States Code, 1946 edition, section 725r, subject to the control of the Secretary of the Interior, the proceeds to be expended in such manner as may hereafter be directed by an act of Congress or in the absence of such direction, as the Secretary of the Interior may deem to be proper, which may include a refund of the money for reasons other than those hereinafter set forth.

(d) In the event that all or any part of the area covered by the State lease should later be determined to be above the ordinary low-water mark or within navigable inland waters, any sum tendered with respect to such area and held under paragraph (c) above will be refunded, either entirely or proportionately, as such determination may make appropriate, upon the request of the person who tendered such sum.

(e) If the United States should fail to provide within a period of 2 years from December 11, 1950 for the granting to the person making such a tender of the right to conduct oil and gas operations on the land covered by the State lease, under provisions substantially equivalent to those of the State lease, the sum so tendered and held under paragraph (c) above will be refunded upon the request of the person who tendered it, unless (1) such person shall have accepted a grant from the United States of the right to conduct oil and gas operations on the land under provisions different from those of the State lease, or (2) such person shall have failed to tender to the Secretary of the Interior, during the 2-year period, a further payment required under the provisions of the State lease

(f) If, at the time for the making of a refund to any person under the preceding paragraphs of this part, the United States should have a claim against such person, the right to offset the amount of such claim against the amount otherwise scheduled for refund may be asserted.

Oscar L. Chapman,<br>
<i>Secretary of the Interior.</i>

January 26, 1951.

---

United States Department of the Interior,<br>
Office of the Secretary,<br>
<i>Washington, February 2, 1951.</i>

## NOTICE

Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico

This supplements part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, are hereby authorized to continue such operations for a period of 30 days after the expiration of the 60-day period mentioned in subdivision (1) of the first paragraph of part II. This supplementary authorization is subject to the conditions prescribed in part II.

(Signed) Oscar L. Chapman,<br>
<i>Secretary of the Interior.</i>

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, March 5, 1951.*

NOTICE

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

This is a further supplement to part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notice issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, as supplemented by the notice dated February 2, 1951, are hereby authorized to continue such operations to and including May 8, 1951. This supplementary authorization is subject to the conditions prescribed in part II.

This notice does not authorize (as the notices of December 11, 1950, and February 2, 1951, did not authorize) the drilling of, or production from, any wells the drilling of which had not been commenced on or before December 11, 1950.

(Sgd.)   OSCAR L. CHAPMAN,
*Secretary of the Interior.*

---

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, April 23, 1951.*

NOTICE

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

This is a third supplement to part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), and March 5, 1951 (16 F. R. 2195).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations to and including June 30, 1951. This supplementary authorization is subject to the conditions prescribed in part II.

This notice does not authorize the drilling of, or production from, any oil or gas wells the drilling of which had not been commenced on or before December 11, 1950.

(Signed)   OSCAR L. CHAPMAN,
*Secretary of the Interior.*

---

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*June 25, 1951.*

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

This is a fourth supplement to part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), and April 23, 1951 (16 F. R. 3623).

Persons conducting oil and gas operations in accordance with part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations to and including August 31, 1951. This supplementary authorization is subject to the conditions prescribed in part II.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

(Signed)   OSCAR L. CHAPMAN,
*Secretary of the Interior.*

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, August 22, 1951.*

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF
OF MEXICO

This is a fifth supplement to Part II of the notice issued by the Secretary of the Interior on December 11, 1950 concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), and June 25, 1951 (16 F. R. 6404).

Persons conducting oil and gas operations in accordance with Part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations to and including October 31, 1951. This supplementary authorization is subject to the conditions prescribed in Part II.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

(Signed)   R. D. SEARLES,
*Acting Secretary of the Interior.*

---

UNITED STATES, DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, October 24, 1951.*

NOTICE

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF
MEXICO

This is a sixth supplement to Part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6404), and August 22, 1951 (16 F. R. 8720).

Persons conducting oil and gas operations in accordance with Part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations to and including December 31, 1951. This supplementary authorization is subject to the conditions prescribed in Part II.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

(Signed)   OSCAR L. CHAPMAN,
*Secretary of the Interior.*

[16 F. R. 10998.]

