James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American
Petroleum Institute*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>  *Defendants*. | No. 3:17-cv-00101 (SLG) |

## AMERICAN PETROLEUM INSTITUTE'S COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 1 of 32

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.    OCSLA Mandates Expeditious Exploration And Development Of The
Nation's Critical OCS Oil And Gas Resources. ................................................. 3

    B.    Congress Designed A Four-Stage Government Review Process For OCS
Exploration And Development. ......................................................................... 4

          1.    The Five-Year Leasing Program. ............................................................. 4

          2.    The Lease Sale. ..................................................................................... 5

          3.    The Exploration Stage. ........................................................................... 6

          4.    Development And Production. ................................................................. 7

    C.    Presidential Withdrawals Of OCS Lands From Consideration For Leasing. ......... 7

ARGUMENT ................................................................................................................. 11

I.    SECTION 1341(a) AUTHORIZES PRESIDENTIAL MODIFICATION OF OCS
WITHDRAWAL DECISIONS .................................................................................. 12

    A.    Section 1341(a)'s Broad Discretionary Language Authorizes The
President Both To Withdraw And Modify A Withdrawal Of OCS Lands
From Consideration For Leasing. ..................................................................... 13

    B.    OCSLA's Developmental Purpose Supports Reading Section 1341(a) To
Authorize The President Both To Withdraw And Modify A Withdrawal
Of OCS Lands From Consideration For Leasing. ............................................... 16

    C.    Presidential And Congressional Practice Supports Reading Section
1341(a) To Authorize The President Both To Withdraw And Modify A
Withdrawal Of OCS Lands From Consideration For Leasing. ............................. 19

II.    THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER
SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II
POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795. .................................. 23

CONCLUSION .............................................................................................................. 25

i

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 2 of 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
 134 S. Ct. 2259 (2014) .......................................................................... 16

*Alaska v. Kerry,*
 972 F. Supp. 2d 1111 (D. Alaska 2013) ............................................... 21

*Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n,*
 796 F.3d 18 (D.C. Cir. 2015) ................................................................ 16

*Ayala-Caballero v. Coleman,*
 58 F. App'x 669 (9th Cir. 2002) .......................................................... 13

*Barber v. Gonzales,*
 347 U.S. 637 (1954) .............................................................................. 13

*Bay Area Peace Navy v. United States,*
 914 F.2d 1224 (9th Cir. 1990) .............................................................. 14

*California v. Watt,*
 668 F.2d 1290 (D.C. Cir. 1981) .................................................... 3, 4, 17

*Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.,*
 844 F.3d 1133 (9th Cir. 2017) ................................................. 16, 19, 23

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
 563 F.3d 466 (D.C. Cir. 2009) ..................................................... 3, 4, 6, 7

*Ctr. for Sustainable Economy v. Jewell,*
 779 F.3d 588 (D.C. Cir. 2015) ................................................................ 5

*Dames & Moore v. Regan,*
 453 U.S. 654 (1981) ........................................................................ 11, 24

*EEOC v. Peabody Western Coal Co.,*
 773 F.3d 977 (9th Cir. 2014) ................................................................ 21

*Erdelyi v. O'Brien,*
 680 F.2d 61 (9th Cir. 1982) .................................................................. 13

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
 561 U.S. 477 (2010) .............................................................................. 15

*Haig v. Agee,*
 453 U.S. 280 (1981) .............................................................................. 19

*Illinois Central RR Co. v. United States,*
 1858 WL 4672 (Ct. Cl. Feb. 1, 1858) ................................................... 14

*In re DBSI, Inc.,*
 869 F.3d 1004 (9th Cir. 2017) .............................................................. 16

ii

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG Document 57 Filed 08/02/18 Page 3 of 32

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ........................................................................................................ 16

*Marbury v. Madison*,
    1 Cranch 137 (1803) ...................................................................................................... 21

*McCulluch v. Maryland*,
    4 Wheat. 316 (1819) ...................................................................................................... 21

*Myers v. United States*,
    272 U.S. 52 (1926) ......................................................................................................... 15

*N. Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980) ........................................................................................ 6

*New Process Steel, L.P. v. NLRB*,
    560 U.S. 674 (2010) ....................................................................................................... 19

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ................................................................................................... 21

*Northern Border Pipeline Co. v. Jackson County*,
    512 F. Supp. 1261 (D. Minn. 1981) ............................................................................... 14

*Presidio Hist. Ass'n v. Presidio Trust*,
    811 F.3d 1154 (9th Cir. 2016) ....................................................................................... 16

*Quinn v. California Shipbuilding Corp.*,
    76 F. Supp. 742 (S.D. Cal. 1947) .................................................................................. 14

*S. Utah Wilderness All. v. BLM*,
    425 F.3d 735 (10th Cir. 2005). ................................................................................. 13, 23

*Saxbe v. Bustos*,
    419 U.S. 65 (1974) ......................................................................................................... 19

*Sec'y of the Interior v. California*,
    464 U.S. 312 (1984) ..................................................................................................... 4, 6

*Shurtleff v. United States*,
    189 U.S. 311 (1903) ....................................................................................................... 15

*State v. McBride*,
    29 Wash. 335 (Wash. 1902) ..................................................................................... 14, 15

*United States v. Amirnazmi*,
    645 F.3d 564 (3rd Cir. 2011) ......................................................................................... 19

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ........................................................................................... 19, 20, 21

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ................................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................. 11, 23, 24, 25

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State,*
   725 F.3d 197 (D.C. Cir. 2013) ................................................................... 23

## **Statutes**

28 U.S.C. § 2071(a) ........................................................................................... 14

33 U.S.C. § 1233 ................................................................................................ 14

43 U.S.C. § 1331(a) ............................................................................................. 3

43 U.S.C. § 1331(b) ............................................................................................. 4

43 U.S.C. § 1332(1) ........................................................................................... 18

43 U.S.C. § 1332(3) ....................................................................................... 3, 17

43 U.S.C. § 1337(a)(1) ........................................................................................ 5

43 U.S.C. § 1340(c) ............................................................................................. 6

43 U.S.C. § 1341(a) ..................................................................................... *passim*

43 U.S.C. § 1344(a) ......................................................................................... 4, 5

43 U.S.C. § 1344(d)(3) ........................................................................................ 5

43 U.S.C. § 1346(d) ............................................................................................. 6

43 U.S.C. § 1349(c)(1) ....................................................................................... 22

43 U.S.C. § 1351 ................................................................................................. 7

43 U.S.C. § 1802(1) ....................................................................................... 3, 17

Pub. L. No. 105-83, 111 Stat. 1543 (Nov. 14, 1997) ......................................... 9

