JAHNA LINDEMUTH
ATTORNEY GENERAL
Bradley E. Meyen (AK Bar No. 8506067)
Jennifer E. Douglas (AK Bar No. 1605029)
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK  99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: brad.meyen@alaska.gov
          jennifer.douglas@alaska.gov

Attorneys for State of Alaska

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| LEGUE OF CONSERVATION VOTERS, *et al.*, <br><br>  Plaintiffs, <br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>  Defendants, | Case No. 3:17-cv-00101-SLG |

**INTERVENOR-DEFENDANT STATE OF ALASKA'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1
II. SECTION 12(A) OF THE OUTER CONTINENTAL SHELF LANDS ACT CLEARLY PERMITS A PRESIDENT TO MODIFY PRIOR WITHDRAWALS ............................................................................................................ 1
III. CONCLUSION ............................................................................................................... 6

# TABLE OF AUTHORITIES

**Cases**

*In re A Community Voice*, 878 F.3d 779 (9th Cir. 2017) ....................................................... 3

*Lacquer & Chem. Corp. v. Mills*, 22 F.2d 697 (E.D. N.Y. 1927) ......................................... 2

*Skinner & Eddy Corporation v. United States*, 249 U.S. 557 (1919) .................................. 2

*U.S. v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580 (1973) .......................................... 3

*V. Mueller & Co. v. U.S.*, 28 CCPA 249 (1940) ................................................................... 2

**Constitution and Statutes**

26 Stat. 1095 (1891) ............................................................................................................... 3

30 Stat. 34 (1897) ................................................................................................................... 4

16 U.S.C. § 473 ................................................................................................................... 3, 4

43 U.S.C. § 1341(a) .................................................................................................... 2, 3, 4, 5, 6

Pub. L. No. 83-212, § 8(a), 67 Stat. 462, 468 (1953). ............................................................ 5

Pub. L. No. 83-212, 67 Stat. at 464 ........................................................................................ 5

Pub. L. No. 94-579, § 704, 90 Stat. 2743 (1976) ................................................................... 4

Pub. L. No. 95-372, § 208, (Section 18), 92 Stat. 629 (1978) ............................................... 5

**Other Authorities**

25 Cong. Rec. 2435 (1893) ..................................................................................................... 4

30 Cong. Rec. 902 (1897) ....................................................................................................... 4

Executive Order No. 13795, 82 Fed. Reg. 20815, § 5, (Apr. 28, 2017) ........................... 1, 6

Williams & Meyers, *Manual of Oil & Gas Terms*, 212 (LexisNexis 12th ed. 2003). ......... 5

## I. INTRODUCTION

This case is about President Trump's authority to change President Obama's prior withdrawals of significant portions of the outer continental shelf ("OCS") from disposition for oil and gas leasing. Plaintiffs allege that the modification of the prior withdrawals in Section 5 of Executive Order No. 13795 is *ultra vires*, and seek declaratory and injunctive relief. The Federal Defendants assert, *inter alia*, that Plaintiffs lack standing, Plaintiffs' claims are not ripe, and that Plaintiffs lack an applicable waiver of sovereign immunity and a private right of action. In addition, Federal Defendants contend that Plaintiffs' *ultra vires* claim fails as a matter of law, as the President possesses broad discretionary power under applicable law to modify the OCS areas previously withdrawn.

Consistent with the State of Alaska's ("State") commitment at intervention to avoid duplicative briefing [Dkt. No. 30 at 14], the State adopts and incorporates the introduction and arguments advanced by Federal Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment [Dkt. No. 56] in sections I, II, III.A.–III.F of their brief. The State will only recount similar factual matters as needed below to address additional issues that support its Motion for Summary Judgment.

## II. SECTION 12(A) OF THE OUTER CONTINENTAL SHELF LANDS ACT CLEARLY PERMITS A PRESIDENT TO MODIFY PRIOR WITHDRAWALS

The State is entitled to judgment as a matter of law. Plaintiffs have not demonstrated that Section 5 of Executive Order No. 13795 is an *ultra vires* action, nor
1

can they. The plain language of Section 12(a) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1341(a), contemplates that the withdrawal from disposition of unleased lands in the OCS can be changed, as it specifically allows presidents to exercise such authority "from time to time." The weight of authority supports a conclusion that when Congress uses the phrase, "from time to time," it does so intentionally to allow for subsequent changes.

