Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Nancy S. Marks (N.Y. Bar No. 2121820) (*admitted pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th Floor
New York, NY 10011
T: 212.727.2700 / F: 415.795.4799
E: nmarks@nrdc.org

*Attorneys for Plaintiffs League of Conservation Voters et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS *et al.*, )<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>DONALD J. TRUMP *et al.*, )<br>)<br>*Defendants*, )<br>)<br>AMERICAN PETROLEUM INSTITUTE and STATE OF )<br>ALASKA, )<br>)<br>*Intervenor-Defendants.* )<br>) | No. 3:17-cv-00101-SLG |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................1

I.  FEDERAL DEFENDANTS' ATTEMPT TO RE-LITIGATE THEIR MOTION
    TO DISMISS IS BARRED BY THE LAW-OF-THE-CASE DOCTRINE AND
    LOCAL RULE 59.1 ....................................................................................................1

II. CONGRESS DID NOT DELEGATE THE AUTHORITY TO REVOKE
    SECTION 12(A) WITHDRAWALS .............................................................................3

    A.  Section 12(a)'s plain text does not authorize revocations. .....................................3

    B.  The President lacks inherent power to reverse Section 12(a) withdrawals. ...........8

    C.  Section 12(a)'s legislative history shows Congress did not intend to
        delegate revocation authority. ............................................................................9

    D.  The President's action is unprecedented and Congress has not acquiesced
        in it. ......................................................................................................................13

III. THE PRESIDENT'S AUTHORITY IS LIMITED TO WHAT CONGRESS
     DELEGATED .............................................................................................................18

IV.  PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK....................................21

CONCLUSION..................................................................................................................22

CERTIFICATE OF SERVICE .............................................................................................24

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                          i

# TABLE OF AUTHORITIES

## CASES

*Al-Bihani v. Obama*,
    619 F.3d 1 (D.C. Cir. 2010) ...................................................................16

*Alabama v. Texas*,
    347 U.S. 272 (1954) ..............................................................18, 19, 20

*Alaska v. Kerry*,
    972 F. Supp. 2d 1111 (D. Alaska 2013) .......................................14, 16

*Albertson v. FCC*,
    182 F.2d 397 (D.C. Cir. 1950) ...................................................................8

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...................................................................14

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
    358 U.S. 133 (1958) ...................................................................9

*Bay Area Peace Navy v. United States*,
    914 F.2d 1224 (9th Cir. 1990) ...................................................................5

*Chan Healthcare Group, PS v. Liberty Mutual Fire Insurance Co.*,
    844 F.3d 1133 (9th Cir. 2017) .................................................................15

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*,
    367 U.S. 316 (1961) ...................................................................8

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ...................................................................2

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) .......................................................14, 16

*EEOC v. Peabody Western Coal Co.*,
    773 F.3d 977 (9th Cir. 2014) .................................................................15

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ...................................................................22

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG

*Gorbach v. Reno*,
219 F.3d 1087 (9th Cir. 2000) ...........................................................................8

*Haig v. Agee*,
453 U.S. 280 (1981)................................................................................14, 15

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir.) ......................................................................................21

*Illinois Central Railroad Co. v. United States*,
1858 WL 4672 (Ct. Cl. Feb. 1, 1858) ...........................................................6

*In re A Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) ...........................................................................5

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ........................................................................8

*Lacquer & Chem. Corp. v. Mills*,
22 F.2d 697 (E.D.N.Y. 1927)...........................................................................5

*Medellin v. Texas*,
552 U.S. 491 (2008)...........................................................................................14

*Myers v. United States*,
272 U.S. 52 (1926).............................................................................................5

*N. Border Pipeline Co. v. Jackson County*,
512 F. Supp. 1261 (D. Minn. 1981)................................................................6

*Nat. Res. Def. Council v. Patterson*,
333 F. Supp. 2d 906 (E.D. Cal. 2004)............................................................2

*New Process Steel, L.P. v. NLRB*,
650 U.S. 674 (2010)..........................................................................................15

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014)......................................................................................15

*Nordstrom v. Ryan*,
856 F.3d 1265 (9th Cir. 2017) .........................................................................2

*North Dakota v. United States*,
460 U.S. 300 (1983)...........................................................................................8

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                          iii

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 4 of 32

*Quinn v. Cal. Shipbldg. Corp.*,
76 F. Supp. 742 (S.D. Cal. 1947) ........................................................................6

*S. Utah Wilderness All. v. BLM*,
425 F.3d 735 (10th Cir. 2005) ............................................................................7

*Saxbe v. Bustos*,
419 U.S. 65 (1974) ............................................................................................15

*Sierra Club v. Van Antwerp*,
560 F. Supp. 2d 21 (D.D.C. 2008) ......................................................................8

*Skinner & Eddy Corp. v. United States*,
249 U.S. 557 (1919) ............................................................................................5

*State v. McBride*,
29 Wash. 335 (1902) ...........................................................................................6

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ..........................................................................22

*United States v. Amirnazmi*,
645 F.3d 547 (3d Cir. 2011) ..............................................................................16

*United States v. California*,
332 U.S. 19 (1947) ............................................................................................19

*United States v. Cuddy*,
147 F.3d 1111 (9th Cir. 1998) .........................................................................2, 3

*United States v. Louisiana*,
363 U.S. 1 (1960) ..............................................................................................19

*United States v. Lummi Nation*,
763 F.3d 1180 (9th Cir. 2014) ..........................................................................1, 2

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915) ......................................................................................14, 16

*United States v. N.Y. Tel. Co.*,
424 U.S. 159 (1977) ..........................................................................................22

*V. Mueller & Co. v. United States*,
115 F.2d 354 (C.C.P.A. 1950) .............................................................................5

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ..................................................................................4, 14, 21

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                           iv

*In re Zappos.com, Inc.*,
  888 F.3d 1020 (9th Cir. 2018) ...................................................................................2

*Zemel v. Rusk*,
  381 U.S. 1 (1965) .....................................................................................15, 16

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015) ................................................................................18, 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. IV, sec. 3, cl. 2 ......................................................................19

## STATUTES

30 U.S.C. § 22 *et seq.* ...................................................................................12

30 U.S.C. § 181 *et seq.* ..................................................................................12

43 U.S.C. § 416 ............................................................................................13

43 U.S.C. § 1332(1) .......................................................................................20

43 U.S.C. § 1335(a)(1) .....................................................................................4

43 U.S.C. § 1341(d) .......................................................................................11

43 U.S.C. § 1347(c) ........................................................................................4

43 U.S.C. § 1351(h)(3) .....................................................................................4

Pub. L. No. 61-303, 36 Stat. 847 (1910) ................................................6, 7, 13

Pub. L. No. 66-280, 41 Stat. 1063 (1920) .................................................7

Pub. L. No. 83-212, 67 Stat. 462 (1953) .................................................20

Pub. L. No. 85-337, 72 Stat. 27 (1958) ..................................................19

Pub. L. No. 94-579, 90 Stat. 2743 (1976) ........................................12, 16, 17

Pub. L. No. 105-83, 111 Stat. 1543 (1997) .............................................17

Pub. L. No. 109-54, 119 Stat. 499 (2005) ..............................................17

Pub. L. No. 110-329, 122 Stat. 3574 (2008) ...........................................17

