JEFFREY WOOD
Acting Assistant Attorney General
ERIC GRANT
Deputy Assistant Attorney General

SARAH D. HIMMELHOCH (MD Bar. No. 199212160064)
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0097
sarah.himmelhoch@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **LEAGUE OF CONSERVATION VOTERS**, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 3:17-cv-00101-SLG |
| | ) |
| v. | ) |
| | ) |
| **DONALD J. TRUMP**, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

   A.   The Law of the Case Doctrine Does Not Bar The Court From Determining
        Whether There Is Jurisdiction To Decide Plaintiffs' Claims. ................................. 2

   B.   Plaintiffs Lack Article III Standing .......................................................... 4

   C.   Plaintiffs *Ultra Vires* Claims Fail as a Matter of Law. ................................... 7

        1.   Plaintiffs' Interpretation of OCSLA is Contrary the Language of Section
             12(a), the Structure and Purpose of the Statute, and its Legislative History.
             7

             As explained in the Defendants' opening brief, Rec. Doc. 56 at 22-29, the text of
             OCSLA, its structure and purpose, and its legislative history all support
             the President's decision to modify and revoke prior withdrawals within the
             OCS .................................................................................. 7

             a.   The Language of Section 12(a) ..................................................... 7

                  i.    The Phrase "from Time to Time" ............................................. 7

                  ii.   Other Statutes Using the Term "Withdrawal" ................................. 9

                  iii.  Changes in Policy ......................................................... 13

        2.   Executive Order No. 13795 Continues the Precedent Set By Prior Actions
             Under OCSLA .................................................................................. 21

        3.   Congress Has Acquiesced in the President's Modification of Former
             Withdrawals .................................................................................. 23

   D.   Plaintiffs Are Not Entitled to An Injunction ............................................. 24

III. CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Albertson v. FCC*, 182 F.2d 397 (D.C. Cir. 1950) ...........................................................13
*Am. Trucking Ass'ns v. Frisco Transportation Co.*, 358 U.S. 133 (1958) .......................15
*Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035 (9th Cir. 2018) .........................3
*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) .................................20
*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988) .............................4
*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316 (1961) ...........................15
*Commonwealth of Pa. v. Lynn*, 501 F.2d 848 (D.C. Cir. 1974) ...................................13
*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ........................................................23
*EEOC v. Global Horizons, Inc.*, 904 F. Supp. 2d 1074 (D. Haw. 2012) ......................3-4
*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ........................................................24
*Free Enterp. Fund v. Public Co. Accounting Bd.*, 561 U.S. 477 (2010) ......................16
*Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) .........................................................14
*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ..........................................18
*Hibbs v. Winn*, 542 U.S. 88 (2004) ...............................................................................7
*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ......................................................15
*Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006) .........................4
*Knebel v. Hein*, 429 U.S. 288 (1977) ...........................................................................17
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................3
*Montclair v. Ramsdell*, 107 U.S. 147 (1883) .................................................................7
*North Dakota v. United States*, 460 U.S. 300 (1983) ..............................................14-15
*Oceana v. Bureau of Ocean Energy Management*, 37 F. Supp. 3d 147 (D.D.C. 2014) ...6
*Pepper v. United States*, 562 U.S. 476 (2011) ...............................................................3
*Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352 (Fed. Cir. 2008) ...........13
*Treasure Salvors v. Unidentified Wrecked & Abandoned Sailing Vessel*,
    569 F.2d 330 (5th Cir. 1978) ..................................................................................12
*Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084 (10th Cir. 1980) ...........................................13
*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534 (1940) .................................17
*United States v. California*, 332 U.S. 19 (1947),
    *opinion supplemented per curiam*, 332 U.S. 804 (1947) ........................................11
*United States v. Lumni Indian Tribe*, 235 F.3d 443 (9th Cir. 2000) ..............................3
*United States v. Lummi Nation*, 763 F.3d 1180 (9th Cir. 2014) .....................................3
*United States v. Miller*, 822 F.2d 828 (9th Cir. 1986) ....................................................3
*United States v. Mills*, 850 F.3d 693 (4th Cir. 2017) .....................................................9
*United States v. Smith*, 389 F.3d 944 (9th Cir. 2004) .....................................................4
*Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ..........................................................9
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................16

**Statutes**

Act of June 8, 1906, ch. 3060, § 1, 34 Stat. 225 .............................................................10
Endangered Species Act, 16 U.S.C. §§ 1531-1544 .......................................................6, 7
Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701-1787 ...................10
General Withdrawal Statute, ch. 421, 36 Stat. 847 (1910) .............................................19

Gulf of Mexico Energy Security Act of 2006 (GOMESA), Pub. L. 109-432, 120 Stat. 3000........4
Loan Act, 16 U.S.C. § 715k-5 ...................................................................................14
National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ................................7, 20
Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356b.......................... passim
Outer Continental Shelf Lands Act, ch. 345, 67 Stat. 462 (Aug. 7, 1953) ....................17
Outer Continental Shelf Lands Act Amendments, Publ. L. 95-372, 92 Stat. 629 .........................8
Reclamation Act of June 17, 1902, 43 U.S.C. §§ 371-616yyyy ...................................................10
Stock-Raising Homestead Act of 1916, 43 U.S.C. §§ 291-301...................................................10
Taylor Grazing Act of 1934, 43 U.S.C. §§ 311-315 (repealed Aug. 1, 1955)..............................10
U.S. Constitution.......................................................................................................2, 16

