James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American Petroleum Institute*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| LEAGUE OF CONSERVATION VOTERS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | No. 3:17-cv-00101 (SLG) |

**AMERICAN PETROLEUM INSTITUTE'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

## TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. SECTION 1341(a) AUTHORIZES PRESIDENTIAL MODIFICATION OF OCS WITHDRAWAL DECISIONS .......... 3

A. Section 1341(a)'s Broad Discretionary Language Authorizes The President Both To Withdraw And Modify A Withdrawal. .......... 4

B. OCSLA's Developmental Purpose Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal .......... 9

C. Presidential And Congressional Practice Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal .......... 11

II. THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795. .......... 15

CONCLUSION .......... 15

i

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
134 S. Ct. 2259 (2014) ........................................ 2, 3

*Bay Area Peace Navy v. United States*,
914 F.2d 1224 (9th Cir. 1990) ........................................ 5

*California v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981) ........................................ 9

*Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.*,
844 F.3d 1133 (9th Cir. 2017) ........................................ 2, 3

*Cherichel v. Holder*,
591 F.3d 1002 (8th Cir. 2010) ........................................ 13

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*,
367 U.S. 316 (1961) ........................................ 8

*Donovan v. S. Cal. Gas Co.*,
715 F.2d 1405 (9th Cir. 1983) ........................................ 10

*Gorbach v. Reno*,
219 F.3d 1087 (9th Cir. 2000) ........................................ 8

*Haig v. Agee*,
453 U.S. 280 (1981) ........................................ 11

*Illinois Central Railroad Co. v. United States*,
1858 WL 4672 (Ct. Cl. Feb. 1, 1858) ........................................ 6, 7

*In re Aiken Cnty*.,
725 F.3d 255 (D.C. Cir. 2013) ........................................ 8

*Lockerty v. Phillips*,
319 U.S. 182 (1943) ........................................ 5

*Myers v. United States*,
272 U.S. 52 (1926) ........................................ 6

*Nat'l Mining Ass'n v. Zinke*,
877 F.3d 845 (9th Cir. 2017) ........................................ 12

*New Process Steel, L.P. v. NLRB*,
560 U.S. 674 (2010) ........................................ 11

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014) ........................................ 11, 12

*Parra v. Astrue*,
481 F.3d 742 (9th Cir. 2007) ........................................ 10

ii

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

*Presidio Hist. Ass'n v. Presidio Trust*,
811 F.3d 1154 (9th Cir. 2016) .......... 10

*Saxbe v. Bustos*,
419 U.S. 65 (1974) .......... 14

*Shurtleff v. United States*,
189 U.S. 311 (1903) .......... 4

*State v. McBride*,
29 Wash. 335 (Wash. 1902) .......... 4, 6, 7

*Udall v. Tallman*,
380 U.S. 1 (1965) .......... 12

*United States v. Augustine*,
712 F.3d 1290 (9th Cir. 2013) .......... 11

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915) .......... 2, 11, 12, 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 15

**Statutes**

2 U.S.C. § 683 .......... 8

28 U.S.C. § 2071(a) .......... 4

43 U.S.C. § 1335(a)(1) .......... 7

43 U.S.C. § 1341(a) .......... 1, 3, 4, 5, 7

43 U.S.C. § 1347(c) .......... 7, 8

43 U.S.C. § 1351(h)(3) .......... 8

43 U.S.C. § 1802(1) .......... 1, 6, 9

43 U.S.C. §§ 1331, *et seq* .......... 1

Pub. L. No. 110-329, 122 Stat. 3574 (Sept. 30, 2008) .......... 15

Pub. L. No. 94-579, 90 Stat. 2743 (Oct. 21, 1976) .......... 13

**Other Authorities**

H.R. Rep. No. 83-413 (1953) .......... 1, 9

S. Rep. No. 83-441 (1953) .......... 10

U.S. Const., art. I § 1 .......... 12

U.S. Const., art. I § 5, cl. 3 .......... 6

U.S. Const., art. I § 9, cl. 7 .......... 6

U.S. Const., art. II § 2 .......... 15

iii

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

U.S. Const., art. II § 3 ........ 6

U.S. Const., art. III § 1 ........ 2, 4, 6

V. Kesavan & J.G. Sidak, *The Legislator-In-Chief*, 44 WM. & MARY L. REV. 1 (2002) ........ 5

VanDercreek, *From the Judiciary Act of 1789 to the Judicial Improvements Act of 1989 - Two Hundred Years of Non-Inferior Inferior Courts*, 14 Okla. City U. L. Rev. 565 (1989) ........ 5

