<pre>
 1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
 2

 3   LEAGUE OF CONSERVATION      )
     VOTERS, ET AL.,            )
 4                              )
             Plaintiffs,        )
 5                              )
     vs.                        )   CASE NO. 3:17-cv-00101-SLG
 6                              )
     DONALD J. TRUMP, ET AL.,   )
 7                              )
             Defendants.        )
 8   _____)

 9                TRANSCRIPT OF ORAL ARGUMENT
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               November 9, 2018; 10:03 a.m.
                       Anchorage, Alaska
11
     FOR THE PLAINTIFFS:
12          Earthjustice
            BY:  ERIK CLIFFORD GRAFE
13          441 West 5th Avenue, Suite 301
            Anchorage, Alaska 99501
14          (907) 277-2500

15          Natural Resource Defense Council
            BY:  NATHANIEL S.W. LAWRENCE
16          BY:  JACQUELINE MIYA IWATA
            3723 Holiday Drive, SE
17          Olympia, Washington 98501
            (360) 534-9900
18
     FOR THE DEFENDANTS:
19          Covington & Burling, LLP
            BY:  STEVEN JOSEPH ROSENBAUM
20          1201 Pennsylvania Avenue, NW
            Washington, DC 20004
21          (202) 662-5568

22          Alaska Department of Law
            BY:  JENNIFER ELLEN DOUGLAS
23          1031 West 4th Avenue, Suite 200
            Anchorage, Alaska 99501
24          (907) 269-5232

25                SONJA L. REEVES, RMR-CRR
                Federal Official Court Reporter
</pre>

1  APPEARANCES CONTINUED:

2          U.S. Department of Justice
           BY:  JEFFREY WOOD
3          BY:  RICHARD L. POMEROY
           950 Pennsylvania Avenue, NW, Room 2611
4          Washington, DC 20530
           (202) 514-0943

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order of the Court at 10:03 a.m.)

 2              DEPUTY CLERK:  All rise.  Her Honor, the Court,

 3    the United States District Court for the District of

 4    Alaska is now in session, the Honorable Sharon L.

 5    Gleason presiding.

 6              Please be seated.

 7              THE COURT:  Good morning.  We're on record in

 8    League of Conservation Voters versus Trump, et al., and

 9    I have a number of lawyers here.

10              Mr. Grafe, why we don't start with you and have

11    everyone identify themselves.

12              MR. GRAFE:  Erik Grafe for the plaintiffs.

13              MR. LAWRENCE:  Nathaniel Lawrence for the

14    plaintiffs.

15              MS. IWATA:  Jacqueline Iwata for the

16    plaintiffs.

17              MR. WOOD:  Jeffrey Wood from the U.S.

18    Department of Justice.

19              MR. ROSENBAUM:  Steven Rosenbaum representing

20    intervenor American Petroleum.

