<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
 2

 3   LEAGUE OF CONSERVATION    )
     VOTERS, ET AL.,           )
 4                             )
             Plaintiffs,       )
 5                             )
     vs.                       )    CASE NO. 3:17-cv-00101-SLG
 6                             )
     DONALD J. TRUMP, ET AL.,  )
 7                             )
             Defendants.       )
 8   _____)

 9                   TRANSCRIPT OF ORAL ARGUMENT
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10                 November 8, 2017; 10:00 a.m.
                        Anchorage, Alaska
11
     FOR THE PLAINTIFFS:
12           Earthjustice
             BY:  ERIK CLIFFORD GRAFE
13           441 West 5th Avenue, Suite 301
             Anchorage, Alaska 99501
14           (907) 277-2500

15           Natural Resource Defense Council
             BY:  NATHANIEL S.W. LAWRENCE
16           3723 Holiday Drive, SE
             Olympia, Washington 98501
17           (360) 534-9900

18   FOR THE DEFENDANTS:
             Covington & Burling, LLP
19           BY:  STEVEN JOSEPH ROSENBAUM
             1201 Pennsylvania Avenue, NW
20           Washington, DC 20004
             (202) 662-5568
21
             Guess & Rudd, P.C.
22           BY:  CHRISTINA A. RANKIN
             1029 West 3rd Avenue, Suite 300
23           Anchorage, Alaska 99501
             (907) 793-2200

24   _____

25                    SONJA L. REEVES, RMR-CRR
                   Federal Official Court Reporter
</pre>

```
 1   APPEARANCES CONTINUED:

 2         Alaska Department of Law
           BY:  JENNIFER ELLEN DOUGLAS
 3         BY:  BRADLEY EDWARD MEYEN
           1031 West 4th Avenue, Suite 200
 4         Anchorage, Alaska 99501
           (907) 269-5232
 5
           U.S. Department of Justice
 6         BY:  ERIC GRANT
           950 Pennsylvania Avenue, NW, Room 2611
 7         Washington, DC 20530
           (202) 514-0943
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to Order of the Court at 10:00 a.m.)

 2              DEPUTY CLERK:  All rise.  Her Honor, the Court,

 3    the United States District Court for the District of

 4    Alaska is now in session, the Honorable Sharon L.

 5    Gleason presiding.

 6              Please be seated.

 7              THE COURT:  Good morning.  Please be seated.

 8    We're on record again in the League of Conservation

 9    Voters, et al. versus Trump, et al.  I have a group of

10    people here.  Are you, sir -- why don't you tell me who

11    you are.

12              MR. LAWRENCE:  I'm Nathaniel Lawrence with the

13    National Resources Defense Council, along with my

14    co-counsel, Erik Grafe.  We represent the plaintiffs.

15              THE COURT:  All right.  Very good.

16              MR. GRANT:  Good morning, Your Honor.  Eric

17    Grant, U.S. Department of Justice for the federal

18    defendants.

19              THE COURT:  All right.  Very good.

20              MR. ROSENBAUM:  Steven Rosenbaum for defendant

21    intervenor American Petroleum Institute.

22              THE COURT:  All right.  Very good.

23              MS. DOUGLAS:  Jennifer Douglas, Alaska

24    Department of Law.

25              THE COURT:  Very good.  Well, I entered the
```

1    order on the time, and I gave the defendants a half

2    hour.  I figured you would divide it among yourselves in

3    a way.  I assume you've done that.

4              MR. GRANT:  We have, Your Honor.

5              THE COURT:  Very good.  Then who am I going to

6    hear from first?

7              MR. GRANT:  You'll hear from me, Your Honor.

8              THE COURT:  All right.  Very good.

9              MR. GRANT:  Good morning again, Your Honor.

10   You gave us a combined total of 30 minutes.  I would

11   like to take 22, and give eight minutes to the private

12   intervenor defendants.  With the Court's indulgence, I

13   would like to reserve five minutes for rebuttal time.

14             THE COURT:  All right.  Very good.

15             MR. GRANT:  The federal defendant's motion to

16   dismiss has numerous facets, but they all represent

17   different ways of making the same point.

18             There is a time and place for a Court to review

19   the legality of Section 5 of Executive Order 13795, but

20   that time and place is not right now in this court.

21             THE COURT:  Let me ask you a question,

22   Mr. Grant, and that is:  Let's assume that instead of

23   the language that is in the statute there was a

24   provision that said, the President may from time to time

25   withdraw land from consideration, but once he does so,

1    or she, it can never be added back in?

2              What if that were the provision and we had this

3    case here?

4              MR. GRANT:  Well, Your Honor, I think that

5    would change the calculus on the merits.  Of course,

6    we're here on the motion to dismiss on jurisdictional

7    pre-merits defenses, components of standing, like

8    ripeness, sovereign immunity, whether Congress has

9    granted plaintiffs a cause of action in these

10   circumstances.

11             So I think essentially, our arguments would be

12   the same, and we would say to the, Court when, at the

13   appropriate time, plaintiffs with standing were to

14   challenge the legality of that action in the District of

15   Columbia Circuit on a five-year leasing plan, in the

16   regional courts of appeals, we would have a harder time.

17             But those are the times and places where

18   plaintiffs with standing, plaintiffs who suffer injury

19   in fact should bring that challenge, and that is the

20   time and place for a Court to exercise judicial review.

21             So one of the themes of my argument is the

22   Government is not arguing in this motion to dismiss that

23   the President's action is unreviewable.  Our essential

24   argument is, again, a time and a place but not here, not

25   now.

 1          This is not a constitutional crisis like the

 2     steel seizure case.  This is not some grand situation

 3     that requires courts to bend the rules.  As my

 4     colleagues at API have cogently documented in pages 8

 5     through 12 of their motion, there's a four-stage process

 6     before any exploration, any drilling occurs in these --

 7     in the outer Continental Shelf.

 8          And Congress in Section 1349 of Title 43 has

 9     provided multiple times and places for judicial review

10     of that action to take place.  And we think that those

11     are the appropriate avenues for judicial review to take

12     place.