---

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, December 21, 1951.*

NOTICE

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE
GULF OF MEXICO

This is the seventh supplement to Part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6404), August 22, 1951 (16 F. R. 8720), and October 24, 1951 (16 F. R. 10998).

Persons conducting oil and gas operations in accordance with Part II of the notice dated December 11, 1950, as previously supplemented, are hereby au-

thorized to continue such operations to and including March 31, 1952.    This supplementary authorization is subject to the conditions prescribed in Part II.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

(Signed)    OSCAR L. CHAPMAN,
*Secretary of the Interior.*

[17 F. R. 43]

---

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*March 25, 1952.*

OIL AND GAS OPERATIONS IN SUBMERGED COASTAL LANDS OF GULF OF MEXICO

This is an eighth supplement to Part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6404), August 22, 1951 (16 F. R. 8720), October 24, 1951 (16 F. R. 10998), and December 21, 1951 (17 F. R. 43).

Persons conducting oil and gas operations in accordance with Part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations to and including June 30, 1952.    This supplementary authorization is subject to the conditions prescribed in Part II.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

OSCAR L. CHAPMAN,
*Secretary of the Interior.*

[17 F. R. 2801]

---

JUNE 26, 1952.

OIL AND GAS OPERATIONS IN SUBMERGED COASTAL LANDS OF GULF OF MEXICO

This is a ninth supplement to Part II of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as previously supplemented by the notices issued by the Secretary of the Interior on February 2, 1951 (16 F. R. 1203), March 5, 1951 (16 F. R. 2195), April 23, 1951 (16 F. R. 3623), June 25, 1951 (16 F. R. 6404), August 22, 1951 (16 F. R. 8720), October 24, 1951 (16 F. R. 10998), December 21, 1951 (17 F. R. 43), and March 25, 1952 (17 F. R. 2821).

Persons conducting oil and gas operations in accordance with Part II of the notice dated December 11, 1950, as previously supplemented, are hereby authorized to continue such operations on an indefinite basis.    This supplementary authorization is subject to amendment or revocation at any time upon the giving of 30 days' notice in advance through the publication of such notice in the FEDERAL REGISTER.    It is also subject to the conditions prescribed in Part II of the notice dated December 11, 1950.

This does not authorize the drilling of, or production from, any oil or gas well the drilling of which had not been commenced on or before December 11, 1950.

OSCAR L. CHAPMAN,
*Secretary of the Interior.*

[17 F. R. 5833]

---

UNITED STATES DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*December 24, 1952.*

OIL AND GAS OPERATIONS IN THE SUBMERGED COASTAL LANDS OF THE GULF OF MEXICO

Paragraph (e) of Part III of the notice issued by the Secretary of the Interior on December 11, 1950, concerning "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as amended on January 26, 1951 (16 F. R. 953), is amended to read as follows:

"(e) If the United States should fail to provide, within two years from the time when any such sum is tendered to the Secretary of the Interior, for the granting to the person making such tender of the right to conduct oil and gas operations on the land covered by the State lease, under provisions substantially equivalent to those of the State lease, the sum so tendered and held under paragraph (c) above will be refunded upon the request of the person who tendered it, unless (1) such person shall have accepted a grant from the United States of the right to conduct oil and gas operations on the land under provisions different from those of the State lease, or (2) such person shall have failed to tender to the Secretary of the Interior, during the period prior to the submission of the request for refund, a further payment required under the provisions of the State lease."

(Signed)  Oscar L. Chapman,
*Secretary of the Interior.*

---

## Appendix D

The text of Executive Order No. 10426, dated January 16, 1953, entitled "Setting Aside Submerged Lands of the Continental Shelf as a Naval Petroleum Reserve," which is revoked by section 13 of S. 1901 is set forth below.

### Executive Order 10426, Setting Aside Submerged Lands of the Continental Shelf as a Naval Petroleum Reserve

By virtue of the authority vested in me as President of the United States, it is ordered as follows:

Section 1. (a) Subject to valid existing rights, if any, and to the provisions of this order, the lands of the continental shelf of the United States and Alaska lying seaward of the line of mean low tide and outside the inland waters and extending to the furthermost limits of the paramount rights, full dominion, and power of the United States over lands of the continental shelf are hereby set aside as a naval petroleum reserve and shall be administered by the Secretary of the Navy.