Pub. L. No. 109-54, 119 Stat. 499 (Aug. 2, 2005) ............................................. 9

## **Other Authorities**

H.R. Rep. No. 83-215 (1953) ............................................................................ 17

H.R. Rep. No. 83-413 (1953) ............................................................................ 17

H.R. Rep. No. 95-590 (1977) .............................................................................. 3

*Hearings Before the S. Comm. on Energy & Nat. Res.*, 95th Cong. (1977) ................ 18

S. Rep. No. 83-411 (1953) ................................................................................ 17

U.S. Const., art. II § 2 ....................................................................................... 24

U.S. Const., art. I § 1 ......................................................................................... 21

U.S. Const., art. III § 1 ...................................................................................... 14

U.S. Const., art. IV § 3 ...................................................................................... 21

## **Regulations**

30 C.F.R. § 250.410 ............................................................................................. 7

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

30 C.F.R. § 550.202(e)...................................................................................................6

30 C.F.R. § 550.208.......................................................................................................6

30 C.F.R. § 550.209.......................................................................................................6

30 C.F.R. § 551.2...........................................................................................................6

30 C.F.R. § 551.5...........................................................................................................6

30 C.F.R. § 551.6...........................................................................................................6

v

Combined Mem. in Support of Cross-Motion for Summ. J.

*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG     Document 57     Filed 08/02/18     Page 6 of 32

## INTRODUCTION

This lawsuit challenges Executive Order 13795, entitled "Implementing an America-First Offshore Energy Strategy," signed by Defendant President Trump on April 28, 2017 to be implemented, in part, by Defendants Secretary of the Interior and Secretary of Commerce. Among other things, Section 5 of the Executive Order revised orders issued by President Obama on December 20, 2016 and January 27, 2015 withdrawing certain areas of the Outer Continental Shelf ("OCS") in the Arctic Ocean and the Atlantic Ocean from potential disposition for oil and gas leasing pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1341(a) ("Section 1341(a)"). Section 5 re-opens certain sections of the Arctic and Atlantic OCS for future potential disposition for oil and gas leasing.

Plaintiffs contend that Section 5 of the Executive Order "exceeds [the President's] constitutional authority and his statutory authority under OCSLA" Section 1341(a), Complaint (Dkt. No. 1), ¶ 1, because, in their view, "Congress has granted the President power to withdraw lands from industrial development, but . . . it has not granted the power to reverse such withdrawals," Pls.' Mem. In Support of Summ. J. (Dkt. No. 51) ("Pls.' Mem.") at 1; *see also id.* at 23. Plaintiffs ask the Court to, *inter alia*, "[e]njoin Defendants from complying with or relying in any way on Section 5" of the Executive Order, and "[i]ssue a writ of mandamus compelling [the Secretaries of Interior and Commerce] to comply with the January 27, 2015, and December 20, 2016, withdrawals of portions of the Arctic and Atlantic Oceans from oil and gas leasing." Compl., Relief Requested, ¶¶ 3–4.

On July 18, 2018, the Federal Defendants filed a cross-motion for summary judgment. *See* Fed. Defs.' Mot. for Summ. J. (Dkt. No. 55). As explained in the Federal Defendants' supporting memorandum, Plaintiffs do not state a cognizable claim, *see* Fed. Defs.' Mem. In

1

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 7 of 32

Support of Summ. J. (Dkt. No. 56) ("Fed. Defs.' Mem.") at 19–22 (demonstrating that plaintiffs lack a private right of action and applicable waiver of the Federal Defendants' sovereign immunity), and Plaintiffs' claims are not justiciable, *see id.* at 13–19 (demonstrating that Plaintiffs lack standing, and that their claims are not ripe). The Federal Defendants have further demonstrated that Plaintiffs' claims fail on the merits because the language, history, purpose, and past conduct under OCSLA support the President's authority—exercised in Executive Order 13795—to modify or reverse a prior withdrawal of OCS lands from disposition for leasing under Section 1341(a). *See id.* at 22–35.

The American Petroleum Institute ("API") hereby adopts and incorporates the Federal Defendants' arguments by reference, and focuses in this motion on additional arguments and authority on the merits of Plaintiffs' claim that Section 1341(a) does not authorize the President to reverse or modify an OCS withdrawal. As detailed below, Section 1341(a) delegates broad authority to the President over OCS land withdrawals through long-settled discretionary language. The power to modify or reverse a prior withdrawal is incident to that delegated discretion. Moreover, OCSLA's foundational purpose to expedite OCS oil and gas development, the statute's legislative history and structure, the President's and Congress's course of conduct under Section 1341(a), and the President's independent executive powers under Section 2 of the Constitution converge to further confirm that authority. Because Plaintiffs' stilted interpretation of Section 1341(a) cannot square with these well-established guideposts of statutory interpretation and executive authority, API moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, dismissing all of Plaintiffs' claims.

2

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 8 of 32

# BACKGROUND

## A. OCSLA Mandates Expeditious Exploration And Development Of The Nation's Critical OCS Oil And Gas Resources.

The OCS is the area of submerged lands that lie seaward of a state's jurisdiction and that are subject to the "jurisdiction and control" of the United States. *See* 43 U.S.C. § 1331(a); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). OCSLA mandates and governs the development of offshore oil and gas resources on the OCS. *See* 43 U.S.C. § 1331, *et seq.* Congress enacted OCSLA to promote and ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* § 1802(1); *see also id.* § 1332(3) (the OCS "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs").

Congress so mandated when it substantially amended OCSLA in 1978 for the stated purpose of "promot[ing] the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf."[1]  As the D.C. Circuit observed soon thereafter, "the Act has an objective—the expeditious development of OCS resources." *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981). "The first stated purpose of the Act, then, is to establish procedures to expedite exploration and development of the OCS." *Id.* Indeed, "[t]he [Act's] remaining purposes primarily concern measures to eliminate or minimize

---

[1] H.R. Rep. No. 95-590, at 8 (1977), *reprinted in* 1978 U.S.C.C.A.N 1450, 1460.

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

the risks attendant to that exploration and development. Several of the purposes, in fact, candidly recognize that some degree of adverse impact is inevitable." *Id*.