For example, in *Skinner & Eddy Corporation v. United States*, 249 U.S. 557 (1919), the Supreme Court was reviewing provisions of the Interstate Commerce Act. In describing a provision of the act that authorized the Interstate Commerce Commission to, "from time to time," relieve a common carrier from rate modification provisions, the Supreme Court explained that "leave granted is not for all time. It is revocable at any time, either because it was improvidently granted or because new conditions have arisen …"[1] Other courts have interpreted "from time to time" to be similarly non-permanent, both before and after the adoption of OCSLA.[2]

---

[1] *Skinner & Eddy Corp.*, 249 U.S. at 567-68.

[2] *See*, *e.g.*, *Lacquer & Chem. Corp. v. Mills*, 22 F.2d 697, 699-700 (E.D. N.Y. 1927) (the commissioner of Internal Revenue can change a regulation under a statute authorizing the power to make regulations "from time to time" as "Congress realized that the interests of the government might not always be the same"); *V. Mueller & Co. v. U.S.*, 28 CCPA 249, 259 (1940) (statute which provides authority to make customs estimates "from time to time" shows "Congress contemplated changing conditions in commerce and sought to meet them by broad legislation"); *see also U.S. v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 597-99 (1973) (observing that rulemaking authority that could be invoked "from time to time" to change contracts created uncertainty due to the power to modify terms); *In re A Community Voice*, 878 F.3d 779, 785 (9th Cir. 2017) (law providing for agency amendment of regulations "from time to time" indicated "Congress

Plaintiffs' contention that the "clear and unambiguous text" of OCSLA Section 12(a) does not authorize "reversals" of prior withdrawals [Dkt. No. 51 at 33-35] is therefore unfounded. The plain language of Section 12(a) clearly indicates that withdrawals may be changed by using language that Congress customarily uses to accommodate changes to an action previously taken. As Congress did not attempt to restrict the president's authority under Section 12(a) to only the types of changes that would address lands not already withdrawn,[3] it is clear that a president may make any withdrawal desired, even if it means changing a predecessor's withdrawal.

Most of the statutes cited by Plaintiffs, i.e., the Pickett Act of 1910, the 1953 Rio Grande law, and the Antiquities Act [Dkt. No. 51 at 35-36], do not include the phrase "from time to time." Although they broadly pertain to federal land management, they are otherwise not analogous to OCSLA Section 12(a). With respect to 16 U.S.C. § 473, the Forest Service Organic Act of 1897, the presidential "withdrawal" authority was originally part of the Creative Act of 1891. It read, in relevant part: "the President … may, from time to time, set apart and *reserve* … the public lands wholly or in part covered with timber or undergrowth … as *public reservations* … [and] declare the establishment of such *reservations* and the limits thereof." 26 Stat. 1095 (1891)

---

did not want EPA to set initial standards and then walk away" but instead "to modify initial standards when necessary").

[3]     The only limitation Congress placed on the OCSLA presidential withdrawal authority is that it be exercised to only affect unleased lands. 43 U.S.C. § 1341(a). *See also* Dkt. No. 56 at 29.

(emphasis added).[4] The distinction the Federal-Defendants make with respect to the use of the term "withdrawal" versus "reservation"[5] is important to ascertain why, when the Forest Service Organic Act was subsequently adopted in 1897 to include language later codified in 16 U.S.C. § 473, it gave the president the specific authority to revoke or change prior executive actions. Those actions were not an exercise of presidential withdrawal authority, but of presidential *reservation* authority.[6] Thus, the Forest Service Organic Act of 1897 withdrawal authority is not analogous to OCSLA, either.