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                          v

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 6 of 32

OTHER AUTHORITIES

10 Fed. Reg. 12,303 (Sept. 28, 1945) ........................................................................20

10 Fed. Reg. 12,305 (Sept. 28, 1945) ........................................................................20

17 Fed. Reg. 4831 (May 26, 1952) ............................................................................13

25 Fed. Reg. 2352 (Mar. 19, 1960)...............................................................7, 10, 13

34 Fed. Reg. 5655 (Mar. 26, 1969)............................................................................13

34 Weekly Comp. Pres. Docs. 1111 (June 12, 1998) ...............................................17

43 Weekly Comp. Pres. Docs. 19 (Jan. 9, 2007) ......................................................17

44 Comp. Pres. Docs. 986 (2008) .............................................................................17

H.R. Rep. No. 83-215 (1953).....................................................................................10

S. Rep. No. 83-411 (1953)....................................................................................10, 11

S. Rep. No. 85-857 (1957) (Conf. Rep.), *as reprinted in* 1958 U.S.C.C.A.N. 2227 ...............7, 19

H.R. Rep. No. 94-1163 (1976)....................................................................................12

*Joint Hearings on S. 1988 & Similar House Bills Before the Comms. on the Judiciary*, 80th Cong. 737 (1948) ...................................................................10

*Hearings Before the S. Comm. on Energy & Nat. Res.*, 95th Cong. 519 (1977)...........................11

43 Pub. Lands Dec. 293 (D.O.I. 1914) ........................................................................7

37 Op. Att'y Gen. 431 (1934).....................................................................................12

39 Op. Att'y Gen. 185 (1938).....................................................................................12

24 Op. O.L.C. 183 (2000)......................................................................................16, 17

Letter to Spencer Roane (Sept. 2, 1819), *in* 8 Writings of James Madison 450 (G. Hunt ed. 1908) ..............................................................................................15

V. S. Chu & T. Garvey, Cong. Res. Serv., RS20846, Executive Orders: Issuance, Modification, and Revocation 7 (2014), https://fas.org/sgp/crs/misc/RS20846.pdf................................................9

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                      vi

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 7 of 32

C. L. Hagerty, Cong. Research Serv., Outer Continental Shelf Moratoria on Oil and Gas Development 2 (2011) ................................................17

V. Kesavan & J. G. Sidak, *The Legislator-In-Chief*, 44 WM. & MARY L. REV. 1 (2002) ................................................................................................5

F. Wheatley, Jr., Pub. Land Law Review Comm'n, Study of Withdrawals & Reservations of Public Domain Lands A-4 (1953) ..............................7

Brief for United States as *Amicus Curiae*, *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) (Nos. 04-10566, 05-51) ..................................................14

D.Ak. L.R. 59.1(b)(1) .......................................................................................1

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                        vii

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 8 of 32

## INTRODUCTION

The President acted without constitutional or statutory authority when he issued an order purporting to strip permanent protections from ecologically vulnerable areas of the Arctic and Atlantic Oceans. Without legislative delegation, the President may not wield powers over public lands that the Constitution vests solely in Congress. Defendants and Intervenors urge the Court to discern that delegation in the Outer Continental Shelf Lands Act, but it is lacking. Neither the plain text of the Act nor any acceptable principle of statutory interpretation supports their claim to unprecedented executive powers. The Court should also decline Defendants' and Intervenors' improper invitation to re-litigate jurisdictional challenges already rejected by the Court.

## ARGUMENT

I.   FEDERAL DEFENDANTS' ATTEMPT TO RE-LITIGATE THEIR MOTION TO DISMISS IS BARRED BY THE LAW-OF-THE-CASE DOCTRINE AND LOCAL RULE 59.1

Federal Defendants' attempt to re-litigate their motion to dismiss as to standing, ripeness, private right of action, and sovereign immunity, Doc. 56 at 19-28, fails for two reasons. First, the Court has already decided the issues Federal Defendants raise; its rejection of their arguments at the motion-to-dismiss stage is law of the case. *See United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014). Defendants have offered no argument, nor is there any, why the Court should depart from its prior holdings. Second, if construed as seeking plain reconsideration of the prior order, Doc. 56 at 24 n.10, Defendants' request would be tardy under the local rules and should be rejected on those grounds as well. *See* D.Ak. L.R. 59.1(b)(1) (any motion to reconsider a non-appealable interlocutory order must be filed within 14 days of the Court's entry of the order).

Defendants focus much of their efforts on again challenging Plaintiffs' standing. Doc. 56 at 19-23. Like the other arguments they advanced at the motion-to-dismiss stage, these arguments are barred by the law-of-the-case doctrine. In its order rejecting Defendants' motion to dismiss, the Court concluded "that Plaintiffs have adequately pleaded facts that demonstrate Article III standing." Doc. 45 at 24. Plaintiffs have now at the summary-judgment phase provided evidence supporting each of the facts alleged in their complaint demonstrating standing. Doc. 51 at 19-28. Because Defendants do not dispute this evidence, Doc. 56 at 18

Case 3:17-cv-00101-SLG   Document 62   Filed 09/14/18   Page 9 of 32

(reporting that they "do not assert any genuine issues of material fact"), the Court's prior holding that Plaintiffs have standing governs. *See Lummi Nation*, 763 F.3d at 1185; *Nat. Res. Def. Council v. Patterson*, 333 F. Supp. 2d 906, 915 (E.D. Cal. 2004) (holding that the court's conclusion at the motion-to-dismiss stage that plaintiffs had standing "effectively foreclosed" defendant's renewed challenge to standing at the summary judgment stage where facts were not in dispute).

The law-of-the-case doctrine applies not only to injury-in-fact, explicitly challenged by Defendants at the motion-to-dismiss stage, but also to redressability, Doc. 56 at 19-22. That would be the case even if they had not raised the issue then. *See Lummi Nation*, 763 F.3d at 1185 (law of the case applies to issues "decided explicitly or by necessary implication"); *see also Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017) (applying law of the case to implicit determination that the plaintiff had standing). However, in their motion to dismiss, Defendants effectively challenged redressability as well as injury-in-fact. They argued that "[t]he seismic survey permits may be applied for and granted without regard to planned leasing, and therefore cannot confer standing for Plaintiffs' OSCLA claims." Doc. 38 at 5. In rejecting this argument, the Court concluded that, "[a]lthough seismic surveying can go forward regardless of the legality of the challenged Executive Order, there would be no apparent incentive for the industry to conduct seismic surveying in areas closed off from drilling." Doc. 45 at 19 n.90. The Court has thus already directly concluded that Plaintiffs' injuries will be redressed by a ruling in their favor. Defendants' argument here that there is a "causal break" between the action Plaintiffs challenge and the harm they seek to avoid, Doc. 56 at 20-21, is just a repeat.

Defendants offer no reason for the Court to depart from its prior holding. The Court does have discretion to depart from the law of the case when "the first decision was clearly erroneous; . . . an intervening change in the law has occurred; . . . other changed circumstances exist; or . . . a manifest injustice would otherwise result." *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) (listing circumstances where departure from law of the case may be appropriate). Plainly, no injustice would result in the application of the law of the case here as to Plaintiffs' standing. None of the other circumstances applies here either. Thus, for example, Defendants argue that Plaintiffs' harm is not imminent because it is more like that in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), than in *In re Zappos.com, Inc.*, 888 F.3d 1020 (9th Cir.

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                                          2

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 10 of 32

2018). Doc. 56 at 22-23. But the Court addressed these cases in its motion-to-dismiss order. Doc. 45 at 15-17. They do not constitute "intervening change in the law" or show that the Court's decision was "clearly erroneous," *Cuddy*, 147 F.3d at 1114.