## Other Authorities

30 C.F.R. § 550.284 ....................................................................................................8
Administration of Coral Reef Resources in the Northwest Hawaiian Islands,
        24 Op. O.L.C. 183 (2000).................................................................................12
Charles F. Wheatley, Jr., I Study of Withdrawals and Reservations
        of Public Domain Lands, 1 (1969) (report to Public Land Review Commission)
        (http://hdl.handle.net/2027/wu.89041980905)......................................... 9-10, 19
Executive Order No. 13795 ...................................................................... passim
Fed. R. Civ. P. 54 ........................................................................................................3
Fed. R. Evid. 803 ........................................................................................................5
Fed. R. Evid. 901 ........................................................................................................5
Law of the Sea: Convention on the Continental Shelf, art. 2(1), June 10, 1964,
        15 U.S.T. 471, T.I.A.S. No. 5578 ................................................................. 11-12
Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the
OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016).........................5
        Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas
        of the United States Outer Continental Shelf from Leasing Disposition,
        43 Weekly Comp. Pres. Docs. 19 (Jan. 9, 2007) ..............................................23
Memorandum on Modification of the Withdrawal of Areas of the United States Outer
        Continental Shelf from Leasing Disposition,
        44 Weekly Comp. Pres. Docs. 986 (July 14, 2008)........................................23
S. Rep. 83-411.............................................................................................18, 19, 20
Truman Proclamation, Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945)................11
V.S. Chu & T. Garvey, Cong. Res. Serv., R20846, Executive Orders: Issuance,
        Modification, and Revocation, 9 (2014), *available at*
        https://fas.org/sgp/crs/misc/RS20846.pdf (last visited Sept. 28, 2018)............................15

## I.  INTRODUCTION

The Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356b, enacted in 1953, is a statute designed to fuel the nation by encouraging development of minerals from the Outer Continental Shelf (OCS). Yet Plaintiffs ask this Court to interpret Section 12(a) of OCSLA to allow one president to permanently remove some, or even all, of the OCS from future development activities – the very activities that are expressly authorized by the statute. Under Plaintiffs' reading, only Congress could reverse that action through subsequent legislation. They claim that Section 12(a) is one-way ratchet that broadly authorizes any one President to limit the national potential for leasing, exploration, and development in the OCS for all time while simultaneously tying the hands of that same President and all future presidents, even if those limits prove unwise or contrary to the critical national priorities that OCSLA advances, including energy development and national security.

The Court should reject this distorted and cramped reading of Section 12(a). The President's authority to take actions to bring valuable resources to market, as intended by OCSLA, necessarily encompasses the authority to reconsider and revise prior withdrawals. Such an interpretation is supported by the statute's plain language, Congress' original purpose, and longstanding principles of constitutional, legislative, and administrative law. The Executive Branch's authority to execute a discretionary government power customarily includes the authority to revoke it, such as the President's implied authority to terminate treaties and appointments, and executive agencies' authority to rescind or revise regulations. Thus, even if Plaintiffs could meet their burden to establish Article III standing and ripeness – which they cannot – the Court should uphold the President's lawful exercise of his authority under Section 12(a).

1

## II.   ARGUMENT

Plaintiffs' efforts to defeat the Defendants' motion for summary judgment are based on misinterpretations of the governing law and applicable statute. *First*, they ask this Court to ignore its duty to reexamine the jurisdictional questions of standing and ripeness based on an erroneous application of the law of the case doctrine. Because Plaintiffs have a higher standard of proof at the summary judgment stage, it is proper and necessary for the Court to reexamine its jurisdiction. In so doing, the Court should conclude that the Plaintiffs have failed to meet their burden.

*Second*, Plaintiffs ask this Court to distort and trample on the language and, indeed, the entire structure and purpose of OCSLA, to conclude that the President lacked sufficient authority to issue Executive Order No. 13795, which the President issued citing his authority under the "Constitution and the laws of the United States of America, including the Outer Continental Shelf Lands Act, 43 U.S.C. [§] 1331 et seq." ("OCSLA"). To reach this conclusion, Plaintiffs selectively read phrases out of the statute, ignore congressional intent, and rely on statutes with entirely different purposes. Moreover, Plaintiffs split hairs to distinguish President Trump's actions from those of prior Presidents pursuant to OCSLA Section 12(a). For these reasons, even if Plaintiffs established the jurisdictional minimums of standing and ripeness, the Defendants are entitled to judgment as a matter of law.

### A.   The Law of the Case Doctrine Does Not Bar The Court From Determining Whether There Is Jurisdiction To Decide Plaintiffs' Claims.

Plaintiffs assert that the Court's consideration of their Article III standing and the ripeness of their claims is barred by the "law of the case" doctrine. Pl. Reply at 1-3, but their reliance on that doctrine is misplaced.

The law of the case doctrine "is a judicial invention designed to aid in the efficient operation of court affairs." *United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014) (quoting *United States v. Lumni Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000)). While application of this doctrine "generally" precludes a court from reconsidering an issue previously decided, the "law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018); *see also* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment . . . ."). Although the doctrine "directs a court's discretion, it does not limit the tribunal's power." *Pepper v. United States*, 562 U.S. 476, 506 (2011) (quotations and citation omitted).

Plaintiffs contend that there has been no change in circumstances warranting the Court's reconsideration of the standing and ripeness issues. But when the Court moves from resolving a motion to dismiss to ruling on the merits of Plaintiffs' claims, the standard of proof on these issues necessarily changes. As the Supreme Court has stated, at the pleadings stage, plaintiffs can rely on "general factual allegations," while at the summary judgment stage they must come forward with admissible evidence of specific facts that establish the court's jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Where, as here, the question presented is whether the Court has jurisdiction, the law of the case doctrine "should not be applied woodenly in a way inconsistent with substantial justice." *United States v. Miller,* 822 F.2d 828, 832-833 (9th Cir. 1986) (citation omitted). The Ninth Circuit Court of Appeals has held that the law of the case doctrine is not "an inexorable command" or a limit on the court's power. *EEOC v. Global Horizons, Inc.,* 904 F. Supp. 2d

1074, 1091 (D. Haw. 2012) (quoting *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (per curiam). A trial judge has broad discretion to reconsider earlier rulings and, in this case, Defendants' Motion for Summary Judgment provides ample reasons to do so. *See Kamakana v. City & Cty. of Honolulu,* 447 F.3d 1172, 1186 (9th Cir. 2006); Rec. Doc. 56 at 13-18. The Court's unflagging duty to assure itself of Article III jurisdiction is not an issue that can be waived, so the law of the case doctrine should not bar consideration of the question under the heightened standard of proof. *Cf. Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818-19 (1988) (finding that the Seventh Circuit did not err in reexamining the question of jurisdiction even though a prior decision by another court in the same case had found that jurisdiction was proper in the Seventh Circuit).