**Regulations**

30 C.F.R. § 550.284 ........ 8

iv

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

## INTRODUCTION

"The principal purpose of [the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq*.] is to authorize the leasing by the Federal Government of . . . the [outer continental shelf ("OCS")]," H.R. Rep. No. 83-413, at 2 (1953), and encourage the "expedited exploration and development of the [oil and gas resources of the OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade," 43 U.S.C. § 1802(1). Plaintiffs nevertheless read OCSLA's delegation to the President of authority "from time to time" to "withdraw from disposition any of the unleased lands of the [OCS]," 43 U.S.C. § 1341(a) ("Section 1341(a)"), to permit a president to contravene Congress' overriding developmental purpose by withdrawing unleased OCS lands entirely and indefinitely from leasing, development, and the reach of Congress itself (absent enactment of a repealing statute subject to the president's veto).

As API's cross-motion for summary judgment demonstrated, OCSLA does no such thing. *See* API Combined Mem. in Opp. to Pls.' Mot. for Summ. J., and In Supp. of Cross-Mot. for Summ. J. (Dkt. No. 59) ("API Mem.") at 12–23.[1] Rather, Section 1341(a) confers broad discretion over withdrawals upon the President in language—delegating authority that the President "may" exercise "from time to time"—long-understood likewise to confer authority to modify previous exercises of that discretionary authority. *See id*. at 13–16. For example, the

[1] API's cross-motion incorporated by reference the Federal Defendants' arguments demonstrating both that Plaintiffs' claims are not justiciable, and that they fail on the merits. *See* API Mem. at 2; Fed. Defs.' Mem. In Supp. of Summ J. (Dkt. No. 56) ("Fed. Defs.' Mem."). API again incorporates Federal Defendants' and the State of Alaska's reply arguments, and focuses this reply on further grounds for granting API's cross-motion for summary judgment.

1

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Constitution uses that discretionary formulation only once—authorizing Congress to establish lower federal courts "from time to time." U.S. Const., art. III § 1. That provision has been understood to confer great flexibility upon Congress to modify the jurisdiction of lower federal courts, and to create and abolish lower federal courts, as Congress sees fit to meet existing circumstances.

Moreover, the breadth of Section 1341(a)'s delegation language is confirmed when viewed, as it must be, in light of OCSLA's "structure, history, and purpose," *Chan Healthcare Group, PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, 1138 (9th Cir. 2017) (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)), and further bolstered by past congressional and presidential implementation of Section 1341(a), *see United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915), and the President's independent constitutional powers. *See* API Mem. at 16–25.

In response, Plaintiffs have provided no justification for deviation from these well-established sources of statutory meaning and executive authority. Instead, Plaintiffs' scattershot response mischaracterizes API's arguments, governing legal authority, OCSLA's purpose, history, and the pattern of practice between Congress and presidents under Section 1341(a). Having failed to support their unprecedented claim that Congress delegated to the President authority completely to undermine Congress' purpose in enacting OCSLA, or to refute contrary legal authority, Plaintiffs' challenge to the President's lawful exercise of his discretionary authority in Executive Order 13795 cannot stand.