21              MS. DOUGLAS:  Jennifer Douglas here for the

22    State of Alaska.

23              THE COURT:  All right.  Were you all able to

24    come to an agreement on your time?  I figured you would

25    be able to.  Very good.
```

1    I have reviewed the briefing that was filed.

2  Very helpful.  I'm going to hear from plaintiff first,

3  so who am I going to hear from?  Mr. Grafe?

4    MR. GRAFE:  May it please the Court, my name is

5  Erik Grafe for the plaintiffs.  I plan to split my time

6  this morning with my colleague Jackie Iwata.  We would

7  like to reserve five minutes for rebuttal.

8    This case challenges President Trump's decision

9  to undo two withdrawals by his predecessor protecting

10 parts of the Arctic and Atlantic Oceans from oil and gas

11 leasing.

12    President Trump lacks the authority to undo

13 these withdrawals.  The President's power must stem from

14 an act of Congress or from the Constitution, and here

15 neither grants him the power to reverse withdrawals.

16    I will address how Section 12(a) of the Outer

17 Continental Shelf Lands Act is a limited delegation of

18 Congress's power under the property clause to the

19 President.

20    THE COURT:  What does the phrase "from time to

21 time" mean to you, Mr. Grafe?

22    MR. GRAFE:  "From time to time" is a phrase

23 that is seized upon by the defendants trying to locate

24 in the text of Section 12(a) some power of reversal.

25 And they say that "from time to time" actually means --

grants a power to reverse withdrawals, that because
Congress said you can -- told the President that he can
withdraw from time to time, actually, it was telling him
that he could reverse withdrawals.

The argument fails for three reasons. First,
the very best indicator of what Congress meant by using
"from time to time" in Section 12 is how it used the
terms in other parts of OCSLA. The answer is that
Congress used that phrase in its most natural sense in
those other parts to mean when something can be done, or
another way to say it is to remove ambiguity about
whether a power is continuing.

For example, in Section 1351(h)(3), which
governs approval of development and production plans,
Congress directed the secretary from time to time to
review each plan he approves.

In the same provision, Congress also directed
the secretary to, quote, "require revisions of already
approved plans if needed," so "from time to time" did
not authorize revisions. It's the express authorization
to revise plans that authorizes revisions.

"From time to time" just means when an action
should happen, and so too in Section 12.

Now, the second argument that the defendants
put forward on "from time to time" is that they argue

1    that courts have interpreted the phrase in other

2    contexts to confer reversal authority, but not a single

3    one of the cases that they cite actually concludes that

4    the phrase "from time to time" in a statute confers

5    reversal authority.

6            The third reason -- argument that API offers to

7    try to locate a reversal power in "from time to time" is

8    to offer three examples that it says supports the idea

9    that words -- that the words may authorize reversals.

10           And as an initial matter, no court has found

11   that any of these examples or any examples at all confer

12   reversal authority through "from time to time."  In any

13   case, each of those examples doesn't help API.

14           So their main example is a Constitutional

15   provision that authorizes Congress from time to time to

16   ordain and establish lower courts.  And API argues that

17   "from time to time" here authorizes Congress to

18   eliminate previously established lower courts or to

19   reorganize the courts, but this ignores the words in the

20   statute.

21           The statute -- I mean in the Constitutional

22   provision.  The Constitutional provision says you could

23   -- that Congress can both ordain and establish courts.

24   And so ordain and establish have different meanings.

25           Ordain means to issue an order, so it is a much

more likely place to locate an authority to revise courts that have been established from time to time. So it doesn't really help them to say "from time to time" is the source of a modification power there. It's more likely it's from "ordain."

Its other two examples are statutes that grant Congress -- in which Congress has delegated to the courts or agencies the power to make rules from time to time. But in these examples, it's the delegation of rule-making authority that's the most likely source of any modification power, because in making rules that modify earlier rules, the Court or an agency is just exercising the delegated power to make rules. And again, so "from time to time" doesn't -- isn't the source of that power.

Now, as I was saying, I hope to be able to address why 12(a) is a limited delegation of authority that allows for withdrawals but not for reversals. And my colleague -- I would also be happy to answer any questions the Court has about standing. My colleague, Ms. Iwata, will address why OCSLA and Section 12(a) are the only sources of presidential authority to dispose of or withdraw the resources of the Outer Continental Shelf, and she would also answer questions about relief.

So going to the statute, it says in full --

well, first of all, as a starting point, the
Constitution's property clause vests the power to
dispose of property belonging to the United States
exclusively in Congress.  Congress may delegate portions
of that power, the executive in a statute, and it's done
so in 12(a).

But in this context, the Ninth Circuit has made
clear that strict adherence to the wording of the
statute is of particular importance.  That's in the
cases of U.S. v. Patton and Kidd v. Interior.

What are the words of Section 12(a)?  It
provides in full, "The President of the United States
may, from time to time, withdraw from disposition any of
the unleased lands of the Outer Continental Shelf."

On its face, it gives the President one power,
the power to protect offshore resources for the
disposition.  It doesn't give him the reverse power,
that's the power to unilaterally undo protections once
established.  Congress has withheld that for itself.

The other factors that courts consider when
trying to understand the text of a statute all support
this reading of the statute.

First, when it passed the statute, Congress was
acting against a history of public land legislation that