13          So to address ripeness first, constitutional

14     ripeness, of course, is a component of the injury in

15     fact required for a plaintiff to have Article III

16     standing.  As stated in the classic formulation by the

17     Supreme Court in Lujan versus Defenders of Wildlife, the

18     irreducible minimum injury is one that is concrete and

19     particularized and actual or imminent, not conjectural

20     or hypothetical.

21          And so ripeness concerns the latter half of

22     that formulation; that is the timing of the alleged

23     injury.  And regarding that timing, the Supreme Court

24     has said "allegations of possible future injury do not

25     satisfy the requirements of Article III, a threatened

1    injury must be certainly impending to constitute an

2    injury in fact."

3           And plaintiffs cannot satisfy that requirement

4    of imminent certainly impending harm.  If we take the

5    harm that they themselves have alleged, and they've

6    succinctly stated that on page five of their opposition,

7    this executive order, quote, "injures plaintiff's

8    members because opening areas to disposition under OCSLA

9    threatens harm from oil and gas activities, including

10   seismic surveying."

11          If we put aside seismic surveying for just a

12   second, the other oil and gas activities are subject to

13   that four-stage process.  And not to steal my

14   colleague's thunder, but there's a five-year leasing

15   program, there's the lease sale itself, there's the

16   exploration stage, and only then and finally development

17   and actual production and drilling.

18          And those stages are successive.  For example,

19   Section 1344(d)(3) provides that no lease shall be

20   issued unless it's for an area within the improved

21   five-year leasing plan.  So you have to have leasing

22   plan first, then the lease, then, as documented in my

23   colleague's motion, other plans, other permits before

24   any of that can happen.

25          What's the timing of that?  Plaintiffs don't

1  really contradict the documented fact that the very

2  first of those stages is only just getting going.  In

3  July, the Interior Department filed a Federal Register

4  notice merely soliciting information and requesting

5  comments on the preparation of a new five-year leasing

6  program.

7           And that program is for 2019 through 2024.  So

8  I think plaintiffs effectively concede on pages 21 and

9  22 of their opposition that harm from drilling itself is

10  not imminent because it's contingent on these multiple

11  stages.

12           Now, they rely also on seismic surveying, and I

13  have two points regarding that.  That's -- one, as a

14  matter of fact, that's not imminent or certainly

15  impending either.  The closest plaintiffs come to that

16  is to say that companies have already sought federal

17  authorization and the government has advanced eagerness

18  to speed development.  That's on page 21 of their brief.

19           But on page five of our reply brief, we've

20  cited authority for the fact that the only operators to

21  apply for seismic survey permits proposed to conduct

22  these activities in areas offshore in the Mid-Atlantic

23  coastal states are from the area in the Atlantic

24  withdrawn by President Obama.

25           So anything that's even close, these

1    applications aren't even -- don't even touch on the

2    areas that are in dispute in this case.

3         And plaintiffs have not explained why they

4    could not challenge in the manner prescribed by Congress

5    and the Administrative Procedure Act or in OCSLA the

6    permits that have to be issued before any seismic

7    surveying may be conducted, and those permits are

8    discussed, among other places, in Footnote 1 of the

9    DC Circuit's decision in Center for Biological Diversity

10   versus U.S. Department of Interior, cited in the briefs.

11        But second and more fundamentally, seismic

12   surveying lacks a connection to the disputed executive

13   order in this case.  Seismic surveying is conducted

14   under the authority of Section 1340 of Title 43, and is

15   independent of leasing.

16        And the withdraw authority that we're fighting

17   about in this case, the President's authority to, quote,

18   "withdraw from disposition any of the unleased lands of

19   the outer Continental Shelf," unquote, is provided by a

20   separate statute, namely Subsection (a) of Section 1341.

21        So really the upshot is that surveying is

22   authorized by a separate statute regardless of what

23   lands are withdrawn or not withdrawn.  So it can go

24   forward regardless of the legality of the challenged

25   executive order.

1          So to go back to the terms of standing,

2     plaintiffs failed to show that their alleged injury is

3     fairly traceable to -- the alleged injury from seismic

4     surveying is fairly traceable to this executive order.

5          So in sum, on this point, plaintiff's alleged

6     injuries are not imminent, they're not certainly

7     impending, in a word there, they're unripe, and they

8     lack Article III standing.

9          So if we turn to another aspect of standing,

10    the Supreme Court has said, as I quoted before, "the

11    injury has to be concrete and particularized."  And we

12    think that the Supreme Court's decision in Summers

13    versus Earth Island Institute is apropos on this point.

14    In that case, the Court denied standing to a challenge

15    about national forest regulation observing that national

16    forests occupy more than 190 million acres, an area

17    larger than Texas.

18          The Court said there may be a chance, but

19    there's certainly not a likelihood that plaintiff's

20    wanderings will bring him to a parcel about to be

21    affected by the alleged unlawful regulations.

22          And here the subject, the area subject to the

23    executive order is similarly enormous.  Plaintiffs

24    themselves allege 128 million acres in their Complaint.

25    And absent any five-year leasing program, absent any

lease sales, absent any exploration plans, there's
similarly no basis for this Court to find a likelihood
that the plaintiff's wanderings will bring them to
particular areas that will be ultimately affected by the
executive order.

Of course, plaintiffs rely on the Ninth
Circuit's decision in Center for Biological Diversity v
Kempthorne escape this conclusion. But in that case,
the Ninth Circuit -- the affected area in that case was
large. It was in and along the Beaufort Sea on the
northern coast of Alaska, but the Ninth Circuit said
nonetheless, that was a geographically specific area.

I think important to the decision to find
standing in that case was the fact that the challenged
regulations there have been and continue to be
implemented such that the alleged injury was imminent.

Here, given the four-stage process, nothing is
imminent. There's been no actual implementation of
authority in these disputed areas. So we think that in
addition, plaintiff's injuries are not concrete and
particularized.