(b) The reservation established by this section shall be for oil and gas only, and shall not interfere with the use of the lands or waters within the reserved area for any lawful purpose not inconsistent with the reservation.

Sec. 2. The provisions of this order shall not affect the operating stipulation which was entered into on July 26, 1947, by the Attorney General of the United States and the Attorney General of California in the case of *United States of America* v. *State of California* (in the Supreme Court of the United States, October Term, 1947, No. 12, Original), as thereafter extended and modified.

Sec. 3. (a) The functions of the Secretary of the Interior under Parts II and III of the notice issued by the Secretary of the Interior on December 11, 1950, and entitled "Oil and Gas Operations in the Submerged Coastal Lands of the Gulf of Mexico" (15 F. R. 8835), as supplemented and amended, are transferred to the Secretary of the Navy; and the term "Secretary of the Navy" shall be substituted for the term "Secretary of the Interior" wherever the latter term occurs in the said Parts II and III.

(b) Paragraph (c) of Part III of the aforesaid notice dated December 11, 1950, as amended, is amended to read as follows:

"(c) The remittance shall be deposited in a suspense account within the Treasury of the United States, subject to the control of the Secretary of the Navy, the proceeds to be expended in such manner as may hereafter be directed by an act of Congress or, in the absence of such direction, refunded (which may include a refund of the money for reasons other than those hereinafter set forth) or deposited into the general fund of the Treasury, as the Secretary of the Navy may deem to be proper."

(c) The provisions of Parts II and III of the aforesaid notice dated December 11, 1950, as supplemented and amended, including the amendments made by this order, shall continue in effect until changed by the Secretary of the Navy.

Sec. 4. Executive Order No. 9633 of September 28, 1945, entitled "Reserving and Placing Certain Resources of the Continental Shelf Under the Control and Jurisdiction of the Secretary of the Interior" (10 F. R. 12305), is hereby revoked.

Harry S. Truman.

The White House,
*January 16, 1953.*

(F. R. Doc. 53-734; Filed, Jan. 16, 1953; 4:56 p. m.)

JANUARY 16, 1953.

STATEMENT BY THE PRESIDENT REGARDING EXECUTIVE ORDER 10426, SETTING ASIDE SUBMERGED LANDS OF THE CONTINENTAL SHELF AS A NAVAL PETROLEUM RESERVE

I have today issued an Executive order setting aside the submerged lands of the Continental Shelf as a naval petroleum reserve, to be administered by the Secretary of the Navy. The great oil and gas deposits in these lands will be conserved and utilized in order to promote the security of the Nation. This is an important step in the interest of the national defense.

The tremendous importance of oil to the Government of the United States in these times is difficult to overestimate.

The latest statistics indicate that, during the year 1952, the domestic consumption of petroleum products in the United States averaged about 7.3 million barrels per day. A large part of that daily consumption of petroleum products was attributable to agencies of the Federal Government, particularly the three military departments of the Army, the Navy, and the Air Force.

The domestic production of petroleum during the year 1952, according to the latest statistics, averaged about 6.8 million barrels per day. It will be seen, therefore, that the production of petroleum in the United States during 1952 fell far short of meeting the consumption of petroleum products. This deficit is expected to grow larger year by year.

In view of the great demand for oil by the Government for defense purposes, it is of the utmost importance that the vast oil deposits in the Continental Shelf, which are assets of all the people of the United States, be conserved and utilized for the national security.

At the present time, there are a total of 22 known oilfields in the Continental Shelf adjacent to the coasts of California, Louisiana, and Texas These known fields contain estimated proven reserves aggregating approximately 492 million barrels of oil.

Moreover, it has been estimated, on the basis of available scientific data, that the Continental Shelf adjacent to the coasts of these three States actually contains a grand total of about 15 billion barrels of oil.

In order that these great reservoirs of oil, which belong to all the people of the United States and are of such crucial importance from the standpoint of the national security may be preserved for the Nation, I have set them aside as a naval petroleum reserve.