## B. Congress Designed A Four-Stage Government Review Process For OCS Exploration And Development.

To facilitate OCSLA's developmental purpose and "forestall premature litigation regarding adverse environmental effects that . . . will flow, if at all, only from the latter stages of OCS exploration and production," *Sec'y of the Interior v. California*, 464 U.S. 312, 341 (1984), Congress created "four distinct statutory stages to developing an offshore oil [or gas] well: (1) formulation of a five year leasing plan . . .; (2) lease sales; (3) exploration by the lessees; (4) development and production," *id*. at 337; *see also Ctr. for Biological Diversity*, 563 F.3d at 472–73. Congress delegated principal responsibility over this extensive and complex development program to the Secretary of the Interior ("Secretary"), *see* 43 U.S.C. § 1331(b), much of whose authority is delegated to the Bureau of Ocean Energy Management ("BOEM").

### 1. The Five-Year Leasing Program.

The five-year leasing program is the first step in the process, in which the Department of the Interior prepares "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). "[P]rospective lease purchasers acquire no rights to explore, produce, or develop at this first stage . . . ." *Sec'y of the Interior*, 464 U.S. at 338.

In deciding upon the five-year leasing program, OCSLA directs the Secretary to "consider[] [the] economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." 43 U.S.C.

4

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 10 of 32

§ 1344(a)(1). The Secretary must also base the "[t]iming and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions" of the OCS on a consideration of eight defined factors concerning, among other things, environmental risks, the needs of energy markets, other uses of the OCS regions, and the interest of oil and gas producers in developing a region. *See* 43 U.S.C. § 1344(a)(2). Finally, the Secretary must assure that the Government receive "fair market value" for any leasing, and "select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a)(3)–(4).

In short, "[t]he key national decisions as to the size, timing, and location of OCS leasing . . . are made at this first stage." *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015). Indeed, "no lease shall be issued unless it is for an area included in the approved leasing program . . . ." 43 U.S.C. § 1344(d)(3). The five-year leasing program is also the basis of "long-term plans" for oil and gas leasing and development for "[f]ederal, state, and local governments, and the companies that participate in national and international energy markets." *Ctr. for Sustainable Economy*, 779 F.3d at 595.

### 2. The Lease Sale.

The second stage in the OCS process is the conduct of the lease sales provided for in the previously-adopted five-year program. 43 U.S.C. § 1337(a)(1). "A lessee does not, however, acquire an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorization." *Sec'y of the Interior*, 464

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 11 of 32

U.S. at 317. *N. Slope Borough v. Andrus*, 642 F.2d 589, 593 (D.C. Cir. 1980) (noting that "no drilling—not even of an exploratory nature" is permitted with the purchase of a lease).

While some preliminary activities, such as seismic surveys, may be conducted off-lease and prior to a lease sale, *see* 30 C.F.R. § 551.2, whether conducted on a lease or off-lease, these preliminary activities must first be approved by BOEM, *see* 30 C.F.R. § 551.5 (off-lease); 30 C.F.R. § 550.208 (on-lease), and are subject to continuing BOEM control through regulations, lease stipulations, and mitigation measures, *see*, *e.g.*, 30 C.F.R. § 550.208(a) (requiring lessees to provide notice of activities); 30 C.F.R. §§ 550.209, 550.202(e) (explaining that notice must show that activity "[d]oes not cause undue or serious harm or damage to the human, marine, or coastal environment"); 30 C.F.R. § 551.6 (prohibiting approved activities from, *inter alia*, "caus[ing] harm or damage to life" of "caus[ing] pollution").

### 3. The Exploration Stage.

The third stage of the OCS process is exploratory drilling, which must be carried out pursuant to an exploration plan submitted by the lessee. 43 U.S.C. § 1340(c). "Interior reviews and determines whether to approve the lessees' . . . exploration plans." *Ctr. for Biological Diversity*, 563 F.3d at 473. In making this decision, the Secretary "shall disapprove such plan if he determines that (A) any proposed activity under such plan would result in any condition described in section 1334(a)(2)(A)(i) of this title [serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment], and (B) such proposed activity cannot be modified to avoid such condition." 43 U.S.C. § 1340(c)(1). In making exploration plan approval decisions, the Secretary must "consider available relevant environmental information . . . ." 43 U.S.C. § 1346(d).

6

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 12 of 32

### 4.   Development And Production.

The fourth and final phase of the OCS process is development and production, which is reached only if the company's exploratory efforts discover commercially recoverable quantities of hydrocarbons.   At the development and production stage, the Department of Interior, along with affected state and local governments, reviews an additional and more detailed plan from the lessee, *see* 43 U.S.C. § 1351, for (in typical cases) construction of a production platform, installation of processing equipment, and the laying of pipelines, all of which may remain in place for decades.   *See* 43 U.S.C. § 1351(c).   "If Interior finds that the plan would 'probably cause harm or damage . . . to the marine, coastal or human environments,' then the plan, and consequently the leasing program, may be terminated."   *Ctr. for Biological Diversity*, 563 F.3d at 473 (quoting 43 U.S.C. § 1351(h)(1)(D)(i)).[2]

### C.   Presidential Withdrawals Of OCS Lands From Consideration For Leasing.

The President also plays a role in the complex OCSLA development process.   Among other things, "[t]he President of the United States may, from time to time withdraw from disposition any of the unleased lands of the outer Continental Shelf."   43 U.S.C. § 1341(a).   Presidents have exercised this authority sparingly.   *See* Fed. Defs.' Mem. at 8–10.   In more recent decades, Presidents have invoked this authority with increasing frequency temporarily to withdraw, or to modify prior withdrawals, of unleased OCS lands.

Starting with President George H. W. Bush, on June 26, 1990 he "announce[ed] my support for a moratorium on oil and gas leasing and development in Sale Area 116, Part II, off the coast of Florida; Sale Area 91, off the coast of northern California; Sale Area 119, off the

---

[2] A lessee operating under an approved exploration or development plan must also obtain a permit prior to drilling a well pursuant to the plan.  *See* 30 C.F.R. § 250.410.