In addition, neither the purpose or structure of OCSLA indicate that Congress did not somehow intend for a successor president to alter OCS withdrawals made by a predecessor, contrary to Plaintiffs' implication that giving the president, in addition to the Secretary of the Interior, a reversible power would be "redundant" and "an intent that ought not to be imputed to Congress in the absence of explicit expression." [Dkt. No. 51 at 40]. This is not the case; not only is the expression of the "reversibility" of presidential withdrawals clearly authorized by the use of the phrase "from time to time," but

---

[4] This provision of the Creative Act was repealed by the adoption of the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, Sec. 704 (90 Stat. 2743) (October 21, 1976).

[5] *See* Dkt. No. 56 at 34, n. 13.

[6] Legislative history also indicates that, even in the context of reservations, it was far from clear that the President did not have an inherent authority to change or revoke prior reservations as a result of the Creative Act. 25 Cong. Rec. 2435 (1893) (debating whether the President already had the authority to revoke a reservation without any amendments); 30 Cong. Rec. 902 (1897) (indicating that the amendment to the Creative Act was seen as more congenial than suspending or revoking prior orders); *see also* 30 Stat. 34 (1897) ("*Provided*, That, to remove any doubt which may exist pertaining to the authority of the President thereunto, the President of the United States is hereby authorized and empowered to revoke, modify, or suspend any and all such Executive orders and proclamations …").

Plaintiffs' assertion rests on the mistaken view that in 1953, the Secretary's leasing power authorized the protection of areas and their natural resources through withholding from leasing. [*Cf.* Dkt. No. 51 at 40]. To the contrary, the focus of Section 8 is on "meet[ing] the urgent need for further exploration and development of the oil and gas deposits on the submerged lands of the outer Continental Shelf." Pub. L. No. 83-212, § 8(a), 67 Stat. 462, 468 (1953). While the Secretary had broad discretion to lease whatever "compact" area determined appropriate, it cannot be said that Congress evidenced an intent in the statute for the Secretary to withhold *anything* from oil and gas leasing.[7] Amendments to OCSLA established a formalized leasing program, which for the first time clarified that leasing activity should, *inter alia*, "best meet national energy needs" and "be conducted in a manner which considers economic, social and environmental values of the … resources contained in the [OCS]." Pub. L. No. 95-372, § 208, (Section 18), 92 Stat. 629 (1978). That Congress left Section 12(a) untouched in these amendments is unremarkable [*cf.* Dkt. No. 51 at 42]; presidents are only elected to a four-year term. A given president may very well wish to withdraw portions of the OCS within a prior Secretary's ongoing leasing plan. Accordingly, neither the plain language nor structure of OCSLA support Plaintiffs' interpretation of Section 12(a).

---

[7]     Section 5(a) authorized the Secretary to adopt regulations for "the prevention of waste" and "conservation of national resources," Pub. L. No. 83-212, 67 Stat. at 464, but that does not undermine this conclusion. With respect to oil and gas, "conservation" and "waste" generally are used to describe the need prevent the "loss of natural resources without economic or beneficial use." *See* Williams & Meyers, *Manual of Oil & Gas Terms*, 212 (defining "conservation") (LexisNexis 12th ed. 2003). It is not intended to refer to all resources that may be affected by oil and gas operations.

5

Case 3:17-cv-00101-SLG    Document 61    Filed 08/02/18    Page 8 of 10

## III. CONCLUSION

Section 5 of Executive Order No. 13795 is a lawful exercise of presidential authority under OCSLA. For the reasons set forth and incorporated here, the State respectfully asks the Court to deny the declaratory and injunctive relief sought by the Plaintiffs.

DATED: August 2, 2018.

JAHNA LINDEMUTH
ATTORNEY GENERAL


By: /s/ Bradley E. Meyen
Bradley E. Meyen
AK Bar No. 8506067
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: brad.meyen@alaska.gov

Jennifer E. Douglas
AK Bar No. 1605029
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: jennifer.douglas@alaska.gov

**CERTIFICATE OF SERVICE**

I certify that on August 2, 2018, the foregoing was served electronically on all parties via CM/ECF.

/s/Bradley E. Meyen
Bradley E. Meyen
Senior Assistant Attorney General