Defendants assert in their brief—without providing any evidence in support—that the government has issued seismic permits in the Gulf of Mexico that include areas withdrawn from leasing consideration pursuant to OCSLA section 12(a). Doc. 56 at 20 n.7. Even were this assertion substantiated, it would not alter the Court's conclusion that industry incentive to conduct surveys in areas withdrawn from leasing is reduced, lessening the risk of such activity there. It would not demonstrate that "changed circumstances exist" or show any error in the Court's prior holding. *Cuddy*, 147 F.3d at 1114.

Defendants' remaining arguments *reinforce* the Court's holding, because they demonstrate that Plaintiffs' harm is imminent. That seismic operators conducted surveys in the Arctic and Atlantic Oceans well in advance of potential lease sales in those areas, Doc. 56 at 21, supports Plaintiffs' allegation that harm from seismic surveying is impending because "companies . . . have sought approval to conduct seismic surveys even when lease sales are more than four years away and are not included in an existing or proposed five-year program." Doc. 45 at 19 (alteration omitted) (quoting Complaint). As the Court squarely held, however, when an area is permanently withdrawn from future leasing, the incentive to explore for oil there is diminished.

As to their arguments about ripeness, private cause of action, and sovereign immunity, Defendants offer nothing not already argued in their motion to dismiss. These rejected arguments do not show anything "clearly erroneous" about the Court's prior decision. *Cuddy*, 147 F.3d at 1114. For all these reasons, the Court should reject Defendants' attempt to re-litigate the arguments rightly rejected at the motion-to-dismiss stage.

II.    CONGRESS DID NOT DELEGATE THE AUTHORITY TO REVOKE SECTION 12(A) WITHDRAWALS

A.    Section 12(a)'s plain text does not authorize revocations.

Defendants are mistaken that the "plain language of OCSLA" makes clear presidential power to revoke withdrawals. *See* Doc. 56 at 29; Doc. 51 at 33-35. Congress's plain language in section 12(a) includes not a word about the authority to reverse withdrawals, and the Court

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                                    3

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 11 of 32

would need a powerful reason, never identified by Defendants or Intervenors, to interject such a term into the statute. If Defendants mean that section 12(a) permits whatever it does not prohibit, that ignores the bedrock principle that presidents enjoy only powers specifically enumerated in the constitution or delegated by Congress. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586 (1952). Defendants' plain language argument is based on Section 12(a)'s use of the terms "from time to time" and "withdraw." But neither delegates the power of reversal to the President.

Intervenors' assertions that the statutory phrase "from time to time" supplies the needed plain language founders most obviously on congressional usage of these words elsewhere in OCSLA itself. *See* 43 U.S.C. §§ 1335(a)(1), 1347(c), 1351(h)(3). Throughout, Congress used them in the ordinary sense of *when* the authority might be exercised, not to expand a delegation to encompass the polar opposite power. API argues that the phrase "carries with it a power to revise." Doc. 57 at 20. Alaska asserts that Congress uses it "to allow for subsequent changes." Doc. 61 at 5. Congress could not, however, have intended that in section 6 of the Act, 43 U.S.C. § 1335(a)(1), which authorized continuation of certain outer continent shelf mineral leases issued by states prior to OCSLA's enactment if, inter alia, they were "filed with the Secretary . . . within ninety days from August 7, 1953, or within such further period or periods . . . as may be fixed from time to time by the Secretary." *Id*. On Intervenors' reading, inclusion of the phrase "from time to time" in that authorization would have empowered the Secretary to fix a filing period and then pull the rug out from under lease-holders by subsequently un-fixing it. The phrase can mean only that one or more such periods could be established at will, not that any could be un-established.

By the same token, Congress plainly did not use the phrase to authorize revision or subsequent change when it amended OCSLA to provide that the Coast Guard "may from time to time modify any regulations, interim or final, dealing with hazardous working conditions on the outer Continental Shelf." 43 U.S.C. § 1347(c). Since to modify *is* to revise, the qualifier "from time to time" cannot have been applied to "modify" to authorize subsequent revision (or reversal of modification). No more could reversal or abandonment have been in Congress's mind when it provided that for development and production plans in the outer continent shelf "[t]he Secretary shall, from time to time, review each plan approved under this section." *Id*. § 1351(h)(3). In

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                 4

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 12 of 32

short, Congress's consistent usage throughout OCSLA rules out Intervenors' invitation to read the phrase "from time to time" as an obscure circumlocution for "and may later revise or undo such action." The plain congressional intent was the phrase's plainest meaning: to emphasize that the authority might be exercised with whatever frequency was thought needed.

Intervenors cite a series of cases that do not establish the use of "from time to time" to indicate reversal authority, let alone show that is what Congress intended as to the special protective power it gave presidents in section 12(a). Some discuss authority that by its nature or explicit provision allows for reversal. *See, e.g.*, *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 564 (1919) (statute at issue expressly granted power "to fix rates or to increase or to reduce them"); *V. Mueller & Co. v. United States*, 115 F.2d 354, 361 (C.C.P.A. 1950) (statutory obligation to levy an offsetting duty necessarily includes flexibility to change it, not at "any definite time"); *Myers v. United States*, 272 U.S. 52, 117 (1926) (President's appointment power must include power to remove administrative officers "for whom he cannot continue to be responsible").[1]

Other cases consider rulemaking authority, where repeated exercise almost necessarily overwrites one set of regulations with another. Thus, revocation is essentially inherent in a grant of regulatory authority, the qualifier "from time to time" emphasizes temporal latitude or counsels diligence, and the cases are inapposite. *See In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("statutory framework clearly indicates that Congress did not want EPA to set initial standards and then walk away"); *Lacquer & Chem. Corp. v. Mills*, 22 F.2d 697, 699 (E.D.N.Y. 1927), *aff'd*, 22 F.2d 700 (2d Cir. 1927) (changes required to keep business "on the highest possible plane"); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1234 n.6 (9th Cir. 1990) (O'Scannlain, J., concurring in part and dissenting in part) (court did not even consider reversibility, let alone ascribe it to the phrase "from time to time").

---

[1] *Myers* concerns not congressional intent but the U.S. Constitution, in which the phrase "from time to time" occurs four times. In each case it is used not to create reversibility but "to delineate the frequency of a legislative power." V. Kesavan & J. G. Sidak, *The Legislator-In-Chief*, 44 Wm. & Mary L. Rev. 1, 13-18 (2002).

To no more effect, API cites *Illinois Central Railroad Co. v. United States*, 1858 WL 4672 (Ct. Cl. Feb. 1, 1858). In that case, no reversal action had been taken under the statutes in question, so the court had no occasion to decide whether the laws at issue actually did convey reversal power, let alone whether it was relevant that one of them included the phrase "from time to time."[2]

Finally, in *State v. McBride*, 29 Wash. 335, 342 (1902), the state court considered an argument for reading "from time to time" as indicating reversibility, but ultimately held only that the phrase did not rule out reversal, and based its decision instead on other terms in the state constitution bolstered by the combined formal opinion of the legislative and executive branches. *Id.* at 342-43.

Thus, neither OCSLA's provisions nor the cases cited by Intervenors support a conclusion that "from time to time" was used by Congress in that statute to include, obliquely, a power to reverse withdrawals. That withdrawals may be made "from time to time" under section 12(a) instead indicates only what is plain from the language: broad discretion about when and how often presidents may withdraw outer continent shelf areas.