### B. Plaintiffs Lack Article III Standing.

Plaintiffs address only one aspect of the Defendants' arguments regarding standing, arguing that their claim is redressable because seismic surveys are unlikely to occur in the absence of Executive Order No. 13795.[1] Plaintiffs accuse Defendants, Pl. Reply at 3, of not "providing any evidence" that the government has issued seismic permits in areas that are withdrawn from leasing. But evidence shows that operators will apply for geophysical and geological exploration permits even in areas that have been withdrawn from development.

For example, Section 104 of the Gulf of Mexico Energy Security Act of 2006 (GOMESA), Pub. L. 109-432, 120 Stat. 3000, 3003, prohibited the Department of the Interior from offering for oil and gas leasing any areas east of the Military Mission Line in the Eastern Planning Area of the Gulf of Mexico until June 30, 2022. Since GOMESA's enactment, the

---

[1] For the reasons set forth in the Memorandum in Support of the Defendants' Motion to Dismiss ECF 13, 16-25, Plaintiffs also lack standing because they have failed to establish a particularized harm.

Bureau of Ocean Energy Management has issued thirty-four permits to entities interested in conducting geological or geophysical activities for the exploration of minerals in this area. Twenty-six of the thirty-four permits were issued for the acquisition of information regarding oil and gas resources, and all but one of these permits were issued before the issuance of Executive Order No. 13795.

Further, the Department of the Interior's Bureau of Ocean Energy Management is currently considering nine applications for geological and geophysical exploration activities in the Atlantic. *See* Def. Br. at 15 n.9 (citing https://www.boem.gov/Currently-submitted-Atlantic-OCS-Region-Permits/ (last accessed Oct. 5, 2018)).[2] Most of these applications were filed before Executive Order No. 13795 and contemplated surveys in areas withdrawn from oil and gas leasing by President Obama, or that were not made available for oil and gas leasing under the Department of the Interior's 2017-2022 oil and gas leasing program. *See* Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the OCS from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 861 (Dec. 20, 2016); Def. Br. at 15 n.9 (citing Department of the Interior, Bureau of Ocean Energy Management, Memorandum of Approval and Record of Decision for the Five Year Outer Continental Shelf (OCS) Oil and Gas Leasing Program for

---

[2] To the extent Plaintiffs are arguing that these facts are not supported by admissible evidence, they are incorrect. The cited information is collected and reported by the Department of the Interior pursuant to its statutory duties, including those under OCSLA, and therefore are government reports and business records within the meaning of Federal Rules of Evidence 803(6) and (8). The appearance, context, and nature of these documents, moreover is more than sufficient to satisfy the authentication requirements of Rule 901(4).

2012-2017 (Aug. 27, 2012), https://www.boem.gov/5-year/2012-2017/ (Last accessed Oct. 5, 2018)).[3]

The fact that many of the geological and geophysical applications currently under consideration, or permits issued, were either submitted or granted prior to Executive Order No. 13795 shows that Plaintiffs' argument about the unlikelihood of geological and geophysical activities in areas not available for oil and gas leasing in the absence of the Executive Order is incorrect.

Further, Plaintiffs have established neither ripeness nor imminent harm. As set forth more fully in Defendants' opening brief, each of Plaintiffs' alleged harms will flow, if at all, from anticipated future action by the agencies. *See* Def. Br. at 4-5. Executive Order No. 13795 itself does not cause any specific leasing or exploration activity, it simply authorizes the Secretary of the Interior to consider areas for leasing. In *Oceana v. Bureau of Ocean Energy Management*, 37 F. Supp. 3d 147 (D.D.C. 2014), the court found that leasing activities could continue while a reinitiated Endangered Species Act Section 7, 16 U.S.C. § 1536, consultation was underway because the Department of the Interior had already conducted an environmental analysis and would do so again at each subsequent phase of the four-step development process. *Id.* at 177-78. Similarly, the programmatic act of simply opening an area to leasing will not lead to harm because the Department of the Interior is obligated prior to each stage – leasing, exploration, and development – to take the requisite OCSLA steps, each of which include assessing impacts under

---

[3] Five of the nine applications for geological and geophysical exploration permits currently under evaluation were filed in 2014. *See* https://www.boem.gov/Currently-submitted-Atlantic-OCS-Region-Permits/ (Last accessed on Oct. 5, 2018).

statutes such as the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the National

Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12.

For these reasons, as set forth more fully in the Defendants' opening brief, ECF No. 56, the Defendants have demonstrated that Plaintiffs have not and cannot establish a causal link between Executive Order No. 13795 and the harm of which they complain. They have neither standing nor claims that are ripe for redress by this Court.

### C. Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law.

#### 1. Plaintiffs' Interpretation of OCSLA is Contrary the Language of Section 12(a), the Structure and Purpose of the Statute, and Its Legislative History.

As explained in the Defendants' opening brief, the text of OCSLA, its structure and purpose, and its legislative history all support the President's decision to modify and revoke prior withdrawals within the OCS. Def. Br. at 22-29.

##### a. The Language of Section 12(a)

Plaintiffs contend that Section 12(a) of OCSLA does not authorize the President to revoke or modify prior withdrawals, *see* Pl. Reply at 3-8, but their textual arguments cannot withstand scrutiny.