2

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

## ARGUMENT

### I. SECTION 1341(a) AUTHORIZES PRESIDENTIAL MODIFICATION OF OCS WITHDRAWAL DECISIONS.

This case is not, as Plaintiffs suggest, about the scope of congressional power over federal land, but rather, the scope of Congress' delegation of authority over OCS lands to the President in Section 1341(a). That question of statutory construction requires consideration of the statutory language, along with "the 'structure, history, and purpose' of the statute.'" *Chan Healthcare*, 844 F.3d at 1138 (quoting *Abramski*, 134 S. Ct. at 2267). All of these sources of meaning belie Plaintiffs' stilted interpretation of the authority Section 1341(a) delegates to the President.[2]

By providing that the President "***may, from time to time,*** withdraw from disposition any of the unleased lands of the [OCS]," 43 U.S.C. § 1341(a) (emphasis added), Congress delegated broad discretionary authority to the President. *See, e.g.*, API Mem. at 13–16 (citing cases). Plaintiffs insist that this broad, discretionary formulation nevertheless cabins the President's authority solely to withdraw unleased lands from disposition for leasing because it does not expressly address "the authority to reverse withdrawals." Pls.' Reply at 3. In Plaintiffs' view, there is no ground "to interject such a term into the statute." *Id*. at 4. But there is no need to insert an absent term. Section 1341(a)'s broad language authorizes the President to reverse or modify an existing withdrawal decision as part of the delegated withdrawal authority itself, and that reading is confirmed by OCSLA's overriding developmental purpose, legislative history, and past practical implementation of Section 1341(a). *See* API Mem. at 13–23.

---

[2] Plaintiffs seek to sidestep the central question of statutory construction at issue and, indeed, dismiss API's reliance on, and citation of, the well-settled standards governing statutory construction. *See* Pls.' Reply at 15 n.9.

3

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

### A. Section 1341(a)'s Broad Discretionary Language Authorizes The President Both To Withdraw And Modify A Withdrawal.

As API's cross-motion demonstrates, statutes and the Constitution commonly employ the discretionary language used in Section 1341(a)—authorizing action that "may" be taken "from time to time"—to bestow the additional power to revise actions previously taken under the discretionary authority "[a]s occasion demands or requires . . . ." *State v. McBride*, 29 Wash. 335, 342 (Wash. 1902). *See also* API Mem. at 13–14. Had Congress intended to cabin the discretion inherent in this formulation, it needed to do so clearly. *See Shurtleff v. United States*, 189 U.S. 311, 316, 318 (1903) ("We think it quite inadmissible to attribute an intention on the part of Congress to make such an extraordinary change in the usual rule . . . without stating such intention in plain an explicit language, instead leaving it to be implied from doubtful inferences."). Plaintiffs respond not with such evidence of congressional intention, but by mischaracterizing the cited authorities.

Contrary to Plaintiffs' assertion, not a single one of the statutory and constitutional examples identified by API involve "legislative delegations" that may be "revoked by the legislature itself." Pls.' Reply at 6 n.2. Rather, in each instance, either Congress or the Constitution authorizes ***a different*** governmental body to take an action "from time to time," with that authorization carrying with it (although unstated) the authority subsequently to reverse or revise its action: (1) 28 U.S.C. § 2071(a) implicitly authorizes the Supreme Court to revise its rules as an incident to its express statutory authority "from time to time" to "prescribe rules," (2) the Constitution implicitly authorizes Congress to revise and modify the federal courts as an incident to its authority "from time to time" to establish lower federal courts, U.S. Const., art. III § 1, and (3) statutes implicitly authorize administrative agencies to revise regulations as an

4

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

incident to the authority "from time to time" to promulgate the regulations, *see* API Mem. at 14–15.[3]

Plaintiffs' contrary reading would mean that, for example, Congress is ***not*** authorized to eliminate a lower federal court previously established, and that an administrative agency ***cannot*** revise or repeal a regulation once promulgated. But both Congress and administrative agencies have exercised these powers, repeatedly. Indeed, the discretionary power to ordain and establish inferior courts "from time to time" has been interpreted with great flexibility, ranging from "declin[ing] to create any such courts" to "investing them with jurisdiction either limited, concurrent, or exclusive, [or] withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943) (quotation omitted). Moreover, Congress has with some regularity abolished inferior courts it had previously established. *See*, *e.g.*, VanDercreek, *From the Judiciary Act of 1789 to the Judicial Improvements Act of 1989 - Two Hundred Years of Non-Inferior Inferior Courts*, 14 Okla. City U. L. Rev. 565, 568–79 (1989).