demonstrates that Congress is explicit about the

1    property clause powers it delegates.

2           What it means to delegate the power to reverse

3    land protections it says so in the statute.  So you have

4    statutes like the Pickett Act of 1910 that provides that

5    the President both, quote, "may withdraw any public

6    lands," and that, quote, "no withdrawals can be revoked

7    by him."

8           You also have other statutes like the

9    Antiquities Act that only authorize protections by

10   establishing national monuments.

11          Congress also passed section 12(a) against a

12   long line of executive authority in the form of attorney

13   general opinions going all the way back to 1862 that

14   conclude that where Congress delegates power to withdraw

15   land, but doesn't in the statute say the reverse power

16   is there, that the President cannot undo the withdrawals

17   unilaterally.

18          A way to think about these opinions is that in

19   effect they are the executive telling Congress at the

20   time it passed OCSLA that if it wanted the President to

21   have the power to undo withdrawals, it needed to say so

22   in the statute, and it didn't in 12(a).

23          The legislative history confirms that Congress

24   was aware of and operating against this history in

25   context.  The Senate report accompanying OCSLA states

1  that Congress intended to give the President withdrawal

2  power in the offshore, quote, "comparable to that vested

3  in him with respect to federally owned lands and the

4  uplands."

5          As I just described on the uplands, there were

6  statutes that sometimes vest authority to do both and

7  sometimes vest authority only to do one.  In choosing in

8  12(a) just to give one type of authority, Congress held

9  for itself the power to undo that.

10          Another indicator is in Section 3 of 1953

11  OCSLA, in which Congress is explicit and says, "The

12  power of disposition is as provided by the terms of this

13  Act," so that again is an indicator to look to the words

14  of the statute in determining what powers Congress was

15  giving up and delegating to the President through that

16  legislation.

17          And Section 12(a)'s delegation of only

18  protective authority is consistent with OCSLA's purpose

19  and structure.  Contrary to the defendant's

20  characterization that OCSLA is a pure drilling statute,

21  when Congress passed OCSLA in 1953, there was no

22  management scheme at all for the offshore.  This was the

23  management scheme.  So it had -- it was passing

24  legislation for a vast area, and it's pretty general

25  legislation.

1          It included the power to lease, to dispose, and

2     it included 12(a), which was critical, that said, "No,

3     President, you can withhold that, withdraw areas from

4     disposition until Congress gets to reconsider an act

5     again."

6          And I would address -- we have already

7     addressed the "from time to time" argument that the

8     defendants put forward to try to locate a reversal

9     authority.

10          I would also like to address another of their

11     main arguments, which is that they argue that

12     presidential action since the passage of 12(a) cement or

13     confirm that Congress intended in 12(a) to authorize

14     reversals of withdrawals.

15          Their argument -- this argument relies

16     principally on Midwest Oil.  And Midwest Oil though sets

17     a really high bar for consideration of past practice in

18     this manner.  It requires a long continued action of the

19     executive that's known to and acquiesced by Congress.

20     In Midwest Oil that action was executive withdrawals of

21     land over 80 years numbering some 252.

22          And here there is just no such longstanding

23     practice that comes even remotely close.  Defendants

24     cite three actions by the President, and even if these

25     actions were like President Trump's action here, which

1  I'll explain they were not, three is not 252 over the
2  course of 80 years.

3          And I'll explain why I think those actions
4  aren't very probative of Congressional acquiescence.

5          First, defendants cite two actions by President
6  George W. Bush in 2007 and 2008, in which he purported
7  to revoke portions of prior withdrawals put in place by
8  President Clinton.

9          But when he did this, Congress itself was
10 encouraging oil leasing in the areas at issue.  It was
11 in the process of undoing longstanding funding moratoria
12 which prevented funding of work on lease sales.  When
13 the President was -- it was totally in line with what
14 the President was going to do.  Congress was encouraging
15 development of these areas and the President revoked
16 withdrawals to allow that.

17         So there wouldn't really have been any reason
18 for Congress to challenge the President's revocation.
19 It was happy.  It wanted to do that.

20         Similarly, defendants also cite to President
21 Obama's 2014 withdrawal of Bristol Bay.  That withdrawal
22 extended protections from an already existing withdrawal
23 in the area.  And in so doing, President Obama revoked
24 that prior more limited withdrawal, but replaced it with
25 a broader withdrawal.

Again, here, Congress's failure to object to a revocation doesn't suggest that it condones revocation because the effect of the revocation was to actually put in place bigger protections.

The Supreme Court -- I direct you to a case in 2016 in which the Supreme Court rejected a similar argument about sort of post-enactment practice informing a statute.  It said that just because Congress, quote, "chooses not to make a point about compliance in a statute when there is no other reason to do so, doesn't mean it endorses the practice."

That case is NLRB versus Southwest at 137 Supreme Court 941.

So the key to a Court's analysis of what Section 12(a) means is Congressional intent in 1953 when it passed the provision.  The Court should look to the traditional tools of statutory interpretation, the text, the history, the context, the purpose and structure.

And as I have just described, these all support the conclusion that Congress wrote Section 12(a) to reserve for itself the power to undo withdrawals.

If there are no further questions --

THE COURT:  Not at this time.  Thank you.

MS. IWATA:  May it please the Court, my name is Jacqueline Iwata on behalf of the plaintiffs.