That brings me to sovereign immunity. And I
think we're in agreement, and, for example, the Ninth
Circuit's fairly recent case in Consejo de Desarollo,
cited in our briefs, makes clear that when federal

defendants are sued in their official capacity, and, of course, that's exactly the capacity alleged in the caption of plaintiff's Complaint here, sovereign immunity bars that suit unless there's been a waiver by Congress.

Now, plaintiffs invoke the so-called ultra vires exception derived from Supreme Court's decision in Larson v Domestic Foreign Commerce Corporation. The Supreme Court made clear that there must be a wholesale lack of delegated power and a mere, quote, "claim of error in the exercise of that power is therefore not sufficient."

I submit, Your Honor, that we're not in a situation where the President or the secretaries are acting wholly outside the powers that the statute has given them. There is a dispute. There's claim of error, and as we say, eventually that will be litigated.

Eventually a Court will be able to make a ruling on that, but only in the forum and under the exception, under the waiver of sovereign immunity that Congress has provided, either in the Administrative Procedure Act or in OCSLA itself.

So eventually, plaintiffs will be able to make the argument, and I'm quoting from 5 U.S.C. Section 7062, that the President's -- that the defendants have

1    taken action that is, quote, "not in accordance with

2    law," or that is in, quote, "excess of statutory

3    jurisdiction, authority or limitations."  That's the

4    waiver of sovereign immunity in the APA.

5            But of course, plaintiffs don't rely on that,

6    because they can't satisfy the final agency action

7    requirement, or similarly, the requirements in OCSLA

8    itself, 43 U.S.C. 1349.

9            So the last of these four doctrines is the lack

10   of cause of action.  And plaintiffs have not been able

11   to point to any statute by which Congress has authorized

12   them to bring suit at this time and in this place.  They

13   cite some cases in which the Supreme Court has reviewed

14   presidential action, but many of those cases, like NLRB

15   v Noel Canning, arose in the course of a statutorily

16   authorized review.  In that case it was 29 U.S.C.

17   Section 160(f).

18           But there's no similar statutory right here.

19   Of course they rely on Hawaii v Trump and similar cases,

20   but the Supreme Court last month vacated those

21   decisions, and the Ninth Circuit itself just last week

22   vacated its own decision and ordered the district court

23   to dismiss those cases.

24           THE COURT:  But not for lack of standing.

25   Wasn't it mooted out by a new order?

1          MR. GRANT:  It was mooted, Your Honor.  I guess

2    to say those cases aren't authority for a waiver of

3    sovereign immunity.

4          And again, plaintiffs cite cases like the steel

5    seizure case from the 1950s, where it looks like the

6    Supreme Court is bending the rules a little bit because

7    it's worried that otherwise, presidential action will go

8    unreviewed, President Truman's seizure of the whole

9    steel industry.

10         But that's not the case here.  Congress has

11   waived immunity.  It has done it in a time and place

12   under prerequisites that plaintiffs simply do not wish

13   to follow.

14         So the last -- my last point, Your Honor, is of

15   course we've asked that the entire action be dismissed,

16   but if Your Honor doesn't give us that complete relief,

17   we'd like the lesser relief of dismissing the President

18   personally.

19         And that, of course, we rely on authorities

20   collected in the district court's decision in Newdow v

21   Bush, that courts have no authority to issue declaratory

22   or injunctive relief against a co-equal branch like the

23   President.

24         In response to that argument, I think

25   plaintiffs expressly disavow any such intent to get such

1  relief.  They say on page 16 of their opposition,

2  "Plaintiff's relief does not require an injunction

3  against the President."

4         On the next page, they say conversely,

5  "Plaintiff's arm can be redressed by an injunction

6  against the defendant secretaries."  And they make a

7  similar statement on page 18.

8         So in response to our motion, plaintiffs have

9  clearly disavowed any request for relief against the

10 President as opposed to the secretaries.  And so we ask,

11 if the Court is not inclined to dismiss the entire case

12 in light of the separation of powers, concerns that

13 we've raised and plaintiff's I think effective

14 concession that they can get relief against the other

15 defendants, the President should be dismissed.

16        THE COURT:  Thank you.

17        MR. ROSENBAUM:  May it please the Court, my

18 argument is going to focus on a single issue, which is:

19 Does this lawsuit belong here or in the DC Circuit.

20 It's a 12(b)(1) issue.

21        In considering that argument, the key factor to

22 recall is the Ninth Circuit's admonition in Nuclear

23 Information that any doubt should be resolved in favor

24 of the court of appeals having jurisdiction.  I think

25 we're going to provide much more than just some doubt.

I think we're going to establish it's clearly the case.

The OCS Lands Act is highly structured. There are four stages. The first stage is the five-year program. That determines what areas are going to be available potentially for leasing. They may not later be leased, but they are the areas that are potentially available for leasing.

It is, in the words of the DC Circuit, where key national decisions are made. And there's only one court in the country that has jurisdiction, and that's the DC Circuit. It's not just it's the court of appeals. There are lots of statutes that provide for jurisdiction directly to the court of appeals.

It's one specific court of appeals, and this was a very considered decision by Congress. They wanted one court to make a unified decision and that was going to be it. And that was going to resolve any judicial challenges to the questions on what areas can be made available for leasing.

The withdrawals present the exact same issue, what areas can be made available for leasing. It's the same question. Indeed, if you look at the withdrawals, and I reference to Government Exhibits 15, 17, 18, these are -- these are the Obama withdrawals. They are memorandum for the Secretary of the Interior. That's

their verbiage. Why? Because they are directions to
the Secretary of the Interior as to what areas he cannot
consider for the five-year programs. That's what they
are.

And indeed, President Trump's executive order
also is a memorandum to the Secretary of the Interior
altering the previous withdrawals. The two obviously
are closely intertwined, the withdrawals and the
five-year program. And that's the test, that's the
standard that the Ninth Circuit looked to in the CEC
case.