The Executive order does not require the shutdown of any existing production of oil from submerged lands of the Continental Shelf. Special provisions have been inserted in the order to permit the continuation of this existing production.

It has been, and still is, my firm conviction that it would be the height of folly for the United States to give away the vast quantities of oil contained in the Continental Shelf, and then buy back this same oil at stiff prices for use by the Army, the Navy, and the Air Force in the defense of the Nation.

# MINORITY REPORT BY SENATOR RUSSELL B. LONG, OF LOUISIANA

I am opposed to S. 1901 because in my opinion it does great violence to our traditional concept of dual sovereignty in American government and will, insofar as law and order are concerned, create a virtual dictatorship which will impose its heavy hand at will on the administration of justice to many thousands of American citizens.

The bill, by denying the States any powers of taxation and refusing them any portion of the revenues which might be derived from the outer Continental Shelf, fails to recognize the tremendous financial burdens which operations in the area will place upon the States concerned.

I also object to the provisions of the bill which provide exclusive Federal administration of the area. Nevertheless, it is fair to observe that the committee amendments in this connection are a vast improvement over the original proposal to apply admiralty and maritime law to structures which are now located in the outer Continental Shelf or may be built there.

While the committee held hearings of considerable length and allowed the presentation of a great deal of evidence from the State officials concerned, I do not believe this bill has received the calm and deliberate consideration which such important legislation deserves. Any act which has as its purpose the establishment of a system of law and a means of administering justice should be considered on a plane free of the ordinary political and economic currents which, unfortunately, are present in the instant case. This is no reflection on the sincerity of the majority of the committee who have done perhaps the best they could under a rigid timetable designed for the purpose of obtaining legislation by a time certain.

Careful delineation must be made between the area with which this bill deals and the area involved in the Submerged Lands Act recently enacted. In the prior legislation, title to the lands within the original boundaries of the States—lands which had been claimed without contest by the States for 150 years—was confirmed in the States. Those lands, until the Supreme Court had applied to them a new concept of "paramount rights" in the Federal Government, always had been within the limits both of the Nation and of the respective States and had been subject to our traditional concepts of dual sovereignty.

When we look upon the Continental Shelf and the resources thereof in its true light, we do not find it to have been an asset historically possessed by the United States. Rather we find that area to be in a sense a vast new strip of territory of major value which this Nation has the fortunate power to take by virtue of the fact that it was closer than any other power of the world to the area. It is important to note that in acquiring this vast resource, the United States found that the States of Louisiana and Texas had already laid claim upon certain

65

parts of it. These claims on behalf of Louisiana and Texas had certain validity. It gave those States the right to extract resources and retain all revenue derived from them until such time as the Federal Government itself asserted its rights. The effects of the claim of paramount rights to such resources by President Truman in 1945 and the congressional claim this year were not only that of acquiring such resources for the United States but of ousting the States of their interest in this area.

There is no truly analogous situation in property law. Logic and reason, however, would compel the Federal Government, in taking such resources from the States, to permit the States to share in the revenues produced in some equitable fashion. Especially is this true when we consider the fact that the Federal Government is receiving the benefit of State services for the support of all activities on shore which are of a larger scope and a greater expense than the actual drilling operation in the sea. Thus we find here a source of wealth, first discovered and developed by the States at considerable expense, and which cannot be fully exploited or developed without the benefit of State services from the mainland. Under this bill a few States will bear a heavy financial burden while all the States—most of which will neither contribute to the development nor bear any of the costs—will reap the benefits.

Many thousands of Louisiana citizens who live under a long established and well understood system of both Federal and State law—enforced as the case might be by both Federal and State officials—under the provisions of this bill, will perform their labors in an area governed by a curious and complex mixture of Federal and State laws, administered only by Federal officials, with power in the Secretary of Interior to abrogate State laws by regulation. A resident of Morgan City, La., who might become a party to litigation arising in the outer Continental Shelf, will bear the expense of having his rights litigated—no matter how insignificant they might be—in a Federal court many miles removed from his domicile, rather than in his nearby parish courthouse. His rights and privileges can vary from day to day at the discretion of a Department head at the seat of government in Washington, many hundreds of miles removed from the area. Insofar as the place of his employment is concerned, his rights as an American citizen will be even less secure and certain than those of the people of the Territories of Alaska and Hawaii. His suffrage will not provide him the customery relief to be expected under our Constitution and all of the great principles upon which American Government is founded.