7

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

coast of central California; and the vast majority of Sale Area 95, off the coast of southern California, ***until after the year 2000***." Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt. No. 13), Exh. 8 at 1006 (emphasis added).[3]

On August 4, 1992, in a memorandum to the Secretary of the Interior, President George H. W. Bush confirmed the Secretary's statement "[i]n the documentation of your decision on the 5-year outer Continental Shelf Oil and Gas Program for 1992-1997" "that my statement on June 26, 1990, concerning putting certain areas off limits to leasing ***until after the year 2000***, was made under the authority of" Section 1341(a). Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt. No. 13), Exh. 9 (emphasis added). He then "further withdr[e]w the remaining 87 tracts in the Southern California Planning Area pending the completion of additional studies in response to the report of the National Academy of Sciences pursuant to the guiding principles I announced June 26, 1990, which satisfactorily address concerns relating to these tracts." *Id.* This action confirmed President Bush's time-limited June 26, 1990 withdrawal, and extended it to include additional California tracts.

Exercising his authority under Section 1341(a), on June 12, 1998 President Clinton withdrew "from disposition by leasing ***through June 30, 2012***, those areas of the [OCS] currently under moratoria pursuant to sections 108–111 of Public Law 105–83," and "for a time period without specific expiration those areas of the Outer Continental Shelf currently designated Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq*." Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt.

---

[3] Even after these withdrawals expired, the temporarily withdrawn areas were never included in a five-year leasing program and were therefore never leased. *See* BOEM, *Past Five Year Programs*, https://www.boem.gov/Past-Five-Year-Programs/ (last visited Aug. 1, 2018). Indeed, no leasing has occurred offshore California since the 1980s.

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

No. 13), Exh. 10 (emphasis added). The referenced statute had set moratoria in place "in the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude," and also in the North Aleutian Basin, the Eastern Gulf of Mexico (aside from one defined lease sale area), and the Mid-Atlantic and South Atlantic planning areas. Pub. L. No. 105-83, §§ 108–111, 111 Stat. 1543, 1561 (Nov. 14, 1997).

On January 9, 2007, President George W. Bush expressly invoked his delegated authority under Section 1341(a) to "***modify*** the first sentence of [President Clinton's] withdrawal of June 12, 1998 . . . [to] withdraw from disposition by leasing ***through June 30, 2012***, (1) those areas under moratoria pursuant to sections 104 and 106 of Public Law 109–54, and (2) those areas under moratoria pursuant to section 105 of Public Law 109–54, excluding that portion of the Central Gulf of Mexico planning area defined as the '181 South Area' in section 102(2) of . . . Public Law 109–432 . . . ." Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt. No. 13), Exh. 11 (emphases added). The referenced statutory provisions had set moratoria in (1) the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude; (2) the Eastern Gulf of Mexico (aside from one defined lease sale area), and (3) the Mid-Atlantic and South Atlantic planning areas. *See* Pub. L. No. 109-54, §§ 104–106, 119 Stat. 499, 521 (Aug. 2, 2005). President Bush's action had the practical effect of opening the North Aleutian Basin for leasing, and that area was in fact covered by proposed leasing in the subsequent five-year leasing program for 2007-2012. *See Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 21, 35 (April 2007), https://www.boem.gov/Oil-and-Gas-Energy-

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 15 of 32

Program/Leasing/Five-Year-Program/MMSProposedFinalProgram2007-2012-pdf.aspx (last visited Aug. 1, 2018).[4]

On July 14, 2008, President George W. Bush again used his authority under Section 1341(a) to "*modify* the prior memoranda of withdrawals from disposition by leasing of the United States [OCS] issued on August 4, 1992, and June 12, 1998, as modified on January 9, 2007, to . . . withdraw from disposition by leasing, for a time period without specific expiration, [only] those areas of the [OCS] designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 et seq." Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt. No. 13), Exh. 12. This action immediately opened all previously withdrawn OCS lands except for existing Marine Sanctuaries. Among other things, an area of the Mid-Atlantic was thereafter included in the updated five-year leasing program for 2007-2012. *See Revised Program: Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 85 (Dec. 2010), https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Five-Year-Program/RP-pdf.aspx (describing "one special interest sale (in 2011), but with a 50-mile buffer and a no-obstruction zone from the mouth of the Chesapeake Bay off the coastline of Virginia") (last visited Aug. 1, 2018).[5]

---

[4] In March 2010, the North Aleutian Basin was withdrawn from disposition for leasing through 2017, and the planned lease sale was canceled. *See* BOEM, *North Aleutian Basin Lease Sale 214*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Alaska-Region/Alaska-Lease-Sales/Sale-214/Index.aspx (last visited Aug. 1, 2018).

[5] In May 2010, the planned Mid-Atlantic lease sale was canceled. *See* BOEM, *Virginia Lease Sale 220 Information*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Gulf-of-Mexico-Region/Lease-Sales/220/Virginia-Lease-Sale-220-Information.aspx (last visited Aug. 1, 2018).

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

On December 20, 2016 and January 27, 2015, President Obama used his authority under Section 1341(a) to "withdraw from disposition by leasing for a time period without specific expiration" the majority of the Chukchi and Beaufort Sea OCS Planning Areas in Northern Alaska, and "the areas of the [OCS] . . . associated with 26 major canyons and canyon complexes offshore the Atlantic coast." Pls.' Mem., Exhs. 2, 3, 4. President Obama explained that these withdrawals were, *inter alia*, "[c]onsistent with principles of responsible public stewardship" and consideration of the withdrawn areas' importance "for marine mammals, other wildlife, and wildlife habitat, and to ensure that the unique resources of these areas remain available for future generations." *Id.*, Exhs. 2, 4.

On April 28, 2017, President Trump issued Executive Order 13795 to "strengthen[] the Nation's security and reduce[] reliance on imported energy." Pls.' Mem., Exh. 1, § 1. Among other things, the Order "modified" President Obama's withdrawal decisions by limiting the withdrawals to "those areas of the Outer Continental Shelf designated as of July 14, 2008, as Marine Sanctuaries . . . ." *Id.*, § 5. This modification re-opened the Chukchi and Beaufort Sea OCS Planning Areas in Northern Alaska and areas of the Atlantic OCS to consideration for mineral leasing. Executive Order 13795 then directed the Secretary to "consider[] . . . revising" the existing five-year leasing program to include lease sales in these areas. *Id.*, § 3.