Defendants and the State also incorrectly infer a lack of permanence from section 12(a)'s use of the term "withdrawal" rather than "reservation." *See* Doc. 56 at 34 n.13; Doc. 61 at 6-7. Although the terms long ago referred to different actions, Congress ceased assuming distinct meanings decades before it enacted OCSLA in 1953. In particular, the notion that withdrawals were inherently impermanent was gone by the time of the Pickett Act of 1910, Pub. L. No. 61-303, Ch. 421, 36 Stat. 847 (1910). When the Pickett Act granted the President authority to "withdraw" land, it included a proviso that the withdrawals be temporary, pure surplusage if the term itself indicated impermanence. *Id.* It also specified that reservations made pursuant to the

---

[2] Other cases cited by API are even further afield, simply affirming that legislative delegations may be revoked by the legislature itself. *See, e.g.*, *Quinn v. Cal. Shipbldg. Corp.*, 76 F. Supp. 742, 743 (S.D. Cal. 1947) (holding that Congress's power to grant court jurisdiction allows it to withdraw the grant of jurisdiction); *N. Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1263 (D. Minn. 1981) (holding that the legislature's power to grant zoning authority to local government includes the power to withdraw it).

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                 6

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 14 of 32

statute be as temporary as withdrawals. *Id.* And it further abandoned any clear distinction by allowing that withdrawals could reserve lands for specific public purposes. *Id.*

Ultimately, the executive branch, and subsequently Congress, eliminated the distinction and used the term withdrawal for lands set aside for public purposes in the same manner as reservations. *See, e.g.*, 43 Pub. Lands Dec. 293, 294 (D.O.I. 1914) (interpreting effect of Pickett Act withdrawals and stating lands may be "withdraw[n]" and "devote[d] . . . to public use"); Federal Water Power Act Pub. L. No. 66-280 § 3, 41 Stat. 1063, 1063-64 (1920) (codified at 16 U.S.C. § 796(2)) (defining "reservations" as including "lands . . . withdrawn, reserved, or withheld from private appropriation and disposal"); *see also* S. Rep. No. 85-857, at 7 (1957) (Conf. Rep.), *as reprinted in* 1958 U.S.C.C.A.N. 2227, 2333 (report on statute limiting defense withdrawals noting that "[t]he term 'withdraw' is used interchangeably with the term 'reserve' to describe the statutory or administrative action which restricts or segregates a designated area of Federal real property from the full operation of the public-land laws"). Indeed, the very study cited by Defendants, Doc. 56 at 34 n.13, recognizes this. *See* Charles F. Wheatley, Jr., Pub. Land Law Review Comm'n, Study of Withdrawals & Reservations of Public Domain Lands A-4 (1953) ("The [Pickett Act's] use of the term 'withdrawal' to embrace 'reservation' . . . established the present interchangeable usage of these words.").

Thus, it does Defendants no good to cite a case interpreting a statute enacted in *1866* for definitions of withdrawals and reservations. *See S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 784 (10th Cir. 2005) (interpreting Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253). By 1953, Congress used both withdraw and reserve to "dedicate[] . . . land to a particular public use" including permanent preservation. *Id.* In fact, the first section 12(a) withdrawal (made by President Eisenhower, who signed OCSLA into law) was to set aside permanently land for a public use: the creation of Key Largo Coral Reef Preserve. *See* Proclamation No. 3339, 25 Fed.

Reg. 2352 (Mar. 19, 1960). The term "withdrawal," standing alone, does not, and did not in 1953, indicate any necessary lack of permanence.[3]

B.  The President lacks inherent power to reverse Section 12(a) withdrawals.

Defendants contend that the power to create must include the power to destroy, but that rhetorical argument has no legal basis. Doc. 56 at 30. When, as here, the executive branch acts pursuant to a delegation of authority by Congress, the touchstone of the judicial inquiry is the nature of Congress's grant of authority. Simply put, "[t]here is no general principle that what one can do, one can undo." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc). Although some statutes grant the executive branch authority to make and revoke certain decisions, the inquiry is statute-specific. *See id.* (concluding that a statute authorizing the Attorney General to naturalize citizens did not also authorize him to denaturalize them); *see also North Dakota v. United States*, 460 U.S. 300, 312-13 (1983) ("[U]ncomplicated" statutory language authorized states to approve federal acquisition of lands; however, "[n]othing in the statute authorizes the withdrawal of approval previously given."); *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 334 (1961) ("[W]e think that both administrative and judicial feelings have been opposed to the proposition that the agencies may expand their powers of reconsideration without a solid foundation in the language of the statute."); *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (noting executive branch authority to spend funds does not include the reverse power to leave them unspent). Under section 12(a), Congress's grant of authority to the President is limited. *See* Doc. 51 at 33-42.

The limited authority administrative agencies possess to correct their decisions under some circumstances is inapposite. *See* Doc. 56 at 30. The cases Defendants cite concern the process required or appropriate when agencies seek to repair factual or legal errors in adjudicative decisions, typically within a short time after their initial decisions. *See Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950); *Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23

---

[3] Defendants attempt to bolster their distinction between withdrawals and reservations by pointing out that the withdrawals at issue here are described as "for a period without specific expiration" in the memoranda creating them. Doc. 56 at 38. As Plaintiffs previously showed, however, everything about those withdrawals signaled presidential intent that they be permanent. *See* Doc. 51 at 32-33.

(D.D.C. 2008).  That principle, however, has no bearing on whether and how they can reverse policy choices.  *See, e.g.*, *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958) ("[T]he power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies.").

Defendants fare no better by alluding to executive orders issued pursuant to the President's enumerated Article II powers.  Doc. 56 at 30.  It is true that when the President issues an executive order or other directive pursuant to those powers, he is normally "free to revoke, modify, or supersede his own orders or those issued by a predecessor."  V. S. Chu & T. Garvey, Cong. Res. Serv., RS20846, Executive Orders:  Issuance, Modification, and Revocation 7 (2014), https://fas.org/sgp/crs/misc/RS20846.pdf.  That, however, is different in kind from the President's issuing of a directive pursuant to a power delegated by Congress.  *Compare id.* at 7-8 (citing examples of executive orders that other presidents revoked), *with id.* at 9 (distinguishing executive orders "issued pursuant to authority provided to the President by Congress," which may be revoked by Congress, from those based on exclusive Article II powers).  Here, the source of the President's withdrawal authority is section 12(a) alone.  Thus, the President's power to revise executive orders issued pursuant to Article II powers—not present here—is irrelevant.

C.    Section 12(a)'s legislative history shows Congress did not intend to delegate revocation authority.

The legislative history Defendants and API cite does not support their argument that Congress intended to delegate to the President the authority to undo prior withdrawals. Defendants rely largely on section 12(a)'s roots focusing on national security, but ignore that Congress's ultimate expansion of section 12(a) to allow the President to protect fragile ocean areas is not only compatible with permanent withdrawal authority but better served by it.  That withdrawals were revoked under other statutes that expressly delegated two-way authority has no bearing on what Congress intended when it enacted section 12(a).  Those statutes had distinct purposes and in fact show that Congress means what it says.  Had Congress thought the President needed the power to revoke section 12(a) withdrawals, it would have expressly granted it.

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                              9

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 17 of 32

Contrary to their arguments, "future use" of offshore mineral resources for national security purposes was not Congress's focus in enacting section 12(a). *See* Doc. 56 at 31; Doc. 57 at 23-24. A statement by President Truman's Interior Secretary does not reveal *congressional* intent or even the intent of President Eisenhower who actually signed OCSLA into law. *See* Doc. 56 at 31 (citing *Joint Hearings on S. 1988 & Similar House Bills Before the Comms. on the Judiciary*, 80th Cong. 737 (1948) (statement of Secretary of the Interior Julius Krug)). True, early versions of OCSLA delegated the President authority to withdraw land primarily for national security purposes. *See* S. Rep. No. 83-411, at 22 (1953); H.R. Rep. No. 83-215, at 10 (1953). Yet, at the Eisenhower Administration's urging, Congress deleted this restriction, believing "the authority of the President to withdraw certain areas of the seabed of the Continental Shelf from leasing should not be limited to security requirements." S. Rep. No. 83-411, at 26; *see also id.* at 31, 39, 41.