###### i. The Phrase "from Time to Time"

Plaintiffs challenge the argument that the phrase "from time to time" provides the President with authority to modify or revoke prior withdrawals. In so doing, Plaintiffs ignore the principle of statutory interpretation that courts should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *accord Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citing the rule against superfluities in rejecting an interpretation that would have rendered certain words unnecessary). Yet Plaintiffs

7

adopt an interpretation of Section 12(a) that would render the words "from time to time" superfluous.

Under Plaintiffs' reading, Section 12(a)'s authorization to make withdrawals "from time to time" means only that the President can make withdrawals at any time. Pl. Reply at 4. But that the same meaning is already evident from the remaining text – that the President "may . . . withdraw from disposition any of the unleased lands." Plaintiffs' reading of Section 12(a) renders the phrase "from time to time" unnecessary.

Plaintiffs go further by referencing the requirement that the Secretary "from time to time, review each" development and production plan approved pursuant to 43 U.S.C. § 1351. *See* 43 U.S.C. § 1351(h)(3). Plaintiffs choose their words carefully here when they assert that "reversal or abandonment" could not have been intended by this language, notably evading the more relevant question of whether the authority to "modify" these plans was intended. Here again, the cited provision supports Defendants' interpretation of OCSLA 12(a), and confirms that Plaintiffs' interpretation is incorrect. Under 43 U.S.C. § 1351(h)(3), the Secretary must from "time to time" review previously approved plans and, where deemed necessary, require a "revision" of the plan. *See* 30 C.F.R. § 550.284. Nothing in the text prohibits the Secretary from requiring a revision that shuts down the exploration or development activity, and Plaintiffs' assertion to the contrary is simply unsupported.

Plaintiffs' final example with respect to interpreting the phrase "from time to time" is equally unavailing. The provision addressing the Coast Guard's authority to modify its regulations cannot be used to interpret the meaning of Section 12(a) because it was enacted decades after Section 12(a) went into effect. *See* Outer Continental Shelf Lands Act Amendments of 1978, Publ. L. 95-372, tit. II, § 208, 92 Stat. 629, 654. Moreover, this provision

8

is consistent with the interpretation that authorizing actions from "time to time" is meant to delegate to the Executive the authority to modify prior decisions in light of changed circumstances or needs.[4]

Plaintiffs' claim that the plain language of Section 12(a) prohibits modifications or reversals of prior withdrawals fails because the phrase from "time to time" must be given meaning. That meaning, when construed in accordance with the statute's structure, purpose, and legislative history, is to give the President authority to revisit and revise prior withdrawal decisions to account for changes in circumstances or need.

### ii. Other Statutes Using the Term "Withdrawal"

Plaintiffs reject the Executive's ability to modify, revise, or reverse withdrawals, pointing out that other statutes using the word "withdrawal" have been construed not to allow modification or reversal of prior withdrawals. Pl. Reply at 6-7. In so doing, Plaintiffs impliedly, and mistakenly, invoke the "doctrine of *in pari materia*," which posits that laws of the same matter and on the same subject must be construed with reference to each other, so as to promote uniformity and predictability in the law. *United States v. Mills*, 850 F.3d 693, 698-99 (4th Cir. 2017). That doctrine, however, is inapplicable when statutes have different purposes. *Id.* at 699 (citing *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)).

When Section 12(a) was enacted, "Over four hundred statutes, thousands of Executive orders, numerous administrative regulations and administrative and judicial adjudications, constitute[d] the body of the law governing the withdrawal process." 1 Charles F. Wheatley, Jr.,

_____

[4] Plaintiffs' reference to Section 6 of OCSLA is unavailing because that provision was designed to address a single time event – bringing pre-OCSLA state-issued leases under the newly created statutory scheme. As such, it is not an analogous provision to Section 12(a) and does not inform the analysis.

Study of Withdrawals and Reservations of Public Domain Lands, 1 (Pub. Land Law Review Comm'n 1969) (http://hdl.handle.net/2027/wu.89041980905 (last accessed Oct. 5, 2018)). To suggest that there is a uniform phrasing or intent behind each of those four hundred statutes, as Plaintiffs do, is to disregard the array of purposes reflected in these statutes. The purposes of these statutes range from protecting water reserves for stock management (Stock-Raising Homestead Act of 1916, 43 U.S.C. §§ 291-301), protecting grazing lands from settlement (Taylor Grazing Act of 1934, 43 U.S.C. §§ 311-315 (repealed Aug. 1, 1955)), protecting scientific and archeological resources (*see* 1 Wheatley at 12), creating township sites in connection with irrigation projects (the Reclamation Act of June 17, 1902, 43 U.S.C. §§ 371-616yyyy), to developing the resources of the OCS (OCSLA, 43 U.S.C. §§ 1331-1356b). With such differing purposes, the Plaintiffs' attempt to apply the *in pari materia* doctrine must fail.

Later in their reply, Pl. Reply at 12, Plaintiffs argue that OCSLA should be interpreted in light of the Antiquities Act. Even granting Plaintiffs' erroneous assumption that the Antiquities Act prohibits the modification of a withdrawal – an issue the Court need not reach in this matter – the purposes of the two statutes are extraordinarily different.[5] OCSLA is a statute specifically aimed at the development of minerals found on the OCS. Its sole reason for existing is to make productive use of the vast resources newly claimed on behalf of the United States. By contrast, the Antiquities Act is a *protective* statute. *See* Act of June 8, 1906, ch. 3060, § 1, 34 Stat. 225.

---

[5] In a footnote, Plaintiffs appear to challenge whether the President can modify national monuments under the Antiquities Act. Pl. Reply at 12 n.7. This question is not relevant to the issue of whether OCSLA permits the modification or revocation of prior withdrawals and need not be addressed by the Court. Moreover, Plaintiffs' assertion is incorrect. The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1787, itself says nothing about limiting the President's authority *under the Antiquities Act;* rather, it only prevents the Secretary of the Interior from utilizing the authority granted by FLPMA to modify or revoke an Antiquities Act reservation. *See id.* § 1714(j).