Plaintiffs' suggestion that the Constitution only uses the "from time to time" formulation to denote timing or "frequency of a legislative power," *see* Pls.' Reply at 5 n.1 (quoting V. Kesavan & J.G. Sidak, *The Legislator-In-Chief*, 44 WM. & MARY L. REV. 1, 13–18 (2002)), ignores the discretionary power over the creation (and elimination) of lower federal courts. That power over lower federal courts, moreover, is the only instance of the formulation in the Constitution that—like Section 1341(a)—pairs the phrase "from time to time" with the

[3] API cited *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1234 n.6 (9th Cir. 1990), to highlight an example of a statutory provision authorizing an agency to exercise its discretion to promulgate regulations "from time to time," not, as Plaintiffs' suggest, *see* Pls.' Reply at 5, as an example of a judicial interpretation of that language.

5

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

discretionary statement that the delegated authority "may" be taken. *See* U.S. Const., art. III § 1.[4]

Moreover, the statutory and constitutional examples identified by API are all consistent with the traditional "rule of constitutional and statutory construction" that the power to reverse a discretionary decision is "incident to the power" to make that discretionary decision in the first instance. *Myers v. United States*, 272 U.S. 52, 119 (1926). Plaintiffs seek to confine *Myers* to its facts via the question-begging suggestion that the appointment power "by its nature," Pls.' Reply at 5, must necessarily include the power to remove a federal officer whereas the Section 1341(a) withdrawal power does not by similar necessity include the power to modify a withdrawal. But Plaintiffs do not explain why the President's constitutional charge to execute the laws—necessitating the appointment and removal power over federal officers—is distinguishable from OCSLA's statutory charge to ensure the "expedited exploration and development of the [OCS]," 43 U.S.C. § 1802(1), which supports the President's companion power to modify a prior withdrawal when occasion requires in order to achieve OCSLA's developmental purpose.

Plaintiffs' attempts to distinguish the interpretation of the same discretionary statutory language in *Illinois Central Railroad Company v. United States*, 1858 WL 4672 (Ct. Cl. Feb. 1, 1858), and *State v. McBride*, 29 Wash. 335 (Wash. 1902), founder upon the actual facts and reasoning of those cases. *See* Pl.'s Reply at 6. Plaintiffs purport to distinguish *Illinois Central* as a case in which "no reversal action had been taken under the statutes in question." *Id*. To the

---

[4] The Constitution's other uses of the phrase "from time to time" correspond to non-discretionary actions that either Congress or the President "shall" take. *See* U.S. Const., art. I § 5, cl. 3 (requiring journal of congressional proceedings to be published); U.S. Const., art. I § 9, cl. 7 (requiring a regular statement of government receipts and expenditures); U.S. Const., art. II § 3 (requiring President to give a statement on the State of the Union).

6

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

contrary, the decision discusses a reversal action—the abandonment of Fort Armstrong—that indubitably ***had*** taken place, with the court concluding that a federal statute authorizing the President to erect forts "from time to time, as he shall judge necessary" "by implication, confer[s] on him the power also, when the place designated and reserved becomes no longer necessary for the purposes of the reservation, to direct its abandonment by the War Department." *See Ill. Central*, 1858 WL 4672, at *1 (citing 1 Stat. 554, Ch. 37 Sec. 1).

In *McBride*, the court held that the discretionary formulation of the state constitutional provision for setting the number of judges on the state supreme court—that the legislature "may" increase the number "from time to time"—authorized the legislature subsequently to decrease the number "[a]s occasion demands." *McBride*, 29 Wash. at 342–43. The "other terms" emphasized by Plaintiffs, *see* Pls.' Reply at 6, simply confirm this reading of the discretionary language, *see McBride*, 29 Wash. at 343 (confirming construction of constitutional provision with the existence of an established minimum number of judges, and past understanding of the provision by executive and legislature). The same is true of Section 1341(a). *See* API Mem. at 13–22; *infra* pp. 9–14.