```
1          As my colleague Mr. Grafe stated, Congress did
2    not intend to delegate authority to the President to
3    revoke a preexisting withdrawal under Section 12(a).
4    Today I will explain why the President also does not
5    have any Constitutional authority to justify his action.
6          Defendants attempt to make this case into
7    something it is not by gesturing at foreign affairs and
8    take-care clause concerns, but the only Constitutional
9    provision at issue in this case is the property clause,
10   which is exclusive to Congress.
11          The mere presence of a foreign policy and
12   national security implications cannot give the President
13   the authority over a disposition of resources that he
14   lacks.  It is true that there are foreign policy
15   concerns with the claiming of the Outer Continental
16   Shelf as well as its defense; however, those interests
17   are not at issue in this case.
18          This case is simply about the disposition of
19   resources in the Outer Continental Shelf.  And the
20   Supreme Court has stated, made clear in a line of cases
21   that that power is exclusive to Congress.
22          First, in United States versus California, the
23   Supreme Court acknowledged that there were foreign
24   policy interests in the Continental Shelf.  Nonetheless,
25   this did not stop it from holding a few years later in
```

Alabama versus Texas that the property clause applied to the disposition of the Continental Shelf's resources without limitation.

And then finally, in United States versus Louisiana, the Supreme Court again acknowledged that there were foreign policy interests with the claiming of resources offshore, but that was very distinct from the disposition of those resources, which it viewed as a purely domestic policy issue that fell under Congress's authority.

Nor can defendants justify President Trump's action by pointing to national security concerns with the resources inside the Outer Continental Shelf. President Trump's executive order points to the resources can be used to further national security, but the same rationale could be applied to the resources in the uplands. That rationale however cannot give the President authority to issue oil and gas leasing in the Grand Canyon.

Defendant's arguments would essentially subsume Congress's exclusive authority to dispose of resources within Article II. This is the type of executive encroachment that the Supreme Court cautioned against in Youngstown. It stated that -- it cautioned against the President using the presence of foreign policy

implications to encroach on what were largely domestic
policy issues, and there the national security interest
was even greater. It was the supply of steel in an
ongoing war. Nonetheless, the Supreme Court declined to
find an Article II power.

That's President Trump's executive order
similarly at its core about the disposition of domestic
resources, and, therefore, there cannot be a separate
foreign policy justification.

If the Court has no further questions about the
foreign policy and national security arguments that the
defendants make, I'll turn to their arguments about the
President having an inherent revocation authority.

THE COURT: All right. Go right ahead.

MR. IWATA: Defendants cannot and do not argue
that it would be a violation of the take-care clause for
Congress to delegate a limited portion of its authority
that only goes one way.

This authority is exclusive to Congress and
plenary, and, therefore, cannot -- it can choose how
much or how little to delegate. Instead defendants
attempt to create a presumption that the President has
inherent revocation authority and that Congress must
expressly override it, but no such principle exists.

In fact, Ninth Circuit precedent has clearly

stated that there is no principle that the power to do
contains the power to undo.  That's in Gorbach versus
Reno.

The cases that the defendant cite do not
support the proposition that they state.  The first line
of cases they cite have to do with limits Congress
placed on the President's removal power, but that --
those cases are simply about the President's own
inherent authority and cannot provide any principles for
Congress's delegation of its own authority.

The second line of cases they cite involve or
state that agencies have inherent authority to
reconsider their decisions, but those cases are all
about adjudication and that the reconsideration
authority that they describe is actually quite narrow.

It's about agencies acting in an adjudicative
context, much like the Court, in reconsidering decisions
based on factual errors.  That's different from clawing
back a decision based on substantive policy grounds like
the President has done here.

And the cases make clear that is a different
power.  The American Trucking case by the Supreme Court
that we cite states that -- cautions against agencies
using, trying and using reconsideration power to change
substantive outcomes.

1          Finally, the remaining cases that defendants

2    cite do concern agency's powers to revoke regulations,

3    but those are all based on statute and thus support the

4    plaintiffs' argument that the power to revoke is context

5    dependent.

6          In fact, one way delegations are not anomalous,

7    in the land context, they are often inherently so.

8    OCSLA itself shows that OCSLA's leases create a one-way

9    movement toward development and creates a permanent

10   change to the environment that cannot be undone.

11         A one-way withdrawal authority simply acts as a

12   counterbalance in this context because to what would

13   otherwise be a one-way move toward development, and that

14   is why, as my colleague Mr. Grafe explained, it is

15   common for there to be one-way delegations of withdrawal

16   authority in the property clause context and also why

17   Congress is always clear when it delegates authority.

18         The presumption that defendants create would

19   render Congress's clear instructions surplusage.  It

20   would also flip the presumption that the President's

21   authority must be delegated either by the Constitution

22   or a statute on its head.

23         THE COURT:  So if you want to reserve time, I

24   think you have used about 25 minutes.  So want to take a

25   moment and sum up your thoughts, and then we'll hear

 1   from the other parties.

 2           Take a moment.

 3           MR. IWATA:  In conclusion, as my colleague, Mr.

 4   Grafe, said, the only issue in this case is what

 5   Congress intended to delegate in Section 12(a).

 6           If there are no further questions, we ask the

 7   Court to declare the President's revocation of the

 8   Section 12(a) withdrawals unlawful and to enjoin the

 9   agency defendants from implementing it.

10           THE COURT:  Thank you.

11           Good morning.

12           MR. WOOD:  May it please the Court, Jeffrey

13   Wood on behalf of the United States, the federal

14   defendants in this case.  I'm joined by Mr. Pomeroy of

15   the U.S. attorney's office from this district.

16           Defendants have allotted 30 minutes, Your

17   Honor.  I will plan to take 20 minutes total.  Since

18   this is cross motions on summary judgment --

19           THE COURT:  You want the last word?  That's

20   fine.

21           MR. WOOD:  State of Alaska represented by

22   Ms. Douglas will take three minutes.  She'll speak after

23   me.  The intervenor defendants, represented by

24   Mr. Rosenbaum, will take the remaining seven minutes of

25   our time.

 1          THE COURT:  I'll leave you all to police

 2     yourselves.  Go right ahead.