Now, the plaintiff's response is it's true that
1349(c)(1) provides exclusive jurisdiction to the DC
Circuit, but it's referencing leasing programs, not
withdrawals. And that's true, but that simply brings
you to the Yeutter line of cases by the Ninth Circuit
and thereafter, where the Court grapples with the
question "What happens when you're dealing with a
decision that is closely intertwined with the decision
that is exclusively before the court of appeals but not
explicitly so?"

And what the Ninth Circuit said in Yeutter is
that that preliminary closely intertwined decision also
goes to the court of appeals. It was, if you will, an
extreme case. It was a decision by the Forest Service

1   as to certain decisions it was making regarding the use

2   of federal lands.  Those lands were going to be used

3   with respect to a hydroelectric plant licensed under the

4   Federal Power Act.  The Federal Power Act says any

5   review of licensing decisions go to the court of

6   appeals.

7          Well, the plaintiffs in that case said, we're

8   suing the Forest Service, we're not suing FERC.  We're

9   not raising claims under the Federal Power Act, we're

10  raising NEPA claims, and we're raising other types of

11  claims, Indian rights statute claims.  So we're in

12  district court.

13         The Ninth Circuit said no.  The Ninth Circuit

14  said that that too is subject to exclusive jurisdiction

15  of the court of appeals because it was an intertwined

16  decision and it was a decision, the Forest Service

17  decision, that had no significance outside the FERC

18  licensing process.

19         That was why the Forest Service was making the

20  decision, and that the lawsuit's ultimate purpose was to

21  block the construction of the hydroelectric facility,

22  which was a FERC licensing issue.

23         Same thing here.  The withdrawals have no

24  significance except to the effect -- except to the

25  extent they affect what can be included in five-year

leasing program.  And the ultimate desire by the plaintiffs, which they are actually explicit about, is they want to restrain what areas can be made available for leasing through that five-year program in the later stages.  So this is Yeutter all the way.

The court in Yeutter also said that Congress obviously did not want a party to have to, in their terms, grind through the district court and then go to the court of appeals.  There obviously was a desire by Congress for expeditious treatment.

Here, it's even stronger.  First of all, the OCS Lands Act itself says, we want -- this is 1331(c) -- expeditious development.  So they're actually using the statute, the OCS Lands Act, the very language they used in Yeutter.  But beyond that, here it's not just, with all due respect to the Ninth Circuit, that these issues are supposed to go to the court of appeals, they're supposed to go to a different of court of appeals. They're supposed to go to the DC Circuit.

And the practical reality here is huge.  As counsel for the federal government explained, the administration is right now drafting a new five-year program that's going to go -- that plans to go into effect in 2019, year after next.

Part of the statutory obligation of the

secretary is to decide how do I balance among the
regions and decide which ones ought to be made available
for leasing.  There's a whole slew of criteria.  That
decision, when it comes out, which will presumably be in
2019, is reviewable solely by the DC Circuit, and yet
under the plaintiff's scenario, any decision by Your
Honor will be before the Ninth Circuit at the same time.

You'll have the DC Circuit grappling with the
question of what's the proper balance among the regions
for leasing at the same time the Ninth Circuit is
dictating what areas are available for leasing.

That's exactly the kind of conundrum that
Yeutter said was to be avoided, and Yeutter wasn't even
dealing with the situation where there was one specific
court of appeals that was designated for resolution of
these kinds of issues.

THE COURT:  So in determining which lands
should be leased, where would I find the criterion or
criteria that the agency is to consider, and does it
address -- does it reference at all withdrawn lands that
are put back into the mix?

MR. ROSENBAUM:  There's no -- the answer to the
second question is no.

THE COURT:  It was a compound question.

MR. ROSENBAUM:  And the criteria --

1        THE COURT:  Where I would find -- are there

2   regulations that set out how you figure out which lands

3   to offer up for lease?

4        MR. ROSENBAUM:  Yes.  It's in Section 1334 of

5   the statute.

6        THE COURT:  It's in the section?

7        MR. ROSENBAUM:  It's in the section.

8        THE COURT:  That was my question.

9        MR. ROSENBAUM:  And it's a consideration of,

10  for example, equitable sharing of development, benefits

11  and environmental risks among agents.  But that's one of

12  several criteria, but that's where it's found.

13       Now, I will also point out that in Yeutter it

14  was -- in Yeutter the Forest Service decisions were held

15  reviewable only in the court of appeals, even though

16  they were decisions that were being challenged under

17  completely different statutes in the Federal Power Act.

18  They were being challenged through NEPA, et cetera.

19       Here the withdrawal is in the OCS Lands Act.  I

20  mean, it's in the same act.  So if Yeutter was correctly

21  decided, which of course it was, then the DC Circuit has

22  the jurisdiction here.  And Yeutter is one case.  We

23  cite many others in our brief.

24       Now, plaintiffs argue, well, our claim here is

25  it's ultra vires, as if that cures things.  We think it

doesn't for two different reasons.  First of all, we think the law is clear that even if it were ultra vires, you would still have to use the jurisdictional parameters of the OCS Lands Act to decide what court gets to resolve whether it's ultra vires or not.  That's what FCC v ITT said.  That's a Supreme Court decision.

The argument was that the FCC acted ultra vires.  They sued in district court, and the Supreme Court bounced it, saying, "No, no, FCC decisions are reviewable in the court of appeals.  It doesn't matter that you're claiming this ultra vires action.  That's where it's heard."

And a case that plaintiffs themselves cite, Noel Canning, a recent decision where actually the action was held to be ultra vires, and this relates to the recess appointments issue, but it related to the action of the National Labor Relations Board.  And the determination whether or not they acted ultra vires, went in the first instance to the court of appeals, not to a district court.

Why?  Because decisions of the National Labor Relations Board are reviewed in the court of appeals by statute.  And the mere fact it was a claim that their action was ultra vires, as indeed it was ultimately found to be, had no bearing on which court had

1    jurisdiction to resolve the matter.