Many circumstances point directly to the fact that operations in the outer Continental Shelf will greatly increase the cost of State and local government and yet the committee ignores this fact and even defeated a last-resort proposal I offered to reimburse the adjacent States for these services to the extent of a mere one-half of the taxes we now collect in the area.

A typical individual employed in operations in the shelf area will maintain his family in one of our coastal parishes; he will own or be buying his house and an automobile there. His children will attend Louisiana schools. If either he or a member of his family becomes ill, he will be cared for by a Louisiana doctor in a Louisiana hospital.

After his employment in the shelf ends, he will continue to live in Louisiana and will spend his old age there.

The children of these employees will attend a free public school, and be provided with free schoolbooks, supplies, lunches, and transportation. Our highways and streets will be traveled by both employer and employee. The State provides charity hospitals for the indigent sick. Care for those stricken with tuberculosis or mental diseases is provided by State-operated hospitals. A State-financed medical school now provides many of the doctors who will minister unto these people. The worker's person and property will be protected by our police. He will be protected from disease and sickness by our public health and sanitation officers. His elderly parents are likely to be receiving a pension during their period of nonproductivity.

Louisiana provides a system of courts in which the employee will litigate many of his claims.

Many of these same services will be provided for the oil company whose base of operations will be necessarily on Louisiana soil. The company will use our highways, will benefit from police protection, and make use of our courts.

None can deny that the furnishing of such services to the thousands of shelf workers, their families, and the companies for which they work will be a heavy financial burden on the State and its subdivisions.

Ordinarily a large percentage of the increased cost of providing such services would be met by increasing the taxes on present sources of revenue. Such action would be grossly unfair in this instance. Yet there will be no alternative if the employers of these workers are subject neither to the State's severance tax, property tax, nor the tax on corporate profits. It is a basic principle in the field of government that the provision of government services to the business enterprise and its employees is made possible largely through the taxation of property and profits of such enterprise. Usually no difficulty is encountered in the application of this principle since the industry and its employees are located in the same State.

No oil company holding a lease in the area protested to the committee against paying the severance tax. I have heard of no such protest being made publicly anywhere else by any of the companies. Since the tax is not applicable to the public royalty interest, its collection would in no wise affect the revenues which will be derived by the Federal Government. Its collection could be allowed, therefore, without any cost to the United States. But rather than deal fairly with the States, the Federal Government has chosen, through the "windfall" provision in this bill, to extract the last ounce of flesh by adding the amount of the States' tax to the royalty to which the Federal Government is otherwise entitled under the validated States' leases.

Where Federal ownership of property or Federal activities within a State has increased the burden of State services, it has been an historic policy that some type of sharing of mineral revenues or payments in lieu of taxes is used to reimburse the State for the additional loss of revenue or increase in costs as the case may be.

In the great public lands States of the West, the policy has been to pay to the States 37½ percent of all mineral revenues, with 52½ percent of the remainder going into the reclamation fund, all of which funds

are expended in the States from which the revenues are in large part derived. Only 10 percent is retained by the Federal Government as the cost of administration. The Tennessee Valley Authority expends some $4 million annually from its receipts in payments to local units of government as replacement for taxes lost as a result of the Authority's operation. The basic flood-control laws provide that 75 percent of the income derived from flood-control reservoirs is returned through the States to the local units of government in the area of the reservoir as payments in lieu of taxes. These are illustrations of the policy in various fields which immediately come to mind. They suffice to show that the proposal in this bill completely disregards this well-established principle in Federal-State relations.

Although justice and fairness under our way of life demand equitable treatment for all the States, this bill discriminates against Louisiana and the other affected States in a manner unheard of in the entire annals of American history. For that reason I must oppose it in its present form.

RUSSELL B. LONG,
*United States Senator, Louisiana.*

O