## ARGUMENT

The President's power to take a given action "must stem either from an act of Congress or from the Constitution itself." *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Executive Order 13795 revised the orders issued by President Obama withdrawing areas of the Alaska and Atlantic OCS from disposition for oil and gas leasing. *See* Pls' Mem., Exh. 1, § 5; Exhs. 2, 3, 4. Plaintiffs

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 17 of 32

contend that Section 1341(a) "authorizes the President to withdraw unleased lands," but "[i]t does not authorize the President to re-open withdrawn areas to disposition." Compl. (Dkt. No. 1), ¶ 58. *See also id.*, ¶ 64; Pls.' Mem. at 23 ("It authorizes the President to exercise one aspect of Congress's Property Clause powers—the power to protect resources and areas from extractive activity offshore."). For this reason, in their view, the Executive Order exceeds the President's statutory authority under Section 1341(a) and is therefore *ultra vires*. *See* Compl., ¶¶ 58–60, 64–65. *See also* Pls.' Mem. at 23–32.

Plaintiffs' claims hinge upon their narrow reading of the statutory language to permit the President only to withdraw unleased lands, and not subsequently to revise the withdrawal, even though such revisions long predate Executive Order 13795. In other words, Plaintiffs' suit turns on a question of statutory interpretation—the scope of the delegation conferred by Section 1341(a). Plaintiffs' arguments that the President lacks constitutional authority to modify a leasing withdrawal and that President Obama permanently withdrew the OCS lands at issue, *see* Pls.' Mem. at 18–23, are little more than question-begging. Those arguments are a mirror of Plaintiffs' statutory claims—only if the scope of the Section 1341(a) delegation fails to cover Executive Order 13795 could it be *ultra vires* and a violation of the federal separation of powers.

Plaintiffs' stilted reading of Section 1341(a) cannot square with the application of well-settled principles of statutory construction to OCSLA's broad delegation of authority to expand and expedite OCS development, buttressed by the extensive executive power over national security and foreign affairs granted to the President by Article II of the Constitution.

## I.     SECTION 1341(a) AUTHORIZES PRESIDENTIAL MODIFICATION OF OCS WITHDRAWAL DECISIONS.

Plaintiffs contend that Section 1341(a) "does one, and only one, thing," it authorizes the President to withdraw OCS lands from disposition for mineral leasing, but "does not authorize

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

the revers[al]" or modification of a prior withdrawal.  Pls.' Mem. at 23.  OCSLA's language,

purpose, and history are to the contrary, and support Executive Order 13795.

A.    **Section 1341(a)'s Broad Discretionary Language Authorizes The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.**

OCSLA provides that the President "***may, from time to time***, withdraw from disposition

any of the unleased lands of the [OCS]," 43 U.S.C. 1341(a) (emphasis added), thereby delegating

broad discretionary authority to the President.  *See, e.g.*, *Erdelyi v. O'Brien*, 680 F.2d 61, 62–63

(9th Cir. 1982) (holding that state statute providing that law enforcement "may" issue a license to

carry a concealed firearm "gives the issuing authority broad discretion"); *cf. Ayala-Caballero v.*

*Coleman*, 58 F. App'x 669, 672 (9th Cir. 2002) ("The statutory language of [Immigration and

Naturalization Act] § 244 ('the Attorney General may, in his discretion, suspend deportation

. . .') makes clear that grants of suspension of deportation are wholly within the discretion of the

Attorney General, even if the statutory requisites [for a suspension] are met.").

And this broad, discretionary language is directed to a "withdraw[al]" of OCS lands.  43

U.S.C. § 1341(a).  Under public land law, "a withdrawal . . . temporarily suspends" land

dispositions, "preserving the status quo while Congress or the executive decides on the ultimate

disposition of the subject lands."  *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 785 (10th Cir.

2005).  *See id*. ("A reservation, on the other hand, goes a step further: it not only withdraws the

land from the operation of the public land laws, but also dedicates the land to a particular public

use.").  *See also Barber v. Gonzales*, 347 U.S. 637, 641 (1954) ("[S]ome [statutory] terms

acquire a special technical meaning by a process of judicial construction.").  In short, Section

1341(a)'s terms authorize the President to take discretionary action on a temporary basis.

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 19 of 32

Moreover, Section 1341(a)'s discretionary formulation—authorizing action that "may" be taken "from time to time"— carries with it a power to revise action previously taken under the delegated authority. For example: (1) 28 U.S.C. § 2071(a) provides that the Supreme Court and the lower federal courts "may from time to time prescribe rules for the conduct of their business," (2) the Constitution provides that Congress "may from time to time ordain and establish" lower federal courts, U.S. Const., art. III § 1, and (3) a number of statutes authorize federal agencies to promulgate regulations "from time to time," *see*, *e.g.*, *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1234 n.6 (9th Cir. 1990) (quoting 33 U.S.C. § 1233)). It is beyond cavil that such formulations permit the courts, Congress, and federal agencies to revise or modify rules, courts, or regulations once initially established. *See*, *e.g.*, *Quinn v. California Shipbuilding Corp.*, 76 F. Supp. 742, 743 (S.D. Cal. 1947) (explaining that the power to revoke a court's jurisdiction is inherently included in the power to grant it); *Northern Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261 (D. Minn. 1981) (holding that state legislature's "power to grant [zoning] authority [to a local government] includes the power to withdraw it").

Although rarely litigated, courts have long read such discretionary language authorizing delegated action necessarily to include the corresponding authority to modify or reverse a previous exercise of that delegated discretion. *See Illinois Central RR Co. v. United States*, 1858 WL 4672 (Ct. Cl. Feb. 1, 1858) (finding that statutes affording President the discretion to establish military fortifications "from time to time" "by implication, confer on him the power also, when the place designated and reserved becomes no longer necessary . . ., to direct its abandonment"). Indeed, the phrase "from time to time" typically means "occasionally" or "[a]s occasion demands or requires . . . ." *State v. McBride*, 29 Wash. 335, 342 (Wash. 1902). Thus, a modification or reversal of previously exercised discretion "may be had . . . when necessity or

14

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 20 of 32

occasion requires, of which necessity or occasion the" decisionmaker given discretion "is the exclusive judge." *Id*. (holding that state constitutional provision permitting the legislature to increase the number of state supreme court judges "from time to time" carried the corresponding authority to reduce the number of judges).