Nor, as API suggests, Doc. 57 at 23, does Congress's expansion of the reasons why a President *may withdraw* land under section 12(a) (beyond national security reasons) say anything about his or her authority to *undo* withdrawals. In fact, the first section 12(a) withdrawal, made by President Eisenhower, did not even mention national security concerns—it created a coral reef preserve off the coast of Florida to "protect and preserve [a] natural wonder for the benefit of future generations." 25 Fed. Reg. at 2352. Section 12(a), as enacted, had a protective purpose that far exceeded national security concerns and is far better served by withdrawals having permanence.

API's use of legislative history, Doc. 57 at 23-24, is not only unavailing but misleading. First, it cites discussion of a proposed provision that would have authorized the President or Congress "to terminate any lease or suspend operations under any lease" during times of war as if it applied to section 12(a). *See* H.R. Rep. No. 83-215, at 10 (cited at Doc. 57 at 23). Next, it claims section 12(a)'s legislative history included an amendment "governing withdrawn land 'so long as [the withdrawal] remains in effect.'" Doc. 57 at 24 (citing S. Rep. No. 83-411, at 22). But this language is clearly from Section 12(*d*)—a provision that authorizes the Secretary of Defense to restrict parts of the outer continental shelf from *exploration* for national defense purposes. *Compare* S. Rep. No. 83-411, at 22 (the statutory text API replaces with "the withdrawal" is actually "the designation" referring to "areas restricted from exploration and

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                 10

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 18 of 32

operation"), *with* 43 U.S.C. § 1341(d). To the extent section 12(d) has a bearing on what Congress intended in the more protective section 12(a), it is to show that in the same enactment Congress was explicit when it meant restrictions to be impermanent. Even less relevant to Congress's intent when it passed section 12(a) is what the Alaska state legislature thought about its re-purchase of state leases in Kachemak Bay. *See* Doc. 57 at 24 (citing debate).[4]

Congress's comparison of section 12(a) to the President's authority in the uplands reinforces the conclusion that it was not delegating, *sub silentio*, its power to reverse withdrawals. *See* S. Rep. No. 83-411, at 26; *cf.* Doc. 56 at 32. As described in Plaintiffs' opening brief, a long history of uplands legislation prior to OCSLA (and since) demonstrates that Congress is explicit when it intends to grant the power both to protect and to undo protections, and sometimes instead delegates one-way withdrawal authority and nothing more. *See* Doc. 51 at 35-37. Congress's reference to uplands authority was made against this statutory context and, paired with its decision not to express reversal power in section 12(a), demonstrates that it meant to delegate only the authority to withdraw.[5]

In an effort to get around this understanding, Federal Defendants incorrectly dismiss the long line of Attorney General opinions demonstrating executive expectation that statutory reversal authority in the uplands would be expressly delegated. First, they argue the opinions are inapposite based on their misguided distinction between reservations and withdrawals, *see* Doc. 56 at 36-37, but as previously discussed, Congress used the term "withdrawal" to authorize the "reservation" of land for public purposes by the time of OCSLA's enactment, *see supra* pp. 6-

---

[4] The cited history is from Congress's revisions to OCSLA in 1978, which left section 12(a) untouched, and it arose in the context of testimony about whether Congress should pass legislation placing areas off-limits to drilling, not what powers it should delegate to the President. *See Hearings Before the S. Comm. on Energy & Nat. Res.*, 95th Cong. 519 (1977) (Senator McClure asking "how we identify the areas" for protection).

[5] Paralleling this uplands argument, Defendants point out that "two authorities (leasing and withdrawal)" existed on the uplands to suggest Congress intended the same in OCSLA. Doc. 56 at 34. This misses the point. Plaintiffs' argument is that a *revocable* withdrawal authority in section 12(a) would duplicate the ability under section 8 not to issue leases, an intent the Court should not impute to Congress. Doc. 51 at 40-41.

8.[6]  Second, Defendants claim there are differences in the substance and purpose of the underlying statutes, such as the Antiquities Act's protective purpose, that render the Attorney General opinions irrelevant.  However, both section 12(a) and the Antiquities Act serve as protective exceptions to otherwise permissive regimes.  *See* Doc. 51 at 38-42.  For section 12(a), much of that regime is contained in the same statute.  The Antiquities Act is a similarly short and plain enactment but exists alongside, and tempers, a myriad of statutes that collectively set a default rule allowing private mining and oil and gas leasing on public lands.  *See, e.g.*, General Mining Act of 1872, 30 U.S.C. § 22 *et seq.*; Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*  Finally, while the 1938 Attorney General opinion acknowledges the fact of monument diminishment,[7] its reasoning underscores one-way authority:  "[T]he reservation made by the President under the discretion vested in him by the statute was in effect a reservation by the Congress itself," meaning "the President thereafter was without power to revoke or rescind the reservation."  39 Op. Att'y Gen. 185, 187 (1938).  It is this reasoning that formed the backdrop for Congress's enactment of section 12(a) and its understanding of whether it needed to make reversal authority explicit.

Defendants also cite to executive orders delegating upland withdrawal authority to the Secretary of the Interior that refer to a reversal power.  *See* Doc. 56 at 38-39.  But those orders

_____

[6] Federal Defendants would cast doubt on the 1938 Attorney General Opinion's holding because that attorney general also authored an opinion stating that the power of the President "to withdraw land from the public domain for public purposes . . . necessarily implies the power to restore the land."  Doc. 56 at 40 (quoting 37 Op. Att'y Gen. 431, 432 (1934)). That language speaks to the President's authority in the absence of a statute, but, in fact, the opinion concludes that the authority at issue was defined by statute. The 1938 Attorney General opinion also interprets a statute.  In both opinions, the Attorney General was careful to trace reversibility to statutory language.

[7] A court has also never ruled on the validity of such modifications, and Congress,  in fact, later suggested it disapproved of such actions when it enacted the Federal Land Policy and Management Act of 1976.  *See* Federal Land Policy & Management Act of 1976, Pub. L. No. 94-579 § 204(j), 90 Stat. 2743 (1976) (codified at 43 U.S.C. § 1714(j)) (prohibiting Secretary of the Interior from modifying national monuments alongside "National Wildlife Refuge[s]" and designations made directly by "Act[s] of Congress"); H.R. Rep. No. 94-1163, at 9 (1976) (explaining § 204(j) "specifically reserve[s] to the Congress the authority to modify and revoke withdrawals for national monuments created under the Antiquities Act").

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                                             12

Case 3:17-cv-00101-SLG     Document 62     Filed 09/14/18     Page 20 of 32

delegate authority pursuant to the Pickett Act, which expressly authorized both withdrawals and their revocation. President Truman's delegation of his Pickett Act authority to the Secretary of the Interior simply parrots the language of the statute. *Compare* Pub. L. No. 61-303, Ch. 421, 36 Stat. 847 (1910), *with* 17 Fed. Reg. 4831 (May 26, 1952). The fact that the executive branch revoked hundreds of thousands of acres of withdrawals during the 1950s is also of little relevance. Defendants cite two statutes, the Pickett Act and the Reclamation Act of 1902, 43 U.S.C. § 416, that both expressly delegated such authority. *See* Doc. 56 at 39.[8] Actions pursuant to statutes that grant two-way authority are irrelevant to interpreting a statute, like section 12(a), that specifies only the authority to withdraw.