Thus, setting aside the Plaintiffs' flawed interpretation of the Antiquities Act, any interpretation of that statute is inapposite to the question at bar.

Plaintiffs' argument that OCSLA must be construed *in pari materia* with the statutes governing federal uplands also fails in light of the distinction between the nature of the OCS and the federal uplands. Beginning with the Truman Proclamation, Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945), the three branches of government have all recognized that the nature of the United States' jurisdiction over the OCS is different in kind from that of federal land. In 1947, the Supreme Court held the federal government rather than the individual states had paramount rights in and power over the offshore three-mile marginal belt and full dominion over the resources of the soil under that area of water, including oil. *See United States v. California,* 332 U.S. 19, 29-31 (1947), *opinion supplemented per curiam*, 332 U.S. 804 (1947). As of 1953, therefore, the United States did not assert any role in the ocean or the seabed beyond the territorial sea other than the right to develop the minerals found there.

Congress recognized this distinction between paramountcy over seabed resources and full ownership or sovereignty several years later when it enacted OCLSA and then ratified the United Nations Convention on the Continental Shelf ("Convention"). Law of the Sea: Convention on the Continental Shelf, art. 2(1), June 10, 1964, 15 U.S.T. 471, T.I.A.S. No. 5578, (The United States, as a coastal state, "exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources."). As with the Truman Proclamation, the Convention recognized the limited nature of the rights of coastal states to the subsoil and seabed of the Continental Shelf. The United States signed the Convention on September 15, 1958, and Congress ratified it on April 12, 1961. Thus, Congress and the Executive confirmed their recognition that coastal states' rights in the continental shelf were not

absolute but limited including, however, the exclusive right to explore and exploit its natural resources. *See also* Administration of Coral Reef Resources in the Northwest Hawaiian Islands, 24 Op. O.L.C. 183, 192 (2000) ("OCSLA gave the Government control only over mineral resources . . . .").

Courts also have recognized the unique character of the United States' jurisdiction over the OCS. For instance, in *Treasure Salvors v. Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978), the Fifth Circuit considered whether the OCS should be treated as lands owned or controlled by the United States for purposes of determining the applicability of the Antiquities Act. The case involved an action for possession and confirmation of title to an abandoned Spanish galleon located on the OCS. The United States asserted title to the vessel chiefly upon two grounds: (1) application of the Antiquities Act to objects located on the OCS; and (2) the right of the United States, as heir to the sovereign prerogative asserted by the Crown of England, to goods abandoned at sea and found by its citizens. The court considered the Truman Proclamation, the Submerged Lands Act, OCSLA, and the Convention and concluded that the United States exercised control and jurisdiction over the OCS solely for purposes of exploiting its resources and, therefore, "the remains of the *Atocha* are not situated on lands owned or controlled by the United States under the provisions of the Antiquities Act." *Id.* at 340.

In sum, Plaintiffs' interpretation of Section 12(a) is drawn from statutes that govern very different types of property for very different purposes and thus sheds no light on its meaning.

### iii.     Changes in Policy

Plaintiffs next make the sweeping claim that there is a general bar prohibiting the President from changing policy decisions made by prior presidents in the exercise of delegated authority. Pl. Reply at 8. That is incorrect.

First, there is no general bar that prevents the Executive Branch from revisiting and revising earlier policy decisions. To the contrary, courts repeatedly have affirmed the inherent authority of the Executive Branch to reconsider and reverse its decisions. *See, e.g.*, *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) ("Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." (citation omitted)); *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008) ("The prohibition against doing something not authorized by statute is altogether different from the power to reconsider something that is authorized by statute. The power to reconsider is inherent in the power to decide."). The authority to execute a discretionary government power usually includes the authority to revoke it, unless the original grant expressly limits the power to revoke. When Congress gives an agency the discretionary authority to issue regulations, the agency is presumed to also have the authority to repeal them. *See, e.g., Commonwealth of Pa. v. Lynn*, 501 F.2d 848, 855-56 (D.C. Cir. 1974). Plaintiffs fail to explain how a President can have less authority to reconsider his actions than those agencies that work for him.

This inherent authority to reconsider remains intact when the Executive Branch is exercising delegated power, except to the extent that the statute prohibits the exercise of this authority. *See Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("So we think there can be no doubt, *in the absence of statutory prohibition*, that the authority of the Commission to hear

13

and determine matters arising under the rehearing provision of Section 405 carries with it by implication the authority to reconsider a 'decision, order or requirement' made within the twenty days allowed for an appeal. The power to reconsider is inherent in the power to decide." (emphasis added)). As Plaintiffs recognize, moreover, whether the statute has abrogated that inherent authority is a question that is specific to the statute in question. Pl. Reply at 8. As demonstrated above, OCSLA does not abrogate that inherent authority; rather, the plain language of OCSLA confirms the President's power to reconsider. And, as demonstrated below, the legislative history similarly confirms that authority.