Nor do Plaintiffs' proposed counter-examples of statutory provisions using the "from time to time" formulation demonstrate that the use of that language in Section 1341(a) refers to the timing, rather than the scope, of the delegated authority. *See* Pls.' Reply at 4. In each instance, Plaintiffs read the formulation without regard to the statutory context. First, the use of "from time to time" in 43 U.S.C. § 1335(a)(1), relates to timing because the sole purpose of that statutory provision is to establish the timing by which holders of a state oil and gas lease issued on the OCS prior to the enactment of OCSLA could bring their lease within the protections of OCSLA. Second, 43 U.S.C. § 1347(c)'s first sentence imposes a non-discretionary duty upon

7

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

the "Department in which the Coast Guard is operating" to promulgate regulations governing unregulated hazardous working conditions. Because the duty—unlike the withdrawal authority in Section 1341(a)—is non-discretionary, it does not include the power to reverse or modify inherent in the "from time to time" formulation. Instead, that formulation is included in the second sentence of 43 U.S.C. § 1347(c), which separately provides that the agency "may from time to time modify" a promulgated regulation. Finally, 43 U.S.C. § 1351(h)(3)'s provision directing the Secretary of Interior to review issued exploration and development plans "from time to time" is both non-discretionary, and, in fact, ***does*** authorizes the Secretary to revise or reverse provisions of an earlier issued plan. *See* 30 C.F.R. § 550.284 ("How will BOEM require revisions to the approved [plan]?").

Read in context, Plaintiffs' arguments and proposed authorities fall far short of undermining the broad discretion inherent in Section 1341(a)'s plain language.[5]

[5] API does not argue generally that "the power to create must include the power to destroy." Pls.' Reply at 8. Rather, API demonstrates that the particular language used by Congress in Section 1341(a), read in light of OCSLA's purpose, history, and practice, authorizes the President to reverse or modify prior withdrawal decisions. Plaintiffs' case citations debating their straw man, *see* Pls.' Reply at 8, are therefore beside the point. At any rate, Plaintiffs' proffered cases involved either (1) delegations to administrative agencies, which are "entirely a creature of Congress," *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961); *see also Gorbach v. Reno*, 219 F.3d 1087, 1092–93 (9th Cir. 2000), whereas the President possesses independent Article II authority over foreign relations and national security, *see* Fed. Defs.' Mem. at 2–3, or (2) express limitations on the President's spending authority, *see In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (citing 2 U.S.C. § 683), and express limitations on the Attorney General's authority to revoke citizenship, *see Gorbach*, 219 F.3d at 1093–94 (describing "express statutory procedure" conferring power over denaturalization to the district courts rather than the Attorney General).

8

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

### B. OCSLA's Developmental Purpose Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal.

Section 1341(a)'s discretionary language is bolstered by OCSLA's purpose and legislative history. *See* API Mem. at 16–19. Congress made clear that "[t]he principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of . . . the [OCS]." H.R. Rep. No. 83-413 (1953). *See also* 43 U.S.C. § 1802(1) (explaining congressional purpose to ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade"); 43 U.S.C. § 1332(3) (finding that the OCS "should be made available for expeditious and orderly development"). Plaintiffs largely ignore OCSLA's stated purpose, instead replacing it with Plaintiffs' own policy preference to "permanent[ly] protect[] . . . ecologically vulnerable areas of the Arctic and Atlantic Oceans." Pls.' Reply at 1. But Plaintiffs are not entitled simply to replace Congress' purpose with their own.

In view of Congress' explicit "objective—the expeditious development of OCS resources," *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981)—reading Section 1341(a) to allow a President to reverse or modify a prior withdrawal in order to open areas to potential future disposition for leasing conforms to "[t]he first stated purpose of the Act . . . to establish procedures to expedite exploration and development of the OCS." *Id.* (explaining that OCSLA's remaining purposes "candidly recognize that some degree of adverse [environmental] impact is inevitable"). By contrast, Plaintiffs' assertion that Section 1341(a) precludes any reversal or modification of an existing withdrawal from leasing would give a president the authority single-handedly—until Congress could enact a repealing statute subject to the president's veto—to negate OCSLA's developmental purpose by withdrawing the entire unleased OCS from

9

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

disposition for leasing. "[S]uch an interpretation is unpersuasive because it contradicts the purpose of the statute." *Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007) (rejecting agency interpretation of statute). *See also, e.g.*, *Donovan v. S. Cal. Gas Co.*, 715 F.2d 1405, 1408 (9th Cir. 1983) ("To allow the construction of the statute which the [party] here urges undermines the purpose of Congress in enacting the statute. We will not do so.").