 3          MR. WOOD:  "OCSLA is a comprehensive piece of

 4     legislation that promotes the expeditious and orderly

 5     development of the OCS with certain environmental

 6     safeguards."  Direct quote from the statute.

 7          In no way is the Act structured to facilitate

 8     the permanent irrevocable closure of vast offshore

 9     products, nor is the Act structured to open up all areas

10     for complete and total development.

11          Instead the Act provides for meaningful

12     balance, flexible stewardship of the OCS over the long

13     term.  This case centers on one sentence of this lengthy

14     statute.

15          That sentence found at Section 12(a) of the Act

16     reinforces the authority of the President to sensibly

17     and flexibly manage the OCS in the national interest.

18     In their briefs, plaintiffs call Section 12(a)

19     authority, quote, "special protective power."  That

20     would have been news to Congress at the time.

21          Here they also say that it's a, quote, "limited

22     delegation."  We don't think they are correct, Your

23     Honor.  This statute was enacted against a backdrop of

24     significant presidential involvement under both Article

25     II power as well as delegated property clause power to

1   effectively manage the lands and waters under the

2   jurisdiction and control of the United States.

3            These are areas, Your Honor, on the outer

4   boundaries of the United States where the President's

5   power under Article II of the Constitution is dramatic.

6            No court has ever ruled that the President of

7   the United States lacks the authority to modify, simply

8   modify or revoke a prior Presidential OCS withdrawal.

9   And this Court, we respectfully suggest, should not be

10  the first.

11           In 2015 and 2016, the previous President issued

12  orders under --

13           THE COURT:  Isn't it also true that no court

14  has held that the President does have the authority?

15           MR. WOOD:  Your Honor, that is correct, no

16  court has been asked to rule directly on that point.  We

17  think it's important though, looking at the full

18  history, when courts have evaluated issues of

19  presidential authority, that they have looked to the

20  statute, and where it provides the President significant

21  discretion, the courts have viewed their role as being

22  extremely limited.

23           They have looked for opportunities to not have

24  to rule on whether this was in fact proper presidential

25  action in the first place.

1    We don't think the lack of judicial

2 determinations on that point is determinative, Your

3 Honor.

4    President Trump issued Executive Order 13795

5 after President Obama's withdrawal.  President Obama's

6 withdrawal said, quote, "It was for a time period

7 without specific authorization."

8    President Trump's withdrawal specifically says,

9 quote, "It's intended to encourage energy exploration

10 and production, including on the OCS, while ensuring

11 that any such activity is safe and environmentally

12 responsible."

13    Section 5 of the order modifies the previous

14 presidential withdrawals by restoring area for possible

15 future disposition.  This action is entirely consistent

16 with the text, purpose and history of the Act.

17    Plaintiffs have challenged Section 5 of that

18 order as ultra vires because it involves one President

19 modifying a prior President's withdrawal.  Such a

20 strained view of the Act and such a strained view of the

21 President's constitutional power under Article II is not

22 supported by law.

23    While our view of Section 12(a) is wholly

24 consistent with past practice, plaintiffs are pressing a

25 novel and flawed theory that would dramatically change

course over the current view of the President's ability
to act in these areas. Courts have thus far widely
steered clear of having to rule on such questions. At
the outset, Your Honor, federal defendants reiterate
that this lawsuit can and should be disposed of on
jurisdictional grounds, namely standing and ripeness,
sovereign immunity and lack of cause of action.

We also acknowledge respectfully that this
Court has denied our motion to dismiss, which asserted
these jurisdictional grounds, but at this next stage of
litigation, this Court is free to, and we respectfully
submit should, reevaluate those jurisdictional arguments
again, but this time under the summary judgment
standard.

THE COURT: If I were to look at it under the
summary judgment standard, what is the -- what's the --
are you now making a factual-based argument on standing
as opposed to simply on the complaint?

MR. WOOD: Yes, Your Honor.

THE COURT: So what are you pointing to in the
record that would support the standing at this time or
the lack of standing?

MR. WOOD: Thank you, Your Honor. We would
first note that where the plaintiffs at the motion to
dismiss stage simply had to put forth plausible grounds

for their theory, at this stage mere plausibility is not
adequate.  We would spotlight for you, Your Honor,
standing in particular, which is a mixed question of law
and fact.  So at this stage the facts are no longer
viewed in the light most favorable to the plaintiffs.

One example, the acts that might arguably one
day cause plaintiff some kind of injury, those things
that they cite in their exhibits, energy, exploration
and production in the areas of the OCS that are made
available for disposition by the 2017 order, those
activities are by no means imminent or even fairly
traceable to the executive order.

One example, Your Honor, there are about
2.8 million acres of leased lands in the Beaufort Sea
area that remained even under President Obama's
proclamation able to be used for energy production.

Seismic activities are occurring in those
areas, as well as energy exploration and development in
those 2.8 million acres, in the same area that they are
complaining that President Trump's order makes
available.  Those areas were already available.  There
is no imminent, immediate, concrete particularized
injury to plaintiffs' interests arising simply from an
executive order that restores the possibility, just the
mere possibility of development of these areas.

1          Your Honor, moving to the merits.  Federal

2    defendants are entitled to summary judgment because the

3    President's 2017 order is consistent with OCSLA.

4    Plaintiffs are simply wrong to argue that the President

5    lacks authority to modify or rescind a prior President's

6    withdrawal.  Section 12(a), which was quoted by

7    plaintiffs' counsel, is a concise sentence, one sentence

8    tucked within a very long, comprehensive statute.

9          That sentence does not restrict a President's

10   authority to modify for at least three textual reasons.

11   First, the text uses the highly discretionary phrases,

12   "may withdraw" and "from time to time."

13         It's hard to imagine Congress using more

14   flexible and impermanent language than that.  This

15   language reinforces the overall structure and purpose of

16   the Act, which is to allow for flexible and sensible

17   management of the OCS for the long term.

18         Second, the phrases "may withdraw" and "from

19   time to time" come with no guardrails, conditions,

20   factors or other limits.  They're discretionary terms

21   and have no baggage to them whatsoever.  Nor do they say

22   withdrawals must be permanent, a condition that

23   plaintiffs would insert into the statute.

24         In fact, as our briefs explain, when Congress

25   inserted this withdrawal provision, the actual purpose