2            And all of what I've just said presupposes that
3    their claim can reasonably be characterized ultra vires.
4    We absolutely dispute that.  We have a -- this is not
5    steel seizures.  I mean, we have a statute in the OCS
6    Lands Act that addresses withdrawals by the President.
7    That's a grant of authority that Congress has given to
8    the President.

9            We have a long history, as we lay out in
10   detail, of that power being exercised in a way that is
11   not permanent or irreversible, which is the plaintiff's
12   position, that the power is permanently irreversible.
13   It's neither, based on practice.  We have cited numerous
14   cases in which Presidents either only made the
15   withdrawal temporary to begin with, or in which other
16   Presidents later came in and changed those earlier
17   withdrawals.

18           Of course the "from time to time" language of
19   the statute provides some reasonable indication that
20   that was the intent.  We cited other statutes, the fact
21   that from time to time there can be establishment of
22   inferior courts, which surely doesn't mean we're limited
23   to the district courts that were established in 1791 or
24   whenever the first district courts were established.

25           So for these reasons, we think it's clear this

1   is a statutory interpretation case where there's
2   discretion, where there's a history of conduct, and
3   ultimately, for those reasons, we think we will succeed
4   on the merits, but for present purposes, it's merely
5   sufficient to conclude this is a question of what the
6   statutory authority is.
7            And that means that the lawsuit is under the
8   OCS Lands Act.  It's a claim there's been a violation of
9   OCS Lands Act.  1349(a)(6) says that claims of violation
10  under the OCS Lands Act are to be pursued pursuant to
11  the jurisdictional provisions of the OCS Lands Act.
12           The only provision of authority to district
13  courts is over things like violations of permits or
14  impropriety in conducting operations, none of which
15  obviously relates to the question of what areas are to
16  be made available for leasing.
17           That is covered by 1349(c)(1), and jurisdiction
18  is provided exclusively to the DC Circuit for that.
19           THE COURT:  Thank you.  Mr. Grafe?
20           MR. GRAFE:  Good morning, Your Honor.  I would
21  like to address ripeness and standing.  My colleague,
22  Mr. Lawrence, will then address cause of action and
23  waiver of sovereign immunity.
24           THE COURT:  All right.
25           MR. GRAFE:  First I would like to emphasize the

significance of President Trump's order.  The order

purports to change the status of the Arctic Ocean and

the Atlantic canyons from permanently closed to oil and

gas development to open for such development.  So in

other words, where the waters were absolutely protected

from offshore oil drilling, they're now open for

leasing, exploration and development under the Outer

Continental Shelf Lands Act.

        This change threatens harm to the plaintiffs.

Most immediately, it threatens harm from the seismic

surveying that opening those areas catalyzes.

        And the plaintiff --

        THE COURT:  Do you agree with the reply brief

that pointed out that the seismic surveying is not part

of the leasing program?

        MR. GRAFE:  That's right.  And that's why it

can happen, and it precedes the four stages.  And in

fact, that's why plaintiffs have alleged detailed

factual allegations in the Complaint that demonstrate

that the harm to them from the seismic surveying that

will be catalyzed by the fact that now these are open to

this position, will cause them imminent harm that's

concrete and particularized.

        THE COURT:  But the executive order didn't

impact the seismic -- I understand your catalyzation

1    argument, but it really didn't prohibit -- President

2    Obama's order didn't prohibit seismic surveying, did it?

3          MR. GRAFE:  It did not, but since those areas

4    were closed for oil drilling, there was no incentive for

5    any of the companies to conduct seismic surveying there,

6    whereas President Trump's order opening them up was

7    greeted with an industry press release that said -- from

8    the seismic industry group, that said this is great, we

9    want to do seismic there, quote, "without delay to

10   inform our decisions for the five-year plan."

11         And in the Atlantic, there already are pending

12   seismic survey permit applications, and they do cover

13   areas affected by President Trump's order, contrary to

14   the Government's brief.

15         We allege that at paragraph 41 of our

16   Complaint, and if you were to look at the exhibits

17   attached to the intervenor's reply brief, they show --

18   they have a map on the last page of each of the

19   exhibits, and that shows these large-scale seismic

20   surveying that the industry wants to conduct.  It shows,

21   if you compare that with a map of the withdrawn areas,

22   there's overlap in several of them.

23         So it's incorrect to say that it doesn't affect

24   the areas in the Atlantic.  Of course, in the Arctic,

25   the whole area was closed to drilling before.  Now it's

1   open, so that has a clear effect there.

2           And we allege that, you know, when courts look

3   to determine imminence, it's a common sense inquiry.

4   And the test is whether as a practical common sense

5   matter the decision that's being challenged creates a

6   substantial risk of harm.

7           And here, you know, courts will look to

8   motivation and past behavior.  And I've described the

9   motivational effect.  And the past behavior also

10  confirms the imminence of seismic surveying.  In 2016,

11  the National Marine Fisheries Service did an EIS

12  assessing noise impacts in the Arctic Ocean.  It

13  predicted that there would be multiple seismic surveys

14  for multiple years if that area was opened to oil and

15  gas drilling.

16          And in the past in the Arctic, the oil

17  companies have conducted seismic surveying several years

18  in advance of leasing, which puts them right in our

19  window.

20          Now, the Government's argument that the harm

21  isn't imminent because it requires future permitting and

22  intervening steps is unavailing because the presence of

23  intervening steps doesn't defeat imminence, because

24  again, the question is does the challenge decision

25  create a substantial risk of those intervening steps

1   happening.

2           And so, for example, in cases that assess this,

3   like Carpenters Industrial Council, the DC Circuit found

4   that timber companies could challenge the designation of

5   critical habitat in the national forest, even though the

6   harm that they claimed, which was economic harm due to

7   lost timber supply, wouldn't happen but for a few

8   intervening steps.

9           There would have to be a forest -- a timber

10  sale by the Forest Service that would provide only a

11  reduced amount of timber.  The company would have to be

12  unable to fulfill the amount of timber it needed from

13  that sale.  It would be unable to substitute that from a

14  different source.