In a related context, the Supreme Court has long recognized "as a rule of constitutional and statutory construction" that the power to reverse a discretionary decision is "incident to the power" to make that discretionary decision in the first instance. *Myers v. United States*, 272 U.S. 52, 119 (1926) (describing as James Madison's and the First Congress's view that "the express recognition of the power of appointment in the second section [of Article II of the Constitution] enforced this view on the well-approved principle of constitutional and statutory construction that the power of removal of executive officers was incident to the power of appointment"). *See also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010) ("Under the traditional default rule, removal is incident to the power of appointment.").

Here, Section 1341(a) broadly delegates to the President discretion to withdraw OCS lands from disposition for leasing "from time to time" or, in other words, as occasion demands. Having determined—consistent with OCSLA's foundational purpose, *see supra* pp. 3–4—that the occasion now requires modification of prior withdrawals to "strengthen[] the Nation's security and reduce[] reliance on imported energy," Pls.' Mem., Exh. 1, § 1, the President's modification of prior withdrawal decisions is properly incident to the broad discretionary authority delegated by Section 1341(a). Had Congress intended to cabin the discretion inherent in the formulation of Section 1341(a) as Plaintiffs suggest, it needed to do so clearly. *See Shurtleff v. United States*, 189 U.S. 311, 316, 318 (1903) ("We think it quite inadmissible . . . to attribute an intention on the part of Congress to make such an extraordinary change in the usual

15

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 21 of 32

occasion requires, of which necessity or occasion the" decisionmaker given discretion "is the exclusive judge." *Id*. (holding that state constitutional provision permitting the legislature to increase the number of state supreme court judges "from time to time" carried the corresponding authority to reduce the number of judges).

In a related context, the Supreme Court has long recognized "as a rule of constitutional and statutory construction" that the power to reverse a discretionary decision is "incident to the power" to make that discretionary decision in the first instance. *Myers v. United States*, 272 U.S. 52, 119 (1926) (describing as James Madison's and the First Congress's view that "the express recognition of the power of appointment in the second section [of Article II of the Constitution] enforced this view on the well-approved principle of constitutional and statutory construction that the power of removal of executive officers was incident to the power of appointment"). *See also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010) ("Under the traditional default rule, removal is incident to the power of appointment.").

Here, Section 1341(a) broadly delegates to the President discretion to withdraw OCS lands from disposition for leasing "from time to time" or, in other words, as occasion demands. Having determined—consistent with OCSLA's foundational purpose, *see supra* pp. 3–4—that the occasion now requires modification of prior withdrawals to "strengthen[] the Nation's security and reduce[] reliance on imported energy," Pls.' Mem., Exh. 1, § 1, the President's modification of prior withdrawal decisions is properly incident to the broad discretionary authority delegated by Section 1341(a). Had Congress intended to cabin the discretion inherent in the formulation of Section 1341(a) as Plaintiffs suggest, it needed to do so clearly. *See Shurtleff v. United States*, 189 U.S. 311, 316, 318 (1903) ("We think it quite inadmissible . . . to attribute an intention on the part of Congress to make such an extraordinary change in the usual

15

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

rule . . . without stating such intention in plain an explicit language, instead leaving it to be implied from doubtful inferences.").

### B. OCSLA's Developmental Purpose Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.

In addition to Section 1341(a)'s discretionary language, a reviewing court "must look not only to the 'particular statutory language at issue' but also to 'the language and design of the statute as a whole.'" *In re DBSI, Inc.*, 869 F.3d 1004, 1010 (9th Cir. 2017) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). In short, "[s]tatutory construction is a holistic endeavor, that relies on context to be a preliminary determinant of meaning," *id.* (internal quotations and citation omitted), including "the 'structure, history, and purpose' of the statute,'" *Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, 1138 (9th Cir. 2017) (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)). *See also*, *e.g.*, *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1167 (9th Cir. 2016) (favoring reading of statutory term that "ties the statutory requirements together in a manner consistent with the statute's language and purpose"); *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015) ("After all, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which the language is used, and the broader context of the statute as a whole." (quoting *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) (alterations omitted)).

Through OCSLA, Congress delegated extensive authority over the nation's offshore resources in a carefully designed statutory scheme. *See supra* pp. 4–7. The overriding purpose of OCSLA's delegations is to ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce

16

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG   Document 57   Filed 08/02/18   Page 22 of 32

dependence on foreign sources, and maintain a favorable balance of payments in world trade."

43 U.S.C. § 1802(1). *See also*, *e.g.*, *supra* pp. 3–4; Defs.' Mem. In Supp. of Motion to Dismiss

(Dkt. No. 13), Exh. 3 ("The principal purpose of [OCSLA] is to authorize the leasing by the

Federal Government of . . . the shelf." (H.R. Rep. No. 83-413 (1953)); 43 U.S.C. § 1332(3)

(finding that the OCS "should be made available for expeditious and orderly development").

That purpose is directly contrary to Plaintiffs' assertion that Section 1341(a) provides the

President only the power to withdraw—without the possibility of future revision or re-opening—

unleased lands "to protect resources and areas" from the exploration and development that

Congress mandated. *Compare* Pls.' Mem. at 23 *with Watt*, 668 F.2d at 1316 (explaining that

"[t]he first stated purpose of the Act . . . is to establish procedures to expedite exploration and

development of the OCS" and its remaining purposes "candidly recognize that some degree of

adverse [environmental] impact is inevitable").

Section 1341(a)'s legislative history further demonstrates that withdrawal is a

discretionary, limited exception to OCSLA's foundational purpose to expedite and expand OCS

oil and gas development. Indeed, the final, enacted version of Section 1341(a) reflects both

Congress's understanding that a withdrawal from OCS development would be temporary, and its

desire to expand rather than restrict presidential authority. As originally proposed, the provision

would have only allowed the President to withdraw land "in time of war or when necessary for

national defense." H.R. Rep. No. 83-215, at 10 (1953), *reprinted in* 1953 U.S.C.C.A.N 1385,

1393. But the final version expanded presidential power over the scope of withdrawals by

removing the limitation of presidential authority to national security situations. *See* S. Rep. No.

83-411, at 22, 26 (1953). Whether for national defense, as originally written, or any

discretionary choice of the President, as passed, the legislative history reflects an understanding

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 23 of 32

that a withdrawal is a temporary exception to the OCS purpose.  *See*, *e.g.*, *id.* at 22 (offering an amendment governing withdrawn land "so long as [the withdrawal] remains in effect"); *Hearings Before the S. Comm. on Energy & Nat. Res.*, 95th Cong. 519–20 (1977) (statements of Sen. McClure, Member, S. Comm. on Energy & Natural Resources and Robert LaResche, Alaska Comm'r of Natural Resources) (discussing similar Alaska state withdrawal provision under which Alaska legislature had withdrawn land because developing the land would have posed risks that "we did not want to take right now," but that "[m]aybe in 20 or 30 years we would feel that risk worth taking because of enhanced value of the resources or improved technology.").