D. <u>The President's action is unprecedented and Congress has not acquiesced in it.</u>

Defendants mistakenly argue that past practice supports their interpretation of section 12(a) and that Congress has acquiesced to Presidents' reversing prior withdrawals. *See* Doc. 56 at 35-36; Doc. 57 at 25-28. Their arguments, however, mischaracterize both the nature of past section 12(a) withdrawals and the standard for acquiescence. Simply put, no President until now has purported to revoke a permanent withdrawal. Although one President twice curtailed a predecessor's time-limited protections under section 12(a), Congress's response does not show that it intended him to have that power—let alone authority for the complete revocation of permanent withdrawals.

Defendants' reliance on acquiescence is inapposite first and foremost because President Trump's action is unprecedented so there can be no history of congressional acquiescence to similar actions. Before President Trump, no President had ever revoked permanent protections created under section 12(a) such as President Eisenhower's establishment of the Key Largo Coral Reef Preserve, *see* 25 Fed. Reg. at 2352, or President Nixon's (via his Interior Secretary) withdrawal in support of the Santa Barbara Channel Ecological Preserve, *see* Public Land Order No. 4587, 34 Fed. Reg. 5655 (Mar. 26, 1969). These permanent withdrawals are similar to

---

[8] Federal Defendants also assert, without any citations, that "most" statutes did not expressly delegate authority to revoke withdrawals. Doc. 56 at 39. But this does not help them. The existence on the upland of some statutes that on their face delegate reversal power and many that do not shows that when Congress omitted a reversal delegation in section 12(a), it meant to withhold that power.

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                        13

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 21 of 32

President Obama's actions to protect the Arctic and Atlantic oceans "to ensure that the unique resources of these areas remain available for future generations." Doc. 51-2; *see also* Doc. 51-4. Congressional acquiescence cannot be found here when President Trump's revocation of the 2015 and 2016 withdrawals is not a "particularly longstanding practice," but rather an "unprecedented action." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) and Brief for United States as *Amicus Curiae*, *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) (Nos. 04-10566, 05-51).

Defendants' arguments to the contrary brush aside essential qualifiers about when courts have found acquiescence. *See* Doc. 56 at 36; Doc. 57 at 25. First, Defendants fail to acknowledge the high bar under which acquiescence has been found. In *United States v. Midwest Oil Co.*, 236 U.S. 459, 471 (1915), the lone withdrawal case Defendants cite, the Court found congressional acquiescence based on the executive's "long-continued practice, known to and acquiesced in by Congress," that included "at least 252 executive orders making reservations." *Id.* at 474, 471. Even in more permissive situations (described below, *infra* pp. 15-16) involving enumerated presidential powers and foreign policy delegations, the Supreme Court has stated that "[p]ast practice does not, by itself, create power," and, instead, "long-continued practice, known to and acquiesced in by Congress" is needed. *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *Midwest Oil*, 263 U.S. at 474); *accord Alaska v. Kerry*, 972 F. Supp. 2d 1111, 1141 (D. Alaska 2013). For example, *Haig v. Agee* concluded that Congress authorized the executive branch to revoke passports based on administrative practice dating to "the earliest days of the Republic," executive orders and regulations asserting the Secretary of State's power over passports, and multiple iterations of passport statutes that left the executive's authority largely untouched. *See* 453 U.S. at 280, 293-301 (1981). Similarly, *Dames & Moore* found acquiescence to "a systematic, unbroken, executive practice" of claim settlement through Congress's enacting statutes to resolve issues arising from claim settlement and its continuing broad delegation of powers to the President. *See* 453 U.S. at 680-83, 686 (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)). This Court in *Alaska v. Kerry* looked at "Congress's long history of enacting legislation that authorizes the executive branch to accept and render enforceable amendments to international agreements" to conclude that the State Department could implement a particular treaty amendment without new legislation. 972 F.

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                                              14

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 22 of 32

Supp. 2d at 1141. A finding of acquiescence requires a strong historical foothold and Congress's knowing failure to curb it, factors not present here.[9]

Second, many of the cases Defendants cite interpret either the President's enumerated Article II powers or Congress's delegation of its foreign policy power not at issue here—both areas in which the Supreme Court has stressed the need for executive branch flexibility. *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), cited by Defendants and API, *see* Doc. 56 at 36; Doc. 57 at 27, interpreted the President's Article II recess appointment power. There, the Court found acquiescence instructive because the Founders anticipated "difficulties and differences of opinion" in interpreting the Constitution's terms and thought "regular course of practice" could "settle the meaning of some of them." *Noel Canning*, 134 S. Ct. at 2560 (quoting Letter to Spencer Roane (Sept. 2, 1819), *in* 8 Writings of James Madison 450 (G. Hunt ed. 1908)); *see also id.* at 2564 (Congress was not "silent or passive" about objecting to recess appointments it disagreed with). Similarly, in the area of foreign affairs, the Court has stated that Congress must "paint with a brush broader than that it customarily wields in domestic areas" when it delegates power to the executive due to a higher level of unpredictability. *Haig*, 453 U.S at 292 (quoting

---

[9] Other cases cited by API are even less responsive to the question of when Congress can acquiesce to presidential action not authorized by statute. *See* Doc. 57 at 25, 27. *Chan Healthcare Group, PS v. Liberty Mutual Fire Insurance Co.*, 844 F.3d 1133, 1138 (9th Cir. 2017), states the unremarkable proposition that a statute's history may influence its interpretation. *EEOC v. Peabody Western Coal Co.*, 773 F.3d 977 (9th Cir. 2014), states another statutory interpretation corollary—that Congress's understanding of certain practices is useful in determining its intent when it *enacts* a statute. *Id.* at 989. *Saxbe v. Bustos*, 419 U.S. 65 (1974), upheld an agency interpretation of a particular statutory term based on long-standing practice rather than answering the question of whether Congress had acquiesced to an action not expressly authorized. *Id.* at 74. Similarly, *New Process Steel, L.P. v. NLRB*, 650 U.S. 674 (2010), states in dictum that courts of appeals have long interpreted the statutory quorum term as allowing them to proceed with two-member panels when the third judge dies or resigns. *Id.* at 686.

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.*,
No. 3:17-cv-00101-SLG                                                    15

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 23 of 32

*Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).[10]  OCSLA section 12(a), in contrast, provides no similar exigency to depart from the plain text—enumerated Article II powers or delegated foreign affairs powers are not involved.  *See infra* pp. 18-21.  And if Congress believed Presidents were unduly hampered by the inability to modify their predecessors' withdrawals, it could simply amend the statute to delegate such authority.