The cases that Plaintiffs rely upon are distinguishable. For instance, in *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), the Ninth Circuit interpreted statues that delegated to the Attorney General the authority to cancel certificates of citizenship but expressly limited the effect of that cancellation. *Id.* at 1093. OCSLA contains no such express limitation on the President's authority to modify or reverse a prior withdrawal. In *North Dakota v. United States*, 460 U.S. 300 (1983), the Supreme Court interpreted the Loan Act, 16 U.S.C. § 715k-5, which provided that "[n]o land shall be acquired with moneys from the migratory bird conservation fund unless the acquisition thereof has been approved by the Governor of the State or the appropriate State agency." *Id*. at 312 n.3. The Court held that North Dakota could not withdraw approval previously given under the statute. In making that determination, the Supreme Court relied heavily upon the statutory language and purpose, finding that the Loan Act was intended to preserve wetlands and reasoning that if the states' consent were revocable, "the United States' ability to engage in such planning [for acquisitions] would be severely hampered." *Id*. at 314. The Supreme Court also concluded that it was important to limit North Dakota's discretion to avoid frustrating congressional intent regarding the federal interest – that is, it was important to

protect the United States' reliance interest in the state's approval. Under OCSLA, however, only the federal government is at issue, so there is no similar need to impose restraints on the withdrawal of approval. While changes by the states in the *North Dakota* case would have hampered the statute's purposes, allowing the President to modify or revoke prior withdrawals actually furthers the purpose of OCSLA to facilitate the development of the mineral resources on the OCS.[6]

Plaintiffs presume that the President can undo an Executive Branch decision made pursuant to delegated authority only with express congressional approval. Not surprisingly, their only citation is to a Congressional Research Report, which does not support their claim. The cited report notes that "[o]rders issued pursuant to the authority provided to the President by Congress, as distinguished from orders that are based on the President's exclusive constitutional authority may be legislatively modified or nullified." V.S. CHU & T. GARVEY, CONG. RES. SERV., R20846, EXECUTIVE ORDERS: ISSUANCE, MODIFICATION, AND REVOCATION, 9 (2014), *available at* https://fas.org/sgp/crs/misc/RS20846.pdf (last accessed Oct. 5, 2018). But the report makes no assertion that the *President's* authority (as opposed to congressional authority) differs with respect to the two types of orders.

Plaintiffs' presumption is not just unsupported, it is incorrect. In fact, the exact opposite presumption applies to the President's exercise of power. The President's broad authority to

_____

[6] Cases involving adjudicative decisions are not relevant to the modification or reversal of prior withdrawals. Pl. Reply at 8-9. Accordingly, Plaintiffs' reliance on *Civil Aeronautics Bd. v. Delta Air Lines, Inc.,* 367 U.S. 316, 334 (1961) and *Am. Trucking Ass'ns v. Frisco Transportation Co.,* 358 U.S. 133, 146 (1958) is misplaced. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) is also inapposite. The question presented in that case was whether the President could refuse to build the Yucca Mountain nuclear waste repository despite a statute requiring and funding that action, a factually distinct scenario from that presented here.

15

revisit, reverse, and undo prior decisions of the Executive Branch is inherent in the powers of the office vested by the Constitution. U.S. CONST. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America."); *id.*, § 3 (the President "shall take Care that the Laws be faithfully executed."). When "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The President's authority to undo or modify prior Executive decisions, like the power to remove inferior officers, is intrinsic in the executive power because the President is politically accountable for executing the laws. *Free Enter. Fund v. Public Co. Accounting Bd.*, 561 U.S. 477, 513 (2010) ("The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so."). "Without such power" to modify or undo past decisions of the Executive Branch, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514.

Such is the case with Section 12(a)—far from restricting the President's power over withdrawals, Congress expressly delegated authority to the President himself to make those decisions "from time to time." Congress could have further cabined the President's discretion to make withdrawals and to modify them. But it did not. Congress did not restrict the President's authority over such withdrawals, other than by limiting them to unleased lands. Thus, the President retains the power to modify and revoke those decisions under Section 12(a).

In Executive Order 13795, the President invoked the full delegated authority that Congress granted him in OCSLA, as well as his inherent constitutional authority under Article II. He did so to further the critical national priorities that OCSLA advances, including energy

development and national security. In exercising his judgment to set a difference course on these important policy matters, the President acted within his authority.

### b. The Structure and Purpose of OCSLA

Plaintiffs' statutory arguments are premised on the flawed assumption that OCSLA is a statute primarily designed to keep the OCS undeveloped. But the exact opposite premise is clear from OCSLA's original structure and purpose. When OCSLA was first enacted in 1953, including Section 12(a), the statute consisted almost entirely of provisions aimed at the exploration and development of the mineral, oil, and gas reserves of the OCS. *See* Outer Continental Shelf Lands Act, ch. 345, 67 Stat. 462 (Aug. 7, 1953). Later amendments to the statute, which did not affect Section 12(a), affirmed that the fundamental purpose of OCSLA is to make the OCS "available for expeditious and orderly development . . . ." Outer Continental Shelf Lands Act Amendments, 92 Stat. 635 (Sept. 18, 1978) (codified at 43 U.S.C. § 1332(3)).

A well-established canon of statutory construction requires that any ambiguities in the language of a statute – such as whether Congress intended to delegate the authority to modify prior withdrawals – should be resolved in a way that is consistent with the stated purposes of legislation. *See, e.g.*, *United States v. Am. Trucking Ass'ns, Inc.,* 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress."); *Knebel v. Hein*, 429 U.S. 288, 292 n.9 (1977) (referring to the statutory purpose when interpreting the Secretary of Agriculture's authority to administer the Food Stamp Program). Yet Plaintiffs' interpretation of the statute leads to the illogical result that a President may perform a *de facto* repeal of OCSLA by withdrawing the entire OCS from exploration and development and that any such withdrawal is permanent and immutable unless revoked by an act of Congress. In other words, Plaintiffs' interpretation would allow a President to withdraw virtually all of the OCS while depriving the

President and all future presidents of the ability to revise that determination. Under Plaintiffs' interpretation, only subsequent legislation could modify or revoke that decision. But this distorted reading of Section 12(a) allows a single sentence in OCSLA to swallow whole all of the provisions that provide for exploration, leasing, and development of the OCS. Plaintiffs' interpretation leads to illogical results that undermine OCSLA's purpose.