Aside from OCSLA's overall purpose, the only other purpose expressly connected to Section 1341(a) in its history was the protection of national security. As originally reported, the withdrawal provision authorized the President only to reserve withdrawn lands "for the use of the United States in the interest of national security." S. Rep. No. 83-441, at 22 (1953) (attached as Ex. 2 to Fed. Defs.' Mem.). That restriction was removed in the final version of OCSLA, thereby confirming the breadth of presidential power over withdrawals. *See id*. Plaintiffs' contrary reading of OCSLA's legislative history, however, again rests on substituting Plaintiffs' policy preference "to protect fragile ocean areas" for OCSLA's expressly stated developmental purposes. Pls.' Reply at 9.[6] Construction of Section 1341(a) depends on "the statute's language and purpose," *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1167 (9th Cir. 2016), not what Plaintiffs would prefer Congress had said or intended.

---

[6] Despite their complaints about API's citations, *see* Pls.' Reply at 10, Plaintiffs' do not (nor could they) dispute that Congress removed the original national security restriction on the President's withdrawal authority. *See* S. Rep. No. 83-441, at 22 (1953). At any rate, API did not cite OCSLA Section 12(d)'s history to demonstrate the terms of the Section 1341(a) withdrawal power, but rather to show Congress' understanding that restrictions on OCSLA's developmental purpose (even for issues of national security) are temporary exceptions. *See id*. (providing for national security designations to restrict OCS exploration "so long as such designation remains in effect").

10

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

### C. Presidential And Congressional Practice Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal.

Plaintiffs fare no better in their attempt to obfuscate presidential and congressional practice that further supports reading Section 1341(a) to authorize the President to modify a withdrawal. It is well-settled that a reviewing court must give heed to the "consistent" usage of delegated authority. *Haig v. Agee*, 453 U.S. 280, 291 (1981). Contrary to Plaintiffs' assertions, *see* Pls.' Reply at 14–15, "practice [is] an important interpretive factor ***even when the nature or longevity of that practice is subject to dispute***," *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) (emphasis added), and may inform delegations to the President in areas beyond foreign policy, *see, e.g.*, *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 686 (2010) ("[O]ur reading of the court of appeals quorum provision was informed by the longstanding practice of allowing two judges from the initial panel to proceed to judgment in the case of a vacancy . . . .").[7]

Indeed, the Supreme Court has applied this very principle to the "long-continued practice" of numerous presidents "to make [withdrawal] orders" of onshore public lands. *Midwest Oil Co.*, 236 U.S. at 469. As the Court explained,

> government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a

[7] Plaintiffs argue that *New Process Steel* is inapposite because it discussed consistent practice "in dictum." Pls.' Reply at 15 & n.9. But *New Process Steel* described the consistent judicial quorum practice to explain its rejection of a related reading of the Taft-Hartley Act's National Labor Relation Board quorum requirement endorsed by other courts. *See* 560 U.S. at 685–86. At any rate, even if "dictum," "considered Supreme Court dictum is special" and a reviewing court does "not treat considered dicta from the Supreme Court lightly." *United States v. Augustine*, 712 F.3d 1290, 1295 (9th Cir. 2013).

11

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

> power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation.

*Id*. at 472–73. *See also Udall v. Tallman*, 380 U.S. 1, 17 (1965) (relying on *Midwest Oil* and past practice in construing executive order's effect on oil and gas leases).

API has not, as Plaintiffs assert, argued that past withdrawal decisions "constitute an implicit delegation of [Congress'] Property Clause authority . . . ." Pls.' Reply at 16. Rather, in Section 1341(a) Congress delegated to the President authority to modify a withdrawal, *see supra* pp. 4–8, and that delegation is confirmed by, among other things, past withdrawal practice. *Midwest Oil* simply recognized, among other things, that past practice may be particularly important with respect to disposition of property because "the land laws are not of a legislative character in the highest sense" given that the Property Clause is not included amongst the enumerated "legislative power[s]" of the United States in Article I of the Constitution, *Midwest Oil*, 236 U.S. at 474; *see also* U.S. Const., art. I § 1.