```
 1   was to expand presidential authority and discretion over
 2   the OCS not to hamstring the President.
 3           Plaintiffs contend that this sole isolated
 4   sentence allows a President to permanently close off
 5   hundreds of millions of acres of offshore areas
 6   depriving him and all subsequent Presidents of the
 7   ability to place those areas back into productive use.
 8           THE COURT:  It wouldn't be permanent if
 9   Congress chose to put the land back in, correct?
10           MR. WOOD:  That is correct.
11           THE COURT:  Permanent as to the President, but
12   not as to Congress.
13           MR. WOOD:  The Congress remains free to
14   legislate in this area, but the irony of the plaintiffs'
15   argument is they wouldn't even allow the President to
16   replace one acre of withdrawn area, so they would say
17   that this limited delegation to the President gives the
18   President the authority to permanently and irrevocably
19   tie the hands of all subsequent Presidents, regardless
20   of the reason for reinserting those areas for possible
21   use, future military need, energy, security, any other
22   of a full range of needs the President might have now or
23   100 years from now to use those resources.
24           Your Honor, the word "withdraw" does not
25   customarily include concepts of permanence and
```

irrevocability, unless the words like that are used in
conjunction with it.  To give you some examples, one
might withdraw from a conversation or a meeting, but no
one would think that means that person might never
rejoin the conversation or a meeting.  One might
withdraw money from a bank, but that does not mean that
person might not put that same money back into the same
bank.

In fact, in 1953, it would be very common to
withdraw money and to redeposit the same cash soon
thereafter.  Oxford English around the same time defines
withdraw to mean:  To take back or away something that
has been given, granted, allowed, possessed, enjoyed or
experienced.

There is no requirement at all that it be a
permanent withdrawal.  In fact, one would not assume
something is withdrawn permanently unless the withdrawal
is phrased that way.  That's also how it's understood in
the relevant legal backdrop.  Throughout our history,
both before and after the Act, Presidents did in fact
withdraw land for some purpose only to subsequently
return the land for use for other purposes.

This is a common and usual understanding for
the phrase "withdraw."  It would be even more true when
it says "may withdraw from time to time," and then super

true, Your Honor, when it's with regard to the President and his power to make decisions as the nation's chief executive.

Your Honor, I also want to make the point that to succeed on plaintiffs' audacious claim, this Court would have to ignore the fact that as the Supreme Court has recognized Congress does not hide elephants in mouse holes.

At the time this law was passed in 1953, the Senate Interior Committee, which was the lead committee that wrote and rewrote the statute, specifically talked about why they put this in there. And they said, Your Honor, the committee believed that the authority of the President to withdraw certain areas of seabed from leasing should not lease limited to security requirements. The authority vested in the President by 12(a) is comparable to that which is vested in him with respect to federally own lands and the uplands, and that included that historic ability to put lands in and take lands out.

It would be an incredibly vast power that Congress certainly would not have contemplated at the time to allow the President to permanently and irrevocably revoke the legislation.

Your Honor, it's interesting to me in 1953 at

1    the immediate time when this bill was enacted, Warren

2    Christopher, who became Secretary of State, actually

3    wrote a leading law review article on the legislation.

4    1953, it's in Stanford Law Review.  He said that -- had

5    full discussion of the Act, what it mean, why it was

6    written.

7            In the very back of this article he had a

8    section on miscellaneous provisions.  He had one or two

9    sentences on Section 12, and in no way describes it as

10   being as vast and robust authority as the plaintiffs

11   suggest.

12           Your Honor, beyond these textual reasons --

13           THE COURT:  How does he describe it?

14           MR. WOOD:  Your Honor, he says -- he puts it in

15   the section on miscellaneous provisions and said it

16   simply gives the President the authority to withdraw

17   areas.

18           And also, he said in that 1953 article,

19   "Special attention is due the actions of the Senate

20   Interior Committee, which in May and June of '53, wrote

21   or rewrote most of the provisions of the bill that was

22   eventually enacted."

23           We think, Your Honor, if Congress thought at

24   the time it was giving the President the ability to pull

25   out every bit of OCS areas, which is what plaintiffs

1    argue, the law would not have passed and Congress would

2    not have allowed that kind of irrevocable permanent

3    action to undermine the purpose of the Act, which is to

4    allow the expeditious development of these energy

5    resources.

6         As to history, 1992, President Bush noted that

7    the withdrawal of the areas at OCS were, quote, "subject

8    to revocation should the President determine the

9    scheduling of a lease sale to be required in the

10   interest of national security."

11        Again, in 1998, President Clinton noted that

12   his withdraws of areas of the OCS were, quote, "subject

13   to revocation by the President in the interest of

14   national security."  It's worth noting here, Your Honor,

15   that President Trump cited national security concerns,

16   along with other factors, when issuing the executive

17   order at issue in this case.

18        And dating back to pre-OCSLA in 1945, the

19   President, President Truman at the time, first exercised

20   U.S. control over these areas under his Article II

21   authority over national security and foreign affairs.

22        Your Honor, my time is running out, so at this

23   point, I would like to turn it over to the State of

24   Alaska.

25        THE COURT:  Thank you.

1    MR. DOUGLAS:  Good morning.  May it please the

2  Court, Jennifer Douglas here on behalf of the State of

3  Alaska.  I'll try to keep my remarks as concise as our

4  briefing, Your Honor, and just briefly highlight our

5  position in this case, which is that Section 5 of

6  Executive Order 13795 is a lawful exercise of

7  presidential authority under Outer Continental Shelf

8  Lands Act of Section 12(a).

9    The expression "from time to time" is a phrase

10 that Congress uses intentionally to allow for subsequent

11 changes.  OCSLA in no ways limits the President's

12 authority with respect to lands unaffected by a prior

13 withdrawal.  The only limitation appearing in 12(a) is

14 with respect to unleased acreage.

15    We think that the statute is actually pretty

16 clear here and that upland statutes are of limited

17 relevance, and certainly not outcome determinative in

18 their text.  But unless there is questions, the State is

19 content to rest on its briefing and allow API to have

20 the remaining time.

21    THE COURT:  Thank you.

22    MR. ROSENBAUM:  Good morning, Your Honor.  I

23 would like to focus first on how the term "from time to

24 time" has been used in other statutes and how it's been

25 applied, including the Constitution.  It appears only

1     once in the Constitution.

2          What it says is that Congress may from time to

3     time ordain and establish lower courts.  It's true they

4     used the term "ordain and establish," but I have no idea

5     why the plaintiffs think that that language provides

6     greater flexibility than "withdraw."  They are just both

7     the operative verbs.

8          The question is whether courts, once ordained

9     and established, can be taken away.  And the history,

10    and this of course goes back to 1789, has been that

11    Congress has ordained courts.  It has then abolished

12    those courts.  It has established temporary courts that

13    had specific expiration dates.  It has had temporary

14    courts that would disappear when certain subsequent

15    events occurred.

16         Congress has established courts of limited

17    jurisdictions, of exclusive jurisdiction.  Congress has

18    determined that courts could not deal with certain

19    things.  These are all flexibilities both to establish,

20    to take away, that have been followed for over 200 years

21    in the context of the exact same language that appears,

22    the exact same language that appears in the Outer

23    Continental Shelf Lands Act.

24         Another example which also deals with courts is

25    28 U.S. Code 2071(a).  The Supreme Court and lower

 1    courts may from time to time prescribe rules for the

 2    conduct of their business.

 3         No one would presuppose that courts couldn't

 4    change those rules over time as they saw fit.  Of course