15          All of that has to happen before the harm

16  accrues.  But the Court nonetheless, calling it a common

17  sense inquiry, determined that the timber companies had

18  standing to challenge that broad decision.  And the

19  Ninth Circuit has undertaken a similar analysis in

20  Oakland versus Lynch in which the City of Oakland sued

21  the federal government to stop their foreclosure

22  petition on a marijuana dispensary claiming lost tax

23  revenue as harm.

24          There, before the harm accrued, a Court would

25  have had to grant that foreclosure motion and the

cannabis sales in the City of Oakland and the City of
Oakland tax would have to have been diminished meaning
the other cannabis dispensaries didn't pick up the slack
and the new tenant of the building would have to pay
less tax to the City.

So these intervening events are accepted by the
Courts as not making things not imminent.  And so to
here where really all that has to happen is the seismic
companies have to apply to do seismic and the government
has to grant those permits, and the government has been
directed by the President and the Secretary of the
Interior to grant permits expeditiously, and the
industry has said, "We would like to do seismic
surveying without delay in the Atlantic and in frontier
areas."

And so for these reasons, plaintiffs have
alleged detailed facts that demonstrate that their harm
is imminent and that it is connected to the decision
here at issue.

Plaintiffs also have met the nexus test between
the use of the Arctic and the Atlantic and the harm from
the President's order.  And again, that's because
they've alleged at paragraph 15 of their Complaint that
they have members that use the areas, different parts of
the areas that will be affected, and that they use

marine mammals that rely on those areas.  And they've
alleged harm from seismic surveying, which has wide
effects.

So that makes it quite different from a case
like Summers where the challenged decision was small
post-fire timber sales across the national forest and
the plaintiffs couldn't connect their use of the forest
with those discreet harms.

Here the harm is broad and will affect a broad
area, and plaintiffs use those areas and have connected
their use to that.  So an example of the difference of
these things can be seen in a case that this Court
decided a few years ago, Kunaknana, which dealt with a
drilling plan in the Colville Delta.  In that case
several of the plaintiffs were found not to have
standing because they couldn't connect their use of the
area to that specific project.

But at Footnote 160 of that opinion --

THE COURT:  It's a long opinion.

MR. GRAFE:  It was.

THE COURT:  Footnote 160.  All right.  Go
ahead.

MR. GRAFE:  At that footnote, the Court
recognizes the difference between small-scale harms and
larger-scale harms, and cites a case, the Defenders of

Wildlife versus EPA, 420 F.3d at 957, which is a Ninth
Circuit case in which the Ninth Circuit found that
plaintiffs who alleged that they used and observed
endangered species in the state of Arizona had a
geographic connection with the decision they challenged,
which was that delegation to the state which would
reduce protections under the Endangered Species Act for
that.  It's because the challenged decision had a broad
effect, it was connected to the plaintiffs' use of a
broad area.  And so too here.

Finally, I'll address very briefly the doctrine
of prudential ripeness, which is discretionary, and so
the Court need not even apply it.  And in fact, the
Ninth Circuit has declined to apply it.  And I'll give a
citation in a case called McClung v City of Sumner,
548 F.3d at 1224, in which the Ninth Circuit said, well,
it's discretionary, we're going to move right past it.

But if the Court does apply the doctrine,
plaintiffs easily meet it here.  The doctrine asks two
questions.  One, is the claim fit for immediate
decision.  And our claim is because it raises strictly
legal issues, which is whether the President had
authority to undo the withdrawals.

And despite the Government's assertion in its
reply, the question doesn't require any further factual

development to answer.  The salient facts about the
Executive Order's lawfulness are known today, and
further agency action at the five-year plan stage of the
leasing stage won't inform that.

      And the plaintiffs also would suffer a hardship
if made to wait until these later stages, again, because
the executive order itself will catalyze seismic
surveying that will harm the plaintiffs and that seismic
surveying is done specially to inform those later
stages, whereas the Government and industry cannot
demonstrate that they will suffer any hardship if the
case is adjudicated now.  And in fact, it may spare them
the trouble of doing a five-year plan for an area that's
determined later to be closed if the order is unlawful.

      For all of these reasons, I would urge the
Court to find that we have standing and that our claims
are ripe for adjudication.

      THE COURT:  All right.  Thank you.

      MR. GRAFE:  Thank you very much.

      MR. LAWRENCE:  Your Honor, again, I'm Nathaniel
Lawrence for the plaintiffs.  I think I would like to
start by addressing the cause of action.

      The Government's position here is that the
plaintiffs need to statutorily provide cause of action.
That's not the case and the Supreme Court has never so

1    held.

2         The case that they principally rely on here is

3    Sandoval and its kin deal with situations where Congress

4    has created the obligation that's being enforced.

5    That's not our situation.  We're seeking here to enforce

6    an obligation that arises under the U.S. Constitution.

7         In Sandoval-type cases where Congress has

8    created the statutory obligation, it makes sense to ask

9    whether Congress intended for there to be a private

10   right of action to enforce.

11        And those cases also involve enforcement

12   against third parties, where it makes sense to ask

13   whether enforcement by third parties, by private parties

14   might unnecessarily suppress commercial activity or

15   trench on the prosecutorial discretion of the federal

16   government.

17        That's not the situation we're in here.  We are

18   asserting an obligation that arises under the

19   Constitution.  It doesn't make any sense to ask whether

20   Congress not having created that obligation concurrently

21   created a cause of action for it.

22        And where you're not suing -- there's not a

23   question of suit against a third party.  It doesn't --

24   where it's a question of suit against a federal officer

25   acting assertively in his or her official capacity, it

doesn't make a lot of sense to ask whether the
enforcement of that obligation ought to be left entirely
up to the federal government.

      The situation we're in is the one squarely
addressed by the Supreme Court in Free Enterprise Fund,
a case cited in our brief.  That's a case where a
statutory scheme created causes of action with
jurisdictional restrictions, but that wasn't the claim
that the plaintiffs brought.  They didn't have a claim
under the Administrative Procedure Act, because there
wasn't any final agency action.