Plaintiffs largely ignore Congress's broad delegation of authority over public lands to the executive in OCSLA, and the clear purpose of that delegation.  Instead, Plaintiffs relegate this enormous structure to merely "extend[ing] federal 'jurisdiction, control, and power of disposition,'" Pls.' Mem. at 29 (quoting 43 U.S.C. § 1332(1)), with no mention of the congressional purpose behind this extension.  Plaintiffs' misunderstanding of OCSLA's structure is also evident in their argument that Section 1341(a) only authorizes withdrawal of OCS lands because reading it to permit opening lands to leasing would be redundant of OCSLA's separate provisions covering leasing.  *See* Pls.' Mem. at 30.  Plaintiffs ignore, *inter alia*, the long-established understanding of the similar onshore withdrawal provision to authorize the executive to make temporary—rather than permanent—withdrawals, and the coexistence of this power to effect temporary withdrawals with the onshore leasing authority, *see* Fed. Defs.' Mem. at 28.  At any rate, Plaintiffs' suggestion that reading Section 1341(a) to permit the President to reverse or modify a withdrawal would be "redundant" of the authority to issue leases, *see* Pls.' Mem. at 30, mischaracterizes the two actions.  The former simply allows previously withdrawn lands to be

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 24 of 32

considered for disposition by leasing; it does not authorize or order any lease to be issued, which—after the 1978 OCSLA amendments—occurs at a later stage. *See supra* pp. 4–6. In short, modifying or reversing a withdrawal may or may not result in leases being issued on the previously withdrawn lands. In order for that to occur, both the five-year leasing program regime and its applicable legal standards and environmental reviews, and the lease sale regime and its applicable legal standards and environmental reviews, must be satisfied.

### C. Presidential And Congressional Practice Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.

It is also not enough, as Plaintiffs' contend, *see* Pls.' Mem. at 23, that the statutory language "does not in so many words confer" upon the President a power to revise or modify a withdrawal, *Haig v. Agee*, 453 U.S. 280, 290 (1981), because the "history . . . of the statute" informs its ultimate meaning, *see Chan Healthcare*, 844 F.3d at 1138 (quotation omitted). In particular, a reviewing court must give heed to a "consistent" usage of authority delegated to the Executive Branch. *Haig*, 453 U.S. at 291. *See also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 686 (2010) ("[O]ur reading of the court of appeals quorum provision was informed by the longstanding practice of allowing two judges from the initial panel to proceed to judgment in the case of a vacancy . . . ."); *Haig*, 453 U.S. at 300 (noting "that congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy"); *United States v. Amirnazmi*, 645 F.3d 564, 579 (3rd Cir. 2011). Indeed, "a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language." *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (citing *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915)).

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

The Supreme Court's foundational decision in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), is instructive. At the dawn of oil development in the United States, Congress made public lands "containing petroleum or other mineral oils . . . 'free and open to occupation, exploration, and purchase by citizens of the United States . . . .'" *Id*. at 466 (quoting Act of February 11, 1897). To stem an ever-accelerating transfer of public lands to private ownership under this law, however, the President temporarily withdrew from disposition all unleased public lands in California and Wyoming. *See id*. at 467. The Supreme Court rejected the challenging oil company's argument that "there is no dispensing power in the Executive, and that he could not suspend a statute or withdraw from entry or location any land which Congress had affirmatively declared should be free and open to acquisition by citizens." *Id*. at 468.

Instead, the Court noted the "long-continued practice" of numerous presidents "to make [withdrawal] orders like the one here involved," *id*. at 469, "when it appeared that the public interest would be served . . .," *id*. at 471. As with presidential exercise of the OCSLA withdrawal power, *see supra* pp. 7–10, "Congress did not repudiate the power claimed or the [property] orders made. On the contrary, it uniformly and repeatedly acquiesced in the practice . . . ." *Midwest Oil*, 236 U.S. at 471. As the Court explained,

> government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation.

*Id*. at 472–73. In short, the continuing practice "would raise [the] presumption that the [presidents' decisions] had been made in pursuance of [congressional] consent or of a recognized administrative power of the Executive in the management of public lands." *Id*. at 474. *See also*

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

*NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) ("[T]he longstanding 'practice of government' can inform our determination of what the law is." (quoting *McCulluch v. Maryland*, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803))); *EEOC v. Peabody Western Coal Co.*, 773 F.3d 977, 989 (9th Cir. 2014) (citing *Midwest Oil*, 236 U.S. at 474); *Alaska v. Kerry*, 972 F. Supp. 2d 1111, 1141 n.194 (D. Alaska 2013) (same). Accordingly, the Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute . . . ." *Noel Canning*, 134 S. Ct. at 2560.

For this case, the importance of past practice between Congress and the President "is particularly true in view of the fact that . . . the land laws are not of a legislative character in the highest sense" because the Property Clause is not included amongst the enumerated "legislative power[s]" of the United States in Article I of the Constitution, *Midwest Oil*, 236 U.S. at 474; *see also* U.S. Const., art. I § 1, but rather appears in Article IV and therefore "savor[s] somewhat of mere rules prescribed by an owner of property for its disposal," *Midwest Oil*, 236 U.S. at 474; *see also* U.S. Const., art. IV § 3. Where emergencies arise or conditions change, "there is nothing in the nature of the power exercised which prevents Congress from granting it by implication just as could be done by any other owner of property under similar conditions." *Midwest Oil*, 236 U.S. at 474. In other words, "[t]he power of the Executive, as agent in charge, . . . need not necessarily be expressed in writing," *id.*, but can be defined in practice.

Here, the practice under Section 1341(a) over at least the past three decades illustrates that withdrawals have rarely, if ever, been treated as permanent or inviolate. Presidents George H.W. Bush, Clinton, George W. Bush all expressly limited withdrawals of OCS lands until a specified date. *See supra* pp. 7–10. While President Obama followed this practice by issuing withdrawals "for a time period without specific expiration," Pls.' Mem., Exhs. 2, 3, 4, the lack of

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 27 of 32

a "specific" expiration confirms that the withdrawal is subject to expiration.[6]  Moreover, President George W. Bush twice invoked his Section 1341(a) authority to modify prior presidential withdrawal decisions and re-open OCS lands for potential disposition for mineral leasing.  *See supra* pp. 9–10.