Finally, citing *Midwest Oil*, 236 U.S. at 459, Defendants attempt to argue that Congress has more generally acquiesced to broad delegations of Property Clause power.  *See* Doc. 57 at 27; Doc. 56 at 40.  While *Midwest Oil* holds that congressional acquiescence to a longstanding executive practice of withdrawals can constitute an implicit delegation of its Property Clause authority, nothing of the sort exists on the outer continental shelf.  Moreover, whatever gloss *Midwest Oil* may have put on the Property Clause delegations in an earlier day, Congress reasserted its "constitutional authority" over federal lands and "repealed" the "implied authority of the President . . . resulting from acquiescence of the Congress" through the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579 §§ 102(4), 704(a), 90 Stat 2743, 2744, 2792.  Based on FLPMA, the Department of Justice's Office of Legal Counsel has concluded that any implied delegation under *Midwest Oil* is no longer tenable and that acquiescence, if any, must be evaluated from a fresh baseline.  *See* Administration of Coral Reef Resources in the Northwest Hawaiian Islands, 24 Op. O.L.C. 183, 203 (2000) ("[T]he legislative

---

[10] Other cases that Defendants cite that fall under this umbrella include *Dames & Moore v. Regan*, 453 U.S. at 686, *United States v. Amirnazmi*, 645 F.3d 547, 578-79 (3d Cir. 2011) (interpreting same statute as *Dames & Moore*), and *Alaska v. Kerry*, 972 F. Supp. 2d at 1140 (finding Congress acquiesced to implementation of treaty amendments that post-dated executing legislation).  Federal Defendants incorrectly label *Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010) as an en banc decision. Doc. 56 at 36.  They quote a single judge's concurrence with an order denying rehearing en banc. *See id.* at 26 (Kavanaugh, J., concurring in denial of rehearing en banc).  Regardless, that case too involved the interpretation of a national security statute.  *See id.*

history of FLPMA supports the view that Congress intended to repeal all implied withdrawal power.").[11]

Under this framework, Defendants cannot carry the heavy burden of showing congressional acquiescence. They pin their arguments largely on two actions pertaining to President Clinton's time-limited withdrawal of lands already subject to an existing congressional funding moratorium on leasing.[12] *See* 34 Weekly Comp. Pres. Docs. 1111, 1111 (June 12, 1998) (extending withdrawals described in Pub. L. No. 105-83 §§ 108-11, 111 Stat. 1543, 1562 (1997)). When Congress modified the moratorium in 2007, President George W. Bush amended President Clinton's temporary action to conform. *Compare* Pub. L. No. 109-54 §§ 104-06, 119 Stat. 499, 521-22 (2005), *with* 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007). Similarly, in 2008, President Bush largely removed his section 12(a) withdrawals, and Congress correspondingly let its funding moratorium lapse completely. *See* C. L. Hagerty, Cong. Research Serv., Outer Continental Shelf Moratoria on Oil and Gas Development 2 (2011) (explaining evolution of moratoria and withdrawals). *Compare* Pub. L. No. 110-329 § 152(a), 122 Stat. 3574, 3581 (2008) (2009 appropriations resolution containing no extension of the moratorium), *with* 44 Comp. Pres. Docs. 986 (2008).

President George W. Bush's modifications were closely tied to congressional shifts in policy signaling disagreement with a withdrawal that was already set to expire by its own terms. Those modifications are best understood as tied to Congress's reversal of the moratoria rather than independent exercises of revocation power, and the context certainly does not indicate acquiescence. Nor are two modifications anywhere close to "a systematic, unbroken, executive practice" unchecked by Congress over a long period that could signal acquiescence. Moreover, these prior modifications were of a withdrawal limited by its own terms—not a withdrawal intended to be permanent. And even if section 12(a) authorizes Presidents to create withdrawals circumscribed in time as well as areal extent, that in no sense implies authority to alter existing

---

[11] Although FLPMA is a statute largely concerning the management of terrestrial lands, the Office of Legal Counsel concluded the repudiation of *Midwest Oil* applied to the outer continental shelf, as well. *See* FLPMA § 704(a); 24 Op. O.L.C. at 202.

[12] The moratorium itself built on President George H.W. Bush's 1990 withdrawal.

withdrawals in either regard, let alone reverse them outright.  For all these reasons, Defendants cannot meet their burden to establish congressional acquiescence to executive reversals of withdrawals.[13]

III.   THE PRESIDENT'S AUTHORITY IS LIMITED TO WHAT CONGRESS DELEGATED

Contrary to Defendants' arguments, Doc. 56 at 8-10, 28, the lack of a delegation of authority by Congress is conclusive because the President's national security and foreign affairs powers under Article II of the Constitution do not extend to the management and disposition of the resources of the continental shelf.   "The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015).  Although there are national security and foreign affairs interests at play in the outer continental shelf, Article IV vests the power over management and disposition of those resources in Congress alone.  Through OCSLA, Congress has delegated some of its power to the President in section 12(a), and this is the sole source of the President's power to withdraw areas of the outer continental shelf.  Defendants' contrary suggestion finds no support in the law or other authorities they cite.

Congress, not the President, holds the power to determine the disposition and management of the outer continental shelf.  The Supreme Court has held that the continental shelf underlying coastal waters is property subject to Congress's Article IV power.  *Alabama v. Texas*, 347 U.S. 272, 273-74 (1954) (per curiam) (upholding Congress's disposition, under its

_____

[13] Federal Defendants point out, Doc. 56 at 36, that President George H.W. Bush and President Clinton authorized revocation of their withdrawals for "national security."  Their authority to do so was not ever tested.  Nor do events suggest congressional acquiescence to this assertion of power where, as described above, Congress itself moved to lift funding moratoria for the areas covered by the withdrawals.  They also argue that President Obama's replacement of his prior time-limited withdrawal with a permanent one shows presidents' power to revoke section 12(a) withdrawals. Doc. 56, at 35-36.  This argument elevates form over substance.  President Obama did not reduce protections but rather extended the term of an existing withdrawal. It is equally formalistic and irrelevant that the device President Trump used here was to substitute President Obama's withdrawal with the text from one of President George W. Bush's orders, rendering it a redundant nullity.  *See* Doc. 56 at 35 n.14.  As explained above, *supra* p. 17-18, President Bush's modification of a time-limited withdrawal, paralleling congressional action, cannot supply acquiescence for the revocation of a permanent withdrawal at issue here.

Article IV powers, of the continental shelf underlying coastal waters to coastal states in the Submerged Lands Act). The same is true for the continental shelf further offshore. *See United States v. Louisiana*, 363 U.S. 1, 35-36 (1960) (upholding Congress's authority to dispose of the continental shelf to the states in the Submerged Lands Act "irrespective of the limit of territorial waters"). This "constitutional power of Congress (under Article IV, sec. 3, cl. 2) is without limitation." *Alabama*, 347 U.S. at 273-74. And "neither the courts nor the executive agencies, [can] proceed contrary to an Act of Congress in this congressional area of national power." *United States v. California*, 332 U.S. 19, 27 (1947).

That the outer continental shelf implicates national security and foreign affairs concerns does not create an Article II basis for the President to usurp Congress's proprietary role. Those concerns apply with equal measure to the submerged lands immediately off the United States' coast. *See California*, 332 U.S. at 29 (concluding these lands implicate the United States' ability to "protect this country against dangers to the security and tranquility of its people" and its "responsib[ility] for conducting United States relations with other nations"). But these national security and foreign policy concerns did not stop the Court from finding Congress's authority over disposition of the continental shelf under coastal waters absolute. *See Alabama*, 347 U.S. at 273-74 (upholding disposal of similar coastal lands as at issue in *California*).[14]

Defendants are wrong to suggest that the President's power to claim outer continental shelf lands for the United States pursuant to his Article II foreign affairs and national security powers is relevant to the question of their management. Doc. 56 at 8-10, 28. The Supreme Court has made clear that the power to claim land vis-a-vis foreign nations is different than, and does not imply, the power to dispose or manage that land once claimed. *See Louisiana*, 363 U.S.