Such a reading of Section 12(a) is completely inconsistent with the purpose of OCSLA, which Congress enacted specifically "to provide for the *development* of . . . [the] vast mineral resources" of the Outer Continental Shelf. S. Rep. No. 83-411 at 2 (ECF No. 56-2) (emphasis added). Plaintiffs' construction is equally inconsistent with the subsequently added express purpose of making the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). Plaintiffs' understanding of the statute leads to absurd results that are inconsistent with the statute as a whole and not dictated by the language of any provision. The Court should reject that interpretation. *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." (citations omitted)).

### c. The Legislative History

In addressing the legislative history of Section 12(a), Plaintiffs mistakenly assert that Congress did not intend to delegate the authority to modify or reverse prior withdrawals to the President. Pl. Reply at 9-13. But the legislative history shows that Congress intended to grant the President wide discretion under Section 12(a) and did not seek to limit the President's authority to withdraw, modify withdrawals, and reverse withdrawals.

As Plaintiffs concede, the 1953 Senate Report on OCSLA stated that the authority bestowed upon the President by Section 12(a) was "comparable to that which is vested in him with respect to federally owned lands on the uplands." S. Rep. No. 83-411, at 26. Yet Plaintiffs argue that because Congress used different language in OCSLA than what was used in the statues governing the uplands – such as the Pickett Act – Congress intended to grant less authority to the President on the OCS. In doing so, they read into the statute a limitation that runs contrary to the exercise of executive authority generally as well as the upland authority to which they specifically refer. Plaintiffs' sleight of hand is to say that the *structure* of the uplands withdrawal authority (that Congress explicitly granted the power to revoke there) means that Congress did not intend to grant that authority in Section 12(a) because the power is not explicit in that statute. But the meaning of Section 12(a) is evidenced by the broad, unfettered authority granted in this concise statutory provision and further supported by the legislative history of Section 12(a) that expresses congressional intent to delegate to the President the same *authority* that existed on the uplands.

As Plaintiffs implicitly acknowledge, the statutes relevant to interpreting the meaning of Section 12(a) must have been in effect before 1953 – when that provision was enacted. At that time, and essentially until 1976, the predominant statute addressing withdrawal authority was the General Withdrawal Statute (the Pickett Act), ch. 421, § 1, 36 Stat. 847 (1910). The Pickett Act "delegated to the President the general power to 'temporarily withdraw' public land from settlement, location, sale, or entry . . . to remain in force until revoked by the President or by Congress." 1 Wheatley at 4. The 1953 Senate Report confirms that Congress intended to confer the same authority on the President with respect to the OCS that it had conferred upon the President in the Pickett Act. Because the Pickett Act authorized the President to modify and

"revoke" prior withdrawals, Congress's meaning can hardly be clearer, giving the President broad authority including the authority to revoke or modify prior withdrawals under OCSLA.

Plaintiffs respond by arguing that the clear intention to make the authority on the OCS parallel in substance to the authority granted by the Pickett Act – including the ability of the President to "revoke[]" prior withdrawals – is belied by the existence of Section 8 of OCSLA, which allows the Secretary to choose not to offer leases in portions of the OCS. This argument goes too far. Not issuing a lease (a discretionary decision for a particular sale) is not the same as, or a duplication of, the decision of the President to close a particular area to leasing until the President modifies that decision.

The Ninth Circuit recognized the distinction between these two statutory provisions in *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229-30 (9th Cir. 1988). There, the issuance of certain leases was being challenged under the National Environmental Policy Act. In rejecting the argument by an intervenor that a "no action alternative" – that is, choosing not to issue the leases – would constitute an illegal withdrawal of land from leasing, the Ninth Circuit distinguished the decision not to lease from a withdrawal – one a formal decision to put the property beyond the possibility of leasing and the other a choice not to issue a particular lease. *Id.* That same sensible distinction exists in OCSLA and cannot be read to negate Congress' intent to provide "comparable" authority to the President as that which existed in the uplands – including the right to modify or reverse prior withdrawals.[7]

_____

[7] Plaintiffs also try to brush aside Executive Orders delegating upland withdrawal authority to the Secretary of the Interior that expressly allow modification and reversal of prior withdrawals by claiming that these statutes are distinguishable because they expressly grant this authority. But Plaintiffs miss Congress' clear intention that the uplands authority and the OCSLA authority related to withdrawals be "comparable." S. Rep. No. 83-411 at 26. By acknowledging the

### 2. Executive Order No. 13795 Continues the Precedent Set By Prior Actions Under OCSLA.

Plaintiffs assert that Executive Order No. 13795 is "unprecedented" in the history of Section 12(a). Pl. Reply at 13. In their attempt to support this assertion, they warp the history of Presidential action under Section 12(a) and overlook Congress' acquiescence in that history.

First, it is notable that in the more than sixty-year history of Section 12(a), Presidents have exercised their authority pursuant to this provision only twelve times. Nonetheless, there is precedent for Executive Order No. 13795. *See* Def. Br. at 7-10. Two of these modifications reduced the area previously withdrawn by a prior Executive order. In 2008, President George W. Bush re-opened OCS areas off the shores of California, Washington, and Oregon, the North Atlantic, Mid-Atlantic, and South Atlantic planning areas, the eastern Gulf of Mexico, and the North Aleutian Basin planning area. *See* Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007) (ECF No. 13-11); Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008) (ECF No. 13-12). Where a prior President has undertaken a nearly identical action under Section 12(a), there is no definition of "unprecedented" that would apply to Executive Order No. 13795.

In seeking to cast Executive Order 13795 as unprecedented, Plaintiffs contrive a distinction between the authority to modify withdrawals that are limited to a specific time frame

_____

authority to modify and revoke prior withdrawals on the uplands, therefore, Plaintiffs effectively concede the congressional intent that the President be able to modify or revoke prior withdrawals under OCSLA. Nothing in the committee reports indicate an intent to only extend uplands authority that is expressly described in statutory language.

and those that were issued "for a time period without specific expiration."[8] Pl. Reply at 17. But they have no authority reading Section 12(a) to authorize modifications in the former case but not the latter. In other words, if Section 12 authorizes the President to revoke withdrawals with a specified expiration, nothing in the provision indicates why the answer would be different for withdrawals where the precise time of expiration was not specified.