The Federal Land Policy and Management Act ("FLPMA"), *see* Pls.' Reply at 16, does not change the nature of the Property Clause or its placement in the Constitution. Nor does the FLPMA undermine the general rules and interpretive standards set out in *Midwest Oil*. *See, e.g.*, *Noel Canning*, 134 S. Ct. at 2560 (citing *Midwest Oil* in support of general rule allowing past practice to inform interpretation). The FLPMA merely represented the culmination of a cooperative policy effort between "members of Congress and presidential appointees" to address changing circumstances in the use of public land after World War II. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 855 (9th Cir. 2017). In short, the FLPMA reflects Congress' exercise of its constitutional authority expressly to supplant—in response to new circumstances—long-established and valid presidential exercise of authority implied from past practice. The FLPMA says nothing about the scope of Congress' past delegations of authority over federal property, or

12

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

the impact of past practice on that delegation where, as here, no express superseding congressional action has been taken.[8]

Past practice under Section 1341(a) illustrates that withdrawals have rarely, if ever, been treated as permanent or inviolate. Instead, withdrawals have been, among other things, made on a time-limited basis, and reversed or modified before expiration of the set time limit. *See* API Mem. at 7–10, 21–22.

For their part, Plaintiffs blithely assert that "no President until now has purported to revoke a permanent withdrawal," Pls.' Reply at 13, thus begging the question whether President Obama's withdrawals were permanent and inviolate. Plaintiffs do not address President Obama's statements inconsistent with the idea that the withdrawals were permanent and inviolate. First, by issuing withdrawals "for a time period without ***specific*** expiration," Pls.' Mem. In. Supp. of Summ. J. (Dkt. No. 51), Exhs. 2, 3, 4 (emphasis added), the withdrawals suggest the potential for expiration at a future time. Second, in his statement announcing the withdrawal of unleased Arctic areas, President Obama explained that the Department of the Interior had determined that significant production was unlikely in those areas "at ***current*** oil prices," *see* Statement by the President on Actions in the Arctic and Atlantic Oceans, at 1 (Dec. 20, 2016) (emphasis added), https://obamawhitehouse.archives.gov/the-press-

---

[8] Plaintiffs suggest that the FLPMA undermines past practice on the OCS. *See* Pls.' Reply at 16. The FLPMA, however, does not address OCSLA or Congress' delegation of authority in Section 1341(a), *see, e.g.*, Pub. L. No. 94-579, § 103(e), 90 Stat. 2743 (Oct. 21, 1976) (excluding "lands located on the Outer Continental Shelf" from the definition of "public lands"), and is therefore irrelevant to presidential withdrawals under Section 1341(a). *See id.*, § 704(a) (listing withdrawal laws and implied authority expressly repealed). Plaintiffs' related reliance on an Office of Legal Counsel decision relating to resources off Hawaii that are not part of the OCS, *see* Pls.' Reply at 16, is likewise inapposite, and, at any rate, not binding on this Court. *See, e.g.*, *Cherichel v. Holder*, 591 F.3d 1002, 1016 n.17 (8th Cir. 2010).

13

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

office/2016/12/20/statement-president-actions-arctic-and-atlantic-oceans (last visited Oct. 12, 2018), again suggesting potential future changes in circumstance affecting the withdrawals.

Setting aside Plaintiffs' self-serving characterization of President Obama's withdrawals as "permanent," Plaintiffs argue that past presidential changes to withdrawals have only followed from, and conformed to, Congress' own changing moratoria over OCS leasing. *See* Pls.' Reply at 17. Plaintiffs' argument cannot square with either their own reading of Section 1341(a) or the actual history of presidential withdrawals.

First, Plaintiffs interpret Section 1341(a) to preclude the President from exercising any authority over withdrawals not expressly provided in the text. Section 1341(a), however, says nothing about presidential authority to impose time limits on withdrawals, and yet numerous presidents have made withdrawals subject to specific dates of expiration. *See* API Mem. at 7–10, 21–22. Plaintiffs apparently concur that a withdrawal may be "limited by its own terms," Pls.' Reply at 17, and have identified no congressional disapproval of this consistent practice that Plaintiffs' theory of Section 1341(a)'s language would suggest is *ultra vires*. Congress' acquiescence thus "add[s] a gloss or qualification" to the statutory language, illustrating the breadth of the withdrawal power. *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (citing *United States v. Midwest Oil*, 236 U.S. 459 (1915)).