 5    they have done that forever since that statute was

 6    enacted.  This is discretion squared.  "May" means the

 7    President can do it, but doesn't have to do it.  And

 8    "from time to time" has to mean, it has to mean in this

 9    context that as needs change or attitudes change or the

10    Presidents change, so too can the withdrawal, and so too

11    can the decision as to what the withdrawal will cover.

12         Other statutes have been read similarly.

13    Illinois Central, an old case, we describe a statute

14    that deals with the fact that the President was given

15    the power.  He could, he may, didn't have to, establish

16    certain forts from time to time, and the courts

17    concluded that as the need for the fort disappeared over

18    time, then Congress -- then the President had the right

19    to abandon those forts.

20         THE COURT:  What's your thought with regard to

21    the AG opinions that were cited in the briefing that

22    predated the statute, that talked about -- I can find

23    where they are in the briefing, but opinions from the

24    United States attorney general that said the President

25    is without authority to abolish reservations when he was

1    only given the authority to create them?

2          MR. ROSENBAUM:  Your Honor, to the extent that

3    a particular action carried with it some subsequent

4    specific use of the land, something that was going to be

5    done with it, that might in the context of another

6    statute carry with it a notion of permanence because

7    there was reliance, because there was other uses

8    actually being made of it.  That's a possibility.  But

9    not here, of course, where withdrawal doesn't dedicate

10   the land to anything.

11          And that takes some history.  Now, I can't give

12   you 120 years of history as the plaintiffs suggest is

13   necessary.  I only have a statute that goes back to

14   1953, so I can only give so much history.  But I can

15   tell you that there is at least 30 years of history

16   going back to 1990, 28-year history going back to 1990

17   of the Presidents consistently interpreting the

18   withdrawal power flexibly.

19          The very first by President Bush, June 26,

20   1990, the first President Bush, declaring certain areas

21   withdrawn until after the year 2000.  Well, where did he

22   get the authority to only withdraw until after the year

23   2000?  It's not stated in the statute.  From plaintiffs'

24   point of view, that was ultra vires.  Withdraw is a

25   one-way street.  When you declare withdraw, you're done.

1   That's not how it was interpreted.

2          Similarly, President Bush did it again

3   August 4, 1992.  There he did a withdraw until a

4   particular study that was underway was completed.  I

5   mean talk about flexibility, talk about an understanding

6   that withdrawal meant something that was then permanent.

7          President Clinton -- this is a bipartisan

8   thing.  President Clinton, June 12, 1998, he declared

9   certain areas offshore through June 30, 2012.

10          Once again, flexibility.  These are all --

11  under a statute, a provision that doesn't actually talk

12  about temporary withdrawals, but everyone, all these

13  Presidents understood that they could engage in

14  temporary withdrawals, the flexibility the plaintiffs

15  won't read into the statute.

16          Then of course we have President George W.

17  Bush January 9, 2007 and July 14, 2018, modifying

18  President Clinton's withdrawals to make certain areas

19  available that were not previously available, the very

20  kind of conduct, of course, that we're now dealing with

21  here in this litigation.

22          Now, he acted -- the plaintiffs' point of view

23  is you can't do that unless you get a specific statute

24  passed by Congress to reinstate that withdrawn area.

25  That didn't happen.  That did not happen.  There was no

1  such statute.

2          And yet it was done and nobody protested and

3  lease areas were included in the five-year leasing

4  program that otherwise couldn't have been.

5          So the Supreme Court in the Noel Canning case

6  in 2014 reaffirmed that long continued practice is very

7  important in interpreting statutory provisions.  They

8  cited back to the Midwest Oil case.  The plaintiffs

9  claim Midwest Oil isn't good law anymore.  There have

10 been statutory changes, true, but the principle of

11 Midwest Oil that you look to long history to determine

12 how powers are properly interpreted and applied, that is

13 still good law because it was cited in Noel Canning for

14 that very proposition.

15          We have a consistent attitude -- conduct here

16 that we think clearly has to be read and applied to

17 allow the conduct here.

18          And that is backed up by the Youngstown Steel

19 principle.  Plaintiffs rely on Youngstown Steel, but we

20 think it reads just the opposite.  We rely principally

21 on Justice Jackson's famous concurrence where he said

22 that "A President's sole powers are entitled to the

23 widest latitude of judicial interpretation."  I'll

24 repeat that, "the widest latitude of judicial

25 interpretation," when there is both delegated power, and

1    here of course there is delegated power.

2            I mean, the whole OCSLA is entirely a delegated

3    power to the executive.  Almost all the power is

4    actually in the executive to decide where to lease, when

5    to lease, what leases to engage in.  Congress handed all

6    that over to the executive.

7            And second, of course, the President has his

8    own Article II powers to provide for national security

9    and conduct foreign affairs.  And OCSLA is based in part

10   on that.  So when those two combine, according to

11   Justice Jackson, that's when the Court is to be most

12   deferential to the determination of what the President's

13   powers are, and that applies four square here.

14           And then finally, Your Honor, it's in the

15   context of a statute that is in its very words aimed

16   toward the, quote, "expedited exploration and

17   development of the oil and gas resources of the OCS."

18   They say that twice.  It's in 43 U.S. code 18021 and

19   they say it in 43.133(2)(3).  That's both in 1953 and

20   after it was amended in 1978.

21           After the 1978 amendments, the DC Circuit said

22   succinctly, quote, "The Act has an objective:  The

23   expeditious development of OCS, the resources," end

24   quote, and other things were secondary.

25           Under those conditions, we think it's

1   impossible to read this statute to allow a President to

2   tie the hands of all future Presidents and declare vast

3   sweeps of the OCS offshore to oil and gas leasing.

4          Now, the President may have the power to do

5   that himself for his own term by issuing such as

6   withdrawal, but it is -- it is simply inconsistent with

7   the structure and purpose of the OCS Lands Act to read a

8   provision that talks about what a President may do and

9   what a President may from time to time do to allow that

10  kind of limitation on executive authority simply because

11  one President chooses to have that particular point of

12  view.

13         This is not obviously a hypothetical concern

14  here.  I mean, the Chukchi Sea was placed completely off

15  limits.  The latest numbers from the federal government

16  are there is 9.25 billion barrels of economically

17  produceable, not just technically produceable, but both

18  technically and economically produceable oil in the

19  Chukchi.  There is 6 billion in the Beaufort.

20         If one is going to allow -- that's using the

21  mid case economics.  I should be clear about that.

22         That it's just impossible to see how a

23  provision that historically with "may from time to time"

24  verbiage, which in so many contexts has been interpreted

25  to allow action and then reversal action and revision

1  and modification, in so many contexts, as I started my

2  presentation with, that somehow that should be read in a

3  different way, the opposite way in the context of a

4  statute that is entirely pro exploration and

5  development.  Of course leasing is the necessary

6  predicate of that.

7          Under the structure of the OCS Lands Act, you

8  can't explore and develop unless you have a lease to

9  begin with.

10          THE COURT:  Thank you.

11          Mr. Grafe, are you going to do rebuttal?

12          MR. GRAFE:  Thank you, Your Honor.  I just want

13  to address a few things.

14          First, words matter and the context matters, so

15  the statute, as I have explained, used -- it delegated

16  only one type of authority, and the history and the

17  context at the time that Congress passed that statute,

18  as we have shown, demonstrates that that matters.

19          And with respect to a difference between

20  withdraw and reservation, at the time it passed that

21  statute there was no difference in those terms at that

22  time.  They meant the same thing.

23          And as we highlighted in our brief, there is a