      Nonetheless, the Supreme Court heard and upheld
their claim that the board they were challenging was
created ultra vires under the Constitution.

      In doing that, the Supreme Court said, even the
Government doesn't dispute that there are causes of
action that arise directly under the Constitution, and
the Court expressly found that claims arising under the
separation of powers were among such causes of action.

      I think it's worth noting that even the author
of the Sandoval that the Government relies so heavily on
subsequently himself in another majority opinion noted
that, quote, "The ability to sue to enjoin
unconstitutional actions by state and federal officials
is the creation of courts of equity and reflects a long

 1   history of judicial review of illegal executive action."

 2          That's Armstrong versus Exceptional Childcare

 3   Center.  It's 135 Supreme Court at 1384.  The dissent in

 4   that case reaffirms that principle and says the

 5   plaintiffs were just, quote, "simply pointing to

 6   background equitable principles authorizing the action."

 7   That's at the same case at 1392.

 8          Let me talk quickly about sovereign immunity.

 9   I don't think this is a big issue in this case.  The

10   Supreme Court case law is quite clear that when the

11   allegation is that a federal official is acting ultra

12   vires that sovereign immunity doesn't attach, so you

13   don't need a waiver from it.  That's the Larson case and

14   many subsequent cases.

15          The government objects that our case is, quote,

16   "addressed to the President in his official capacity,"

17   but that's always true in cases like this.  You are

18   suing a federal official who has acted in his or her

19   official capacity ostensibly with authority that he or

20   she doesn't have.  That's the nature of these cases.

21          In fact, the Ninth Circuit in State of

22   Washington versus Udall described such cases as, quote,

23   "a suit against a government officer in his official

24   capacity," unquote, and therefore, quote, "not a suit

25   against the sovereign," unquote.  That's 417 F.2d at

1   1314, a 1969 case.

2           THE COURT:  So with regard to the Government's

3   position on having the President removed as a defendant,

4   as I understood your briefing, you're not seeking an

5   injunction against the President, correct?

6           MR. LAWRENCE:  We do not believe that you have

7   to issue an injunction against the President.  I think

8   your ability to do that is an open question.  But you do

9   not need to do that to afford at least partial relief.

10          THE COURT:  And so then with regard to his

11  dismissal, what's the plaintiffs' position?

12          MR. LAWRENCE:  Well, the action here that

13  causes the harm, and the action that violates the

14  Constitution is the President's, so he's a proper

15  defendant.  And Presidents do get sued.  They get sued

16  for declaratory relief, and that's what we're looking

17  for here.

18          That proposition I think is beyond doubt,

19  certainly in this day and age.  I think if you dismiss

20  the President, we would not have -- we would not have a

21  current cause of action.  So I think he is not only "a,"

22  but the necessary party in this case.

23          THE COURT:  Thank you.

24          MR. LAWRENCE:  Let me talk a little bit about

25  the argument that this case somehow falls under the

1    citizen provision of OCSLA.

2         The industry, the intervenors here argue that

3    what President Trump did is part of the OCSLA process.

4    It's really not.  It was an independent action by an

5    independent official not named in OCSLA, not named in

6    the relevant sections of OCSLA.

7         And it has independent force and effect, as my

8    colleague explained.  Changes the world now.

9         It was undertaken prior to any administrative

10   process that's described in the citizen provision.  And

11   that citizen pursuit provision is really quite narrowly

12   tailored.

13        THE COURT:  So what's your response to the

14   argument from the Government that if this case were to

15   go forward, then you could end up with parallel

16   proceedings going on in the DC Circuit?

17        MR. LAWRENCE:  Well, one thing that would not

18   be happening is the Ninth Circuit dictating anything

19   about leasing.  That was dictated by President Obama's

20   withdraw under Section 12(a) of OCSLA.

21        If the Ninth Circuit finds that it's

22   unconstitutional, it finds it's unconstitutional, but

23   presumably that decision would not be so delayed as to

24   trench on any consideration by the DC Circuit of a

25   five-year leasing program that takes two to two and a

1   half years to develop and a process that has not yet

2   commenced.

3           I don't think there's any real world concern

4   here, nor do I think the two courts, if for some reason

5   it dragged on that long, would be unable to coordinate

6   their decision.  I just don't see that as a real world

7   consideration at all.

8           I do want to stress that 1349 Section (c), the

9   section that directs some claims under OCSLA to the

10  appellate courts, is a very narrow provision, that the

11  statute itself, the citizens provision in OCSLA itself

12  calls it an exception.  1349(b)(1) says, "except as

13  provided in subsection (c), everything goes to the

14  district courts."

15          And the 1349(c) describing the cases that go to

16  direct appellate review is very precise in its terms.

17  Those are cases that involve decisions by the Secretary

18  of Interior.  They are made after an administrative

19  process.  They are heard solely on the record made in

20  that administrative process.  And 1349(c)(7) says

21  appellate jurisdiction doesn't even attach until the

22  filing of the record, which is an impossibility in this

23  case because there's no record.  There was no

24  administrative proceeding.  So it's really a very

25  narrowly tailored provision.

1          I think it's also -- I think it's worth noting

2    that the statute itself also preserves jurisdiction,

3    causes of action and the normal jurisdiction to hear

4    them that are not enumerated in 1349(c), anywhere in

5    1349.

6          1349(a)(6) says, quote, "Nothing in this

7    section shall restrict any right which any person may

8    have under any other Act or common law to seek

9    appropriate relief."  That's a savings clause that

10   squarely covers the situation that we are in.

11         I want to take a minute if I can to address the

12   Yeutter line of cases, the intertwined argument that

13   first appeared in intervenor's reply brief.  Those are

14   cases that deal with subsidiary actions by the same or

15   another agency that are statutorily required as part and

16   parcel of an ongoing administrative process.

17         Challenges to those subsidiary actions are

18   challenges to the decision in chief.  They have no other

19   function, they have no other force and effect, and they

20   are heard in the same forum that Congress directed for

21   the decision in chief.