Viewed as a whole, this history confirms that withdrawals are not a one-way, permanent street, but have often been either issued on a temporary or time-limited basis, or subsequently revised prior to the date set for expiration.  In each instance, Congress could have issued its own moratoria, or otherwise over-ridden the President's withdrawals pursuant to the Property Clause, if it disagreed with the President's exercise of authority under Section 1341(a).  It did not do so.  Rather, the presidential withdrawals often incorporated moratoria independently issued by Congress.  *See supra* pp. 8–10.  Past practice is therefore inconsistent with the notion that withdrawals are permanent and inviolate, *see* Pls.' Mem. at 22–32, and directly undermines Plaintiffs' characterization of Executive Order 13795 as unconstitutionally *ultra vires*.[7]

---

[6] Indeed, in his December 20, 2016 statement announcing and justifying the withdrawal—which Plaintiffs contend to be permanent—of unleased Arctic areas from disposition for leasing, President Obama indicated the changeable circumstances that may inform a withdrawal decision, noting, *inter alia*, that "at ***current*** oil prices" the Department of Interior concluded that "significant production in the arctic will not occur."  *See Statement by the President on Actions in the Arctic and Atlantic Oceans*, at 1 (Dec. 20, 2016) (emphasis added), https://obamawhitehouse.archives.gov/the-press-office/2016/12/20/statement-president-actions-arctic-and-atlantic-oceans (last visited Aug. 1, 2018).

[7] Past practice also confirms that the five-year leasing program stage is the appropriate time to challenge a modification of withdrawals under Section 1341(a).  *See* API Reply In Supp. of Motion to Dismiss (Dkt. No. 39) at 21 n.11.  While API does not now reassert its prior arguments for dismissal of this action in favor of the D.C. Circuit's exclusive jurisdiction under 43 U.S.C. § 1349(c)(1), *see* Order Denying Motions to Dismiss (Dkt. No. 45), at 24–29, API reserves the right to present those arguments again on appeal.

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

* * *

Taken together, the plain terms, "structure, history, and purpose" of OCSLA, *Chan Healthcare*, 844 F.3d at 1138, confirm Section 1341(a)'s broad delegation to the President of discretionary authority both to withdraw OCS lands from disposition for leasing, and modify withdrawals when the occasion so requires. Plaintiffs' opposite reading of Section 1341(a) to preclude any reversal or modification of a withdrawal decision is contrary to both the established tools of statutory construction and sound reasoning. "[I]t would make little sense for Congress," *S. Utah Wilderness All.*, 425 F.3d at 786, to establish the complicated OCSLA structure for the express purpose of expanding and expediting oil and gas development, *see supra* pp. 3–7, and then give the President authority single-handedly to negate the statutory purpose by permanently removing all unleased lands from such development.

## II.    THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795.

In his well-known concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "Justice Jackson set forth a tripartite framework for evaluating the President's powers to act depending on the level of congressional acquiescence." *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 204 (D.C. Cir. 2013). Under that framework,

> When the President acts pursuant to an ***express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action*** "***would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.***" When the President acts in the absence of congressional authorization he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." In such a case the analysis becomes more complicated, and the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on ***a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action, including*** "***congressional inertia, indifference or

23

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)
Case 3:17-cv-00101-SLG    Document 57    Filed 08/02/18    Page 29 of 32

*quiescence."* Finally, when the President acts in contravention of the will of Congress, "his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject."

*Dames & Moore*, 453 U.S. at 668–69 (quoting *Youngstown Sheet & Tube*, 343 U.S. at 635–38 (Jackson, J., concurring)) (emphases added). In other words, the President's power is at its apex where Congress's express or implied delegation of authority over a given action converges with the President's own constitutional authority covering the action. Executive Order 13795 rests on such an apex.

OCSLA's language and purpose either exhibit implied authorization for Executive Order 13795, *see supra* pp. 13–19, or past practice coupled with congressional "quiescence" support the Presidents' adoption of non-permanent withdrawals and modifications as circumstances dictate. *See supra* pp. 19–22. *See also Dames & Moore*, 453 U.S. at 668–69 ("[I]t is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition."). Alongside this congressional authorization, as Federal Defendants explained, "the management and disposition of the resources on the OCS also implicate the President's authority to provide for national security and conduct foreign affairs." Fed. Defs.' Mem. at 2 (citing U.S. Const., art. II § 2). *See also id.* at 2–4; *id.* at 11–12 ("OCSLA is a statute grounded not only in the Property Clause of the U.S. Constitution, but also the constitutional authority of the President to provide for national security and conduct foreign affairs.").

Because the President's statutory and constitutional power thus converge, Executive Order 13795 is "supported by the strongest of presumptions and the widest latitude of judicial interpretation" of the President's authority. *Youngstown Sheet & Tube*, 343 U.S. at 636–37

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

(Jackson, J., concurring). Plaintiffs have not met their "heav[y]" burden to prove otherwise. *Id.*

at 637 (Jackson, J., concurring).

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary

Judgment and grant API's Cross-Motion for Summary Judgment.

<div style="margin-left: 40%">

Respectfully submitted,

*/s/ James D. Linxwiler*
James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American Petroleum Institute*

</div>

August 2, 2018

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.,* No. 3:17-cv-00101 (SLG)

# CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2018, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon the following:

Erik Grafe
Earthjustice
441 W. 5th Ave., Suite 301
Anchorage, AK 99501
Tel: 907-792-7102
Fax: 907-277-1390
Email: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
Tel: 907-586-2751
Fax: 907-463-5891
Email: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
Tel: 360-534-9900
Email: nlawrence@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Tel: 212-727-2700
Fax: 415-795-4799
Email: nmarks@nrdc.org

*Counsel for Plaintiffs*

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20004
Tel: 202-514-0180
Fax: 202-514-0057
Email: sarah.himmelhoch@usdoj.gov

*Counsel for Federal Defendants*

*/s/  James D. Linxwiler*
James D. Linxwiler

1

Combined Mem. in Support of Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Case 3:17-cv-00101-SLG     Document 57     Filed 08/02/18     Page 32 of 32