---

[14] Further underscoring this point, in 1958 Congress forbade the executive branch from withdrawing more than 5000 acres of land, including in the outer continental shelf, for Department of Defense projects—which almost certainly had national security implications—without congressional approval. *See* Pub. L. No. 85-337 §§ 1-2, 72 Stat. 27, 27-28 (1958) (codified at 43 U.S.C. § 155-56). As the Conference Report unequivocally stated, "that Congress has the final authority for the making of public land withdrawals or reservations cannot be doubted." S. Rep. No. 85-857, at 10, 1958 U.S.C.C.A.N. at 2235.

at 32-35 (distinguishing between powers); *Alabama*, 347 U.S. at 273-74 (acknowledging Congress's plenary power to dispose of property offshore). That power is Congress's alone.[15]

The two actions by President Truman that Defendants cite for the proposition that the President has asserted power under Article II to manage the disposition of the continental shelf do not support that point. Doc. 56 at 8-9. As to the cited proclamation, Doc. 56 at 9, for the reasons described above, President Truman's claim of jurisdiction over outer continental shelf lands for the United States as against foreign nations is different than a claim to presidential authority to manage and dispose of those lands. Moreover, when he asserted jurisdiction over the continental shelf, President Truman contemporaneously acknowledged in a parallel executive order that the executive branch would administer the newly acquired territory only "pending the enactment of legislation in regard thereto." Exec. Order No. 9633, 10 Fed. Reg. 12,305 (Sept. 28, 1945); *see also* Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945) (referencing the executive order).

As to President Truman's later executive order setting aside the continental shelf as a petroleum reserve (which was for the national-security related purpose of providing the Navy with a fuel reserve), Congress in OCSLA revoked the order, Pub. L. No. 83-212, § 13, 67 Stat. 462, 470 (1953), reaffirming its exclusive power over disposition of the continental shelf under Article IV and delegating some of that power to the President in section 12(a), *id.* § 12, 67 Stat. at 469. As Congress stated in OCSLA, the Executive Branch has only the "power of disposition *as provided in this Act*." *Id.* § 3, 67 Stat. at 462 (emphasis added); *see also* 43 U.S.C. § 1332(1).

In short, the President has no independent constitutional basis for revoking section 12(a) withdrawals. Combined with the lack of any congressional delegation, this is fatal to the

---

[15] Of course, the President enjoys Article II powers in the seas overlying the continental shelf, for example, to control navigation or otherwise act vis-a-vis foreign nations, but that power does not extend to the management and disposition of the shelf's resources. Defendants assert, nonsensically, that the national security interest in offshore minerals is not present onshore. Doc. 56 at 8. But any national security interests implicated in energy production from the outer continental shelf would also be equally applicable to energy production from the mineral resources within national parks, national monuments, and other federal public lands. It is indisputable, however, that the Property Clause is the sole source of disposition and management authority there. By the same token, Article II cannot provide management authority in the continental shelf either.

President's action. Thus, API is wrong when it argues, Doc. 57 at 29-30, that the revocations should be upheld under Justice Jackson's tripartite framework from *Youngstown*, 343 U.S. at 635-38 (Jackson, J., concurring). To the extent that framework applies, the President's action falls under *Youngstown* tier III because revocations are not authorized by section 12(a) and are therefore "incompatible" with the will of Congress. *Id.* at 637. But "[t]o succeed in this third category, the President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky*, 135 S. Ct. at 2084 (quoting *Youngstown*, 343 U.S. at 637). Such claims "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

The Constitution clearly vests Congress, not the President, with the exclusive power to manage public resources, and thus the President's actions cannot go beyond what Congress has delegated. Indeed, in *Youngstown*, the Court addressed a similar national security based claim for executive power. *Compare* Doc. 56 at 31, *and* Doc. 57 at 23-24 (asserting national security interest in obtaining oil from the outer continental shelf for military use), *with Youngstown*, 343 U.S. at 583 (asserting national security interest in the production of steel for military use). The Court rejected these arguments in a context not unlike this one—Congress had enacted statutory provisions setting out the President's seizure authority, but he took an action not authorized by the statute. *Youngstown*, 343 U.S. at 585-86. Thus, Defendants' argument should be rejected here as well.

## IV. PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK

Defendants argue injunctive relief is inappropriate based on the strawman that courts cannot directly enjoin the President himself. Doc. 56 at 35-36. To be absolutely clear, Plaintiffs' requested remedy does not require that the President take or refrain from taking any action. Plaintiffs seek only a declaration that section 5 of Executive Order 13,795 is unlawful and an injunction against the Secretaries of the Interior and Commerce barring them from implementing it and directing them to comply with the withdrawals President Trump purported, illegally, to reverse. These are forms of relief courts have longed approved of in challenges to presidential action. *See, e.g.*, *Youngstown*, 343 U.S. at 583-84, 588-89; *Hawaii v. Trump*, 859 F.3d 741, 788

(9th Cir.), *vacated and remanded on other grounds*, 138 S. Ct. 377 (2017); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).[16]

Defendants incorrectly suggest that Plaintiffs are entitled to injunctive relief against subordinate officials only if there is a stand-alone APA claim. *See* Doc. 56 at 36-37. The very cases Defendants cite show that courts may use their equitable powers to "issue commands that apply to 'persons who though not parties to the original action . . . are in a position to frustrate the implementation of a court order or the proper administration of justice.'" *Swan*, 100 F.3d at 980 (quoting *United States v. N.Y. Tel. Co.*, 424 U.S. 159, 174 (1977)). In *Franklin v. Massachusetts*, the Supreme Court held that the plaintiff's constitutional claim against the President was redressable because the plaintiff could obtain injunctive relief against agency officials. *See* 505 U.S. at 803. There was, manifestly, no need for a separate APA action to enjoin agency officials pursuant to the plaintiff's *constitutional* claim, the Court having dismissed all of the APA claims in that case. *See id.* at 798, 800-01. Indeed, in *Swan v. Clinton*, while acknowledging that the plaintiffs lacked an APA claim, the court sua sponte added agency defendants in connection with the injunctive relief the plaintiffs sought in their challenge to a presidential action. *See* 100 F.3d at 981 n.4, 979-80. These cases make clear that a court may enjoin agency officials as part of its equitable powers, quite apart from the officials' amenability to suit under the APA.

## CONCLUSION

Despite their myriad arguments, Defendants never explain why the President should have authority Congress and the Constitution saw fit to withhold. For the foregoing reasons, Plaintiffs ask the Court to grant their motion for summary judgment, declare Section 5 of President Trump's executive order to be unlawful, and enjoin the Secretaries to act in accordance with the prior withdrawals.

---

[16] Because Plaintiffs do not seek an injunction against the President, Federal Defendants' argument that an injunction is appropriate only in the case of a "ministerial duty" misses the mark. Doc. 56 at 35. The separation of powers concerns that may limit injunctions directly against the President do not arise in injunctions against agency officials. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992).

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                    22

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 30 of 32

Respectfully submitted this 14th day of September, 2018.

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (admitted pro hac vice)
Nancy S. Marks (N.Y. Bar No. 2121820) (admitted pro hac vice)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiffs League of Conservation Voters; Natural Resources Defense Council; Sierra Club; Alaska Wilderness League; Defenders of Wildlife; Northern Alaska Environmental Center; Resisting Environmental Destruction on Indigenous Lands; Center for Biological Diversity; Greenpeace, Inc.; and The Wilderness Society*

*On the brief*
Jacqueline M. Iwata
NATURAL RESOURCES DEFENSE COUNCIL

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                 23

Case 3:17-cv-00101-SLG    Document 62    Filed 09/14/18    Page 31 of 32

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2018, a copy of foregoing REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT was served electronically on all counsel of record using the CM/ECF system.

*s/ Erik Grafe*
Erik Grafe
EARTHJUSTICE

REPLY IN SUPP. OF PLS.' MOT. FOR SUMM. J.
*League of Conservation Voters et al. v. Trump et al.,*
No. 3:17-cv-00101-SLG                                                                24

Case 3:17-cv-00101-SLG     Document 62     Filed 09/14/18     Page 32 of 32