Moreover, Plaintiffs' attempt to dismiss these prior modifications of withdrawals as done in "concert" with Congress does not provide a meaningful distinction. The statutory changes to which they point did not require the President to modify the prior withdrawals. In short, before President George W. Bush took action in 2007 and 2008, there were two bars to development of oil and gas in the areas covered by President Clinton's prior withdrawal: (1) the congressional annual appropriations statute and (2) the Executive Order issued by President Clinton. Congress' decision not to renew the prohibitions on the use of appropriated funds for lease sales simply removed one of the two bars to development. Nothing in the appropriations statute required or explicitly authorized President Bush to modify the Executive Orders issued under Section 12(a). President Bush made those modifications "[u]nder the authority vested in [him] as President of the United States, including Section 12(a) . . . ," not pursuant to the appropriations statutes that, by silence, discontinued the congressional ban on exploration and development of the OCS.

Plaintiffs also have no good answer to President Obama's modification of a prior withdrawal under Section 12(a). President Obama replaced his prior withdrawal that had a specific expiration date with a withdrawal that had no specific expiration. To be consistent with

---

[8] Notably, the Plaintiffs avoid the language actually used by President Obama in his Executive Orders – that the withdrawals were for a time period without specific limitation – and replace it with the term "permanent." Pl. Reply at 13. In doing so, Plaintiffs assume a meaning not given by the plain language of President Obama's Orders.

their statutory interpretation, Plaintiffs should assert that the second modification was unlawful. Instead, Plaintiffs contend that labeling this as a modification is to "elevate form over substance." Pl. Reply at 18 n.13. Either Congress granted the authority to modify or revoke prior withdrawals or it did not. As demonstrated above, Congress did grant that authority and President Obama himself exercised it.

Plaintiffs' bold assertion that Executive Order 13795 is "unprecedented" is wrong.

### 3. Congress Acquiesced in the President's Modification of Former Withdrawals.

Plaintiffs claim that the history of Presidential actions pursuant to Section 12(a) is too slight to warrant a finding of congressional acquiescence. They deny that the modifications by the last two Presidents can represent an "unbroken pattern" sufficient to warrant a finding of acquiescence. Pl. Reply at 18-21. They choose an odd example to make this point.

Specifically, Plaintiffs point to Congress's decision to override President Truman's executive order setting aside the continental shelf as a petroleum reserve for the Navy. *Id* at 20. What this example shows, however, is both that Congress knows well how to act when it wishes to override the President's actions under his withdrawal authority and that it intends OCSLA to be a statute focused on development of the mineral reserves. Congress, however, has not stepped in to override any of the Executive Orders modifying or revoking prior withdrawals, including Executive Order 13795. *See, e.g., Dames & Moore v. Regan,* 453 U.S. 654, 684-85 (1981) (upholding a settlement entered into by the President and finding based on a precedent of at least ten settlements that Congress did not overturn that "[t]he President has exercised the power, acquiesced in by Congress . . . ."). Moreover, in evaluating the question of congressional acquiescence, the Supreme Court has found it "telling" when Congress had considered limiting the President's authority and decided against it. *Id.* at 685. As Plaintiffs acknowledge, Congress

23

has considered narrowing the President's authority under OCSLA Section 12 to certain purposes – specifically national security – but concluded it was unwise to cabin the President's discretion. *See* Pl. Reply at 9-10; Def. Br. at 26-27 (and authorities cited therein).

In sum, past Presidents have taken actions modifying or revoking prior withdrawals made pursuant to Section 12(a). Congress was aware of these actions and took no action to overturn them. In such circumstances, it is clear Congress has acquiesced in that interpretation of Section 12(a). Accordingly, Defendants are entitled to summary judgment.

### D. Plaintiffs Are Not Entitled to An Injunction

Plaintiffs correctly concede that they cannot obtain an injunction against the President – "Plaintiffs' requested remedy does not require that the President take or refrain from taking any action." Pl. Reply at 21. Moreover, as demonstrated above and in their opening brief, Defendants have established that they are entitled to summary judgment based on the language, purpose and legislative history of OCSLA. Accordingly, no injunction should issue.

Plaintiffs do not address the Defendants' arguments regarding the balance of the equities, arguing simply that they are not required to assert a claim pursuant to the Administrative Procedure Act. Even were they correct on that point, the balance of the equities still weighs against the issuance of an injunction in this case. Even if the Court concluded that Plaintiffs have established sufficient standing at the summary judgment stage, an injunction in this matter would bar actions that have not yet been taken or even articulated in detail. Accordingly, where the injuries could be resolved simply by declaratory relief, an injunction would be improper. *See Franklin v. Massachusetts*, 505 U.S. 788, 796-801 (1992).

## III. CONCLUSION

President Trump's Executive Order 13795 is supported by the statutory language, its structure and purpose, and legislative history. Therefore, Defendants are entitled to summary judgment in their favor.

Dated: October 5, 2018

Respectfully submitted,

JEFFREY WOOD
Acting Assistant Attorney General
ERIC GRANT
Deputy Assistant Attorney General
Environment & Natural Resources Division

_____/s/_____
SARAH D. HIMMELHOCH
MD Bar. No. 199212160064
Senior Litigation Counsel
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington, DC 20004
Telephone: (202) 514-0180
Facsimile: (202) 514-0057
sarah.himmelhoch@usdoj.gov

*Attorneys for Defendants*

## Certificate of Service

I hereby certify that on October 5, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record.

_____/s/_____
Sarah D. Himmelhoch
*Attorney for Defendants*