Moreover, it is simply not true that presidential modifications of previous withdrawal decisions simply followed parallel Congressional action. For example, on July 14, 2008, President George W. Bush used his authority under Section 1341(a) to "modify the prior memoranda of withdrawal from disposition by leasing" to open all previously withdrawn OCS lands except for existing Marine Sanctuaries. *See* Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Dkt. No. 13), Exh. 12; API Mem. at 10. Congress then followed suit, excluding its prior

14

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

moratoria from appropriations for 2009. *See* Consolidated Security Disaster Assistance, and Continuing Appropriation Act, 2009, Pub. L. No. 110-329, 122 Stat. 3574 (Sept. 30, 2008). Thus, by adopting presidential withdrawal decisions and modifications, Congress' acquiescence further supports the President's authority exercised in Executive Order 13795.

## II. THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795.

As API's cross-motion demonstrates, Executive Order 13795 rests at the apex of the President's authority, *see* API Mem. at 23–35, which combines the OCS withdrawal powers expressly and impliedly delegated by Congress in Section 1341(a) with the President's own "authority to provide for national security and conduct foreign affairs." Fed. Defs.' Mem. at 2 (citing U.S. Const., art. II § 2). Executive Order 13795 is thus "supported by the strongest of presumptions and the widest latitude of judicial interpretation" of the President's authority. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636–37 (1952) (Jackson, J., concurring).

Plaintiffs' argument to the contrary depends upon their view that modification of a withdrawal decision is "not authorized" by Section 1341(a). *See* Pls.' Reply at 21. Because Section 1341(a)'s language and past implementation, bolstered by OCSLA's purpose and history, belie Plaintiffs' construction of Section 1341(a), Plaintiffs have fallen far short of their "heav[y]" burden to prove that Executive Order 13795 is beyond presidential authority. *Youngstown Sheet & Tube*, 343 U.S. at 637 (Jackson, J., concurring).

## CONCLUSION

For the foregoing reasons, this Court should grant API's Cross-Motion for Summary Judgment.

15

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

Respectfully submitted,

*/s/ James D. Linxwiler*

James D. Linxwiler (Alaska Bar No. 7705185)
Christina A. Rankin (Alaska Bar No. 0306034)
Guess & Rudd P.C.
1029 W. 3rd Ave. #400
Anchorage, AK 99501
Tel: (907) 793-2200
Fax: (907) 793-2299
jlinxwiler@guessrudd.com
crankin@guessrudd.com

Steven J. Rosenbaum (*Pro hac vice*)
Bradley K. Ervin (*Pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. N.W.
Washington, D.C. 20001
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
bervin@cov.com

*Attorneys for Intervenor-Defendant American Petroleum Institute*

October 12, 2018

16

Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2018, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon the following:

Erik Grafe
Earthjustice
441 W. 5th Ave., Suite 301
Anchorage, AK 99501
Tel: 907-792-7102
Fax: 907-277-1390
Email: egrafe@earthjustice.org

Eric P. Jorgensen
Earthjustice
325 Fourth Street
Juneau, AK 99801
Tel: 907-586-2751
Fax: 907-463-5891
Email: ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
Tel: 360-534-9900
Email: nlawrence@nrdc.org

Nancy S. Marks
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Tel: 212-727-2700
Fax: 415-795-4799
Email: nmarks@nrdc.org

*Counsel for Plaintiffs*

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20004
Tel: 202-514-0180
Fax: 202-514-0057
Email: sarah.himmelhoch@usdoj.gov

*Counsel for Federal Defendants*

*/s/ James D. Linxwiler*
James D. Linxwiler

1
Reply in Support of API Cross-Motion for Summ. J.
*League of Conservation Voters, et al., v. Trump, et al.*, No. 3:17-cv-00101 (SLG)