24  -- Congress passed a statute in 1957 limiting certain

25  defense withdraws, and in the legislative history of

 1  that statute it explicitly said, "We use withdraw and

 2  reservation interchangeably."

 3          And the defendants would just brush over that

 4  and say, well, there was a lot going on on the onshore,

 5  that's what was delegated on the offshore, but, no, we

 6  have demonstrated that Congress is precise about its

 7  delegations.

 8          THE COURT:  So in your reading of the statute,

 9  could a President say, "I'm going to withdraw all of the

10  unleased lands in the Outer Continental Shelf

11  permanently from development"?

12          MR. GRAFE:  Again, that's not --

13          THE COURT:  It's a hypothetical.

14          MR. GRAFE:  I think the answer is yes, it's --

15  the President -- the reason for it is that what the

16  statute allows the President to do is to identify areas

17  that he thinks should be held back and then gives

18  Congress, or held back until Congress acts, so throws it

19  back to Congress.

20          And makes sense because this was a statute that

21  in 1953 for the first time was managing, providing a

22  management regime for the Outer Continental Shelf.  And

23  so there might be an outer bound that is too far, but

24  it's perfectly consistent and reasonable that Congress

25  would in promulgating a statute that's general and

covers a big area that's a new area, give this President
the power to -- the President is going to be managing
it, say, "I have identified an area that I think should
not be leased without further consideration by
Congress," and that's the function of 12(a).

THE COURT:  And you read the statute to -- do
you read the statute to allow the President to, say,
withdraw for a period of time, like President Bush did?

MR. GRAFE:  So the question of whether there
could be temporary withdrawals or time-limited
withdrawals is a question of Congressional intent.  And
it's not an issue that's been briefed here.

And the answer to that question isn't
determinative of the outcome here, and that's because
whatever types of withdrawals Congress may have
authorized the President to put in place, President
Trump here revoked the withdrawal.

It's very clear that the text history and
context of 12(a) didn't give that reversal, opposite
power to the President.

THE COURT:  Do you have a position on how to
interpret the statute with regard to the question that
was posed with:  Does the statute accord a President the
right to have a limited time withdrawal, or you have no
position on that?

 1          MR. GRAFE:  Our position is that we don't have

 2     a position on that.  We have -- but I would just say --

 3     it's a matter -- like the revocation, it's a matter of

 4     Congressional intent, and so things that might be

 5     probative to that are what Congress has done in other

 6     public land statutes.

 7          I would just point out that in other public

 8     land statutes like the Pickett Act, Congress is explicit

 9     when it gives temporary power, so the Pickett Act

10     authorizes temporary withdrawals.  Here Congress didn't

11     say one way or another permanent or temporary.

12          Again, it would just be a question of

13     Congressional intent.  I would say with respect to

14     standing, quickly, I wanted to point out that the

15     defendants do not in fact dispute our factual evidence.

16     They say that at Docket 56 at 18 that they do not assert

17     any -- they don't assert any genuine issues of material

18     fact.

19          And plaintiffs have -- this Court found

20     standing based on the pleadings.  Plaintiffs have

21     provided evidence to support the pleadings.  And there

22     is no reason for the Court to reconsider that standing.

23          And as to API's invocation of Youngstown, in

24     fact, here we are -- if you think about the Youngstown

25     framework, we're in the framework where the President's

power is at its lowest because there is no delegated

authority we assert in 12(a), and the President doesn't

have independent authority, Constitutional authority

with respect to disposition of lands in the Outer

Continental Shelf, as my colleague Jackie Iwata has

said.  The power that he has must come from Congress,

and it was not delegated here.

THE COURT:  Thank you.

MR. WOOD:  Your Honor, Jeffrey Wood on behalf

of the United States.  You raised a very important

question:  Can a President do a time-limited withdrawal?

You heard the plaintiffs say they could not answer that

question because if they answered it, they would have to

say that every past President who exercised 12(a)

authority did it in the wrong way, as our briefs show.

President Bush, President Clinton, President George W.

Bush, even President Obama in his withdrawals used the

phrase "time period" without specific expiration.

Your Honor, I do think it's helpful to look at

some hypotheticals.  Consider this:  Again, OCSLA being

a flexible statute intended to promote the development

of OCS.  Suppose a president withdrew areas from

disposition because he wanted to allow temporary science

research project to occur or for a temporary economic

development project that was not compatible to leasing

1    in the area.

2           Would that President or any subsequent

3    President be barred from modifying or rescinding or

4    changing that withdrawal when that temporary study or

5    project was ended?  Of course not.

6           Suppose that the President was looking at two

7    areas of the OCS, in another hypothetical, one area

8    where the President determined that there was, based on

9    data, high conservation value, and another area where,

10   based on current data, decided that energy development

11   was particularly important in that area.

12          Suppose the data changed a few years later, or

13   decades later, and the President decided he wanted to

14   make a change.  OCS as it's currently written would

15   allow a President to operate flexibly in line with

16   purposes of the Act.  Plaintiffs would deprive any

17   President of that very basic authority.

18          Your Honor, you asked a question about the

19   attorney general's opinions.  I did want to respond to

20   that briefly if I might.

21          THE COURT:  Go right ahead.

22          MR. WOOD:  So in the 1930s, I believe you're

23   referring to the Attorney General Cummings' opinion with

24   regard to the Antiquities Act.  That was specifically

25   about language that's not at issue here and it predated

OCSLA, but even that opinion that said the President

could not abolish did allow for modifications, but the

Antiquities Act language is very different than what's

at issue here. Antiquities Act gives the President

discretion to make monumental proclamations, but then

says "shall confine the limits to the smallest area

compatible with protection of the objects."

So when Congress was granting this vast

authority under the Antiquities Act, it limited the

ability to do it to vast areas. The President had to

make a determination that's the smallest area compatible

with protection of the object. That's amazing that's

missing from Section 12(a), which simply says the

President may from time to time withdraw areas, but if

Congress intended to give basically Antiquities Act

power in OCS to the President for that kind of thing,

they would have said something different than they said

here, Your Honor.

We do agree with plaintiffs that Youngstown

Steel, the last case referenced by them, we do think

that's a helpful framework. We submit that of the three

categories, category one is the most appropriate because

there is express or implied authorization from Congress

for the President to act in this way. The President has

his own power and his own right under the Constitution,

plus all the power that Congress has given him, both in
the Act and under the delegated property clause power.

If it wasn't category one in Youngstown Steel,
we still think we win because category two says you
apply a flexible deferential test for presidential
actions when there is an absence of express grant or an
express denial of authority.  We think that would be a
fine category for us as well.

We simply don't believe that this is the kind
of category three steel seizure kind of context that
plaintiffs would like to fit this into, Your Honor.

THE COURT:  Thank you all.  I'll take the
matter under advisement.  The briefs were very helpful
as well from everyone, so thank you.

And we'll stand in recess at this time.  We'll
go off record.

DEPUTY CLERK:  All rise.  Court is now
adjourned.  This court stands in recess until 11:30 a.m.

(Proceedings concluded at 11:02 a.m.)

1                          CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
   matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
   Conference of the United States.

6
       Dated this 30th day of January, 2019.
7

8
                              /s/ Sonja L. Reeves
9                            SONJA L. REEVES, RMR-CRR
                             FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25