22         Those cases just don't have any relevance here

23   where we're challenging a presidential decision of

24   independent force and effect that was made prior to and

25   apart from any of the processes that are named in 1349.

1          Yeutter involved a letter that the FERC had to

2    obtain per Section 4(e) of the Federal Power Act in

3    order to go ahead with what was it doing.  Without that

4    letter, it couldn't proceed.  Same thing is true of the

5    other cases that the intervenors cite.

6          There's one exception to that.  That's the

7    California Energy Commission case that my colleague here

8    referenced.  That's a case that involved a citizen

9    supervision which was very different from this one, a

10   citizen supervision which specified jurisdiction in the

11   appellate court to hear claims by, quote, "any person

12   who will be adversely effected by any one of a set of

13   enumerated decisions."

14         So it wasn't limited to the decisions

15   themselves, but to anybody who was adversely effected by

16   them.  So in that case, the plaintiffs were adversely

17   affected by one of the enumerated decisions.  They

18   sought a waiver from it.  When the waiver was denied,

19   then that adverse effect was made good to them.

20         And the Court found this is a case that

21   belongs, because by the very terms of the citizen

22   supervision, it belongs in the appellate court.  The

23   Court said that the denial of the waiver was, quote,

24   "qualitatively no different from challenges to the

25   decision in chief," that was listed in that citizen

provision.  That's 585 F.3d at 1150.

There's also a series of cases cited in the reply brief by the intervenor that talk about resolving the ambiguity in favor of the court of appeals jurisdiction.  They didn't raise it at the argument here, but because we didn't get an opportunity to respond, I want to point out that those cases all deal with a patent ambiguity in the citizen supervision.  There is no such ambiguity here.  They haven't identified any relevant ambiguity.

What they argue is that you ignore cases they themselves cite, which say jurisdictional provisions have to be strictly construed.  They want you to ignore that admonition and go beyond the language of the statute and find that an action that is not mentioned in their citizen provision is somehow caught up in it.  That's not a question resolving ambiguity.  That's a question going belong the language of the statute, so those cases that talk about resolving any ambiguity in favor of Court jurisdiction simply don't apply.

THE COURT:  All right.

MR. LAWRENCE:  If you have no questions --

THE COURT:  Not at this time.  Thank you.

MR. LAWRENCE:  Thank you very much.

MR. GRANT:  Your Honor, I think we might have

1   taken our full 30 minutes.

2          THE COURT:  If you have two minutes of things

3   you really need to say, that's fine.

4          MR. GRANT:  I of course do.

5          THE COURT:  I knew you would.  Go right ahead.

6          MR. GRANT:  I thought I heard my colleague say

7   that imminence doesn't require temporal proximity.  That

8   makes no sense to me.  For something to being imminent,

9   it has to be soon.

10          Our argument is not just count up the number of

11   steps, if all of those steps happen tomorrow the injury

12   could be imminent, but these steps are going to play out

13   literally over years.

14          In fact, Counsel just said, if I heard him

15   correctly, there's, quote, "no real world concern here,

16   because this five-year program is going to take a long

17   time to even get off the ground."  So I think our point

18   is this is not imminent injury.

19          One of my colleagues also said this harm is

20   broad and will affect broad areas.  We just don't know

21   that until the process plays out.  Until we get the

22   five-year leasing program, until we get the individual

23   leases, we don't know what areas will be affected.  So

24   to say it's broad is just speculative at this point.

25          As to whether there's a cause of action, I

don't of course want to get into the merits, but I'm not

sure this is a constitutional cause of action.  As I

understand the plaintiff's complaint, they're saying

that the President took action not authorized by this

statute, contrary to the terms of this statute.

Judge, if you read the statute, he couldn't do

what he purports to do.  So, to me, it seems like a very

generic statutory cause of action, so to put it in -- to

gussy it up as a constitutional cause of action merely

by saying the separation of powers would turn all of

these statutory issues into so-called constitutional

issues.

THE COURT:  I think they cite the property

clause, as I read it, in the first claim for relief of

the Constitution.  Accords to Congress the power to

dispose of and make all needful rules and regulations

respecting the territory or other property.

MR. GRANT:  They do, Your Honor.  And Congress

has obviously in Section 1341(a) -- and this brings me

to another point, that the President is mentioned by

name in this statute.  "The President of the United

States may, from time to time, withdraw from disposition

any of the unleased lands of the outer Continental

Shelf."

So using its property clause powers, Congress

1  has delegated power to the President.  Did he exceed

2  those powers?  That's a question some court will have to

3  review at some point, but we say not here.

4          As for sovereign immunity, as I understand the

5  plaintiff's argument, any time a statutory violation is

6  alleged that's the ultra vires exception, it seems to us

7  that that exception is going to swallow the rule.

8          And the last point about jurisdiction in

9  1349(b) versus (c), whether a case could go to the

10 district courts under Subsection (b), many cases can and

11 will, but of course not this case where there hasn't

12 been final agency action.

13         So I think my colleague's argument about the

14 court of appeals is sound, but if Your Honor disagrees

15 and thinks that this fits under Subsection (b), fine,

16 the final agency action requirement still applies and

17 plaintiffs haven't met it.  So for those reasons, we

18 urge the Court to grant the motion.

19         THE COURT:  All right.  Thank you.  Very well

20 briefed all around.  I appreciate that.  I'll take it

21 under advisement.

22         Anything further at this time?  Nothing

23 further?  Thank you all.  We'll go off record.

24         DEPUTY CLERK:  All rise.  This matter is now

25 adjourned.  Court stands in recess until 1:30.

1           (Proceedings concluded at 11:02 a.m.)

2

3

4

5                          CERTIFICATE

6      I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
7   District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
8   original stenographic record in the above-entitled
   matter and that the transcript page format is in
9   conformance with the regulations of the Judicial
   Conference of the United States.

10

       Dated this 31st day of July, 2019.

11

12

                        /s/ Sonja L. Reeves
13                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25